**GOLDEN GOODRICH LLP**
Jeffrey I. Golden, State Bar No. 133040
jgolden@go2.law
3070 Bristol Street, Suite 640
Costa Mesa, California 92626
Telephone    714-966-1000
Facsimile    714-966-1002

Examiner

# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF NEVADA

| | |
|---|---|
| In re | Case No. 23-50177-hlb |
| GUARDIAN FUND, LLC | Consolidated Case No. 23-50233-hlb |
| | Chapter 11 |
| Debtor. | **EXAMINER'S REPORT DATED JANUARY 5, 2024, PURSUANT TO ORDERS DATED JULY 28, 2023 [DKT. 406] AND NOVEMBER 3, 2023 [DKT. 598]** |
| | **Judge:    Hilary L. Barnes**<br>**Date:    January 24, 2024**<br>**Time:    2:00 p.m.** |

0

## TABLE OF CONTENTS

**Page**

I. INTRODUCTION ...............................................................................................1

II. APPOINTMENT OF EXAMINER ....................................................................1

III. RESOURCES AND RESEARCH.....................................................................3

IV. CHALLENGES ...............................................................................................4

V. DISCLAIMER .................................................................................................4

VI. INDEPENDENCE ...........................................................................................4

VII. RELEVANT BACKGROUND .........................................................................5

VIII. ANALYSIS OF OPERATIONS/FINANCIALS OF 12BR.................................15

IX. NOE'S BACKGROUND AND EXPERIENCE AND RELATIONSHIP WITH
12BR AND PREDECESSORS.........................................................................22

X. SUMMARY OF NOE'S ROLES .....................................................................27

XI. NOE'S INVOLVEMENT WITH ACTIONS OF HPC PRE-BANKRUPTCY..................29

XII. NOE'S CURRENT INVOLVEMENT GENERALLY WITH GUARDIAN
AND 12BR ......................................................................................................30

XIII. INCONSISTENCIES AND LACK OF CORPORATE FORMALITIES IN
CONNECTION WITH MANAGEMENT OF VARIOUS ENTITIES .......................30

XIV. FINDINGS.....................................................................................................34

XV. ISSUES RAISED BY REPORT ......................................................................37

XVI. CONCLUSION ..............................................................................................39

**I.     INTRODUCTION**

Jeffrey I. Golden ("Examiner") submits the following report ("Report") pursuant to Bankruptcy Court Orders dated July 28, 2023 (Dkt. 406) and November 3, 2023 (Dkt. 598) (together, "Orders"), as follows:

The Examiner's charge has been to analyze the issues enumerated in sections 1104(c) and 1106(b) of the Bankruptcy Code as they relate to 12B Residential's ("12BR") operations and financials as well as 12BR's predecessors KRCH Realty ("KRCH") and Hughes Private Capital LLC ("HPC"), and to analyze and investigate the experience and background of Aaron Noe ("Noe") with respect to both his past and current involvement with HPC and its predecessors.  The Examiner has spent significant time requesting and reviewing documents and pleadings and interviewing various constituents to prepare this Report.  Everyone the Examiner has spoken with and interviewed has been cooperative, although as of the date of this Report, not all documents requested have been provided. The Examiner's findings are set forth below along with his conclusions and some suggested recommendations.

**II.    APPOINTMENT OF EXAMINER**

      **A.     Scope of Investigation**

By the Order dated July 24, 2023, (Dkt. 381), the United States Bankruptcy Court for the District of Nevada ("Court") directed the United States Trustee ("UST") in the above-captioned proceeding to appoint an Examiner **pursuant to 11 U.S.C. § 1104(c) and § 1106(b)** except that the Examiner's duties shall be limited in scope to: (1) **"review the financial and operations of Debtor's wholly owned property management company, 12 B Residential, Inc. (or any of its predecessors)"** and (2) **"to investigate Mr. Aaron Noe's background, experience, and involvement, either past or current, with Debtor's prior management, Hughes Private Capital, Inc. (or any of its predecessors").** (emphasis added).

11 U.S.C. § 1104(c) states that the Court shall order the appointment of an examiner to conduct such an investigation of the debtor as is appropriate, including an

EXAMINER'S REPORT

investigation of any allegations of fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the debtor of or by current or former management of the debtor.

11 U.S.C. § 1106(b) states, in relevant part, that except to the extent that the court orders otherwise, the examiner shall investigate the acts, conduct, assets, liabilities, and financial condition of the debtor, the operation of the debtor's business and the desirability of the continuance of such business, and any other matter relevant to the case or to the formulation of a plan.

While the Court's appointment of an Examiner in this matter was pursuant to 11 U.S.C. § 1104(c) and § 1106(b), the scope of this examination is narrowed to the issues highlighted by the Court's Order, as stated above, in accordance with such sections.

Therefore, to summarize, the Examiner is to investigate allegations of fraud, dishonesty, incompetence, misconduct, mismanagement, and the acts, conduct, assets, liabilities, operations and desirability of the business in connection with 12BR's financial and operational situation, and Noe's knowledge, experience, and involvement with HPC and its predecessors, and to draw conclusions and make recommendations based upon his findings.

**B.     Order Appointing Examiner and Establishing Deadline**

By the Order dated July 28, 2023 (Dkt.406), the Court approved this Examiner's appointment as Examiner by the UST.[1]  The Examiner filed an Application for a status conference (Dkt. 557) on September 26, 2023, a status conference was held, and the Court established January 5, 2024 as the deadline for filing the Report [Dkt. 598].

---

[1] On December 20, 2023, the Court denied the employment of Golden Goodrich LLP ("Firm") as counsel to the Examiner pursuant to the Examiner's application (Dkt. 610), without prejudice to the Examiner submitting fees of all individuals who have assisted subject to the notice and opportunity to be heard and the Court's determination of reasonableness.

EXAMINER'S REPORT

## III.    RESOURCES AND RESEARCH

Since his appointment, the Examiner has conducted an extensive investigation and has conducted numerous interviews, requested documents, and reviewed the relevant portions of the record in both the Guardian and the HPC bankruptcy cases.

### A.    Interviews

The Examiner has personally interviewed multiple persons and entities, including by way of example: (1) Noe, principal of Guardian and formerly of HPC; (2) Norma Guariglia of Harris Law Practice, LLC, counsel for the Debtor; (3) Sallie B. Armstrong of McDonald Carano LLP, counsel for the Official Committee of the Unsecured Creditors ("Committee"); (4) various members of the Committee; (5) Robert E. Atkinson of Atkinson Law Associates LTD, counsel for the HPC Trustee; (6) Christopher Burke, the HPC Chapter 7 Trustee ("HPC Trustee"); (7) Paul Andronico, General Partner of Andronico Family Partnership, LP, a creditor and former member of the Committee; (8) Bob Nicholson, creditor; (9) Greg Hughes ("Hughes") of HPC; (10) J. Mitchell Little, counsel for certain arbitration claimants; (11) Kyle Krch of KRCH Realty; (12) Jeff Hartman, counsel for the involuntary petitioning creditors counsel and certain petitioning creditors; (13) various other interested creditors and lenders; (14) various investors; (15) various employees of 12BR; (16) certain members of the Concerned Advisory Committee ("Concerned Committee"); (17) Tom Vallas, corporation counsel; (18) Larry Pino, attorney at Pino Law Group, securities and corporation counsel; and (19) others.

### B.    Documents

The Examiner also received and reviewed documents including, without limitation: (1) financial records for Guardian, HPC and 12BR; (2) corporate formation documents relating to HPC and 12BR; (3) 12BR employee contracts; (4) master lease agreements; (5) Noe's resume prior to his employment with HPC; (6) bank statements; (7) corporate flow charts and employee rosters; (8) Debtor's bankruptcy docket, including (a) monthly operating reports and (b) 341(a) meeting hearing transcripts; (9) arbitration pleadings; (10) various recorded documents (such as deeds of trust and grant deeds); (11) NetSuite;

3

(12) thousands of emails from HPC with Noe and others; (13) promissory notes; (14) various transaction documents; (15) 12BR agreements with its landlords, Guardian, and others; (16) board resolutions; (17) lease agreements; (18) organizational charts; (19) various financial documents of HPC and 12BR; and (20) emails and correspondence from investors and  other parties in interest.  Some documents have not yet been provided, including, for example, financial and cash flow projections and certain documents from corporate counsel.

**IV.   CHALLENGES**

Obtaining facts was very difficult and challenging in this case.  Although everyone was cooperative, focusing on the actual underlying data needed was not easy.  Frequently, multiple interviews were necessary because of new data which was discovered or produced after the initial communication.

**V.   DISCLAIMER**

The Examiner believes this Report and its conclusions and considerations (regardless of whether the Court adopts some or any of them), are supportable based on information received to date. They are based on the information provided to the Examiner as set forth above.  However, the following further disclaimers are made:  First, no formal discovery occurred.  Only documents requested or voluntarily provided were received by the Examiner.  Second, the Examiner did not audit the books and records of 12BR.  Finally, the Examiner did not receive any financial or cash flow projections for 12BR for current or future operations.  Some of these questions may be better understood with a more in-depth analysis to the extent the Court should determine such an analysis to be appropriate.

**VI.   INDEPENDENCE**

The Examiner was appointed pursuant to the Order for specific purposes and has not deviated from the charge directed to him.  At times, certain parties requested that he seek expansion of his powers, or to argue for certain positions.  The Examiner has explained verbally and in writing to these individuals and creditors that he will not and

4

does not take a position on any of these matters.  He simply seeks to deliver this Report per the Order.

## VII.    RELEVANT BACKGROUND

To address the questions posed, the Examiner believes it is useful to have an understanding of the various parties-in-interest and an overview of the timeline of various events in the case.

### A.    Procedural History

On March 17, 2023, certain creditors ("Petitioning Creditors") filed an involuntary chapter 7 petition against Guardian Fund, LLC ("Guardian Fund" and "Debtor"). [ECF No. 1].[2]

On April 11, 2023, Guardian Fund filed its own voluntary chapter 11 petition.  ECF No. 1, District of Nevada Bankruptcy Case No. 23-50233.

On April 17, 2023, the Debtor and Petitioning Creditors filed their *Stipulation Between Debtor and Petitioning Creditors to Consolidate Involuntary and Voluntary Cases Pursuant to Fed. R. Bankr. P. 1015(a)* (Dkt. 12).

On May 10, 2023, the UST formed the Official Committee of Unsecured Creditors ("Committee") in the Case and appointed the following parties as members of the Committee: (i) Roger & Sherry Iveson, Trustees of the 1982 Iveson Trust; (ii) Kirk & Roberta Johnson, Trustees of The Kiro Family Trust; (iii) The Amp'd Group, LLC; (iv) Kathy Gibson, Horizon Trust FBO; and (v) Andronico Family Partnership, L.P. ("Adronico") [ECF No. 54].[3]

On June 13, 2023, the UST filed a motion to appoint a Chapter 11 trustee pursuant to 11 U.S.C. § 1104(a) or, in the alternative, an examiner ("Motion") in the Case. *See* ECF No. 107.

After conducting a hearing on the Motion, the Court entered an order granting the

---

[2] "ECF No." refers to the bankruptcy docket for the above-captioned chapter 11 case.

[3] Andronico withdrew from the Committee.

5

Motion in part and directing the appointment of an examiner in the Case on July 24, 2023 ("Order"). *See* ECF No. 381.

The Order provides, in part: "the examiner shall perform the statutory duties set forth in sections 1104(c) and 1106(b) of the Bankruptcy Code, except that those duties shall be limited in scope to review the financials and operations of Debtor's wholly owned property management company, 12 B Residential, Inc. (or any of its predecessors), and to investigate Mr. Aaron Noe's background, experience, and involvement, either past or current, with Debtor's prior manager, Hughes Private Capital, Inc. (or any of its predecessors)."… IT IS FINALLY ORDERED that the Court will consider expanding the scope of the examiner's duties if the examiner finds it necessary to move for such relief during the performance of his/her investigation."

On July 25, 2023, the UST filed its Application for Order Approving the Appointment of Examiner.  See ECF No. 384 which included a verified statement and resume of Jeffrey I. Golden.  On July 28, 2023, the Court entered the Order Approving Appointment of Examiner approving Jeffrey I. Golden as Examiner. See ECF No. 406.

On May 12, 2023, a voluntary chapter 11 petition was filed by Hughes Private Capital, Inc. ("HPC").  ECF No. 1, District of Nevada Bankruptcy Case No. 3:23-bk-50322.

**B.    Parties-In-Interest**

**1.    Guardian**

Guardian is a portfolio of residential real estate assets that Guardian acquired for the purpose of renting and managing for the collective benefit of its investors[4].  According to the Nevada Secretary of State, Guardian, an LLC, was founded on April 15, 2016, and Stephen R. Harris, Esq. is the registered agent.  Exhibit "1."  Currently, Guardian has no employees and is managed by El Monte Capital, Inc., a Nevada corporation, ("El Monte").

---

[4] According to its schedules, Guardian has approximately 750 unsecured creditors and equity security holders creditors in excess of $48,306,454.4.  There may be some dispute regarding who are creditors and who are equity.

EXAMINER'S REPORT

There are currently no other named officers. Previously, HPC was the manager of Guardian, with Steven Sixberry ("Sixberry") and Hughes operating HPC.

The Debtor owns four primary entities:  (1) Guardian CVI LLC ("CVI"); (2) Guardian CVII LLC ("CVII"); (3) Guardian DE LLC ("DE"); and (4) 12BR.  Guardian owned about 300 properties itself or through other entities including CVI, CVII, DE, and about 150 properties indirectly through 12 Bridges.  Guardian also managed about 1,500 properties under various lease agreements and owns an interest in the subsidiaries which own one or more real properties.  Guardian alleges it holds beneficial rights to certain properties held by 12 Bridges.  Guardian also is the beneficiary under various carry-back loans in the amount of approximately $16.4 million.

Guardian's business model consisted of acquiring property or holding property in the name of 12 Bridges and then selling the property.  The property would then be leased back to Guardian, as the lessee, to manage.  Guardian would then be responsible for paying bills generally.  Specifically, 12 Bridges purchased property, would rehabilitate the property and flip it to Guardian at a profit, and then Guardian would sell it to the 1031 homeowner at no mark-up or profit. Guardian would then sign a master lease for the property guaranteeing the rent income regardless of whether the property was rented. The master lease was a return on investment of around 7%.  To a large extent, operations were delegated to 12BR.

Pre-petition, Guardian was part of HPC and then spun off after discussions with the Concerned Committee and others. El Monte then became the managing partner of Guardian and HPC withdrew from management.  Also pre-petition, at HPC, Guardian used property management, investor and shareholder relations, construction, financial services and asset management services at HPC or its subsidiaries Krch Realty ("KRCH").  KRCH provided property management services.  12 Bridges was partly used as a means for Guardian to acquire properties.  HPC was extricated from these roles pre-petition.

7

In the bankruptcy case, Guardian does not employ non-bankruptcy counsel. Guardian contracts out all services other than its manager, El Monte, and essentially operates through its subsidiaries. Guardian's operations are largely run through 12BR.

### 2. El Monte Capital, Inc.

El Monte Capital, Inc. ("El Monte") was formed on April 10, 2023. Exhibit "2." According to the Nevada Secretary of State, Noe is its President, Secretary, and Treasurer. El Monte's corporate address is 3810 Vista Lucci, Reno, Nevada 89519. On April 11, 2023, HPC engaged El Monte as manager, Chief Restructuring Officer ("CRO"), and financial advisor to Guardian ("Company"). There was an engagement letter ("El Monte Agreement") between Guardian and El Monte dated April 11, 2023. Exhibit "3." The El Monte Agreement was not approved by the Bankruptcy Court. It contains an indemnity of El Monte by Guardian and is still in effect although it has not been assumed.

El Monte's specific responsibilities per the El Monte Agreement consists of replacing HPC as manager and having duties typical of a chief executive engaged in restructuring activities, including, but not limited to (a) assisting in all aspects of Guardian's business activities and operations, including budgeting, cash management, and financial management; (b) negotiating the relationship with the Company's lenders and investors; (c) negotiating with vendors, customers, and other creditors; (d) evaluating liquidity options including restructuring, refinancing, and reorganizing; (e) reviewing purchases and expenses; (f) evaluating, selling and initiating capital improvements for existing property portfolio; and (g) acting as the Debtor's representative in court hearings as appropriate. Additionally, El Monte is to assist Debtor in evaluating and executing restructuring alternatives, analyze the Debtor's operations and financial position and provide recommendations with respect to financial restructuring or disposition of assets, and serve as the principal point of contract for the Debtor and its creditors/investors with respect to financial and operations matters.

El Monte, of which Noe is the sole member, is paid by the Debtor for the services as the CRO at $20,000 per month, provided that El Monte employs Noe. Other El Monte

8

staff will have rates that ranges from $75.00 to $175.00 per hour.  El Monte, itself, does not employ professionals or other employees.  The agreement between Guardian and El Monte is contractual with Noe essentially being the sole employee.  The Examiner is not aware of any other El Monte staff.

### 3.    12 Bridges

12 Bridges is a corporation, though it was originally filed as an LLC on March 3, 2017, as Home Partners, LLC ("Home Partners").  Exhibit "4."  When it was an LLC, HPC was the registered agent and Manager.  On or around March 1, 2019, Hughes, Krch and Sixberry were named as Managers.  After the formation of Home Partners, it was decided that Home Partners should change its name.

Effective March 17, 2023, 12 Bridges, LLC converted to a corporation through the filing of Articles of Conversion with the Nevada Secretary of State. The officers (President, Secretary, Treasurer and Director) of 12 Bridges are currently listed as Christopher P. Burke, the Chapter 7 Trustee in the HPC case ("HPC Trustee"). Exhibit "5."

12 Bridges' function was primarily for the acquisition of property.  12 Bridges purchased properties with money from Guardian and significant funds went from Guardian to 12 Bridges.

12 Bridges is owned by HPC.  12 Bridges still operates in the sense that although it does not appear to be engaged in ongoing business, it does own multiple properties with at least some equity, and requires management of those properties. The management of these properties is outsourced.

12 Bridges owns various properties which are the subject of a dispute between Guardian and HPC estates.  In or about March 2023, some properties were sold to Hughberry and to Vista to generate revenues for 12 Bridges to pay down its debt to Guardian.

Certain parties sought to have Noe execute the grant deeds of the properties from 12 Bridges to Hughberry and others instead of Hughes.  The Examiner has been provided with three different resolutions that authorized Noe's ability to sign: (1) Resolution of

9

Home Partners, LLC, dated February 8, 2023; (2) Resolution of 12 Bridges, LLC dated March 20, 2023; and (3) Resolution of 12 Bridges, Inc. which is undated, but the Examiner has been informed that it was signed on April 19th, 2023.  Exhibit "6."  The resolutions do not restrict Hughes or any other officer of HPC from signing any such deeds so it is difficult to understand why it was necessary for Noe to sign[5].

The Examiner was unable to identify any board meeting minutes or board meeting notes in connection with such a resolution. Noe signed the subject deeds as "Real Estate Administrator on behalf of 12 Bridges" – a wholly owned subsidiary of HPC and therefore Noe was effectively executing documents on behalf of 12 Bridges and, indirectly on behalf of, HPC as well.  12 Bridges did not regularly keep minutes of meetings, hold votes, or issue resolutions, with the few exceptions noted above.

### 4.   HPC

HPC was the Debtor's prior manager.  HPC was originally formed as an LLC on January 29, 2009, but was converted to a corporation, effective March 14, 2023, via the filing of Articles of Conversion with the Nevada Secretary of State.  Exhibit "7."  Hughes, Krch and Sixberry are currently listed as the managers for HPC.

HPC was advertised as a family-run, conservatively managed private real estate investment company based in Reno, Nevada.  HPC is in a Chapter 7 bankruptcy proceeding since the Order for Relief was entered on May 12, 2023.

Noe was employed at HPC from approximately May 2022 to January/February 2023.  As set forth below, Noe acted as CEO in various ways but does not appear to have been legally appointed CEO or legal COO.  At a minimum, Noe appears to have been the *de facto* CEO of the operations side of HPC.

During that time, HPC's financial problems began to escalate.  HPC was without hiring, financial, management, oversight, administrative and business controls from the

---

[5] Noe also was listed on a draft power of attorney which potentially shows Noe as Manager of 12 Bridges, but it is a corporation and he is not in charge of it since he stepped down as President.  Noe did not execute such a Power of Attorney on behalf of 12 Bridges, but one was prepared.  There are no board minutes or other resolutions.

start of Noe's presence when he was brought in as CEO.  HPC also solicited new investors during a portion of this time.

While it was the Debtor's manager, HPC had several affiliates and/or subsidiaries. The key officers of HPC were Hughes, Sixberry, and Krch.  They also owned and controlled KRCH, its property management company.

HPC's marketing approach included written and radio advertisements as well as other forms of communication. Essentially, they solicited investors to invest in a "long-term, stable situation."  By way of example, some of the marketing "pitches" were as follows:  According to the HPC "Investor Kit", Exhibit "8", HPC would buy and hold "recession-resistant residential real estate chosen for long-term stability and profitability". HPC's tagline was "Be an Investor, Not a Landlord". They marketed 100% passive investment options through various strategies:

(1)     Investing in Hughberry Homes – Hughberry Homes was an HPC fund, separate from the Debtor. HPC advertised that an investor could participate in a "secured portfolio". Hughberry Homes promised a guaranteed 7% return on investment for the first 12 months (less debt services, if any).  This was meant to be a 100% passive investment, with zero property management hassles, and to provide alleged safety through diversification within the Hughberry Homes portfolio in Arizona.

(2)     Liquidity – With liquidity, HPC advertised that an investor earned a fixed 3.9% interest rate.  The investment was secured by real estate assets and the ability to access your money in 30 days or less.  An investor would invest cash in the fund through a promissory note; the investor would lend money to Guardian and could redeem the note on demand, similar to a bank account.  The notes were supposed to accumulate interest and generate an investment return.

(3)     1031 Exchange – HPC also advertised that they would guide the investor from start to finish by providing the best price on the sale of the property and provide the investor with custom-built investment packages from their inventory of ready-made 1031 properties. HPC stated that the investor would be secured by having their name on the

11

title and then HPC would master lease the property back from the investor.  The monthly returns were based on how the entire portfolio performed.  The investor could choose to receive the monthly return as a contribution or could reinvest and compound the return for greater earnings.  In short, investors would directly purchase individual homes that would then be titled in the name of the investor in their designated entity.  Guardian would then manage the asset for the investor by renting the homes to generate cash flow.

In its marketing materials, HPC represented that it would 1) buy a property that fit the investment model requirements, 2) rehabilitate the property, 3) put qualified residents in the property, 4) sell the property to the investor, 5) lease the property back from the investor and pay the investor a set monthly income, and 6) through the lease, HPC would become responsible for everything property-related, including all expenses.

In summary, HPC appeared to have told investors that all they needed to do was essentially either 1) reinvest and compound their profits for greater earnings or 2) receive the profits as monthly income. The pitch to investors seemed to imply that investors did not need to do much to achieve a continual rate of return at a reasonable rate with very low risk.

No minutes or resolutions of board meetings were regularly made or maintained at HPC.

### 5.    Hughberry Homes

Hughberry Homes LLC ("Hughberry") was and is an HPC fund, separate and apart from Guardian but similar to Guardian in some respects.  Hughberry was formed on April 19, 2022 and HPC is the registered agent.  Exhibit "9."  It is not related to the other entities and was meant to "stand alone."  HPC also managed Hughberry.  Hughberry owned various properties and HPC appears to have solicited investors for Hughberry.  Hughberry purchased properties from 12 Bridges in warranty deeds executed by Noe (and possibly others), purportedly to pay down Guardian debt.

12

### 6.    Vista Fund

Vista Fund LLC ("Vista") is another fund similar to Hughberry.  It was formed on May 1, 2017 and is managed by HPC.  Exhibit "10."  Its relationship to 12 Bridges is that 12 Bridges (like Hughberry) purchased properties with funds from Vista.

### 7.    KRCH Realty

KRCH was HPC's property management company.  It was managed by Kyle Krch and formed on July 15, 2005.  Exhibit "11."  It ultimately transferred its services to 12BR, when 12BR was formed and the transition to the bankruptcy occurred.

### 8.    12BR

12BR is a subsidiary of Guardian and performs property management, investor relations, asset management, construction, IT and financial services.  12BR is a corporation incorporated on February 17, 2023. Exhibit "12."  At that time, Noe was listed as President.  Currently, there is no president or CFO.  Noe is the sole director and has previously been president up until April 11, 2023.  Palmer was named as President on April 11, 2023.  Adrian Maravilla is Secretary and Christopher Capurro is Treasurer. 12BR has assisted Guardian with respect to the management of numerous properties owned directly and indirectly by Guardian, as well as providing other services to Guardian and its subsidiaries.  12BR employs about 16 employees and originally employed about 27 employees.  A Stock Subscription between Guardian and 12BR was entered into on April 11, 2023. Exhibit "13." A PowerPoint describing 12BR's functions, dated May 24, 2023, is attached as Exhibit "14."

No minutes of meetings or board resolutions are regularly made or maintained. 12BR is discussed in greater detail below.

### 9.    Partial Successor to Property Management Services of 12BR: Evernest, LLC

12BR has been shifting recently to a new management company, Evernest, LLC ("Evernest").  This is a third-party entity unrelated to the Debtor or any affiliated enterprise.

13

Contracts with Evernest have been executed regarding many of the properties pursuant to the Evernest Rental Listing and Management Agreement ("Evernest Agreement").  Exhibit "15."  The 12BR Property Management Agreement is also still in effect between 12BR and the Debtor. However, given the shift to Evernest, the Examiner is informed that the Debtor is not currently paying 12BR, in part because 12BR is receiving funds from two outside sources: (1) referral fees; and (2) asset management fees.

Arguably, to the Examiner's knowledge, Guardian still has the liabilities under the management agreement as it has not been formally terminated, rejected, or modified to 12BR, notwithstanding the partial shift to Evernest.  Evernest is paid per the terms of the Evernest Agreement with the property owner and/or 12 BR.  12BR and Evernest entered into the contract which provides for arguably standard compensation for real property management services.  The Examiner is informed that any excess rent Evernest receives over its expenses on a Guardian or Guardian-affiliate property should be paid over to Guardian and that this is apparently memorialized in a writing between them.  Evernest signs a different contract with each property owner along with 12BR.

As a result of this shift of property management services, 12BR is currently performing minimal property management relative to what it was previously, but is still involved in investor relations, and other services, such as asset management, financial support, construction and IT support.

The Evernest agreements have not been approved by the Bankruptcy Court. Guardian is not a party to these contracts although it could be impacted by them, as these include obligations which run between 12BR, Guardian and the property owners.

**C.    Timeline**

In an effort to organize relevant events that are discussed within the report, the Examiner has attached a timeline which summarizes key events.  Exhibit "16."

14

**VIII.   ANALYSIS OF THE OPERATIONS/FINANCIALS OF 12BR**

**A.   12BR Functions/Operations**

Understanding 12BR's purpose, function, and operation is essential to analyzing the questions posed. 12BR performs several different tasks and responsibilities, including property management, investor relations, asset management, construction, compliance, finance and accounting, among others. This section explores the structure and breadth of 12BR.

The scope of such services is relevant. The Court's order appointing the Examiner refers to 12BR as a "property management company." However, 12BR is not just a property management company; it has many other responsibilities. The Examiner had to evaluate what the breadth of responsibilities of 12BR is and its relationship to the duties and responsibilities of Guardian in order to understand who the predecessors are and how to analyze its operations and financials.

12BR is wholly-owned by Guardian. 12BR was incorporated on February 17, 2023, with its corporate office located at 5440 Louis Lane, Suite 160, Reno, Nevada.

12BR leases office space located at 5905 S. Virginia Street, Suite 201 ("12BR Lease"). Exhibit "17." The landlord is Cypress Meadowood LLC and the current lease expires on April 30, 2024. The lease was executed by Andrew Palmer on April 26, 2023 as CFO, although he was president at this time. He has since left the company and there is currently no president or CFO.

12BR performs services for Guardian and non-Guardian entities and has a management agreement with Guardian ("12BR Management Agreement"), dated May 22, 2023, and serves as their property management company ("12 BR Property Management Agreement"). Exhibit "18."

The 12BR Property Management Agreement dated May 22, 2023 is broad and relates not only to property management services. Specifically, the 12BR Property Management Agreement includes services such as asset management, investor relations, debt servicing, construction, IT support, compliance and accounting, and performs

15

services for both 12BR, 12 Bridges, Guardian and its subsidiaries.  *See* 12 BR Property Management Agreement, p. 2, ¶ 3.

It receives asset management fees in the amount of $35.00 per property per month, and also receives referral fees for investors to sell property in the amount of 25% of the brokerage fee.  In addition, 12BR receives other fees.

There is also an indemnification provision in which 12BR is indemnified by Guardian (12BR Property Management Agreement, page 6, section 12) and the compensation owed to 12BR is on a formula (12BR Property Management Agreement, page 2, section 3).

The 12BR Property Management Agreement was executed by Noe instead of by El Monte on behalf of Guardian and Adrian Maravilla on behalf of 12BR.  Maravilla was the secretary of 12 BR.  Neither the president or vice president executed the Agreement.

12BR had 27 employees.  12BR had employees in a variety of departments: Human Resources, Technology, Finance, Property Owner/Investor Relations, Compliance, and Property Management.  Some specific job titles include: IT Administrator, Broker Manager, Investor Relations Manager, 1031 Exchange Facilitator, Human Resources Manager, Director of Human Resources, Executive Assistant, Senior Account Executive, Account Executive, Product Manager, Accounting Clerk, Accountant/Internal Auditor, President of Property Management Operations, Director of Property Management, Director of Construction, Housing Program Specialist, Account Administrator, Senior Property Tech, and Asset Coordinator.

In addition to property management services, 12BR performs other services: investor relations services including dealing with mitigating damages caused through lease termination; working with investors to help move to a new management company and collecting on loan carry back notes; construction services including analyzing what construction is necessary, and renovation; IT services, including technology support for all entities; and finance services, including analyzing accounting and assisting in preparing tax returns for 12BR and Guardian and its affiliates.  All accounting functions, paying bills,

16

payroll and supporting services for taxes for Guardian and 12BR for all affiliates are performed by 12BR.

The following was a list of employees of 12BR when 12BR started or shortly thereafter (most of the employees came from HPC and/or KRCH):

| **Property Management:** | **Finance/Accounting:** | **Property Owner/ Investor Relations** |
|---|---|---|
| Adrian Maravilla | Nancy King | Adam Johnson |
| Amanda Johnston | Wendall King | Anthony Jacobs |
| Chris Capurro | **Construction** | Katie Robinson |
| Ed Russell | Jason Morris | Alexis Spencer |
| Juan Salazar | **Technology** | Isabella Gargano |
| Lekeshia Jones | John Baumb | Nate Edwards |
| Melissa Langlois | **Human Resources** | |
| Nina Cross | Sherri Vaughan | |
| Patrick Klinge | Sally Huele | |
| Phyllis Backus | **Compliance/Other** | |
| Ruth Munoz | Heather Hull | |
| Thomas Jackson BOR | Lynsey Goodrich | |
| Valetta Sullivan | | |

12BR has been downsizing, apparently to reduce costs and also because of the lack of need to perform as much property management activity as it previously did.

The new list of employees and their roles is as follows:

//

//

//

17

| Employee | Current Title |
|---|---|
| Adrain Maravilla | President of Property Management |
| Patrick Kllinge | Director of Property Management |
| Wendell King | Director of Accounting |
| Jason Morris | Director of Construction |
| Sherri Vaughan | Director of Human Resources |
| Chris Capurro | Broker Manager |
| Nate Edwards | Investor Relations Manager |
| Heather Hull | Operations Manager |
| Adam Johnson | Project Manager |
| Ruth Munoz | Housing Program Specialist |
| Alexsis Spencer | IR Account Executive |
| John Baumb | IT Administrator |
| Ed Russell | SR Property Tech |
| Nancy King | Accounting Clerk |
| Katie Robinson | IR Account Administrator |
| Lynsey Goodrich | Asset Coordinator |

12BR is still providing a variety of functions and is contracting with and/or subleasing to Evernest.

Currently, Guardian owes 12BR outstanding management fees, but as stated above, that may not be enforced given the shift to Evernest. 12BR also continues to be obligated to turn revenues over to Guardian, but currently as 12BR, is mostly obtaining money from third party sources for referral fees and asset management fees.

Guardian stopped paying 12BR several months ago with Evernest coming on board. Evernest took over many CVI & CVII Properties in or about September 2023 and many Guardian properties in or about October 2023.

**B.    Predecessors of 12BR**

12BR has had a variety of predecessors. This is somewhat complex to define as 12BR has taken over a variety of functions. 12BR has not and does not only perform property management services. 12BR performs a variety of services such as: 1) financial and accounting for Guardian and its subsidiaries; 2) construction analyses relating to the properties managed; 3) collection of notes; 4) analyzing lease terminations and surrenders, and more. Many of these services had been provided by HPC and its

18

subsidiaries.  This Report did not examine or confirm that all paid invoices for 12BR were paid with properties which were sold or that there was not commingling.  It should be mentioned that Guardian and 12BR would determine which invoices are paid and which are not.

KRCH was the property manager but HPC was using 12 Bridges as a holding company to buy and sell properties.  12 Bridges would borrow funds from Guardian and then use those funds to buy and rehabilitate properties and sell them back to Guardian.  12BR would manage these properties.  Under this structure, Guardian was paying for the properties and owned the properties as inventory under its name or 12 Bridges.  Guardian would then, at times, sell a property and master lease it back.  Accordingly, some properties would stay inside Guardian but others were owned by investors with the master lease going back to Guardian.  HPC performed many of the other functions 12BR is now engaged in.

12BR has also taken over the investor relations function which had previously been performed by HPC.

Thus, the predecessors of 12BR include: (1) aspects of HPC; and (2) KRCH. 12 Bridges is a bit less clear as 12 Bridges held properties for sale but was also involved in the purchase and sale of such properties as is 12BR through its management services to some extent.  Per the Court's order, the operations and relationships of 12BR to all these predecessor entities need to be analyzed and should be examined.

**C.    12BR Management and Oversight**

12BR is a corporation that was formed on February 17, 2023, before the Guardian bankruptcy filed on April 11, 2023 and HPC filed on March 17, 2023.

According to the Initial List and State Business License Application that was submitted on February 17, 2023, HPC was 12BR's registered agent for service of process and Noe was its President.  Noe was involved in the formation of 12BR.

On May 1, 2023, the Bylaws of 12BR were executed by Andrew Palmer ("Palmer"), as President.  Adrian Maravilla was the Secretary.  The Bylaws provide however that Noe

19

would be the immediate President (Article IV, subsection A.4) but Palmer signed those same bylaws as President. Exhibit "19."

Palmer left 12BR on or about June 2023.  He was also the CFO.  No one has replaced him in either role.  Currently, there is no president or CFO and only one board member, Noe.

Currently, the Nevada Secretary of State does not list anyone as President of 12BR since Palmer has resigned.  According to the Nevada Secretary of State, the current officers of 12BR are: Noe, Director; Adrian Maravilla, Secretary; and Christopher Capurro, Treasurer.  The registered agent is Hoy Chrissinger Kimmel Vallas PC, 12BR's corporate counsel. Theodore E. Chrissinger, a partner at the firm, is listed as an "individual with authority to act".

Solely in his capacity as director of 12BR, Noe has signed documents on behalf of 12BR, including several Rental Listing and Management Agreements with Evernest dated September 28, 2023.  He does not appear to be an officer of 12BR at the time of executing the agreements.

Nothing was ever provided that evidenced the removal of Noe as President and the installation of Palmer or the subsequent resignation of Palmer.

There are no corporate minutes, no resolutions, and no other documentation regularly kept or maintained at 12BR.

It is unclear why Noe was President of 12BR in the beginning.  Noe appears to have been President from February 17, 2023 to April 11, 2023.  However, Noe does appear to be involved in the day-to-day activities of 12BR under the premise that 12BR is a subsidiary of Guardian and Guardian's input matters.

**D.    Current Operations**

12BR's operations are shifting to some extent as property management services are decreased.  Their role may or may not change as a chapter 11 plan is developed and proposed. As stated above, they perform construction, financial, asset management, investor relations, property management, IT and other functions.

20

There have been allegations that 12BR has not performed adequately during its existence, citing delays and other issues.  The Examiner is informed by 12BR management that these issues have largely been taken care of, but challenges based on the size of the portfolio relative to the amount of available staff have been difficult.

For example, creditors have found their properties not fixed up or invoices not paid which they contemplated would be as well. 12BR is working through these issues. There have been and are complaints.  It is certainly true that, pre-petition, the fund would not always perform the services that were contemplated, and it appears that funds from one property may have been used to fund others.  Post-petition, 12BR management has indicated they are seeking to comply with the bankruptcy laws to deliver the best result possible to investors. The Examiner was not able to evaluate this fully with the resources available and it is not within the scope of this Report.

### E.      Financial Issues

12BR earns money from external sources (referral fees and asset management fees) and pays its expenses from receipts it obtains.  12 BR was to turn over all net funds to Guardian.  The Examiner has not reviewed an accounting of the obligations between 12BR and Guardian.

### F.      Value Provided by 12BR

12BR historically provides value in property management, investor relations, asset management, accounting, and construction services for Guardian, 12BR, and others. The cost-effectiveness of this value is a function of a liquidation or reorganization plan, neither of which the Examiner has seen as of this date.  The Examiner has requested but has not received financial and/or cash flow projections.

### G.      Future Services of 12BR

It is contemplated that 12BR may be involved in the acquisition of other properties and soliciting new investors as opposed to its current liquidation-based scenario.  The Examiner is not commenting on these potential operations without more data.  At this

21

point, Guardian and 12BR are engaged in dealing with the status quo and administering and/or liquidating the properties it has.

## IX.   NOE'S BACKGROUND AND EXPERIENCE AND RELATIONSHIP WITH HPC AND PREDECESSORS

### A.   Noe's History

According to his resume, Noe has more than three decades of experience relating to real estate, property management, and related matters.  He received his Bachelor of Science in Real Estate Finance and holds his real estate and brokers' licenses in Nevada, Georgia, and New Mexico.  In 1992, he founded a company specializing in real property tax advocacy consulting, Tax Review Group, Inc., where he successfully represented clients holding more than $2 billion in assets in administrative hearings before various assessment appeals boards, achieving single-year valuation reductions in excess of $350 million. In 2010, he joined American Homes 4 Rent, a startup company at which he was directly responsible for creating and opening field operations and transitions from third-party to internal property management structure.  In his eight years with this company, he grew his role to Executive Vice President, Director of Operations, and provided leadership as lead manager for prominent deals such as the $1.5 billion acquisition of American Residential Properties (NYSE: ARPI).  In 2018, Noe joined Redfin and became Vice President and founder of Redfin Home Services.  Noe grew the home services business unit into one of the largest residential general contractors in the country with offices in California, Oregon, Washington, Colorado, Arizona, Nevada, Texas, Florida, Massachusetts, Virginia, Maryland, and Washington D.C.

Per Noe's resume, one cannot easily discern his experience as a CFO or a financial advisor, nor his ability to provide financial projections and related data.   Noe advised this Examiner that he does have some special experience and expertise in these areas.  12BR's former CFO, Andrew Palmer, left on or about June 2023.  Noe does not formally serve as CFO.  Wendall King, a CPA, works at 12BR and is an investor and creditor and performs various certain functions for 12BR and for Guardian, among other

22

entities, relating to various financial matters.  Mr. King is not employed by the bankruptcy estate.

### B.    Noe is Recruited by HPC as CEO

On or around March 2022, a recruiter named Dawn Fingers (Director of Recruiting Services, Diverse Recruiting Experts) reached out to Noe regarding an opportunity to be Chief Operating Officer ("COO") of HPC.  According to email exchanges between Noe and the recruiter, the recruiter stated that she did not have a job description for the position, as it was a "newly created role".  According to Noe, the recruiter said he would essentially come in and "help run the company that manages properties".

According to Hughes, they were very impressed with Noe's experience with American Homes 4 Rent and set up meetings to further discuss the COO role with him.  According to HPC's Operating Agreement dated May 21, 2020, the HPC board members consisted of Hughes, Krch and Sixberry.  In an email exchange between Noe and Krch dated March 10, 2022, Krch states the following:

> "Greg, Steve and I are currently, and would like to continue to stay in board advisories roles.  We are looking for a rockstar to continue to build, refine and expand the company offerings.  This COO position will have an opportunity to grow into a true CEO role if so desired."  Exhibit "20."

Noe ultimately moved from Las Vegas to Reno to take the position.  While no job description was ever provided and no formal employment agreement was drafted or executed, Noe joined HPC as an employee in or around May 2022.  The position ended up being a CEO position.  According to Noe, he came on as a CEO "only in name" but was never formally appointed as an officer or director at HPC.  Unlike a traditional CEO, Noe indicates that he didn't have signing authority and needed Hughes, Sixberry, and Krch to approve any company changes or make decisions.  Unfortunately, there are no documents to evidence the formal scope of his role or what powers Noe had or did not have at HPC.  As mentioned earlier, there are no known minutes or board resolutions at HPC and the Examiner is informed that they were not kept or maintained.

23

While the CEO position was not "official", Noe did hold himself out as CEO in his day-to-day business affairs and interactions with investors, including his email signature block and business cards.  Noe referred to himself as CEO on most of the emails he sent out.  For example, see Exhibit "21."[6]   Based on most of the emails the Examiner was provided, Sixberry and Hughes did not have any titles on many of their emails during these same time periods.

At HPC, people referred to Noe as CEO and Noe signed documents for 12 Bridges, a subsidiary of HPC. The director of Human Resources, Sherri Vaughn, also understood that Noe came on board as CEO. Noe ran many of the executive meetings, gave directions, and people generally understood that he was there to help fix issues created prior to his tenure and give some directions for the future.  Multiple employees have corroborated this and there are various examples of other times Noe effectively being CEO, at least with respect to operational issues.

Furthermore, in March 2023, Noe participated in a webinar ("Webinar") in which he indicated that he was the CEO of HPC and he was managing partner of El Monte. However, he supposedly left HPC prior to the Webinar in or about January/February 2023 and El Monte was not apparently formed until after the Webinar on or about April 10, 2023.  Exhibit "22."

There are other instances of Noe being the *de facto* CEO.  In an email dated February 16, 2023 from Nate Edwards, it is indicated that Noe is CEO of HPC and he will be given a Power of Attorney on behalf of a creditor to complete a sale. Exhibit "23."

Despite the numerous examples of Noe acting and/or presenting himself as CEO for HPC, Noe does not appear to be legally the CEO because: (1) CEO is not an officer designated under the corporate documents for HPC, as this does not appear to be an

---

[6] Attached are the following emails:  Email from Noe as CEO dated June 1, 2022; Email from Noe as CEO dated July 10, 2022; Email from NOE as CEO dated August 18, 2022; Email from Noe dated April 12, 2023, in which Noe indicates that he is CEO and says he was hired as CEO in mid-May 2022 and that he resigned in early February 2023, but there are no minutes reflecting his resignation as CEO.

24

office designated under the documents for HPC; and (2) there are no minutes or resolutions appointing him as such.

### C. Noe's Role/Involvement with Hughes Private Capital

#### 1. Noe's Employment with HPC

Noe served effectively as "CEO" of HPC from approximately May 2022 until he resigned in early February 2023. During Noe's tenure, he managed approximately 1,200 properties. Up until 12BR took over, HPC was the entity that managed the Debtor and its various investment vehicles. Unfortunately, things did not pan out as HPC promised or as the investors hoped. Noe quickly learned that HPC needed to fix some fundamental management and infrastructure deficiencies. Noe concluded that HPC scaled the business without proper internal controls. Shortly after starting his employment at HPC, he discovered there was no oversight to some of the most key business functions, including acquisitions, management, operations, construction, and property management.

#### 2. Noe Learns of the Company's Problems

Noe was meeting with Hughes, Krch, and Sixberry about once a month, starting in June 2022. He then learned about the lack of control in the organization "in phases" after he joined the company in May 2022. There was a lack of infrastructure within the company, such that it lacked the most basic organization, and it was quickly losing money. After discovering these notable issues, Noe brought them to the attention of the Board members (Hughes, Krch, and Sixberry). The exact time this occurred is uncertain.

Also, in or around July or August 2022, Noe discovered that investors were receiving periodic statements that were inaccurate. The company was cutting and pasting spreadsheets from one month to the next which resulted in many inaccuracies. Noe would have expected there to be a more sophisticated software system that would accurately track the numbers. Unfortunately, this was lacking. In the third quarter of 2022, HPC seemed to indicate that they were doing well financially. Exhibit "24." Investors were solicited during this time period as well.

25

The property management system was never configured correctly.  Noe indicated that once he realized what was happening, he started a conversation with the Board on how to turn things around.  The properties simply weren't generating enough revenue and there wasn't enough money to pay the promised fixed percentage to investors.  Guardian would pay the promised fixed percentage, but Guardian was using member money to pay leasehold expenses.  In October/November 2022, Noe informed Hughes, Krch, and Sixberry that HPC would have to cover a very large financial shortfall in order for the Debtor to pay funds owed to investors, to the tune of hundreds of thousands of dollars.  Apparently, Hughes, Krch, and Sixberry stated that they did not have the money to pay.  They also did not have the money to hire a CFO, something Noe indicated was needed.  At that point, Noe realized they needed to stop paying the promised fixed rate to investors.

Moreover, HPC was falling behind in its payments to investors.  When the fund was gated and the payments stopped in December 2022, HPC was attempting to make the October payments to the equity investors.

### D.    The Decision to Gate the Fund

In December 2022, the Board decided to gate the fund and stop payments to investors.  According to Hughes, the decision to stop investor payments was prompted by Noe's discovery of inaccurate profit and loss statements in or around November 2022.  It was at this time they specifically discovered that the figures listed on the profit and loss statements were inaccurate.  The statements showed the total amount invoiced but there was no adjustment to show the amount of rents actually collected, which was substantially less.  According to Hughes, this resulted in a monthly difference of hundreds of thousands of dollars.  The Board spent the next thirty days trying to determine their next steps and it was eventually decided that the fund needed to be closed in December 2022.  The investors were notified that they would not be receiving payments for the month of December.  The December payment would have covered the investor payment due for October, as payments were always issued approximately 45 days after rents were paid.

26

According to various creditors, after the payments by Guardian stopped in December 2022, investors lost faith with HPC and wanted HPC out of the picture. Investors did not want everything to collapse but they wanted to get control of the assets, including control of the approximately $25 million unsecured note that was in favor of Guardian and owed by 12BR.

According to Hughes, there was a plan to have Guardian up and running again within the next 90 days.  During that time, the decision was made to form the new company, 12BR, which would replace both Krch, 12 Bridges and HPC.  Unlike the other entities (all with ties to HPC), 12BR would be wholly owned by Guardian.  Noe was involved in the transition and supported by many creditors in this regard.  It was hoped that 12BR could rehabilitate the properties that needed work and that would result in a lower vacancy rate.  12BR would hopefully get to buy and sell properties again and the profit would go to the Debtor and remedy the financial problems caused by the flawed reports.

## X.  SUMMARY OF NOE'S ROLES

### A.  Noe's Role at HPC

Noe apparently left HPC as effective CEO in or about January or February 2023 but continued to represent that he was part of HPC and CEO in March 2023. He had been involved extensively at HPC with managing Guardian, among other things, and ran some of the executive meetings at HPC.

### B.  Noe's Role at El Monte

Noe is President of El Monte which is the manager of Guardian.  There is an agreement between El Monte and Guardian which has not been approved by the Court. El Monte and Guardian appear to have a debtor-creditor relationship in that each has potential claims against the other and the contract would appear to be arguably executory. Noe is the sole employee of El Monte and El Monte receives a management fee.

27

### C.      Noe's Role at Hughberry

Noe had no formal role at Hughberry but did execute warranty deeds of properties from 12 Bridges to Hughberry. Noe did not have a role at Hughberry but was appointed by 12 Bridges (subsidiary of HPC) as the "Real Estate Administrator" to execute grant deeds and other documents to Hughberrry.

### D.      Noe's Role at 12 Bridges

Noe had no formal role at 12 Bridges other than through Guardian's relationship pre- and post-bankruptcy with 12 Bridges and the management and sale of such properties.  However, he was designated as 12BR's Real Estate Administrator to execute a number of different documents on behalf of 12 Bridges.

### E.      Noe's Role at 12BR

Noe appears to largely run the operations of 12 BR even though he stepped down quickly as President. He also signs documents on behalf of 12 BR as well as Guardian. Noe was involved in the formation of 12BR. When 12BR was formed on February 17, 2023, Noe was listed as President in the bylaws signed by Palmer as President but was subsequently replaced with Palmer in April. Noe is currently the sole board member for 12BR.

### F.      Noe's Role at KRCH

Noe does not appear to have had a role at KRCH, other than through his role as CEO of HPC.

### G.      Noe's Role at Vista

Noe has had no formal role at Vista other than through its relationship with Guardian and 12 Bridges.

### H.      Noe's Role at Guardian/Reorganization

Noe's role as *de facto* CEO of HPC pre-petition (at least operationally) and President/CEO of El Monte post-petition have all largely related to Noe running and operating Guardian.

28

Noe is working on the reorganization effort. The Examiner has requested projections in order to analyze the financials of 12BR and Noe's role but these financial and cash flow projections have not been made available as of the date of this Report.

## XI.    NOE'S INVOLVEMENT WITH ACTIONS OF HPC PRE BANKRUPTCY

### 1.    Evidence of fraud and gross negligence.

The Examiner has not found any evidence of fraud or gross negligence in connection with Noe's involvement.  Although emails recently obtained from HPC have not yet all been reviewed as of the date of this Report, the Examiner believes upon the available evidence that Noe was brought in as CEO, essentially acted as CEO to try to fix various issues and a complete lack of control, accountability, and efficiency in the organization.  There was little or no control over construction/property management, rent collection and other areas.  Noe apparently became aware of many of these structural, organizational, and financial issues while he was there and attempted to fix and correct them rather than shutting down the fund immediately. When he realized this did not seem possible in the foreseeable future, he joined in gating and closing the fund.  Noe appeared to be helpful and constructive in the process.  Certain employees and members of the sales team corroborate much of this.

### 2.    Awareness of Financial and Structural Problems

It is unclear when the fund should have been closed and gated.  Guardian missed payments to its equity investors (as approved to fixed payment obligations) as of December 2022 and its payments were becoming later and later.  The December payment missed was actually for October 2022.  Noe was aware of the financial problems throughout but what actions should have taken place and at what time is a difficult question to answer with the information provided so far to the Examiner.

Investors were solicited during this period but there is no evidence that Noe solicited investors, although he would have been aware of such solicitation.

Noe was hired because Hughes and Sixberry knew there were issues and he was brought on as COO/CEO.  While Noe was acting CEO (although apparently without legal

29

authority), additional solicitations occurred and new money was taken to in or about November, prior to gating and closing the fund in December 2022. It is unclear what knowledge exactly Noe had and at what point in time and whether actions could have and or should have been taken earlier.

Noe alleges that as an employee he could not have done anything, but it is still uncertain what actions should have been taken as there are no minutes or documents other than emails.  However, Noe appears to have been trying to fix the problems early on and tried to be constructive in seeking to help prevent losses.

## XII.   NOE'S CURRENT INVOLVEMENT GENERALLY WITH GUARDIAN AND 12BR

Having interviewed many employees, creditors and others, as well as Noe, Noe appears to be hard working, credible, caring about the investors, and diligent in attempting to move the bankruptcy case forward.  Most employees are supportive of him.  Noe understands the concerns and facts of the case and appears to be coordinating the efforts of Guardian, 12 Bridges and 12BR to find an exit strategy for the case.  Employees of 12BR support Noe as a caring, intelligent and an effective manager.  12BR and Guardian largely seem to be running as one enterprise under Noe.

## XIII.   INCONSISTENCIES AND LACK OF CORPORATE FORMALITIES IN CONNECTION WITH THE MANAGEMENT OF VARIOUS ENTITIES

Many of the entities and agreements ignore corporate formalities and there are inconsistencies as a result.  Also, individuals sometimes sign in capacities which are not correct.  This has led to confusion over the roles and powers of each individual and entity.  Some examples are as follows:

1. No regular minutes, resolutions or other corporate formalities seem to have been in effect in HPC, 12 Bridges and 12BR.  The Examiner has made the request repeatedly but virtually no such documents exist or were created.  This occurred both pre- and post-petition.

30

2.    Noe has acted on behalf of 12 Bridges, a wholly-owned subsidiary of HPC, as well as acted on behalf of HPC as CEO and signed documents on behalf of 12 Bridges.

Noe had stated at his 341(a) meeting of creditors on May 15, 2023, that he was at most CEO in name only.  "I was never an officer or the director or having signing authority or anything with respect to Hughes Private Capital or any of their affiliates."  Exhibit "25" 341(a) Transcript, p. 42, lines 8-10.  12 Bridges is arguably an affiliate of HPC.  In reality, Noe has executed documents on behalf of 12 Bridges and indirectly HPC since 12 Bridges is a wholly-owned subsidiary.

By way of example, in a warranty deed ("Warranty Deed", Exhibit "26") (the Examiner is informed there were multiple deeds) between 12 Bridges and Joseph Nacy Castello, Hughberry Homes, LLC, and The Stephen T. Doyle Trust, which Noe signs on behalf of 12 Bridges, LLC, as "Real Estate Administrator" raises a number of different issues.  The Warranty Deed was signed and notarized on March 1, 2023 – well after Noe states that he resigned from HPC.  The purchase agreement was executed by Hughes even though the Warranty Deed was executed by Noe.

There are a number of observations which are relevant in analyzing the purported authority for these transfers. When the Examiner inquired, he was provided with ultimately three resolutions pertaining to Noe's signing authority – one for Home Partners, LLC, one for 12 Bridges, LLC and one for 12 Bridges, Inc.  The corporate resolution of Home Partners LLC is dated February 8, 2023 (the "February 2023 HP LLC Resolution"), the corporate resolution of 12 Bridges, LLC is dated March 20, 2023 (the "March 2023 LLC Resolution"), and the corporate resolution of 12 Bridges, Inc. appears to be undated (the "Undated Inc. Resolution"). *See* Exhibit 6. There was no explanation provided regarding why there was no date on this document[7] or why these resolutions were even necessary.

---

[7] The Undated Inc. Resolution was provided to Examiner first and Examiner was informed that it should have been dated April 19, 2023.  After it was pointed out that it post-dated the Warranty Deed, the March 2023 LLC Resolution was provided.  Subsequently, the Examiner was provided with the February 2023 HP LLC Resolution.

31

EXAMINER'S REPORT

Krch, Hughes and Sixberry signed as managers in the LLC resolutions and as officers of the undated one. Each resolution granted authority for certain people to take acts other than the managers and officers.  In the February 2023 Resolution, Adrian Maravilla, Allyson Evans, Roxanne Spring, Noe, Jim Dickson, Andrew Palmer and Tom Ortiz were authorized.  In the March 2023 Resolution, Adrian Maravilla, Roxanne Spring, Noe, and Andrew Palmer were authorized.  In the Undated Inc. Resolution only Noe were granted such authority.

The resolutions provide that the aforementioned authorized agents can execute "Purchase Contracts, Deeds, Deeds of Trust, Deeds of Release, Leases, Statements, Affidavits, and any other documents necessary to consummate the sale of real estate owned by [12 Bridges]…." Except in the Undated Inc. Resolution it excludes the Ridgeview Apartment Complex.  This authority is very broad and seems to go well beyond the scope of any type of surgical authorization for a specific purpose.

Moreover, there is no legal concept of a "Real Estate Administrator" in the sense that it does not seem to technically be an officer of director but if one is given the authority to sign deeds and related documents, then, arguably, they must have corporate authority. This appears consistent with Noe's *de facto* CEO role at HPC. There are no other resolutions, and no minutes appointing Noe in this capacity, only a resolution authorizing him in this capacity of Real Estate Administrator to execute documents at 12 Bridges.  It is also curious that 12 Bridges would maintain such resolutions but have no other resolutions at all. Finally, two of the three resolutions provided to Examiner grant Noe with signing authority after he resigned from HPC in early February 2023.

3.      Noe has signed documents on behalf of Guardian in his individual capacity instead of El Monte.  See 12BR Property Management Agreement dated May 22, 2023.  It should be noted that this agreement was never provided to the Bankruptcy Court for review and approval.

4.      Noe signed documents as "director" of 12BR.  In multiple Rental Listing and Management Agreements between 12BR and Evernest, LLC, Noe has signed as

32

"Director" of 12BR. These agreements are dated September 28, 2023.  Although Noe was at most, if not all, relevant times a director of 12BR, one would typically expect the officer of 12BR to execute these documents, not a director and not the owner of El Monte who is the managing director of Guardian who has a contractual property management agreement with 12BR.

5.      Although Noe claims he resigned from HPC around early February 2023, it appears he continued to hold himself out as CEO of HPC until at least March 29, 2023, as well as founder of El Monte.  Noe was a panelist on a Webinar with Chris Rediger, Head of Product for HouseCanary, regarding portfolio services.  It was advertised that this webinar would discuss SFR strategies to tackle economic challenges and (1) explore strategies for mitigating portfolio risk and capitalize on opportunities; (2) leverage new disposition strategies for SFR investors for both off-market and on-market; and (3) access off-market properties for investors expanding their portfolios opportunistically. During the Webinar, Noe continued to allege he was founder of Hughes after he left and CEO of El Monte before it appears to have been formed.

6.      Noe seems to be running both companies as a single unit under his direction.  The distinction between the companies are blurred as set forth below even though there are debtor-creditor relationships.  Noe is operating Guardian and 12BR together for the most part.

7.      The Examiner received a document unsigned reflecting Noe as manager on March 9, 2023, the First Amendment to the Marketing and Development Agreement (unsigned) with one creditor lists Noe as the manager of 12BR. Exhibit "27."  It is unclear why Noe was listed as "manager" of a corporation, instead of an officer.  It is unclear if this agreement was ever signed or used.

8.      The motion to approve compromise (Dkt. 616) filed on November 22, 2023, contains a form contract for conveyance between Guardian and the borrower relating to

33

carry-back loans with the form contract on 12B letterhead. Exhibit "28," as another example of the overlapping of 12BR and Guardian.[8]

9.      Noe was acting on behalf of 12BR while he was CEO of HPC, starting February 2023.  Noe still appeared to be CEO of HPC, or at least held himself out as CEO from time to time until the bankruptcy was filed on April 11, 2023, while he was still involved in 12BR but stopped being President.  Also, while Noe was President of 12BR, Palmer signed the bylaws as President.

These are some examples of inconsistencies and lack of formalities, all of which may have been inadvertent.  However, the Examiner finds it appropriate to identify them.

## XIV.    FINDINGS

The Examiner has been charged with analyzing the operations and financials of 12BR as well as investigating Noe's background experience and involvement with various entities.  In doing so, the Examiner has made several conclusions based upon the information, discovery, documentation and information provided to the Examiner as of the date of this Report, including, without limitation:

1.      Noe does not appear to have been involved in any fraud or deceit or the solicitation of investor funds prior to the gating of the Guardian fund.

2.      Noe appears to have sought to help HPC and protect the investors to the extent he was able to do so.

3.      Noe precipitated the gating of the fund which helped investors and stopped further losses and damage.

4.      Noe was not legally CEO or COO at HPC (as no minutes or resolutions exist), but was *de facto* CEO.  Others understood him to be a CEO, and he held himself as CEO.  He ran many of the executive committee meetings at HPC, and appeared to take charge in the company's future, at least operationally.

---

[8] *See* also correspondence dated October 22, 2023 to Nate Edwards blurring the distinction between 12BR and Guardian.  Exhibit "23."

34

5. It is unclear how much legal authority Noe had at HPC, but was not formally approved as an officer.

6. Noe was not a signatory on bank accounts at HPC.

7. Noe has the support of many 12BR employees.

8. Noe testified that he has not signed documents on behalf of HPC and was not an officer or director of HPC.

9. Noe executed warranty deeds transferring 12 Bridges properties in which Guardian had an interest.

10. 12 Bridges is a wholly-owned subsidiary of HPC.

11. Noe has been granted the authority to execute a large number of documents by 12 Bridges.

12. Financial projections have not been provided to the Examiner.

13. Noe has executed the 12BR Property Management Agreement in his individual capacity and not as managing member of El Monte.

14. Guardian does not have a CFO or financial consultant; 12BR has some financial support which it provides to Guardian, and Noe provides some support in these areas as well.

15. Palmer acted as CFO of 12BR but then resigned. He was employed by 12BR but did work for Guardian as well. Wendell King is a creditor and has provided financial services to 12BR and Guardian.

16. There is a property management agreement between Guardian and 12BR which is only partially in effect currently and has not been modified in writing.

17. The 12BR Management Agreement involves many services beyond property management.

18. 12BR performs multiple services including investor relations, asset management, construction, IT services, accounting and financial services for 12BR, Guardian and others.

35

19. The predecessors of 12BR include at least HPC and KRCH Realty, and possibly 12 Bridges.

20. Most of these entities did not and do not keep minutes, or resolutions absent certain exceptions, or follow corporate formalities. Specifically, 12BR, HPC, and 12 Bridges did not generally follow such formalities. There are only a few exceptions.

21. 12BR's former President and CFO, Palmer, resigned in June 2023.

22. There is no president, CFO or vice president of 12BR currently.

23. Noe is the sole director.

24. As a director of 12BR, Noe signs agreements for 12BR in that capacity. He is not an officer.

25. Noe appears to operate 12BR as well as Guardian.

26. No court approval exists for the property management agreement between 12BR and Guardian, the agreement between 12BR and Evernest, or the agreement between Guardian and El Monte.

27. Noe held himself out as CEO of Hughes in March 2023 after he was purportedly no longer with Hughes and had left in February 2023.

28. Noe held himself out as founder of El Monte in March 2023 before El Monte was legally formed in April 2023.

29. Noe, through El Monte, is operating Guardian.

30. The benefit of 12BR should be examined with an understanding of the liquidation and reorganization scenarios, and financial and cash flow projections.

31. While Noe was CEO of HPC, HPC had no internal controls and was soliciting investors.

32. No projections have been provided to the Examiner as of this point.

33. Noe's compensation is $20,000 per month through El Monte.

34. Noe, Guardian and El Monte appear to be in control of both Guardian and its subsidiaries.

35. The El Monte Agreement has indemnity provisions.

36

36.     The 12BR Property Management Agreement has indemnity provisions.

37.     Noe appears to be running 12BR and Guardian as a single unit.

38.     12BR has employed corporate counsel.

39.     It is unclear what knowledge Noe had at HPC at any given time.

40.     Noe appeared to act to try to fix the problems of HPC and when he concluded they could not be remedied quickly, joined in the calling for gating of the funds.

## XV.    ISSUES RAISED BY THE REPORT

The Examiner identifies the following issues raised by the Report for consideration by the Court and parties-in-interest.

### A.    Is Appointment of a Trustee Appropriate?

A trustee may be in the best interests of creditors and Guardian.  Although there is no evidence of deceit, fraud or gross negligence or misconduct, section 1104(b) does provide for the appointment of a trustee where in the best interests of the estate.

Here, Guardian and Noe appear to be operating 12BR and their interests and assets as essentially one unit and they have a debtor-creditor relationship. Corporate formalities are not being consistently followed and there is limited oversight at times, either because of business occurring at the subsidiary level and/or because such agreements could arguably be in the ordinary course of the Debtor's business under section 363.  There are also potential conflicts of interest given the variety of debtor-creditor relationships.  A trustee could help avoid the corporate formality issues and create accountability in a single person and avoid some of the structural potential challenges. However, the appointment of a trustee would need to be evaluated relative to the costs of a trustee, and its impact on the business itself.  Currently, Guardian is not engaged in new business, but rather the administration and liquidation of its current assets.  No plan of reorganization or liquidation has yet been proposed.

### B.    Appointment of a CFO and Financial Advisor

An independent CFO or financial consultant could be helpful.  12BR has a financial advisor other than Noe but he is a creditor and is employed by a subsidiary.   Noe has

37

some experience and expertise in this area, but he is also in the role of the manager of Guardian through El Monte as CRO and wears multiple hats.  Here, also, a cost-benefit analysis may need to be undertaken, in deciding whether a CFO or financial advisor is appropriate.

### C.    Corporate Counsel

Corporate counsel could be helpful in dealing with fixing some of these issues going forward, and avoiding them.

### D.    The Importance of Financial Projections

When available, understanding these projections in juxtaposition with liquidation scenarios will be very useful to further analysis of 12BR audits, operations and financials. 12BR's efficiency must be analyzed in this context to determine whether it is cost effective, and what the alternatives are.

### E.    Potential Conflicts of Interest

Noe may have potential conflicts in his various roles on behalf of El Monte, Guardian, 12 BR and his prior connection with HPC and 12 Bridges.  As explained, he has had numerous roles.  Many of these entities are creditors of each other.  No actual conflict of interest appears to exist at this time.  The current dual roles at 12BR and Guardian should be analyzed and investigated further, if consolidation does not occur.  Given the various debtor-creditor relationships, potential conflicts can exist.  For example, Guardian may have a claim against 12BR and vice versa.  Similarly, Evernest may have claims against 12BR and/or Guardian, yet 12BR and Guardian are somewhat the same entity and same decision makers.

### F.    Consolidation

It may make sense to consolidate 12BR into Guardian as they function to an extent as a single organization at least with respect to non-property management services.

### G.    Checks and Balances

Given the various relationships between the affiliates and individuals, it may be appropriate to have some checks and balances implemented, absent a trustee.  Guardian

38

is a creditor of 12BR. 12BR could be a creditor of Guardian by virtue of the indemnification. Similarly, Evernest is indemnified by 12 BR, and the legal relationship between Guardian and Evernest is somewhat unclear.  Clarity of these relationships will help with transparency and efficiency for future operations, and perhaps create some more accountability.

**XVI.    CONCLUSION**

The Examiner respectfully submits that once the Court determines that the Examiner has fulfilled his responsibilities under the Orders, that the Examiner be discharged, absent any further instruction, or orders from this Court, with the retention of the right to seek compensation for his fees and expenses upon notice and court approval, and for any other relief or order the Court deems appropriate.

Respectfully submitted,

Dated:  January 5, 2024          By:  __*/s/ Jeffrey I. Golden*_____

Jeffrey I. Golden
Examiner

EXAMINER'S REPORT

# Exhibit 1

## ENTITY INFORMATION

### ENTITY INFORMATION

**Entity Name:**

GUARDIAN FUND, LLC

**Entity Number:**

E0173832016-9

**Entity Type:**

Domestic Limited-Liability Company (86)

**Entity Status:**

Active

**Formation Date:**

04/15/2016

**NV Business ID:**

NV20161225779

**Termination Date:**

**Annual Report Due Date:**

4/30/2024

**Compliance Hold:**

**Series LLC:**

☐   **Restricted LLC:**   ☐

### REGISTERED AGENT INFORMATION

**Name of Individual or Legal Entity:**

STEPHEN R. HARRIS, ESQ.

**Status:**

Active

**CRA Agent Entity Type:**

**Registered Agent Type:**

Commercial Registered Agent

**NV Business ID:**

**Office or Position:**

**Jurisdiction:**

**Street Address:**

6151 LAKESIDE DR STE 2100, RENO, NV, 89511, USA

**Mailing Address:**

**Individual with Authority to Act:**

STEPHEN R HARRIS

**Fictitious Website or Domain Name:**

**OFFICER INFORMATION**

☐ **VIEW HISTORICAL DATA**

| Title | Name | Address | Last Updated | Status |
|---|---|---|---|---|
| Manager | El Monte Capital, Inc. | 5440 Louie Lane, Suite 106, Reno, NV, 89511, USA | 04/12/2023 | Active |

Page 1 of 1, records 1 to 1 of 1

Filing History      Name History      Mergers/Conversions

Exhibit 1, Page 41

Return to Search        Return to Results

Exhibit 1, Page 42

# Exhibit 2

Case 23-50177-hlb   Doc 648   Entered 01/05/24 20:15:39   Page 47 of 464

## ENTITY INFORMATION

### ENTITY INFORMATION

**Entity Name:**

EL MONTE CAPITAL INC.

**Entity Number:**

E31151582023-8

**Entity Type:**

Foreign Corporation (80)

**Entity Status:**

Active

**Formation Date:**

04/10/2023

**NV Business ID:**

NV20232759879

**Termination Date:**

**Annual Report Due Date:**

4/30/2024

**Compliance Hold:**

**Domicile Name:**

Wyoming

**Jurisdiction:**

Wyoming - United States

Exhibit 2, Page 43

1/5/2024, 2:13 PM

Case 23-50117-hlb   Doc 64-3   Entered 01/05/24 20:15:39   Page 48 of 464

## REGISTERED AGENT INFORMATION

**Name of Individual or Legal Entity:**

CT Corporation System

**Status:**

Active

**CRA Agent Entity Type:**

**Registered Agent Type:**

Non-Commercial Registered Agent

**NV Business ID:**

**Office or Position:**

**Jurisdiction:**

**Street Address:**

701 S. Carson Street, Suite 200, Carson City, NV, 89701, USA

**Mailing Address:**

**Individual with Authority to Act:**

**Fictitious Website or Domain Name:**

## OFFICER INFORMATION

☑ **VIEW HISTORICAL DATA**

| Title | Name | Address | Last Updated | Status |
|---|---|---|---|---|
| President | Aaron Noe | 701 S. Carson St. Suite 200, Carson City, NV, 89701, USA | 04/10/2023 | Active |
| Secretary | Aaron Noe | 701 S. Carson St. Suite 200, Carson City, NV, 89701, USA | 04/10/2023 | Active |
| Treasurer | Aaron Noe | 701 S. Carson St. Suite 200, Carson City, NV, 89701, USA | 04/10/2023 | Active |

Page 1 of 1, records 1 to 3 of 3

Exhibit 2, Page 44

Case 23-50177-hlb    Doc 648    Entered 01/05/24 20:15:39    Page 49 of 464

## CURRENT SHARES

| Class/Series | Type | Share Number | Value |
|---|---|---|---|
| | | No records to view. | |

○ Unlimited Foreign Entities Only

◉ No Stock Foreign Entities Only

Number of No Par Value Shares:

**0**

Total Authorized Capital:

Filing History      Name History      Mergers/Conversions

Return to Search      Return to Results

Exhibit 2, Page 45                    1/5/2024, 2:13 PM

# Exhibit 3

El Monte Capital, Inc

**3810 Vista Lucci, Reno,**
**NV 89519**

<u>CONFIDENTIAL</u>

## <u>MANAGER, CHIEF RESTRUCTURING OFFICER AND FINANCIAL</u> <u>ADVISOR ENGAGEMENT LETTER AGREEMENT</u>

April 11, 2023

Mr. Greg Hughes
Hughes Private Capital
5440 Louie Lane, Suite 106
Reno, Nevada 89511

RE:   Engagement of El Monte Capital, Inc as the Manager, Chief
Restructuring Officer and Financial Advisor to Guardian Fund LLC
(Company)

Dear Mr. Hughes,

This Engagement Letter Agreement confirms our understanding that Company, through its current Manager, Hughes Private Capital is engaging El Monte Capital, Inc ("EMC") as the Successor Manager, Chief Restructuring Officer ("CRO") and Financial Advisor and sets forth the terms and conditions of the engagement including the scope of services to be performed and the basis of compensation for those services. Upon execution of this letter by each of the parties below and subject to approval of the United States Bankruptcy Court presiding over the chapter 11 case for the Company, this letter will constitute an agreement (the "Agreement") between Company and EMC, its Manager, and CRO.

 1. <u>Description of Services</u>

   A. <u>Officers.</u> In connection with this engagement, EMC shall make available to the Company that certain individual Aaron M. Noe to serve as the President of EMC, at a monthly rate of $20,000.

   B. <u>Duties and Powers</u>.

    (i) The CRO shall also serve as the Manager of Company, replacing and succeeding Hughes Private Capital Inc. as Manager of Company and shall have duties typical of a

Exhibit 3, Page 46

CONFIDENTIAL

Mr. Greg Hughes
Hughes Private Capital – El Monte Capital
April 11, 2023
Page 2

Chief Executive engaged in restructuring activities, but not limited to: (a) assisting in all aspects of the Company's business activities and operations, including budgeting, cash management and financial management; (b) negotiations regarding the relationship with the Company's lenders and investors: (c) negotiations with vendors, customers, and other creditors: (d) evaluating liquidity options including restructuring, refinancing and reorganizing; (e) reviewing purchases and expenses: (f) evaluating, selling, initiating capital improvements for existing property portfolio, and (g) acting as the Company representative in court hearings as appropriate.

(ii)   The CRO understands that the Company has engaged the law firm of Harris Law Practice LLC as its bankruptcy reorganization counsel ("Counsel"), and that the powers of the CRO do include the power to terminate Counsel, acting as the Manager of Company.

(iii)   The CRO shall assist the Company in evaluating and executing restructuring alternatives.

(iv)   The CRO shall assist the Company and its Counsel in connection with resolution of matters related to the U.S. Department of Justice, the Securities and Exchange Commission, Internal Revenue Service and the State of Nevada Secretary of State's Office.

(v)   Analyze Company's operations and financial position and provide recommendations with respect to financial restructuring or disposition of assets;

(vi)   On behalf of Company, evaluate strategic alternatives to maximize the value of the Company's assets, enterprise or operations and, as necessary, to develop a plan of reorganization or liquidation, in conjunction with its Manager role;

(vii)   Serve as a principal point of contact for the Company and its creditors/investors with respect to financial and operational matters;

(viii)   If a decision is made by the CRO to initiate a voluntary bankruptcy proceeding, acting as the Manager of Company:

Exhibit 3, Page 47

CONFIDENTIAL

Mr. Greg Hughes
Hughes Private Capital – El Monte Capital
April 11, 2023
Page 3

     a. To provide information and analyses for inclusion in Bankruptcy Court filings and testimony related thereto;

     b. Upon request and under the supervision of Company's Counsel, to support negotiations with the various creditor groups and other constituents in the Bankruptcy Case;

     c. Supervise EMC's preparation of any and all monthly financial reports as required of a debtor-in-possession and other financial reporting required by the Office of the United States Trustee on behalf of the Debtor;

     d. Coordinate all activities on behalf of the Debtor in connection with any refinancing, capital raising and sale process for the Debtor.

C. Reporting.

The CRO shall report monthly or as needed to the Bankruptcy Court and Company Members/Creditors.

D. Employment by El Monte Capital, Inc.

Aaron Noe will continue to be employed by EMC and while rendering services to the Company continue to work with other personnel at EMC in connection with other unrelated matters, which will not unduly interfere with services provided pursuant to this engagement. With respect to the Company, however, the CRO shall operate pursuant to the terms of this Agreement.

E. Projections: Reliance: Limitation of Duties.

You understand that the services to be rendered by the CRO may include the preparation of projections and other forward-looking statements, and that numerous factors can affect the actual results of Company's operations, which may materially and adversely differ from those projections and other forward- looking statements. Neither the CRO nor EMC makes any representation or guarantee that the business will achieve or not achieve a particular result. Further, that any restructuring plan formulated for the Company, as selected by the CRO, will be more successful than all other possible restructuring alternatives or that any proposed restructuring alternative will be accepted by any of the Company's creditors and other constituents.

CONFIDENTIAL

Mr. Greg Hughes
Hughes Private Capital – El Monte Capital
April 11, 2023
Page 4

2.    Compensation

A.    EMC will be paid by the Company for the services of the CRO/Manager at $20,000 per month, provided that EMC employs Aaron M Noe.  Other EMC staff used will have rates that range from $75 per hour to $175 per hour.

B.    EMC requires no retainer.

C.    Should the Company initiate a Chapter 11 proceeding, EMC's retention as CRO and Manager and as financial advisor will be subject to approval of the United States Bankruptcy Court with the payment of monthly fees, in accordance with local rules, and the bankruptcy code and bankruptcy rules, whether subject to an interim fee application or the submission to the court of itemized monthly fee statements.

D.    If EMC provides avoidable transfer analysis, evaluation of potential causes of action, valuation, litigation support consulting or forensic accounting, those services will be billed in addition to CRO services, albeit at the same rates.

E.    EMC will be reimbursed by the Company for the reasonable out-of- pocket expenses, including travel expenses of the CRO and necessary staff.

F.    EMC will be reimbursed by the Company for its reasonable legal fees incurred in connection with this Engagement, if necessary.

3.    Termination

Subject to Manager approval, the engagement will commence effective with the execution of the Agreement and approval of the Bankruptcy Court and can be terminated by either party with 30 days written notice.  Any professional services provided during the period after notice but before the end of the term are the liability of the Company.

4.    No Audit, Duty to Update

It is understood that the CRO and EMC are not being requested to perform an audit, review or compilation, or any other type of financial statement reporting engagement that is subject to the rules of the AICPA, SEC or other state or national professional or regulatory body.  They are entitled to rely on the accuracy and validity of the data disclosed to them or supplied to them by manager employees and representatives of the Company.  The CRO and EMC are under no obligation to update data submitted to them

Exhibit 3, Page 49

CONFIDENTIAL

Mr. Greg Hughes
Hughes Private Capital – El Monte Capital
April 11, 2023
Page 5

or review any other areas.

5.      No Third Party Beneficiary.

The Company acknowledges that all advice (written or oral) given by EMC to the Company in connection with this engagement is intended solely for the benefit and use of the Company in considering the matters to which this engagement relates. The Company agrees that no such advice shall be used for any other purpose or reproduced, disseminated, quoted or referred to at any time in any manner or for any purpose other than accomplishing the tasks referred to herein without EMC's prior approval (which shall not be unreasonably withheld), except as required by law.

6.      Confidentiality / Non-Solicitation.

The CRO and EMC shall keep as confidential all non-public information received from Company as its Manager in conjunction with this engagement, except
(i) as requested by its legal counsel; (ii) as required by legal proceedings or (iii) as reasonably required in the performance of this engagement. All obligations as to non-disclosure shall cease as to any part of such information to the extent that such information is or becomes public other than as a result of a breach of this provision.

7.      Indemnification.

The Company shall indemnify EMC and the CRO to the same extent as the most favorable indemnification it extends to its officers or directors, whether under the Company's bylaws, its certificate of incorporation, or otherwise, and no reduction or termination in any of the benefits provided under any such indemnities shall affect the benefits provided to EMC and the CRO. The CRO shall be covered as an officer under the Company's existing director and officer liability insurance policies if such policy is in effect and the Company shall also maintain any such insurance coverage for the CRO for a period of not less than two years following the date of the termination of such officer's services hereunder. The attached indemnity provisions are incorporated herein and the termination of this agreement or the engagement shall not affect those provisions, which shall survive termination.

Exhibit 3, Page 50

CONFIDENTIAL

Mr. Greg Hughes
Hughes Private Capital – El Monte Capital
April 11, 2023
Page 6

8.    Miscellaneous.

This Agreement shall (together with the attached indemnity provisions) be: (a) governed and construed in accordance with the laws of the State of Nevada, regardless of the laws that might otherwise govern under applicable principles of conflict of laws thereof; (b) incorporates the entire understanding of the parties with respect to the subject matter thereof; and (c) may not be amended or modified except in writing executed by each of the signatories hereto. Company and its Manager and EMC agree to waive trial by jury in any action, proceeding or counterclaim brought by or on behalf of the parties hereto with respect to any matter relating to or arising out of the performance or non-performance of the Company, its Board or EMC hereunder.

9.    Notices.

Notices to the Consultant shall be sent to the office address and by email in the signature block below.

10.    Conclusion.

If the foregoing is acceptable to you, kindly sign the enclosed copy to acknowledge your agreement with its terms.

11.    Additional Indemnity Provision:

Guardian Fund, LLC, to the extent permissible under Nevada State law, agrees to indemnify and hold harmless each of El Monte Capital, Inc ("EMC"), EMC's shareholders, officers, employees, agents, representatives and subcontractors (each, an "Indemnified Party" and collectively, the "Indemnified Parties") against any and all losses, claims, damages, liabilities, penalties, obligations and expenses, including the costs for counsel or others (including employees of EMC, based on their then current hourly billing rates) in investigating, preparing or defending any action or claim, whether or not in connection with litigation in which any Indemnified Party is a party, or enforcing the Agreement (including these indemnity provisions), as and when incurred, caused by, relating to, based upon or arising out of (directly or indirectly) the Indemnified Parties' acceptance of or the performance or

CONFIDENTIAL

Mr. Greg Hughes
Hughes Private Capital – El Monte Capital
April 11, 2023
Page 7

nonperformance of their obligations under the Agreement; provided, however, such indemnity shall not apply to any such loss, claim, damage, liability or expense to the extent it is found in a final judgment by a court of competent jurisdiction (not subject to further appeal) to have resulted from such Indemnified Party's gross negligence or willful misconduct. Company and its Board also agree that no Indemnified Party shall have any liability (whether direct or indirect, in contract or tort or otherwise) to Company and its Board for or in connection with the engagement of EMC, except to the extent that any such liability for losses, claims, damages, liabilities or expenses are found in a final judgment by a court of competent jurisdiction (not subject to further appeal) to have resulted from such Indemnified Party's gross negligence or willful misconduct. Company and its Board further agree that it will not, without the prior consent of an Indemnified Party, settle or compromise or consent to the entry of any judgment in any pending or threatened claim, action, suit or proceeding in respect of which such Indemnified Party seeks indemnification hereunder (whether or not such Indemnified Party is an actual party to such claim, action, suit or proceedings) unless such settlement, compromise or consent includes an unconditional release of such Indemnified Party from all liabilities arising out of such claim, action, suit or proceeding.

El Monte Capital, Inc

Aaron M Noe
President & Director

[Signature page follows]

Exhibit 3, Page 52

CONFIDENTIAL

Mr. Greg Hughes
Hughes Private Capital – El Monte Capital
April 11, 2023
Page 8

Accepted and Agreed:

Guardian Fund, LLC

By: _____
          Manager

_____          _____
               Name                                          Date
         Greg Hughes                                    4/11/23

_____
               Title
       Managing Member

# Exhibit 4

**FILING HISTORY**

### ENTITY INFORMATION

**Entity Name:**

12 BRIDGES LLC

**Entity Number:**

E0104042017-2

**Entity Type:**

Domestic Limited-Liability Company (86)

**Entity Status:**

Converted

**Formation Date:**

03/03/2017

**NV Business ID:**

NV20171140370

**Termination Date:**

**Annual Report Due Date:**

3/31/2023

**Compliance Hold:**

**Series LLC:**

☐    **Restricted LLC:**    ☐

FILING HISTORY DETAILS

| File Date | Effective Date | Filing Number | Document Type | Amendment Type | Source | # of Pages | View |
|---|---|---|---|---|---|---|---|
| 03/14/2023 | 03/17/2023 | 20233032249 | Articles of Conversion | | Internal | 4 |  |
| 10/31/2022 | 11/01/2022 | 20222727915 | Amendment to Articles of Organization | | External | 4 | |
| 03/07/2022 | 03/07/2022 | 20222154005 | Annual List | | External | 2 | |
| 03/29/2021 | 03/29/2021 | 20211342017 | Annual List | | External | 2 | |
| 10/28/2020 | 10/28/2020 | 20201017055 | Registered Agent-Statement of Change | | Internal | 1 | |
| 03/28/2020 | 03/28/2020 | 20200573436 | Annual List | | External | 2 | |
| 03/01/2019 | 03/01/2019 | 20190093167-68 | Annual List | | External | 1 | |
| 03/07/2018 | 03/07/2018 | 20180105374-21 | Annual List | | External | 1 | |
| 03/27/2017 | 03/27/2017 | 20170129032-77 | Amended List | | External | 1 | |
| 03/03/2017 | 03/03/2017 | 20170097915-61 | Initial List | | External | 1 | |

Page 1 of 1, records 1 to 10 of 10

**FILING DATE SNAPSHOT AS OF: 03/17/2023**

| Business Details | Name Changes | Principal Office | Registered Agent |
|---|---|---|---|
| Officer Information | Shares | | |

| Date | Title | Name | Attention | Address1/Address2/City/State/Zip/Country |
|---|---|---|---|---|
| 03/07/2022 | Manager | Hughes Private Capital | | 5440 Louie Lane, Suite 106, Reno, NV, 89511, USA |

Page 1 of 1, records 1 to 1 of 1

Back        Return to Search        Return to Results

# Exhibit 5

## ENTITY INFORMATION

### ENTITY INFORMATION

**Entity Name:**

12 BRIDGES, INC.

**Entity Number:**

E30322372023-2

**Entity Type:**

Domestic Close Corporation (78A)

**Entity Status:**

Active

**Formation Date:**

03/14/2023

**NV Business ID:**

NV20232721206

**Termination Date:**

**Annual Report Due Date:**

3/31/2024

**Compliance Hold:**

### REGISTERED AGENT INFORMATION

**Name of Individual or Legal Entity:**

Director

**Status:**

Active

**CRA Agent Entity Type:**

**Registered Agent Type:**

Non-Commercial Registered Agent

**NV Business ID:**

**Office or Position:**

**Jurisdiction:**

**Street Address:**

526 Lander St, Reno, NV, 89509, USA

**Mailing Address:**

**Individual with Authority to Act:**

**Fictitious Website or Domain Name:**

## OFFICER INFORMATION

☐ VIEW HISTORICAL DATA

| Title | Name | Address | Last Updated | Status |
|---|---|---|---|---|
| President | Christopher P. Burke | 526 Lander St, Reno, NV, 89509, USA | 05/24/2023 | Active |
| Secretary | Christopher P. Burke | 526 Lander St, Reno, NV, 89509, USA | 05/24/2023 | Active |
| Treasurer | Christopher P. Burke | 526 Lander St, Reno, NV, 89509, USA | 05/24/2023 | Active |
| Director | Christopher P. Burke | 526 Lander St, Reno, NV, 89509, USA | 05/24/2023 | Active |

Page 1 of 1, records 1 to 4 of 4

## CURRENT SHARES

| Class/Series | Type | Share Number | Value |
|---|---|---|---|
| | Authorized | 100 | 0.01 |

Exhibit 5, Page 57

**Page 1 of 1, records 1 to 1 of 1**

Number of No Par Value Shares:

**0**

Total Authorized Capital:

**1**

Filing History    Name History    Mergers/Conversions

Return to Search    Return to Results

# Exhibit 6

DocuSign Envelope ID: ABB2CB30-C76A-4885-B938-0C1D8BD52458

## LIMITED LIABILITY COMPANY RESOLUTION
## Of
## Home Partners LLC

THE UNDERSIGNED, being the only Managers of **Home Partners LLC, a Nevada limited liability company (the "LLC"),** hereby authorize, approve, and adopt the following resolution:

RESOLVED THAT,

Adrian Maravilla and/or
Allyson Evans and/or
Roxanne Spring and/or
Aaron Noe and/or
Jim Dickson and/or
Andrew Palmer and/or
Tom Ortiz

as Real Estate Administrators for Home Partners LLC, a Nevada limited liability company, is/are authorized and empowered SOLELY for and on behalf of and in the name of this LLC:
To make, execute and deliver Purchase Contracts, Deeds, Deeds of Trust, Deeds of Release, Leases, Statements, Affidavits, and any other documents necessary to consummate the closing of the purchase and/or sale of real estate owned by the LLC.

**Home Partners LLC, a Nevada limited liability company.**

DocuSigned by:

*Kyle Krch*                   2/8/2023 | 10:57:15 AM PST
1A3D2A865A0A4CF

By Kyle J. Krch, as
Manager of Home Partners LLC

DocuSigned by:

*Greg Hughes*                 2/8/2023 | 10:49:24 AM PST
34AA62A7D265436

By Gregory W. Hughes, as
Manager of Home Partners LLC

DocuSigned by:

*Steve Sixberry*              2/8/2023 | 3:36:37 PM PST
84B2A49BF3B9437

By Steven R. Sixberry, as
Manager of Home Partners LLC

Exhibit 6, Page 59

DocuSign Envelope ID: 0B6CC3B3-516C-4720-87DC-C540F8B13A4A

## LIMITED LIABILITY COMPANY RESOLUTION
## Of
## 12 Bridges LLC

THE UNDERSIGNED, being the only Managers of **12 Bridges LLC, a Nevada limited liability company (the "LLC")**, hereby authorize, approve, and adopt the following resolution:

RESOLVED THAT,

Adrian Maravilla and/or
Roxanne Spring and/or
Aaron Noe and/or
Andrew Palmer and/or

as Real Estate Administrators for 12 Bridges LLC, a Nevada limited liability company, is/are authorized and empowered SOLELY for and on behalf of and in the name of this LLC:
To make, execute and deliver Purchase Contracts, Deeds, Deeds of Trust, Deeds of Release, Leases, Statements, Affidavits, and any other documents necessary to consummate the closing of the purchase and/or sale of real estate owned by the LLC.

## 12 Bridges LLC, a Nevada limited liability company

_Kyle Krch_                3/20/2023 | 5:28:34 PM PDT

By Kyle J. Krch, as
Manager of 12 Bridges LLC

_Greg Hughes_              3/20/2023 | 2:18:08 PM PDT

By Gregory W. Hughes, as
Manager of 12 Bridges LLC

_Steve Sixberry_           3/20/2023 | 2:56:55 PM PDT

By Steven R. Sixberry, as
Manager of 12 Bridges LLC

DocuSign Envelope ID: 26187B13-86F1-494B-9185-33979FDD7D14

# CORPORATE RESOLUTION
# OF
# 12 BRIDGES INCORPORATED

THE UNDERSIGNED, being the only Managers of **12 Bridges, Inc., a Nevada Corporation, (the "Corporation")**, formally known as **12 Bridges LLC aka Home Partners, LLC,** hereby authorize, approve, and adopt the following resolution:

RESOLVED THAT,

### Aaron Noe

as Real Estate Administrator for 12 Bridges Inc, a Nevada Corporation, is authorized and empowered SOLELY for and on behalf of and in the name of this Corporation:
To make, execute and deliver Purchase Contracts, Deeds, Deeds of Trust, Deeds of Release, Leases, Statements, Affidavits, and any other documents necessary to consummate the sale of real estate owned by the Corporation, excluding the Ridgeview Apartment Complex.

## 12 Bridges, Inc., a Nevada Corporation

DocuSign by:

*Greg Hughes*

By Greg Hughes, as
President of 12 Bridges, Inc.

DocuSigned by:

*kyle krch*

By Kyle Krch, as
Secretary of 12 Bridges, Inc.

DocuSigned by:

*Steven Sixberry*

By Steve Sixberry, as
Treasurer of 12 Bridges, Inc.

Exhibit 6, Page 61

# Exhibit 7

## ENTITY INFORMATION

### ENTITY INFORMATION

**Entity Name:**

HUGHES PRIVATE CAPITAL, LLC

**Entity Number:**

E0057822009-8

**Entity Type:**

Domestic Limited-Liability Company (86)

**Entity Status:**

Converted

**Formation Date:**

01/29/2009

**NV Business ID:**

NV20091345868

**Termination Date:**

**Annual Report Due Date:**

1/31/2024

**Compliance Hold:**

**Series LLC:**

☐    **Restricted LLC:**    ☐

## REGISTERED AGENT INFORMATION

**Name of Individual or Legal Entity:**

Hughes Private Capital

**Status:**

Active

**CRA Agent Entity Type:**

**Registered Agent Type:**

Non-Commercial Registered Agent

**NV Business ID:**

**Office or Position:**

**Jurisdiction:**

**Street Address:**

5440 Louie Lane, Ste. 106, Reno, NV, 89511, USA

**Mailing Address:**

**Individual with Authority to Act:**

**Fictitious Website or Domain Name:**

## OFFICER INFORMATION

☐ VIEW HISTORICAL DATA

| Title | Name | Address | Last Updated | Status |
|-------|------|---------|--------------|--------|
| Manager | Steven Sixberry | 5440 Louie Lane, Ste. 106, Reno, NV, 89511, USA | 01/13/2023 | Active |
| Manager | Gregory Hughes | 5440 Louie Lane, Ste. 106, Reno, NV, 89511, USA | 01/13/2023 | Active |
| Manager | Kyle Krch | 5440 Louie Lane, Ste. 106, Reno, NV, 89511, USA | 01/13/2023 | Active |

Page 1 of 1, records 1 to 3 of 3

Filing History        Name History        Mergers/Conversions

Exhibit 7, Page 63

Return to Search     Return to Results

## FILING HISTORY

### ENTITY INFORMATION

**Entity Name:**

HUGHES PRIVATE CAPITAL, INC.

**Entity Number:**

E30244192023-6

**Entity Type:**

Domestic Close Corporation (78A)

**Entity Status:**

Active

**Formation Date:**

03/13/2023

**NV Business ID:**

NV20232719111

**Termination Date:**

**Annual Report Due Date:**

3/31/2024

**Compliance Hold:**

### FILING HISTORY DETAILS

| File Date | Effective Date | Filing Number | Document Type | Amendment Type | Source | # of Pages | View |
|-----------|----------------|---------------|---------------|----------------|--------|------------|------|

| File Date | Effective Date | Filing Number | Document Type | Amendment Type | Source | # of Pages | View |
|---|---|---|---|---|---|---|---|
| 03/13/2023 | 03/14/2023 | 20233024621 | Articles of Conversion | | Internal | 0 | 📷 |
| 03/13/2023 | 03/13/2023 | 20233024418 | Articles of Incorporation-For-Profit | | Internal | 2 | 📷 |
| 03/13/2023 | 03/13/2023 | 20233024530 | Initial List | | Internal | 2 | 📷 |

Page 1 of 1, records 1 to 3 of 3

---

## FILING DATE SNAPSHOT AS OF: 03/14/2023

| Business Details | Name Changes | Principal Office | Registered Agent |
|---|---|---|---|
| Officer Information | Shares | | |

| Date | Title | Name | Attention | Address1/Address2/City/State/Zip/Country |
|---|---|---|---|---|
| 01/13/2023 | Manager | Steven Sixberry | | 5440 Louie Lane, Ste. 106, Reno, NV, 89511, USA |
| 01/13/2023 | Manager | Gregory Hughes | | 5440 Louie Lane, Ste. 106, Reno, NV, 89511, USA |
| 01/13/2023 | Manager | Kyle Krch | | 5440 Louie Lane, Ste. 106, Reno, NV, 89511, USA |

Page 1 of 1, records 1 to 3 of 3

---

Back        Return to Search        Return to Results

Exhibit 7, Page 66

# Exhibit 8



# Hughes Private Capital
# Investor Kit

**Our #1 priority is to protect your principal.**

Hughes Private Capital buys and holds **recession-resistant** residential real estate in select U.S. neighborhoods chosen for **long-term stability and profitability.**

This provides our investors with **predictable, consistent net returns** in a **100% passive** investment.

*"For over a decade, we have offered our investors recession-resistant investments that give them peace of mind, regardless of what the economy does next. Our assets are investment grade, not speculative, providing consistent net returns and a high level of portfolio safety."*
— Greg Hughes
*Hughes Private Capital CEO*



Exhibit 8, Page 67

*For cash, IRA/401k, and 1031 Exchange investors who want to **own real estate** in their portfolio **without any of the landlord hassles**. All investors have the option to leverage their properties with financing for greater returns.*

# Hughes Private Capital
## Secured Portfolio

-2-

Exhibit 8, Page 68



**Be an** Investor**, Not a Landlord**
Secured Portfolio

# There are four ways to invest...



**1031 Exchange**



Cash



Financing



**IRA/401k**

# ...with two easy steps.

## Step 1

We design a Secured Portfolio for you from our existing inventory of homes. The homes will go through the normal closing process with a title company, so that they are titled and secured in your name.

## Step 2

We lease the homes back from you, taking on complete responsibility for the property. Then, we pay you a Set Monthly Income regardless of the performance of your properties.

**P.S. The performance of your properties is our responsibility**. In fact, you'll never know if a water heater breaks or a tenant leaves, because we are 100% responsible for handling and paying for the management, maintenance, and expenses — including the property taxes. Even if your property is vacant, you will still be paid your Set Monthly Income.

**Hughes Capital Investor Kit**

Exhibit 8, Page 69





### Want to invest with a 1031 Exchange?

There is one additional step you need to complete before the two steps mentioned on the previous page can occur, and that is setting up your 1031 Exchange escrow account.  Having your 1031 account set up is an important step that has to take place *before* you sell your investment property that you will be using for the exchange on the open market.  Your proceeds from the sale have to go into a 1031 Exchange escrow account for it to qualify to be TAX FREE.  You don't have to do it alone either.  We will set up your 1031 escrow account for you in-house through our exchange company, Equity 1031.  This way, **the whole process is handled through one company and you enjoy significant savings with exchange fees of only $100 per property.**

 **Our investors save tens of thousands to hundreds of thousands of dollars on this step.**

Once your account is set up and your property is sold, we follow the first two steps mentioned on the previous page.  It is that easy.

*"Doing a 1031 Exchange through Hughes Capital allowed me to avoid paying taxes on the sale of my property and forget about all those fees that really add up in the end."* — **Ken Koeppe, Hughes Capital Investor**

## How much will you save in taxes?

Many investors are surprised by their large tax bill when they go to sell their property.  In less than 3 minutes, our easy online calculator will estimate how much you could save in taxes when you sell your property through a 1031 Exchange.

## www.1031Calculator.com



Estimate Your Tax Savings

$ Current Sales Price
% Transactional Costs
Property Type
Tax Filing Status
% Capital Gains Rate

CALCULATE

**Hughes Capital Investor Kit**



Be an Investor, **Not a Landlord**
Secured Portfolio

# How does it work?

**Our nationwide team takes care of everything.  Here's what we do:**

**1** We buy a property that fits our investment model requirements

**2** We rehab the property

**3** We put qualified tenants in the property

**4** We sell the property to you (your name is on the title)

**5** We lease it back from you, and pay you a Set Monthly Income

**6** Through our lease, we become responsible for everything property-related, including all expenses

You only have to do ( ONE ) thing: Choose whether you prefer to reinvest and compound your profits for greater earnings, or receive your profits as monthly income.

Exhibit 8, Page 71



**Be an Investor, Not a Landlord**
Secured Portfolio

# Three Steps to Becoming a Secured Portfolio Investor

## 1. Decide how much you want to invest using cash, IRA, 401k, or through a 1031 Exchange.

We'll create a Secured Portfolio for you based on the amount you want to invest. We will hand pick the homes that go into your portfolio. **There is no need for you to worry about which homes you will own, where they are located, what their value is, etc.**

Many investors ask why they don't get to choose their own homes. While you will fully own each home and be secured with your name on the title of each home, it actually doesn't matter which homes you own. How is this possible? After we sell you the homes, we lease them back from you and pay you a Set Monthly Income. **The Set Monthly Income amount has _nothing_ to do with the individual homes you own.** Your Set Monthly Income is based off two things:

1. Your investment amount
2. The performance of Hughes Capital's real estate portfolio as a whole

At the time this Investor Kit was printed, we had 1,280+ doors under management — and we are purchasing around 50 more every month. **These homes are spread across five cities and three states, creating diversification and safety for our portfolio and in turn, for your investment.**

**Remember you are an INVESTOR, not a LANDLORD with us.**

Should you ever want to discontinue your lease with us and sell your homes, we will buy them back from you. Yet another reason why it doesn't matter which homes you own. **We almost make real estate a liquid investment for you.**

_The bottom line?_ The specific homes you own do not matter at all.



Everything from vacancies, to repairs, to the performance of your specific homes, to wanting to sell your homes is OUR problem, not your problem. **Your investment is backed by the strength, security, and diversity of Hughes Capital's portfolio of 1,280+ doors under management**. That's what being an investor, and not a landlord, is all about.

## 2. Choose whether you'd like to finance your homes for greater returns.

You have the option to finance your homes, which will significantly increase your net return. We can help you get financing through our preferred lender who is set up and ready to finance these Secured Portfolio homes.

Here are some examples of how financing can increase your net returns:

| Examples of Set Annual Income + Tax Benefits + Principal Paydown Minus the Debt Service, Based on the Amount You Put Down | | |
|---|---|---|
| **Amount You Put Down** | **Without Financing** | **With Financing** |
| $100,000 | $8,000 | $19,000 |
| $300,000 | $24,000 | $57,000 |
| $500,000 | $40,000 | $96,000 |
| $1,000,000 | $80,000 | $191,000 |

## 3. Choose whether you'd like to receive a Set Monthly Income or reinvest your earnings to let them compound.

With a Secured Portfolio, you can choose to have your Set Monthly Income deposited into an account with us and let it compound, earning you significantly more over time. This unique feature is extremely advantageous for investors who aren't looking for monthly income and want to reinvest their money automatically. **It's not an option you'd have with a normal investment property**.

Exhibit 8, Page 73



**Be an** Investor, **Not a Landlord**
Secured Portfolio

Let's look at what happens over a 20-year period, using the example of a $300,000 investment that is paying you $30,000 per year. If you put your Set Monthly Income in your pocket every month, you would earn a total of $600,000 over 20 years. But if you were to reinvest your $30,000 every year into an investment that produced an 8.5% rate of return to let it compound, it would become $1,574,672 over 20 years. That's $974,672 more. There is a reason Einstein called compounding the 8th wonder of the world!

| The Nearly Million Dollar Difference Between Collecting vs. Compounding Income | |
|---|---|
| Equity Invested | $300,000 |
| Monthly Net Income | $2,500 |
| Annual Net Income | $30,000 |
| Net Income Over 20 Years | $600,000 |
| Net Income Compounded at 8.5% Over 20 Years | $1,574,672 |



"I have known Greg for over 15 years, and have worked with him on several businesses. I was one of the first investors on board because I know how smart he is! True to form, **I have more than doubled my money** since investing about 10 years ago."

— *Alice Heiman, Hughes Capital Investor*

---

**Hughes Capital Investor Kit**

www.HughesCapital.com | (775) 234-4001 | Invest@HughesCapital.com

-8-

Exhibit 8, Page 74



Be an Investor, Not a Landlord
Secured Portfolio

# Benefits you can expect with your Secured Portfolio:



Invest through a **1031 Exchange** and save thousands in taxes



Invest with **cash, IRA, or 401k** and diversify your retirement savings



Own properties in one of the most stable, **recession-resistant** housing categories in the U.S.



Receive a **Set Monthly Income** or reinvest it to compound your earnings



**Buy Back Advantage:** If you ever want to sell your properties, we'll purchase them back from you



Celebrate and never worry about an unexpected bill again because **we pay** for all property-related expenses



**Double your income** by putting your underutilized equity to work as a 1031 Exchange investor



Own real estate in your portfolio with zero landlord hassles **(100% passive investment)**



Add safety to your portfolio with real estate holdings in **diverse locations** across the United States

Exhibit 8, Page 75



Be an Investor, Not a Landlord
Secured Portfolio

## How is Hughes Capital able to pay investors a Set Monthly Income?

We have purchased these homes ourselves and completed a full rehab on them to meet our standards, so the homes provide safe and affordable living for qualified families to lease from us.  Once a qualified tenant is matched with a home, we sell the home to investors like you and then lease it back from you.  Then, we continue to manage every single aspect of the property for you.

**To do all of this effectively, we have put together a nationwide operations team** who is responsible for the acquisition, construction, rehab, and ongoing management of our homes.  Everyone on our team is a full-time employee, eliminating the problems that come with relying on third-party contractors.  We also own real estate brokerages in every city where we buy homes.  ***This provides complete quality-control and transparency with our properties and is how we are able to make your investment 100% passive and ensure your Set Monthly Income is paid on time and in full.***



Exhibit 8, Page 76



**Be an** Investor, **Not a Landlord**
Secured Portfolio

# If I ever want to sell my properties, how does that work?

### We offer a Buy Back Advantage.



When it comes time to cash out all or a portion of your portfolio, <u>we will purchase your real estate back from you</u>. At this time, you will receive the purchase price plus all of your reinvested profits and the accumulated principal paid down on any financing.

**That almost makes your real estate a liquid investment!**





"Greg [Hughes Capital CEO and Investment Manager] is taking all this experience he's had over the last 10 years and he's offering a one-of-a-kind solution for investors who don't want to deal with the hassles of being a landlord or even the hassles of managing the managers of properties."

— **David Phelps, Financial Planner and Real Estate Investment Advisor**

---

**Hughes Capital Investor Kit**

www.HughesCapital.com | (775) 234-4001 | Invest@HughesCapital.com                -11-

Exhibit 8, Page 77



## Be an Investor, Not a Landlord
### Secured Portfolio

### How can you buy back the homes?
### I've never heard of such an option in real estate.

We are in this for the long run. We expect to be managing our Buy and Hold Fund and our portfolio of homes for the next 30 years or longer. That is why we have built our model to rely only on cash flow, not appreciation. Cash flow models are investment grade and not speculative. **If you want to play the long game of wealth creation, cash flow is the way to go.** Most of these homes have very little fluctuation in value, translating to a smaller amount of appreciation than what many of us are used to in our local real estate market.

**We don't think you will find this unique option of a Buy Back Advantage anywhere else.**



"Hughes Capital investments get reasonable returns, and as an investor I'm looking for risk (How much risk do I have? What are my returns?) and liquidity, quite frankly. Things come up in life. You might have big bills that come out of left field, and all of the sudden, money that you had invested to pull out of investments. If it's not a liquid investment and you have to sell it immediately, you'll take a [loss] on it... Greg and Steve have really thought it out quite well, and I applaud them for that."

**— Steve Mestre, Hughes Capital Investor**

Exhibit 8, Page 78



# Our investments are recession resistant.

**We purchase real estate assets that deliver long-term stability, consistent cash flow, and recession-resistant returns for investors. Here's how:**

### Recession-resistant rents

We purchase homes with market values of $50,000 to $150,000 — a range we've found to be a "sweet spot" for investing. While the economy may go through highs and lows, rent in this price range stays steady, so our investors enjoy predictable income month to month.

### Diverse asset locations

Having real estate holdings in different cities and states produces a strong, healthy, geographically-diverse portfolio that functions like a giant safety net for investors. We only purchase assets in select U.S. neighborhoods that fit our buying criteria.

### Solid renter base

In an economic downturn, renters don't upsize — they downsize. This means our core market homes with affordable rents can always count on a solid renter base, resulting in stable, consistent cash flow whether we're in an up or down economy.

### Reliable cash flow model

We don't gamble with your investment by betting on appreciation to produce a profit. Our reliable cash flow model keeps generating predictable net returns, month after month, providing our investors with stable, secure income.

*"My stocks recently took a deep dive due to COVID-19, but my investment with Hughes Capital just kept cruising along! Thank you, thank you, thank you!"*

— *Steve Miller, Hughes Capital Investor*

Exhibit 8, Page 79



# What is depreciation and how does it affect my final return?

You may have noticed that depreciation was included in some of the returns we showed earlier. Depending on your method of investment, you will get the added tax benefit of writing depreciation off on your taxes. Your return could be 1% to 3% higher when you add in depreciation.

## How does depreciation increase my return?

One of the benefits of owning real estate is that you get to depreciate your property, saving you money on taxes every year. For example, if you owned an $85,000 home, you could expect to save about 1% of the value of that home on your taxes every year. ($85,000 X 1% is $850 in tax savings every year.) That is $850 that stays in your pocket and doesn't go to the IRS on an annual basis.

If you purchased the property all cash and your annual net income was $6,800 plus the $850 in tax benefits from your depreciation, the depreciation would be increasing your annual net return by 1% as seen in the table below.

| | All-Cash $85,000 Property | |
|---|---|---|
| | WITHOUT Depreciation | WITH Depreciation |
| Annual Net Income | $6,800 | $6,800 |
| Depreciation Benefit | N/A | $850 |
| Amount Invested | $85,000 | $85,000 |
| Net Return | 8% | 9% |

**Your net return increased by 1% thanks to depreciation!**

---

**Hughes Capital Investor Kit**

Exhibit 8, Page 80



**Be an Investor, Not a Landlord**
Secured Portfolio

If you financed the same $85,000 property with a $30,000 down payment and $55,000 loan and your annual net income was $2,850 plus the $850 in tax benefits, the depreciation would increase your return by 2.8% as seen in the table below. Ah, the beauty of leverage and depreciation together.

| $85,000 Property with a $30,000 Down Payment | | |
|---|---|---|
| | **WITHOUT Depreciation** | **WITH Depreciation** |
| **Annual Net Income** | $2,850 | $2,850 |
| **Depreciation Benefit** | N/A | $850 |
| **Amount Invested** | $30,000 | $30,000 |
| **Net Return** | 9.50% | 12.33% |

**Your net return increased by 2.8% thanks to depreciation!**

*Let's go over one last example but done in a different way*. Let's say you have $10,000 in annual net income from your property, but you are able to write off $4,000 in depreciation. That means you only need to pay taxes on $6,000. If you are in a 35% tax bracket, you will save $4,000 x 35% = $1,400 *each year*.

Another important thing to remember is that depreciation is NOT tied to the economy. You own an asset with established tax rules, which are not affected by the ups and downs of the market. **You can see how depreciation is a not-so-tiny benefit that keeps money in your pocket and adds significantly to your bottom line**.

Exhibit 8, Page 81



Be an Investor, Not a Landlord
Secured Portfolio

# It all comes down to one question:
# Would you rather be an Investor or a Landlord?

As a landlord, you have to deal with a lot of uncertainty: property management issues, unexpected expenses, late rent, vacancies, and so much more.  With a **Secured Portfolio**, all those uncertainties go away, and you never have to think about landlord hassles again.  In the table below, see how a Secured Portfolio compares to being a landlord of a typical rental property.

| | Secured Real Estate Portfolio | Typical Rental Property |
|---|---|---|
| 1 Find Suitable Properties | No work at all, we provide the properties for you | Good luck, it's a lot of work |
| 2 Title | Your name is on it | Your name is on it |
| 3 Repairs and Maintenance | Our problem | Your problem |
| 4 Marketing to Find a Tenant | We pay | You pay |
| 5 Property Management | It's included | 10% charge for unpredictable management |
| 6 Vacant Property | No problem, you still receive a Set Monthly Income | Too bad, you receive no rent |
| 7 Appreciation | You earn money through cash flow, not appreciation | You're rolling the dice |
| 8 Property Taxes | We pay | You pay |
| 9 Sell Property | We buy them back | You must find an agent and list it |
| 10 Depreciation | You get to write it off | You get to write it off |
| 11 Your Emotional State | Relaxed — no surprises | Worried — like a box of chocolates, you never know what you're going to get |
| 12 Your Role | Investor | Landlord |

Simple, Predictable Income

Uncertain Rent, Expenses, and Landlord Hassles

**Hughes Capital Investor Kit**

www.HughesCapital.com | (775) 234-4001 | Invest@HughesCapital.com

-16-

Exhibit 8, Page 82



Be an Investor, **Not a Landlord**
Secured Portfolio

# Investing through a 1031 Exchange?

Without investing a dollar more on real estate than you already have, a Secured Portfolio uses the power of a 1031 Exchange to fully utilize your existing equity to double your current net rental income. **And a 100% passive investment means zero landlord hassles for you**.

## Supercharging Your Equity



**How are most 1031 Exchange investors able to earn double or more what they were previously earning on their investment properties?**

When you first bought your investment property, you likely leveraged it and had a high return on your investment. Over the years, you have paid down your loan, or maybe it's paid off by now. In this situation, you have good cash flow since you won't have a mortgage payment, **but your equity, which has risen significantly since you paid off your loan, is not being utilized in an optimal way because your net income has not increased proportionally to your equity**.



Exhibit 8, Page 83



## Be an Investor, Not a Landlord
### Secured Portfolio

We'll run some example numbers to demonstrate why. Let's say 20 years ago you bought a rental property for $250,000. Today, the mortgage is paid off, and the property has appreciated to $400,000. We'll suppose it has a typical net income (net = total rent received minus expenses) of $1,300/month or $15,600/year.

When investing in a Secured Portfolio with Hughes Capital, every dollar of equity goes straight to work for you, generating a superior monthly return. Remember — through the terms of our lease, **we pay investors a Set Monthly Income**.

Not factoring in the benefits of depreciation and the option to finance your homes, you could expect to earn $2,833/month or $34,000/year with a $400,000 investment — **more than double your current net rental income** of $15,600/year.

**We've found that most of our 1031 Exchange investors are able to double — or more — their net income on their existing equity by "supercharging" it with a Secured Portfolio with Hughes Capital**. This is demonstrated with the table on the next page.



"We owned a rental property in Reno that brought in $1,200 a month in rental income, but the money we put in our pocket at the end of the day was always less than that after paying the annual property tax, sewer, and garbage. We also had to pay for and handle repairs and maintenance — we even mowed the lawn weekly to ensure the property was well maintained. Through the Hughes Capital 1031 Exchange on that property, we now earn $1,865 per month in completely passive rental income."

— *Ryan and Shonee Hansen, Hughes Capital Investors*

Exhibit 8, Page 84



**Be an** Investor, **Not a Landlord**
Secured Portfolio

## How a Secured Portfolio through a 1031 Exchange compares to owning a typical investment property

**Supercharge your equity**

| Typical Investment Property | VS | Secured Portfolio |
|---|---|---|
| **$400,000** | **Value of Investment** | **$400,000** |
| What's Typically Left After Expenses **$1,300** | **Monthly Net Income** | Your Full Equity Put to Work **$2,833** |
| $1,300 x 12 Months = **$15,600** | **Annual Net Income** | $2,833 x 12 Months = **$34,000**  *218% More!* |

### What happens after 12 years?

| Does Not Compound **$187,200** | **12-Year Net Income** | Compounded Net Income **$710,200**  *379% More!* |
|---|---|---|

**About a million**  ←  **Number of Landlord Hassles**  →  **ZERO**

We see numbers like this every day with our 1031 Exchange investors. This investment provides a unique and welcome alternative to the way people traditionally think about owning real estate.

Exhibit 8, Page 85



Be an Investor, Not a Landlord
Secured Portfolio

## How does the 1031 Exchange investment option work if my property carries debt?

For a complete tax deferral, the value of the asset or assets you're trading INTO must be equal or greater than the asset you're trading OUT OF.



**Your Property**

$400,000

**Exchange Property**

$400,000 or ⬆

Let's say you're selling your property for $400,000 and you have $280,000 in equity, leaving $120,000 in debt.  Since the exchange needs to be for the full $400,000, how do you handle the remaining $120,000 in debt?

For a standard 1031 Exchange, you would either have to take out a $120,000 loan on the new property or come up with the cash out of pocket.  With a Hughes Capital 1031 Exchange, you can choose to have us lend you the additional property value to meet your total 1031 exchange amount for the debt portion, or you can finance your homes using our preferred lender to significantly increase your return.

## I've heard I can only do a 1031 Exchange with "similar" or "like" properties.  Is this true?

**No, that is a myth**.  Any investment property — whether it is commercial, residential, land, etc. — can be exchanged for any other investment property. (You can also exchange your vacation home as long as it has been rented out for at least 14 days per year for the past two years.)  The only type of property that doesn't qualify for a 1031 Exchange is your primary residence, since it's not an investment property.

Exhibit 8, Page 86



Be an Investor, **Not a Landlord**
Secured Portfolio

## What about the taxes on my Set Monthly Income and depreciation?

At the end of the year, you will receive a 1099 for the monthly income you have earned, and you will be able to deduct any remaining depreciation from your sold property on the new properties.

## What if I have investment partners and not everyone wants to do an exchange?

If you are in an LLC or another business structure with partners and you want to do a 1031 Exchange, but your partners do not, there is an easy way to make this work.  Contact us and we'll show you how.

## There's one thing that hasn't been addressed yet — the elephant in the room: won't I eventually have to pay taxes on the capital gain and the recapture of my depreciation?



Although a 1031 Exchange is considered "tax free" at the time of the exchange, it is actually tax deferred.  So yes, you will have to pay taxes on the final sale.

**However, through something called a "Step-up in Basis," you could relieve the tax burden for good**. To do this, you would leave the property or properties in your estate and never sell them.  Your beneficiaries will inherit the assets on an adjusted stepped-up cost basis, which means the assets will be adjusted or "stepped up" to fair market value at the time of inheritance, wiping out any existing capital gain.

We find this to be one of the best strategies for estate planning because it provides the best of both worlds.  In order to benefit from tax-free real estate, you usually have to make a sacrifice or give something up, like locking up your asset in an irrevocable trust.  However, with a 1031 Exchange, your real estate properties are always accessible to you and can be sold at any time during your lifetime.  Plus, by putting the properties in your estate, your beneficiaries will inherit the properties tax-free at the current market value.  It is rare to get such beneficial tax treatment without having to first give something up.  The elephant has left the room!

Exhibit 8, Page 87



## Be an Investor, Not a Landlord
### Secured Portfolio

*"A 1031 Exchange with Hughes Capital was the best way to increase ROI without much work on my part, and I was able to defer $165,000 of capital gains taxes!"*

— **Steve and Sandy Miller, Hughes Capital Investors**



## How much will you save in taxes?

Many investors are surprised by their large tax bill when they go to sell their property. In less than 3 minutes, our easy online calculator will estimate how much you could save in taxes when you sell your property through a 1031 Exchange.

## www.1031Calculator.com

## Want to know more about **becoming a Secured Portfolio investor?** Let's get started!



**Call us** at 775-234-4001
**Email us** at Invest@HughesCapital.com
**Schedule a call or meeting** by visiting CallHughesCapital.com

Exhibit 8, Page 88

*For cash, IRA, and 401k investors who want to earn **8%+ net returns** in a **100% passive investment**.*

# Hughes Private Capital
## Buy and Hold Fund

-23-

Exhibit 8, Page 89

# Hughes Capital's
## Buy and Hold Fund



Hughes Private Capital's **Buy and Hold Real Estate Investment Fund** purchases residential real estate in select U.S. neighborhoods chosen for **long-term stability and profitability**.

The fund is structured to be **recession resistant,** producing the same predictable returns, month after month, <u>regardless of how the economy is performing</u>.

It is a **100% passive,** cash flow-based investment that produces **8%+ consistent net returns** for investors.  (Cash investors receive up to 1.4% more.)

## 8%+



Invest with a **direct cash investment** or with funds from your **IRA or 401(k).**  All investors receive the same benefits and are considered pro rata share members (meaning they own a proportionate share) of the fund.



Prefer an even more conservative approach? Be a **lender** to the Buy and Hold Fund and receive a fixed annualized interest rate of 5.5%.

## Lenders:
## 5.5%

-24-

Exhibit 8, Page 90



# Be an investor or lender in Hughes Capital's Buy and Hold Fund using cash, IRA, or 401(k)



Cash



IRA



401(k)

## Be an **INVESTOR** in the fund



8%+ Consistent Net Return


Receive a monthly dividend as income or reinvest to compound your return


Withdraw funds with a 90-day notice (no fees or penalties)


Own real estate in your portfolio with zero landlord hassles


Enjoy portfolio safety through diversification across hundreds of homes in the fund


Invest in recession-resistant assets that don't correlate with the ups and downs of our unpredictable economy


Benefit from a proven cash flow structure that doesn't rely on appreciation

Cash investors earn approximately **1.4% more** with their tax benefits from depreciation.

## Be a **LENDER** to the fund



5.5% Fixed Annualized Interest Rate


Be in priority position and get paid before equity investors receive their returns


Enjoy a greater level of safety — an appealing option for the more conservative investor

-25-



# How is being an <u>investor</u> different from being a <u>lender</u>?

## EQUITY
### Be an Investor



◄ **OWNERSHIP** ►

Investors own a pro rata equity share of the LLC

 **OR**

◄ **PAYMENTS** ►

Receive a monthly dividend as income

Reinvest to compound your money

Once the lenders are paid, all net profits are distributed to equity investors

◄ **DISTRIBUTION** ►

**8%+** consistent net return

Cash investors earn approximately **1.4% more** with their tax benefits from depreciation.

**GREATER POTENTIAL RETURNS**

## DEBT
### Be a Lender



Lenders are in 1st position, secured by real estate



Your monthly payment is fixed, and your position is more secure

Lenders are paid first to satisfy the terms of the loan

**5.5%** fixed annualized interest rate

**SECURED 1ST POSITION**

Exhibit 8, Page 92



**Be an Investor, Not a Landlord**
Buy and Hold Fund

# Buy and Hold Fund Frequently Asked Questions

## If I want to withdraw part or all of my money from the fund, how would that work?

With a simple 90-day notice, our investors are able to withdraw their funds at any time, free of fees or penalties.

## Can I receive a monthly income from my investment?

Yes, you may choose to take the monthly profit and have it direct deposited to your bank account. You may also elect to reinvest your monthly profits so they can compound.

## How much is the minimum investment?

The minimum investment is $25,000.

## How often do you report to investors or send out statements?

You will receive a quarterly Investor Update and a monthly Capital Statement. We communicate regularly with our investors and are always available to meet in person or take your calls.

## What makes Hughes Capital's Buy and Hold fund a 100% _passive_ investment?

There is nothing to "do" as a Hughes Capital investor other than read your monthly statement and receive your returns.

---



Be an Investor, **Not a Landlord**
Buy and Hold Fund

# Buy and Hold Fund Overview

## Where does the Hughes Capital Buy and Hold Fund purchase homes?

We currently purchase homes in: Akron/Canton, Cleveland, and Toledo, Ohio; Birmingham, Alabama; and St. Louis, Missouri.



## How does owning properties in different cities protect the portfolio's overall return?

Owning homes in different geographic locations is vitally important to diversifying and protecting the assets in the fund. If one city were to experience an economic challenge, such as a large employer leaving, diversifying with assets in other locations protects the portfolio's overall return.

## How much is the typical home price?

We purchase homes in the most affordable housing category within the core rental market where the typical home prices are **between $50,000 and $150,000.** We've found this price range to be the sweet spot for investing.

Exhibit 8, Page 94



**Be an Investor, Not a Landlord**
Buy and Hold Fund

## Why is this price range a benefit to investors?

Homes in this pricing band have high rent ratios, they fluctuate very little in value, and they tend to stay rented. Even in a market downturn, affordable housing remains stable and may experience an increase in demand as people are forced to downsize. Owning assets in this category provides tremendous safety for an investment.

The affordable housing category is a stable, profitable choice for investors.

Take a look at a few homes in our portfolio:


$60,388 — Toledo, OH


$116,537 — Birmingham, AL


$154,921 — Cleveland, OH


$94,700 — Birmingham, AL


$77,309 — Toledo, OH


$110,800 — Akron, OH


$93,639 — Cleveland, OH


$100,581 — Akron, OH


$63,950 — St. Louis, MO

Exhibit 8, Page 95



Be an Investor, **Not a Landlord**
Buy and Hold Fund

## How does this compare to homes that cost more?

Higher-priced homes tend to have poor margins, will lose value in a bad downturn, and are not always rentable.



**Affordable homes win in a market downturn.**

## What is the rent ratio, and why is it important?

The rent ratio is the monthly rent divided by the home's value. The average value of a home in our fund is about $86,000 and rents for about $950/month, producing a rent ratio of 1.1%. If you compare that with similar core rental market homes around most of the country, you can see that our Buy and Hold Fund home produces 2 times the ratio at about 200% higher. In many cities around the country, it is common for landlords to have a rent ratio of around .50% which is not going to produce the best return on investment.

|  | Average Home in the Fund | Similar Core Rental Market Home |
|---|---|---|
| Home Price | $86,000 | $335,000 |
| Rent | $950 | $1,800 |
| Rent Ratio | 1.1% | 0.54% |

Exhibit 8, Page 96



**Be an** Investor, **Not a Landlord**
Buy and Hold Fund

# Knowing Your Downside Risk: Stress Test

As with any investment, it's important to understand your downside risk and know how to preserve your principal during a downturn. We have built protections into the Buy and Hold Fund to make it as *recession-resistant* as possible.

Now that we've established the average rent on one of our Buy and Hold Fund homes, let's stress test the rent to see how a rent reduction would affect the fund's 8%+ net return.

Let's assume something drastic happened in the economy, and we had to reduce rents by 20%. (A 20% reduction in rent would take some extreme circumstances, so this makes it a powerful stress test!)

| Stress Test 20% Reduction in Rent | |
|---|---|
| 20% Reduced Rent | ~~$950~~ $760 |
| **Net Return** | **4.9%** |

Even with a 20% rent reduction, our home would still be producing a 4.9% net return. Could you live with a 4.9% return for a couple years if you had to? We have seen much worse investments!

Now, we're going to really push this stress test. Let's say a major manufacturer or employer left a region and things got so bad that residents started moving out in droves. Given this scenario, we're going to reduce rents by a whopping 40%.

| Stress Test 40% Reduction in Rent | |
|---|---|
| 40% Reduced Rent | ~~$950~~ $570 |
| **Net Return** | **2.6%** |

**Hughes Capital Investor Kit**
www.HughesCapital.com | (775) 234-4001 | Invest@HughesCapital.com                    -31-

Exhibit 8, Page 97



**Be an Investor, Not a Landlord**
Buy and Hold Fund

At a 40% reduction in rent, our home would still produce a positive cash flow of 2.6%. What's more, if a drop like this were to ever happen, most homes in traditional, more expensive rental markets would have probably lost a lot of their value, whereas, due to the nature of affordable homes, our properties will do a much better job of retaining their value.

## What else makes single-family affordable homes such a desirable investment?



☑ Since there is little-to-no value fluctuation within our pricing band, the **timing of the market (when to buy or sell) is not important.**

☑ There is no speculation on appreciation. Hughes Capital's fund is structured to produce returns based on cash flow, which is not speculative at all. This makes the assets even more resistant to a market downturn or recession.



By purchasing homes in **diverse geographic locations,** we are able to **limit your downside risk & protect your principal** in the unlikely event that rents were to drop significantly in one or two areas.



**Be an Investor, Not a Landlord**
Hughes Capital Buy and Hold Fund

# A Look Inside the Homes

**CLEVELAND**
2133 W. 101st St.

**BIRMINGHAM**
316 21st Ave. NE



Want to know more about
Hughes Capital's **Buy and
Hold Fund?** Let's talk!

**Phone:** (775) 234-4001
**Email:** Invest@HughesCapital.com
**Schedule a meeting:**
CallHughesCapital.com

-33-

Exhibit 8, Page 99

# About
# **Hughes Private Capital**

-34-

Exhibit 8, Page 100



**Be an Investor, Not a Landlord**
About Hughes Private Capital

# About Hughes Private Capital



Hughes Private Capital is a family-run, conservatively-managed, private real estate investment company based out of Reno, Nevada with properties and teams located across the country. We specialize in targeted niche markets that are not correlated with Wall Street or the market. Hughes Capital has over $100 million in assets under management and 1,280+ doors in our portfolio.

By rigorously stress-testing our investments and focusing on the preservation of principal, we are able to provide consistent net returns with low risk and low volatility.



### Our mission is to educate investors on the benefits of a diverse portfolio, including a strong asset allocation in real estate investments.

"I am appreciative of the deep and serious research that Steve Sixberry and Greg Hughes put into their investment strategies and operations before they offer them to investors. **Their approach is detailed and skeptical.** Only time will tell on performance and correlation. There is always risk in any investment, but I plan to stay invested."

— **Terry Oliver, Hughes Capital Investor**

---

**Hughes Capital Investor Kit**

www.HughesCapital.com | (775) 234-4001 | Invest@HughesCapital.com

Exhibit 8, Page 101



# Be an Investor, Not a Landlord
## About Hughes Private Capital

**Greg Hughes and Steve Sixberry are co-founders of Hughes Private Capital and co-managers of Hughes Capital's Buy and Hold Fund and the Secured Portfolio investment option.**

Together, they manage four investment options and run four operational companies.

Steve and Greg have a passion for teaching others about the value that non-traditional investments can bring to a portfolio, not to mention the positive effect it can have on one's quality of sleep!



**GREG HUGHES CEO**

When Greg was only 19, he made his first real estate investment: he bought three houses on a half-acre lot, living in one and renting the other two. After learning the value of a smart investment strategy, he partnered to build several commercial buildings from the ground up which he still owns and manages today.

Over the last ten years, Greg has raised more than $140 million and has profitably bought and sold over 1,600 properties in 22 states.

A real estate and investment author and finance strategist, Greg has been a regular guest on *Nevada Real Estate Radio, Money Watch Channel 2 News with Kristen Remington, The Morning Blend in Las Vegas,* and has been a speaker at the Small Balance Real Estate Summits. He is also a Trusted Advisor for Freedom Founders, which helps medical professionals invest in real estate to achieve financial freedom.

Greg was born and raised in Reno, NV, where he lives with Tanja, his wife of 31 years. They have four children: Kayla, 29, Hayden, 27, Tate, 24, and Dexter, 23. In his down time, Greg enjoys golf, tennis, pickleball, and snow skiing.

Exhibit 8, Page 102



# Be an Investor, Not a Landlord
## About Hughes Private Capital



## STEVE SIXBERRY
### COO

Steve spent more than 25 years in the wireless industry, which began in the US Air Force in beautiful Alaska. After returning to civilian life, he partnered in a small communications company and grew the business to span six western states before successfully selling the company to the major wireless carrier Sprint/Nextel.

Since entering the finance and real estate business, Steve has profitably bought, sold, managed, and financed more than $81 million in real estate assets.

Steve and Jill, his wife of 38 years, have two grown children. They have all called Northern Nevada "home" for the last 31 years.

A passionate archery hunter, hiker, and fly fisherman, Steve's love of outdoor activities keeps him quite busy. We don't mind, as he seems to have some of his best ideas out in the middle of nowhere.

## STACY SILVA
### Investor Relations Advisor

**Stacy manages all aspects of your investment account and is there to support you every step of the way.**

Before joining the Hughes Capital Investor Relations Team, Stacy had accumulated more than 15 years of experience across various industries in areas such as operations, executive client services, corporate account management, project and contract management and negotiation, and event planning.

As the San Francisco area rep for a global corporate travel company, Stacy routinely negotiated multi-million-dollar contracts with a client base that spanned the globe. She spent four years at Microsoft, supervising contractors and managing the internal recruiting team. Her ties with Microsoft

---

**Hughes Capital Investor Kit**
www.HughesCapital.com | (775) 234-4001 | Invest@HughesCapital.com                    -37-

Exhibit 8, Page 103



# Be an Investor, Not a Landlord
## About Hughes Private Capital

led her to relocate from Redmond, WA to Reno, NV, leading the infrastructure setup for Microsoft retail stores.

Stacy worked for Dale Carnegie professional training and is a graduate of all of the Dale Carnegie courses. She is a former president of BNI Northwest, in Bellevue, WA, and is a former board member of NCET in Reno, NV.

In her spare time, you might find Stacy on the golf course exercising her swing (and a little patience). If she's not there, she's probably off-roading in her Jeep or fishing and camping in the deep wilderness.



JIM DICKSON
Multifamily Acquisitions Director

**Jim Dickson runs the Multifamily Acquisitions Division at Hughes Capital** and routinely performs analysis to help with decision-making throughout the company as a whole. He has more than 10 years of experience in the real estate industry and has directly worked on over $1 billion in deal volume across a variety of property types and markets across the world.

Prior to Hughes Private Capital, Jim worked on acquisitions, development, and asset management in the multifamily space for Equity Residential in Seattle, WA. Prior to that, he spent time underwriting acquisitions and value-add execution across a variety of property types for Everest Holdings in Scottsdale, AZ.

Jim started his career working on international transactions for Colliers International in Santiago, Chile. Jim graduated from Indiana University's Kelley School of Business with a degree in Real Estate Finance. In his free time, he enjoys spending time with his family, hiking, reading, and playing the piano.

Exhibit 8, Page 104



# Be an Investor, Not a Landlord
## About Hughes Private Capital



**JESSICA SYKES**
Investor Relations Advisor

**Jessica manages all aspects of your investment account and is there to support you every step of the way.**

Jessica is a long-time member of the Hughes Private Capital team. In 2013, she was welcomed to the accounting department, not knowing that this team would become more like a family. She has since witnessed and enjoyed the challenges of change and growth surrounding the company. After working several years in accounting, which allowed her to gain a deep understanding of the technical side of the investments, Jessica has settled into her role on the Investor Relations team; she feels right at home building personal relationships with investors.

Jessica is a Reno native, but grew up across many western states. She eventually attended college in Chico, California, but returned to her roots in Nevada to help operate a family business. Soon after, she started her own family and developed two new businesses. It was then that she realized her passion for learning and growth — and all the multi-tasking and problem solving that comes along with it — which plays such a huge role in her position at Hughes Capital today.

When not working alongside some of her favorite people, she spends time with a team of her own: five children from 7 to 24, a son in law, and now one darling grandson — all of which she claims are her greatest accomplishments, by far.

---

Exhibit 8, Page 105



# Be an Investor, Not a Landlord
## About Hughes Private Capital



**KATIE
ROBINSON**
Investor
Relations
Admin

**In her Investor Relations Admin role, Katie helps with administrative tasks and investor communication.**

Born and raised in Alaska, Katie relocated to Reno in 2012. Since then, she has been gathering experience supporting CEOs, managers, and teams.

Her innate capacity for organization, and her love for strong and consistent communication, led Katie to Hughes Private Capital, where she uses these skills to assist the Investor Relations Team so they can do what they do best: serve our investors. Katie is excited to be part of such an innovative and rapidly growing business that still maintains such a deep, family feel.

When Katie isn't in the office, you can find her exploring more of the Reno area with her dog or spending time with her best friends and their kids.



Contact our Investor Relations Team at 775-234-4001 or
Invest@HughesCapital.com with any questions
or to get started with your investment.
You can also schedule a call online by visiting:
CallHughesCapital.com





**Be an Investor, Not a Landlord**
Investing with your IRA or 401(k)

# Using Your IRA or 401k to Invest With Hughes Capital

## Can I use my IRA or 401k for investments that are not the traditional stocks, bonds, or mutual funds?

Yes, in addition to traditional investments, you can also use your retirement account funds to invest in things like real estate, secured and unsecured notes, privately held stock, precious metals, Limited Liability Corporations (LLCs), private funds like Hughes Capital's Buy and Hold Fund, and Hughes Capital's Secured Portfolio option.

## Why is this a secret to so many people?

Unfortunately, most financial advisors don't tell their clients about it because investing in private funds takes dollars away from their managed accounts. Of course, not all financial advisors do this. The good ones who are looking out for their clients' best interests will tell clients about it, and to be fair, not all financial advisors even know about the option or understand how it works.

**It's a fact: many investors are uncomfortable with the stock market.** It's not the specific performance of the market as much as the overall feeling investors have about it. What investors are uncomfortable with — and rightly so — is what they're unable to control when investing in the market.

That is one of the reasons why people are very interested when they learn that they can hold other types of investments with their IRA and 401k.



*"Gaining greater monetary control and transparency has tremendous appeal for many investors — myself included. Since 2007, I have been using an IRA in this way for my personal investments; at Hughes Private Capital, we have made it part of our mission to share this opportunity with others."*

— **Greg Hughes, Hughes Private Capital CEO**



Be an Investor, Not a Landlord
Investing with your IRA or 401(k)

### If I wanted to invest in Hughes Capital's investment opportunities or another non-traditional investment, would I have to invest my entire IRA or 401k?

Nope, it's not all or nothing. You can leave part of it invested as you have it now and set aside a partial amount to diversify into something else.



### Let's say I wanted to invest all or part of my retirement account into a Hughes Capital investment. How would that work?

**To invest your IRA or 401k in something other than the stock market or mutual funds, you need to have a Self-Directed IRA (SDIRA) or Self-Directed 401k. A self-directed account gives _you_ the freedom to choose where you want the funds to be invested.**

Your retirement account must be placed with a custodian like Fidelity or Charles Schwab. However, not all custodians allow retirement accounts to invest in non-traditional investments like real estate, LLCs, notes, etc. Many custodians only allow you to invest in stocks, bonds, and mutual funds. Don't worry about becoming an expert in all of this and how it works. We can help you get set up with a custodian that allows you to make self-directed decisions with your retirement account into investments that are not tied to the stock or bond market, such as real estate.

## Prohibited Transactions and Disqualified Persons

**The one thing to watch out for in a self-directed account is the non-self-benefiting rule. You and your family members in a direct generational line up or down are considered "disqualified persons" and are not allowed to receive any form of compensation or benefit from the self-directed account or its assets.**

---

Exhibit 8, Page 108



# Be an Investor, Not a Landlord
## Investing with your IRA or 401(k)

This includes your spouse and any immediate family on both sides, such as parents, grandparents, children, and grandchildren. Only the self-directed account can benefit. It is, after all, in place to fund your retirement.



## What does "self-benefit" mean?

**First, think of your self-directed account as its own entity.** Any IRA or 401k income received must go *into* the account and any IRA or 401k expenses paid must come *out* of the account. Just like when you invest in the stock market, in order to put money in or take it out, you have to follow the rules. It works the same way with a self-directed account, but it's not as intuitive or clear-cut. This is best explained by using a couple of examples.

## Example #1

You have purchased a single-family rental home with your self-directed account, but it needs a few repairs and some landscaping before you can rent it out. You think this would be a perfect time to get your kid's lazy butt out there to teach him or her how to do some of these repairs and earn some spending money. **This would violate your self-directed account since a direct descendant can't be paid or benefit through the self-directed account.**

Exhibit 8, Page 109



**Be an Investor, Not a Landlord**
Investing with your IRA or 401(k)

## Example #2

You decide that the best place to buy a rental home is your favorite vacation spot. It would be great because you could rent it out, and when it wasn't being used, you and your family could use it. **Again, this would violate your self-directed account since you would benefit from it.**

There are many ways to purposely or accidentally violate your SDIRA or self-directed 401k account — especially when investing in real estate on your own. The easiest (and perhaps safest) way to invest your self-directed account is with a private investment like Hughes Capital's Buy and Hold Fund or Secured Portfolio option. It eliminates most (if not all) of the problems that could threaten your self-directed account's tax-deferred or tax-exempt status. Since it is fully managed by someone other than you or your direct descendants, you stay completely out of the mix, so the IRS can never claim that you were self-benefiting.

This is not to say that you can't do it on your own. Many people manage their self-directed accounts successfully. Just go in with your eyes open and make sure you understand all the rules before starting the process.

*Note: We are not retirement account custodians. We can help guide and assist you in getting your account set up, but it can only be finalized by your custodian. There are many companies that act as custodians; we're happy to share our experiences and recommendations with you.*



**Still have questions?**
**We're all about it!**
Phone: (775) 234-4001
Email: Invest@HughesCapital.com
Schedule a meeting:
CallHughesCapital.com

Exhibit 8, Page 110



**Be an Investor, Not a Landlord**
About Hughes Private Capital

# Hughes Private Capital's Investing Principles

At Hughes Private Capital, we use two simple, proven investing principles to protect and strengthen your investment portfolio.

## Hughes Investing Principle #1:
## Preservation of Principal

There's absolutely nothing more important than protecting your hard-earned money.  If you lose part or all of your principal in any investment, it takes way too much time and risk to rebuild it, assuming it is even possible.

The preservation of principal is one of the most effective ways to build wealth.  The best game plan is to avoid volatility — the ups and downs — as much as possible, as volatility can have a devastating effect on your portfolio's overall return.



**Two rules of investing:**
**1) Never lose money.**
**2) Never forget rule #1.**
— **Warren Buffett**

"Even worse than the financial effects are the effects you can encounter on a personal level.  I know, because I've been there.  In 2002, I lost $250,000 on a personal investment before I founded Hughes Private Capital.  It was an extremely gut-wrenching experience that I never want to have again and that we never want our investors to experience.  In fact, that painful lesson is one of the reasons that protecting our investors' principal is so important to us.  It is one thing if an investment doesn't perform up to expectations, but losing your principal should be avoided at all costs." — **Greg Hughes, CEO, Hughes Private Capital**

---

**Hughes Capital Investor Kit**

www.HughesCapital.com | (775) 234-4001 | Invest@HughesCapital.com                    -45-

Exhibit 8, Page 111



## Be an Investor, Not a Landlord
About Hughes Private Capital

## Hughes Investing Principle #2:
## Consistent Return on Investment

After we have preserved your principal, the next step is to achieve the most consistent returns possible. All of our investment opportunities do this by using a proven cash flow model which allows our investors to earn consistent net returns month after month, without having to worry about the whims of the market.

*"I opted for the monthly distribution of my earnings, and the funds have shown up like clockwork from the very first month." — **Elliot Epstein, Hughes Capital Investor***

**Our cash flow model creates consistent net returns, month after month**



As far as we are concerned, betting on appreciation is like gambling. It's all speculation, since you never know: 1) How much appreciation, if any, will occur, 2) When it will happen, and 3) Whether it will be at a time when you want or need to sell.

Our goal is not to produce massive returns by gambling with our investors' money, but rather to achieve consistency with little or no volatility.

**Appreciation = Gambling**



*"I never look for a killing on my money but a nice return with what I consider low risk. So far, so good. In fact, better!" — **Bob Christensen, Hughes Capital Investor***

---



# The Hazards of Volatility and the Power of Consistent Returns

It is no accident that the term "volatility" makes multiple appearances while defining our two investing principles.  This is because volatility is a crucial concept to understand, as it greatly affects your return on investment.  **If you want to build your wealth quickly and safely (with "safely" being the more important of the two!), you'll want to avoid volatility as much as possible.**

**This chart shows us how <u>devastating</u> volatility can be to your portfolio!**



If you invested $100,000 at a consistent 10% return, you could double your money in about seven years.  However, if that investment were to take a 25% loss in value the first year, <u>you would need to achieve a 17.8% return for the next six years in a row to double your money</u> — a feat that would be difficult to pull off.

**Especially if you're an older investor and don't have time to play "catch up," are you willing to risk everything in volatile investments like the stock market?**
One of the reasons it requires such a large return to double your initial investment

---

**Hughes Capital Investor Kit**



Be an Investor, Not a Landlord
About Hughes Private Capital

over the next six years is that your $100,000 investment has a remaining value of only $75,000. Not only do you have to play "catch up," but you have to do it with far less money.

Here's one more example. Let's look at the performance of the S&P 500 over a period of 42 years. You can see the volatility year after year. Even so, the average return has been a respectable 10.09%.

## S&P Index Fund Volatility 42 Years



10.09% average annualized return

If you were to have invested $100,000 into the S&P 500 index fund in 1975, it would be worth $3.8 million by 2017. That's not bad, but what you don't see is what is lurking below the surface of all that volatility.

Let's look at the same time period of 42 years, but imagine you found an investment with a consistent return of 10%. What would it look like without all that volatility?

---

**Hughes Capital Investor Kit**

www.HughesCapital.com | (775) 234-4001 | Invest@HughesCapital.com                    -48-



# Be an Investor, Not a Landlord
## About Hughes Private Capital

You might be surprised to find that, even though the average annualized returns are almost identical, the same $100,000 investment with consistent returns and no volatility becomes $6 million.



# The Power of Consistent Returns

By putting your money in an investment with a consistent 10% return and little to no volatility, you would have $2.2 million more in your account 42 years later. A consistent return with no volatility is the clear winner.



Higher returns look good on paper, but as you can see, all the volatility kills them over time because they have to make up more ground every time they take a loss. On the other hand, investments with consistent returns never lose ground and keep chugging right along. Does it remind you of the tortoise and the hare?



# Be an Investor, Not a Landlord
## About Hughes Private Capital

**All of Hughes Capital's investment opportunities offer investors consistent net returns, month after month, with no worry of volatility.**

**What about risk, and how does that relate to volatility?**

People often refer to *volatility* and *risk* as being synonymous; they are not.  Volatility is more about the ups and downs of an investment, while risk is all about the timing.  This refers to the timing of the <u>purchase</u>, but even more so, the timing of the <u>sale</u>, because that is where your risk comes in.

Any time you are required to sell an investment, the risk increases because the timing of the sale might not be optimal.  If you become forced to sell in a down-cycle, it will usually result in a loss of profits, or worse yet, principal.  You may think that you'll be able to control when you need to sell, but things like needing to care for an elderly parent, hefty medical bills, or other situations that require a sudden need for capital can come up unexpectedly.

One way to limit your risk is by choosing investments that don't require a lot of timing on either end.  (This usually means an investment with low volatility.)  A 10-year treasury bond would be a good example of this type of investment, as it has minimal volatility, but it also has a low return on investment, which is not ideal.  **Investments with low volatility and higher net returns are not easy to find, but our Buy and Hold Fund and Secured Portfolio investment options solve this dilemma for investors.**



## Still have questions?
## We're all about it!

**Phone:** (775) 234-4001
**Email:** Invest@HughesCapital.com
**Schedule a meeting:**
<u>CallHughesCapital.com</u>

**Hughes Capital Investor Kit**

Exhibit 8, Page 116

*We know, everyone tells us it sounds too good to be true. Don't just take our word for it. Hear directly from our family of investors about how our investments have performed for them.*

# Hughes Private Capital
# **Testimonials**



Be an Investor, Not a Landlord
Testimonials

# Hear what some of our investors have to say:



"At 55 years of age, I have spent a good deal of my life doing the typical investing: the routine 401K, standard retirement plans, and, of course, the volatile stock market.  As with anybody interested in seeing their money grow, parking it in the bank was no longer an option, since bank interest has become a joke for what seems like an eternity now. I needed something a little more aggressive, but wanted to invest in an area where I had some knowledge, and that was real estate.  **Having a business to run, I just didn't have time to research the buying and selling of homes**.  That is when a friend told me about Hughes Capital.  Since they specialize in buying homes, I figured, **"let them do the work that I don't have time to research."**  I started with Hughes over five years ago. They are a good group of people who send out a monthly newsletter that keeps you abreast of what they are doing with your money.  **There is no nonsense, no hype**.  They just tell you like it is — what went right and what may have gone wrong, over the prior quarter.  I opted for the monthly distribution of my earnings, and **the funds have showed up like clockwork from the very first month**.  When you have any questions, unlike most of society today, **these folks return your phone calls**.  **If you're looking for a place to invest your hard-earned money, I recommend Hughes Capital."**

— *Elliot Epstein*

Exhibit 8, Page 118



# Be an Investor, Not a Landlord
## Testimonials



"All investments have risk and require due diligence. I attended one of the live seminars hosted by Hughes and then proceeded to have numerous meetings and one-on-one conversations with Greg and "Six Pack" Steve (as I like to refer to him). They explained the nuts and bolts of the Secured Portfolio option, and all their answers to my questions were **direct and transparent**. I really appreciated the **honest discussions** and how their team made the 1031 Exchange process simple and seamless.

I am very pleased that I found a way to exchange my California investment property through a 1031 Exchange tax deferral program that requires **no landlord responsibilities** on my part, and provides a **HIGHER monthly net return** than I was previously earning.

California has a voracious appetite for collecting every dollar they can get from your real estate transactions. Between the massive 10% they steal from your sale proceeds and the $105 annual "rental inspection program" city-specific fee, it seems like every time I turn the corner, California is nickel and diming me for owning real estate. Doing a 1031 Exchange through Hughes Capital allowed me to **avoid paying taxes on the sale of my property and forget about all those fees that really add up in the end**.

Since Hughes Capital pays for all expenses associated with my properties, **I'm finally able to plan for the future** without having to factor in possible rent loss, unforeseen repairs, or normal upkeep. **The only thing I have to do now is deposit my check from my Set Monthly Income, which nets a higher return** than what I was previously earning."

— *Ken Koeppe*

---

**Hughes Capital Investor Kit**

www.HughesCapital.com | (775) 234-4001 | Invest@HughesCapital.com                    -53-

Exhibit 8, Page 119



# Be an Investor, Not a Landlord
## Testimonials



"I'm REALLY happy that I'm in the Hughes Capital Buy and Hold Fund.
**My stocks recently took a deep dive due to COVID-19, but my investment with Hughes Capital just kept cruising along**! Thank you, thank you, thank you!

Before investing, I was only making about 4% to 5% on my two rental properties in Reno. **While they had huge capital appreciation over the years, I could not raise the rent enough to take advantage of that**. This was partly due to the rental market in Reno and partly due to the fact that when you have good renters you want to keep them, not punish them! A 1031 Exchange with Hughes Capital was the best way to increase ROI without much work on my part, and **I was able to defer $165,000 of capital gains taxes**! Our master plan is to keep our investment with Hughes Capital until we pass on and leave it to our children through our estate. By doing this, our children can inherit the properties tax-free at the current market value, and they will be very well taken care of.

My wife and I spent a lot of time managing our own properties. It wasn't overbearing in general, but it was still a drag on our time and a constant worry that something would go wrong. **You know there will be expenses coming, things breaking, tenants misbehaving — and it always hangs over your head and sits in the back of your mind**. Not healthy. Now I don't even have to think about it. Worry free works for me!

The first 1031 Exchange I completed was quite an exercise — and rather stressful and expensive — mostly because Hughes was just starting out and finding the right employees, partners, and servicers. But the Hughes Capital crew was at our side every step of the way. **If I had questions Stacy could not answer, I could talk to Steve or Greg directly. Try that with any other fund**! The second 1031 Exchange went much smoother. I would do it again. Bottom line advice to others: just let the Hughes team lead you through it, and life will be fine!

**Hughes Capital Investor Kit**

www.HughesCapital.com | (775) 234-4001 | Invest@HughesCapital.com                    -54-

Exhibit 8, Page 120



# Be an Investor, Not a Landlord
## Testimonials

I spent a lot of time researching Hughes Private Capital, Greg and Steve, and everything I could find related to the company, current and past. I attended the seminars and drank their wine. I talked to them personally. I found a few friends that grew up locally and knew Greg when he was younger, and they vouched for him as an honest and respected person. <u>I really like that Hughes is local; it seems much safer and more personal that way</u>, but something like this is still scary when you are talking huge sums of money and a good chunk of your retirement nest egg. So, I dipped my toe in first by investing some cash into the Buy and Hold Fund to see how that went and found that worked nicely. Next, I 1031'd one property to see how that went. Then I did my second property. All done now, mission accomplished. **I have steady monthly income at a very good rate, and I don't do anything but smile."**

— *Steve and Sandy Miller*



"My husband and I have been very pleased so far. <u>Our monthly income has improved, and we no longer have to deal with any landlord hassles</u>. **The 1031 Exchange process itself was relatively easy and fast**. The investment property we exchanged was an old house that required a lot of maintenance, which ate up the majority of our income. After investing, <u>it's so nice to receive a check every month without worrying about how much money to set aside for mold, termites, and dry rot damage</u> – in addition to regular maintenance. **We are definitely coming out ahead!"**

— *Barbara and Kevin Artero*

Exhibit 8, Page 121



## Be an Investor, **Not a Landlord**
### Testimonials



**"We've had a very positive experience so far with our Secured Portfolio.**

We owned a rental property in Reno that brought in $1,200 a month in rental income, but the money we put in our pocket at the end of the day was always less than that after paying the annual property tax, sewer, and garbage. We also had to pay for and handle repairs and maintenance — we even mowed the lawn weekly to ensure the property was well maintained. **Through the Hughes Capital 1031 Exchange on that property, we now earn $1,865 per month in completely passive rental income**.

I guess our biggest compliment would be that after we cautiously went through the 1031 Exchange process and made our first investment with Hughes Capital, we now plan to invest additional funds with Hughes Capital in the future. By nature, I am a somewhat conservative investor, but we still invest in the stock market through index funds and bond portfolios — and will continue to do so. Our **Secured Portfolio investments through Hughes Capital complement our other investments and provide a desired level of stability to our overall portfolio**.

Although I did not know Greg Hughes well before we invested, I had interacted with him through our mutual business interests 20+ years ago, and he always struck me as hard-working and ethical. That was probably one of the main things that prompted us to take a chance with Hughes Capital. That, and the fact that **real estate is a fairly reliable and tangible investment**."

— *Ryan and Shonee Hansen*

Exhibit 8, Page 122



# Be an Investor, **Not a Landlord**
## Testimonials



"We did a 1031 Exchange on our condo and <u>it was a very smooth and easy transition to invest in Hughes Capital</u> from there.

**We went from making $1,200 per year on a condo to $1,200 per MONTH, while also eliminating the hassles of being a landlord.**

This is great "mailbox money." The process was simple, and the investment has been rewarding."

— *Buzz and Caroline Harris*

"The value proposition for investing in Hughes Capital goes beyond the high rate of return — **the investments have very little correlation with the stock market**. As an investor, it has been difficult to find opportunities that do not follow the ebbs and flows of stocks. <u>Hedge funds are proving to be expensive, currently underperforming and not as "alternative" as one would like</u>. Hughes Capital's investments look to be uncorrelated to the stock market.

I am also appreciative of the deep and serious <u>research that Steve Sixberry and Greg Hughes put into their investment strategies and operations</u> before they offer them to investors. **Their approach is detailed and skeptical**. Only time will tell on performance and correlation. There is always risk in any investment, but I plan to stay invested.

<u>Please do your own research and consider your financial situation, goals and risk tolerance before any investment</u>."

— *Terry Oliver*



## Be an Investor, Not a Landlord
### Testimonials



"I have known Greg for over 15 years, and have worked with him on several businesses. I was one of the first investors on board because I know how smart he is! True to form, **I have more than doubled my money** since investing about 10 years ago. I get monthly reports on the growth of my investment and can communicate by phone or email with Greg or Steve. **They have the highest integrity and run their investments with complete visibility**. I highly recommend investing in Hughes Capital. It's the best investment decision I have ever made."

— *Alice Heiman*

"My wife and I purchased two rental properties about 20 years ago. During that period, it took a lot of time — and quite a bit of money — to keep them rented. Then I heard about Hughes Capital. It sounded too good to be true, but what could we lose by looking into it? Greg was buying dinner, so we went and listened intently. I kept hearing one thing: **it all revolved around preserving principal while still providing a better than average return**. We sat down with Greg one more time, then sold one of our rentals and completed a 1031 Exchange to invest with Hughes Capital. The first year wasn't without a few changes; the company was growing and with each change our investment became more secure. After the first year, we sold our second rental and invested the sale proceeds with Greg as well. Each time **we more than doubled our net profit**, and that is on top of what we were able to save in taxes through the 1031 Exchange. Now we have the freedom to leave town without the possibility of renter emergencies. This unique investment answers the questions and fills all the voids for landlords. **It has become my number one investment recommendation to family and friends**. We feel better about the next 20 years than we did before."

— *Mike and Analisa Jones*

Exhibit 8, Page 124



# Be an Investor, Not a Landlord
## Testimonials



"I want to thank Greg for the **great returns on my investment**. I have known Greg Hughes for 30 plus years, and I have always watched him perform with **integrity**, which is why **I trust him with my money**. I never look for a killing on my money. Instead, I look for a nice return with what I consider low risk. So far, so good – in fact, better! Thanks for the opportunity to take advantage of **this once in a lifetime market**. Greg seems to have knack at finding the great real estate deals."

— *Bob Christensen*



"After only a few minutes of listening to Greg and Steve share their approach to investing in real estate, I wanted to be part of what they were doing, so I immediately committed to investing $200,000 in their fund. **After having spent more than 50 years in real estate, I quickly recognized this as a great win-win investment**. I read Greg's book, *Excess Returns*, which I shared with my sons and others because he really lays out his investment program in a simple to understand way. I enjoy the weekly blogs that Greg writes, and **my investment has gone just as the boys said it would**."

— *William Martin*

Exhibit 8, Page 125



# Be an Investor, Not a Landlord
## Testimonials

"I met Greg Hughes over 14 years ago when we were on the Reno Junior Achievement Board of Directors. In 2011, I made my first of a number of investments with Hughes Private Capital, and more recently, my business partner and I provided capital for business expansion. I am pleased that several of my investments have matured and have done well. **In addition to a solid financial return, Greg's company has always operated in a very professional manner. Reports are timely and payments are always made when due.**"

— *Tom Baker*

"We have known Greg and Steve since 2012. We began investing with them in 2016 and have since invested in four other Hughes Capital investment options. Over the past year, we have gotten to know the rest of the team as well and have nothing but great things to say. **Communication is the key to a long-lasting relationship, and the team at Hughes Private Capital always does what they say they are going to do. We are quite happy with our returns and look forward to continuing our fruitful partnership with the Hughes Team.**"

— *Cliff and Joan Hartwell*

"Hughes Capital has opened up **great opportunities for investors like me who do not conform to traditional investing.** I have grown very fond of your team and appreciate your true professionalism and transparency — something you don't see very often in the world of traditional investing."



— *Sami Zamzam*

"**These guys know what they're doing! I trust Hughes Capital implicitly to manage my investments.** They seem to have a knack for finding and capitalizing on niche investment markets, plus **they have clear strategies that really make sense to me.** That's refreshing."

— *Tim Tucker*

---

**Hughes Capital Investor Kit**



# Be an Investor, Not a Landlord
## Testimonials



"I have land, I have real estate, I have some money in the stock market, and I recently invested in your Buy and Hold Fund. What I really like about it is that you've found a niche that is too small for the big players to really want to look at. You've created a real win-win in my opinion where you're really helping the economy, and you're helping people. **I believe in what you are doing**. I think it is a very clever and smart thing you've created. **And so that is why I've invested in it, and I'll probably continue to put more money in as time goes on**. You get reasonable returns, and as an investor I'm looking for risk (How much risk do I have? What are my returns?) and liquidity, quite frankly. Things come up in life. You might have big bills that come out of left field, and all of the sudden money that you had invested you need to pull out of investments. If it's not a liquid investment and you have to sell it immediately, you'll take a [loss] on it.... You've really thought it out quite well and I applaud you for that. **I think it's going to be very successful**."

— *Steve Mestre*

"**I applaud Greg and Steve for doing business in such a personable way. That is something you just can't get from Wall Street. They're available by phone or email and constantly give me updates and reports so I am never left in the dark**. I have access to any information I want so that I feel comfortable with my investments. After having had a frustrating experience with a fund manager I was never able to get ahold of, I fully appreciate the hard work Greg and Steve put into communicating with their investors. I look forward to watching my investment grow with Hughes Capital."

— *Dennis Dagoff*

Exhibit 8, Page 127

# Exhibit 9

## ENTITY INFORMATION

### ENTITY INFORMATION

**Entity Name:**

HUGHBERRY HOMES LLC

**Entity Number:**

E22602722022-5

**Entity Type:**

Domestic Limited-Liability Company (86)

**Entity Status:**

Active

**Formation Date:**

04/19/2022

**NV Business ID:**

NV20222428566

**Termination Date:**

**Annual Report Due Date:**

4/30/2024

**Compliance Hold:**

**Series LLC:**

☐    **Restricted LLC:**    ☐

### REGISTERED AGENT INFORMATION

Exhibit 9, Page 128

**Name of Individual or Legal Entity:**

Hughes Private Capital LLC

**Status:**

Active

**CRA Agent Entity Type:**

**Registered Agent Type:**

Non-Commercial Registered Agent

**NV Business ID:**

**Office or Position:**

**Jurisdiction:**

**Street Address:**

5440 Louie Ln., Ste. 106, Reno, NV, 89511, USA

**Mailing Address:**

**Individual with Authority to Act:**

**Fictitious Website or Domain Name:**

## OFFICER INFORMATION

☐ **VIEW HISTORICAL DATA**

| Title | Name | Address | Last Updated | Status |
|---|---|---|---|---|
| Manager | HPCM Corporation | 5440 Louie Lane, Suite 106, Reno, NV, 89511, USA | 04/30/2023 | Active |

Page 1 of 1, records 1 to 1 of 1

Filing History        Name History        Mergers/Conversions

Return to Search        Return to Results

Exhibit 9, Page 129

# Exhibit 10

## ENTITY INFORMATION

### ENTITY INFORMATION

**Entity Name:**

VISTA FUND, LLC

**Entity Number:**

E0208552017-8

**Entity Type:**

Domestic Limited-Liability Company (86)

**Entity Status:**

Active

**Formation Date:**

05/01/2017

**NV Business ID:**

NV20171281009

**Termination Date:**

**Annual Report Due Date:**

5/31/2024

**Compliance Hold:**

**Series LLC:**

☐    **Restricted LLC:**    ☐

### REGISTERED AGENT INFORMATION

**Name of Individual or Legal Entity:**

HUGHES PRIVATE CAPITAL

**Status:**

Active

**CRA Agent Entity Type:**

**Registered Agent Type:**

Non-Commercial Registered Agent

**NV Business ID:**

**Office or Position:**

**Jurisdiction:**

**Street Address:**

5440 LOUIE LANE STE 106, RENO, NV, 89511, USA

**Mailing Address:**

**Individual with Authority to Act:**

**Fictitious Website or Domain Name:**

## OFFICER INFORMATION

☐ **VIEW HISTORICAL DATA**

| Title | Name | Address | Last Updated | Status |
|-------|------|---------|--------------|--------|
| Manager | HPCM Corporation | 5440 LOUIE LANE, SUITE 106, Reno, NV, 89511, USA | 07/12/2023 | Active |

Page 1 of 1, records 1 to 1 of 1

Filing History        Name History        Mergers/Conversions

Exhibit 10, Page 131

Return to Search      Return to Results

# Exhibit 11

## ENTITY INFORMATION

### ENTITY INFORMATION

**Entity Name:**

KRCH REALTY, LLC.

**Entity Number:**

E0482392005-6

**Entity Type:**

Domestic Limited-Liability Company (86)

**Entity Status:**

Active

**Formation Date:**

07/15/2005

**NV Business ID:**

NV20051423647

**Termination Date:**

**Annual Report Due Date:**

7/31/2024

**Compliance Hold:**

**Series LLC:**

☐ **Restricted LLC:** ☐

### REGISTERED AGENT INFORMATION

**Name of Individual or Legal Entity:**

HUGHES PRIVATE CAPITAL

**Status:**

Active

**CRA Agent Entity Type:**

**Registered Agent Type:**

Non-Commercial Registered Agent

**NV Business ID:**

**Office or Position:**

**Jurisdiction:**

**Street Address:**

5440 LOUIE LANE STE 106, RENO, NV, 89511, USA

**Mailing Address:**

**Individual with Authority to Act:**

**Fictitious Website or Domain Name:**

## OFFICER INFORMATION

☐ **VIEW HISTORICAL DATA**

| Title | Name | Address | Last Updated | Status |
|---|---|---|---|---|
| Manager | HPCM Corp | 500 Westover Dr #37070, Sanford, NC, 27330, USA | 12/12/2023 | Active |

Page 1 of 1, records 1 to 1 of 1

Filing History        Name History        Mergers/Conversions

Return to Search        Return to Results

Exhibit 11, Page 134

# Exhibit 12

## ENTITY INFORMATION

### ENTITY INFORMATION

**Entity Name:**

12B RESIDENTIAL

**Entity Number:**

E29619302023-9

**Entity Type:**

Domestic Corporation (78)

**Entity Status:**

Active

**Formation Date:**

02/17/2023

**NV Business ID:**

NV20232702032

**Termination Date:**

**Annual Report Due Date:**

2/29/2024

**Compliance Hold:**

### REGISTERED AGENT INFORMATION

**Name of Individual or Legal Entity:**

HOY CHRISSINGER KIMMEL VALLAS PC

**Status:**

Active

**CRA Agent Entity Type:**

**Registered Agent Type:**

Commercial Registered Agent

**NV Business ID:**

NV20161507226

**Office or Position:**

**Jurisdiction:**

NEVADA

**Street Address:**

50 W LIBERTY ST STE 840, RENO, NV, 89501, USA

**Mailing Address:**

**Individual with Authority to Act:**

THEODORE E CHRISSINGER

**Fictitious Website or Domain Name:**

**OFFICER INFORMATION**

☑ **VIEW HISTORICAL DATA**

| Title | Name | Address | Last Updated | Status |
|---|---|---|---|---|
| Secretary | Adrian Maravilla | 5905 S Virginia, Suite 201, Reno, NV, 89502, USA | 10/03/2023 | Active |
| Treasurer | Christopher Capurro | 5905 S Virginia, Suite 201, Reno, NV, 89502, USA | 10/03/2023 | Active |
| Director | Aaron Noe | 5905 S Virginia, Suite 201, Reno, NV, 89502, USA | 10/03/2023 | Active |
| President | Aaron Noe | 5440 Louie Lane, Suite 106, Reno, NV, 89511, USA | 02/17/2023 | InActive |
| President | Andrew Palmer | 5440 Louie Lane, Suite 106, Reno, NV, 89511, USA | 04/11/2023 | InActive |

Exhibit 12, Page 136

< Previous   ...   1  2  ...   Next >   Page 1 of 2, records 1 to 5 of 9            Go to Page

**CURRENT SHARES**

| Class/Series | Type | Share Number | Value |
|---|---|---|---|
| | Common | 1,000 | 1.0 |
| | Authorized | 1,000 | 1.00 |

**Page 1 of 1, records 1 to 2 of 2**

Number of No Par Value Shares:

**0**

Total Authorized Capital:

**2,000**

Filing History      Name History      Mergers/Conversions

Return to Search      Return to Results

# Exhibit 13

DocuSign Envelope ID: 74CE2E89-2BF3-4309-953B-7021E6CE1B94

## STOCK SUBSCRIPTION AGREEMENT FOR

## 12B RESIDENTIAL, A NEVADA CORPORATION

GUARDIAN FUND, LLC, a Nevada limited liability company (the "Subscriber"), desires to become a new stockholder of 12 B RESIDENTIAL, a Nevada corporation (the "Company"), by purchasing TWO HUNDRED TWENTY-FIVE (225) of the authorized shares of common stock of the Company in exchange for the payment of ONE MILLION FIVE HUNDRED THOUSAND and 00/100 Dollars (US$1,500,000.00) (the "Purchase Price") subject to the terms of the Bylaws of the Company currently in effect. The Company will issue the shares to Subscriber upon execution of this Agreement by Subscriber and the Company and Subscriber's payment in full of the Purchase Price.

The Subscriber, by executing this Subscription Agreement, acknowledges and understands that investing in the Company involves a high degree of risk, including the risk of losing all or a substantial portion of the Subscriber's investment. The Subscriber represents that it, through its advisers and other authorized persons, has the financial and business knowledge and experience necessary to capably evaluate the risks and merits of this investment, and has had an opportunity to ask any questions, review any documents, undertake any due diligence it deems necessary, and obtain any additional information desired concerning the Company prior to entering into this Subscription Agreement. The Subscriber also acknowledges and understands that no federal or state agency has made any determination as to the fairness of the investment or has recommended it. Both parties have undertaken independent investigation and determined that the stock being sold by Company and purchased by Subscriber is exempt from registration pursuant to NRS §90.530(11).

The Subscriber has reviewed the existing Articles of Incorporation and Bylaws and knows and understands the terms of those documents. By executing this Subscription Agreement, the Subscriber subscribes to and joins in those documents and agrees to execute, abide by and be subject to all terms and provisions of the Bylaws, and agrees that its shares are subject to the provisions of the Bylaws.

If the Subscriber breaches this Subscription Agreement, the Company may, in its sole discretion, terminate its obligation to sell the shares effective ten (10) days after the date on which the Company sends written notification to the Subscriber of that breach if not cured within that time.

The Subscriber acknowledges and understands that, upon execution by both parties, this Subscription Agreement becomes effective.

**SUBSCRIBER:**

GUARDIAN FUND, LLC, a Nevada limited liability company

Dated: ___Apil  11_____ 2023

By: _____

Print Name: __Steve Sixberry___

Title: __Manager__

Hughes Private Capital, Inc., its Manager

**COMPANY:**

12B RESIDENTIAL, a Nevada corporation

Dated: __4/11/2023 | 5:57:50 PM PDT___ 2023

DocuSigned by:

By: _andrew Palmer_____

Andrew Palmer, Director

Exhibit 13, Page 138

# Exhibit 14



# Welcome

May 24, 2023



1. Property Management Overview

2. Leadership and Team Structure

3. Services Provided

4. Closing Thoughts



# New Management Structure





**Guardian Fund**



**Fund Manager
Aaron Noe
El Monte Capital**



12B RESIDENTIAL

- Guardian Estate representative
- Evaluate and execute restructure alternatives
- Assist Counsel with Bankruptcy matters
- Oversee all activities on behalf of debtor in connection with financial affairs

- Owned by Guardian Fund
- Property management, leasing, maintenance and rent collection
- Asset Management – pay all bills, oversee insurance, fund accounting, manage debt
- Customer & tenant service



12B RESIDENTIAL

Exhibit 14, Page 141



## Prior Servicer

- Unknown property condition
- Property performance metrics not accurate or published
- Properties sold with extensive markups
- Co-mingling of investments
- Non-standard accounting
- Unaudited financials

## 12B Residential

- Visibility to property condition
- Visibility to true property performance metrics
- Property acquisition and disposition at industry standard fees
- Segregation of investments
- Professional, transparent accounting
- Financials to be audited



Exhibit 14, Page 142







**Andrew Palmer**
Chief Financial Officer

**Adrian Maravilla**
President of Property Operations

Mr. Palmer serves as the Chief Financial Officer for 12B Residential and is responsible for all financial, capital and accounting matters.

Mr. Palmer brings over 25 years of finance and accounting experience to 12B Residential. He spent much of his early career in the tech space working with industry leaders Microsoft and Hewlett-Packard.

More recently, Andrew has been scaling high-growth middle-market companies.

Mr. Maravilla serves as the President of Property Operations for 12B Residential and is responsible for directing property and resident operations.

Prior to joining 12B Residential Mr. Maravilla served as Vice President of Operations at Strategic Property Management. At Strategic, Adrian was responsible for a single-family portfolio valued at over $700 million.

**12B RESIDENTIAL**

Exhibit 14, Page 144

## Patrick Klinge
### Director of Property Management

## Kendall Stieber
### Director of Asset Management

Mr. Klinge serves as the Director of Property Management and is responsible for managing all property management activities and market field teams.

Patrick Klinge is a highly skilled property management professional with a strong track record of success in the field. With over 12 years extensive experience and a deep understanding of property management principles.

Mrs. Stieber serves as the Director of Asset Management and Compliance for 12B Residential and is responsible for asset, vendor, and real estate management as well as corporate compliance.

Kendall brings over 15 years of strategic business development, organizational leadership and compliance experience.



## Jason Morris
### Director of Construction

## Nate Edwards
### Director of Investor Relations

Mr. Morris serves as the Director of Construction for 12B Residential and is responsible for all Construction Budgets and Renovation matters.

Mr. Morris brings over 20 years of Residential Construction experience to 12B Residential. He has Worked with Company's Managing Budgets, Major rehabs, Turns, and Maintenance as both Employee and Contractor

Mr. Edwards serves as the Director of Investor Relations. He is responsible for investor communications and providing investment solutions.

Mr. Edwards has multiple years of experience in financial advising, private investment services, and personal banking.



## Property Management

- Leasing, rent roll optimization and growth, resident retention, rent collection
- Property management fee  collected rent; other fees: leasing 1 month rent, lease renewals, turns
- Routine property maintenance oversight fee per repair

## Asset Management

- Fund accounting: investor statements, distributions, K1 creation, insurance mgmt., property tax mgmt., loan management
- Reserve study: replacement reserve accounting
- Asset management fee monthly per property

## Acquisition & Disposition

- Best cities; census growth regions, tech sector hiring, low home ownership affordability
- Exit strategy: portfolio review and optimization, market data

## Construction

- Initial rehab and turns
- National vendor accounts, vendor management and oversight



# Services Offered



12 B RESIDENTIAL

Exhibit 14, Page 147



Property Management
Your Assets, Our Expertise.

12 B RESIDENTIAL

Exhibit 14, Page 148

## Our Team and Markets

6 Skilled Property Managers  ante team operating in 4 competitive markets (Toledo, Cleveland, St. Louis, and Birmingham)

## Structural Efficiency

Comprehensive property management teams, each including:
- Property Manager for strategic oversight
- Maintenance Technicians for unit maintenance and eviction management
- Property Coordinators for field duties, inspections, and tenant transitions
- Resident Service Managers for rent collections, resident inquiries, and lease renewals
- Maintenance Coordinators for prompt response to maintenance requests
- Housing Assistance Program: Specialized Manager and dedicated team of 2, ensuring smooth coordination of all housing assistance programs across our markets – from applications to regular inspections and renewals

## Leasing Excellence

A proficient leasing team:
- 1 Marketing Specialist for targeted property promotion
- Use of professional photography
- 8 Application Underwriters/Leasing Managers for efficient tenant placement



Exhibit 14, Page 149

# 12BR Strategic Advantage

**In-depth Market Knowledge**: Extensive understanding of each market we operate in, enhancing the potential of your investments

**Systematic Property Care:** Comprehensive management of unit maintenance, property inspections, and tenant transitions for optimal property upkeep

**Effective Tenant Management:** From rent collections to renewals and inquiries, our resident service managers ensure a smooth tenant experience

**Rapid Maintenance Response:** Our dispatchers ensure swift resolution of maintenance requests, preventing property damage and tenant dissatisfaction

**Housing Assistance Expertise**: Efficient management of housing assistance programs, boosting property occupancy

**Strategic Leasing:** Our leasing team ensures your properties are marketed effectively and filled quickly with suitable tenants



# Performance Trends





| Month | Vacant Unit Count |
|---|---|
| 23-Jan | 916 |
| 23-Feb | 833 |
| 23-Mar | 783 |
| 23-Apr | 718 |

# Vacant Home Count





| Month | Occupancy Rate |
|-------|----------------|
| 23-Jan | 52% |
| 23-Feb | 57% |
| 23-Mar | 59% |
| 23-Apr | 63% |

# Occupancy Rate



| Month | Eviction Lockouts |
|-------|-------------------|
| 23-Jan | 3 |
| 23-Feb | 7 |
| 23-Mar | 23 |
| 23-Apr | 12 |

| Month | New Lease |
|-------|-----------|
| 23-Jan | 41 |
| 23-Feb | 53 |
| 23-Mar | 107 |
| 23-Apr | 45 |





# Evictions and New Leases





| Month | Renewal Offers Sent |
|-------|--------------------|
| 23-Jan | 0 |
| 23-Feb | 0 |
| 23-Mar | 17 |
| 23-Apr | 311 |



| Month | Renewals |
|-------|----------|
| 23-Jan | 6 |
| 23-Feb | 10 |
| 23-Mar | 11 |
| 23-Apr | 19 |

# Renewals



### Rent Growth



| Month | Rent Growth |
|-------|-------------|
| 23-Jan | 3% |
| 23-Feb | 5% |
| 23-Mar | 11% |
| 23-Apr | 4% |

# Rent Growth





| Month | Including Evictions | Excluding Evictions |
|-------|---------------------|---------------------|
| 23-Jan | 68% | 78% |
| 23-Feb | 69% | 80% |
| 23-Mar | 76% | 86% |
| 23-Apr | 79% | 88% |

# Collections





| Month | Renewals | Move-ins |
|--------|----------|----------|
| 23–Jan | 7 | 1 |
| 23–Feb | 14 | 4 |
| 23–Mar | 27 | 5 |
| 23–Apr | 8 | 12 |

# Housing Authority



Exhibit 14, Page 158



**Unit Turns Completed**

| Month | Unit Turns Completed |
|-------|---------------------|
| 23-Jan | 41 |
| 23-Feb | 6 |
| 23-Mar | 77 |
| 23-Apr | 33 |

# Unit Turns Completed

 RESIDENTIAL



Exhibit 14, Page 160



## Benefits of Asset Management and Compliance

→ Ensures rules are established in the best interest of stakeholders.

→ Ensures applicable laws and regulations are followed.

→ Mitigates risk by implementing internal controls to protect assets and bottom line.

→ Streamlines processes and workflows to optimizes portfolio pricing.

→ Increases transparency and data integrity.

**12B** RESIDENTIAL

# Asset Management Benefits

## Asset Management

- Manage Carrying Costs of the Portfolio's Assets:
    - Insurance
    - Property Taxes
    - Licensing
    - Utilities
    - Notices
- Ensure Data Integrity
- Ownership Transfers & Onboarding/Offboarding

## Vendor Management

- Identify and Qualify Vendors
- Negotiate Terms and Contracts
- Manage Vendor Relationships & Performance
- Invoice and Payment Approval Process

## Acquisition and Disposition

- Identify and Evaluate Acquisition Opportunities
- Manage the Marketing and Sale of Assets
- Identify and Evaluate Disposition Opportunities
- Manage the Disposition Process
- Transaction Coordination

## Corporate Compliance

- Corporate Governance
- Corporate Compliance
- Risk Management
- Streamlined Contracts and Commitments
- Audits





Construction

12 B RESIDENTIAL

Exhibit 14, Page 163

# Construction Benefits

### Estimation

- Manage Carrying Costs of Portfolio Assets:
- Insurance
- Property Taxes
- Licensing
- Utilities
- Ensure Data Integrity
- Ownership Transfers

### Vendor Oversight

- Corporate Governance
- Corporate Compliance
- Risk Management
- Contracts and Agreements
- Audit

### Contracting

- Identify and Evaluate Acquisition Opportunities
- Manage the marketing and sale of Assets
- Identify and Evaluate Disposition Opportunities
- Manage the Disposition Process
- Transaction Coordination

### Completion

- Identify and Qualify Vendors
- Negotiate Terms and Contracts
- Manage Vendor Relationships & Performance
- Establish and Sustain a Robust Procurement Process
- Invoice and Payment Management



Exhibit 14, Page 164

# Visibility



- Scope projects with Accuracy
- Current material prices based on location to nearest supplier
- Input current labor rates per market
- Supply job cost before purchase of asset



- Standardize Construction management across all markets
- Improve visibility into work-in-progress, vendor commitments, and outstanding liabilities
- Manage our contracts with vendors
- Contract With investors , vendors, and AR/AP all in one place
- Investor Portal
- Contractor Portal

Exhibit 14, Page 165



# System Architecture, Governance, & Measures







# What Can You Expect?

- Communication and Information
- Investor Engagement
- Strategic Insight
- Transparency and Reporting



37



# Closing Thoughts







# Exhibit 15



**Evernest**
Property Management

Rev.4.17.2023

1 Independence Plaza, Suite 620● Homewood, AL 35209 ● (205) 940.6363
● www.Evernest.co ● support@evernest.co

### RENTAL LISTING AND MANAGEMENT AGREEMENT

On this the 28th day of September, 2023 in consideration of the covenants herein contained, 12B Residential (hereinafter called "Owner Representative") and Evernest, LLC (hereinafter called "Agent"), agree as follows:

Owner Representative hereby contracts the Agent, as its exclusive agent, to lease and to manage the premises known as and listed in Addendum A (the "Property").

1. LEASING AUTHORITY. Agent's authorization to lease the premises to tenants ("Tenant") shall be subject to the following terms and conditions:
    a. Authorization. Agent is hereby authorized on behalf of Owner Representative to enlist the services of other real estate agents in making such rentals.
    b. Term. Original term of this agreement shall be in effect for a period of time beginning on October 1, 2023 and ending on October 1 2024 at 12:00 midnight, unless the expiration date is extended in writing. Thirty (30) days from the executed date, if the Property is vacant, the Owner Representative may terminate agreement before the end of the term by giving written notice to Agent; provided Owner Representative reimburses Agent of all expenses the Agent has incurred on the Property. Unless either party terminates this Agreement, this Agreement will renew on a month-to-month basis after the Agreement "ending" date.
    c. Leasing Terms. Owner Representative and Agent agree that the Property shall be offered for lease or rent on the following terms and conditions, or such terms and conditions that Owner Representative and Agent may subsequently agree to in writing:
        i. Monthly rental amount may be negotiated between Owner Representative, Agent, and Tenant.
        ii. The Lease Term shall be for one year, unless Owner Representative, Agent, and Tenant agree on a longer or shorter Lease Term
        iii. Owner Representative agrees to maintain and keep in force sufficient hazard insurance and liability insurance during the term of this Agreement and during the lease term.
    d. Owner Representative Representations and Disclosures.
        i. Owner Representative hereby specifically authorizes Agent and all cooperating agents to disclose to prospective tenants all defects, latent or otherwise known to them. Owner Representative acknowledges that Agent does not have the responsibility to discover latent defects in the Property.
        ii. Owner Representative is not delinquent in the payment of any property taxes, owners' association fees, property insurance, mortgage, or any encumbrance on or affecting the Property. If Agent receives notice of the Owner's delinquency in the payment of: (1) any mortgage or other encumbrance secured by the Property; (2) property taxes; (3) property insurance; or (4) owners' association fees, Agent may give Owner Representative 15 days to cure the delinquency during which period Owner Representative authorizes Agent to freeze any funds held by Agent and no disbursements will be made to Owner Representative related to this agreement or the Property. If after the 15-day period, the delinquency is not cured and the foreclosure process is initiated,



Exhibit 15, Page 174

Owner Representative authorizes Agent to deduct from any other funds being held by Agent for Owner Representative any remaining Fees or funds due to Agent related to services performed under this agreement. Additionally, Owner Representative authorizes Agent to return any security deposit being held by Agent to a tenant of the Property in addition to any prorated amount of rent being held by Agent and Agent may terminate this agreement. This paragraph does not preclude the Agent from seeking any other remedies under this agreement or at law that may be available to the Agent.

    iii. this    If the Property was built before 1978, the Owner Representative will complete and attach to this agreement an addendum regarding lead-based paint and lead-based paint hazards that will be made part of any lease of the Property. If the Property was built before 1978, federal law requires the Owner Representative (before a tenant is obligated under a lease) to: (1) provide the tenant with the federally approved pamphlet on lead poisoning prevention; (2) disclose the presence of any known lead-based paint or hazards in the Property; and (3) deliver all records and reports to the tenant related to such paint or hazards.

e. Marketing.

    i.    Agent agrees to use reasonable efforts in marketing the Property in accordance with the terms of the Agreement. Owner Representative gives Agent the exclusive right to place a "For Rent" or other appropriate signs on the Property and to advertise the Property on the Agent's Internet website, or any other Internet website which the Agent may deem appropriate. Agent shall also advertise the Property through circulars and other forms of advertising, all subject to the approval of the Owner Representative and at the expense of the Owner Representative gives the Agent permission to photograph and/or video the Property and to use such photographs and videos in its marketing efforts described above. Owner Representative also agrees to refer all inquiries regarding the Property to Agent promptly, furnish Agent with keys to the Property, allow the use of Owner's name and Owner Representative Information Sheets in marketing the Property, and make the Property available for showing during reasonable hours to prospective tenants. Any negotiations connected therewith shall be conducted solely by or under the direction of Agent.

    ii.    Owner Representative gives permission for a lockbox to be placed on its Property. In giving permission for a lockbox to be used, Owner Representative hereby releases and holds harmless the Agent and their agents from all responsibility for any loss, and damage or theft that might occur while the Property is listed except as caused by Agent's gross negligence or intentional acts. Owner Representative also acknowledges that a lockbox is intended only as an aid to market the Property. It is not intended or designed as a security device.

f. Leasing & Renewal Fees. The leasing fee payable to the Agent in the leasing or renting of said Property is not set by the Alabama Division of Real Estate, but in all cases is set by the Agent and the Owner Representative. In this Agreement, the Owner Representative agrees to pay the Agent a leasing fee as indicated in attached Addendum A - Management Package Selection Sheet.

g. Security Deposit. Owner Representative authorizes Agent to collect a Security Deposit for no more than one month's rent – except where the agent deems an increased liability risk to the landlord or premises, pet deposits, or changes to the premises. The Agent shall hold the Security Deposit in Agent's segregated escrow account – any interest accrued, if any, shall inure to the Agent. It shall be the Agent's responsibility to refund the security deposit to the Tenant if the Tenant keeps the terms of the lease, if the Property is clean and free

AMN

from damage at the conclusion of the lease and if the Tenant returns the key to the Agent at the conclusion of the lease.

h. Agent's Duties. The Owner Representative hereby gives the Agent the following authority and powers, and Agent accepts the following duties:

    i. To advertise the Property for Rent.

    ii. To show the Property to prospective tenants.

    iii. To process Rental Applications by obtaining a credit report and verifying the information on the Rental Application.

    iv. To provide a lease for Tenant to sign.

2. MANAGEMENT AUTHORITY   Agent's authorization to manage the Property shall be subject to the following terms and conditions:

a. Appointment and Acceptance. The Owner Representative appoints the Agent as exclusive Agent for the management of the Property, and the Agent accepts the appointment, subject to the terms and conditions set forth in this Agreement.

b. Duties. The duties and responsibilities of the Agent in connection with the management of the Property are as follows:

    i. *Collection of Revenue.* Agent shall take all reasonable steps to collect and enforce the collection of all rentals and other charges due Owner Representative from tenants of the Property in accordance with the terms of their tenancies.

    ii. *Expenses and Mortgages.* From gross revenues collected from the Property, Agent shall pay all operating expenses and such other expenses of the Property. Owner Representative shall pay all sum that may become due on any mortgage, all ad valorem tax payments, all insurance premium payments, fire dues, and/or garbage dues.

    iii. *Inspection and Repairs.* Agent shall do everything reasonably necessary for the proper management of the Property, including supervision of maintenance, and arranging for such improvements, alterations, and repairs as may be required of the Owner Representative. The Agent is authorized to purchase all materials, equipment, and supplies, and to provide all services necessary for the proper maintenance and repair and any exception to this policy must be pre-arranged between the Agent and Owner Representative and stated in writing.

    iv. *Negotiation of Leases.* Agent shall have the authority and exclusive right to negotiate leases with tenants on terms approved by Owner Representative. All leases shall be signed by the Agent on Owner's behalf. Agent will proceed with renewal of the Lease unless the Owner Representative gives Agent ninety (90) day notice in writing not to renew the lease.

    v. *Independent Contractors.* Agents shall have authority to hire, supervise, and terminate all independent contractors and other personnel, if any, reasonably required in the operation of such Property. All such employees shall not be employees of Agent or Owner Representative.

    vi. *Tenants.* Agent shall handle all Tenant requests and negotiations that may arise from time to time.

    vii. *Records.* Agent shall maintain accurate records of all monies received and disbursed in connection with its management of the Property, and such records shall be open for inspection by Owner Representative at all reasonable times. Agent shall also render to the Owner Representative a monthly statement showing all receipts and disbursements.

    viii. *Payment of Owner Representative.* After an Agent deducts all authorized expenses and reserves relating to the operation and management of the Property from the funds collected for the account of the Owner Representative, Agent shall remit the balance to Owner Representative.

*AMN*
AMN

Exhibit 15, Page 176

c. Insurance.
  i. *Liability Insurance.* Owner Representative hereby agrees to carry, at its own expense, general liability insurance in an amount not less than Three Hundred Thousand Dollars ($300,000.00), which policy shall be so written as to protect the Agent in the same manner and to the same extent they protect the Owner Representative and will name the Agent as co-insured. A copy of the endorsement naming Agent as an additional insured shall be sent to Agent.
  ii. *Hazard Insurance.* The Owner Representative will be responsible to carry all hazard insurance Owner Representative desires with respect to Property and any personal property therein which is owned by Owner Representative and will cause such insurance to be placed and kept in effect at all times. The Agent will investigate and furnish the Owner Representative with full reports as to all accidents, claims, and potential claims for damage relating to the Property, and will cooperate with the Owner's insurers in connection therewith. Owner Representative agrees that there shall be no requirement that a Tenant carry casualty or property insurance covering the Property or its contents in any lease for the Property and the Agent shall be entitled to waive any requirement to such effect where the requirement for the Tenant to carry such insurance is set forth in the written lease with the Tenant.

ci. Enforcement of Leases. The Agent will attempt to secure full compliance by each Tenant with the terms of the lease. Owner Representative hereby delegates to Agent authority to serve in the name of the Owner Representative such notices as are appropriate; to institute and prosecute actions, to evict tenants and to recover possession of said premises; to sue for in the name of the Owner Representative and recover rents and other sums due; and when expedient, to settle, compromise, and release such actions or suits or reinstate such tenancies. Agent may lawfully terminate any tenancy when, in the Agent's judgment, sufficient cause (including but not limited to nonpayment of rent) for such termination occurs under the terms of the tenant's lease. For this purpose, the Agent will consult with legal counsel to bring actions for eviction and judicial pleading incident to such action; provided, however, the Owner Representative is notified and consents to such actions in advance, the Agent keeps the Owner Representative informed of such actions and follows such instructions as the Owner Representative may prescribe for the conduct of any such action. Attorney fees and other necessary costs incurred in connection with such actions will be paid by the Owner Representative as a cost of operating the Property.

cii. Disbursements from Operating Account.
  i. From the funds collected by the Agent pursuant to this Agreement, the Agent will make the following disbursements promptly when payable:
    1. Reimbursement to the Agent for compensation payable to independent contractors and employees specified in Section 2.b.v hereof.
    2. All sums otherwise due and payable by the Owner Representative as expenses of the Property authorized to be incurred by the Agent under the terms of this Agreement including compensation payable to the Agent for its services hereunder.
    3. An operating reserve of $100 per property will be held to cover maintenance/repairs on each property. A minimum of $500 operating reserve will be held when less than 5 properties are managed.
  ii. In the event the balance in the Owner's account is at any time insufficient to pay disbursements due and payable under this Section, the Agent will inform the Owner Representative of that fact and the Owner Representative will provide funds to the Agent to enable the Agent to pay such amounts. In no event will the Agent be required to use its own funds to pay such disbursements.

*AMN*
AMN

Exhibit 15, Page 177

    iii.    Fidelity Bond. The Agent will furnish at its own expense, a fidelity bond in the amount of $25,000 to protect the Owner Representative against misappropriation of the Property funds by the Agent and its employees.

    iv.    Financial Responsibility of the Owner Representative shall be personally responsible for the payment for any expenses or other obligations incurred by the Agent in the proper exercise of its authority and duties hereunder and shall be personally responsible for the payment to the Agent of the amount of excess expenditures over receipts. Owner Representative hereby grants to Agent a lien against said Property to insure the repayment to Agent of said excess and any other amount that may be due hereunder. In the event that any or all of such an excess remains unpaid to Agent ten (10) days after Agent has delivered to Owner Representative a statement showing the amount of excess, Owner Representative will incur a service charge equal to one and one-half percent (1 ½%) of the amount of the excess unpaid each month. Furthermore, any property, personal or real, held by Agent at a site other than Property, on behalf of Owner Representative, for which a balance remains unpaid past 30 days, shall be considered abandoned property. Owner Representative releases the Agent to dispose of such abandoned property as Agent sees fit.

f.    Compliance with Governmental Orders. The Agent will take such actions as may be necessary to comply promptly with any and all government orders or other requirements affecting the Property, whether imposed by federal, state, county, or municipal authority.

g.    Habitability. Owner Representative warrants that the occupied premises are habitable and that they are in compliance with all state and local ordinances relating to rental property.

h.    Nondiscrimination. In the performance of its obligations under this Agreement, the Agent will comply with the provisions of any federal, state, or local law prohibiting discrimination in housing on the grounds of race, color, sex, physical or mental disability, marital or familial status, creed or national origin.

i.    Agent's Compensation. The sole compensation which the Agent shall be entitled to receive from Owner Representative for all services performed under Section 2 of this Agreement shall be paid to Agent as indicated in attached "Addendum A - Management Package Selection Sheet"

    i.    Other Compensation - Agent shall collect revenue from tenants and prospective tenants for items such as, but not limited to: application fees, notice posted fees, late fees, lease renewal fees, pet fees, document preparation fees, administration fees, and maintenance services. Fees payable to Agent will be collected pursuant to fees payable from tenant to Owner Representative. Any tenant fees due to the Owner Representative are indicated as such in Addendum A

    ii.    Changes to fee structure – Agent reserves the right to change any fee but will only do so with at least 30 days written notice to Owner Representative.

    iii.    In the event Owner Representative sells the demised premises to a tenant acquired by Agent during term of the lease or within ninety (90) days after termination of a lease, Agent is entitled to a brokerage commission of 3% of the sales price. In such an event, Agent will, at owner's request, Broker transaction with both sides within a defined Brokerage Relationship.

    iv.    In the event Owner Representative wants to sell the property to a buyer that is not the tenant, Agent will, at the Owner's request, broker the transaction within a defined Brokerage Relationship for a commission of 5% of the sales price, provided there is a cooperating broker involved in the transaction. If Agent secures a contract without a cooperating broker, Agent will be entitled to a commission of 4% of the sales price.

*AMN*
AMN

Exhibit 15, Page 178

j. Tenant Performance. The Agent does not warrant that the Tenant or Tenants selected to lease the Property will perform the requirements of the lease; except as defined in Agent's Lease Tenure Performance Guarantee - Should any tenant procured by Agent break their lease within the first twelve (12) months of their lease term, Agent will waive the next leasing fee of the property. This Guarantee is only applicable to properties that are managed by Agent and for Tenants procured by Agent.

3. <u>INDEMNITY.</u>

a. The Agent shall perform its obligations and duties under this Agreement as agent of the Owner Representative, and any and all obligations reasonably incurred by the Agent on behalf of the Owner Representative hereunder shall be for the account and at the expense of the Owner Representative agrees to indemnify and hold harmless the Agent, its successors and assigns, from and against any and all liability paid or incurred by Agent arising from or as the result of or in any way connected with any and all of the following:

i. The performance by the Owner Representative of any or all of its obligations and agreements arising under or by virtue of this Agreement.

ii. Any bodily or personal injury to or death of any person or persons whomsoever (including but not limited to any agent, servant or employee of the Owner Representative or the Agent, or of any of their respective contractors or subcontractors, or any lessee, tenant, licensee, guest, invitee or any other person who enter upon the Property), or any loss, theft or destruction of or damage to any property of the Owner Representative or of others, arising out of or in connection with the ownership of the Property by the Owner Representative or the operation, leasing or management of the Property by Owner Representative, or the exercise or failure to exercise any of the duties or obligations of the Owner Representative with respect to the foregoing.

iii. The presence, suspected presence, release, disposal or discharge at any time or times or from time to time of any environmental pollutants or any dangerous, hazardous or toxic substances, materials or wastes of any kind or nature whatsoever on, in, under, from or in the vicinity of the Property or any part or parts thereof, regardless of whether same occurs or is discovered before, during or after the Term of this Agreement.

iv. Any liability for any or all of the foregoing that may be imputed as a matter of law to the Agent or any of its officers, directors, agents, servants or employees; provided, however, that the Owner Representative shall not be required to indemnify the Agent or any of its officers, directors, agents, servants or employees, with respect to any matter arising out of the negligence, willful misconduct or breach of the terms of this Agreement by the Agent, office, director, agent, servant or employee seeking indemnification hereunder.

b. Agent agrees to indemnify and hold harmless the Owner Representative, its successors and assigns, from and against any and all liability paid or incurred by the Owner Representative arising from or as a result of or in any way connected with any and all of the following:

i. The performance by the Agent of, or their failure of the Agent to perform, any or all of its obligations and agreements arising under or by virtue of this Agreement.

ii. Any bodily or personal injury to or death of any person or persons whomsoever (including but not limited to any agent, servant or employee of the Owner Representative or the Agent, or of any of their respective contractors or subcontractors, or any lessee, tenant, licensee, guest, invited or any other person who enter upon the Property), or any loss, theft or destruction of or damage to any property of the Agent or others, arising out of or in connection with the ownership of the Property by the

*AMN*
N

Exhibit 15, Page 179

Owner Representative or the operation, leasing or management of the Property by the Agent, or the exercise or failure to exercise any of the duties, obligations or powers herein or hereafter granted to, or conferred upon or assumed by the Agent.

iii. Any liability for any or all of the foregoing that may be imputed as a matter of law to the Owner Representative of any of its members, agents, servants, or employees; provided, however, that the Agent shall not be required to indemnify the Owner Representative, its members, agents, servants or employees with respect to any matter arising out of the negligence or willful misconduct or breach of the terms of this Agreement by the Owner Representative or other person seeking indemnification hereunder.

4. <u>Pets</u>. Pets shall be considered for approval on a case by case basis. Owner will be notified and will decide before a lease is signed whether or not to allow pets. Agent agrees to inform Owner Representative of all breeds of pet who potentially may inhabit the Property. Owner Representative agrees to hold Agent harmless for any misrepresentation by Tenant either by mouth or application as to the amount of pets and their breeds. Owner Representative also holds the Agent harmless for any actions of the pets allowed to live on the Property.

5. <u>Non-Solicitation:</u> Non-Disparagement. For so long as the Owner Representative remains a client of the Agent and for eighteen (18) months after termination of this Agreement for whatever reason, the Owner Representative will not:

   a. directly or indirectly, engage, employ or hire any employee of the Agent or any of its affiliates (whether or not for compensation), or any other person whose status as an employee of the Agent or any of its affiliates has terminated while the Owner Representative is under this Agreement with the Agent or during the eighteen (18) month period after the termination of the Owner's Agreement for whatever reason, as an officer, employee, consultant, agent, adviser, partner or independent contractor for any person or entity other than the Agent or any of its affiliates;

   b. directly or indirectly, on the Owner's own behalf or on behalf of any other person or entity (i) solicit, induce or attempt to induce any employee of the Agent or any of its affiliates to leave the employ of the Agent or any of such affiliates, or (ii) in any way interfere with the relationship between the Agent or any of its affiliates, on the one hand, and any employee of the Agent or any of its affiliates, on the other hand.

6. <u>Age of Property.</u> The Owner Representative hereby represents to Agent that the Property was constructed on or about 1900s.

7. <u>Notice.</u> All written notices to Owner Representative may be addressed and mailed to the Owner Representative at El Monte Capital or may be emailed to Owner Representative at aaron.noe@12br.com and All written notices to Agent shall be mailed to 1 Independence Plaza Suite 620. Homewood, AL 35209 or may be emailed to Agent at support@Evernest.co. Electronic notice sent via email shall be deemed to have the same legal effect and validity as written notice for all purposes under this agreement.

8. <u>Termination.</u> 12 month agreement whereas Owner Representative agrees to pay remainder of term if terminated. 90 day termination notice after year 1.

9. <u>BINDING AGREEMENT</u>. This Agreement shall be binding upon and will inure to the benefit of the parties hereto, their representatives, successors, heirs, or assigns, subject to approval of the bankruptcy court in Owner's chapter 11 case pending in the District of Nevada as Case No. 23-50177-hlb.

10. <u>ATTORNEY'S FEES</u>. If a party hereto goes to court to enforce its rights hereunder, the party that prevails shall be entitled to recover reasonable attorney's fees and other associated costs.

11. <u>INTERPRETATIVE PROVISIONS.</u>

    a. This agreement represents the complete understanding between the Owner Representative and the Agent regarding the management of the Property. Any changes to this agreement shall be communicated in writing by the Agent to the Owner Representative, and such changes shall be


AMN

Exhibit 15, Page 180

subject to a notice period of at least 30 days to allow for review and consideration. The agreement may be modified by mutual written agreement executed by the Principal Parties or by electronic written notice provided by the Agent, the receipt and acceptance of which shall be acknowledged electronically by the Owner  Representative Representative,  subject to the notice period.

b.  This Agreement may be executed in counterparts, each of which shall constitute a

complete original Agreement, which may be introduced in evidence or used for any other purpose without production of any other counterparts.

12. <u>AGENT DISCLOSURES.</u>
   a.  Agent employs licensed real estate professionals in accordance with Alabama state real estate laws.
   b.  Agent may have an ownership interest in 3rd party vendors who perform services for Agent.
   c.  By signing this agreement the Owner Representative(s) hereby agree to receive an electronic IRS Form 1099-MISC.

IN WITNESS WHEREOF, The Principal Parties have executed this Agreement on the date first above written.

Owner Representative

12B Residential

*Aaron M Noe*          Sep 28, 2023
Aaron M Noe (Sep 28, 2023 16:25 PDT)
Name: Aaron Noe          Date
Title: Director

AGENT

Evernest, LLC

*Hunter Terryn*          Sep 29, 2023
Hunter Terryn (Sep 29, 2023 09:21 CDT)
Name: Hunter Terryn          Date
Title: Broker

Exhibit 15, Page 181

## **Addendum A**

**Monthly Management Fee Pricing, Ancillary Administrative Fees, Property Roster**

8% of monthly rent

| Features: | Pricing: |
|---|---|
| • Property Inspection<br>• Rent Collection Services<br>• 24/7 Tenant Comm<br>• Maintenance Work Order Mgmt<br>• Electronic Monthly Statements & Cash Disbursements<br>• Dedicated Owner Representative Phone Line<br>• Owner Representative Portal<br>• Monthly Inspections during Vacancy | • Leasing Fee- 50% of a month's rent for vacant properties and a $50/month fee for occupied<br>• Renewal Fee- $150 for vacant properties and $50/month for occupied<br>• $90/hour handyman<br>• $105/speciality maintenance (HVAC & Plumbing)<br>• Hourly labor rates subject to change per market but not without a minimum 30 day notice<br>• $40,000 onboarding deposit that will be applied to future management fees |

- Distressed Properties-any properties that we bring on with squatters, trespassers, non paying tenants, active evictions, or tenants with no lease, ledger, accurate contact info, may be subject to a $350 onboarding fee.

- For properties deemed uninhabitable, the fee will be labor + materials for our maintenance techs. Please see above regarding hourly maintenance rate.

- Inherited tenants subject to eviction, refer to distressed property clause above

- Reserves- $500/door. Prioritization schedule will be set based on occupied, vacant, renovation, sold/offloaded/uninhabitable.

- Termination fees will be waived for properties sold using Evernest brokerage services.

*AMN*
AMN

Exhibit 15, Page 182

| | | | | | |
|---|---|---|---|---|---|
| 1112 Elm Ave Unit 1 (FRONT) | Birmingham | AL | 35217 | BHM | Guardian Fund, LLC |
| 1112 Elm Ave Unit 2 (REAR) | Birmingham | AL | 35217 | BHM | Guardian Fund, LLC |
| 12513 Jerry Dr | Mc Calla | AL | 35111 | BHM | Guardian Fund, LLC |
| 1313 18Th St N Unit 1 | Birmingham | AL | 35234 | BHM | Guardian Fund, LLC |
| 1313 18Th St N Unit 2 | Birmingham | AL | 35234 | BHM | Guardian Fund, LLC |
| 1313 18Th St N Unit 3 | Birmingham | AL | 35234 | BHM | Guardian Fund, LLC |
| 1313 18Th St N Unit 4 | Birmingham | AL | 35234 | BHM | Guardian Fund, LLC |
| 1313 18Th St N Unit 5 | Birmingham | AL | 35234 | BHM | Guardian Fund, LLC |
| 1324 19Th St Sw | Birmingham | AL | 35211 | BHM | Guardian Fund, LLC |
| 700 Graymont Ave W Unit 1 | Birmingham | AL | 35204 | BHM | Guardian Fund, LLC |
| 700 Graymont Ave W Unit 2 | Birmingham | AL | 35204 | BHM | Guardian Fund, LLC |
| 700 Graymont Ave W Unit 3 | Birmingham | AL | 35204 | BHM | Guardian Fund, LLC |
| 700 Graymont Ave W Unit 4 | Birmingham | AL | 35204 | BHM | Guardian Fund, LLC |
| 700 Graymont Ave W Unit 5 | Birmingham | AL | 35204 | BHM | Guardian Fund, LLC |
| 700 Graymont Ave W Unit 6 | Birmingham | AL | 35204 | BHM | Guardian Fund, LLC |
| 700 Graymont Ave W Unit 7 | Birmingham | AL | 35204 | BHM | Guardian Fund, LLC |
| 700 Graymont Ave W Unit 8 | Birmingham | AL | 35204 | BHM | Guardian Fund, LLC |
| 833 1St Ave | Pleasant Grove | AL | 35127 | BHM | Guardian Fund, LLC |

Owner Representative

12B Residential

*Aaron M Noe*
Aaron M Noe (Sep 28, 2023 16:25 PDT)                Sep 28, 2023

Name: Aaron Noe                Date
Title:Director

## Addendum B

**3rd Party Vendors:** Evernest employs licensed and insured in-house technicians in order to provide the absolute best service for your property and the resident living in your home. Whenever possible, we use our technicians because they have built trust with the resident and are accountable for the quality of workmanship they provide.

In the event we are not able to use one of our technicians on your property, we will contract with a trusted 3rd party vendor and charge a 10% fee to dispatch, coordinate, and handle invoicing for the work. This might occur when the scope of work is outside of our capabilities.

We also provide a one-year maintenance guarantee on all work completed on a property. However, in the event that either party terminates the management agreement, the maintenance guarantee will also end.

**Home Warranty:** Evernest will execute all Home Warranty claims on a case by case basis. Evernest will charge the Owner Representative a $100 fee to handle all Home Warranty Claims.  Depending on the claim's complexity, we reserve the right to charge out an hourly rate for time spent managing and working with the Home Warranty company on your behalf.

In some cases, we spend hours communicating between the home warranty provider and the resident. Most of the time, the Home Warranty work is not handled in a timely manner which causes more communication and frustration with your resident.

---

_AMN_
ıMN

**HOA:** Evernest will not make HOA payments on an owner's behalf but will manage all needed communication between the HOA and resident.

**Other Fees** Evernest will not be responsible for paying the following on the owner's behalf:

- Property Taxes
- Property Insurance
- Property Mortgage
- Home Warranty Fees

---

**Annual Inspection:**

We believe that annual inspections are beneficial for the care of your property. Here are the benefits of the annual inspections:

- We are able to catch any issues in the home that are left unaddressed, and might become a major repair over time.
- We make sure that your resident is responsibly changing air filters and keeping the batteries in the smoke detectors working properly.
- Ensure the tenant is abiding by the terms and conditions set within the lease.
- You receive a full report with images so that you can see how your resident is caring for your property.

We value these annual inspections by a trained professional at $299 but our Annual Inspection Package will be billed to you at just $149. **NOTE: If you are on the Platinum offering, this service is a feature that is already included in the pricing and you will not receive a separate charge per service.**

If you choose to opt-out of this service, please notify your property manager and we'll make sure to eliminate the annual inspection and reports for you.

☐ Please check here if you wish to opt out of the Annual Inspection. If you check this box, please understand it is possible that we do not access inside the property for the duration of the lease to ensure the tenant is abiding by the agreement.

## Addendum C

For properties deemed uninhabitable that require services specifically but not limited to boarding up and/or overall securement of said property, Evernest LLC will charge a fee of $90/hour for labor plus materials. If owners request a routine visit in terms of a wellness cadence, the charge would be $90/hour for time spent.



## Optional Services for Your Property

Our optional services are designed to ensure you have the best property management experience with Evernest.

Read through each of these services to determine if any of them might benefit you. If you decide that one or more of these optional services make sense to you, simply circle the service and we'll add it to your management services.

### 1.  Eviction Protection Plan (EPP)

Our Eviction Protection Plan (EPP) is available for your Evernest tenant. It is designed to give you peace of mind knowing you won't be caught covering the expense of an eviction. EPP covers the cost of an eviction (which can be up to $900) should an unforeseen issue arise that prevents your tenant from paying rent in agreement with their lease (loss of job or health related issue). We will cover all attorney fees, court costs, and set out charges associated with evicting your tenant. We will also change out your locks.

The cost of EPP is $200 per year, billed annually.

_____ **Add the Eviction Protection Plan to my Management Plan.**

### 2. Bi-annual HVAC Preventative Maintenance

Each year we receive emergency calls from tenants regarding their air or heat. These calls (especially emergency weekend calls) end up costing owners much more than a routine service call.

Our Spring and Fall Heating and Air Service can aid in the early detection of problems and save the cost of expensive, emergency repairs. A skilled Evernest tech will visit your home once in the fall and once in the spring to perform an assessment and cleaning. During our check, we also ensure that the unit(s) is up to code.

The cost of our Bi-annual HVAC Preventative Maintenance is $150 each.

☐ **Add Bi-Annual HVAC Preventative Maintenance to my Management Plan**



### 3. Rent Protection Membership

Are you worried about your tenant not paying rent? When we surveyed our owners, this was their number one worry. With our Rent Protection Membership (included in the Platinum Plan), you won't ever worry about not collecting rent again.

Frequently Asked Questions:

What does the rental income protection cover?

The membership benefits cover up to 11 months or $25,000 in lost rent per rental unit, whichever is less. It also covers the cost of eviction which include court costs, attorney fees, and set-out charges. How Does It Work?

If your tenant does not pay rent, you will still be paid rent by Evernest. If we must move to evict your tenant, we will pay for all eviction costs and continue paying you rent. When we gain possession of the rental home, we will continue paying rent to the lessor of up to three months or until we place a new tenant in your home as long as benefits do not exceed $25,000 or 11 months of rent paid.

Is my current tenant eligible?

Yes, if the tenant has been up to date on payments for the last 12 consecutive months they are eligible.

How much does it cost?

The rent protection membership cost is equal to one month's rent per year along with a $100 one-time fee. We will break that fee up over a 12 month period.

_____ Add Rent Protection to my GOLD or INVESTOR Plan (already included in Platinum)

### 4. Annual Gutter Cleaning

Gutters can fill up quickly, especially in the Southeast, and can be one of the leading problems with exterior damage to your home. When your gutters are full of leaves, water can run behind the gutters causing rot to the soffit and fascia boards. To prevent this damage we recommend having your gutters cleaned at least once per year.

The cost of our Annual Gutter Cleaning will range between $150 and $250 per cleaning depending on the size of the house.

_____ Add Annual Gutter Cleaning to my Management Plan



AMN

**HOA Information**

HOA Manager Name _____
HOA Manager Phone Number _____
Is lawn care handled by your HOA, building manager, etc.? _____
Do you have an HOA document that must be signed by the tenant? _____
If yes, please provide a copy to Evernest.

**Utility Information**

Water Provider:

Name _____
Address _____
Phone _____

Power Provider:

Name _____
Address _____
Phone _____

Gas Provider:

Name _____
Address _____
Phone _____

**Home Warranty**

Home Warranty?         ___ YES ___ NO *
*Please provide any relevant information and documents related to your Home Warranty.

**Year the Home was Built?** Please record the year your home was built _____

**Home Alarm?** If so, please provide the code to disarm _____

**Note: Evernest will execute all Home Warranty claims on a case by case basis. Evernest will charge the Owner Representative a $100 fee to handle all Home Warranty Claims.  Depending on the claim's complexity, we reserve the right to charge out an hourly rate for time spent managing and working with the Home Warranty company on your behalf.**

**Disclosure of Information on Lead-Based Paint and/or Lead-Based Paint Hazards**

**Lead Warning Statement**

*Housing built before 1978 may contain lead-based paint. Lead from paint, paint chips, and dust can pose health hazards if not managed properly. Lead exposure is especially harmful to young children and pregnant women. Before renting pre-1978 housing, lessors must disclose the presence of known lead-based paint and/or lead-based paint hazards in the dwelling. Lessees must also receive a federally approved pamphlet on lead poisoning prevention.*

**Lessor's Disclosure**

(a) Presence of lead-based paint and/or lead-based paint hazards (check (i) or (ii) below):

    (i) _____ Known lead-based paint and/or lead-based paint hazards are present in the housing (explain).

    _____

    (ii) _____ Lessor has no knowledge of lead-based paint and/or lead-based paint hazards in the housing.

(b) Records and reports available to the lessor (check (i) or (ii) below):

    (i) _____ Lessor has provided the lessee with all available records and reports pertaining to lead-based paint and/or lead-based paint hazards in the housing (list documents below).

    _____

    (ii) _____ Lessor has no reports or records pertaining to lead-based paint and/or lead-based paint hazards in the housing.

**Lessee's Acknowledgment (initial)**

(c) _____ Lessee has received copies of all information listed above.

(d) _____ Lessee has received the pamphlet *Protect Your Family from Lead in Your Home.*

**Agent's Acknowledgment (initial)**

(e) _HT_ Agent has informed the lessor of the lessor's obligations under 42 U.S.C. 4852d and is aware of his/her responsibility to ensure compliance.

**Certification of Accuracy**

The following parties have reviewed the information above and certify, to the best of their knowledge, that the information they have provided is true and accurate.

| *Aaron M Noe* | Sep 28, 2023 | | |
|---|---|---|---|
| Aaron M Noe (Sep 28, 2023 16 25 PDT) | | | |
| **Lessor** | **Date** | **Lessor** | **Date** |
| **Lessee** | **Date** | **Lessee** | **Date** |
| *Hunter Terryn* | Sep 29, 2023 | | |
| Hunter Terryn (Sep 29, 2023 09.21 CDT) | | | |
| **Agent** | **Date** | **Agent** | **Date** |

Exhibit 15, Page 189

# AUTHORIZATION AGREEMENT FOR DEPOSITS (ACH CREDITS)

| COMPANY NAME | Tax id Number: |
|---|---|
| Evernest LLC | 80-0158684 |

## CHECK ONE:

❑ ADD
(New Pre Authorized Debit Participant)

❑ CHANGE
(Financial Institution and/or Account #)

❑ DELETE
(Cancel Participation in the Program)

**NOTE:** Due to the time required for company and bank processing, please allow one or two weeks for processing.

I (we) hereby authorize <u>Evernest LLC</u> , hereinafter called COMPANY, to initiate credit entries and to initiate, if necessary, debit entries and adjustments for any credit entries in error to my (our) account indicated below and the depository financial institution named below, hereinafter called DEPOSITORY, to debit and/or credit the same to such account.

| DEPOSITORY FINANCIAL INSTITUTION | | BRANCH | |
|---|---|---|---|
| CITY | | STATE | ZIP CODE |

TRANSIT ROUTING NUMBERS

| I: | |

ACCOUNT NUMBER INFORMATION

| |

□ CHECKING                    □ SAVINGS

This authority is to remain in full force and effect until COMPANY has received written notification from me (or either of us) of its termination in such a time and in such a manner as to afford COMPANY and DEPOSITORY a reasonable opportunity to act on it. **Please attach a voided check for account validation.**

| NAME(S) - Please Print | | |
|---|---|---|
| ADDRESS OF HOUSE/APT | CITY/STATE | ZIP CODE |
| SIGNED | DATE | |

NOTE: Please submit this completed form to us along with a copy of a voided check OR a picture of a check. These can be emailed to <u>support@evernest.co</u>

Exhibit 15, Page 190

**Form W-9**
(Rev. October 2018)
Department of the Treasury
Internal Revenue Service

**Request for Taxpayer**
**Identification Number and Certification**

▶ Go to *www.irs.gov/FormW9* for instructions and the latest information.

**Give Form to the requester. Do not send to the IRS.**

1 Name (as shown on your income tax return). Name is required on this line; do not leave this line blank.

2 Business name/disregarded entity name, if different from above

3 Check appropriate box for federal tax classification of the person whose name is entered on line 1. Check only one of the following seven boxes.

☐ Individual/sole proprietor or single-member LLC   ☐ C Corporation   ☐ S Corporation   ☐ Partnership   ☐ Trust/estate

☐ Limited liability company. Enter the tax classification (C=C corporation, S=S corporation, P=Partnership) ▶ _____

Note: Check the appropriate box in the line above for the tax classification of the single-member owner. Do not check LLC if the LLC is classified as a single-member LLC that is disregarded from the owner unless the owner of the LLC is another LLC that is not disregarded from the owner for U.S. federal tax purposes. Otherwise, a single-member LLC that is disregarded from the owner should check the appropriate box for the tax classification of its owner.

☐ Other (see instructions) ▶

4 Exemptions (codes apply only to certain entities, not individuals; see instructions on page 3):

Exempt payee code (if any) _____

Exemption from FATCA reporting code (if any) _____

*(Applies to accounts maintained outside the U.S.)*

5 Address (number, street, and apt. or suite no.) See instructions.

Requester's name and address (optional)

6 City, state, and ZIP code

7 List account number(s) here (optional)

Print or type.
See Specific Instructions on page 3.

**Part I    Taxpayer Identification Number (TIN)**

Enter your TIN in the appropriate box. The TIN provided must match the name given on line 1 to avoid backup withholding. For individuals, this is generally your social security number (SSN). However, for a resident alien, sole proprietor, or disregarded entity, see the instructions for Part I, later. For other entities, it is your employer identification number (EIN). If you do not have a number, see *How to get a TIN,* later.

Note: If the account is in more than one name, see the instructions for line 1. Also see *What Name and Number To Give the Requester* for guidelines on whose number to enter.

Social security number

☐☐☐ - ☐☐ - ☐☐☐☐

or

Employer identification number

☐☐ - ☐☐☐☐☐☐☐

**Part II    Certification**

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me); and
2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding; and
3. I am a U.S. citizen or other U.S. person (defined below); and
4. The FATCA code(s) entered on this form (if any) indicating that I am exempt from FATCA reporting is correct.

Certification instructions. You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the certification, but you must provide your correct TIN. See the instructions for Part II, later.

**Sign Here**

Signature of U.S. person ▶

Date ▶

## General Instructions

Section references are to the Internal Revenue Code unless otherwise noted.

**Future developments.** For the latest information about developments related to Form W-9 and its instructions, such as legislation enacted after they were published, go to *www.irs.gov/FormW9.*

## Purpose of Form

An individual or entity (Form W-9 requester) who is required to file an information return with the IRS must obtain your correct taxpayer identification number (TIN) which may be your social security number (SSN), individual taxpayer identification number (ITIN), adoption taxpayer identification number (ATIN), or employer identification number (EIN), to report on an information return the amount paid to you, or other amount reportable on an information return. Examples of information returns include, but are not limited to, the following.

• Form 1099-INT (interest earned or paid)

• Form 1099-DIV (dividends, including those from stocks or mutual funds)

• Form 1099-MISC (various types of income, prizes, awards, or gross proceeds)

• Form 1099-B (stock or mutual fund sales and certain other transactions by brokers)

• Form 1099-S (proceeds from real estate transactions)

• Form 1099-K (merchant card and third party network transactions)

• Form 1098 (home mortgage interest), 1098-E (student loan interest), 1098-T (tuition)

• Form 1099-C (canceled debt)

• Form 1099-A (acquisition or abandonment of secured property)

Use Form W-9 only if you are a U.S. person (including a resident alien), to provide your correct TIN.

*If you do not return Form W-9 to the requester with a TIN, you might be subject to backup withholding. See What is backup withholding, later.*

Cat. No. 10231X

Form **W-9** (Rev. 10-2018)

# Evernest Management Agreement- Guardian Fund, LLC [BHM]

Final Audit Report                                                                    2023-09-29

| | |
|---|---|
| Created: | 2023-09-28 |
| By: | Jackie Cracknell (jcracknell@evernest.co) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAVoOxHKBGkdt_ybyA4IS-rGbzbJf1t1Mx |

## "Evernest Management Agreement- Guardian Fund, LLC [BHM]" History

📄 Document created by Jackie Cracknell (jcracknell@evernest.co)
2023-09-28 - 7:32:00 PM GMT

✉ Document emailed to aaron.noe@12br.com for signature
2023-09-28 - 7:37:25 PM GMT

📄 Email viewed by aaron.noe@12br.com
2023-09-28 - 11:24:06 PM GMT

🖊 Signer aaron.noe@12br.com entered name at signing as Aaron M Noe
2023-09-28 - 11:25:42 PM GMT

🖊 Document e-signed by Aaron M Noe (aaron.noe@12br.com)
Signature Date: 2023-09-28 - 11:25:44 PM GMT - Time Source: server

✉ Document emailed to Hunter Terryn (hterryn@evernest.co) for signature
2023-09-28 - 11:25:48 PM GMT

📄 Email viewed by Hunter Terryn (hterryn@evernest.co)
2023-09-29 - 1:21:26 AM GMT

🖊 Document e-signed by Hunter Terryn (hterryn@evernest.co)
Signature Date: 2023-09-29 - 2:21:09 PM GMT - Time Source: server

✅ Agreement completed.
2023-09-29 - 2:21:09 PM GMT

 **Adobe Acrobat Sign**



**Evernest**
Property Management

Rev.4.17.2023

1 Independence Plaza, Suite 620• Homewood, AL 35209 • (205) 940.6363
• www.Evernest.co • support@evernest.co

**RENTAL LISTING AND MANAGEMENT AGREEMENT**

On this the 18th day of July, 2023 in consideration of the covenants herein contained, Guardian CV1, LLC (hereinafter called "Owner") and Evernest, LLC (hereinafter called "Agent"), agree as follows:

Owner hereby contracts the Agent, as its exclusive agent, to lease and to manage the premises known as, Guardian CV1, LLC (the "Property").

1. LEASING AUTHORITY. Agent's authorization to lease the premises shall be subject to the following terms and conditions:
   a. Authorization. Agent is hereby authorized on behalf of Owner to enlist the services of other real estate agents in making such rentals.
   b. Term. Original term of this agreement shall be in effect for a period of time beginning on August 1st, 2023 and ending on August 1st, 2024 at 12:00 midnight, unless the expiration date is extended in writing. Thirty (30) days from the executed date, if the Property is vacant, the Owner may terminate agreement before the end of the term by giving written notice to Agent; provided Owner reimburses Agent of all expenses the Agent has incurred on the Property. Unless either party terminates this Agreement, this Agreement will renew on a month-to-month basis after the Agreement "ending" date.
   c. Leasing Terms. Owner and Agent agree that the Property shall be offered for lease or rent on the following terms and conditions, or such terms and conditions that Owner and Agent may subsequently agree to in writing:
      i. Monthly rental amount may be negotiated between Owner, Agent, and Tenant.
      ii. The Lease Term shall be for one year, unless Owner, Agent, and Tenant agree on a longer or shorter Lease Term
      iii. Owner agrees to maintain and keep in force sufficient hazard insurance and liability insurance during the term of this Agreement and during the lease term.
   d. Owner Representations and Disclosures.
      i. Owner hereby specifically authorizes Agent and all cooperating agents to disclose to prospective tenants all defects, latent or otherwise known to them. Owner acknowledges that Agent does not have the responsibility to discover latent defects in the Property.
      ii. Agent acknowledges that loans related to Guardian Fund CV1 and CV2 are in default due to the bankruptcy filing per the previous manager, thus resulting in this agreement requiring a court approval per Addendum B. If Agent receives future notice(s) of the Owner's delinquency upon in the payment of: (1) any mortgage or other encumbrance secured by the Property; (2) property taxes; (3) property insurance; or (4) owners' association fees, Agent may give Owner 15 days to cure the delinquency during which period Owner authorizes Agent to freeze any funds held by Agent and no disbursements will be made to Owner related to this agreement or the Property. If after the 15-day period, the


AMN

Exhibit 15, Page 193

delinquency is not cured and the foreclosure process is initiated, Owner authorizes Agent to deduct from any other funds being held by Agent for Owner any remaining Fees or funds due to Agent related to services performed under this agreement. Additionally, Owner authorizes Agent to return any security deposit being held by Agent to a tenant of the Property in addition to any prorated amount of rent being held by Agent and Agent may terminate this agreement. This paragraph does not preclude the Agent from seeking any other remedies under this agreement or at law that may be available to the Agent.

iii. If the Property was built before 1978, the Owner will complete and attach to this agreement an addendum regarding lead-based paint and lead-based paint hazards that will be made part of any lease of the Property. If the Property was built before 1978, federal law requires the Owner (before a tenant is obligated under a lease) to: (1) provide the tenant with the federally approved pamphlet on lead poisoning prevention; (2) disclose the presence of any known lead-based paint or hazards in the Property; and (3) deliver all records and reports to the tenant related to such paint or hazards.

e. Marketing.

i. Agent agrees to use reasonable efforts in marketing the Property in accordance with the terms of the Agreement. Owner gives Agent the exclusive right to place a "For Rent" or other appropriate signs on the Property and to advertise the Property on the Agent's Internet website, or any other Internet website which the Agent may deem appropriate. Agent shall also advertise the Property through circulars and other forms of advertising, all subject to the approval of the Owner and at the expense of the Owner. Owner gives the Agent permission to photograph and/or video the Property and to use such photographs and videos in its marketing efforts described above. Owner also agrees to refer all inquiries regarding the Property to Agent promptly, furnish Agent with keys to the Property, allow the use of Owner's name and Owner Information Sheets in marketing the Property, and make the Property available for showing during reasonable hours to prospective tenants. Any negotiations connected therewith shall be conducted solely by or under the direction of Agent.

ii. Owner gives permission for a lockbox to be placed on its Property. In giving permission for a lockbox to be used, Owner hereby releases and holds harmless the Agent and their agents from all responsibility for any loss, and damage or theft that might occur while the Property is listed except as caused by Agent's gross negligence or intentional acts. Owner also acknowledges that a lockbox is intended only as an aid to market the Property. It is not intended or designed as a security device.

f. Leasing & Renewal Fees. The leasing fee payable to the Agent in the leasing or renting of said Property is not set by the Alabama Division of Real Estate, but in all cases is set by the Agent and the Owner. In this Agreement, the Owner agrees to pay the Agent a leasing fee as indicated in attached Addendum A - Management Package Selection Sheet.

g. Security Deposit. Owner authorizes Agent to collect a Security Deposit for no more than one month's rent – except where the agent deems an increased liability risk to the landlord or premises, pet deposits, or changes to the premises. The Agent shall hold the Security Deposit in Agent's segregated escrow account – any interest accrued, if any, shall insure to the Agent. It shall be the Agent's responsibility to refund the security

AMN
AMN

Exhibit 15, Page 194

deposit to the Tenant if the tenant keeps the terms of the lease, if the Property is clean and free from damage at the conclusion of the lease and if the Tenant returns the key to the Agent at the conclusion of the lease.

h. Agent's Duties. The Owner hereby gives the Agent the following authority and powers, and Agent accepts the following duties:

   i. To advertise the Property for Rent.

   ii. To show the Property to prospective tenants.

   iii. To process Rental Applications by obtaining a credit report and verifying the information on the Rental Application.

   iv. To provide a lease for Tenant to sign.

2. **MANAGEMENT AUTHORITY** Agent's authorization to manage the Property shall be subject to the following terms and conditions:

a. Appointment and Acceptance. The Owner appoints the Agent as exclusive Agent for the management of the Property, and the Agent accepts the appointment, subject to the terms and conditions set forth in this Agreement.

b. Duties. The duties and responsibilities of the Agent in connection with the management of the Property are as follows:

   i. *Collection of Revenue.* Agent shall take all reasonable steps to collect and enforce the collection of all rentals and other charges due Owner from tenants of the Property in accordance with the terms of their tenancies.

   ii. *Expenses and Mortgages.* From gross revenues collected from the Property, Agent shall pay all operating expenses and such other expenses of the Property. Owner shall pay all sum that may become due on any mortgage, all ad valorem tax payments, all insurance premium payments, fire dues, and/or garbage dues.

   iii. *Inspection and Repairs.* Agent shall do everything reasonably necessary for the proper management of the Property, including supervision of maintenance, and arranging for such improvements, alterations, and repairs as may be required of the Owner. The Agent is authorized to purchase all materials, equipment, and supplies, and to provide all services necessary for the proper maintenance and repair and any exception to this policy must be pre-arranged between the Agent and Owner and stated in writing.

   iv. *Negotiation of Leases.* Agent shall have the authority and exclusive right to negotiate leases with tenants on terms approved by Owner. All leases shall be signed by the Agent on Owner's behalf. Agent will proceed with renewal of the Lease unless the Owner gives Agent ninety (90) day notice in writing not to renew the lease.

   v. *Independent Contractors.* Agents shall have authority to hire, supervise, and terminate all independent contractors and other personnel, if any, reasonably required in the operation of such Property. All such employees shall not be employees of Agent or Owner.

   vi. *Tenants.* Agent shall handle all Tenant requests and negotiations that may arise from time to time.

   vii. *Records.* Agent shall maintain accurate records of all monies received and disbursed in connection with its management of the Property, and such records shall be open for inspection by Owner at all reasonable times. Agent shall also render to the Owner a monthly statement showing all receipts and disbursements.

*AMN*
AMN

    viii.    *Payment of Owner.* After an Agent deducts all authorized expenses and reserves relating to the operation and management of the Property from the funds collected for the account of the Owner, Agent shall remit the balance to Owner.

c.   Insurance.

    i.    *Liability Insurance.* Owner hereby agrees to carry, at his own expense, general liability insurance in an amount not less than Three Hundred Thousand Dollars ($300,000.00), which policy shall be so written as to protect the Agent in the same manner and to the same extent they protect the Owner and will name the Agent as co-insured. A copy of the endorsement naming Agent as an additional insured shall be sent to Agent.

    ii.    *Hazard Insurance.* The Owner will be responsible to carry all hazard insurance Owner desires with respect to Property and any personal property therein which is owned by Owner and will cause such insurance to be placed and kept in effect at all times. The Agent will investigate and furnish the Owner with full reports as to all accidents, claims, and potential claims for damage relating to the Property, and will cooperate with the Owner's insurers in connection therewith. Owner agrees that there shall be no requirement that a Tenant carry casualty or property insurance covering the Property or its contents in any lease for the Property and the Agent shall be entitled to waive any requirement to such effect where the requirement for the Tenant to carry such insurance is set forth in the written lease with the Tenant.

d.   Enforcement of Leases. The Agent will attempt to secure full compliance by each tenant with the terms of the lease. Owner hereby delegates to Agent authority to serve in the name of the Owner such notices as are appropriate; to institute and prosecute actions, to evict tenants and to recover possession of said premises; to sue for in the name of the Owner and recover rents and other sums due; and when expedient, to settle, compromise, and release such actions or suits or reinstate such tenancies. Agent may lawfully terminate any tenancy when, in the Agent's judgment, sufficient cause (including but not limited to nonpayment of rent) for such termination occurs under the terms of the tenant's lease. For this purpose, the Agent will consult with legal counsel to bring actions for eviction and judicial pleading incident to such action; provided, however, the Owner is notified and consents to such actions in advance, the Agent keeps the Owner informed of such actions and follows such instructions as the Owner may prescribe for the conduct of any such action. Attorney fees and other necessary costs incurred in connection with such actions will be paid by the Owner as a cost of operating the Property.

e.   Disbursements from Operating Account.

    i.    From the funds collected by the Agent pursuant to this Agreement, the Agent will make the following disbursements promptly when payable:

        1.   Reimbursement to the Agent for compensation payable to independent contractors and employees specified in Section 2.b.v hereof.

        2.   All sums otherwise due and payable by the Owner as expenses of the Property authorized to be incurred by the Agent under the terms of this Agreement including compensation payable to the Agent for its services hereunder.

        3.   An operating reserve of $100 per property will be held to cover maintenance/repairs on each property. A minimum of $500 operating reserve will be held when less than 5 properties are managed.

    ii.    In the event the balance in the Owner's account is at any time insufficient to pay disbursements due and payable under this Section, the Agent will inform the

*AMN*
AMN

Owner of that fact and the Owner will provide funds to the Agent to enable the Agent to pay such amounts. In no event will the Agent be required to use its own funds to pay such disbursements.

   iii.  Fidelity Bond. The Agent will furnish at its own expense, a fidelity bond in the amount of $25,000 to protect the Owner against misappropriation of the Property funds by the Agent and its employees.

   iv.  Financial Responsibility of the Owner. Owner shall be personally responsible for the payment for any expenses or other obligations incurred by the Agent in the proper exercise of its authority and duties hereunder and shall be personally responsible for the payment to the Agent of the amount of excess expenditures over receipts. Owner hereby grants to Agent a lien against said Property to insure the repayment to Agent of said excess and any other amount that may be due hereunder. In the event that any or all of such an excess remains unpaid to Agent ten (10) days after Agent has delivered to Owner a statement showing the amount of excess, Owner will incur a service charge equal to one and one-half percent (1 ½%) of the amount of the excess unpaid each month. Furthermore, any property, personal or real, held by Agent at a site other than Property, on behalf of Owner, for which a balance remains unpaid past 30 days, shall be considered abandoned property. Owner releases the Agent to dispose of such abandoned property as Agent sees fit.

f.  Compliance with Governmental Orders. The Agent will take such actions as may be necessary to comply promptly with any and all government orders or other requirements affecting the Property, whether imposed by federal, state, county or municipal authority.

g.  Habitability. Owner warrants that the premises are habitable and that they are in compliance with all state and local ordinances relating to rental property.

h.  Nondiscrimination. In the performance of its obligations under this Agreement, the Agent will comply with the provisions of any federal, state, or local law prohibiting discrimination in housing on the grounds of race, color, sex, physical or mental disability, marital or familial status, creed or national origin.

i.  Agent's Compensation. The sole compensation which the Agent shall be entitled to receive from Owner for all services performed under Section 2 of this Agreement shall be paid to Agent as indicated in attached "Addendum A - Management Package Selection Sheet"

   i.  Other Compensation - Agent shall collect revenue from tenants and prospective tenants for items such as, but not limited to: application fees, notice posted fees, late fees, lease renewal fees, pet fees, document preparation fees, administration fees, and maintenance services. Fees payable to Agent will be collected pursuant to fees payable from tenant to owner. Any tenant fees due to the owner are indicated as such in Addendum A

   ii.  Changes to fee structure – Agent reserves the right to change any fee but will only do so with at least 30 days written notice to Owner.

   iii.  In the event Owner sells the demised premises to a tenant acquired by Agent during term of the lease or within ninety (90) days after termination of a lease, Agent is entitled to a brokerage commission of 3% of the sales price. In such an event, Agent will, at owner's request, Broker transaction with both sides within a defined Brokerage Relationship.

   iv.  In the event Owner wants to sell the property to a buyer that is not the tenant, Agent will, at the owner's request, broker the transaction within a defined Brokerage Relationship for a commission of 5% of the sales price, provided there

_AMN_
AMN

Exhibit 15, Page 197

is a cooperating broker involved in the transaction. If Agent secures a contract without a cooperating broker, Agent will be entitled to a commission of 4% of the sales price.

j.  Tenant Performance. The Agent does not warrant that the Tenant or Tenants selected to lease the Property will perform the requirements of the lease; except as defined in Agent's Lease Tenure Performance Guarantee - Should any tenant procured by Agent break their lease within the first twelve (12) months of their lease term, Agent will waive the next leasing fee of the property. This Guarantee is only applicable to properties that are managed by Agent and for Tenants procured by Agent.

3.  INDEMNITY.

a.  The Agent shall perform its obligations and duties under this Agreement as agent of the Owner, and any and all obligations reasonably incurred by the Agent on behalf of the Owner hereunder shall be for the account and at the expense of the Owner. Owner agrees to indemnify and hold harmless the Agent, its successors and assigns, from and against any and all liability paid or incurred by Agent arising from or as the result of or in any way connected with any and all of the following:

  i.  The performance by the Owner of any or all of its obligations and agreements arising under or by virtue of this Agreement.

  ii.  Any bodily or personal injury to or death of any person or persons whomsoever (including but not limited to any agent, servant or employee of the Owner or the Agent, or of any of their respective contractors or subcontractors, or any lessee, tenant, licensee, guest, invitee or any other person who enter upon the Property), or any loss, theft or destruction of or damage to any property of the Owner or of others, arising out of or in connection with the ownership of the Property by the Owner or the operation, leasing or management of the Property by Owner, or the exercise or failure to exercise any of the duties or obligations of the Owner with respect to the foregoing.

  iii.  The presence, suspected presence, release, disposal or discharge at any time or times or from time to time of any environmental pollutants or any dangerous, hazardous or toxic substances, materials or wastes of any kind or nature whatsoever on, in, under, from or in the vicinity of the Property or any part or parts thereof, regardless of whether same occurs or is discovered before, during or after the Term of this Agreement.

  iv.  Any liability for any or all of the foregoing that may be imputed as a matter of law to the Agent or any of its officers, directors, agents, servants or employees; provided, however, that the Owner shall not be required to indemnify the Agent or any of its officers, directors, agents, servants or employees, with respect to any matter arising out of the negligence, willful misconduct or breach of the terms of this Agreement by the Agent, office, director, agent, servant or employee seeking indemnification hereunder.

b.  Agent agrees to indemnify and hold harmless the Owner, it successors and assigns, from and against any and all liability paid or incurred by the Owner arising from or as a result of or in any way connected with any and all of the following:

  i.  The performance by the Agent of, or their failure of the Agent to perform, any or all of its obligations and agreements arising under or by virtue of this Agreement.

  ii.  Any bodily or personal injury to or death of any person or persons whomsoever (including but not limited to any agent, servant or employee of the Owner or the Agent, or of any of their respective contractors or subcontractors, or any lessee,

AMN
AMN

Exhibit 15, Page 198

tenant, licensee, guest, invited or any other person who enter upon the Property), or any loss, theft or destruction of or damage to any property of the Agent or others, arising out of or in connection with the ownership of the Property by the Owner or the operation, leasing or management of the Property by the Agent, or the exercise or failure to exercise any of the duties, obligations or powers herein or hereafter granted to, or conferred upon or assumed by the Agent.

 iii. Any liability for any or all of the foregoing that may be imputed as a matter of law to the Owner of any of its members, agents, servants, or employees; provided, however, that the Agent shall not be required to indemnify the Owner, its members, agents, servants or employees with respect to any matter arising out of the negligence or willful misconduct or breach of the terms of this Agreement by the Owner or other person seeking indemnification hereunder.

4. Pets. Pets shall be considered for approval on a case by case basis. Owner will be notified and will decide before a lease is signed whether or not to allow pets. Agent agrees to inform Owner of all breeds of pet who potentially may inhabit the Property. Owner agrees to hold Agent harmless for any misrepresentation by Tenant either by mouth or application as to the amount of pets and their breeds. Owner also holds the Agent harmless for any actions of the pets allowed to live on the Property.

5. Non-Solicitation; Non-Disparagement. For so long as the Owner remains a client of the Agent and for eighteen (18) months after termination of this Agreement for whatever reason, the Owner will not:

 a. directly or indirectly, engage, employ or hire any employee of the Agent or any of its affiliates (whether or not for compensation), or any other person whose status as an employee of the Agent or any of its affiliates has terminated while the Owner is under this Agreement with the Agent or during the eighteen (18) month period after the termination of the Owner's Agreement for whatever reason, as an officer, employee, consultant, agent, adviser, partner or independent contractor for any person or entity other than the Agent or any of its affiliates;

 b. directly or indirectly, on the Owner's own behalf or on behalf of any other person or entity (i) solicit, induce or attempt to induce any employee of the Agent or any of its affiliates to leave the employ of the Agent or any of such affiliates, or (ii) in any way interfere with the relationship between the Agent or any of its affiliates, on the one hand, and any employee of the Agent or any of its affiliates, on the other hand.

6. Age of Property. The Owner hereby represents to Agent that the Property was constructed on or about 1900s.

7. Notice. All written notices to Owner may be addressed and mailed to the Owner at El Monte Capital or may be emailed to Owner at aaron.noe@12br.com and All written notices to Agent shall be mailed to 1 Independence Plaza Suite 620. Homewood, AL 35209 or may be emailed to Agent at support@Evernest.co. Electronic notice sent via email shall be deemed to have the same legal effect and validity as written notice for all purposes under this agreement.

8. Termination. 12 month agreement whereas owner agrees to pay remainder of term if terminated. 90 day termination notice after year 1. * Please see addendum B.

9. BINDING AGREEMENT. This Agreement shall be binding upon and will insure to the benefit of the parties hereto, their representatives, successors, heirs, or assigns.

10. ATTORNEY'S FEES. If a party hereto goes to court to enforce his rights hereunder, the party that prevails shall be entitled to recover reasonable attorney's fees and other associated costs.

11. INTERPRETATIVE PROVISIONS.

 a. This agreement represents the complete understanding between the Owner and the Agent regarding the management of the Property. Any changes to this agreement shall

*AMN*
AMN

Exhibit 15, Page 199

be communicated in writing by the Agent to the Owner, and such changes shall be subject to a notice period of at least 30 days to allow for review and consideration. The agreement may be modified by mutual written agreement executed by the Principal Parties or by electronic written notice provided by the Agent, the receipt and acceptance of which shall be acknowledged electronically by the Owner, subject to the notice period.

b.  This Agreement may be executed in counterparts, each of which shall constitute a complete original Agreement, which may be introduced in evidence or used for any other purpose without production of any other counterparts.

12. AGENT DISCLOSURES.

a.  Agent employs licensed real estate professionals in accordance with Alabama state real estate laws.

b.  Agent may have an ownership interest in 3rd party vendors who perform services for Agent.

c.  By signing this agreement the owner(s) hereby agree to receive an electronic IRS Form 1099-MISC.

IN WITNESS WHEREOF, The Principal Parties have executed this Agreement on the date first above written.

OWNER

Guardian CV1, LLC

AGENT

Evernest, LLC

*Aaron M Noe*
Aaron M Noe (Sep 8, 2023 09:25 PDT)                    Sep 8, 2023

Name: Aaron Noe                                        Date
Title: Managing Member

*Hunter Terryn*
Hunter Terryn (Sep 8, 2023 12:43 CDT)                  Sep 8, 2023

Name: Hunter Terryn                                    Date
Title: Broker

Exhibit 15, Page 200

## Addendum A

**Monthly Management Fee Pricing, Ancillary Administrative Fees, Property Roster**

8% of monthly rent

| Features: | Pricing: |
|---|---|
| • Property Inspection<br>• Rent Collection Services<br>• 24/7 Tenant Comm<br>• Maintenance Work Order Mgmt<br>• Electronic Monthly Statements & Cash Disbursements<br>• Dedicated Owner Phone Line<br>• Owner Portal<br>• Monthly Inspections during Vacancy | • Leasing Fee- 50% of a month's rent for vacant properties and a $50/month fee for occupied<br>• Renewal Fee- $150 for vacant properties and $50/month for occupied<br>• $90/hour handyman<br>• $105/speciality maintenance (HVAC & Plumbing)<br>• Hourly labor rates subject to change per market but not without a minimum 30 day notice<br>• $40,000 onboarding deposit that will be applied to future management fees |

- Distressed Properties-any properties that we bring on with squatters, trespassers, non paying tenants, active evictions, or tenants with no lease, ledger, accurate contact info, may be subject to a $350 onboarding fee.

- For properties deemed uninhabitable, the fee will be labor + materials for our maintenance techs. Please see above regarding hourly maintenance rate.

- Inherited tenants subject to eviction, refer to distressed property clause above

- Reserves- $500/door. Prioritization schedule will be set based on occupied, vacant, renovation, sold/offloaded/uninhabitable.

- Termination fees will be waived for properties sold using Evernest brokerage services.

| Guardian CV1, LLC | 1009 Rutledge Dr | Midfield | Alabama | 35228 |
| Guardian CV1, LLC | 1525 Matt Leonard Dr SW | Birmingham | Alabama | 35211 |
| Guardian CV1, LLC | 229 22nd Ave NW | Center Point | Alabama | 35215 |

OWNER

Guardian CV1, LLC


*Aaron M Noe*
Aaron M Noe (Sep 8, 2023 09:25 PDT)          Sep 8, 2023

Name: Aaron Noe                              Date
Title: Managing Member

## Addendum B

**Termination Policy**

Agent shall be due a Termination fee for each house or unit where Owner terminates Agent's services. The fee shall be calculated by taking the average of the previous 3 months of management fees for the house or unit and multiplying this average as follows:

a. Year 1: multiply the average by four

b. Year 2: multiply the average by three

c. Year 3: multiply the average by two

d. Year 4: multiply the average by one

e. Year 5+: no termination fee

## Addendum C

For properties deemed uninhabitable that require services specifically but not limited to boarding up and/or overall securement of said property, Evernest LLC will charge a fee of $90/hour for labor plus materials. If owners request a routine visit in terms of a wellness cadence, the charge would be $90/hour for time spent.

OWNER

Guardian CV1, LLC

*Aaron M Noe*
Aaron M Noe (Sep 8, 2023 09:25 PDT)

Aaron Noe

## Addendum D

This agreement between Guardian Fund, the owner and Evernest, LLC, the Agent is subject to a court approval. Selection of said judge/court, scheduling and all associated costs regarding said court approval is the responsibility of Guardian Fund, the owner.

## Addendum E

**3rd Party Vendors:** Evernest employs licensed and insured in-house technicians in order to provide the absolute best service for your property and the resident living in your home. Whenever possible, we use

our technicians because they have built trust with the resident and are accountable for the quality of workmanship they provide.

In the event we are not able to use one of our technicians on your property, we will contract with a trusted 3rd party vendor and charge a 10% fee to dispatch, coordinate, and handle invoicing for the work. This might occur when the scope of work is outside of our capabilities.

We also provide a one-year maintenance guarantee on all work completed on a property. However, in the event that either party terminates the management agreement, the maintenance guarantee will also end.

**Home Warranty**: Evernest will execute all Home Warranty claims on a case by case basis. Evernest will charge the owner a $100 fee to handle all Home Warranty Claims. Depending on the claim's complexity, we reserve the right to charge out an hourly rate for time spent managing and working with the Home Warranty company on your behalf.

In some cases, we spend hours communicating between the home warranty provider and the resident. Most of the time, the Home Warranty work is not handled in a timely manner which causes more communication and frustration with your resident.

---

**HOA**: Evernest will not make HOA payments on an owner's behalf but will manage all needed communication between the HOA and resident.

Other Fees Evernest will not be responsible for paying the following on the owner's behalf:

- Property Taxes
- Property Insurance
- Property Mortgage
- Home Warranty Fees

---

**Annual Inspection:**

We believe that annual inspections are beneficial for the care of your property. Here are the benefits of the annual inspections:

- We are able to catch any issues in the home that are left unaddressed, and might become a major repair over time.


AMN

- We make sure that your resident is responsibly changing air filters and keeping the batteries in the smoke detectors working properly.
- Ensure the tenant is abiding by the terms and conditions set within the lease.
- You receive a full report with images so that you can see how your resident is caring for your property.

We value these annual inspections by a trained professional at $299 but our Annual Inspection Package will be billed to you at just $149. **NOTE: If you are on the Platinum offering, this service is a feature that is already included in the pricing and you will not receive a separate charge per service.**

If you choose to opt-out of this service, please notify your property manager and we'll make sure to eliminate the annual inspection and reports for you.

☐ Please check here if you wish to opt out of the Annual Inspection. If you check this box, please understand it is possible that we do not access inside the property for the duration of the lease to ensure the tenant is abiding by the agreement.



AMN

**Optional Services for Your Property**

Our optional services are designed to ensure you have the best property management experience with Evernest.

Read through each of these services to determine if any of them might benefit you. If you decide that one or more of these optional services make sense to you, simply circle the service and we'll add it to your management services.

## 1.   Eviction Protection Plan (EPP)

Our Eviction Protection Plan (EPP) is available for your Evernest tenant. It is designed to give you peace of mind knowing you won't be caught covering the expense of an eviction. EPP covers the cost of an eviction (which can be up to $900) should an unforeseen issue arise that prevents your tenant from paying rent in agreement with their lease (loss of job or health related issue). We will cover all attorney fees, court costs, and set out charges associated with evicting your tenant. We will also change out your locks.

The cost of EPP is $200 per year, billed annually.

☐ **Add the Eviction Protection Plan to my Management Plan.**

## 2. Bi-annual HVAC Preventative Maintenance

Each year we receive emergency calls from tenants regarding their air or heat. These calls (especially emergency weekend calls) end up costing owners much more than a routine service call.

Our Spring and Fall Heating and Air Service can aid in the early detection of problems and save the cost of expensive, emergency repairs. A skilled Evernest tech will visit your home once in the fall and once in the spring to perform an assessment and cleaning. During our check, we also ensure that the unit(s) is up to code.

The cost of our Bi-annual HVAC Preventative Maintenance is $150 each.

☐ **Add Bi-Annual HVAC Preventative Maintenance to my Management Plan**



AMN

Exhibit 15, Page 206

### 3. Rent Protection Membership

Are you worried about your tenant not paying rent? When we surveyed our owners, this was their number one worry. With our Rent Protection Membership (included in the Platinum Plan), you won't ever worry about not collecting rent again.

Frequently Asked Questions:

What does the rental income protection cover?

The membership benefits cover up to 11 months or $25,000 in lost rent per rental unit, whichever is less. It also covers the cost of eviction which include court costs, attorney fees, and set-out charges. How Does It Work?

If your tenant does not pay rent, you will still be paid rent by Evernest. If we must move to evict your tenant, we will pay for all eviction costs and continue paying you rent. When we gain possession of the rental home, we will continue paying rent to the lessor of up to three months or until we place a new tenant in your home as long as benefits do not exceed $25,000 or 11 months of rent paid.

Is my current tenant eligible?

Yes, if the tenant has been up to date on payments for the last 12 consecutive months they are eligible.

How much does it cost?

The rent protection membership cost is equal to one month's rent per year along with a $100 one-time fee. We will break that fee up over a 12 month period.

\_\_\_\_ **Add Rent Protection to my GOLD or INVESTOR Plan (already included in Platinum)**

### 4. Annual Gutter Cleaning

Gutters can fill up quickly, especially in the Southeast, and can be one of the leading problems with exterior damage to your home. When your gutters are full of leaves, water can run behind the gutters causing rot to the soffit and fascia boards. To prevent this damage we recommend having your gutters cleaned at least once per year.

The cost of our Annual Gutter Cleaning will range between $150 and $250 per cleaning depending on the size of the house.

☐ **Add Annual Gutter Cleaning to my Management Plan**

### Utility Information

Water Provider:

Name      _____



Exhibit 15, Page 207

Address      _____

Phone      _____

Power Provider:

Name      _____

Address      _____

Phone      _____

Gas Provider:

Name      _____

Address      _____

Phone      _____

## Home Warranty

Home Warranty?      ___ YES ___ NO *

*Please provide any relevant information and documents related to your Home Warranty.*

**Year the Home was Built?** Please record the year your home was built _____

**Home Alarm?** If so, please provide the code to disarm _____

**Note: Evernest will execute all Home Warranty claims on a case by case basis. Evernest will charge the owner a $100 fee to handle all Home Warranty Claims. Depending on the claim's complexity, we reserve the right to charge out an hourly rate for time spent managing and working with the Home Warranty company on your behalf.**

Exhibit 15, Page 208

## Disclosure of Information on Lead-Based Paint and/or Lead-Based Paint Hazards

**Lead Warning Statement**

*Housing built before 1978 may contain lead-based paint. Lead from paint, paint chips, and dust can pose health hazards if not managed properly. Lead exposure is especially harmful to young children and pregnant women. Before renting pre-1978 housing, lessors must disclose the presence of known lead-based paint and/or lead-based paint hazards in the dwelling. Lessees must also receive a federally approved pamphlet on lead poisoning prevention.*

**Lessor's Disclosure**

(a)  Presence of lead-based paint and/or lead-based paint hazards (check (i) or (ii) below):

(i) ☐ Known lead-based paint and/or lead-based paint hazards are present in the housing (explain).

_____

_____

(ii) ■ Lessor has no knowledge of lead-based paint and/or lead-based paint hazards in the housing.

(b)  Records and reports available to the lessor (check (i) or (ii) below):

(i) ☐ Lessor has provided the lessee with all available records and reports pertaining to lead-based paint and/or lead-based paint hazards in the housing (list documents below).

_____

_____

(ii) ■ Lessor has no reports or records pertaining to lead-based paint and/or lead-based paint hazards in the housing.

**Lessee's Acknowledgment (initial)**

(c)  _____ Lessee has received copies of all information listed above.

(d)  _____ Lessee has received the pamphlet *Protect Your Family from Lead in Your Home.*

**Agent's Acknowledgment (initial)**

(e)  _HT_ Agent has informed the lessor of the lessor's obligations under 42 U.S.C. 4852d and is aware of his/her responsibility to ensure compliance.

**Certification of Accuracy**

The following parties have reviewed the information above and certify, to the best of their knowledge, that the information they have provided is true and accurate.

| | | | |
|---|---|---|---|
| _Aaron M Noe_<br><sub>Aaron M Noe (Sep 8, 2023 09:55 PDT)</sub> | Sep 8, 2023 | | |
| **Lessor** | Date | Lessor | Date |
| **Lessee** | Date | Lessee | Date |
| _Hunter Terryn_<br><sub>Hunter Terryn (Sep 8, 2023 17:45 CDT)</sub> | Sep 8, 2023 | | |
| **Agent** | Date | Agent | Date |

# AUTHORIZATION AGREEMENT FOR DEPOSITS (ACH CREDITS)

**COMPANY NAME**

Evernest LLC

**Tax id Number:**

80-0158684

## CHECK ONE:

❑ ADD
(New Pre Authorized Debit Participant)

❑ CHANGE
(Financial Institution and/or Account #)

❑ DELETE
(Cancel Participation in the Program)

**NOTE:** Due to the time required for company and bank processing, please allow one or two weeks for processing.

I (we) hereby authorize Evernest LLC , hereinafter called COMPANY, to initiate credit entries and to initiate, if necessary, debit entries and adjustments for any credit entries in error to my (our) account indicated below and the depository financial institution named below, hereinafter called DEPOSITORY, to debit and/or credit the same to such account.

| DEPOSITORY FINANCIAL INSTITUTION | | BRANCH | |
|---|---|---|---|
| CITY | STATE | | ZIP CODE |

TRANSIT ROUTING NUMBERS

| �psi: | ⒫: |
|---|---|

ACCOUNT NUMBER INFORMATION

|  |
|---|

❑ CHECKING

❑ SAVINGS

This authority is to remain in full force and effect until COMPANY has received written notification from me (or either of us) of its termination in such a time and in such a manner as to afford COMPANY and DEPOSITORY a reasonable opportunity to act on it. **Please attach a voided check for account validation.**

| NAME(S) - Please Print | | | |
|---|---|---|---|
| ADDRESS OF HOUSE/APT | | CITY/STATE | ZIP CODE |
| SIGNED | | DATE | |

NOTE: Please submit this completed form to us along with a copy of a voided check OR a picture of a check. These can be emailed to support@evernest.co

Exhibit 15, Page 210

| Form **W-9**<br>(Rev. October 2018)<br>Department of the Treasury<br>Internal Revenue Service | **Request for Taxpayer<br>Identification Number and Certification**<br><br>► Go to *www.irs.gov/FormW9* for instructions and the latest information. | **Give Form to the<br>requester. Do not<br>send to the IRS.** |

**1** Name (as shown on your income tax return). Name is required on this line; do not leave this line blank.

**2** Business name/disregarded entity name, if different from above

**3** Check appropriate box for federal tax classification of the person whose name is entered on line 1. Check only one of the following seven boxes.

☐ Individual/sole proprietor or single-member LLC    ☐ C Corporation    ☐ S Corporation    ☐ Partnership    ☐ Trust/estate

☐ Limited liability company. Enter the tax classification (C=C corporation, S=S corporation, P=Partnership) ► _____

Note: Check the appropriate box in the line above for the tax classification of the single-member owner. Do not check LLC if the LLC is classified as a single-member LLC that is disregarded from the owner unless the owner of the LLC is another LLC that is not disregarded from the owner for U.S. federal tax purposes. Otherwise, a single-member LLC that is disregarded from the owner should check the appropriate box for the tax classification of its owner.

☐ Other (see instructions) ►

**4** Exemptions (codes apply only to certain entities, not individuals; see instructions on page 3):

Exempt payee code (if any) _____

Exemption from FATCA reporting code (if any) _____

*(Applies to accounts maintained outside the U.S.)*

**5** Address (number, street, and apt. or suite no.) See instructions.

Requester's name and address (optional)

**6** City, state, and ZIP code

**7** List account number(s) here (optional)

**Part I    Taxpayer Identification Number (TIN)**

Enter your TIN in the appropriate box. The TIN provided must match the name given on line 1 to avoid backup withholding. For individuals, this is generally your social security number (SSN). However, for a resident alien, sole proprietor, or disregarded entity, see the instructions for Part I, later. For other entities, it is your employer identification number (EIN). If you do not have a number, see *How to get a TIN,* later.

Note: If the account is in more than one name, see the instructions for line 1. Also see *What Name and Number To Give the Requester* for guidelines on whose number to enter.

Social security number

☐☐☐ - ☐☐ - ☐☐☐☐

or

Employer identification number

☐☐ - ☐☐☐☐☐☐☐

**Part II    Certification**

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me); and
2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding; and
3. I am a U.S. citizen or other U.S. person (defined below); and
4. The FATCA code(s) entered on this form (if any) indicating that I am exempt from FATCA reporting is correct.

**Certification instructions.** You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the certification, but you must provide your correct TIN. See the instructions for Part II, later.

**Sign Here** | Signature of U.S. person ► | Date ►

## General Instructions

Section references are to the Internal Revenue Code unless otherwise noted.

**Future developments.** For the latest information about developments related to Form W-9 and its instructions, such as legislation enacted after they were published, go to *www.irs.gov/FormW9.*

## Purpose of Form

An individual or entity (Form W-9 requester) who is required to file an information return with the IRS must obtain your correct taxpayer identification number (TIN) which may be your social security number (SSN), individual taxpayer identification number (ITIN), adoption taxpayer identification number (ATIN), or employer identification number (EIN), to report on an information return the amount paid to you, or other amount reportable on an information return. Examples of information returns include, but are not limited to, the following.

• Form 1099-INT (interest earned or paid)

• Form 1099-DIV (dividends, including those from stocks or mutual funds)

• Form 1099-MISC (various types of income, prizes, awards, or gross proceeds)

• Form 1099-B (stock or mutual fund sales and certain other transactions by brokers)

• Form 1099-S (proceeds from real estate transactions)

• Form 1099-K (merchant card and third party network transactions)

• Form 1098 (home mortgage interest), 1098-E (student loan interest), 1098-T (tuition)

• Form 1099-C (canceled debt)

• Form 1099-A (acquisition or abandonment of secured property)

Use Form W-9 only if you are a U.S. person (including a resident alien), to provide your correct TIN.

*If you do not return Form W-9 to the requester with a TIN, you might be subject to backup withholding. See What is backup withholding, later.*

Cat. No. 10231X    Form **W-9** (Rev. 10-2018)

Exhibit 15, Page 211

DocuSign Envelope ID: E54ECCEB-B577-404D-A631-1B38B38C7B8C

## Addendum F

Guardian CV1, LLC, Guardian CV2, LLC and Guardian DE, LLC have not petitioned for bankruptcy protection. As such, both parties agree to strike Addendum D from the Rental Listing and Management Agreement dated July 18th, 2023, between Guardian CV1, LLC and Evernest, LLC. This agreement will **NOT** be subject to court approval.

IN WITNESS WHEREOF, The Principal Parties have executed this Agreement on the date first above written.

**OWNER**

Guardian CV1, LLC

10-25-23

Name: Aaron Noe                Date

Title: Managing Member

**AGENT**

Evernest, LLC

11/16/2023

Name: Hunter Terryn           Date

Title: Broker

Exhibit 15, Page 212

# Exhibit 16

## TIMELINE

**July 15, 2005**: Krch Realty is formed.

**January 29, 2009**: Hughes Private Capital, LLC is formed.

**April 15, 2016**: Guardian is formed.

**March 3, 2017**: 12 Bridges, LLC is formed.

**May 1, 2017**: Vista Fund LLC is formed.

**March 2022**: Noe is contacted by a recruiter regarding the possibility of working at HPC.

**April 19, 2022**: Hughberry Homes LLC is formed.

**May 2022**: Noe starts working at HPC.

**July/August 2022**: Noe discovers that investors are receiving inaccurate periodic statements.

**October/November 2022**: Noe informs Hughes, Sixberry, and Krch regarding financial, operation, and management issues at HPC.

**December 2022**: The fund was gated.

**Early February 2023**: Noe resigned from HPC.

**February 8, 2023**: Resolution passed which authorized Noe to sign as Real Estate Administrator on behalf of Home Partners, LLC

**February 17, 2023**: The formation of 12BR.  Noe is named as President. 12BR was formed by Larry Pino of Pino Law Group at the request of HPC.

**March 1, 2023**: A Warranty Deed is signed by Noe on behalf of 12 Bridges, LLC.

**On or about March 13, 2023**: 12BR began to employ individuals to perform property management and other functions necessary to service Guardian.

**On or about mid-March 2023**: 12BR assumed the property management contract from KRCH.

**March 14, 2023:** Hughes Private Capital, LLC converted to Hughes Private Capital, Inc.

**March 17, 2023**: Debtor's involuntary Chapter 7 bankruptcy filed.

**March 17, 2023**:  12 Bridges, LLC converted 12 Bridges, Inc.

**March 20, 2023**: Resolution passed which authorized Noe to sign as Real Estate Administrator on behalf of 12 Bridges, LLC.


**March 29, 2023**: Noe participates in a webinar where he indicates that he is the CEO of HPC and founder of El Monte.

**April 10, 2023**: El Monte Capital, Inc. is formed and HPC engages El Monte Capital, Inc. as manager, CRO and financial advisor to Guardian.

**April 11, 2023**: Hoy Chrissinger Vallas PC replaced HPC as Resident Agent and Noe was replaced as an officer by Maravilla and Palmer.  Palmer was added as a director.

**On or about April 11, 2023**: Guardian purchased a 100% stock ownership in 12BR.  The stock purchase agreement was signed by Steve Sixberry representing Guardian and Palmer representing 12BR.

**April 11, 2023**: Guardian filed Chapter 11 Bankruptcy.

**April 19, 2023**: Resolution passed which authorized Noe to sign as Real Estate Administrator on behalf of 12 Bridges, Inc.

**May 22, 2023**: Property Management Agreement between 12BR and Guardian is signed by Noe.

**September 28, 2023**: 12BR enters into several Rental Listing and Management Agreements with Evernest, all signed by Noe as "director" of 12BR.

Exhibit 16, Page 214

# Exhibit 17

## Commercial Lease & Deposit Receipt

**1. Names**

This Commercial Lease is entered into on the _26_ day of April 2023, by and between **Cypress Meadowood, LLC (Landlord), and 12B Residential, Inc. (Tenant).**

**2. Premises Being Leased**

    **2.1 Premises:** An office suite consisting of approximately 4,843 rentable square feet, and commonly known as 5905 South Virginia St. Suite 201, Reno, Nevada 89502 **(the "Premises").**

    **2.2 Use of Premises:** The Premises shall be used as a business or professional office, and for associated, or ancillary legal related uses.

**3. Term of Lease**

This lease shall continue for twelve (12) months, commencing on **May 1st, 2023.** The lease term will expire on **April 30th, 2024.**

**4. Occupancy**

Tenant shall maintain occupancy of the premises, with no interruption, for the duration of the Lease Agreement.

**5. Rent**

    **5.1 Rent Schedule:** Tenant shall pay monthly rent amount of Seven Thousand Seven Hundred Forty-Eight dollars and Eighty cents **($7,748.80).**

    **5.2 Full-Service Gross Lease**

The rent under Section 5.1 of this lease includes all operating expenses for the property with the exception of janitorial service within the Tenant's Premises, and any excess operating costs

Tenant (_AP_) Landlord (_SwC_)

Page 1

brought about by after standard Building Service Hours operation by the Tenant. Standard Building Service Hours are: 9:00 AM to 5:00 PM Monday through Friday.

### 5.3 Payment of Rent

Tenant will pay rent in advance on the first day of each month. All rents will be paid to:

**Cypress Meadowood, LLC**
**c/o Cypress Management**
**1005 Terminal Way, Suite 259**
**Reno, Nevada 89502**

Or at such other place as may be designated by Landlord from time to time. Electronic transfer is preferred method of payment, and Tenant is encouraged to set this up with the management company to avoid late payments.

### 5.4 Initial Payment Received & Security Deposit

Upon execution of this Lease, Tenant shall simultaneously pay to Landlord a total amount of $22,748.80. This total includes $15,000.00 to be retained as a security deposit, as well as the first month's full rent ($7,748.80). The security deposit is refundable to Tenant within 30 days after the expiration of this Lease, as long as Tenant is not in default beyond any applicable cure period and has left the Premises in a good state and condition as they were at the commencement of Tenant's occupancy of the Premises, except for reasonable wear and tear.

### 5.5 Late Fees

The rent is due on the first (1st) day of each month. In the event rent is not received by Landlord by the fifth (5th) of the month, Tenant agrees to pay a late fee equal to 10%, plus interest at 8% per annum on the delinquent amount. Tenant further agrees to pay $100.00 for each dishonored bank check. The late charge period is not a grace period, and Landlord is entitled to make written demand for any rent if not paid when due.

## 6. Intentionally Omitted

Tenant ( AP ) Landlord ( SWC )

Page 2

## 7. Tenant Improvements

**7.1 Tenant Improvements:** Landlord and Tenant agree that the Premises are in rent-ready condition.

**7.2 Improvements by Tenant:** If Tenant chooses to make any additional improvements, Tenant will submit a Scope of Work for Landlord's approval, not to be unreasonably withheld. Tenant shall assume the responsibility for completion of Tenant's own TI's, to their full satisfaction, including any IT equipment, electrical outlets, cabling, wiring, furnishings, and equipment cooling, to meet their operating needs. Tenant will be responsible for removing all of their tenant improvements installed and return the suite to its original conditions, prior to completion of the lease.

**7.3 No Liens:** Tenant shall not cause or permit any lien or encumbrance, of any kind to attach or to be placed upon the building, the property, or the Premises.

**7.4 Alterations:** During the term of this Lease, the Tenant may subsequently request in writing to alter the Premises, with the Landlord's written approval, not to be unreasonably withheld. Alterations shall not impair the safety or structural integrity of the building, and be made in compliance with all applicable laws and may not be required to have permits from the local authorities.

## 8. Landlord's Representations

Landlord represents that:

A. At the beginning of the lease term, the Premises will be properly zoned for Tenant's stated use and will be in compliance with all applicable laws and regulations.

B. The Premises have not been used for the storage or disposal of any toxic or hazardous substance and Landlord has received no notice from any governmental authority concerning removal of any toxic or hazardous substance from the property.

Tenant (_AP_) Landlord (_SWC_)

Page 3

## 9. Maintenance and Repairs

**9.1 Landlord responsibilities:** Landlord will maintain and make all necessary repairs to the roof, structural components, exterior walls and interior common walls of the Premises, and heating, ventilation and air conditioning systems (HVAC). Landlord will regularly clean and maintain (including snow removal) the parking areas, exterior, landscaping and common areas of the building so that the Premises will be kept in an attractive condition. Landlord will use its best efforts to minimize interference with Tenant's business, and will restore the Premises following all work as quickly as possible, except for circumstances beyond Landlord's control.

**9.2 Tenant Responsibilities:** Tenant will clean and maintain Tenant's Premises so that it will be kept in good working order and in attractive condition, as well as address any maintenance within the suite, including lightbulbs or other supplies. Tenant is responsible for janitorial service inside the premises.

## 10. Insurance

**10.1 Landlord:** Landlord will carry all risk property insurance and extended coverage insurance on the building, and all other improvements to the property of which it is a part, for not less than replacement value, and comprehensive commercial general liability insurance with a minimum single limit of $1,000,000.00 per occurrence.

**10.2 Tenant:** Tenant will carry public liability insurance; this insurance will include Landlord as an additional insured party. The public liability coverage for personal injury will be at least $1,000,000.00 per occurrence. Tenant is also responsible to insure its business and personal property located on the Premises.

**10.3 Release of Liability:** Landlord and Tenant release each other from any liability to the other for any property loss, property damage or personal injury to the extent covered by insurance carried by the party suffering the loss, damage or injury, or required to be carried by such party.

Tenant ( AP ) Landlord ( Swc )

**10.4 Certificate of Insurance:** Tenant shall provide Landlord a certificate of insurance for all insurance policies that this lease requires Tenant to obtain prior to commencement of the lease, and copies of renewed Certificates each year.

## 11. Signage

Landlord guarantees both directory and suite signage for Tenant, per project and municipal standards. All signage shall be at the sole cost of Tenant. Tenant is advised that monument and building signage is subject to review and approval by Bank of America, per their existing lease agreement, and cannot be guaranteed.

## 12. Parking

Parking is available on a first come first serve basis at no additional charge except for Bank of America reserved parking spaces as shown in Exhibit B, which may not be used by Tenant, its employees, agents or guests during bank business hours. The property includes total parking in excess of 200 spaces.

## 13. Access

Normal business hours are 9AM to 5PM Monday through Friday. However, Tenant shall have access 24 hours per day, 7 days per week, and 52 weeks per year to the Premises, building and parking facilities. Some services, like Heating, Ventilation & Air Conditioning (HVAC), operate during normal business hours. Please refer to Section 14 for more details. Additional use is available upon request.

## 14. Services

Landlord agrees to provide the following services to the suite 24 hours per day, 7 days per week, and 52 weeks per year: electrical service, water, trash, and sewer. Landlord provides HVAC service during building operating hours of 8am to 5pm Monday through Friday. If Tenant wishes for extended HVAC service, Tenant may request to Landlord in writing, and pay extended hour's

Tenant (_AP_) Landlord (_SWC_)

Page 5

service charge of $50.00 per hour, and Landlord will provide such service upon request.

## 15. Subordination, Non-Disturbance and Attornment

Tenant shall agree to consent to a Subordination, Non-Disturbance and Attornment agreement as part of the Lease Agreement. Tenant agrees to execute an estoppel certificate no more than twice per year as required by Landlord's lender. Execution of either document will be completed within ten (10) business days of receipt.

## 16. Taxes

**16.1 Landlord responsibilities:** Landlord will pay all real property taxes levied but not assessed against the Premises.

**16.2 Tenant responsibilities:** Tenant will pay all personal property taxes levied and assessed against Tenant's personal property.

## 17. Subletting and Assignment

Tenant shall have the right to sublease or assign all or part of the Premises at any time with Landlord's prior written consent, which shall not be unreasonably withheld, conditioned or delayed. Each request for consent to sublease all or a portion of the Premises shall be in writing, accompanied by information relevant to Landlord's determination as to the financial and operational responsibility and appropriateness of the proposed assignee or sublease, including but not limited to the intended use and/or required modification of Premises. Tenant shall pay Landlord a review fee of $250.00 for Landlord's review of any requested sublease. No consent shall be required for an assignment or sublease to any entity controlling, controlled by or under common control with Tenant.

## 18. Damage to Premises or Building

**18.1** If the Premises are damaged through fire or other cause not the fault of Tenant, Tenant will owe no rent for any period during which Tenant is substantially deprived of the use of the Premises.

**Tenant ( AP ) Landlord ( SWC )**

**Page 6**

**18.2** If Tenant is substantially deprived of the use of the Premises for more than 90 days because of such damage, Tenant may terminate this lease by delivering written notice of termination to Landlord.

## 19. Notice of Default

Before starting a legal action to recover possession of the Premises based on Tenant's default, Landlord will notify Tenant in writing of the default. Landlord will take legal action only if Tenant does not correct the default within ten (10) days after written notice is given or mailed to Tenant.

## 20. Events of Default

Each of the following occurrences shall be considered to be a "Default": (a) Tenant's failure to pay any portion of Rent when due, if the failure continues for 3 days after written notice to Tenant, which notice shall be in satisfaction of, and not in addition to, notice required by Law ("Monetary Default"); or (b) Tenant's failure (other than a Monetary Default) to comply with any term, provision, condition or covenant of this Lease, if the failure is not cured within 10 days after written notice to Tenant, which notice shall be in satisfaction of, and not in addition to, notice required by Law, provided, however, if Tenant's failure to comply cannot reasonably be cured within 10 days, Tenant shall be allowed additional time (not to exceed 60 days) as is reasonably necessary to cure the failure so long as Tenant commences to cure within 10 days and Tenant diligently pursues the cure to completion.

## 21. Remedies for Default

**21.1** Upon Default, Landlord shall have the right to terminate this Lease or Tenant's right to possession, in which case Tenant shall immediately surrender the Premises to Landlord.  If Tenant fails to surrender the Premises, Landlord may, in compliance with Law, enter upon and take possession of the Premises. Tenant shall pay Landlord, on demand, all past due Rent and other losses and damages Landlord suffers as a result of Tenant's Default, including, without limitation,

Tenant (_AP_) Landlord (_SwC_)

Page 7

all Costs of Reletting (defined below) and any deficiency that may arise from reletting or the failure to relet the Premises. "**Costs of Reletting**" shall include all costs and expenses incurred by Landlord in reletting or attempting to relet the Premises, including, without limitation, reasonable legal fees, brokerage commissions, the cost of alterations and the value of other concessions or allowances granted to a new tenant. Landlord may collect and receive all rents and other income from the reletting. Landlord shall not be responsible or liable for the failure to relet all or any part of the Premises or for the failure to collect any rent.

21.2  In lieu of calculating damages under Section 20.1 above, Landlord may elect to receive as damages the sum of (a) all Rent accrued through the date of termination of this Lease or Tenant's right to possession, and (b) an amount equal to the total Rent that Tenant would have been required to pay for the remainder of the Term discounted to present value, minus the then present fair rental value of the Premises for the remainder of the Term, similarly discounted, after deducting all anticipated Costs of Reletting. If Tenant is in Default of any of its non-monetary obligations under the Lease, Landlord shall have the right to perform such obligations. Tenant shall reimburse Landlord for the cost of such performance upon demand together with an administrative charge equal to 10% of the cost of the work performed by Landlord. The repossession or re-entering of all or any part of the Premises shall not relieve Tenant of its liabilities and obligations under the Lease. No right or remedy of Landlord shall be exclusive of any other right or remedy. Each right and remedy shall be non-exclusive, cumulative and in addition to any other right and remedy now or subsequently available to Landlord at Law or in equity.

## 22. Quiet Enjoyment

As long as Tenant is not in default under the terms of this lease, Tenant will have the right to occupy the Premises peacefully and without interference.

## 23. Condemnation

If any part of the Premises is condemned for public use, and a part remains which is susceptible of

Tenant ( AP ) Landlord ( SJC )

occupation by Tenant, this lease will, as to the part taken, terminate as of the date the condemnor acquires possession. Tenant will be required to pay such proportion of the rent for the remaining term as the value of the Premises remaining bears to the total value of the Premises at the date of condemnation; provided, however, that either party may, at his or her option, terminate this lease as of the date the condemnor acquires possession. In the event that the Premises are condemned in whole, or the remainder is not susceptible for use by the Tenant, this lease will terminate upon the date which the condemnor acquires possession. All sums which may be payable on account of any condemnation will belong solely to the Landlord; except that Tenant will be entitled to retain any amount awarded to him or her for his or her trade fixtures and moving expenses.

### 24. Holding Over

If Tenant remains in possession of premises after this lease ends, the monthly base rental rate will adjust to 125% of the last monthly base rental rate, and the continuing tenancy will be a month-to-month rental agreement. Termination of the tenancy by either party will require a 30-day written notice of termination, as required by Nevada law.

### 25. Disputes

If a dispute arises, Landlord and Tenant herby waive any right to trial by jury in any proceeding based upon a breach of this Lease. The parties will try in good faith to settle through mediation conducted by a mediator to be mutually selected. The parties will share the costs of the mediator equally. Each party will cooperate fully and fairly with the mediator and will attempt to reach a mutually satisfactory compromise to the dispute. If the dispute is not resolved within 30 days after it is referred to the mediator, it will be arbitrated by an arbitrator to be mutually selected. Judgment on the arbitration award may be entered in any court that has jurisdiction over the matter. Costs of arbitration, including lawyers' fees, will be allocated by the arbitrator.

### 26. Entire Agreement

This is the entire agreement between the parties. It replaces and supersedes any and all oral

Tenant (_AP_) Landlord (_Suc_)

Page 9

agreements between the parties, as well as any prior writings.

## 27. Successors and Assignees

This lease binds and benefits the heirs, successors and assignees of the parties.

## 28. Notices

All notices must be in writing. A notice may be delivered to Landlord at the address referenced in Section 5.3, or to a new address that Landlord designates in writing. Any notice delivered to Tenant shall be delivered to: **5905 S. Virginia St, Suite 201, Reno, Nevada 89502**, or to a new address that Tenant designates in writing.  A notice shall be delivered:  A) in person; B) by certified mail; or C) by overnight courier.

## 29. Governing Law

This lease will be governed by and construed in accordance with the laws of the state of Nevada.

## 30. Counterparts

This lease may be signed by the parties in different counterparts and the signature pages combined will create a document binding on all parties.

## 31. Modification

This lease may be modified only in writing with the signatures of all parties.

## 32. Waiver

If one party waives any term or provision of this lease at any time, that waiver will be effective only for the specific instance and specific purpose for which the waiver was given. If either party fails to exercise or delays exercising any of its rights or remedies under this lease, that party retains the right to enforce that term or provision at a later time.

## 33. Severability

If any court determines that any provision of this lease is invalid or unenforceable, any invalidity or

Tenant ( AP ) Landlord ( SwC )

Exhibit 17, Page 224

unenforceability will affect only that provision and will not make any other provision of this lease invalid or unenforceable and shall be modified, amended or limited only to the extent necessary to render it valid and enforceable.

## 34. Entry and Inspection

Tenant will permit Landlord or Landlord's agents to enter the Premises at reasonable times and upon reasonable notice for the purpose of inspecting, to clean and make repairs, alterations, or additions, and to perform or facilitate maintenance, repairs, alterations, or additions to any portion of the building. Except in emergencies or to provide Building services, Landlord shall provide Tenant with reasonable prior verbal or written notice of entry. Entry by Landlord shall not constitute a constructive eviction or entitle Tenant to an abatement or reduction of Rent. Tenant shall also permit Landlord, at any time within ninety (90) days prior to the expiration of this lease, to place upon the Premises any usual "For Lease" signs, and permit persons desiring to lease the Premises to inspect the Premises at reasonable times.

## 35. Indemnification

Landlord will not be liable for any damage or injury to tenant, or any other person, or to any property, occurring on the Premises, absent negligence on the part of Landlord. Tenant agrees to hold Landlord harmless from any claims for damages arising out of Tenant's use of the Premises, and to indemnify Landlord for any expense incurred by Landlord in defending any such claims.

Likewise, Tenant will not be liable for any damage or injury to Landlord, or any other person, or to any property, occurring on the Premises, absent negligence on the part of Tenant. Landlord agrees to hold Tenant harmless from any claims for damages arising out of Tenant's use of the Premises, and to indemnify Tenant for any expenses incurred by Tenant in defending any such claim. All references in this Section to negligence include both acts and omissions.

Tenant ( AP ) Landlord ( SWC )

Page 11

## 36. Hazardous Materials

Tenant will not use, store, or dispose of any hazardous substances on the Premises, except for the use and storage of such substances that are customarily used in Tenant's business, and are in compliance with all environmental laws.  Hazardous substances mean any hazardous waste, substance or toxic materials regulated under any environmental laws or regulations applicable to the property.  Tenant will be responsible for the cost of removal of any toxic contamination caused by Tenant's use of the Premises.

## 37. Landlord's Liability

In the event of a transfer of Landlord's title or interest to the property during the term of this lease, Tenant agrees that the grantee of such title or interest will be substituted as the Landlord under this lease, and the original Landlord will be released of all further liability; provided, that all deposits will be transferred to the grantee.

## 38. Illegal and Criminal Activities

Tenant, any employees, guest, vendors or other persons invited to the property by Tenant or otherwise under Tenant's control shall not engage in criminal activity, including drug-related criminal activity, on or near project Premises.  "Drug related criminal activity" means the illegal manufacture, sale, distribution, use or possession with intent to manufacture, sell or distribute of a controlled substance (as defined in Section 102 of the Controlled Substance Act 21 U.S.C 802).

## 39. Mold

Tenant herby acknowledges and agrees that the presence of mold at the Premises can pose significant hazard to the health and safety of Tenant, its customers, employees and invitees.  Tenant therefore agrees as follows:

39.1 To maintain the Premises in a manner that prevents the occurrence of an infestation of mold or mildew.

39.2 Immediately notify Landlord upon discovery of any leaks, moisture problems and or

Tenant (_AP_) Landlord (_SWC_)

Page 12

mold growth.

39.3 Keep Premises free of dirt and debris that can harbor mold, as well as keep clean, dry and prevent moisture on windows, walls and surfaces on the Premises.

39.4 Immediately notify Landlord of any problems with the HVAC system that are discovered by Tenant.

39.5 Indemnify, defend with counsel of Landlord's choice, and hold harmless Landlord and its agents and employees from any and all actions, claims, losses, damages and expenses, including, but not limited to attorney's fees that Landlord may sustain or incur as a result of negligence of Tenant or any customer, employee or invitee of Tenant, resulting in the presence of mold at the Premises during the term of this lease.

## 40. Consent

If either party fails to respond to any request for consent or approval within ten (10) days after receipt, approval or consent will be deemed to have been granted to the requesting party. The requested party will provide its reasons in writing if consent or approval is withheld.

## 41. Landlord's Information Rights

Following an event of Default, Landlord may request copies of Tenant's financial statements, including, but not limited to, Income and Expense, Balance Sheet and Cash Flow Statements, under this lease agreement, provided that Landlord shall keep such information strictly confidential and agrees not to release or share such information without Tenant's written authorization.

## 42. Force Majeure

In either party is delayed or prevented from performing due to reasons not the fault of such party, performance of any such act will be extended for a period equal to the period of such delay.

Tenant (_AP_) Landlord (_Swc_)

Page 13

| TENANT: | LANDLORD: |
|---|---|
| **12B RESIDENTIAL, Inc., a Nevada limited liability company** | **CYPRESS MEADOWOOD LLC, a Nevada limited liability company** |
| By: | By: |
| Print Name:__Andrew Palmer__ | Print Name:_Steven W Covec_ |
| Title:_____CFO_____ | Title:_Managing Member_ |
| Date:_____26-Apr-23_____ | Date:_4/27/2023_ |

(Attach Exhibits A & B)

Exhibit A- Layout of 2nd Floor Space

Exhibit B- Reserved Parking for Bank of America

Tenant (_AP_) Landlord (_SWC_)

Exhibit 17, Page 228

# Exhibit 18



## PROPERTY MANAGEMENT AGREEMENT

## FOR

## 12B RESIDENTIAL

This PROPERTY MANAGEMENT AGREEMENT (the "Agreement") is entered into this 22 day of May 20 23 , by and between Guardian Fund, LLC ("Owner") and 12B Residential, a Nevada corporation ("Manager") (each a "Party" and collectively the "Parties").

### 1. COMMUNICATION

**(A)** All communication between Owner and Manager, including without limitation all notices, agreements, consents, demands, and reports required or provided for under this Agreement shall be delivered in writing and addressed to Owner or Manager as follows:

| MANAGER: | | OWNER: | |
|---|---|---|---|
| 12B Residential | | NAME: | Guardian Fund, LLC<br>PO Box 12935 |
| P.O. BOX 12430 | | ADDRESS: | Reno, NV |
| Reno, NV 89510 | | | 89510 |
| Office: 888-718-1705 | | PHONE: | |
| Email: Info@12BR.com | | EMAIL: | Invest@12br.com |

The following are all acceptable forms of communication between the Parties, except as otherwise may be required by law: **Fax, Email, Mail.** Notices shall be deemed effective upon the date sent.

**(B)** All communication from Owner to Tenant (as that term is defined below) shall be conducted through Manager.

### 2. EMPLOYMENT OF MANAGER

**(A)   Acceptance and Employment of Manager.** Owner appoints Manager as Owner's exclusive agent to manage the **REAL PROPERTY** identified on Exhibit A (the "Property"), attached to this Agreement, and incorporated by reference, in accordance with the terms and conditions of this Agreement. Manager accepts said appointment in accordance with the terms and conditions of this Agreement. Owner agrees to pay all expenses associated with the services described in this Agreement.

1

*AM*

Manager box sign

Owner ___ amn

2023-05-22

Exhibit 18, Page 229



**(B)  Manager Relationship to Owner.** Manager shall at no time during the term of this Agreement be considered an employee of the Owner. All duties and obligations performed under this Agreement by Manager shall be performed on behalf of the Owner, for the Owner's account, and in the Owner's name. Manager is authorized to act on the Owner's behalf as is necessary to perform Manager's duties and obligations under this Agreement and to carry out the spirit of this Agreement. Manager, Manager's employees, vendors, assigns, and heirs are not responsible for any delays in the performance of any of Manager's obligations under this Agreement unless the delay is intentional in nature and was caused by the Manager or its employees. Any losses or gains the Owner may incur are the sole responsibility of the Owner, and no terms or provisions of this Agreement shall be read or construed to create or constitute a partnership between Owner and Manager. Manager shall not be required to accept responsibility for or to bear any liability for any losses connected to the operation of the Property.

**(C)  Agreement Term.** This Agreement shall commence on the date of execution (the "Effective Date") for a term of one (1) year and shall renew automatically for successive 1-year terms on each Effective Date anniversary unless cancelled by either Party, with notice provided in writing to the other Party, no later than 45 days prior to the end of the then-current term.

### 3. MANAGER OBLIGATIONS AND COMPENSATION

**(A) PROPERTY MANAGEMENT AND ADVERTISING** Owner shall pay a fee of 10% of collected gross monthly rent to Manager for property management monthly.

**(B) LEASING SERVICES.** Owner shall pay to Manager a leasing fee equal to 100% of one (1) month's rent upon Manager: obtaining an executed lease from a tenant; collecting a security deposit; and receiving the first month's rent from the tenant. Manager may charge, collect, and retain an application fee from prospective tenants for the purpose of qualifying those prospective tenants.

**(C)LEASE RENEWALS.** Owner shall pay to Manager a leasing fee of $275 upon each renewal of a lease for any additional term.

**(D) PROPERTY TURNS.** Owner shall pay to Manager a $250 fee or 12% for each property turn, whichever is greater.

**(E) ASSET MANAGEMENT.** Owner shall pay Manager $35 per property listed on Exhibit A, each month for asset management services. The asset management services include fund and investor accounting, property taxes management, debt servicing, insurance, investor relations and like functions.

   **(a) UNINHABITABLE PROPERTY MANAGEMENT.** Owner shall pay Manager $25 a month for each property listed on Exhibit B. The uninhabitable management fee is to cover the cost associated with overseeing and paying property utilities, city code violations, and other expenses. The properties identified in Exhibit B are currently unhabitable and will require significant capital improvements. The Manager is not responsible for property security, preservation, or safety on the identified properties.

2

*AM*

Manager _____

Owner_____ *amn*

2023-05-22

2 PHONE: (775) 360-4109      |      EMAIL:  INVEST@12BR.COM      |      VISIT: WWW.12BR.COM

Exhibit 18, Page 230

# 12B RESIDENTIAL

**(F) APPLIANCES.** If Owner does not provide appliances for use by tenants of the Property, the Manager may provide appliance leasing services to the tenant on behalf of the Owner. The tenant shall pay a fee for such appliance leasing services that Manager shall collect per appliance and retain.

## 4. ACCOUNTING FOR CLIENT FUNDS

**(A) ESCROW ACCOUNT.** Manager will establish an escrow account with an FDIC-insured financial institution of its choice for the purpose of securely holding tenant security deposits. Manager also will establish a separate operating escrow account at an FDIC-insured financial institution of its choice for the purpose of depositing collected rents and any other payments constituting the property of Owner (the "Operating Account"). Owner authorizes Manager to disburse these funds to the Owner less any fees due to the Manager or expenses incurred by the Manager on the Owner's behalf.

## 5. COLLECTION OF RENTS AND OTHER RECEIPTS

**(A) MANAGER OBLIGATIONS.** Manager will collect all rents and all other amounts receivable on the Owner's account on behalf of the Owner as set forth in this Agreement. All funds will be deposited into the Escrow Account and maintained by the Manager for the Owner. Disbursements by the Manager to the Owner will be made on or about the 7th day of the preceding month.

**(B) SPECIAL CHARGES.** If collection services are deemed necessary, Manager is permitted to collect all fees from the tenants, including but not limited to: Property related tenant late fees, administrative fees associated with late payments or partial payments, charges associated with returned checks, and application fees. The Manager may retain any fees collected in excess of the monthly rental payment. (e.g., late fees).

## 6.    RENT DISBURSEMENTS AND OTHER RECIEPTS

**(A)    MANAGEMENT FEES AND OPERATING EXPENSES.** Owner authorizes Manager to pay itself for the cost of operating the property and for all expenses incurred in fulfilling the Manager's responsibility under this agreement and any other fees due to the Manager under this Agreement.

**(B)    MANAGER OBLIGATIONS.** Manager will make timely payments of all property related expenses that fall outside of this Agreement and/or any lease agreement with any tenant including without limitation property taxes, insurance, utilities, assessments, and mortgage payments (if applicable).

**(C)    OWNER PROCEEDS.** Manager will deliver the net proceeds of the Property to the Owner monthly after all management fees and operating expenses (and the obligations set forth in **Exhibit C**, (if applicable) have been paid.

## 7. MANAGER NOT REQUIRED TO ADVANCE FUNDS.

3

*AM*

Manager _____

Owner ____*amn*

2023-05-22

Exhibit 18, Page 231

# 12B RESIDENTIAL

If the balance of the Manager's escrow account is insufficient to pay for services rendered, the Owner will have a maximum of 10 days from date of insufficiency to remit payment covering any deficiency or supply the Manager to facilitate payment. Under no circumstances will the Manager be required to pay for any expenses associated with the Property on the Owner's behalf out of Manager's own funds. If Manager chooses to advance any funds to cover any expenses that are Owner's responsibility, Owner shall reimburse Manager for any such expenses paid by Manager plus 15% per annum from the date such expenses were paid by Manager.

## 8. FINANCIAL REPORTING REQUIREMENTS

**(A) INCOME TAX REPORTING AND PAYMENT.** Owner is responsible exclusively for complying with all of Owner's own income tax reporting and payment obligations under State and Federal law.

**(B) MANAGER FINANCIAL REPORTING.** Manager will supply Owner with all financial information requested by Owner for accurate income tax reporting purposes including, but not limited to, a ledger of cash receipts and expenses paid from the monthly operation of the Property. Upon request by Owner, Manager will furnish all information that is required by the IRS for the accurate accounting of 12B Residential. Manager agrees to provide all necessary reports within ten (10) business days after receiving a written request for such documents from Owner.

## 9. LEASING

**(A) AUTHORITY OF MANAGER.** Owner authorizes Manager to prepare and sign all leases for the Property on Owner's behalf, including all lease renewals, extensions, modifications, and cancellations. Owner also authorizes Manager to act on Owner's behalf to manage tenant relations and expectations, and to negotiate with tenants when performing these tasks. Owner authorizes Manager to utilize Manager's forms for all Leases.

**(B) LEASE ENFORCEMENT.** To the extent allowed by governing state law, Owner authorizes Manager to initiate legal action on behalf of Owner, if necessary, to enforce leases on Owner's behalf. Owner also authorizes Manager to sign and serve notices to facilitate this process. If Manager takes legal action against a tenant or other party to enforce a lease on Owner's behalf, Manager may retain legal representation of its choice and Owner shall pay all costs associated with such legal representation including, without limitation, all attorney fees and court costs.

**(C) PROPERTY INSPECTIONS AND CONDITION REPORTING.** Manager reserves the right to report on the condition of the Property within seven (7) days after the execution of this Agreement, at the time of lease signing and at the expiration of the lease term. If deemed necessary, Manager will prepare a written report for Owner's review. This report may contain opinions of Manager, employees of the Manager, or of contractors hired by Manager to propose recommended improvements necessary for efficient operation of the Property. After approval by Owner, Manager shall supervise the completion of all improvements to be made to bring the Property to Manager's minimum standards for occupancy and, if necessary, improvements needed for the efficient operation of the Property. Manager will, in its sole discretion, conduct exterior inspections of the Property to facilitate the operation

4

*AM*

Manager _____

Owner _____ amn

2023-05-22

# 12 B RESIDENTIAL

of the Property during the lease term. If Manager determines that the Property is vacant, Manager will take reasonable precautions to secure the Property.

## 10. PROPERTY MAINTENANCE AND REPAIR

**(A) ORDINARY MAINTENANCE.** Manager will employ best practices to maintain the property in habitable condition. Manager will make ordinary repairs or contract for such repairs to be completed by **licensed and insured vendors** as required by applicable laws and regulations or otherwise required by the lease. A management fee of **$35** will be applied to these repairs.

**(B) EMERGENY CIRCUMSTANCES OR REPAIRS.** If an emergency circumstance arises that requires Manager to take action to maintain the condition, security and safety of the Property and its inhabitants (collectively, "Emergency Services"), which Emergency Services do not fall under the normal management duties of Manager required under this Agreement, then Owner shall pay Manager an hourly rate of $75/hour for such Emergency Services. If the nature and scope of the Emergency Services require however, said hourly rate for Emergency Services is subject to a reasonable increase depending on the nature and scope of the Emergency Services provided and may be changed by Manager without prior notification to Owner. Emergency circumstances include, but are not limited to, the following:

(a) **Property is reported as unsecure.**

(b) **Property is without heat when outside low temperature is below 65 Degrees Fahrenheit.**

(c) **Plumbing and drain issues involving leaks and inoperable drains exist.**

(d) **Roof leaks.**

(e) **Any condition that poses an immediate health and safety risk or could lead to further damages if not remediated immediately.**

**Manager will use its best efforts to temporarily mitigate these issues and address permanent repairs at negotiated rates when possible. Owner acknowledges that temporary mitigation of an emergency circumstance may not be possible in certain situations in the interest of protecting the Property and the health and safety of the Tenant.**

**(C) SMOKE DETECTORS.** Smoke detectors must be installed and in working condition in the Property at time of leasing and at Owner's expense. It is the tenant's responsibility to maintain operation of the smoke detectors during the lease term.

## 11. INSURANCE

**(A) TENANT'S INSURANCE.** Tenants **may be required** to obtain renter's insurance.

**(B) INSURANCE.** Manager is required to maintain adequate insurance on all Properties under management to protect against liability for loss, injury, or damage to property or persons that may arise out of the occupancy,

5

*AM*

Manager _____

Owner _____ *amn*

2023-05-22

Exhibit 18, Page 233



operation, management, or maintenance of the Property. **Manager shall be named as an additional insured on liability insurance maintained with respect to the Property.** Manager will be notified immediately of any changes or cancellations to any insurance policies required to be maintained by Owner under this Agreement.

## 12. INDEMNITY

Owner agrees to save, defend, and indemnify and hold harmless Manager from and against all claims, demands and liabilities arising from or relating to:

**(A)** Any negligence, by act or omission, by Owner, Owner's agents, employees, servants, representatives or subcontractors;

**(B)** Any accident, injury or damage to any person, or to the Property, alleged to have been caused by the negligence of Owner (as described in Section 13(a));

**(C)** Owner's failure to comply with any applicable law, rule or regulation of any governing body having jurisdiction over the Property or the subject matter of this Agreement; and

**(D)** Any breach of Owner's obligations or other default by Owner under this Agreement

This indemnity obligation shall include all damages, costs, litigation expenses, fines, liabilities and attorney fees incurred by Manager in defending against any such claim or proceeding brought against Manager. Manager shall be entitled to recover all its attorney fees and litigation expenses associated with enforcing the terms of this Agreement.

## 13. NO ASSUMPTION OF LIABILITY

Manager assumes no liability for any damages or losses incurred by the tenant, or for any acts or omissions of the Owner or any previous Owners or Managers of the Property. Manager assumes no liability for the solvency of any financial institution used by Manager for the purposes stated in this Agreement. Manager does not assume liability for violations of any kind that are discovered during the term of this Agreement. Upon discovery of any such violation the Manager will notify the Owner immediately, at which point Owner shall bear sole responsibility for curing such violations.

## 14. LEGAL EXPENSES

**(A)  LEGAL FEES FOR PROFESSIONAL GUIDANCE.** Any reasonable expense that is incurred by Manager in the process of acquiring legal advice on behalf of the Owner shall be paid by Owner.

**(B)  LITIGATION EXPENSES.** Owner is responsible for paying all fines levied against Owner or the Property by any Federal, State or local government agency or any court of law with respect to any claimed violation of any state and federal laws, regulations and ordinances, including without limitation laws and regulations governing housing

6

*AM*

Manager _____

Owner ____ *amn*

2023-05-22

Exhibit 18, Page 234

# 12B RESIDENTIAL

discrimination, housing quality and conditions, employment discrimination, credit reporting, and environmental regulation, unless the fines are levied as a result of Manager's violation of such laws, regulations and ordinances.

## 15. OWNER REPRESENTATIONS

**(A) OWNER REPRESENTATIONS.** Owner represents and warrants to Manager that Owner has full power and authority to enter into this Agreement and that there are no written or oral agreements affecting the Property other than disclosed tenant leases, copies of which have been furnished to Manager. Owner further represents and warrants that that no recorded easements, restrictions, reservations, or rights of way exist that adversely affect the use of the Property for the purposes intended under this Agreement; that the Property is zoned for the intended use; and that Owner has secured all permits for the leasing and operation of the Property and those permits are current. Owner further warrants that the building and its construction and operation do not violate any applicable laws, regulations, ordinances, or orders; that the information supplied by Owner to Manager is dependable and accurate; and that Owner has fully paid, or paid currently, any loans, notes, mortgages, or dues related to the Property without defaults.

## 16. AGREEMENT TERMINATION

**(A) EARLY TERMINATION.** Either Party may terminate this Agreement at any time by giving written notice to the other Party no less than thirty (30) days prior to the termination date. If Owner requests early termination of this Agreement, Owner shall pay to Manager the lesser of a fee of $250 or 50% of the gross management fee for the remaining term of any lease which is then in effect, which payment shall be paid on or before ten (10) days prior to the date of termination of this Agreement. If Owner fails to pay such fee in a timely manner, this Agreement shall continue in full force and effect until the tenth (10th) day following the payment of such fee. Following termination, Manager will transfer any and all information related to the operation of the Property to the Owner or a management company selected by Owner.

**(B) TERMINATION BY MANAGER FOR CAUSE.** Manager may terminate this Agreement immediately by giving notice in writing to Owner if Owner fails to pay any mortgage lien attached to the Property, taxes associated with the Property, invoices for work performed by the Manager or its agents or contractors, any bill that could impact the operation of the Property, Manager, or tenant, or Owner involvement in any illegal or immoral acts that could impact the Manager or the tenant.

**(C) OWNER RESPONSIBILITY FOR PAYMENTS.** Immediately upon termination of this Agreement Owner shall assume all outstanding bills or contracts entered by Manager for the benefit of the Owner or the Property. Manager reserves the right to withhold disbursements up to thirty-five (35) days after termination of the Agreement to complete a final accounting (e.g. rent collections and disbursements). Upon completion of the final accounting, Manager shall pay any outstanding liabilities of Owner and disburse any remaining funds to Owner. Manager shall transfer all Security Deposits from the Manager's escrow account to the Owner and provide written notice of such

7

Manager *AM*

Owner ____ amn

2023-05-22

Exhibit 18, Page 235

# 12B RESIDENTIAL

transfer to tenant. **(C) SALE OF PROPERTY:** In the event of sale of the Property by the Owner in an arms-length transaction, and conveyance of the deed, this Agreement will automatically terminate.

**(D)   SALE OF PROPERTY:** In the event of sale of the Property by the Owner in an arms-length transaction to a third party, evidenced by conveyance of a deed, this Agreement will terminate automatically.

**(E)   CONDEMNATION.** In the event of total condemnation of the Property this Agreement will terminate. In the event of partial condemnation of the Property either Party may terminate this Agreement at their option.

**(F)   BANKRUPTCY.** If bankruptcy proceedings are initiated by Owner, either Party may terminate this Agreement with thirty (30) days advance written notice.

## 17. PROVISIONS SURVIVING TERMINATION

All representations, warranties, and indemnification obligations set forth in this Agreement shall survive its termination. All provisions of this Agreement that require Owner to procure and maintain insurance for the benefit of Manager shall survive the termination of this Agreement. If Manager becomes involved in any proceeding or litigation by reason of having been the Owner's Manager under this Agreement, all indemnification and hold harmless provisions of this Agreement shall apply as if this Agreement were still in effect.

## 18. MISCELLANEOUS

**(A)   ALL RIGHTS UNDER THIS AGREEMENT ARE CUMULATIVE.** All rights and remedies provided in this Agreement are cumulative and not exclusive of any other rights or remedies that may be available to the Parties, whether provided in law or in equity, in any other agreement between the Parties or otherwise.

**(B)   DISPUTE RESOLUTION. This Agreement will be governed by and construed in accordance with the laws of the State of Nevada, without application of principles of conflict of law. The Parties choose the state and federal courts of Washoe County, Nevada as the exclusive venue for any litigation between the Parties related in any way to this Agreement. Manager will be entitled to recover its reasonable attorneys' fees and costs, including but not limited to paralegal fees and litigation expenses, in any legal proceeding arising out of or related to this Agreement including mediation, arbitration, administrative, litigation (trial), and bankruptcy proceedings (including any appellate proceedings arising in any legal proceeding). The Parties each knowingly, voluntarily and intentionally waives all rights to a trial by jury regarding any and all litigation arising out of the Agreement and any right it may have to seek to consolidate any such litigation with any other litigation in which a jury trial cannot or has not been waived.**

**(C)   WARRANTY WORK.** Owner will notify Manager of any work previously completed on the Property that is under warranty within seven (7) days of acceptance of this Agreement.

**(D)   NO WAIVER.** The failure by a Party to require performance of any provision of this Agreement shall not affect that Party's right to require performance of that provision (or any other provision of this Agreement) subsequently, nor shall a waiver of any breach or default of this Agreement constitute a waiver of any subsequent breach or default.

8

*AM*

Manager _____

Owner _____ *amn*

2023-05-22



## 19. SEVERABILITY

If any part of this Agreement is adjudged by a court of competent jurisdiction to be invalid, such judgment shall not affect or nullify the remainder of this Agreement. The remainder of this Agreement will remain in full force and effect.

## 20. COMPLETE AGREEMENT

This Agreement constitutes the entire Agreement between Manager and Owner. No oral or written representation, inducement, statement or promise made by or on behalf of a part not contained in this Agreement shall be relied upon or binding on Manager or Owner. Any amendments, modifications or supplements to this Agreement must be in writing and signed by each Party. The terms of this Agreement shall be binding upon and inure to the benefit of the successors and assigns of the Parties.

## 21. ADDITIONAL PROVISIONS

N/A

9

*AM*

Manager _____

Owner ____ *amn*

2023-05-22

Exhibit 18, Page 237

# 12B RESIDENTIAL

**IN WITNESS WHEREOF, Owner and Manager have signed and executed this Agreement.**

*Aaron M Noe*

May 22, 2023

Owner Guardian Fund, LLC                               **Date**

Aaron M Noe

**Printed**

*Adrian Maravilla*

May 22, 2023

**Manager**                                            **Date**

Adrian Maravilla

**Printed**

10

*AM*

Manager _____

Owner _____ *amn*

2023-05-22

Exhibit 18, Page 238



## EXHIBIT A TO THE PROPERTY MANAGEMENT AGREEMENT

**List of Properties:**

| Portfolio Name | Building Name | Unit Name | Building City | Building Zip |
|---|---|---|---|---|
| 2014 Wells Revocable Family Trust | 3076 W 104th St | Unit 1 | Cleveland | 44111 |
| 2014 Wells Revocable Family Trust | 11315 East Blvd | 11315 East Blvd | Cleveland | 44105 |
| 2014 Wells Revocable Family Trust | 13801 Othello Ave | 13801 Othello Ave | Cleveland | 44110 |
| 2014 Wells Revocable Family Trust | 13413 Chapelside Ave | 13413 Chapelside Ave | Cleveland | 44120 |
| 2014 Wells Revocable Family Trust | 1459 Clermont Rd | 1459 Clermont Rd | Cleveland | 44110 |
| 2014 Wells Revocable Family Trust | 1217 E 113th St | 1217 E 113th St | Cleveland | 44108 |
| 2014 Wells Revocable Family Trust | 2623 Avie Drive | 2623 Avie Drive | Saint Louis | 63136 |
| 2014 Wells Revocable Family Trust | 9901 Yale Ave | 9901 Yale Ave | Cleveland | 44108 |
| 320 South Ames Street, LLC, a Colorado Limited Lia | 1143 Lakeview Road | 1143 Lakeview Road | Cleveland | 44108 |
| 320 South Ames Street, LLC, a Colorado Limited Lia | 448 Adrian Drive | 448 Adrian Drive | Saint Louis | 63137 |
| 800 W Belleview Avenue #102 LLC, a Colorado Limite | 509 La Motte Lane | 509 La Motte Lane | Ferguson | 63135 |
| 800 W Belleview Avenue #102 LLC, a Colorado Limite | 2419 Shirley Avenue | 2419 Shirley Avenue | Saint Louis | 63136 |
| 816 Tarpan, LLC, a Colorado Limited Liability Comp | 212 Cameron Rd | 212 Cameron Rd | Saint Louis | 63137 |
| 816 Tarpan, LLC, a Colorado Limited Liability Comp | 10219 Hobkirk Drive | 10219 Hobkirk Drive | Saint Louis | 63137 |
| 816 Tarpan, LLC, a Colorado Limited Liability Comp | 10217 Royal Drive | 10217 Royal Drive | Saint Louis | 63136 |
| 816 Tarpan, LLC, a Colorado Limited Liability Comp | 1062 Mona Drive | 1062 Mona Drive | Saint Louis | 63130 |
| 816 Tarpan, LLC, a Colorado Limited Liability Comp | 2335 Grants Parkway | 2335 Grants Parkway | Florissant | 63031 |
| 9809 Palmer Lane LLC | 5902 Dressell Avenue | 5902 Dressell Avenue | Saint Louis | 63120 |
| Aaron  P Lukas and Carlyn L Lukas | 716 10th Street South | 716 10th Street South | Gadsden | 35901 |
| Aaron  P Lukas and Carlyn L Lukas | 500 Oakland Avenue | 500 Oakland Avenue | Sylacauga | 35150 |

11

Manager _____

Owner ____ amn

2023-05-22

11 PHONE: (775) 360-4109    |    EMAIL:  INVEST@12BR.COM    |    VISIT: WWW.12BR.COM

Exhibit 18, Page 239

# 12B RESIDENTIAL

| | | | | |
|---|---|---|---|---|
| Aaron P Lukas and Carlyn L Lukas | 127 Stonehaven Way | 127 Stonehaven Way | Pelham | 35124 |
| Aaron P Lukas and Carolyn L Lukas | 13812 Southview Ave | 13812 Southview Ave | Cleveland | 44120 |
| Aaron P Lukas and Carolyn L Lukas | 8422 Rosewood Avenue | 8422 Rosewood Avenue | Cleveland | 44105 |
| Alan & Joy Palelis | 1420 7th Avenue N | 1420 7th Avenue N | Bessemer | 35020 |
| Alan & Joy Palelis | 1032 E 145th St | 1032 E 145th St | Cleveland | 44110 |
| Alan & Joy Palelis | 10721 Columbia Ave | 10721 Columbia Ave | Cleveland | 44108 |
| Alan & Joy Palelis | 10404 Earl Drive | 10404 Earl Drive | Saint Louis | 63136 |
| Alan & Joy Palelis | 670 Indiana Avenue | 670 Indiana Avenue | Toledo | 43604 |
| Alan & Joy Palelis | 2314 Airline Avenue | 2314 Airline Avenue | Toledo | 43609 |
| Alicia A Gardner | 11672 Herefordshire Dr | 11672 Herefordshire Dr | Saint Louis | 63138 |
| Alicia A Gardner | 1235 Dawson Street | 1235 Dawson Street | Toledo | 43605 |
| Alicia A Gardner | 3822 House of Stuart Avenue | 3822 House of Stuart Avenue | Toledo | 43607 |
| Allerton Holdings LLC | 9008 Birchdale Ave | 9008 Birchdale Ave | Cleveland | 44106 |
| Almond Blossom Properties LLC, a California limite | 786-788 E 156th St | 788 Front | Cleveland | 44110 |
| Almond Blossom Properties LLC, a California limite | 786-788 E 156th St | 786 Back | Cleveland | 44110 |
| Almond Blossom Properties LLC, a California limite | 1507 Beecher Drive | 1507 Beecher Drive | Saint Louis | 63136 |
| Almond Blossom Properties LLC, a California limite | 9323 Hathaway Drive | 9323 Hathaway Drive | Jennings | 63136 |
| Andrew Lodato and Misti Lodato | 1180 Howdershell Rd | 1180 Howdershell Rd | Florissant | 63031 |
| Andrew Lodato and Misti Lodato | 430 Plaza Avenue | 430 Plaza Avenue | Saint Louis | 63135 |
| Andrew S. Han and Sally R. Han, Trustees of the Ha | 715 E 160th St | Unit 2 | Cleveland | 44110 |
| Andrew S. Han and Sally R. Han, Trustees of the Ha | 1646 Burgess Rd | Unit 1 | Cleveland | 44112 |
| Andrew S. Han and Sally R. Han, Trustees of the Ha | 1646 Burgess Rd | Unit 3 | Cleveland | 44112 |
| Andrew S. Han and Sally R. Han, Trustees of the Ha | 609 Rebecca Road | 609 Rebecca Road | Birmingham | 35206 |

12

*AM*

Manager _____

Owner ___ *amn*

2023-05-22

Exhibit 18, Page 240

# 12B RESIDENTIAL

| | | | | |
|---|---|---|---|---|
| Andrew S. Han and Sally R. Han, Trustees of the Ha | 2327 Treadwell Rd | 2327 Treadwell Rd | Birmingham | 35217 |
| Andrew S. Han and Sally R. Han, Trustees of the Ha | 10609 Dove Ave | 10609 Dove Ave | Cleveland | 44105 |
| Andrew S. Han and Sally R. Han, Trustees of the Ha | 2305 13th Court N | 2305 13th Court N | Bessemer | 35020 |
| AR & RD Trust | 650 Mullanphy Rd | 650 Mullanphy Rd | Florissant | 63031 |
| AR & RD Trust | 8116 Pelham Avenue | 8116 Pelham Avenue | Saint Louis | 63147 |
| AR & RD Trust | 3121 Potomac Avenue | 3121 Potomac Avenue | Saint Louis | 63118 |
| AR & RD Trust | 6114 Margaret Avenue | 6114 Margaret Avenue | Saint Louis | 63120 |
| Aron P Lukas and Carolyn L Lukas | 34 E Streicher Street | 34 E Streicher Street | Toledo | 43608 |
| Aron P Lukas and Carolyn L Lukas | 221 Somerset Street | 221 Somerset Street | Toledo | 43609 |
| Aron P Lukas and Carolyn L Lukas | 913 Berry Street | 913 Berry Street | Toledo | 43605 |
| Aruta Family Trust dated October 16, 2015 | 7712 Force Ave | 7712 Force Ave | Cleveland | 44105 |
| Auburn Ridge Capital, LLC, a Colorado limited liab | 4389 Penrose Street | 4389 Penrose Street | Saint Louis | 63115 |
| Auburn Ridge Capital, LLC, a Colorado limited liab | 412 Crawford Road | 412 Crawford Road | Saint Louis | 63137 |
| Auburn Ridge Capital, LLC, a Colorado limited liab | 29 San Carlos Drive | 29 San Carlos Drive | Saint Charles | 63303 |
| Avalon Holding Group, LLC | 3646-3648 Virginia Avenue | Unit 1 | Saint Louis | 63118 |
| Avalon Holding Group, LLC | 2019 Raven Drive | 2019 Raven Drive | Saint Louis | 63133 |
| Avalon Holding Group, LLC | 6604 Etzel Avenue | 6604 Etzel Avenue | University City | 63130 |
| Avalon Holding Group, LLC | 11824 Criterion Avenue | 11824 Criterion Avenue | Saint Louis | 63138 |
| Avalon Holding Group, LLC | 7065 Idlewild Avenue | 7065 Idlewild Avenue | Saint Louis | 63136 |
| Avalon Holding Group, LLC | 142 Becker Drive | 142 Becker Drive | Saint Louis | 63135 |
| Avalon Holding Group, LLC | 10848 Spring Garden | 10848 Spring Garden | Saint Louis | 63137 |
| Barbara J. Artero and Kevin S. Artero | 866 E 130th St | 866 E 130th St | Cleveland | 44108 |
| Barbara J. Artero and Kevin S. Artero | 1190 E112th St | 1190 E112th St | Cleveland | 44108 |

13

*AM*

Manager _____

Owner ____ *amn*

2023-05-22 ____

Exhibit 18, Page 241

# 12B RESIDENTIAL

| | | | | |
|---|---|---|---|---|
| Bart Eric Probasco and Cynthia S. Probasco | 2720 2nd Street NW | 2720 2nd Street NW | Center Point | 35215 |
| Bart Eric Probasco and Cynthia S. Probasco | 15 Mont Camille | 15 Mont Camille | Anniston | 36207 |
| Bart Eric Probasco and Cynthia S. Probasco | 389 Ragland St | 389 Ragland St | Lincoln | 35096 |
| Bertram Jones | 5056-5058 Cates Avenue | 5056 Up | Saint Louis | 63010 63026, 63042, |
| Bertram Jones | 5056-5058 Cates Avenue | 5058 Down | Saint Louis | 63010 63026, 63042, |
| Bertram Jones | 1146 Swarthmore Lane | 1146 Swarthmore Lane | Saint Louis | 63130 |
| Bhupinder Estates, LLC | 706 AL Hwy 204 | 706 AL Hwy 204 | Wellington | 36279 |
| Bhupinder Estates, LLC | 2075 Grants Parkway | 2075 Grants Parkway | Florissant | 63031 |
| Bhupinder Estates, LLC | 1278 George Street | 1278 George Street | University City | 63130 |
| Bhupinder Estates, LLC | 11760 El Camara Drive | 11760 El Camara Drive | Florissant | 63033 |
| Bhupinder Estates, LLC | 4893 Bristol Rock Road | 4893 Bristol Rock Road | Black Jack | 63033 |
| Bhupinder Estates, LLC | 4925 Evelynaire Place | 4925 Evelynaire Place | Black Jack | 63033 |
| Bhupinder Estates, LLC | 5004 Louisiana Avenue | 5004 Louisiana Avenue | Saint Louis | 63111 |
| Bryan James Wolf, Trustee of the Wolf Living Trust | 7836 1st Ave S | 7836 1st Ave S Unit 1 | Birmingham | 35206 |
| Bryan James Wolf, Trustee of the Wolf Living Trust | 7836 1st Ave S | 7836 1st Ave S Unit 2 | Birmingham | 35206 |
| Bryan James Wolf, Trustee of the Wolf Living Trust | 2312 6th Place NW | 2312 6th Place NW | Center Point | 35215 |
| Bryan James Wolf, Trustee of the Wolf Living Trust | 330 Farmhouse Lane | 330 Farmhouse Lane | Springville | 35146 |
| Bryan James Wolf, Trustee of the Wolf Living Trust | 333 Lawson Rd | 333 Lawson Rd | Birmingham | 35215 |
| Bryan James Wolf, Trustee of the Wolf Living Trust | 1828 Steiner Avenue | 1828 Steiner Avenue | Birmingham | 35211 |
| Bryan James Wolf, Trustee of the Wolf Living Trust | 2213 Diane Drive | 2213 Diane Drive | Birmingham | 35235 |

14

Manager _AM_

Owner _amn_

2023-05-22

Exhibit 18, Page 242

# 12B RESIDENTIAL

| | | | | |
|---|---|---|---|---|
| Bryan James Wolf, Trustee of the Wolf Living Trust | 1462 Sulzer Avenue | 1462 Sulzer Avenue | Euclid | 44132 |
| Bryan James Wolf, Trustee of the Wolf Living Trust | 339 Fork Drive | 339 Fork Drive | Saint Louis | 63137 |
| Bryan James Wolf, Trustee of the Wolf Living Trust | 4140 Virginia Avenue | 4140 Virginia Avenue | Saint Louis | 63118 |
| Bryan James Wolf, Trustee of the Wolf Living Trust | 12 McNulty Drive | 12 McNulty Drive | Florissant | 63031 |
| Bryan James Wolf, Trustee of the Wolf Living Trust | 10414 Reno Avenue | 10414 Reno Avenue | Cleveland | 44105 |
| BXB Holdings, LLC | 3261 E 119th St | 3261 E 119th St | Cleveland | 44120 |
| BXB Holdings, LLC | 4114 Appleberry Lane | 4114 Appleberry Lane | Saint Louis | 63121 |
| BXB Holdings, LLC | 8139 Bloom Drive | 8139 Bloom Drive | Saint Louis | 63114 |
| BXB Holdings, LLC | 215 Midlothian Rd | 215 Midlothian Rd | Saint Louis | 63137 |
| BXB Holdings, LLC | 5944 Thekla Avenue | 5944 Thekla Avenue | Saint Louis | 63136 |
| BXB Holdings, LLC | 3917 Lada Avenue | 3917 Lada Avenue | Saint Louis | 63121 |
| BXB Holdings, LLC | 545 Davis Street | 545 Davis Street | Saint Louis | 63111 |
| BXB Holdings, LLC | 10602 Moidart Circle | 10602 Moidart Circle | Saint Louis | 63137 |
| Cannon-Vachon Enterprises | 3713 W. 14th St | Top | Cleveland | 44109 |
| Cannon-Vachon Enterprises | 3713 W. 14th St | Bottom | Cleveland | 44109 |
| Cannon-Vachon Enterprises | 461-463 E 115th St | Unit 1 | Cleveland | 44108 |
| Cannon-Vachon Enterprises | 461-463 E 115th St | Unit 2 | Cleveland | 44108 |
| Cannon-Vachon Enterprises | 461-463 E 115th St | Unit 3 | Cleveland | 44108 |
| Cannon-Vachon Enterprises | 461-463 E 115th St | Unit 4 | Cleveland | 44108 |
| Cannon-Vachon Enterprises | 3946 E. 147th St | 3946 E. 147th St | Cleveland | 44128 |
| Cannon-Vachon Enterprises | 3560 W. 65th St. | 3560 W. 65th St. | Cleveland | 44102 |
| Cannon-Vachon Enterprises | 4106 E. 154th St. | 4106 E. 154th St. | Cleveland | 44128 |
| Cannon-Vachon Enterprises | 1163 W Woodruff Avenue | 1163 W Woodruff Avenue | Toledo | 43606 |
| Cannon-Vachon Enterprises | 1211 Manila Street | 1211 Manila Street | Toledo | 43607 |
| Cannon-Vachon Enterprises | 3515 Wersell Ave | 3515 Wersell Ave | Toledo | 43608 |
| Cannon-Vachon Enterprises | 560 Bronx Dr. | 560 Bronx Dr. | Toledo | 43609 |
| Carl W. Casey | 879 Elias Ave | 879 Elias Ave | Saint Louis | 63147 |
| Carl W. Casey | 128 McAlpine Drive | 128 McAlpine Drive | Saint Louis | 63137 |
| Carl W. Casey | 1707 Joffre Street | 1707 Joffre Street | Toledo | 43607 |

15

*AM*

Manager _____

Owner _____ *amn*

2023-05-22

Exhibit 18, Page 243

# 12B RESIDENTIAL

| | | | | |
|---|---|---|---|---|
| Carol Waltens Trustee of the Carol E Waltens Famil | 10101 Hilgert Dr | Unit 1 | Cleveland | 44104 |
| Carol Waltens Trustee of the Carol E Waltens Famil | 10101 Hilgert Dr | Unit 2 | Cleveland | 44104 |
| Catania Family Trust, Dated February 6, 2001 | 8313 Fay Drive | 8313 Fay Drive | Saint Louis | 63134 |
| Catania Family Trust, Dated February 6, 2001 | 11884 Critertion Avenue | 11884 Critertion Avenue | Saint Louis | 63138 |
| Cat-Hein Nguyen | 2026 Brunswick Rd | 2026 Brunswick Rd | East Cleveland | 44112 |
| Cat-Hein Nguyen | 9611 Balboa | 9611 Balboa | Saint Louis | 63136 |
| Cat-Hein Nguyen | 2611 Solway Ave | 2611 Solway Ave | Saint Louis | 63136 |
| Cat-Hein Nguyen | 9767 Lilac | 9767 Lilac | Saint Louis | 63137 |
| Cat-Hein Nguyen | 350 South Harvey | 350 South Harvey | Saint Louis | 63135 |
| Cat-Hein Nguyen | 230 Leland Ave. | 230 Leland Ave. | Toledo | 43609 |
| CG2632, LLC | 3684 E 106th St | Unit 1 | Cleveland | 44105 |
| CG2632, LLC | 3684 E 106th St | Unit 2 | Cleveland | 44105 |
| Charles M. Lamar and Carolyn B. Lamar | 10016 Aetna Road | 10016 Aetna Road | Cleveland | 44105 |
| Charles M. Lamar and Carolyn B. Lamar | 21000 Crystal Ave | 21000 Crystal Ave | Euclid | 44123 |
| Chin-Zong Tsai and Chin-Chiang Tsai, Trustees of t | 3125 Cedarbrook Lane | 3125 Cedarbrook Lane | Trussville | 35173 |
| Chin-Zong Tsai and Chin-Chiang Tsai, Trustees of t | 7445 Carriage Way | 7445 Carriage Way | Pinson | 35126 |
| Chin-Zong Tsai and Chin-Chiang Tsai, Trustees of t | 11830 El Camara Drive | 11830 El Camara Drive | Florissant | 63033 |
| Chin-Zong Tsai and Chin-Chiang Tsai, Trustees of t | 710 Jungs Station Rd | 710 Jungs Station Rd | Saint Charles | 63303 |
| Christopher David Lee | 960 Meadowbrook Dr | 960 Meadowbrook Dr | Birmingham | 35215 |
| Christopher David Lee | 5125 Farrell Ave | 5125 Farrell Ave | Fairfield | 35064 |
| Christopher David Lee | 1128 Gadsden Highway | 1128 Gadsden Highway | Birmingham | 35235 |
| Christopher David Lee | 99 Valleydale Court | 99 Valleydale Court | Birmingham | 35244 |
| Christopher David Lee | 705 Florland Drive | 705 Florland Drive | Florissant | 63031 |
| Christopher David Lee | 5 Silverbrook Drive | 5 Silverbrook Drive | Black Jack | 63033 |
| Christopher David Lee | 2913 Selkirk Circle | 2913 Selkirk Circle | Birmingham | 35242 |
| CMS Property Services, LLC | 10101 Dunlap Ave | 10101 Dunlap Ave | Cleveland | 44105 |

16

*AM*

Manager

Owner _____ *amn*

2023-05-22

Exhibit 18, Page 244

# 12B RESIDENTIAL

| | | | | |
|---|---|---|---|---|
| Cody Edwards, trustee of the Edwards Living Trust, | 12410 Ingomar Ave. | 12410 Ingomar Ave. | Cleveland | 44108 |
| Cody Edwards, trustee of the Edwards Living Trust, | 3103 W 96th St | 3103 W 96th St | Cleveland | 44102 |
| Cody Edwards, trustee of the Edwards Living Trust, | 711 Eddy Rd | 711 Eddy Rd | Cleveland | 44108 |
| Cody Edwards, trustee of the Edwards Living Trust, | 15720 Hazel Rd | 15720 Hazel Rd | East Cleveland | 44112 |
| Cody Edwards, trustee of the Edwards Living Trust, | 1397 E 93rd Street | 1397 E 93rd Street | Cleveland | 44106 |
| Cody Edwards, trustee of the Edwards Living Trust, | 726 Earl St | 726 Earl St | Toledo | 43605 |
| Cody Edwards, trustee of the Edwards Living Trust, | 406 Utah Street | 406 Utah Street | Toledo | 43605 |
| Cody Edwards, trustee of the Edwards Living Trust, | 56 Garfield Place | 56 Garfield Place | Toledo | 43605 |
| Cody Edwards, trustee of the Edwards Living Trust, | 14414 Kingsford Avenue | 14414 Kingsford Avenue | Cleveland | 44128 |
| Collin Van Zile Snyder | 2002-2004 Nelawood Road | Unit 2 2004 | East Cleveland | 44112 |
| Collin Van Zile Snyder | 30 First Avenue | Unit 1 | Bedford | 44146 |
| Collin Van Zile Snyder | 30 First Avenue | Unit 2 | Bedford | 44146 |
| Crazy Deer Properties, LLC | 1218 Jupiter Street | 1218 Jupiter Street | Gadsden | 35901 |
| Crazy Deer Properties, LLC | 1000 7th Place | 1000 7th Place | Sylacauga | 35150 |
| Crazy Deer Properties, LLC | 4611 Louisiana Avenue | 4611 Louisiana Avenue | Saint Louis | 63111 |
| Creekside Pines, LLC, a California Limited Liabili | 4001 E 144th | Unit 1 | Cleveland | 44128 |
| Creekside Pines, LLC, a California Limited Liabili | 4001 E 144th | Unit 2 | Cleveland | 44128 |
| Creekside Pines, LLC, a California Limited Liabili | 9914 Adams Ave | Unit 1 | Cleveland | 44108 |
| Creekside Pines, LLC, a California Limited Liabili | 13807-09 Rugby Rd | Unit 1(13809) | Cleveland | 44110 |
| Creekside Pines, LLC, a California Limited Liabili | 7008 Russell Ct | 7008 Russell Ct | Cleveland | 44103 |
| Creekside Pines, LLC, a California Limited Liabili | 14000 Christine Ave | 14000 Christine Ave | Cleveland | 44105 |
| Creekside Pines, LLC, a California Limited Liabili | 146 S Detroit Ave | 146 S Detroit Ave | Toledo | 43609 |

17

*AM*

Manager _____

Owner ___*amn*

2023-05-22

Exhibit 18, Page 245

# 12 B RESIDENTIAL

| | | | | |
|---|---|---|---|---|
| Crow Electric, LLC, an Oregon Limited Liability Co | 2724 5th St NE | 2724 5th St NE | Center Point | 35215 |
| Crow Electric, LLC, an Oregon Limited Liability Co | 208 Argent Ave | 208 Argent Ave | Saint Louis | 63135 |
| Dallas D. Debatin Revocable Living Trust Dated Aug | 535 Nicholas St | 535 Nicholas St | Toledo | 43609 |
| Dallas D. Debatin Revocable Living Trust Dated Aug | 1841 Milburn Avenue | 1841 Milburn Avenue | Toledo | 43606 |
| Dallas D. Debatin Revocable Living Trust Dated Aug | 1130 Pinewood Avenue | 1130 Pinewood Avenue | Toledo | 43607 |
| DAM Properties, LLC | 1112 9th Court | 1112 9th Court | Pleasant Grove | 35127 |
| DAM Properties, LLC | 1300 Stonecrest Dr | 1300 Stonecrest Dr | Birmingham | 35235 |
| DAM Properties, LLC | 1138 E 114th St | 1138 E 114th St | Cleveland | 44108 |
| DAM Properties, LLC | 553 E 101st St | 553 E 101st St | Cleveland | 44108 |
| DAM Properties, LLC | 3413 Saint Henry Lane | 3413 Saint Henry Lane | Saint Louis | 63121 |
| DAM Properties, LLC | 10193 Green Valley Dr | 10193 Green Valley Dr | Saint Louis | 63136 |
| DAM Properties, LLC | 3339 W Tennyson Ave | 3339 W Tennyson Ave | Saint Louis | 63114 |
| DAM Properties, LLC | 11776 Talbott Ct | 11776 Talbott Ct | Saint Louis | 63138 |
| DAM Properties, LLC | 100 Glen Garry Road | 100 Glen Garry Road | Saint Louis | 63137 |
| DAM Properties, LLC | 10052 Clairmont Drive | 10052 Clairmont Drive | Saint Louis | 63136 |
| DAM Properties, LLC | 783 Boulevard St | 783 Boulevard St | Akron | 44311 |
| DAM Properties, LLC | 389 E 250th St | 389 E 250th St | Euclid | 44132 |
| Darren P. Evans | 264 McCalla Road | 264 McCalla Road | Bessemer | 35022 |
| Darren P. Evans | 101 Park Avenue | 101 Park Avenue | Bessemer | 35020 |
| Darren P. Evans | 893 E 75th Street | 893 E 75th Street | Cleveland | 44103 |
| Darren P. Evans | 948 Post Street | 948 Post Street | Toledo | 43610 |
| Darren P. Evans | 259 E Pearl Street | 259 E Pearl Street | Toledo | 43608 |
| David & Stephanie McKinley | 3194 E. 132nd St. | 3194 E. 132nd St. | Cleveland | 44120 |
| David & Stephanie McKinley | 2023 Brussels St | 2023 Brussels St | Toledo | 43613 |
| David Drown Wiggins and Shaun Wiggins Family Trust | 3306 Berkley Avenue | 3306 Berkley Avenue | Bessemer | 35020 |
| David Drown Wiggins and Shaun Wiggins Family Trust | 1326 22nd Avenue N | 1326 22nd Avenue N | Bessemer | 35020 |

18

Manager

Owner _____amn

2023-05-22

Exhibit 18, Page 246

# 12B RESIDENTIAL

| | | | | |
|---|---|---|---|---|
| David Drown Wiggins and Shaun Wiggins Family Trust | 4804 Court I | 4804 Court I | Birmingham | 35208 |
| David Drown Wiggins and Shaun Wiggins Family Trust | 5758 Jennings Station | 5758 Jennings Station | Saint Louis | 63136 |
| David Drown Wiggins and Shaun Wiggins Family Trust | 8146 Rector Dr | 8146 Rector Dr | Saint Louis | 63134 |
| David Drown Wiggins and Shaun Wiggins Family Trust | 8346 Flora Ave | 8346 Flora Ave | Saint Louis | 63114 |
| David Drown Wiggins and Shaun Wiggins Family Trust | 459 Scenic Dr | 459 Scenic Dr | Saint Louis | 63137 |
| David J Perez | 481 E 148th St | 481Unit 1 | Cleveland | 44110 |
| David J Perez | 6315 - 6317 Lansing Avenue | 6315 Lansing Avenue: Front | Cleveland | 44105 |
| David J Perez | 6315 - 6317 Lansing Avenue | 6317 Lansing Avenue: Back | Cleveland | 44105 |
| David J Perez | 888 London Road | 888 London Road | Cleveland | 44110 |
| David McKinley | 12701 Benham Ave | Unit 2 | Cleveland | 44105 |
| David McKinley | 12701 Benham Ave | Unit 1 | Cleveland | 44105 |
| David McKinley | 10112 Orleans Ave. | 10112 Orleans Ave. | Cleveland | 44105 |
| David Springer | 4229 Rosewood Ave | 4229 Rosewood Ave | Saint Louis | 63120 |
| David Springer | 10200 Cedarhurst Drive | 10200 Cedarhurst Drive | Saint Louis | 63136 |
| Deborah Anne V. Morris | 414 (416) E 146th St | Unit 1 | Cleveland | 44110 |
| Deborah Anne V. Morris | 414 (416) E 146th St | Unit 2 | Cleveland | 44110 |
| Deborah Anne V. Morris | 439 E 123rd St | Unit 1 | Cleveland | 44108 |
| Deborah Anne V. Morris | 439 E 123rd St | Unit 2 | Cleveland | 44108 |
| Directed Trust Company FBO Gary G Gilberg IRA | 21300 Morris Ave | 21300 Morris Ave | Euclid | 44123 |
| Dog Luv LLC | 12114 Soika Ave | Unit 2 | Cleveland | 44120 |
| Dog Luv LLC | 6117 Patton Ave | 6117 Patton Ave | Birmingham | 35228 |
| Dog Luv LLC | 9512 Marah Ave | 9512 Marah Ave | Cleveland | 44104 |
| Dog Luv LLC | 10420 Earl Drive | 10420 Earl Drive | Saint Louis | 63136 |
| Dog Luv LLC | 3027 Forge Drive | 3027 Forge Drive | Saint Louis | 63136 |
| Dog Luv LLC | 3347 E 145th St | 3347 E 145th St | Cleveland | 44120 |
| Don Roland Griffiths Jr. and Marcia Lynn Griffiths | 12102 Imperial Ave | 12102 Imperial Ave | Cleveland | 44120 |

19

*AM*

Manager

Owner _____ *amn*

2023-05-22

Exhibit 18, Page 247

# 12B RESIDENTIAL

| | | | | |
|---|---|---|---|---|
| Don Roland Griffiths Jr. and Marcia Lynn Griffiths | 638 Foredale Avenue | 638 Foredale Avenue | Toledo | 43609 |
| Doodle Properties LLC | 10133 Clairmont | 10133 Clairmont | Saint Louis | 63136 |
| Doodle Properties LLC | 10332 Castle Dr | 10332 Castle Dr | Saint Louis | 63136 |
| Douglas Gorvetzian and Patricia Sullivan | 1000 17th Place SW | 1000 17th Place SW | Birmingham | 35211 |
| Douglas Gorvetzian and Patricia Sullivan | 5376 Ville Rosa Lane | 5376 Ville Rosa Lane | Hazelwood | 63042 |
| Douglas Gorvetzian and Patricia Sullivan | 10188 Count Drive | 10188 Count Drive | Saint Louis | 63136 |
| Douglas Gorvetzian and Patricia Sullivan | 535 Paul Avenue | 535 Paul Avenue | Florissant | 63031 |
| Douglas Gorvetzian and Patricia Sullivan | 130 Gladys Avenue | 130 Gladys Avenue | Saint Louis | 63135 |
| Douglas Gorvetzian and Patricia Sullivan | 4037 Peak Avenue | 4037 Peak Avenue | Toledo | 43612 |
| Douglas Gorvetzian and Patricia Sullivan | 13302 Melzer Avenue | 13302 Melzer Avenue | Cleveland | 44120 |
| Douglas J. Green | 3648 Edmundson Road | Unit 1 | Saint Louis | 63114 |
| Douglas J. Green | 3648 Edmundson Road | Unit 2 | Saint Louis | 63114 |
| Douglas J. Green | 405 55th St | 405 55th St | Fairfield | 35064 |
| Douglas J. Green | 109 9th Court S | 109 9th Court S | Bessemer | 35020 |
| Douglas J. Green | 612 Vaughn Circle | 612 Vaughn Circle | Birmingham | 35235 |
| Douglas J. Green | 948 S Cherrydale Circle | 948 S Cherrydale Circle | Birmingham | 35214 |
| Douglas J. Green | 1039 N Hanley Rd | 1039 N Hanley Rd | University City | 63130 |
| Dylan Proehl | 1532 Lake Park Drive | 1532 Lake Park Drive | Center Point | 35215 |
| Dylan Proehl | 5434 Maple Avenue | 5434 Maple Avenue | Saint Louis | 63112 |
| Dylan Proehl | 309 West Steins Street | 309 West Steins Street | Saint Louis | 63111 |
| Dylan Proehl | 4430 Parker Road | 4430 Parker Road | Black Jack | 63033 |
| Edward E. Hale & Kathleen A. Hale | 12710 Benwood Ave | 12710 Benwood Ave | Cleveland | 44105 |
| Edward E. Hale & Kathleen A. Hale | 805 E. 131st St | 805 E. 131st St | Cleveland | 44108 |
| Edward E. Hale & Kathleen A. Hale | 822 Rudyard Rd. | 822 Rudyard Rd. | Cleveland | 44110 |
| Edward E. Hale & Kathleen A. Hale | 8205 Force Ave | 8205 Force Ave | Cleveland | 44105 |

20

*AM*

Manager _____

Owner _____ *amn*

2023-05-22

Exhibit 18, Page 248

# 12B RESIDENTIAL

| | | | | |
|---|---|---|---|---|
| Edwards H. Rodier and Catherine F. Rodier | 3644 E 50th St | 3644 E 50th St | Cleveland | 44105 |
| Eichelberger Chen Family Trust 2017 | 6811-6813 Bonna Ave | Left (6811) | Cleveland | 44103 |
| Eichelberger Chen Family Trust 2017 | 6819 (6821)Harvard Ave | Unit 1 | Cleveland | 44105 |
| Eichelberger Chen Family Trust 2017 | 6819 (6821)Harvard Ave | Unit 2 | Cleveland | 44105 |
| Eichelberger Chen Family Trust 2017 | 1372 E 134th St | Unit 2 | East Cleveland | 44112 |
| Eichelberger Chen Family Trust 2017 | 745 Starlite Dr | 745 Starlite Dr | Odenville | 35120 |
| Eichelberger Chen Family Trust 2017 | 348 Grove Street | 348 Grove Street | Springville | 35146 |
| Eichelberger Chen Family Trust 2017 | 2300 9th St NW | 2300 9th St NW | Center Point | 35215 |
| Eichelberger Chen Family Trust 2017 | 1317 5th Ave N | 1317 5th Ave N | Bessemer | 35020 |
| Eichelberger Chen Family Trust 2017 | 16706 Priebe Ave | 16706 Priebe Ave | Cleveland | 44128 |
| Eichelberger Chen Family Trust 2017 | 111 Candlelight Ln | 111 Candlelight Ln | Irondale | 35210 |
| Elgene Edward Hood Jr. | 6606 Memory Ln | 6606 Memory Ln | Trussville | 35173 |
| Elgene Edward Hood Jr. | 3501 Avenue D | 3501 Avenue D | Birmingham | 35218 |
| Elgene Edward Hood Jr. | 961 Montford Rd | 961 Montford Rd | Cleveland Heights | 44121 |
| Elgene Edward Hood Jr. | 11338 Cotes Ave | 11338 Cotes Ave | Cleveland | 44105 |
| Elgene Edward Hood Jr. | 13701 Eastwood Blvd | 13701 Eastwood Blvd | Garfield Heights | 44125 |
| Elgene Edward Hood Jr. | 3538 W 65th St | 3538 W 65th St | Cleveland | 44102 |
| Elgene Edward Hood Jr. | 12822 Ferris Ave | 12822 Ferris Ave | Cleveland | 44105 |
| Elkridge Investments LLC | 11417 Avon Ave | 11417 Avon Ave | Cleveland | 44105 |
| Elkridge Investments LLC | 1222 E. 170th St. | 1222 E. 170th St. | Cleveland | 44110 |
| Elkridge Investments LLC | 4308 E. 142nd St. | 4308 E. 142nd St. | Cleveland | 44128 |
| Elkridge Investments LLC | 791 Eddy Rd | 791 Eddy Rd | Cleveland | 44108 |
| Elkridge Investments LLC | 12701 Lenacrave Ave. | 12701 Lenacrave Ave. | Cleveland | 44105 |
| Elliot Epstein | 325 24th Ave NE | 325 24th Ave NE | Center Point | 35215 |
| Elliot Epstein | 960 Martinwood Road | 960 Martinwood Road | Birmingham | 35235 |
| Elliot Epstein | 3721 Grasselli Ave | 3721 Grasselli Ave | Birmingham | 35221 |
| Elliot Epstein | 712 Cedar Cone Cir | 712 Cedar Cone Cir | Birmingham | 35214 |
| Elliot Epstein | 600 McAdory Ave | 600 McAdory Ave | Bessemer | 35020 |
| Elliot Epstein | 7513 Haywood Drive | 7513 Haywood Drive | Saint Louis | 63133 |

21

*AM*

Manager ___

Owner ___ *amn*

2023-05-22

Exhibit 18, Page 249

# 12B RESIDENTIAL

| | | | | |
|---|---|---|---|---|
| Elliot Epstein | 1158 Reale Ave | 1158 Reale Ave | Saint Louis | 63138 |
| Elliot Epstein | 7546 Trenton Ave | 7546 Trenton Ave | Saint Louis | 63130 |
| Eric E and Theresa L Fox | 2833 N Erie Street | 2833 N Erie Street | Toledo | 43611 |
| Eric E and Theresa L Fox | 2206 Dundee Avenue | 2206 Dundee Avenue | Toledo | 43609 |
| Eric E and Theresa L Fox | 608 Whitlock Avenue | 608 Whitlock Avenue | Toledo | 43605 |
| Eric E. Fox and Theresa L. Fox | 1438 E 133rd Street | 1438 E 133rd Street | East Cleveland | 44112 |
| Erling R. Salvesen and Susan Salvesen | 19316 Meadowlark Ln | 19316 Meadowlark Ln | Warrensville Heights | 44128 |
| F&J Properties, LLC, a Colorado Limited Liability | 12613 Phillips Ave | 12613 Phillips Ave | East Cleveland | 44112 |
| F&J Properties, LLC, a Colorado Limited Liability | 1879 Knowles Street | 1879 Knowles Street | East Cleveland | 44112 |
| FabFive Holdings, LLC, a Limited Liability Company | 4029 Shirley Dr | 4029 Shirley Dr | Saint Louis | 63121 |
| FabFive Holdings, LLC, a Limited Liability Company | 151 Ben Nevis Road | 151 Ben Nevis Road | Saint Louis | 63137 |
| FabFive Holdings, LLC, a Limited Liability Company | 2809 Glendale Avenue | 2809 Glendale Avenue | Saint Louis | 63136 |
| FabFive Holdings, LLC, a Limited Liability Company | 7116 Paisley Drive | 7116 Paisley Drive | Saint Louis | 63136 |
| FabFive Holdings, LLC, a Limited Liability Company | 6633 Torlina Drive | 6633 Torlina Drive | Saint Louis | 63134 |
| Fireside Estates, LLC-2740 Series, a Nevada Series | 10201 Gibson Ave | Unit 2 | Cleveland | 44105 |
| Fireside Estates, LLC-2740 Series, a Nevada Series | 10201 Gibson Ave | Unit 1 | Cleveland | 44105 |
| Fireside Estates, LLC-2740 Series, a Nevada Series | 3943 W. 22nd St | 3943 W. 22nd St | Cleveland | 44109 |
| Fireside Estates, LLC-2740 Series, a Nevada Series | 4125 E. 144th St. | 4125 E. 144th St. | Cleveland | 44128 |
| Fireside Estates, LLC-2740 Series, a Nevada Series | 4230 E. 164th St | 4230 E. 164th St | Cleveland | 44128 |
| Fred and Christine Gorges Living Trust | 606 W Pine Street | 606 W Pine Street | Sylacauga | 35150 |
| Fred and Christine Gorges Living Trust | 12909 Benwood Avenue | 12909 Benwood Avenue | Cleveland | 44105 |
| Fred and Christine Gorges Living Trust | 1460 Clermont Road | 1460 Clermont Road | Cleveland | 44110 |
| Fred and Christine Gorges Living Trust | 10300 Ross Circle | 10300 Ross Circle | Saint Louis | 63137 |

22

Manager _AM_ box sign

Owner ____ amn

2023-05-22

# 12B RESIDENTIAL

| | | | | |
|---|---|---|---|---|
| Gary Gilberg and Karyn Freested Family Trust | 3022 E 125th St | Unit 1 | Cleveland | 44120 |
| Gary Gilberg and Karyn Freested Family Trust | 3022 E 125th St | Unit 2 | Cleveland | 44120 |
| Gary Gilberg and Karyn Freested Family Trust | 16617 Burnside Ave | 16617 Burnside Ave | Cleveland | 44110 |
| Gary Gilberg and Karyn Freested Family Trust | 16006 Seville Rd | 16006 Seville Rd | Cleveland | 44128 |
| Gary Gilberg and Karyn Freested Family Trust | 4007 E 154th St | 4007 E 154th St | Cleveland | 44128 |
| Gaspar Anthony Sacco Revocable Trust U/A dated Sep | 1726 Leafcrest Dr | 1726 Leafcrest Dr | Hazelwood | 63042 |
| Geoffrey and Jennifer Parlane | 1105 Pineview Rd | 1105 Pineview Rd | Birmingham | 35228 |
| Geoffrey and Jennifer Parlane | 1738 Creekway Avenue SW | 1738 Creekway Avenue SW | Birmingham | 35211 |
| Geoffrey and Jennifer Parlane | 3328 Hemlock Avenue SW | 3328 Hemlock Avenue SW | Birmingham | 35221 |
| Giani Missouri LLC | 228 72nd St N | 228 72nd St N | Birmingham | 35206 |
| Giani Missouri LLC | 6752 Kenwood Drive | 6752 Kenwood Drive | Saint Louis | 63121 |
| Giani Missouri LLC | 1159 Reale Ave | 1159 Reale Ave | Saint Louis | 63138 |
| Giani Missouri LLC | 1629 Mowbry Lane | 1629 Mowbry Lane | Saint Louis | 63136 |
| Giani Missouri LLC | 6837 Bradley Avenue | 6837 Bradley Avenue | Saint Louis | 63139 |
| Glenn E. Davis and Kathleen A. Davis Family Trust | 13718 Horner Ave | 13718 Horner Ave | Cleveland | 44120 |
| Glenn E. Davis and Kathleen A. Davis Family Trust | 13604 Claiborne Road | 13604 Claiborne Road | East Cleveland | 44112 |
| Glenn E. Davis and Kathleen A. Davis Family Trust | 3551 E 105th Street | 3551 E 105th Street | Cleveland | 44105 |
| Gnorthm129 Trust | 4230 Bluestone Rd | 4230 Bluestone Rd | South Euclid | 44121 |
| Goldwatch Properties LLC | 909 28th Street SW | 909 28th Street SW | Birmingham | 35211 |
| Greg Conners | 1115 Briarwood Circle | 1115 Briarwood Circle | Moody | 35004 |
| Grover C. Edmondson III | 11622 Lenacrave Ave | 11622 Lenacrave Ave | Cleveland | 44105 |
| Grover C. Edmondson III | 11213 Forest Ave | 11213 Forest Ave | Cleveland | 44104 |
| Guardian CV1, LLC | 1525 Matt Leonard Dr SW | Birmingham | Alabama | 35211 |
| Guardian CV1, LLC | 229 22nd Ave NW | Center Point | Alabama | 35215 |

23

Manager _____ AM

Owner _____ amn

2023-05-22

Exhibit 18, Page 251

# 12B RESIDENTIAL

| | | | | |
|---|---|---|---|---|
| Guardian CV1, LLC | 1009 Rutledge Dr | Midfield | Alabama | 35228 |
| Guardian CV1, LLC | 9481 Adler Ave | Bellefontaine Neighbors | Missouri | 63137 |
| Guardian CV1, LLC | 9916 Norwich Dr | Bellefontaine Neighbors | Missouri | 63137 |
| Guardian CV1, LLC | 10301 Ittner Dr | Dellwood | Missouri | 63136 |
| Guardian CV1, LLC | 10308 Deem Dr | Dellwood | Missouri | 63136 |
| Guardian CV1, LLC | 10331 Ittner Dr | Dellwood | Missouri | 63136 |
| Guardian CV1, LLC | 10504 Olney Dr | Dellwood | Missouri | 63136 |
| Guardian CV1, LLC | 1570 Champlin Dr | Dellwood | Missouri | 63136 |
| Guardian CV1, LLC | 124 Anabel Ave | Ferguson | Missouri | 63135 |
| Guardian CV1, LLC | 202 Frost Ave | Ferguson | Missouri | 63135 |
| Guardian CV1, LLC | 277 Dashwood Dr | Ferguson | Missouri | 63135 |
| Guardian CV1, LLC | 299 Dashwood Dr | Ferguson | Missouri | 63135 |
| Guardian CV1, LLC | 315 Coppinger Dr | Ferguson | Missouri | 63135 |
| Guardian CV1, LLC | 418 Jehling Dr | Ferguson | Missouri | 63135 |
| Guardian CV1, LLC | 705 Palace Ct | Ferguson | Missouri | 63135 |
| Guardian CV1, LLC | 7510 Blanding Dr | Ferguson | Missouri | 63135 |
| Guardian CV1, LLC | 932 Thatcher Ave | Ferguson | Missouri | 63135 |
| Guardian CV1, LLC | 680 Central Pkwy | Florissant | Missouri | 63031 |
| Guardian CV1, LLC | 9426 Westchester Dr | Jennings | Missouri | 63136 |
| Guardian CV1, LLC | 3814 Waco Dr | Normandy | Missouri | 63121 |
| Guardian CV1, LLC | 7826 Blandford Dr | Normandy | Missouri | 63121 |
| Guardian CV1, LLC | 8911 Shawnee Ln | Overland | Missouri | 63114 |
| Guardian CV1, LLC | 9017 Tudor Ave | Overland | Missouri | 63114 |
| Guardian CV1, LLC | 258 Sadonia Ave | Saint Louis | Missouri | 63135 |
| Guardian CV1, LLC | 1001 Ford Dr | St Louis | Missouri | 63135 |
| Guardian CV1, LLC | 1072 Prigge Dr | St Louis | Missouri | 63138 |
| Guardian CV1, LLC | 1209 Reale Ave | St Louis | Missouri | 63138 |
| Guardian CV1, LLC | 1215 Astoria Dr | St Louis | Missouri | 63137 |
| Guardian CV1, LLC | 1231 Reale Ave | St Louis | Missouri | 63138 |
| Guardian CV1, LLC | 12355 Pinta Dr | St Louis | Missouri | 63138 |
| Guardian CV1, LLC | 1359 Cove Ln | St Louis | Missouri | 63138 |
| Guardian CV1, LLC | 1466 Widefields Ln | St Louis | Missouri | 63138 |
| Guardian CV1, LLC | 1523 Fir Dr | St Louis | Missouri | 63136 |
| Guardian CV1, LLC | 1525 Westmont Pl | St Louis | Missouri | 63130 |

24

Manager _____ *AM*

Owner _____ *amn*

2023-05-22

Exhibit 18, Page 252

# 12B RESIDENTIAL

| | | | | |
|---|---|---|---|---|
| Guardian CV1, LLC | 1533 Chesley Dr | St Louis | Missouri | 63136 |
| Guardian CV1, LLC | 1537 Chesley Dr | St Louis | Missouri | 63136 |
| Guardian CV1, LLC | 2018 Raven Dr | St Louis | Missouri | 63133 |
| Guardian CV1, LLC | 2032 Stillwater Dr | St Louis | Missouri | 63114 |
| Guardian CV1, LLC | 232 Anistasia Dr | St Louis | Missouri | 63135 |
| Guardian CV1, LLC | 2362 Rockdale Ave | St Louis | Missouri | 63121 |
| Guardian CV1, LLC | 4608 Barbara Dr | St Louis | Missouri | 63121 |
| Guardian CV1, LLC | 4815 Barbara Dr | St Louis | Missouri | 63121 |
| Guardian CV1, LLC | 6849 Roberts Ave | St Louis | Missouri | 63130 |
| Guardian CV1, LLC | 6937 Berkridge Ct | St Louis | Missouri | 63042 |
| Guardian CV1, LLC | 7009 Laupher Ln | St Louis | Missouri | 63042 |
| Guardian CV1, LLC | 7743 Monroe Dr | St Louis | Missouri | 63133 |
| Guardian CV1, LLC | 7818 Madison Dr | St Louis | Missouri | 63133 |
| Guardian CV1, LLC | 8319 Hawkesbury Dr | St Louis | Missouri | 63121 |
| Guardian CV1, LLC | 920 Delaird Dr | St Louis | Missouri | 63137 |
| Guardian CV1, LLC | 9231 Tutwiler Ave | St Louis | Missouri | 63134 |
| Guardian CV1, LLC | 9701 Glen Owen Dr | St Louis | Missouri | 63136 |
| Guardian CV1, LLC | 9729 Lilly Jean Dr | St Louis | Missouri | 63134 |
| Guardian CV1, LLC | 1085 Ferguson Ave | University City | Missouri | 63130 |
| Guardian CV1, LLC | 1138 George St | University City | Missouri | 63130 |
| Guardian CV1, LLC | 1205 Meyer St | University City | Missouri | 63130 |
| Guardian CV1, LLC | 7074 Plymouth Ave | University City | Missouri | 63130 |
| Guardian CV1, LLC | 7505 Lynn Ave | University City | Missouri | 63130 |
| Guardian CV1, LLC | 3676 E 46Th St | Cleveland | Ohio | 44105 |
| Guardian CV1, LLC | 4236 W 23Rd St | Cleveland | Ohio | 44109 |
| Guardian CV1, LLC | 4349 W 132Nd St | Cleveland | Ohio | 44135 |
| Guardian CV1, LLC | 4474 W 147Th St | Cleveland | Ohio | 44135 |
| Guardian CV1, LLC | 16312 Helmsdale Rd | East Cleveland | Ohio | 44112 |
| Guardian CV1, LLC | 13208 Maplerow Ave | Garfield Heights | Ohio | 44105 |
| Guardian CV1, LLC | 4680 Beechgrove Ave | Garfield Heights | Ohio | 44125 |
| Guardian CV2, LLC | 525 Selma Rd | Bessemer | Alabama | 35020 |

25

*AM*

Manager

Owner _____ amn

2023-05-22

Exhibit 18, Page 253

# 12B RESIDENTIAL

| | | | | |
|---|---|---|---|---|
| Guardian CV2, LLC | 1100 Cotton Ave Sw | Birmingham | Alabama | 35211 |
| Guardian CV2, LLC | 1961 Westridge Dr | Birmingham | Alabama | 35235 |
| Guardian CV2, LLC | 3209 Cedar Ave Sw | Birmingham | Alabama | 35221 |
| Guardian CV2, LLC | 5504 Madison Dr | Birmingham | Alabama | 35228 |
| Guardian CV2, LLC | 1809 Mara Dr | Center Point | Alabama | 35215 |
| Guardian CV2, LLC | 716 Brookview Dr | Gardendale | Alabama | 35071 |
| Guardian CV2, LLC | 1729 27Th Ave N | Hueytown | Alabama | 35023 |
| Guardian CV2, LLC | 1346 Vivian St | Leeds | Alabama | 35094 |
| Guardian CV2, LLC | 12967 Vanderwood Dr | Black Jack | Missouri | 63033 |
| Guardian CV2, LLC | 4950 Patricia Ridge Dr | Black Jack | Missouri | 63033 |
| Guardian CV2, LLC | 10323 Tanner Dr | Dellwood | Missouri | 63136 |
| Guardian CV2, LLC | 166 Powell Avenue | Ferguson | Missouri | 63135 |
| Guardian CV2, LLC | 235 Forestwood Dr | Ferguson | Missouri | 63135 |
| Guardian CV2, LLC | 56 N Marguerite Ave | Ferguson | Missouri | 63135 |
| Guardian CV2, LLC | 2340 St Catherine St | Florissant | Missouri | 63033 |
| Guardian CV2, LLC | 2740 Holiday Hill Dr | Florissant | Missouri | 63033 |
| Guardian CV2, LLC | 124 Foxtree Dr | Hazelwood | Missouri | 63042 |
| Guardian CV2, LLC | 100 Mcalpine Dr | Saint Louis | Missouri | 63137 |
| Guardian CV2, LLC | 10337 Galloway Dr | Saint Louis | Missouri | 63137 |
| Guardian CV2, LLC | 1215 Odessa Dr | Saint Louis | Missouri | 63137 |
| Guardian CV2, LLC | 1229 Ashford Dr | Saint Louis | Missouri | 63137 |
| Guardian CV2, LLC | 228 Grampian Rd | Saint Louis | Missouri | 63137 |
| Guardian CV2, LLC | 244 Estridge Rd | Saint Louis | Missouri | 63137 |
| Guardian CV2, LLC | 420 Warfield Ave | Saint Louis | Missouri | 63135 |
| Guardian CV2, LLC | 828 Marias Dr | Saint Louis | Missouri | 63137 |
| Guardian CV2, LLC | 132 Constance Ct | St Ann | Missouri | 63074 |
| Guardian CV2, LLC | 10212 Lynncrest Ct | St Louis | Missouri | 63136 |
| Guardian CV2, LLC | 10506 Hoyt Dr | St Louis | Missouri | 63137 |
| Guardian CV2, LLC | 1718 Newhall Ct | St Louis | Missouri | 63136 |
| Guardian CV2, LLC | 311 Goetz Ave | St Louis | Missouri | 63125 |
| Guardian CV2, LLC | 32 Robert Ave | St Louis | Missouri | 63135 |

26

amn

Manager ⸻

Owner ___ AM

2023-05-22 ⸻

Exhibit 18, Page 254

# 12 B RESIDENTIAL

| | | | | |
|---|---|---|---|---|
| Guardian CV2, LLC | 3642 S Compton Ave | St Louis | Missouri | 63116 |
| Guardian CV2, LLC | 3925 Pennsylvania Ave | St Louis | Missouri | 63118 |
| Guardian CV2, LLC | 405 Caithness Rd | St Louis | Missouri | 63137 |
| Guardian CV2, LLC | 614 Fremont Ave Rear | St Louis | Missouri | 63147 |
| Guardian CV2, LLC | 11709 Guardian Blvd | Cleveland | Ohio | 44135 |
| Guardian CV2, LLC | 12800 Signet Ave | Cleveland | Ohio | 44120 |
| Guardian CV2, LLC | 13705 Othello Ave | Cleveland | Ohio | 44110 |
| Guardian CV2, LLC | 3184 W 95th Street | Cleveland | Ohio | 44102 |
| Guardian CV2, LLC | 3378 E 135th St | Cleveland | Ohio | 44120 |
| Guardian CV2, LLC | 3414 E 143Rd St | Cleveland | Ohio | 44120 |
| Guardian CV2, LLC | 3415 E 113Th St | Cleveland | Ohio | 44104 |
| Guardian CV2, LLC | 3557 E 139Th St | Cleveland | Ohio | 44120 |
| Guardian CV2, LLC | 3675 E 139th Street | Cleveland | Ohio | 44120 |
| Guardian CV2, LLC | 3975 E 120Th St | Cleveland | Ohio | 44105 |
| Guardian CV2, LLC | 4149 E 139Th St | Cleveland | Ohio | 44105 |
| Guardian CV2, LLC | 4313 E 141st Street | Cleveland | Ohio | 44128 |
| Guardian CV2, LLC | 9008 Tioga Ave | Cleveland | Ohio | 44105 |
| Guardian CV2, LLC | 9618 Raymond Ave | Cleveland | Ohio | 44104 |
| Guardian CV2, LLC | 866 Selwyn Road | Cleveland Heights | Ohio | 44112 |
| Guardian CV2, LLC | 1427 E 133rd Street | East Cleveland | Ohio | 44112 |
| Guardian CV2, LLC | 14705 Alder Avenue | East Cleveland | Ohio | 44112 |
| Guardian CV2, LLC | 4672 Hillside Ave | Garfield Heights | Ohio | 44125 |
| Guardian CV2, LLC | 19707 Sunset Dr | Warrensville Heights | Ohio | 44122 |
| Guardian DE, LLC | 4032 Garfield Ave | Kansas City | Missouri | 64130 |
| Guardian DE, LLC | 7316 Paseo Blvd | Kansas City | Missouri | 64131 |
| Guardian DE, LLC | 7511 Paseo Blvd | Kansas City | Missouri | 64131 |
| Guardian DE, LLC | 4242 N Euclid Ave | St Louis | Missouri | 63115 |
| Guardian DE, LLC | 3128 W 86th Street | Cleveland | Ohio | 44102 |
| Guardian DE, LLC | 8504 Tioga Ave | Cleveland | Ohio | 44105 |

27

*AM*

Manager _____    _____

Owner _____ *amn*

2023-05-22    _____

Exhibit 18, Page 255

# 12B RESIDENTIAL

| Guardian Fund LLC | 719 2nd Ave N | Bessemer | Alabama | 35020 |
|---|---|---|---|---|
| Guardian Fund LLC | 1112 Elm Ave | Birmingham | Alabama | 35217 |
| Guardian Fund LLC | 1228 Fulton Ave | Birmingham | Alabama | 35217 |
| Guardian Fund LLC | 1313 18Th St N | Birmingham | Alabama | 35234 |
| Guardian Fund LLC | 1324 19Th St Sw | Birmingham | Alabama | 35211 |
| Guardian Fund LLC | 5500 Kiska Ave | Birmingham | Alabama | 35224 |
| Guardian Fund LLC | 700 Graymont Ave W | Birmingham | Alabama | 35204 |
| Guardian Fund LLC | 12513 Jerry Dr | McCalla | Alabama | 35111 |
| Guardian Fund LLC | 833 1St Ave | Pleasant Grove | Alabama | 35127 |
| Guardian Fund LLC | 2150 E Potter Ave | Kingman | Arizona | 86409 |
| Guardian Fund LLC | 4919 Long Creek Rd | Alpena | Arkansas | 72611 |
| Guardian Fund LLC | 19900 Se 156th St | Umatilla | Florida | 32784 |
| Guardian Fund LLC | 114 Hanner St | East Alton | Illinois | 62024 |
| Guardian Fund LLC | 1031 College St | South Bend | Indiana | 46628 |
| Guardian Fund LLC | 1141 Fremont St | South Bend | Indiana | 46628 |
| Guardian Fund LLC | 1806 Johnson St | South Bend | Indiana | 46628 |
| Guardian Fund LLC | 1941 Johnson St | South Bend | Indiana | 46628 |
| Guardian Fund LLC | 201 N Wellington St | South Bend | Indiana | 46619 |
| Guardian Fund LLC | 235 E Fox St | South Bend | Indiana | 46613 |
| Guardian Fund LLC | 1328 Woodley Ave | Terre Haute | Indiana | 47804 |
| Guardian Fund LLC | 3220 N 24th St | Terre Haute | Indiana | 47805 |
| Guardian Fund LLC | 435 Emmett St E | Battle Creek | Michigan | 49017 |
| Guardian Fund LLC | 18489 Goulburn St | Detroit | Michigan | 48205 |
| Guardian Fund LLC | 4323 Sheridan Rd | Saginaw | Michigan | 48601 |
| Guardian Fund LLC | 999 N Cass Ave | Vassar | Michigan | 48768 |
| Guardian Fund LLC | 1159 E Townline Rd | White Cloud | Michigan | 49349 |
| Guardian Fund LLC | 118 Stokes Robertson Rd | Jackson | Mississippi | 39212 |
| Guardian Fund LLC | 1311 Fourth Ave | Jackson | Mississippi | 39203 |
| Guardian Fund LLC | 2209 Paden St | Jackson | Mississippi | 39204 |
| Guardian Fund LLC | 229 Sollitt St | Jackson | Mississippi | 39209 |
| Guardian Fund LLC | 2307 Mobile Ave | Jackson | Mississippi | 39213 |
| Guardian Fund LLC | 245 Shady Pine Ln | Jackson | Mississippi | 39204 |
| Guardian Fund LLC | 2647 Glenn St | Jackson | Mississippi | 39204 |

28

amn

Manager _____

Owner ___ AM

2023-05-22

Exhibit 18, Page 256

# 12B RESIDENTIAL

| Guardian Fund LLC | 3513 Hines St | Jackson | Mississippi | 39212 |
|---|---|---|---|---|
| Guardian Fund LLC | 3728 Cromwell St | Jackson | Mississippi | 39213 |
| Guardian Fund LLC | 3940 Beaufort St | Jackson | Mississippi | 39212 |
| Guardian Fund LLC | 4274 Lynda Dr | Jackson | Mississippi | 39209 |
| Guardian Fund LLC | 438 W Ash St | Jackson | Mississippi | 39203 |
| Guardian Fund LLC | 931 Union St | Jackson | Mississippi | 39204 |
| Guardian Fund LLC | 12615 Old Halls Ferry Rd | Black Jack | Missouri | 63033 |
| Guardian Fund LLC | 2649 Melvin Ave | Brentwood | Missouri | 63144 |
| Guardian Fund LLC | 1265 Paddock Dr | Florissant | Missouri | 63033 |
| Guardian Fund LLC | 21 Saint Celeste Dr | Florissant | Missouri | 63031 |
| Guardian Fund LLC | 35 Florissant Park Dr | Florissant | Missouri | 63031 |
| Guardian Fund LLC | 507 Saratoga Ln | Hazelwood | Missouri | 63042 |
| Guardian Fund LLC | 1201 N Pleasant St | Independence | Missouri | 64050 |
| Guardian Fund LLC | 1929 Park Lane Ct | Jennings | Missouri | 63136 |
| Guardian Fund LLC | 2807 E 73rd St | Kansas City | Missouri | 64132 |
| Guardian Fund LLC | 2833 Van Brunt Blvd | Kansas City | Missouri | 64128 |
| Guardian Fund LLC | 3017 E 51st St | Kansas City | Missouri | 64130 |
| Guardian Fund LLC | 6019 Park Ave | Kansas City | Missouri | 64130 |
| Guardian Fund LLC | 711 Longhorn Dr | O Fallon | Missouri | 63368 |
| Guardian Fund LLC | 344 Midridge Dr | Riverview | Missouri | 63137 |
| Guardian Fund LLC | 10072 Bon Oak Dr | Saint Louis | Missouri | 63136 |
| Guardian Fund LLC | 1028 Briarbrae Dr | Saint Louis | Missouri | 63138 |
| Guardian Fund LLC | 10348 Earl Dr | Saint Louis | Missouri | 63136 |
| Guardian Fund LLC | 133 Cameron Rd | Saint Louis | Missouri | 63137 |
| Guardian Fund LLC | 134 Anistasia Dr | Saint Louis | Missouri | 63135 |
| Guardian Fund LLC | 2110 Lexa Dr | Saint Louis | Missouri | 63136 |
| Guardian Fund LLC | 2713 Allen Ave | Saint Louis | Missouri | 63104 |
| Guardian Fund LLC | 3125 Michigan Ave | Saint Louis | Missouri | 63118 |
| Guardian Fund LLC | 325 New York St | Saint Louis | Missouri | 63122 |
| Guardian Fund LLC | 3864 Marietta Dr | Saint Louis | Missouri | 63121 |
| Guardian Fund LLC | 406 Plaza Ave | Saint Louis | Missouri | 63135 |
| Guardian Fund LLC | 408 Crawford Rd | Saint Louis | Missouri | 63137 |
| Guardian Fund LLC | 426 Bluff Dr | Saint Louis | Missouri | 63137 |
| Guardian Fund LLC | 4351 Bingham Ave | Saint Louis | Missouri | 63116 |

29

*AM*

Manager _____

Owner _____*amn*

2023-05-22

Exhibit 18, Page 257

# 12B RESIDENTIAL

| | | | | |
|---|---|---|---|---|
| Guardian Fund LLC | 4440 Norfolk Ave | Saint Louis | Missouri | 63110 |
| Guardian Fund LLC | 4526 Alice Ave | Saint Louis | Missouri | 63115 |
| Guardian Fund LLC | 4541 Oakland Ave | Saint Louis | Missouri | 63110 |
| Guardian Fund LLC | 488 Adrian Dr | Saint Louis | Missouri | 63137 |
| Guardian Fund LLC | 5633 Vivian Pl | Saint Louis | Missouri | 63136 |
| Guardian Fund LLC | 5907 Laura Ave | Saint Louis | Missouri | 63136 |
| Guardian Fund LLC | 5950 Enright Ave | Saint Louis | Missouri | 63112 |
| Guardian Fund LLC | 6140 Payne Ave | Saint Louis | Missouri | 63135 |
| Guardian Fund LLC | 6742 Crest Ave | Saint Louis | Missouri | 63130 |
| Guardian Fund LLC | 6902 Greenway Ave | Saint Louis | Missouri | 63121 |
| Guardian Fund LLC | 7011 Paisley Dr | Saint Louis | Missouri | 63136 |
| Guardian Fund LLC | 7113 Lamont Dr | Saint Louis | Missouri | 63136 |
| Guardian Fund LLC | 7441 Calvin Ave | Saint Louis | Missouri | 63136 |
| Guardian Fund LLC | 7620 Mallard Drive | Saint Louis | Missouri | 63133 |
| Guardian Fund LLC | 7815 Ellington Dr | Saint Louis | Missouri | 63121 |
| Guardian Fund LLC | 8130 Myrick St | Saint Louis | Missouri | 63134 |
| Guardian Fund LLC | 9500 Lewis And Clark Blvd | Saint Louis | Missouri | 63136 |
| Guardian Fund LLC | 10852 Spring Garden Dr | St Louis | Missouri | 63137 |
| Guardian Fund LLC | 1644 Nemnich Avenue | St Louis | Missouri | 63136 |
| Guardian Fund LLC | 320 Millman Dr | St Louis | Missouri | 63135 |
| Guardian Fund LLC | 3610 Oakmount Avenue | St Louis | Missouri | 63121 |
| Guardian Fund LLC | 5557 Sunbury Avenue | St Louis | Missouri | 63136 |
| Guardian Fund LLC | 5598 Floy Avenue | St Louis | Missouri | 63136 |
| Guardian Fund LLC | 1243 Fairview Ave | University City | Missouri | 63130 |
| Guardian Fund LLC | 2319 La Puente St | Las Vegas | Nevada | 89115 |
| Guardian Fund LLC | 11325 Walnut Ave Ne | Alliance | Ohio | 44601 |
| Guardian Fund LLC | 1507 S Freedom Ave | Alliance | Ohio | 44601 |
| Guardian Fund LLC | 16 E Vine St | Alliance | Ohio | 44601 |
| Guardian Fund LLC | 10101 North Blvd | Cleveland | Ohio | 44108 |
| Guardian Fund LLC | 1018 E 72Nd St | Cleveland | Ohio | 44103 |

30

*AM*

Manager _____

Owner _____ *amn*

2023-05-22

30 PHONE: (775) 360-4109    |    EMAIL:  INVEST@12BR.COM    |    VISIT: WWW.12BR.COM

Exhibit 18, Page 258



# PROPERTY MANAGEMENT AGREEMENT

## FOR

## 12B RESIDENTIAL

This PROPERTY MANAGEMENT AGREEMENT (the "Agreement") is entered into this 22 day of May 20 23 , by and between Guardian Fund, LLC ("Owner") and 12B Residential, a Nevada corporation ("Manager") (each a "Party" and collectively the "Parties").

### 1. COMMUNICATION

**(A)** All communication between Owner and Manager, including without limitation all notices, agreements, consents, demands, and reports required or provided for under this Agreement shall be delivered in writing and addressed to Owner or Manager as follows:

**MANAGER:**

12B Residential
P.O. BOX 12430
Reno, NV 89510
Office: 888-718-1705
Email: Info@12BR.com

**OWNER:**

NAME:
ADDRESS:

PHONE:
EMAIL:

Guardian Fund, LLC
PO Box 12935
Reno, NV
89510

Invest@12br.com

The following are all acceptable forms of communication between the Parties, except as otherwise may be required by law: **Fax, Email, Mail.** Notices shall be deemed effective upon the date sent.

**(B)** All communication from Owner to Tenant (as that term is defined below) shall be conducted through Manager.

### 2. EMPLOYMENT OF MANAGER

**(A)** **Acceptance and Employment of Manager.** Owner appoints Manager as Owner's exclusive agent to manage the **REAL PROPERTY** identified on Exhibit A (the "Property"), attached to this Agreement, and incorporated by reference, in accordance with the terms and conditions of this Agreement. Manager accepts said appointment in accordance with the terms and conditions of this Agreement. Owner agrees to pay all expenses associated with the services described in this Agreement.

1

Manager  *AM*

Owner  *amn*

2023-05-22

Exhibit 18, Page 259



**(B)   Manager Relationship to Owner.** Manager shall at no time during the term of this Agreement be considered an employee of the Owner. All duties and obligations performed under this Agreement by Manager shall be performed on behalf of the Owner, for the Owner's account, and in the Owner's name. Manager is authorized to act on the Owner's behalf as is necessary to perform Manager's duties and obligations under this Agreement and to carry out the spirit of this Agreement. Manager, Manager's employees, vendors, assigns, and heirs are not responsible for any delays in the performance of any of Manager's obligations under this Agreement unless the delay is intentional in nature and was caused by the Manager or its employees. Any losses or gains the Owner may incur are the sole responsibility of the Owner, and no terms or provisions of this Agreement shall be read or construed to create or constitute a partnership between Owner and Manager. Manager shall not be required to accept responsibility for or to bear any liability for any losses connected to the operation of the Property.

**(C)   Agreement Term.** This Agreement shall commence on the date of execution (the "Effective Date") for a term of one (1) year and shall renew automatically for successive 1-year terms on each Effective Date anniversary unless cancelled by either Party, with notice provided in writing to the other Party, no later than 45 days prior to the end of the then-current term.

### 3. MANAGER OBLIGATIONS AND COMPENSATION

**(A) PROPERTY MANAGEMENT AND ADVERTISING** Owner shall pay a fee of 10% of collected gross monthly rent to Manager for property management monthly.

**(B) LEASING SERVICES.** Owner shall pay to Manager a leasing fee equal to 100% of one (1) month's rent upon Manager: obtaining an executed lease from a tenant; collecting a security deposit; and receiving the first month's rent from the tenant. Manager may charge, collect, and retain an application fee from prospective tenants for the purpose of qualifying those prospective tenants.

**(C)LEASE RENEWALS.** Owner shall pay to Manager a leasing fee of $275 upon each renewal of a lease for any additional term.

**(D) PROPERTY TURNS.** Owner shall pay to Manager a $250 fee or 12% for each property turn, whichever is greater.

**(E) ASSET MANAGEMENT.** Owner shall pay Manager $35 per property listed on Exhibit A, each month for asset management services. The asset management services include fund and investor accounting, property taxes management, debt servicing, insurance, investor relations and like functions.

**(a) UNINHABITABLE PROPERTY MANAGEMENT.** Owner shall pay Manager $25 a month for each property listed on Exhibit B. The uninhabitable management fee is to cover the cost associated with overseeing and paying property utilities, city code violations, and other expenses. The properties identified in Exhibit B are currently unhabitable and will require significant capital improvements. The Manager is not responsible for property security, preservation, or safety on the identified properties.

2

*AM*

Manager _____

Owner_____ *amn*

2023-05-22

2 PHONE: (775) 360-4109      |      EMAIL:   INVEST@12BR.COM      |      VISIT: WWW.12BR.COM

Exhibit 18, Page 260

# 12B RESIDENTIAL

**(F) APPLIANCES.** If Owner does not provide appliances for use by tenants of the Property, the Manager may provide appliance leasing services to the tenant on behalf of the Owner. The tenant shall pay a fee for such appliance leasing services that Manager shall collect per appliance and retain.

## 4. ACCOUNTING FOR CLIENT FUNDS

**(A) ESCROW ACCOUNT.** Manager will establish an escrow account with an FDIC-insured financial institution of its choice for the purpose of securely holding tenant security deposits. Manager also will establish a separate operating escrow account at an FDIC-insured financial institution of its choice for the purpose of depositing collected rents and any other payments constituting the property of Owner (the "Operating Account"). Owner authorizes Manager to disburse these funds to the Owner less any fees due to the Manager or expenses incurred by the Manager on the Owner's behalf.

## 5. COLLECTION OF RENTS AND OTHER RECEIPTS

**(A) MANAGER OBLIGATIONS.** Manager will collect all rents and all other amounts receivable on the Owner's account on behalf of the Owner as set forth in this Agreement. All funds will be deposited into the Escrow Account and maintained by the Manager for the Owner. Disbursements by the Manager to the Owner will be made on or about the 7th day of the preceding month.

**(B) SPECIAL CHARGES.** If collection services are deemed necessary, Manager is permitted to collect all fees from the tenants, including but not limited to: Property related tenant late fees, administrative fees associated with late payments or partial payments, charges associated with returned checks, and application fees. The Manager may retain any fees collected in excess of the monthly rental payment. (e.g., late fees).

## 6. RENT DISBURSEMENTS AND OTHER RECIEPTS

**(A)  MANAGEMENT FEES AND OPERATING EXPENSES.** Owner authorizes Manager to pay itself for the cost of operating the property and for all expenses incurred in fulfilling the Manager's responsibility under this agreement and any other fees due to the Manager under this Agreement.

**(B)  MANAGER OBLIGATIONS.** Manager will make timely payments of all property related expenses that fall outside of this Agreement and/or any lease agreement with any tenant including without limitation property taxes, insurance, utilities, assessments, and mortgage payments (if applicable).

**(C)  OWNER PROCEEDS.** Manager will deliver the net proceeds of the Property to the Owner monthly after all management fees and operating expenses (and the obligations set forth in **Exhibit C**, (if applicable) have been paid.

## 7. MANAGER NOT REQUIRED TO ADVANCE FUNDS.

3

*AM*

Manager boxsign

Owner _____ *amn*

2023-05-22

Exhibit 18, Page 261

# 12B RESIDENTIAL

If the balance of the Manager's escrow account is insufficient to pay for services rendered, the Owner will have a maximum of 10 days from date of insufficiency to remit payment covering any deficiency or supply the Manager to facilitate payment.  Under no circumstances will the Manager be required to pay for any expenses associated with the Property on the Owner's behalf out of Manager's own funds.  If Manager chooses to advance any funds to cover any expenses that are Owner's responsibility, Owner shall reimburse Manager for any such expenses paid by Manager plus 15% per annum from the date such expenses were paid by Manager.

## 8. FINANCIAL REPORTING REQUIREMENTS

**(A) INCOME TAX REPORTING AND PAYMENT.**  Owner is responsible exclusively for complying with all of Owner's own income tax reporting and payment obligations under State and Federal law.

**(B) MANAGER FINANCIAL REPORTING.**  Manager will supply Owner with all financial information requested by Owner for accurate income tax reporting purposes including, but not limited to, a ledger of cash receipts and expenses paid from the monthly operation of the Property. Upon request by Owner, Manager will furnish all information that is required by the IRS for the accurate accounting of 12B Residential. Manager agrees to provide all necessary reports within ten (10) business days after receiving a written request for such documents from Owner.

## 9. LEASING

**(A) AUTHORITY OF MANAGER.**  Owner authorizes Manager to prepare and sign all leases for the Property on Owner's behalf, including all lease renewals, extensions, modifications, and cancellations. Owner also authorizes Manager to act on Owner's behalf to manage tenant relations and expectations, and to negotiate with tenants when performing these tasks. Owner authorizes Manager to utilize Manager's forms for all Leases.

**(B) LEASE ENFORCEMENT.**  To the extent allowed by governing state law, Owner authorizes Manager to initiate legal action on behalf of Owner, if necessary, to enforce leases on Owner's behalf. Owner also authorizes Manager to sign and serve notices to facilitate this process. If Manager takes legal action against a tenant or other party to enforce a lease on Owner's behalf, Manager may retain legal representation of its choice and Owner shall pay all costs associated with such legal representation including, without limitation, all attorney fees and court costs.

**(C) PROPERTY INSPECTIONS AND CONDITION REPORTING.**  Manager reserves the right to report on the condition of the Property within seven (7) days after the execution of this Agreement, at the time of lease signing and at the expiration of the lease term. If deemed necessary, Manager will prepare a written report for Owner's review. This report may contain opinions of Manager, employees of the Manager, or of contractors hired by Manager to propose recommended improvements necessary for efficient operation of the Property. After approval by Owner, Manager shall supervise the completion of all improvements to be made to bring the Property to Manager's minimum standards for occupancy and, if necessary, improvements needed for the efficient operation of the Property. Manager will, in its sole discretion, conduct exterior inspections of the Property to facilitate the operation

4

*AM*

Manager _____

Owner _____ *amn*

2023-05-22

# 12 B RESIDENTIAL

of the Property during the lease term. If Manager determines that the Property is vacant, Manager will take reasonable precautions to secure the Property.

## 10. PROPERTY MAINTENANCE AND REPAIR

**(A) ORDINARY MAINTENANCE.** Manager will employ best practices to maintain the property in habitable condition. Manager will make ordinary repairs or contract for such repairs to be completed by **licensed and insured vendors** as required by applicable laws and regulations or otherwise required by the lease. A management fee of **$35** will be applied to these repairs.

**(B) EMERGENY CIRCUMSTANCES OR REPAIRS.** If an emergency circumstance arises that requires Manager to take action to maintain the condition, security and safety of the Property and its inhabitants (collectively, "Emergency Services"), which Emergency Services do not fall under the normal management duties of Manager required under this Agreement, then Owner shall pay Manager an hourly rate of $75/hour for such Emergency Services. If the nature and scope of the Emergency Services require however, said hourly rate for Emergency Services is subject to a reasonable increase depending on the nature and scope of the Emergency Services provided and may be changed by Manager without prior notification to Owner. Emergency circumstances include, but are not limited to, the following:

(a) **Property is reported as unsecure.**

(b) **Property is without heat when outside low temperature is below 65 Degrees Fahrenheit.**

(c) **Plumbing and drain issues involving leaks and inoperable drains exist.**

(d) **Roof leaks.**

(e) **Any condition that poses an immediate health and safety risk or could lead to further damages if not remediated immediately.**

**Manager will use its best efforts to temporarily mitigate these issues and address permanent repairs at negotiated rates when possible. Owner acknowledges that temporary mitigation of an emergency circumstance may not be possible in certain situations in the interest of protecting the Property and the health and safety of the Tenant.**

**(C) SMOKE DETECTORS.** Smoke detectors must be installed and in working condition in the Property at time of leasing and at Owner's expense. It is the tenant's responsibility to maintain operation of the smoke detectors during the lease term.

## 11. INSURANCE

**(A) TENANT'S INSURANCE.** Tenants **may be required** to obtain renter's insurance.

**(B) INSURANCE.** Manager is required to maintain adequate insurance on all Properties under management to protect against liability for loss, injury, or damage to property or persons that may arise out of the occupancy,

5

*AM*

Manager _____

Owner ____ *amn*

2023-05-22

Exhibit 18, Page 263



operation, management, or maintenance of the Property. **Manager shall be named as an additional insured on liability insurance maintained with respect to the Property.** Manager will be notified immediately of any changes or cancellations to any insurance policies required to be maintained by Owner under this Agreement.

## 12. INDEMNITY

Owner agrees to save, defend, and indemnify and hold harmless Manager from and against all claims, demands and liabilities arising from or relating to:

**(A)**    Any negligence, by act or omission, by Owner, Owner's agents, employees, servants, representatives or subcontractors;

**(B)**    Any accident, injury or damage to any person, or to the Property, alleged to have been caused by the negligence of Owner (as described in Section 13(a));

**(C)**    Owner's failure to comply with any applicable law, rule or regulation of any governing body having jurisdiction over the Property or the subject matter of this Agreement; and

**(D)**    Any breach of Owner's obligations or other default by Owner under this Agreement

This indemnity obligation shall include all damages, costs, litigation expenses, fines, liabilities and attorney fees incurred by Manager in defending against any such claim or proceeding brought against Manager. Manager shall be entitled to recover all its attorney fees and litigation expenses associated with enforcing the terms of this Agreement.

## 13. NO ASSUMPTION OF LIABILITY

Manager assumes no liability for any damages or losses incurred by the tenant, or for any acts or omissions of the Owner or any previous Owners or Managers of the Property. Manager assumes no liability for the solvency of any financial institution used by Manager for the purposes stated in this Agreement. Manager does not assume liability for violations of any kind that are discovered during the term of this Agreement. Upon discovery of any such violation the Manager will notify the Owner immediately, at which point Owner shall bear sole responsibility for curing such violations.

## 14. LEGAL EXPENSES

**(A)    LEGAL FEES FOR PROFESSIONAL GUIDANCE.** Any reasonable expense that is incurred by Manager in the process of acquiring legal advice on behalf of the Owner shall be paid by Owner.

**(B)    LITIGATION EXPENSES.** Owner is responsible for paying all fines levied against Owner or the Property by any Federal, State or local government agency or any court of law with respect to any claimed violation of any state and federal laws, regulations and ordinances, including without limitation laws and regulations governing housing

6

*AM*

Manager _____

Owner ____ *amn*

2023-05-22

Exhibit 18, Page 264

# 12B RESIDENTIAL

discrimination, housing quality and conditions, employment discrimination, credit reporting, and environmental regulation, unless the fines are levied as a result of Manager's violation of such laws, regulations and ordinances.

## 15. OWNER REPRESENTATIONS

**(A) OWNER REPRESENTATIONS.** Owner represents and warrants to Manager that Owner has full power and authority to enter into this Agreement and that there are no written or oral agreements affecting the Property other than disclosed tenant leases, copies of which have been furnished to Manager. Owner further represents and warrants that that no recorded easements, restrictions, reservations, or rights of way exist that adversely affect the use of the Property for the purposes intended under this Agreement; that the Property is zoned for the intended use; and that Owner has secured all permits for the leasing and operation of the Property and those permits are current. Owner further warrants that the building and its construction and operation do not violate any applicable laws, regulations, ordinances, or orders; that the information supplied by Owner to Manager is dependable and accurate; and that Owner has fully paid, or paid currently, any loans, notes, mortgages, or dues related to the Property without defaults.

## 16. AGREEMENT TERMINATION

**(A) EARLY TERMINATION.** Either Party may terminate this Agreement at any time by giving written notice to the other Party no less than thirty (30) days prior to the termination date. If Owner requests early termination of this Agreement, Owner shall pay to Manager the lesser of a fee of $250 or 50% of the gross management fee for the remaining term of any lease which is then in effect, which payment shall be paid on or before ten (10) days prior to the date of termination of this Agreement. If Owner fails to pay such fee in a timely manner, this Agreement shall continue in full force and effect until the tenth (10th) day following the payment of such fee. Following termination, Manager will transfer any and all information related to the operation of the Property to the Owner or a management company selected by Owner.

**(B) TERMINATION BY MANAGER FOR CAUSE.** Manager may terminate this Agreement immediately by giving notice in writing to Owner if Owner fails to pay any mortgage lien attached to the Property, taxes associated with the Property, invoices for work performed by the Manager or its agents or contractors, any bill that could impact the operation of the Property, Manager, or tenant, or Owner involvement in any illegal or immoral acts that could impact the Manager or the tenant.

**(C) OWNER RESPONSIBILITY FOR PAYMENTS.** Immediately upon termination of this Agreement Owner shall assume all outstanding bills or contracts entered by Manager for the benefit of the Owner or the Property. Manager reserves the right to withhold disbursements up to thirty-five (35) days after termination of the Agreement to complete a final accounting (e.g. rent collections and disbursements). Upon completion of the final accounting, Manager shall pay any outstanding liabilities of Owner and disburse any remaining funds to Owner. Manager shall transfer all Security Deposits from the Manager's escrow account to the Owner and provide written notice of such

7

*AM*

Manager ⸻

Owner ⸻ *amn*

2023-05-22

Exhibit 18, Page 265

# 12B RESIDENTIAL

transfer to tenant. **(C) SALE OF PROPERTY:** In the event of sale of the Property by the Owner in an arms-length transaction, and conveyance of the deed, this Agreement will automatically terminate.

**(D)   SALE OF PROPERTY:** In the event of sale of the Property by the Owner in an arms-length transaction to a third party, evidenced by conveyance of a deed, this Agreement will terminate automatically.

**(E)   CONDEMNATION.** In the event of total condemnation of the Property this Agreement will terminate. In the event of partial condemnation of the Property either Party may terminate this Agreement at their option.

**(F)   BANKRUPTCY.** If bankruptcy proceedings are initiated by Owner, either Party may terminate this Agreement with thirty (30) days advance written notice.

## 17. PROVISIONS SURVIVING TERMINATION

All representations, warranties, and indemnification obligations set forth in this Agreement shall survive its termination. All provisions of this Agreement that require Owner to procure and maintain insurance for the benefit of Manager shall survive the termination of this Agreement. If Manager becomes involved in any proceeding or litigation by reason of having been the Owner's Manager under this Agreement, all indemnification and hold harmless provisions of this Agreement shall apply as if this Agreement were still in effect.

## 18. MISCELLANEOUS

**(A)   ALL RIGHTS UNDER THIS AGREEMENT ARE CUMULATIVE.** All rights and remedies provided in this Agreement are cumulative and not exclusive of any other rights or remedies that may be available to the Parties, whether provided in law or in equity, in any other agreement between the Parties or otherwise.

**(B)   DISPUTE RESOLUTION. This Agreement will be governed by and construed in accordance with the laws of the State of Nevada, without application of principles of conflict of law. The Parties choose the state and federal courts of Washoe County, Nevada as the exclusive venue for any litigation between the Parties related in any way to this Agreement. Manager will be entitled to recover its reasonable attorneys' fees and costs, including but not limited to paralegal fees and litigation expenses, in any legal proceeding arising out of or related to this Agreement including mediation, arbitration, administrative, litigation (trial), and bankruptcy proceedings (including any appellate proceedings arising in any legal proceeding). The Parties each knowingly, voluntarily and intentionally waives all rights to a trial by jury regarding any and all litigation arising out of the Agreement and any right it may have to seek to consolidate any such litigation with any other litigation in which a jury trial cannot or has not been waived.**

**(C)   WARRANTY WORK.** Owner will notify Manager of any work previously completed on the Property that is under warranty within seven (7) days of acceptance of this Agreement.

**(D)   NO WAIVER.** The failure by a Party to require performance of any provision of this Agreement shall not affect that Party's right to require performance of that provision (or any other provision of this Agreement) subsequently, nor shall a waiver of any breach or default of this Agreement constitute a waiver of any subsequent breach or default.

8

*AM*

Manager _____

Owner _____ *amn*

2023-05-22

8 PHONE: (775) 360-4109   |   EMAIL: INVEST@12BR.COM   |   VISIT: WWW.12BR.COM

Exhibit 18, Page 266



### 19. SEVERABILITY

If any part of this Agreement is adjudged by a court of competent jurisdiction to be invalid, such judgment shall not affect or nullify the remainder of this Agreement. The remainder of this Agreement will remain in full force and effect.

### 20. COMPLETE AGREEMENT

This Agreement constitutes the entire Agreement between Manager and Owner. No oral or written representation, inducement, statement or promise made by or on behalf of a part not contained in this Agreement shall be relied upon or binding on Manager or Owner. Any amendments, modifications or supplements to this Agreement must be in writing and signed by each Party. The terms of this Agreement shall be binding upon and inure to the benefit of the successors and assigns of the Parties.

### 21. ADDITIONAL PROVISIONS

N/A

9

*AM*

Manager ⌐DOCSIGN⌐ 1B44UQP-11

Owner _____ *amn*

2023-05-22 1RLZ843-11

Exhibit 18, Page 267

# 12B RESIDENTIAL

**IN WITNESS WHEREOF, Owner and Manager have signed and executed this Agreement.**

*Aaron M Noe*

May 22, 2023

**Owner** Guardian Fund, LLC                                    **Date**

Aaron M Noe

**Printed**

*Adrian Maravilla*

May 22, 2023

**Manager**                                                              **Date**

Adrian Maravilla

**Printed**

10

*AM*

Manager _____

Owner _____ *amn*

2023-05-22

10 PHONE: (775) 360-4109        |        EMAIL:  INVEST@12BR.COM        |        VISIT: WWW.12BR.COM

Exhibit 18, Page 268



## EXHIBIT A TO THE PROPERTY MANAGEMENT AGREEMENT

**List of Properties:**

| Portfolio Name | Building Name | Unit Name | Building City | Building Zip |
|---|---|---|---|---|
| 2014 Wells Revocable Family Trust | 3076 W 104th St | Unit 1 | Cleveland | 44111 |
| 2014 Wells Revocable Family Trust | 11315 East Blvd | 11315 East Blvd | Cleveland | 44105 |
| 2014 Wells Revocable Family Trust | 13801 Othello Ave | 13801 Othello Ave | Cleveland | 44110 |
| 2014 Wells Revocable Family Trust | 13413 Chapelside Ave | 13413 Chapelside Ave | Cleveland | 44120 |
| 2014 Wells Revocable Family Trust | 1459 Clermont Rd | 1459 Clermont Rd | Cleveland | 44110 |
| 2014 Wells Revocable Family Trust | 1217 E 113th St | 1217 E 113th St | Cleveland | 44108 |
| 2014 Wells Revocable Family Trust | 2623 Avie Drive | 2623 Avie Drive | Saint Louis | 63136 |
| 2014 Wells Revocable Family Trust | 9901 Yale Ave | 9901 Yale Ave | Cleveland | 44108 |
| 320 South Ames Street, LLC, a Colorado Limited Lia | 1143 Lakeview Road | 1143 Lakeview Road | Cleveland | 44108 |
| 320 South Ames Street, LLC, a Colorado Limited Lia | 448 Adrian Drive | 448 Adrian Drive | Saint Louis | 63137 |
| 800 W Belleview Avenue #102 LLC, a Colorado Limite | 509 La Motte Lane | 509 La Motte Lane | Ferguson | 63135 |
| 800 W Belleview Avenue #102 LLC, a Colorado Limite | 2419 Shirley Avenue | 2419 Shirley Avenue | Saint Louis | 63136 |
| 816 Tarpan, LLC, a Colorado Limited Liability Comp | 212 Cameron Rd | 212 Cameron Rd | Saint Louis | 63137 |
| 816 Tarpan, LLC, a Colorado Limited Liability Comp | 10219 Hobkirk Drive | 10219 Hobkirk Drive | Saint Louis | 63137 |
| 816 Tarpan, LLC, a Colorado Limited Liability Comp | 10217 Royal Drive | 10217 Royal Drive | Saint Louis | 63136 |
| 816 Tarpan, LLC, a Colorado Limited Liability Comp | 1062 Mona Drive | 1062 Mona Drive | Saint Louis | 63130 |
| 816 Tarpan, LLC, a Colorado Limited Liability Comp | 2335 Grants Parkway | 2335 Grants Parkway | Florissant | 63031 |
| 9809 Palmer Lane LLC | 5902 Dressell Avenue | 5902 Dressell Avenue | Saint Louis | 63120 |
| Aaron P Lukas and Carlyn L Lukas | 716 10th Street South | 716 10th Street South | Gadsden | 35901 |
| Aaron P Lukas and Carlyn L Lukas | 500 Oakland Avenue | 500 Oakland Avenue | Sylacauga | 35150 |

11

*AM*

Manager ━━━━

Owner ____ *amn*

2023-05-22

11 PHONE: (775) 360-4109    |    EMAIL:  INVEST@12BR.COM    |    VISIT: WWW.12BR.COM

Exhibit 18, Page 269

# 12B RESIDENTIAL

| | | | | |
|---|---|---|---|---|
| Aaron P Lukas and Carlyn L Lukas | 127 Stonehaven Way | 127 Stonehaven Way | Pelham | 35124 |
| Aaron P Lukas and Carolyn L Lukas | 13812 Southview Ave | 13812 Southview Ave | Cleveland | 44120 |
| Aaron P Lukas and Carolyn L Lukas | 8422 Rosewood Avenue | 8422 Rosewood Avenue | Cleveland | 44105 |
| Alan & Joy Palelis | 1420 7th Avenue N | 1420 7th Avenue N | Bessemer | 35020 |
| Alan & Joy Palelis | 1032 E 145th St | 1032 E 145th St | Cleveland | 44110 |
| Alan & Joy Palelis | 10721 Columbia Ave | 10721 Columbia Ave | Cleveland | 44108 |
| Alan & Joy Palelis | 10404 Earl Drive | 10404 Earl Drive | Saint Louis | 63136 |
| Alan & Joy Palelis | 670 Indiana Avenue | 670 Indiana Avenue | Toledo | 43604 |
| Alan & Joy Palelis | 2314 Airline Avenue | 2314 Airline Avenue | Toledo | 43609 |
| Alicia A Gardner | 11672 Herefordshire Dr | 11672 Herefordshire Dr | Saint Louis | 63138 |
| Alicia A Gardner | 1235 Dawson Street | 1235 Dawson Street | Toledo | 43605 |
| Alicia A Gardner | 3822 House of Stuart Avenue | 3822 House of Stuart Avenue | Toledo | 43607 |
| Allerton Holdings LLC | 9008 Birchdale Ave | 9008 Birchdale Ave | Cleveland | 44106 |
| Almond Blossom Properties LLC, a California limite | 786-788 E 156th St | 788 Front | Cleveland | 44110 |
| Almond Blossom Properties LLC, a California limite | 786-788 E 156th St | 786 Back | Cleveland | 44110 |
| Almond Blossom Properties LLC, a California limite | 1507 Beecher Drive | 1507 Beecher Drive | Saint Louis | 63136 |
| Almond Blossom Properties LLC, a California limite | 9323 Hathaway Drive | 9323 Hathaway Drive | Jennings | 63136 |
| Andrew Lodato and Misti Lodato | 1180 Howdershell Rd | 1180 Howdershell Rd | Florissant | 63031 |
| Andrew Lodato and Misti Lodato | 430 Plaza Avenue | 430 Plaza Avenue | Saint Louis | 63135 |
| Andrew S. Han and Sally R. Han, Trustees of the Ha | 715 E 160th St | Unit 2 | Cleveland | 44110 |
| Andrew S. Han and Sally R. Han, Trustees of the Ha | 1646 Burgess Rd | Unit 1 | Cleveland | 44112 |
| Andrew S. Han and Sally R. Han, Trustees of the Ha | 1646 Burgess Rd | Unit 3 | Cleveland | 44112 |
| Andrew S. Han and Sally R. Han, Trustees of the Ha | 609 Rebecca Road | 609 Rebecca Road | Birmingham | 35206 |

12

*AM*

Manager

Owner _____ *amn*

2023-05-22

12 PHONE: (775) 360-4109    |    EMAIL:  INVEST@12BR.COM    |    VISIT: WWW.12BR.COM

Exhibit 18, Page 270

# 12B RESIDENTIAL

| | | | | |
|---|---|---|---|---|
| Andrew S. Han and Sally R. Han, Trustees of the Ha | 2327 Treadwell Rd | 2327 Treadwell Rd | Birmingham | 35217 |
| Andrew S. Han and Sally R. Han, Trustees of the Ha | 10609 Dove Ave | 10609 Dove Ave | Cleveland | 44105 |
| Andrew S. Han and Sally R. Han, Trustees of the Ha | 2305 13th Court N | 2305 13th Court N | Bessemer | 35020 |
| AR & RD Trust | 650 Mullanphy Rd | 650 Mullanphy Rd | Florissant | 63031 |
| AR & RD Trust | 8116 Pelham Avenue | 8116 Pelham Avenue | Saint Louis | 63147 |
| AR & RD Trust | 3121 Potomac Avenue | 3121 Potomac Avenue | Saint Louis | 63118 |
| AR & RD Trust | 6114 Margaret Avenue | 6114 Margaret Avenue | Saint Louis | 63120 |
| Aron P Lukas and Carolyn L Lukas | 34 E Streicher Street | 34 E Streicher Street | Toledo | 43608 |
| Aron P Lukas and Carolyn L Lukas | 221 Somerset Street | 221 Somerset Street | Toledo | 43609 |
| Aron P Lukas and Carolyn L Lukas | 913 Berry Street | 913 Berry Street | Toledo | 43605 |
| Aruta Family Trust dated October 16, 2015 | 7712 Force Ave | 7712 Force Ave | Cleveland | 44105 |
| Auburn Ridge Capital, LLC, a Colorado limited liab | 4389 Penrose Street | 4389 Penrose Street | Saint Louis | 63115 |
| Auburn Ridge Capital, LLC, a Colorado limited liab | 412 Crawford Road | 412 Crawford Road | Saint Louis | 63137 |
| Auburn Ridge Capital, LLC, a Colorado limited liab | 29 San Carlos Drive | 29 San Carlos Drive | Saint Charles | 63303 |
| Avalon Holding Group, LLC | 3646-3648 Virginia Avenue | Unit 1 | Saint Louis | 63118 |
| Avalon Holding Group, LLC | 2019 Raven Drive | 2019 Raven Drive | Saint Louis | 63133 |
| Avalon Holding Group, LLC | 6604 Etzel Avenue | 6604 Etzel Avenue | University City | 63130 |
| Avalon Holding Group, LLC | 11824 Criterion Avenue | 11824 Criterion Avenue | Saint Louis | 63138 |
| Avalon Holding Group, LLC | 7065 Idlewild Avenue | 7065 Idlewild Avenue | Saint Louis | 63136 |
| Avalon Holding Group, LLC | 142 Becker Drive | 142 Becker Drive | Saint Louis | 63135 |
| Avalon Holding Group, LLC | 10848 Spring Garden | 10848 Spring Garden | Saint Louis | 63137 |
| Barbara J. Artero and Kevin S. Artero | 866 E 130th St | 866 E 130th St | Cleveland | 44108 |
| Barbara J. Artero and Kevin S. Artero | 1190 E112th St | 1190 E112th St | Cleveland | 44108 |

13

*AM*

Manager box sign _____

Owner _____ amn

2023-05-22

# 12B RESIDENTIAL

| | | | | |
|---|---|---|---|---|
| Bart Eric Probasco and Cynthia S. Probasco | 2720 2nd Street NW | 2720 2nd Street NW | Center Point | 35215 |
| Bart Eric Probasco and Cynthia S. Probasco | 15 Mont Camille | 15 Mont Camille | Anniston | 36207 |
| Bart Eric Probasco and Cynthia S. Probasco | 389 Ragland St | 389 Ragland St | Lincoln | 35096 |
| Bertram Jones | 5056-5058 Cates Avenue | 5056 Up | Saint Louis | 63010 63026, 63042, |
| Bertram Jones | 5056-5058 Cates Avenue | 5058 Down | Saint Louis | 63010 63026, 63042, |
| Bertram Jones | 1146 Swarthmore Lane | 1146 Swarthmore Lane | Saint Louis | 63130 |
| Bhupinder Estates, LLC | 706 AL Hwy 204 | 706 AL Hwy 204 | Wellington | 36279 |
| Bhupinder Estates, LLC | 2075 Grants Parkway | 2075 Grants Parkway | Florissant | 63031 |
| Bhupinder Estates, LLC | 1278 George Street | 1278 George Street | University City | 63130 |
| Bhupinder Estates, LLC | 11760 El Camara Drive | 11760 El Camara Drive | Florissant | 63033 |
| Bhupinder Estates, LLC | 4893 Bristol Rock Road | 4893 Bristol Rock Road | Black Jack | 63033 |
| Bhupinder Estates, LLC | 4925 Evelynaire Place | 4925 Evelynaire Place | Black Jack | 63033 |
| Bhupinder Estates, LLC | 5004 Louisiana Avenue | 5004 Louisiana Avenue | Saint Louis | 63111 |
| Bryan James Wolf, Trustee of the Wolf Living Trust | 7836 1st Ave S | 7836 1st Ave S Unit 1 | Birmingham | 35206 |
| Bryan James Wolf, Trustee of the Wolf Living Trust | 7836 1st Ave S | 7836 1st Ave S Unit 2 | Birmingham | 35206 |
| Bryan James Wolf, Trustee of the Wolf Living Trust | 2312 6th Place NW | 2312 6th Place NW | Center Point | 35215 |
| Bryan James Wolf, Trustee of the Wolf Living Trust | 330 Farmhouse Lane | 330 Farmhouse Lane | Springville | 35146 |
| Bryan James Wolf, Trustee of the Wolf Living Trust | 333 Lawson Rd | 333 Lawson Rd | Birmingham | 35215 |
| Bryan James Wolf, Trustee of the Wolf Living Trust | 1828 Steiner Avenue | 1828 Steiner Avenue | Birmingham | 35211 |
| Bryan James Wolf, Trustee of the Wolf Living Trust | 2213 Diane Drive | 2213 Diane Drive | Birmingham | 35235 |

14

*AM*

Manager

Owner _____ *amn*

2023-05-22

Exhibit 18, Page 272

# 12B RESIDENTIAL

| | | | | |
|---|---|---|---|---|
| Bryan James Wolf, Trustee of the Wolf Living Trust | 1462 Sulzer Avenue | 1462 Sulzer Avenue | Euclid | 44132 |
| Bryan James Wolf, Trustee of the Wolf Living Trust | 339 Fork Drive | 339 Fork Drive | Saint Louis | 63137 |
| Bryan James Wolf, Trustee of the Wolf Living Trust | 4140 Virginia Avenue | 4140 Virginia Avenue | Saint Louis | 63118 |
| Bryan James Wolf, Trustee of the Wolf Living Trust | 12 McNulty Drive | 12 McNulty Drive | Florissant | 63031 |
| Bryan James Wolf, Trustee of the Wolf Living Trust | 10414 Reno Avenue | 10414 Reno Avenue | Cleveland | 44105 |
| BXB Holdings, LLC | 3261 E 119th St | 3261 E 119th St | Cleveland | 44120 |
| BXB Holdings, LLC | 4114 Appleberry Lane | 4114 Appleberry Lane | Saint Louis | 63121 |
| BXB Holdings, LLC | 8139 Bloom Drive | 8139 Bloom Drive | Saint Louis | 63114 |
| BXB Holdings, LLC | 215 Midlothian Rd | 215 Midlothian Rd | Saint Louis | 63137 |
| BXB Holdings, LLC | 5944 Thekla Avenue | 5944 Thekla Avenue | Saint Louis | 63136 |
| BXB Holdings, LLC | 3917 Lada Avenue | 3917 Lada Avenue | Saint Louis | 63121 |
| BXB Holdings, LLC | 545 Davis Street | 545 Davis Street | Saint Louis | 63111 |
| BXB Holdings, LLC | 10602 Moidart Circle | 10602 Moidart Circle | Saint Louis | 63137 |
| Cannon-Vachon Enterprises | 3713 W. 14th St | Top | Cleveland | 44109 |
| Cannon-Vachon Enterprises | 3713 W. 14th St | Bottom | Cleveland | 44109 |
| Cannon-Vachon Enterprises | 461-463 E 115th St | Unit 1 | Cleveland | 44108 |
| Cannon-Vachon Enterprises | 461-463 E 115th St | Unit 2 | Cleveland | 44108 |
| Cannon-Vachon Enterprises | 461-463 E 115th St | Unit 3 | Cleveland | 44108 |
| Cannon-Vachon Enterprises | 461-463 E 115th St | Unit 4 | Cleveland | 44108 |
| Cannon-Vachon Enterprises | 3946 E. 147th St | 3946 E. 147th St | Cleveland | 44128 |
| Cannon-Vachon Enterprises | 3560 W. 65th St. | 3560 W. 65th St. | Cleveland | 44102 |
| Cannon-Vachon Enterprises | 4106 E. 154th St. | 4106 E. 154th St. | Cleveland | 44128 |
| Cannon-Vachon Enterprises | 1163 W Woodruff Avenue | 1163 W Woodruff Avenue | Toledo | 43606 |
| Cannon-Vachon Enterprises | 1211 Manila Street | 1211 Manila Street | Toledo | 43607 |
| Cannon-Vachon Enterprises | 3515 Wersell Ave | 3515 Wersell Ave | Toledo | 43608 |
| Cannon-Vachon Enterprises | 560 Bronx Dr. | 560 Bronx Dr. | Toledo | 43609 |
| Carl W. Casey | 879 Elias Ave | 879 Elias Ave | Saint Louis | 63147 |
| Carl W. Casey | 128 McAlpine Drive | 128 McAlpine Drive | Saint Louis | 63137 |
| Carl W. Casey | 1707 Joffre Street | 1707 Joffre Street | Toledo | 43607 |

15

Manager *AM*

Owner *amn*

2023-05-22

15 PHONE: (775) 360-4109    |    EMAIL: INVEST@12BR.COM    |    VISIT: WWW.12BR.COM

Exhibit 18, Page 273

# 12B RESIDENTIAL

| | | | | |
|---|---|---|---|---|
| Carol Waltens Trustee of the Carol E Waltens Famil | 10101 Hilgert Dr | Unit 1 | Cleveland | 44104 |
| Carol Waltens Trustee of the Carol E Waltens Famil | 10101 Hilgert Dr | Unit 2 | Cleveland | 44104 |
| Catania Family Trust, Dated February 6, 2001 | 8313 Fay Drive | 8313 Fay Drive | Saint Louis | 63134 |
| Catania Family Trust, Dated February 6, 2001 | 11884 Critertion Avenue | 11884 Critertion Avenue | Saint Louis | 63138 |
| Cat-Hein Nguyen | 2026 Brunswick Rd | 2026 Brunswick Rd | East Cleveland | 44112 |
| Cat-Hein Nguyen | 9611 Balboa | 9611 Balboa | Saint Louis | 63136 |
| Cat-Hein Nguyen | 2611 Solway Ave | 2611 Solway Ave | Saint Louis | 63136 |
| Cat-Hein Nguyen | 9767 Lilac | 9767 Lilac | Saint Louis | 63137 |
| Cat-Hein Nguyen | 350 South Harvey | 350 South Harvey | Saint Louis | 63135 |
| Cat-Hein Nguyen | 230 Leland Ave. | 230 Leland Ave. | Toledo | 43609 |
| CG2632, LLC | 3684 E 106th St | Unit 1 | Cleveland | 44105 |
| CG2632, LLC | 3684 E 106th St | Unit 2 | Cleveland | 44105 |
| Charles M. Lamar and Carolyn B. Lamar | 10016 Aetna Road | 10016 Aetna Road | Cleveland | 44105 |
| Charles M. Lamar and Carolyn B. Lamar | 21000 Crystal Ave | 21000 Crystal Ave | Euclid | 44123 |
| Chin-Zong Tsai and Chin-Chiang Tsai, Trustees of t | 3125 Cedarbrook Lane | 3125 Cedarbrook Lane | Trussville | 35173 |
| Chin-Zong Tsai and Chin-Chiang Tsai, Trustees of t | 7445 Carriage Way | 7445 Carriage Way | Pinson | 35126 |
| Chin-Zong Tsai and Chin-Chiang Tsai, Trustees of t | 11830 El Camara Drive | 11830 El Camara Drive | Florissant | 63033 |
| Chin-Zong Tsai and Chin-Chiang Tsai, Trustees of t | 710 Jungs Station Rd | 710 Jungs Station Rd | Saint Charles | 63303 |
| Christopher David Lee | 960 Meadowbrook Dr | 960 Meadowbrook Dr | Birmingham | 35215 |
| Christopher David Lee | 5125 Farrell Ave | 5125 Farrell Ave | Fairfield | 35064 |
| Christopher David Lee | 1128 Gadsden Highway | 1128 Gadsden Highway | Birmingham | 35235 |
| Christopher David Lee | 99 Valleydale Court | 99 Valleydale Court | Birmingham | 35244 |
| Christopher David Lee | 705 Florland Drive | 705 Florland Drive | Florissant | 63031 |
| Christopher David Lee | 5 Silverbrook Drive | 5 Silverbrook Drive | Black Jack | 63033 |
| Christopher David Lee | 2913 Selkirk Circle | 2913 Selkirk Circle | Birmingham | 35242 |
| CMS Property Services, LLC | 10101 Dunlap Ave | 10101 Dunlap Ave | Cleveland | 44105 |

16

*AM*

Manager

Owner _____ *amn*

2023-05-22

Exhibit 18, Page 274

# 12B RESIDENTIAL

| | | | | |
|---|---|---|---|---|
| Cody Edwards, trustee of the Edwards Living Trust, | 12410 Ingomar Ave. | 12410 Ingomar Ave. | Cleveland | 44108 |
| Cody Edwards, trustee of the Edwards Living Trust, | 3103 W 96th St | 3103 W 96th St | Cleveland | 44102 |
| Cody Edwards, trustee of the Edwards Living Trust, | 711 Eddy Rd | 711 Eddy Rd | Cleveland | 44108 |
| Cody Edwards, trustee of the Edwards Living Trust, | 15720 Hazel Rd | 15720 Hazel Rd | East Cleveland | 44112 |
| Cody Edwards, trustee of the Edwards Living Trust, | 1397 E 93rd Street | 1397 E 93rd Street | Cleveland | 44106 |
| Cody Edwards, trustee of the Edwards Living Trust, | 726 Earl St | 726 Earl St | Toledo | 43605 |
| Cody Edwards, trustee of the Edwards Living Trust, | 406 Utah Street | 406 Utah Street | Toledo | 43605 |
| Cody Edwards, trustee of the Edwards Living Trust, | 56 Garfield Place | 56 Garfield Place | Toledo | 43605 |
| Cody Edwards, trustee of the Edwards Living Trust, | 14414 Kingsford Avenue | 14414 Kingsford Avenue | Cleveland | 44128 |
| Collin Van Zile Snyder | 2002-2004 Nelawood Road | Unit 2 2004 | East Cleveland | 44112 |
| Collin Van Zile Snyder | 30 First Avenue | Unit 1 | Bedford | 44146 |
| Collin Van Zile Snyder | 30 First Avenue | Unit 2 | Bedford | 44146 |
| Crazy Deer Properties, LLC | 1218 Jupiter Street | 1218 Jupiter Street | Gadsden | 35901 |
| Crazy Deer Properties, LLC | 1000 7th Place | 1000 7th Place | Sylacauga | 35150 |
| Crazy Deer Properties, LLC | 4611 Louisiana Avenue | 4611 Louisiana Avenue | Saint Louis | 63111 |
| Creekside Pines, LLC, a California Limited Liabili | 4001 E 144th | Unit 1 | Cleveland | 44128 |
| Creekside Pines, LLC, a California Limited Liabili | 4001 E 144th | Unit 2 | Cleveland | 44128 |
| Creekside Pines, LLC, a California Limited Liabili | 9914 Adams Ave | Unit 1 | Cleveland | 44108 |
| Creekside Pines, LLC, a California Limited Liabili | 13807-09 Rugby Rd | Unit 1(13809) | Cleveland | 44110 |
| Creekside Pines, LLC, a California Limited Liabili | 7008 Russell Ct | 7008 Russell Ct | Cleveland | 44103 |
| Creekside Pines, LLC, a California Limited Liabili | 14000 Christine Ave | 14000 Christine Ave | Cleveland | 44105 |
| Creekside Pines, LLC, a California Limited Liabili | 146 S Detroit Ave | 146 S Detroit Ave | Toledo | 43609 |

17

*AM*

Manager _____

Owner _____*amn*

2023-05-22

17 PHONE: (775) 360-4109     |     EMAIL:   INVEST@12BR.COM     |     VISIT: WWW.12BR.COM

# 12B RESIDENTIAL

| | | | | |
|---|---|---|---|---|
| Crow Electric, LLC, an Oregon Limited Liability Co | 2724 5th St NE | 2724 5th St NE | Center Point | 35215 |
| Crow Electric, LLC, an Oregon Limited Liability Co | 208 Argent Ave | 208 Argent Ave | Saint Louis | 63135 |
| Dallas D. Debatin Revocable Living Trust Dated Aug | 535 Nicholas St | 535 Nicholas St | Toledo | 43609 |
| Dallas D. Debatin Revocable Living Trust Dated Aug | 1841 Milburn Avenue | 1841 Milburn Avenue | Toledo | 43606 |
| Dallas D. Debatin Revocable Living Trust Dated Aug | 1130 Pinewood Avenue | 1130 Pinewood Avenue | Toledo | 43607 |
| DAM Properties, LLC | 1112 9th Court | 1112 9th Court | Pleasant Grove | 35127 |
| DAM Properties, LLC | 1300 Stonecrest Dr | 1300 Stonecrest Dr | Birmingham | 35235 |
| DAM Properties, LLC | 1138 E 114th St | 1138 E 114th St | Cleveland | 44108 |
| DAM Properties, LLC | 553 E 101st St | 553 E 101st St | Cleveland | 44108 |
| DAM Properties, LLC | 3413 Saint Henry Lane | 3413 Saint Henry Lane | Saint Louis | 63121 |
| DAM Properties, LLC | 10193 Green Valley Dr | 10193 Green Valley Dr | Saint Louis | 63136 |
| DAM Properties, LLC | 3339 W Tennyson Ave | 3339 W Tennyson Ave | Saint Louis | 63114 |
| DAM Properties, LLC | 11776 Talbott Ct | 11776 Talbott Ct | Saint Louis | 63138 |
| DAM Properties, LLC | 100 Glen Garry Road | 100 Glen Garry Road | Saint Louis | 63137 |
| DAM Properties, LLC | 10052 Clairmont Drive | 10052 Clairmont Drive | Saint Louis | 63136 |
| DAM Properties, LLC | 783 Boulevard St | 783 Boulevard St | Akron | 44311 |
| DAM Properties, LLC | 389 E 250th St | 389 E 250th St | Euclid | 44132 |
| Darren P. Evans | 264 McCalla Road | 264 McCalla Road | Bessemer | 35022 |
| Darren P. Evans | 101 Park Avenue | 101 Park Avenue | Bessemer | 35020 |
| Darren P. Evans | 893 E 75th Street | 893 E 75th Street | Cleveland | 44103 |
| Darren P. Evans | 948 Post Street | 948 Post Street | Toledo | 43610 |
| Darren P. Evans | 259 E Pearl Street | 259 E Pearl Street | Toledo | 43608 |
| David & Stephanie McKinley | 3194 E. 132nd St. | 3194 E. 132nd St. | Cleveland | 44120 |
| David & Stephanie McKinley | 2023 Brussels St | 2023 Brussels St | Toledo | 43613 |
| David Drown Wiggins and Shaun Wiggins Family Trust | 3306 Berkley Avenue | 3306 Berkley Avenue | Bessemer | 35020 |
| David Drown Wiggins and Shaun Wiggins Family Trust | 1326 22nd Avenue N | 1326 22nd Avenue N | Bessemer | 35020 |

18

*AM*

Manager

Owner ____ *amn*

2023-05-22

# 12B RESIDENTIAL

| | | | | |
|---|---|---|---|---|
| David Drown Wiggins and Shaun Wiggins Family Trust | 4804 Court I | 4804 Court I | Birmingham | 35208 |
| David Drown Wiggins and Shaun Wiggins Family Trust | 5758 Jennings Station | 5758 Jennings Station | Saint Louis | 63136 |
| David Drown Wiggins and Shaun Wiggins Family Trust | 8146 Rector Dr | 8146 Rector Dr | Saint Louis | 63134 |
| David Drown Wiggins and Shaun Wiggins Family Trust | 8346 Flora Ave | 8346 Flora Ave | Saint Louis | 63114 |
| David Drown Wiggins and Shaun Wiggins Family Trust | 459 Scenic Dr | 459 Scenic Dr | Saint Louis | 63137 |
| David J Perez | 481 E 148th St | 481Unit 1 | Cleveland | 44110 |
| David J Perez | 6315 - 6317 Lansing Avenue | 6315 Lansing Avenue: Front | Cleveland | 44105 |
| David J Perez | 6315 - 6317 Lansing Avenue | 6317 Lansing Avenue: Back | Cleveland | 44105 |
| David J Perez | 888 London Road | 888 London Road | Cleveland | 44110 |
| David McKinley | 12701 Benham Ave | Unit 2 | Cleveland | 44105 |
| David McKinley | 12701 Benham Ave | Unit 1 | Cleveland | 44105 |
| David McKinley | 10112 Orleans Ave. | 10112 Orleans Ave. | Cleveland | 44105 |
| David Springer | 4229 Rosewood Ave | 4229 Rosewood Ave | Saint Louis | 63120 |
| David Springer | 10200 Cedarhurst Drive | 10200 Cedarhurst Drive | Saint Louis | 63136 |
| Deborah Anne V. Morris | 414 (416) E 146th St | Unit 1 | Cleveland | 44110 |
| Deborah Anne V. Morris | 414 (416) E 146th St | Unit 2 | Cleveland | 44110 |
| Deborah Anne V. Morris | 439 E 123rd St | Unit 1 | Cleveland | 44108 |
| Deborah Anne V. Morris | 439 E 123rd St | Unit 2 | Cleveland | 44108 |
| Directed Trust Company FBO Gary G Gilberg IRA | 21300 Morris Ave | 21300 Morris Ave | Euclid | 44123 |
| Dog Luv LLC | 12114 Soika Ave | Unit 2 | Cleveland | 44120 |
| Dog Luv LLC | 6117 Patton Ave | 6117 Patton Ave | Birmingham | 35228 |
| Dog Luv LLC | 9512 Marah Ave | 9512 Marah Ave | Cleveland | 44104 |
| Dog Luv LLC | 10420 Earl Drive | 10420 Earl Drive | Saint Louis | 63136 |
| Dog Luv LLC | 3027 Forge Drive | 3027 Forge Drive | Saint Louis | 63136 |
| Dog Luv LLC | 3347 E 145th St | 3347 E 145th St | Cleveland | 44120 |
| Don Roland Griffiths Jr. and Marcia Lynn Griffiths | 12102 Imperial Ave | 12102 Imperial Ave | Cleveland | 44120 |

19

_AM_

Manager

Owner _____ amn

2023-05-22

# 12B RESIDENTIAL

| | | | | |
|---|---|---|---|---|
| Don Roland Griffiths Jr. and Marcia Lynn Griffiths | 638 Foredale Avenue | 638 Foredale Avenue | Toledo | 43609 |
| Doodle Properties LLC | 10133 Clairmont | 10133 Clairmont | Saint Louis | 63136 |
| Doodle Properties LLC | 10332 Castle Dr | 10332 Castle Dr | Saint Louis | 63136 |
| Douglas Gorvetzian and Patricia Sullivan | 1000 17th Place SW | 1000 17th Place SW | Birmingham | 35211 |
| Douglas Gorvetzian and Patricia Sullivan | 5376 Ville Rosa Lane | 5376 Ville Rosa Lane | Hazelwood | 63042 |
| Douglas Gorvetzian and Patricia Sullivan | 10188 Count Drive | 10188 Count Drive | Saint Louis | 63136 |
| Douglas Gorvetzian and Patricia Sullivan | 535 Paul Avenue | 535 Paul Avenue | Florissant | 63031 |
| Douglas Gorvetzian and Patricia Sullivan | 130 Gladys Avenue | 130 Gladys Avenue | Saint Louis | 63135 |
| Douglas Gorvetzian and Patricia Sullivan | 4037 Peak Avenue | 4037 Peak Avenue | Toledo | 43612 |
| Douglas Gorvetzian and Patricia Sullivan | 13302 Melzer Avenue | 13302 Melzer Avenue | Cleveland | 44120 |
| Douglas J. Green | 3648 Edmundson Road | Unit 1 | Saint Louis | 63114 |
| Douglas J. Green | 3648 Edmundson Road | Unit 2 | Saint Louis | 63114 |
| Douglas J. Green | 405 55th St | 405 55th St | Fairfield | 35064 |
| Douglas J. Green | 109 9th Court S | 109 9th Court S | Bessemer | 35020 |
| Douglas J. Green | 612 Vaughn Circle | 612 Vaughn Circle | Birmingham | 35235 |
| Douglas J. Green | 948 S Cherrydale Circle | 948 S Cherrydale Circle | Birmingham | 35214 |
| Douglas J. Green | 1039 N Hanley Rd | 1039 N Hanley Rd | University City | 63130 |
| Dylan Proehl | 1532 Lake Park Drive | 1532 Lake Park Drive | Center Point | 35215 |
| Dylan Proehl | 5434 Maple Avenue | 5434 Maple Avenue | Saint Louis | 63112 |
| Dylan Proehl | 309 West Steins Street | 309 West Steins Street | Saint Louis | 63111 |
| Dylan Proehl | 4430 Parker Road | 4430 Parker Road | Black Jack | 63033 |
| Edward E. Hale & Kathleen A. Hale | 12710 Benwood Ave | 12710 Benwood Ave | Cleveland | 44105 |
| Edward E. Hale & Kathleen A. Hale | 805 E. 131st St | 805 E. 131st St | Cleveland | 44108 |
| Edward E. Hale & Kathleen A. Hale | 822 Rudyard Rd. | 822 Rudyard Rd. | Cleveland | 44110 |
| Edward E. Hale & Kathleen A. Hale | 8205 Force Ave | 8205 Force Ave | Cleveland | 44105 |

20

*AM*

Manager _____

Owner _____*amn*

2023-05-22

Exhibit 18, Page 278

# 12B RESIDENTIAL

| | | | | |
|---|---|---|---|---|
| Edwards H. Rodier and Catherine F. Rodier | 3644 E 50th St | 3644 E 50th St | Cleveland | 44105 |
| Eichelberger Chen Family Trust 2017 | 6811-6813 Bonna Ave | Left (6811) | Cleveland | 44103 |
| Eichelberger Chen Family Trust 2017 | 6819 (6821)Harvard Ave | Unit 1 | Cleveland | 44105 |
| Eichelberger Chen Family Trust 2017 | 6819 (6821)Harvard Ave | Unit 2 | Cleveland | 44105 |
| Eichelberger Chen Family Trust 2017 | 1372 E 134th St | Unit 2 | East Cleveland | 44112 |
| Eichelberger Chen Family Trust 2017 | 745 Starlite Dr | 745 Starlite Dr | Odenville | 35120 |
| Eichelberger Chen Family Trust 2017 | 348 Grove Street | 348 Grove Street | Springville | 35146 |
| Eichelberger Chen Family Trust 2017 | 2300 9th St NW | 2300 9th St NW | Center Point | 35215 |
| Eichelberger Chen Family Trust 2017 | 1317 5th Ave N | 1317 5th Ave N | Bessemer | 35020 |
| Eichelberger Chen Family Trust 2017 | 16706 Priebe Ave | 16706 Priebe Ave | Cleveland | 44128 |
| Eichelberger Chen Family Trust 2017 | 111 Candlelight Ln | 111 Candlelight Ln | Irondale | 35210 |
| Elgene Edward Hood Jr. | 6606 Memory Ln | 6606 Memory Ln | Trussville | 35173 |
| Elgene Edward Hood Jr. | 3501 Avenue D | 3501 Avenue D | Birmingham | 35218 |
| Elgene Edward Hood Jr. | 961 Montford Rd | 961 Montford Rd | Cleveland Heights | 44121 |
| Elgene Edward Hood Jr. | 11338 Cotes Ave | 11338 Cotes Ave | Cleveland | 44105 |
| Elgene Edward Hood Jr. | 13701 Eastwood Blvd | 13701 Eastwood Blvd | Garfield Heights | 44125 |
| Elgene Edward Hood Jr. | 3538 W 65th St | 3538 W 65th St | Cleveland | 44102 |
| Elgene Edward Hood Jr. | 12822 Ferris Ave | 12822 Ferris Ave | Cleveland | 44105 |
| Elkridge Investments LLC | 11417 Avon Ave | 11417 Avon Ave | Cleveland | 44105 |
| Elkridge Investments LLC | 1222 E. 170th St. | 1222 E. 170th St. | Cleveland | 44110 |
| Elkridge Investments LLC | 4308 E. 142nd St. | 4308 E. 142nd St. | Cleveland | 44128 |
| Elkridge Investments LLC | 791 Eddy Rd | 791 Eddy Rd | Cleveland | 44108 |
| Elkridge Investments LLC | 12701 Lenacrave Ave. | 12701 Lenacrave Ave. | Cleveland | 44105 |
| Elliot Epstein | 325 24th Ave NE | 325 24th Ave NE | Center Point | 35215 |
| Elliot Epstein | 960 Martinwood Road | 960 Martinwood Road | Birmingham | 35235 |
| Elliot Epstein | 3721 Grasselli Ave | 3721 Grasselli Ave | Birmingham | 35221 |
| Elliot Epstein | 712 Cedar Cone Cir | 712 Cedar Cone Cir | Birmingham | 35214 |
| Elliot Epstein | 600 McAdory Ave | 600 McAdory Ave | Bessemer | 35020 |
| Elliot Epstein | 7513 Haywood Drive | 7513 Haywood Drive | Saint Louis | 63133 |

21

*AM*

Manager _____

Owner ___ *amn*

2023-05-22

# 12B RESIDENTIAL

| | | | | |
|---|---|---|---|---|
| Elliot Epstein | 1158 Reale Ave | 1158 Reale Ave | Saint Louis | 63138 |
| Elliot Epstein | 7546 Trenton Ave | 7546 Trenton Ave | Saint Louis | 63130 |
| Eric E and Theresa L Fox | 2833 N Erie Street | 2833 N Erie Street | Toledo | 43611 |
| Eric E and Theresa L Fox | 2206 Dundee Avenue | 2206 Dundee Avenue | Toledo | 43609 |
| Eric E and Theresa L Fox | 608 Whitlock Avenue | 608 Whitlock Avenue | Toledo | 43605 |
| Eric E. Fox and Theresa L. Fox | 1438 E 133rd Street | 1438 E 133rd Street | East Cleveland | 44112 |
| Erling R. Salvesen and Susan Salvesen | 19316 Meadowlark Ln | 19316 Meadowlark Ln | Warrensville Heights | 44128 |
| F&J Properties, LLC, a Colorado Limited Liability | 12613 Phillips Ave | 12613 Phillips Ave | East Cleveland | 44112 |
| F&J Properties, LLC, a Colorado Limited Liability | 1879 Knowles Street | 1879 Knowles Street | East Cleveland | 44112 |
| FabFive Holdings, LLC, a Limited Liability Company | 4029 Shirley Dr | 4029 Shirley Dr | Saint Louis | 63121 |
| FabFive Holdings, LLC, a Limited Liability Company | 151 Ben Nevis Road | 151 Ben Nevis Road | Saint Louis | 63137 |
| FabFive Holdings, LLC, a Limited Liability Company | 2809 Glendale Avenue | 2809 Glendale Avenue | Saint Louis | 63136 |
| FabFive Holdings, LLC, a Limited Liability Company | 7116 Paisley Drive | 7116 Paisley Drive | Saint Louis | 63136 |
| FabFive Holdings, LLC, a Limited Liability Company | 6633 Torlina Drive | 6633 Torlina Drive | Saint Louis | 63134 |
| Fireside Estates, LLC-2740 Series, a Nevada Series | 10201 Gibson Ave | Unit 2 | Cleveland | 44105 |
| Fireside Estates, LLC-2740 Series, a Nevada Series | 10201 Gibson Ave | Unit 1 | Cleveland | 44105 |
| Fireside Estates, LLC-2740 Series, a Nevada Series | 3943 W. 22nd St | 3943 W. 22nd St | Cleveland | 44109 |
| Fireside Estates, LLC-2740 Series, a Nevada Series | 4125 E. 144th St. | 4125 E. 144th St. | Cleveland | 44128 |
| Fireside Estates, LLC-2740 Series, a Nevada Series | 4230 E. 164th St | 4230 E. 164th St | Cleveland | 44128 |
| Fred and Christine Gorges Living Trust | 606 W Pine Street | 606 W Pine Street | Sylacauga | 35150 |
| Fred and Christine Gorges Living Trust | 12909 Benwood Avenue | 12909 Benwood Avenue | Cleveland | 44105 |
| Fred and Christine Gorges Living Trust | 1460 Clermont Road | 1460 Clermont Road | Cleveland | 44110 |
| Fred and Christine Gorges Living Trust | 10300 Ross Circle | 10300 Ross Circle | Saint Louis | 63137 |

22

Manager _AM_

Owner _____ amn

2023-05-22

Exhibit 18, Page 280

# 12B RESIDENTIAL

| | | | | |
|---|---|---|---|---|
| Gary Gilberg and Karyn Freested Family Trust | 3022 E 125th St | Unit 1 | Cleveland | 44120 |
| Gary Gilberg and Karyn Freested Family Trust | 3022 E 125th St | Unit 2 | Cleveland | 44120 |
| Gary Gilberg and Karyn Freested Family Trust | 16617 Burnside Ave | 16617 Burnside Ave | Cleveland | 44110 |
| Gary Gilberg and Karyn Freested Family Trust | 16006 Seville Rd | 16006 Seville Rd | Cleveland | 44128 |
| Gary Gilberg and Karyn Freested Family Trust | 4007 E 154th St | 4007 E 154th St | Cleveland | 44128 |
| Gaspar Anthony Sacco Revocable Trust U/A dated Sep | 1726 Leafcrest Dr | 1726 Leafcrest Dr | Hazelwood | 63042 |
| Geoffrey and Jennifer Parlane | 1105 Pineview Rd | 1105 Pineview Rd | Birmingham | 35228 |
| Geoffrey and Jennifer Parlane | 1738 Creekway Avenue SW | 1738 Creekway Avenue SW | Birmingham | 35211 |
| Geoffrey and Jennifer Parlane | 3328 Hemlock Avenue SW | 3328 Hemlock Avenue SW | Birmingham | 35221 |
| Giani Missouri LLC | 228 72nd St N | 228 72nd St N | Birmingham | 35206 |
| Giani Missouri LLC | 6752 Kenwood Drive | 6752 Kenwood Drive | Saint Louis | 63121 |
| Giani Missouri LLC | 1159 Reale Ave | 1159 Reale Ave | Saint Louis | 63138 |
| Giani Missouri LLC | 1629 Mowbry Lane | 1629 Mowbry Lane | Saint Louis | 63136 |
| Giani Missouri LLC | 6837 Bradley Avenue | 6837 Bradley Avenue | Saint Louis | 63139 |
| Glenn E. Davis and Kathleen A. Davis Family Trust | 13718 Horner Ave | 13718 Horner Ave | Cleveland | 44120 |
| Glenn E. Davis and Kathleen A. Davis Family Trust | 13604 Claiborne Road | 13604 Claiborne Road | East Cleveland | 44112 |
| Glenn E. Davis and Kathleen A. Davis Family Trust | 3551 E 105th Street | 3551 E 105th Street | Cleveland | 44105 |
| Gnorthm129 Trust | 4230 Bluestone Rd | 4230 Bluestone Rd | South Euclid | 44121 |
| Goldwatch Properties LLC | 909 28th Street SW | 909 28th Street SW | Birmingham | 35211 |
| Greg Conners | 1115 Briarwood Circle | 1115 Briarwood Circle | Moody | 35004 |
| Grover C. Edmondson III | 11622 Lenacrave Ave | 11622 Lenacrave Ave | Cleveland | 44105 |
| Grover C. Edmondson III | 11213 Forest Ave | 11213 Forest Ave | Cleveland | 44104 |
| Guardian CV1, LLC | 1525 Matt Leonard Dr SW | Birmingham | Alabama | 35211 |
| Guardian CV1, LLC | 229 22nd Ave NW | Center Point | Alabama | 35215 |

23

Manager _____ AM

Owner _____ amn

2023-05-22

Exhibit 18, Page 281

# 12B RESIDENTIAL

| Guardian CV1, LLC | 1009 Rutledge Dr | Midfield | Alabama | 35228 |
|---|---|---|---|---|
| Guardian CV1, LLC | 9481 Adler Ave | Bellefontaine Neighbors | Missouri | 63137 |
| Guardian CV1, LLC | 9916 Norwich Dr | Bellefontaine Neighbors | Missouri | 63137 |
| Guardian CV1, LLC | 10301 Ittner Dr | Dellwood | Missouri | 63136 |
| Guardian CV1, LLC | 10308 Deem Dr | Dellwood | Missouri | 63136 |
| Guardian CV1, LLC | 10331 Ittner Dr | Dellwood | Missouri | 63136 |
| Guardian CV1, LLC | 10504 Olney Dr | Dellwood | Missouri | 63136 |
| Guardian CV1, LLC | 1570 Champlin Dr | Dellwood | Missouri | 63136 |
| Guardian CV1, LLC | 124 Anabel Ave | Ferguson | Missouri | 63135 |
| Guardian CV1, LLC | 202 Frost Ave | Ferguson | Missouri | 63135 |
| Guardian CV1, LLC | 277 Dashwood Dr | Ferguson | Missouri | 63135 |
| Guardian CV1, LLC | 299 Dashwood Dr | Ferguson | Missouri | 63135 |
| Guardian CV1, LLC | 315 Coppinger Dr | Ferguson | Missouri | 63135 |
| Guardian CV1, LLC | 418 Jehling Dr | Ferguson | Missouri | 63135 |
| Guardian CV1, LLC | 705 Palace Ct | Ferguson | Missouri | 63135 |
| Guardian CV1, LLC | 7510 Blanding Dr | Ferguson | Missouri | 63135 |
| Guardian CV1, LLC | 932 Thatcher Ave | Ferguson | Missouri | 63135 |
| Guardian CV1, LLC | 680 Central Pkwy | Florissant | Missouri | 63031 |
| Guardian CV1, LLC | 9426 Westchester Dr | Jennings | Missouri | 63136 |
| Guardian CV1, LLC | 3814 Waco Dr | Normandy | Missouri | 63121 |
| Guardian CV1, LLC | 7826 Blandford Dr | Normandy | Missouri | 63121 |
| Guardian CV1, LLC | 8911 Shawnee Ln | Overland | Missouri | 63114 |
| Guardian CV1, LLC | 9017 Tudor Ave | Overland | Missouri | 63114 |
| Guardian CV1, LLC | 258 Sadonia Ave | Saint Louis | Missouri | 63135 |
| Guardian CV1, LLC | 1001 Ford Dr | St Louis | Missouri | 63135 |
| Guardian CV1, LLC | 1072 Prigge Dr | St Louis | Missouri | 63138 |
| Guardian CV1, LLC | 1209 Reale Ave | St Louis | Missouri | 63138 |
| Guardian CV1, LLC | 1215 Astoria Dr | St Louis | Missouri | 63137 |
| Guardian CV1, LLC | 1231 Reale Ave | St Louis | Missouri | 63138 |
| Guardian CV1, LLC | 12355 Pinta Dr | St Louis | Missouri | 63138 |
| Guardian CV1, LLC | 1359 Cove Ln | St Louis | Missouri | 63138 |
| Guardian CV1, LLC | 1466 Widefields Ln | St Louis | Missouri | 63138 |
| Guardian CV1, LLC | 1523 Fir Dr | St Louis | Missouri | 63136 |
| Guardian CV1, LLC | 1525 Westmont Pl | St Louis | Missouri | 63130 |

24

*AM*

Manager

Owner _____ *amn*

2023-05-22

24 PHONE: (775) 360-4109   |   EMAIL:   INVEST@12BR.COM   |   VISIT: WWW.12BR.COM

# 12B RESIDENTIAL

| | | | | |
|---|---|---|---|---|
| Guardian CV1, LLC | 1533 Chesley Dr | St Louis | Missouri | 63136 |
| Guardian CV1, LLC | 1537 Chesley Dr | St Louis | Missouri | 63136 |
| Guardian CV1, LLC | 2018 Raven Dr | St Louis | Missouri | 63133 |
| Guardian CV1, LLC | 2032 Stillwater Dr | St Louis | Missouri | 63114 |
| Guardian CV1, LLC | 232 Anistasia Dr | St Louis | Missouri | 63135 |
| Guardian CV1, LLC | 2362 Rockdale Ave | St Louis | Missouri | 63121 |
| Guardian CV1, LLC | 4608 Barbara Dr | St Louis | Missouri | 63121 |
| Guardian CV1, LLC | 4815 Barbara Dr | St Louis | Missouri | 63121 |
| Guardian CV1, LLC | 6849 Roberts Ave | St Louis | Missouri | 63130 |
| Guardian CV1, LLC | 6937 Berkridge Ct | St Louis | Missouri | 63042 |
| Guardian CV1, LLC | 7009 Laupher Ln | St Louis | Missouri | 63042 |
| Guardian CV1, LLC | 7743 Monroe Dr | St Louis | Missouri | 63133 |
| Guardian CV1, LLC | 7818 Madison Dr | St Louis | Missouri | 63133 |
| Guardian CV1, LLC | 8319 Hawkesbury Dr | St Louis | Missouri | 63121 |
| Guardian CV1, LLC | 920 Delaird Dr | St Louis | Missouri | 63137 |
| Guardian CV1, LLC | 9231 Tutwiler Ave | St Louis | Missouri | 63134 |
| Guardian CV1, LLC | 9701 Glen Owen Dr | St Louis | Missouri | 63136 |
| Guardian CV1, LLC | 9729 Lilly Jean Dr | St Louis | Missouri | 63134 |
| Guardian CV1, LLC | 1085 Ferguson Ave | University City | Missouri | 63130 |
| Guardian CV1, LLC | 1138 George St | University City | Missouri | 63130 |
| Guardian CV1, LLC | 1205 Meyer St | University City | Missouri | 63130 |
| Guardian CV1, LLC | 7074 Plymouth Ave | University City | Missouri | 63130 |
| Guardian CV1, LLC | 7505 Lynn Ave | University City | Missouri | 63130 |
| Guardian CV1, LLC | 3676 E 46Th St | Cleveland | Ohio | 44105 |
| Guardian CV1, LLC | 4236 W 23Rd St | Cleveland | Ohio | 44109 |
| Guardian CV1, LLC | 4349 W 132Nd St | Cleveland | Ohio | 44135 |
| Guardian CV1, LLC | 4474 W 147Th St | Cleveland | Ohio | 44135 |
| Guardian CV1, LLC | 16312 Helmsdale Rd | East Cleveland | Ohio | 44112 |
| Guardian CV1, LLC | 13208 Maplerow Ave | Garfield Heights | Ohio | 44105 |
| Guardian CV1, LLC | 4680 Beechgrove Ave | Garfield Heights | Ohio | 44125 |
| Guardian CV2, LLC | 525 Selma Rd | Bessemer | Alabama | 35020 |

25

*AM*

Manager ⬛⬛⬛

Owner _____ *amn*

2023-05-22

Exhibit 18, Page 283

# 12B RESIDENTIAL

| | | | | |
|---|---|---|---|---|
| Guardian CV2, LLC | 1100 Cotton Ave Sw | Birmingham | Alabama | 35211 |
| Guardian CV2, LLC | 1961 Westridge Dr | Birmingham | Alabama | 35235 |
| Guardian CV2, LLC | 3209 Cedar Ave Sw | Birmingham | Alabama | 35221 |
| Guardian CV2, LLC | 5504 Madison Dr | Birmingham | Alabama | 35228 |
| Guardian CV2, LLC | 1809 Mara Dr | Center Point | Alabama | 35215 |
| Guardian CV2, LLC | 716 Brookview Dr | Gardendale | Alabama | 35071 |
| Guardian CV2, LLC | 1729 27Th Ave N | Hueytown | Alabama | 35023 |
| Guardian CV2, LLC | 1346 Vivian St | Leeds | Alabama | 35094 |
| Guardian CV2, LLC | 12967 Vanderwood Dr | Black Jack | Missouri | 63033 |
| Guardian CV2, LLC | 4950 Patricia Ridge Dr | Black Jack | Missouri | 63033 |
| Guardian CV2, LLC | 10323 Tanner Dr | Dellwood | Missouri | 63136 |
| Guardian CV2, LLC | 166 Powell Avenue | Ferguson | Missouri | 63135 |
| Guardian CV2, LLC | 235 Forestwood Dr | Ferguson | Missouri | 63135 |
| Guardian CV2, LLC | 56 N Marguerite Ave | Ferguson | Missouri | 63135 |
| Guardian CV2, LLC | 2340 St Catherine St | Florissant | Missouri | 63033 |
| Guardian CV2, LLC | 2740 Holiday Hill Dr | Florissant | Missouri | 63033 |
| Guardian CV2, LLC | 124 Foxtree Dr | Hazelwood | Missouri | 63042 |
| Guardian CV2, LLC | 100 Mcalpine Dr | Saint Louis | Missouri | 63137 |
| Guardian CV2, LLC | 10337 Galloway Dr | Saint Louis | Missouri | 63137 |
| Guardian CV2, LLC | 1215 Odessa Dr | Saint Louis | Missouri | 63137 |
| Guardian CV2, LLC | 1229 Ashford Dr | Saint Louis | Missouri | 63137 |
| Guardian CV2, LLC | 228 Grampian Rd | Saint Louis | Missouri | 63137 |
| Guardian CV2, LLC | 244 Estridge Rd | Saint Louis | Missouri | 63137 |
| Guardian CV2, LLC | 420 Warfield Ave | Saint Louis | Missouri | 63135 |
| Guardian CV2, LLC | 828 Marias Dr | Saint Louis | Missouri | 63137 |
| Guardian CV2, LLC | 132 Constance Ct | St Ann | Missouri | 63074 |
| Guardian CV2, LLC | 10212 Lynncrest Ct | St Louis | Missouri | 63136 |
| Guardian CV2, LLC | 10506 Hoyt Dr | St Louis | Missouri | 63137 |
| Guardian CV2, LLC | 1718 Newhall Ct | St Louis | Missouri | 63136 |
| Guardian CV2, LLC | 311 Goetz Ave | St Louis | Missouri | 63125 |
| Guardian CV2, LLC | 32 Robert Ave | St Louis | Missouri | 63135 |

26

amn

Manager _____

Owner ___ AM

2023-05-22 _____

Exhibit 18, Page 284

# 12B RESIDENTIAL

| | | | | |
|---|---|---|---|---|
| Guardian CV2, LLC | 3642 S Compton Ave | St Louis | Missouri | 63116 |
| Guardian CV2, LLC | 3925 Pennsylvania Ave | St Louis | Missouri | 63118 |
| Guardian CV2, LLC | 405 Caithness Rd | St Louis | Missouri | 63137 |
| Guardian CV2, LLC | 614 Fremont Ave Rear | St Louis | Missouri | 63147 |
| Guardian CV2, LLC | 11709 Guardian Blvd | Cleveland | Ohio | 44135 |
| Guardian CV2, LLC | 12800 Signet Ave | Cleveland | Ohio | 44120 |
| Guardian CV2, LLC | 13705 Othello Ave | Cleveland | Ohio | 44110 |
| Guardian CV2, LLC | 3184 W 95th Street | Cleveland | Ohio | 44102 |
| Guardian CV2, LLC | 3378 E 135th St | Cleveland | Ohio | 44120 |
| Guardian CV2, LLC | 3414 E 143Rd St | Cleveland | Ohio | 44120 |
| Guardian CV2, LLC | 3415 E 113Th St | Cleveland | Ohio | 44104 |
| Guardian CV2, LLC | 3557 E 139Th St | Cleveland | Ohio | 44120 |
| Guardian CV2, LLC | 3675 E 139th Street | Cleveland | Ohio | 44120 |
| Guardian CV2, LLC | 3975 E 120Th St | Cleveland | Ohio | 44105 |
| Guardian CV2, LLC | 4149 E 139Th St | Cleveland | Ohio | 44105 |
| Guardian CV2, LLC | 4313 E 141st Street | Cleveland | Ohio | 44128 |
| Guardian CV2, LLC | 9008 Tioga Ave | Cleveland | Ohio | 44105 |
| Guardian CV2, LLC | 9618 Raymond Ave | Cleveland | Ohio | 44104 |
| Guardian CV2, LLC | 866 Selwyn Road | Cleveland Heights | Ohio | 44112 |
| Guardian CV2, LLC | 1427 E 133rd Street | East Cleveland | Ohio | 44112 |
| Guardian CV2, LLC | 14705 Alder Avenue | East Cleveland | Ohio | 44112 |
| Guardian CV2, LLC | 4672 Hillside Ave | Garfield Heights | Ohio | 44125 |
| Guardian CV2, LLC | 19707 Sunset Dr | Warrensville Heights | Ohio | 44122 |
| Guardian DE, LLC | 4032 Garfield Ave | Kansas City | Missouri | 64130 |
| Guardian DE, LLC | 7316 Paseo Blvd | Kansas City | Missouri | 64131 |
| Guardian DE, LLC | 7511 Paseo Blvd | Kansas City | Missouri | 64131 |
| Guardian DE, LLC | 4242 N Euclid Ave | St Louis | Missouri | 63115 |
| Guardian DE, LLC | 3128 W 86th Street | Cleveland | Ohio | 44102 |
| Guardian DE, LLC | 8504 Tioga Ave | Cleveland | Ohio | 44105 |

27

*AM*

Manager _____

Owner ____*amn*

2023-05-22

27 PHONE: (775) 360-4109    |    EMAIL:  INVEST@12BR.COM    |    VISIT: WWW.12BR.COM

# 12B RESIDENTIAL

| Guardian Fund LLC | 719 2nd Ave N | Bessemer | Alabama | 35020 |
|---|---|---|---|---|
| Guardian Fund LLC | 1112 Elm Ave | Birmingham | Alabama | 35217 |
| Guardian Fund LLC | 1228 Fulton Ave | Birmingham | Alabama | 35217 |
| Guardian Fund LLC | 1313 18Th St N | Birmingham | Alabama | 35234 |
| Guardian Fund LLC | 1324 19Th St Sw | Birmingham | Alabama | 35211 |
| Guardian Fund LLC | 5500 Kiska Ave | Birmingham | Alabama | 35224 |
| Guardian Fund LLC | 700 Graymont Ave W | Birmingham | Alabama | 35204 |
| Guardian Fund LLC | 12513 Jerry Dr | McCalla | Alabama | 35111 |
| Guardian Fund LLC | 833 1St Ave | Pleasant Grove | Alabama | 35127 |
| Guardian Fund LLC | 2150 E Potter Ave | Kingman | Arizona | 86409 |
| Guardian Fund LLC | 4919 Long Creek Rd | Alpena | Arkansas | 72611 |
| Guardian Fund LLC | 19900 Se 156th St | Umatilla | Florida | 32784 |
| Guardian Fund LLC | 114 Hanner St | East Alton | Illinois | 62024 |
| Guardian Fund LLC | 1031 College St | South Bend | Indiana | 46628 |
| Guardian Fund LLC | 1141 Fremont St | South Bend | Indiana | 46628 |
| Guardian Fund LLC | 1806 Johnson St | South Bend | Indiana | 46628 |
| Guardian Fund LLC | 1941 Johnson St | South Bend | Indiana | 46628 |
| Guardian Fund LLC | 201 N Wellington St | South Bend | Indiana | 46619 |
| Guardian Fund LLC | 235 E Fox St | South Bend | Indiana | 46613 |
| Guardian Fund LLC | 1328 Woodley Ave | Terre Haute | Indiana | 47804 |
| Guardian Fund LLC | 3220 N 24th St | Terre Haute | Indiana | 47805 |
| Guardian Fund LLC | 435 Emmett St E | Battle Creek | Michigan | 49017 |
| Guardian Fund LLC | 18489 Goulburn St | Detroit | Michigan | 48205 |
| Guardian Fund LLC | 4323 Sheridan Rd | Saginaw | Michigan | 48601 |
| Guardian Fund LLC | 999 N Cass Ave | Vassar | Michigan | 48768 |
| Guardian Fund LLC | 1159 E Townline Rd | White Cloud | Michigan | 49349 |
| Guardian Fund LLC | 118 Stokes Robertson Rd | Jackson | Mississippi | 39212 |
| Guardian Fund LLC | 1311 Fourth Ave | Jackson | Mississippi | 39203 |
| Guardian Fund LLC | 2209 Paden St | Jackson | Mississippi | 39204 |
| Guardian Fund LLC | 229 Sollitt St | Jackson | Mississippi | 39209 |
| Guardian Fund LLC | 2307 Mobile Ave | Jackson | Mississippi | 39213 |
| Guardian Fund LLC | 245 Shady Pine Ln | Jackson | Mississippi | 39204 |
| Guardian Fund LLC | 2647 Glenn St | Jackson | Mississippi | 39204 |

28

amn

Manager

Owner _____ AM

2023-05-22

Exhibit 18, Page 286

# 12B RESIDENTIAL

| | | | | |
|---|---|---|---|---|
| Guardian Fund LLC | 3513 Hines St | Jackson | Mississippi | 39212 |
| Guardian Fund LLC | 3728 Cromwell St | Jackson | Mississippi | 39213 |
| Guardian Fund LLC | 3940 Beaufort St | Jackson | Mississippi | 39212 |
| Guardian Fund LLC | 4274 Lynda Dr | Jackson | Mississippi | 39209 |
| Guardian Fund LLC | 438 W Ash St | Jackson | Mississippi | 39203 |
| Guardian Fund LLC | 931 Union St | Jackson | Mississippi | 39204 |
| Guardian Fund LLC | 12615 Old Halls Ferry Rd | Black Jack | Missouri | 63033 |
| Guardian Fund LLC | 2649 Melvin Ave | Brentwood | Missouri | 63144 |
| Guardian Fund LLC | 1265 Paddock Dr | Florissant | Missouri | 63033 |
| Guardian Fund LLC | 21 Saint Celeste Dr | Florissant | Missouri | 63031 |
| Guardian Fund LLC | 35 Florissant Park Dr | Florissant | Missouri | 63031 |
| Guardian Fund LLC | 507 Saratoga Ln | Hazelwood | Missouri | 63042 |
| Guardian Fund LLC | 1201 N Pleasant St | Independence | Missouri | 64050 |
| Guardian Fund LLC | 1929 Park Lane Ct | Jennings | Missouri | 63136 |
| Guardian Fund LLC | 2807 E 73rd St | Kansas City | Missouri | 64132 |
| Guardian Fund LLC | 2833 Van Brunt Blvd | Kansas City | Missouri | 64128 |
| Guardian Fund LLC | 3017 E 51st St | Kansas City | Missouri | 64130 |
| Guardian Fund LLC | 6019 Park Ave | Kansas City | Missouri | 64130 |
| Guardian Fund LLC | 711 Longhorn Dr | O Fallon | Missouri | 63368 |
| Guardian Fund LLC | 344 Midridge Dr | Riverview | Missouri | 63137 |
| Guardian Fund LLC | 10072 Bon Oak Dr | Saint Louis | Missouri | 63136 |
| Guardian Fund LLC | 1028 Briarbrae Dr | Saint Louis | Missouri | 63138 |
| Guardian Fund LLC | 10348 Earl Dr | Saint Louis | Missouri | 63136 |
| Guardian Fund LLC | 133 Cameron Rd | Saint Louis | Missouri | 63137 |
| Guardian Fund LLC | 134 Anistasia Dr | Saint Louis | Missouri | 63135 |
| Guardian Fund LLC | 2110 Lexa Dr | Saint Louis | Missouri | 63136 |
| Guardian Fund LLC | 2713 Allen Ave | Saint Louis | Missouri | 63104 |
| Guardian Fund LLC | 3125 Michigan Ave | Saint Louis | Missouri | 63118 |
| Guardian Fund LLC | 325 New York St | Saint Louis | Missouri | 63122 |
| Guardian Fund LLC | 3864 Marietta Dr | Saint Louis | Missouri | 63121 |
| Guardian Fund LLC | 406 Plaza Ave | Saint Louis | Missouri | 63135 |
| Guardian Fund LLC | 408 Crawford Rd | Saint Louis | Missouri | 63137 |
| Guardian Fund LLC | 426 Bluff Dr | Saint Louis | Missouri | 63137 |
| Guardian Fund LLC | 4351 Bingham Ave | Saint Louis | Missouri | 63116 |

29

*AM*

Manager _____

Owner _____ *amn*

2023-05-22

Exhibit 18, Page 287

# 12B RESIDENTIAL

| Guardian Fund LLC | 4440 Norfolk Ave | Saint Louis | Missouri | 63110 |
|---|---|---|---|---|
| Guardian Fund LLC | 4526 Alice Ave | Saint Louis | Missouri | 63115 |
| Guardian Fund LLC | 4541 Oakland Ave | Saint Louis | Missouri | 63110 |
| Guardian Fund LLC | 488 Adrian Dr | Saint Louis | Missouri | 63137 |
| Guardian Fund LLC | 5633 Vivian Pl | Saint Louis | Missouri | 63136 |
| Guardian Fund LLC | 5907 Laura Ave | Saint Louis | Missouri | 63136 |
| Guardian Fund LLC | 5950 Enright Ave | Saint Louis | Missouri | 63112 |
| Guardian Fund LLC | 6140 Payne Ave | Saint Louis | Missouri | 63135 |
| Guardian Fund LLC | 6742 Crest Ave | Saint Louis | Missouri | 63130 |
| Guardian Fund LLC | 6902 Greenway Ave | Saint Louis | Missouri | 63121 |
| Guardian Fund LLC | 7011 Paisley Dr | Saint Louis | Missouri | 63136 |
| Guardian Fund LLC | 7113 Lamont Dr | Saint Louis | Missouri | 63136 |
| Guardian Fund LLC | 7441 Calvin Ave | Saint Louis | Missouri | 63136 |
| Guardian Fund LLC | 7620 Mallard Drive | Saint Louis | Missouri | 63133 |
| Guardian Fund LLC | 7815 Ellington Dr | Saint Louis | Missouri | 63121 |
| Guardian Fund LLC | 8130 Myrick St | Saint Louis | Missouri | 63134 |
| Guardian Fund LLC | 9500 Lewis And Clark Blvd | Saint Louis | Missouri | 63136 |
| Guardian Fund LLC | 10852 Spring Garden Dr | St Louis | Missouri | 63137 |
| Guardian Fund LLC | 1644 Nemnich Avenue | St Louis | Missouri | 63136 |
| Guardian Fund LLC | 320 Millman Dr | St Louis | Missouri | 63135 |
| Guardian Fund LLC | 3610 Oakmount Avenue | St Louis | Missouri | 63121 |
| Guardian Fund LLC | 5557 Sunbury Avenue | St Louis | Missouri | 63136 |
| Guardian Fund LLC | 5598 Floy Avenue | St Louis | Missouri | 63136 |
| Guardian Fund LLC | 1243 Fairview Ave | University City | Missouri | 63130 |
| Guardian Fund LLC | 2319 La Puente St | Las Vegas | Nevada | 89115 |
| Guardian Fund LLC | 11325 Walnut Ave Ne | Alliance | Ohio | 44601 |
| Guardian Fund LLC | 1507 S Freedom Ave | Alliance | Ohio | 44601 |
| Guardian Fund LLC | 16 E Vine St | Alliance | Ohio | 44601 |
| Guardian Fund LLC | 10101 North Blvd | Cleveland | Ohio | 44108 |
| Guardian Fund LLC | 1018 E 72Nd St | Cleveland | Ohio | 44103 |

30

Manager _____  *AM*

Owner _____ *amn*

2023-05-22

30 PHONE: (775) 360-4109    |    EMAIL:  INVEST@12BR.COM    |    VISIT: WWW.12BR.COM

Exhibit 18, Page 288

# Exhibit 19

# BYLAWS OF
## 12B RESIDENTIAL

### ARTICLE I - OFFICES

The Corporate Office of the Corporation shall be established and maintained at 5440 Louie Lane, Suite 106, Reno, County of Washoe, State of Nevada. The Corporation may also have offices at such places within or without the State of Nevada as the board may from time to time establish.

### ARTICLE II - SHAREHOLDERS

#### A. MEETINGS

The annual meeting of the shareholders of this Corporation shall be held annually each year or at such other time and place designated by the Board of Directors of the Corporation. Business transacted at the annual meeting shall include the election of Directors of the Corporation and all other matters properly before the Board. If the designated day shall fall on a Sunday or legal holiday, the meeting shall be held on the first business day thereafter.

#### B. SPECIAL MEETINGS

Special meetings of the Shareholders shall be held when directed by the President or the Board of Directors, or when requested in writing by the holders of not less than ten (10%) of all the shares entitled to vote at the meeting. A meeting requested by Shareholders shall be called for a date not less than ten (10) nor more than thirty (30) days after the request is made unless the Shareholders requesting the meeting designate a later date. The call for the meeting shall be issued by the Secretary, unless the President, Board of Directors, or Shareholders requesting the meeting shall designate another person to do so.

#### C. PLACE

Meetings of Shareholders shall be held at the principal place of business of the Corporation or at such other place as may be designated by the Board of Directors.

#### D. NOTICE

Written notice to each Shareholder entitled to vote stating the place, day and hour of the meeting and, in the case of a special meeting, the purpose or purposes for which the meeting is called, shall be delivered not less than ten (10) nor more than thirty (30) days before the meeting. If any Stockholder shall transfer his stock after notice, it shall not be necessary to notify the transferee. Any Stockholder may waive notice of any meeting either before, during or after the meeting.

#### E. QUORUM

The majority of the Shares entitled to vote, represented in person or by Proxy, shall constitute a Quorum at a meeting of Shareholders, but in no event shall a Quorum consist of less than two-thirds (2/3) of the shares entitled to vote at the meeting.

After a Quorum has been established at a Shareholders' meeting, the subsequent withdrawal of Shareholders, so as to reduce the number of shares entitled to vote at the meeting below the number required for a Quorum, shall not affect the validity of any action taken at the meeting or any adjournment thereof.

#### F. PROXY

Every Shareholder entitled to vote at a meeting of Shareholders, or to express consent or dissent without a meeting, or his duly authorized attorney-in-fact, may authorize another person

or persons to act for him by Proxy. The Proxy must be signed by the Shareholder or his attorney-in-fact. No Proxy shall be valid after the expiration of six (6) months from the date thereof, unless otherwise provided in the Proxy.

## ARTICLE III - DIRECTORS

### A. BOARD OF DIRECTORS

The business of the Corporation shall be managed, and its corporate powers exercised by a Board of five (5) Directors, each of whom shall be of majority age. It shall not be necessary for Directors to be Shareholders. Aaron Noe will serve as one of the initial Directors.

### B. ELECTION AND TERM OF DIRECTORS

Directors shall be elected at the annual meeting of Stockholders and each Director elected shall hold office until his successor has been elected and qualified, or until his prior resignation or removal. The Chairman of the Board shall be granted one (1) additional vote.

### C. VACANCIES

If the office of any Director, member of a committee or other officer becomes vacant, the remaining Directors in office, by a majority vote, may appoint any qualified person to fill such vacancy, who shall hold office for the unexpired term and until his successor shall be duly chosen.

### D. REMOVAL OF DIRECTORS

Any or all of the Directors may be removed with or without cause by vote of a majority of all of the stock outstanding and entitled to vote at a special meeting of Stockholders called for that purpose.

### E. NEWLY CREATED DIRECTORSHIPS

The number of Directors may be increased by amendment of these Bylaws and by the affirmative vote of a majority in interest of the Stockholders, at the annual meeting or at a special meeting called for that purpose, and by like vote the additional Directors may be chosen at such meeting to hold office until the next annual election and until their successors are elected and qualify.

### F. RESIGNATION

A Director may resign at any time by giving written notice to the Board, the President or the Secretary of the Corporation. Unless otherwise specified in the notice, the resignation shall take effect upon receipt thereof by the Board of such resignation, and the acceptance of the resignation shall not be necessary to make it effective.

### G. QUORUM OF DIRECTORS

A majority of the Directors shall constitute a quorum for the transaction of business. If at any meeting of the Board there shall be less than a quorum present, those present may obtained, and no further notice thereof need to be given other than by announcement at the meeting which shall be so adjourned.

### H. PLACE AND TIME OF BOARD MEETINGS

The Board may hold its meeting at the office of the Corporation or at such other places, either within or without the State, as it may from time to time determine.

### I. NOTICE OF MEETINGS OF THE BOARD

A regular annual meeting of the Board may be held without notice at such time and place as it shall from time to time determine. Special meetings of the Board shall be held upon

2

Exhibit 19, Page 290

notice to the Directors either personally, by mail or by wire.  Special meetings shall be called by the President or by the Secretary on the written request of two Directors.  Notice of a meeting need not be given to any Director who submits a waiver of notice before or after the meeting or who attends the meeting without protesting the lack of notice to him prior thereto or at its commencement.

### J.  REGULAR ANNUAL MEETING

A regular annual meeting of the Board shall be held immediately following the annual meeting of Stockholders at the place of such annual meeting of Stockholders.

### K.  EXECUTIVE AND OTHER COMMITTEES

The Board, by resolution, may designate two or more of their members to the Executive Committee.  To the extent provided in said resolution or these Bylaws, said committee may exercise the powers of the Board concerning the management of the business of the Corporation.

### L.  COMPENSATION

No compensation shall be paid to Directors, as such, for their services, but by resolution of the Board, a fixed sum and expenses for actual attendance, at each regular or special meeting of the Board, may be authorized.  Nothing herein contained shall be construed to preclude any Director from serving the Corporation in any other capacity and receiving compensation therefor.

## ARTICLE IV - OFFICERS

### A.  OFFICERS, ELECTION AND TERM

1. The Board may elect or appoint a Chairman, a President, one or more Vice Presidents, a Secretary and a Treasurer, and such other officers as it may determine, who shall have such duties and powers as hereinafter provided.

2. All officers shall be elected or appointed to hold office until the meeting of the Board following the next annual meeting of Stockholders and until their successors have been elected or appointed and qualified.

3. Any two or more offices may be held by the same person.

4. Aaron Noe shall serve as initial President.

### B.  REMOVAL, RESIGNATION, SALARY, ETC

1. Any officer elected or appointed by the Board may be removed by the Board with or without cause.

2. In the event of the death, resignation or removal of an officer, the Board in its discretion may elect or appoint a successor to fill the unexpired term.

3. Any officer elected by the Shareholders may be removed only by a majority vote of the Shareholders unless otherwise provided by the Shareholders.

4. The salaries of all officers shall be fixed by the Board.

5. The Directors may require any Officer to give security for the faithful performance of his duties.

### C.  DUTIES

The officers of this Corporation shall have the following duties:

1. The President shall be the chief executive officer of the Corporation, shall have general and active management of the business and affairs of the Corporation subject to the

3

directions of the Board of Directors, and shall preside at all meetings of the Shareholders and Board of Directors.

2. The Secretary shall have custody of, and maintain, all of the corporate records except the financial records; shall record the minutes of all meetings of the Shareholders and Board of Directors, send all notices of all meetings, and perform such other duties as may be prescribed by the Board of Directors or the President.

3. The Treasurer shall have custody of all corporate funds and financial records, shall keep full and accurate accounts of receipts and disbursements and render accounts thereof at the annual meetings of Shareholders and whenever else required by the Board of Directors or the President, and shall perform such other duties as may be prescribed by the Board of Directors or the President.

## D. REMOVAL OF OFFICERS

An officer or agent elected or appointed by the Board of Directors may be removed by the Board whenever, in its judgment, the best interests of the Corporation will be served thereby. Any vacancy in any office may be filled by the Board of Directors.

## ARTICLE V - STOCK

### A. ISSUANCE

Every holder of shares of this Corporation shall be entitled to have a certificate representing all shares of which he is entitled. No certificate shall be issued for any share until such share is fully paid.

### B. FORM

Certificates representing shares in this Corporation shall be signed by the President or Vice President and the Secretary or an Assistant Secretary and may be sealed with the seal of the corporation or a facsimile thereof.

### C. TRANSFER OF STOCK

The Corporation shall register a stock certificate presented to it for transfer if the certificate is properly endorsed by the holder of record or by his duly authorized attorney.

### D. LOST, STOLEN OR DESTROYED CERTIFICATES

If the Shareholder shall claim to have lost or destroyed a certificate of shares issued by the Corporation, a new certificate shall be issued upon the making of an affidavit of that fact by the person claiming the certificate of stock to be lost, stolen or destroyed, and, at the discretion of the Board of Directors, upon the deposit of a bond or other indemnity in such amount and with such sureties, if any, as the Board may reasonably require.

### E. PREFERRED STOCK

The Preferred Stock shall have such rights, preferences, and limitations as the Board of Directors may from time to time determine, provided that the Founders shall own all of the outstanding shares of Preferred Stock, which shall have elevated voting rights and control of the Company.

1. Voting Rights. The Preferred Stock shall have elevated voting rights and control of the Company and shall be entitled to elect a majority of the members of the Board of Directors.

2. Dividends. The Preferred Stock shall be entitled to receive dividends at such rates and times as the Board of Directors may from time to time determine.

4

3. Liquidation Preference. In the event of the liquidation, dissolution, or winding up of the Corporation, the Preferred Stock shall be entitled to receive the amount of its liquidation preference before any payment or distribution is made to the holders of Employee Stock or Common Stock.

## F. EMPLOYEE STOCK

The Employee Stock shall be issued to employees of the Company and shall have the same rights and preferences as the Common Stock, except that the Employee Stock shall have a higher order of priority in the event of dissolution, after payment of all claims and debts of the Corporation, before any distribution or payment is made to the holders of Common Stock.

1. Issuance. The Employee Stock may be issued by the Board of Directors to employees of the Corporation, subject to such terms and conditions as the Board of Directors may from time to time determine.

2. Voting Rights. The Employee Stock shall have limited voting rights as set forth in the Stockholder's Agreement and shall not be entitled to vote on any matter requiring the approval of the holders of the Preferred Stock.

3. Dividends. The Employee Stock shall be entitled to receive dividends at the same rates and times as the Common Stock.

4. Liquidation Preference. In the event of the liquidation, dissolution, or winding up of the Corporation, the Employee Stock shall be entitled to receive payment of its liquidation preference after payment of the Preferred Stock and before any payment or distribution is made to the holders of Common Stock.

## G. COMMON STOCK

The Common Stock shall have such rights, preferences, and limitations as the Board of Directors may from time to time determine, provided that the Common Stock shall be subordinate to the Employee Stock in the event of dissolution.

1. Issuance. The Common Stock may be issued by the Board of Directors to any person, subject to such terms and conditions as the Board of Directors may from time to time determine.

2. Voting Rights. The Common Stock shall have voting rights as set forth in the Stockholder's Agreement.

3. Dividends. The Common Stock shall be entitled to receive dividends at the same rates and times as the Employee Stock.

4. Liquidation Preference. In the event of the liquidation, dissolution, or winding up of the Corporation, the holders of Common Stock shall be entitled to receive payment after payment of the Preferred Stock and Employee Stock.

## ARTICLE VI - BOOKS AND RECORDS

### A. BOOKS AND RECORDS

This Corporation shall keep correct and complete books and records of account and minutes of the proceedings of its Shareholders, Board of Directors and committees of Directors. This Corporation shall keep at its registered office or principal place of business a record of its Shareholders, giving the names and addresses of all Shareholders and the number of the shares held by each. Any books, records and minutes may be in written form or in any other form capable of being converted into written form within a reasonable time.

5

## B. SHAREHOLDERS' INSPECTION RIGHTS

Any person who shall have been a holder of record of shares or of voting trust certificates therefore at least ninety (90) days immediately preceding his demand or shall be the holder of record of shares or of voting trust certificates for at least five (5%) percent of the outstanding shares of the Corporation, upon written demand stating the purpose thereof, shall have the right to examine, in person, by agent or attorney, at any reasonable time, for any proper purpose, the Corporation's relevant books and records of accounts, minutes, and records of Shareholders, and to make extracts therefrom.

## C. FINANCIAL INFORMATION

Not later than three (3) months after the close of each fiscal year, this Corporation shall prepare a balance sheet showing, in reasonable detail, the financial condition of the Corporation at the close of its fiscal year, and a profit and loss statement showing the results of the operations of the Corporation during its fiscal year. Upon the written request of any Shareholder or holder of voting trust certificates for shares of the Corporation, the Corporation shall mail to each Shareholder or holder of voting trust certificates a copy of the most recent such balance sheet and profit and loss statement. The balance sheet and profit and loss statements shall be filed in the registered office of the Corporation of this state, shall be kept for at least five years, and shall be subject to inspection during business hours by any Shareholder or holder of voting trust certificates, in person or by agent.

## ARTICLE VII - DIVIDEND

The Board may out of funds legally available therefor, at any regular or special meeting, declare dividends upon the capital stock of the Corporation as and when it deems expedient. Before declaring any dividend there may be set apart out of any funds of the Corporation available for dividends, such sum or sums as the Board from time to time in their discretion deem proper for working capital or as a reserve fund to meet contingencies or for equalizing dividends or for such other purposes as the Board shall deem conducive to the interests of the Corporation.

## ARTICLE VIII - CORPORATE SEAL

The seal of the Corporation shall be circular in form and bear the name of the Corporation, the year of its organization and the words "CORPORATE SEAL, STATE OF NEVADA." The seal may be used by causing it to be impressed directly on the instrument or writing to be sealed, or upon adhesive substance affixed thereto. The seal on the certificates for shares or on any corporate obligation for the payment of money may be facsimile, engraved or printed.

## ARTICLE IX - EXECUTION

All corporate instruments and documents shall be signed or countersigned, executed, verified, or acknowledged by such officer, officers, or other person or persons as the Board may from time to time designate.

## ARTICLE X - FISCAL YEAR

The fiscal year shall begin the first day of January in each year.

## ARTICLE XI - NOTICE AND WAIVER OF NOTICE

Whenever any notice is required by these Bylaws to be given, personal notice is not meant unless expressly so stated, and any notice so required shall be deemed to be sufficient if given by depositing the same in the post office box in a sealed post-paid wrapper, addressed to the person entitled thereto at his last known post office address, and such notice shall be deemed to have

6

been given and received two (2) days subsequent to mailing. Stockholders not entitled to vote shall not be entitled to receive notice of any meetings except as otherwise provided by Statute.

Whenever any notice is required to be given under the provisions of any law, or under the provisions of the Certificate of Incorporation of the Corporation or these Bylaws, a waiver thereof in writing, signed by the person or persons entitled to said notice, before or after the time stated therein, shall be deemed equivalent thereto.

## ARTICLE XII - CONSTRUCTION

Whenever a conflict arises between the language of these Bylaws and the Certificate of Incorporation, the Certificate of Incorporation shall govern.

## ARTICLE XIII - BUSINESS

### A. CONDUCT OF BUSINESS WITHOUT MEETINGS

Any action of the Stockholders, Directors and committee may be taken without a meeting if consent in writing, setting forth the action so taken, shall be signed by all persons who would be entitled to vote on such action at a meeting and filed with the Secretary of the Corporation as part of the proceedings of the Stockholders, Directors or committees as the case may be.

### B. MANAGEMENT BY STOCKHOLDER

In the event the Stockholders are named in the Articles of Incorporation and are empowered therein to manage the affairs of the Corporation in lieu of Directors, the Stockholders of the Corporation shall be deemed Directors for the purposes of these Bylaws and wherever the words "directors", "board of directors", or "board" appear in these Bylaws, those words shall be taken to mean Stockholders. The Shareholders may, by majority vote, create a Board of Directors to manage the business of the Corporation and exercise its corporate powers.

## ARTICLE XIV - AMENDMENTS

These Bylaws may be altered or repealed and Bylaws may be made at any annual meeting of the Stockholders or at any special meeting thereof if notice of the proposed alteration or repeal to be made be contained in the notice of such special meeting, by the affirmative vote of a majority of the stock issued and outstanding and entitled to vote thereat, or by the affirmative vote of a majority of the Board at any regular meeting of the Board or at any special meeting of the Board if notice of the proposed alteration or repeal to be made, be contained in the notice of such special meeting.

## ARTICLE XV - REMARKS

Whenever an officer, director, or majority stockholder fails or refuses to comply with any provision herein or in the Corporation's Articles of Incorporation, any other officer, director or shareholder shall have the right to enforce said provision and provide for said compliance through an action for injunctive relief or a derivative action, if such are cognizable at law, and to collect court costs and attorney's fees from such officer, director or majority stockholder personally. Any such officer, director or majority stockholder consents, for any such action, to the personal jurisdiction and venue of a court of subject matter jurisdiction located in the city of Reno, county of Washoe, state of Nevada.

7

I HEREBY CERTIFY that I am the duly elected, qualified and acting Secretary of 12B Residential, Nevada corporation, and that the above and foregoing Bylaws were adopted as the Bylaws of the Corporation as of May 1, 2023, by all shareholders and the President (Andrew Palmer), the Secreta (Adrian Maravilla), and the Treasurer (Andrew Palmer).

IN WITNESS WHEREOF, I have executed this Certificate as of May 1, 2023.

05-01-2023

Adrian Maravilla, Secretary 12B Residential Corporation

*Andrew Palmer*

May 1, 2023

Andrew Palmer, President 12B Residential Corporation

# Exhibit 20

Gmail - Aaron Noe Conversation

 **Gmail**

Aaron Noe <elmontecapital@gmail.com>

## Aaron Noe Conversation
15 messages

---

**Kyle Krch** <kyle@hughescapital.com>                     Tue, Mar 8, 2022 at 11:56 AM
To: Aaron Noe <elmontecapital@gmail.com>, Greg Hughes <greg@hughescapital.com>, Steve Sixberry
<steve@hughescapital.com>

Hi Aaron .. looking forward to chatting with you.

Thanks

Kyle

---

# Microsoft Teams meeting

### Join on your computer or mobile app

**Click here to join the meeting**

Learn More | Meeting options

---

☐ **invite.ics**
  4K

---

**Aaron Noe** <elmontecapital@gmail.com>                     Tue, Mar 8, 2022 at 5:52 PM
To: Kyle Krch <kyle@hughescapital.com>
Cc: Greg Hughes <greg@hughescapital.com>, Steve Sixberry <steve@hughescapital.com>

Thank you, looking forward to it.
[Quoted text hidden]

---

**Kyle Krch** <kyle@hughescapital.com>                     Wed, Mar 9, 2022 at 2:34 PM
To: Aaron Noe <elmontecapital@gmail.com>

Hi Aaron .. hope you are having a great week so far. We just completed a 1st draft team video that was used for an
company vision day. The video will give you a peak into the culture and history of "Kyhusix", see the below youtube link..
Kyhisix is a newly formed brand that in the future will act as an umbrella company for Krch Realty, Hughes Private
Capital, Equity 1031 and a few other companies in the works. Currently Kyhusix is merely team branding. (one team one
goal type of idea).

https://youtu.be/BIX-usRyeE8

Have a great evening and chat with you tomorrow.

Kyle

[Quoted text hidden]

---

**Aaron Noe** <elmontecapital@gmail.com>                              Thu, Mar 10, 2022 at 11:26 AM
To: Kyle Krch <kyle@hughescapital.com>

Hi Kyle,

It was a pleasure to meet you and the rest of the team this morning. I really appreciate everyone's time and the conversation.

If you are in Las Vegas next week I would welcome the opportunity to grab coffee or lunch. Also, let me know if you would like an introduction to the team at Up&Up.

Thanks again,

Aaron
Cell 702-375-9249
[Quoted text hidden]

---

**Kyle Krch** <kyle@hughescapital.com>                               Thu, Mar 10, 2022 at 12:01 PM
To: Aaron Noe <elmontecapital@gmail.com>

Hi Aaron .. likewise, had a great time chatting with you this morning.  Are you free on Wednesday the 16th to get together in Vegas?  I would be free to meet anytime prior to my 3pm flight.  I will be staying at the Aria and can uber anywhere that is convenient for you.


Talk with you soon.

Here is my cell as well 775-527-1601


Thanks

[Quoted text hidden]

---

**Aaron Noe** <elmontecapital@gmail.com>                              Thu, Mar 10, 2022 at 4:11 PM
To: Kyle Krch <kyle@hughescapital.com>

Hi Kyle,

My schedule is pretty flexible on the 16th so let me know what works best for you. I am happy to meet at the Aria, it's only about 15 minutes from my house.

I look forward to continuing our conversation.


[Quoted text hidden]

---

**Kyle Krch** <kyle@hughescapital.com>                               Fri, Mar 11, 2022 at 8:08 AM

Exhibit 20, Page 298

To: Aaron Noe <elmontecapital@gmail.com>

Morning Aaron .. How about Zen Kitchen at the Waldorf, 11:45am Wednesday the 16th for lunch?

Also want to give you some food for thought .. Greg, Steve and I are currently, and would like to continue to stay in board advisories roles. We are looking for a rockstar to continue to build, refine and expand the company offerings. This COO position will have an opportunity to grow into a true CEO role if so desired. We do have a lot of quality team members, but none that have the experience running an operation of the size we are heading over the next few years. Our culture is still in the beginning stages but our current president has done a good job in creating an environment that truly cares as much about the people aspect of business then the profit aspects. In my mind you cant have sustained profits without an amazing work culture.

Im excited to continue the conversation around your future vision and the direction you desire to grow companies in our sector. I can say that from our brief hour kick off call we seem to be exactly on the same page. With this in mind start putting thought into a potential compensation package and how you would want to design it not only for yourselves but other key team members/positions needed for long term success. I still consider ourselves as a start up (135 current team members, + 130 more 1099 contractor realtors) company with plenty of small issues, but we are quickly getting our feet under us

If you have any questions prior to meeting next week feel free to shoot them my way. Could make our conversation on Wednesday more productive.

Have a great Friday and Weekend!

Kyle

(not sure if you are a football fan, but my Broncos got Russel Wilson as a QB, watch out! Thinking you may be a Charger or even worse a Raider fan, so could be a deal killer! Haha)

[Quoted text hidden]

---

**Aaron Noe** <elmontecapital@gmail.com>                                        Sun, Mar 13, 2022 at 10:28 AM
To: Kyle Krch <kyle@hughescapital.com>

Hi Kyle,

Lunch sounds great and I'm looking forward to the conversation. I appreciate the additional insight on the business and feel we are very likeminded on the direction. I had some high level questions about your future vision and the current revenue model for different business units. I was hoping we could discuss them during lunch.

- What is the current organization structure?
- When you look at the different businesses, which are generating the most revenue, best gross margin and which have the highest growth potential?
- How are you raising capital for the fund and is the model sufficient to achieve the desired growth?
- Is the vision for the business to be a fee-based service business or to grow into an asset-based fixed income type of business?
- I would also like to understand a little about the company's balance sheet and debt positions.

Thanks again for taking the time to meet with me in Las Vegas this week.

Thanks,

Aaron

[Quoted text hidden]

Exhibit 20, Page 299

**Kyle Krch** <kyle@hughescapital.com>                                       Mon, Mar 14, 2022 at 12:09 PM
To: Aaron Noe <elmontecapital@gmail.com>

Hi Aaron,

Looking forward to it. Here is some additional information that will help answer your questions below.

1. What is the current organization structure? Take a look at the attached "Aaron Noe Overview", I threw together our future state org chart (we have about 80% of the hires made), regional office phased approach (we are getting ready to enter phase 2 for most locations) and high-level overview of our family of companies and how they interact with one another.
2. When you look at the different businesses, which are generating the most revenue, best gross margin and which have the highest growth potential? Currently our REG D fund generates the most revenue & has the most gross margin. However when you talk about "highest growth potential in terms of total revenue" I would bet on the non-retail divisions of Krch Realty. Acquisition, Construction and Management. With the entry of fin tech into the real estate sector there will be HUGE demands for fully verticalized real estate management companies. I believe the majority of the revenue will be derived from the construction sector.
3. How are you raising capital for the fund and is the model sufficient to achieve the desired growth? Yes. We have a fully operational investor relations department. We hired Jonathan Whistman https://www.thesalesboss.com/ as a consultant to help us put together a world-class sales department. Jonathan is still on board today and we are planning to have him focus on real estate brokerage/street 78 recruiting next. We are currently staffed to raise 120 – 160 million from accredited investors annually. We raised just under 70 million in 2021. We currently have close to 200 million AUM.
4. Is the vision for the business to be a fee-based service business or to grow into an asset-based fixed income type of business? Great question and a bit hard to answer clearly. For example I believe that real estate agents are about to get uberized! Take a look at what happened to travel agents once the internet hit its stride in the early 2000's. Krch Realty brokerage revenue model is a very low monthly subscription with certain upsells for additional services. This allows our agents to compete (if they wish) with discount brokerages and other up and coming big tech backed brokerages. (like redfin! Haha). Our guardian funds revenue is generated on upfront asset based fees and much lower recurring subscription fees like PM fees, and fund management fees pay for the ongoing operational overhead.  In short we always try to take the long term upside approach as apposed to the 2 year maximum revenue plan. (look how long it took elon to turn a profit, but look at him now!!)
5. I would also like to understand a little about the companies balance sheet and debt positions? This is a great question for Steve and I have asked him to provide a little color on this. However I can tell you we are in great shape with about 3 ½ months of OPLIQ (operational Liquidity) with just under 6 million dollars in cash. As with any company this can have some pretty big swings epically both negative and position as we scale. However one of the things we key in on is PPP. Productivity per Person, this has ensured we don't hire to just hire people. We have begun tracking our PPP so as we hire we ensure our productivity increases and in turn ensures our long term success. PPP target is at 102K by EOY 2022. Would love to hit the 2 million PPP like apple some day!. Balance sheet is strong, a lot of that credit goes to us purchasing real estate in appreciating markets over the last 3 years.

You did not ask but I also want to point out our main obstacles.

1. HR – With piss poor planning we have been caught off guard by our growth over the last three quarters and have been playing from behind when hiring. Our current staff is at 130 team members, but need 165 to maintain the growth. Two new full time recruiters have joined our HR department and seem to be ramping up nicely.
2. Training – Our training programs or lack there of have been a problem and is reflective in our customer service and finished product. We recently started to use a system called www.birdeye.com to track and improve our online reviews and surveys, we have a LOT of work to do but our front line obsession will help us solve ASAP.
3. Management – we need to continue to hire A players, train B players to become A players and cut ties with C players. We have a handful of good to great leaders but need to continue to make headway here.

So in a nut shell we are at the ground floor of our expansion, timing and demand seem to be in our favor. This position will work directly with Greg, Steve and I. We are looking for a COO who in the short term has the capability to overcome our current obstacles with long term aspirations of growing the family of companies into something special.

If any other questions pop up before Wednesday let me know.

Exhibit 20, Page 300

[Quoted text hidden]

---

📎 **Aaron Noe Kyhusix Overview.pdf**
635K

---

| **Aaron Noe** <elmontecapital@gmail.com> | Thu, Mar 17, 2022 at 7:15 PM |
|---|---|

To: Kyle Krch <kyle@hughescapital.com>

Hi Kyle,

Thanks again for lunch and the enjoyable discussion. It was a pleasure to learn a little about yourself, family and your business. As mentioned, I am tied up next week but would welcome the opportunity to meet the rest of the team up in Reno the following week. Thursday or Friday would work best for me but I can accommodate other days if it would be more convenient for the group.

Thanks again,

Aaron

[Quoted text hidden]

---

| **Kyle Krch** <kyle@hughescapital.com> | Fri, Mar 18, 2022 at 9:04 AM |
|---|---|

To: Aaron Noe <elmontecapital@gmail.com>

Hi Aaron ... agreed, I had a great time chatting with you and eating our dry chicken.  Haha.  Thursday March 31st works really well on our side as well.    Would you prefer to fly up Wednesday night, dive in on Thursday and fly home Friday AM or fly up early Thursday and back home on Friday?   We will cover your air fare and hotel stay as well.

Let me know what works best and we will have someone from our team set it up for you.

Have a great Friday

[Quoted text hidden]

---

| **Aaron Noe** <elmontecapital@gmail.com> | Sat, Mar 19, 2022 at 7:15 PM |
|---|---|

To: Kyle Krch <kyle@hughescapital.com>

Hi Kyle,

I can fly up Thursday morning and get in by 9 and there is a late flight out Thursday night. If you think we might need more time I can stay and fly out on Friday. Let me know what you feel would be best.

Thanks and have a great weekend.
[Quoted text hidden]

---

| **Kyle Krch** <kyle@hughescapital.com> | Mon, Mar 21, 2022 at 10:04 AM |
|---|---|

To: Aaron Noe <elmontecapital@gmail.com>

HI Aaron .. if you don't mind the long day and want to sleep in your own bed I bet we can get everything knocked out in one day.  What about these flights.

Southwest

Depart 7:20am – Arrive 8:45am

Exhibit 20, Page 301

Depart 9:25pm – Arrive 10:40pm

We can pick you and drop you off at the airport.

That work?

[Quoted text hidden]

---

**Aaron Noe** <elmontecapital@gmail.com>                     Mon, Mar 21, 2022 at 4:09 PM
To: Kyle Krch <kyle@hughescapital.com>

Hi Kyle,

Don't mind a long and productive day, in fact I very much look forward to it. Thanks for the offer but happy to book my flight and use points. The benefit of traveling so much is you can never spend all your points.

I have a host of questions/thoughts that I will consolidate and send to you by the end of the weekend. Please let me know if there is anything you would like me to prepare for the meeting.

Thanks,

Aaron
[Quoted text hidden]

---

**Kyle Krch** <kyle@hughescapital.com>                      Mon, Mar 21, 2022 at 4:37 PM
To: Aaron Noe <elmontecapital@gmail.com>

Sounds great .. thanks. Looking forward to your questions/thoughts. See you next week!

[Quoted text hidden]

Exhibit 20, Page 302

# Exhibit 21

## David  M. Fitzgerald

**From:**          Aaron Noe
**Sent:**          Wednesday, June 1, 2022 9:03 AM
**To:**            Greg Hughes
**Subject:**       Marketing Hires

**Follow Up Flag:**   Follow up
**Flag Status:**      Flagged

Morning Greg,

I understand the need for the five marketing hires but would like to push opening the reqs until July to allow us time to get the needed construction hires in-place. This is for cash flow reasons and bandwidth on recruiting. I want the recruiting teams efforts focused 100% on the construction hires because that is where our money is stuck.

Please let me know if you disagree with this decision.

Thanks,

Aaron

**Aaron Noe**
Chief Executive Officer
Cell : 702-375-9249
www.HughesCapital.com



5440 Louie Lane, Suite 106
Reno, NV 89511

1

Exhibit 21, Page 303

## David  M. Fitzgerald

**From:** Aaron Noe
**Sent:** Sunday, July 10, 2022 7:45 PM
**To:** Greg Hughes; Steve Sixberry; Kyle Krch
**Cc:** Andrew Palmer; Roxanne Spring
**Subject:** Q3 Goals
**Attachments:** Q3 Rocks AMN.docx

**Follow Up Flag:** Follow up
**Flag Status:** Flagged

Happy Sunday,

Attached please find a draft of the Q3 goals & projects. I was hoping we could discuss the document at this week's BOD meeting.

Best,

Aaron


## Aaron Noe
Chief Executive Officer
Cell : 702-375-9249
www.HughesCapital.com



5440 Louie Lane, Suite 106
Reno, NV 89511

1

Exhibit 21, Page 304

# Strategy Overview – Q3

**Overview:** The outcome of the third quarter efforts is to stabilize our revenue to become cashflow positive and balance our operational cycle. Marketing-IR-Acquisitions-Renovation-Leasing-Property Management

1. **Focus – People**
   a. Right people
   b. Right seat
   c. Right organizational structure
   d. Right size for current revenue and volume
2. **Growth - Prove investor demand & performance for vacation/short-term rentals**
   a. Run marketing campaign to attract investors
   b. Sell one asset through Arrived Homes
   c. Engage property manager & go live with both properties
3. **Key Financial Results**
   a. Increase quarterly revenue to $7,715,000 million
      i. Home Sales $7,215,000
         1. 180 owned HP buildings @ $37,000 in revenue per building
         2. 30 Market Ready purchase sold @ $18,500 in revenue per building
      ii. Property Management Revenue of $350,000
      iii. Brokerage Revenue of $150,000
   b. Reduce QTR OpEx expense by $200k
      i. Staff reduction of 14 FTE, $170k
      ii. Renegotiate IT contracts, $30k
      iii. Pilot HouseCanary Acquisitions Explorer Platform, $?
   c. Reduce QTR Warranty by $175,000
      i. Net leasing absorption of 120 properties for QTR, reduce warranty by $150k
         1. This will require PM to lease approximately 140 properties per month (60 new properties added construction, 40 turn/vacate and 40 additional properties)
      ii. Improve collections from 86% to 92%, reduce warranty by $110k
      iii. Add 180 properties to Guardian/Secured Investors, add $85k to warranty
      iv. Sell poor performing Guardian/Secured assets, reduce warranty by $?
   d. Reduce QTR interest expense by $350k
      i. Reduce HP inventory by $14mil

## Key Projects

**Property Management**

- Propertyware cleanup and optimization
- Role based dashboards in Propertyware
- Partner with Propertyware or ServiceLive to augment vendor base for maintenance & turns
- Internalize property turns
- Institute tenant renewal program, reduce month-to-month to 10%

Exhibit 21, Page 305

- Institute a formal collections process, improve collections to north of 92%

**Construction**

- Field staffing – Four Sr. Construction managers, four supers in Cleveland & St. Louis & two in Alabama & Toledo
- Migrate to Buildertrend and fully utilize PO & project tracking capability
- On-board enough vendor to complete 100-120 projects per month
- Migrate vendor to MSA & Buildertrend portal
- Start transitioning from GC to subcontractors
- File for G.C. licenses in Nevada, Ohio and Alabama (GC license not required in Missouri)

**Acquisitions**

- Transition to more dynamic underwriting platform, optimizing capacity and operating capital
- Reduce revenue cycle (cash out to cash in) to 30 days for properties acquired in QTR
- Consolidate DTS and acquisitions team
- Pilot HouseCanery's Acq Explorer

**Accounting/Finance**

- Dynamic Cashflow forecast for HPC
- Create cost centers for different disciplines
- Complete investors return automation (IT)
- Migrate A/P for construction to Buildertrend platform
- Hire Accounting Manager and resize team

**IT**

- Investor return automation
- Data validation/compliance & governance
- Support Propertyware & Buildertrend migration/relaunch

**IR**

- Raise $33 million for Guardian/Secured
- Raise $5 for Hughberry

## David  M. Fitzgerald

| | |
|---|---|
| **From:** | Aaron Noe |
| **Sent:** | Thursday, August 18, 2022 10:51 AM |
| **To:** | Greg Hughes; Steve Sixberry; Kyle Krch |
| **Subject:** | Head of Sales and Marketing |
| **Attachments:** | Beverly K Thorne Resume  July 2022.pdf |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

Jerry brought this individual to me, and I had an amazing conversation with her this morning. She has a very impressive track record, stellar education, and extensive experience in the RE space. I also feel she would be a very good mentor for Kayla, Sarah and Stacy and her experience could guide the organization's brand to the next level. I have not discussed compensation with her yet because I wanted to sell her on the opportunity first. Let me know when you all would be available to talk with her.

Thanks,

Aaron
**Aaron Noe**
Chief Executive Officer
Cell : 702-375-9249
www.HughesCapital.com



5440 Louie Lane, Suite 106
Reno, NV 89511

1

Exhibit 21, Page 307

# BEVERLY K. THORNE

(908) 303-1690 | bevkristenthorne@gmail.com | www.linkedin.com/in/bevthorne

## CHIEF MARKETING OFFICER

- Senior executive who excels in strengthening and fulfilling strategic visions by building high performance teams and high impact initiatives that span from branding to demand generation, successfully engaging prospects and acquiring customers profitably.
- Passionate leader with proven ability to implement disciplined team operating model that capitalizes on data to assess go-to-market campaign performance, and uses data to drive decision making across all customer retention and acquisition initiatives.
- Recognized for strong written and verbal communications skills as well as impactful presentation capabilities. Rewarded for successfully championing causes that address strategic challenges beyond marketing, collaborating effectively across the firm.

## CORE SKILLS & COMPETENCIES

- Strategic Planning & Implementation
- Value Proposition Messaging
- Brand Awareness & Activation
- Brand Reputation Management

- Performance Marketing
- Dynamic, Omni-Channel Marketing
- Digital Marketing and Transformation
- Solutions-Focused, Using Analytics

- Social Media Marketing
- Influencer Marketing
- Content and Video Marketing
- Action & Execution Orientation

## SELECTED CAREER ACHIEVEMENTS

- **FREEDOM MORTGAGE CORPORATION.** Oversaw all branding and direct-to-consumer lead generation programs, stimulating 1.8 million leads in 2020, a 400% YOY gain. This fueled $72B in originations and an historic brand acquisition production run rate.
- **PROSIGHT SPECIALTY INSURANCE.** With launch of visual brand identity, drove 25% growth via online e-commerce programs.
- **CENTURY 21 REAL ESTATE.** Launched consumer-facing brand website as part of company's first digital ecosystem connecting all brokers nationwide, and launched the brand's first Super Bowl ads, which together resulted in brand website ranking as the most visited real estate franchise site in the world for over 3 years. Increased franchise leads by 425% and conversion by 25%.

## PROFESSIONAL EXPERIENCE

**SPROUT MORTGAGE, East Meadow, NY** (July 2021 to present)
*Chief Marketing Officer*
- Building strong brand foundation and marketing strategy to scale growth and generate demand for this non-QM mortgage lender before its abrupt closure. Led all marketing for corporate, TPO, Distributed Retail and Call Center.

**FREEDOM MORTGAGE CORPORATION, Mount Laurel, NJ** (2016 to July 2021)
*Chief Marketing Officer*
Led marketing vision, strategy, and execution at this non-bank nationwide lender with team of 100+ and $100M annual budget.

- *Developed and executed 2020 omni-channel marketing strategy for portfolio retention which captured 70% retention, 45 points above industry analogue, and for acquisition prospects which drove $800 million of new production volume in 6 months.*
- *Architected a comprehensive corporate rebranding strategy, encompassing new brand positioning, value proposition, new customer experience journeys and updated visual identity to address acquisition opportunity, planned for a Q4 2021 launch.*
- *Established and led deployment of employer brand marketing program, resulting in national award and recognition for CEO.*

**PROSIGHT SPECIALTY INSURANCE, Morristown, NJ** (2015 to 2016)
*Consulting Chief Marketing Officer*
Bolstered the visibility of this specialty insurance company through the leadership of brand building and product marketing strategies, campaigns, and initiatives. 25% growth results achieved via targeted online marketing and e-commerce.

Exhibit 21, Page 308

**FIRSTKEY FINANCE, New York, NY** (2014 to 2015)
*Consulting Chief Marketing Officer*
Recruited to build and execute formal marketing organization and functions to support the launch of a single-family real estate investment financing business. Successfully positioned team and program for venture capitalist liquidity event.

**CENTURY 21 REAL ESTATE, Madison, NJ** (2007 to 2014)
*Chief Marketing Officer*
Recruited to restore brand strength and revenue growth to reverse declining market share. Instrumental in navigating this global real estate franchise through an unprecedented contraction in the market, modernizing the brand image while leading marketing to support lead generation for over 100,000 agents in 7000 offices in 74 countries. Launched a full brand refresh anchored by Super Bowl advertising, Olympic team sponsorships and customer experience transformation.

- *Led redesign and development of company's website to rank as the most visited real estate franchise website in the world with over 5 million unique visitors each month. Increased online leads by 425% and online visitor conversion by 25%.*

- *Increased broker owner satisfaction from 28% to 82% over four years.*

- *With heavy emphasis on customer experience, led the team to win an unprecedented 4 JD Power Customer Satisfaction awards – the first time achieved by any real estate franchise brand.*

- *Integrated the use of radio and social media campaigns, as well as website and digital programs targeting specific geographies and property types, into the overall communications and promotional plan.*

- *Initiated high-profile campaigns that included Super Bowl game advertising for 2 years and Olympic Games advertisements and sponsorships of US Men & Women's soccer for 3 years.*

**Earlier Roles**
*Senior Vice President of Customer Marketing,* JPMorgan Chase, Edison, NJ
*Director of Business Local Services,* AT&T, Bridgewater, NJ
*Director of Offer Management and Marketing,* AT&T, Bridgewater, NJ
*Division Manager, Marketing Communications,* AT&T, Bridgewater, NJ

---

## EDUCATION

---

UNIVERSITY OF PENNSYLVANIA, THE WHARTON SCHOOL
**Master of Business Administration, Concentration in Marketing**

UNIVERSITY OF NEW HAMPSHIRE
**Bachelor of Arts Degree in Economics, Summa Cum Laude**
*Phi Beta Kappa*

## AWARDS, HONORS & RECOGNITION

---

**2022 Housing Wire Marketing Leader**

**2022 Mortgage Star Award, Mortgage Women Magazine**

Inman News: Named One of 100 Most Influential Real Estate Leaders in 2012, 2013 and 2014

Stefan Swanepoel: Named One of 200 Most Powerful People in Residential Real Estate in 2014

GOLD Stevie Award: Women in Business in 2014, for Innovative Social Media Campaigns

Bronze CLIO Award in 2014, for Best Digital Social Media Activation

A Webby Award in 2014, for Social Media / Native Advertising
GOLD International ANDY Award in 2014, Financial Products & Services

Bronze London International Award in 2014, for Best Use of Digital Media

A GOLD Ad Club Hatch Award in 2014, for Best Idea Implemented for Under $20,000

## David  M. Fitzgerald

| | |
|---|---|
| **From:** | Aaron Noe <aaron@elmontecapital.com> |
| **Sent:** | Wednesday, April 12, 2023 2:37 PM |
| **Subject:** | Guardian Investors and Creditors |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |
| **Categories:** | Orange Category |

aaron@elmontecapital.com appears similar to someone who previously sent you email, but may not be that person. Learn why this could be a risk

Dear Guardian Fund Investors & Creditors (Buy & Hold Fund, Liquidity Accounts, Lenders, and Secured Portfolio Owners),

Aaron Noe here. As of April 11, 2023, Hughes Private Capital will no longer be managing the Guardian Fund (the "Fund"), and I have been engaged through my corporation, El Monte Capital, Inc as the Chief Restructuring Officer as we work through the bankruptcy reorganization and restructuring process. I will be working very closely with Andrew Palmer and Adrian Maravilla, who will be at the helm of the newly formed company, **12B Residential**. 12B Residential is the operational arm of the Fund and will be taking over the property management and all day-to-day operations of the Fund from Hughes Private Capital (HPC) and HPC-affiliated companies. The Guardian Fund is the sole shareholder in 12B Residential and has no affiliations with HPC or their affiliated network of companies. Additionally, El Monte Capital has no affiliation with HPC or any of its Principals.

As many of you know, I was originally hired to tackle the role of CEO of Hughes Private Capital in mid-May 2022. I quickly learned of the operational, accounting, and governance challenges with which HPC and its affiliated companies were struggling. I brought in Andrew Palmer as the CFO to establish proper financial controls, create an operational budget, and provide financial visibility into the company's performance. In July 2022, I brought on Adrian Maravilla as the President of Property Management to establish effective operating procedures and to restructure the property management organization and software platform. During this time, I spent a few weeks in the field touring many of our homes to better understand our portfolio. Thereafter, I engaged Neal Analytics to build our data environment to integrate the many disparate software systems so the company's operational performance could be evaluated. Unfortunately, this newfound visibility revealed that Guardian Fund was not on a sustainable financial course. I shared my concerns with the founders of HPC, Greg Hughes and Steve Sixberry, and these conversations are what led to the Guardian Fund being gated at the beginning of December 2022.

Over the weeks that followed, I spoke with a multitude of investors, and many of the conversations were truly heartbreaking, yet very informative. It became apparent that the HPC structure was fraught with conflicting interests; as such, I resigned from HPC in early February 2023.

Even after I was no longer employed or being compensated in any way, I continued to work closely with some of the investors and the Guardian Fund attorney, Steve Harris, to develop a legal and operational strategy that would yield the best financial outcome for the Guardian Fund. To move in this direction, on March 17, 2023, a group of "Concerned Investors" filed a petition to move the Guardian Fund into an Involuntary Chapter 7 Bankruptcy (a.k.a. liquidation). The Petitioners' goal was not to have the Fund liquidated but to get HPC removed as the fund managers. As such, Steve Harris and I worked with HPC and they agreed to step down as managers. We then quickly established an operations company, 12B Residential, and began assuming many of the operational responsibilities from HPC. On April 11, 2023, I filed for a voluntary Chapter 11 reorganization

1

petition, on behalf of and with the consensus of the Concerned Investors which will be consolidated, on request to the bankruptcy court, with the current Chapter 7 involuntary liquidation filing. This action will allow Guardian Fund to remain in control as the "Debtor in Possession" in a Chapter 11 reorganization and proceed with a restructuring plan, instead of being forced to liquidate. The complete restructuring plan will be presented to the Bankruptcy Court and voted on by the investors and creditors of Guardian Fund. I estimate that the Fund's proposed restructuring plan will be filed with the Bankruptcy Court within 120 days of the original involuntary petition date of March 17, 2023.

Throughout and after the bankruptcy process, you as an investor and/or creditor will have:

1. <u>Transparency</u>: This means Generally Accepted Accounting Principles (GAAP) financial statements, financial budgets, and forecasts will be provided. A Board of Directors for 12B Residential will be established to govern operations. Throughout the bankruptcy reorganization process, all financial decisions for Guardian Fund will need Bankruptcy Court approval and the investors will be represented by *Committee(s)*.
2. <u>Accountability</u>: 12B Residential will be submitting a restructuring plan to the Bankruptcy Court, investors, creditors, and the United States Trustee on behalf of Guardian Fund. The Fund will also be required to file monthly accounting reports with the Bankruptcy Court disclosing all its financial transactions. Regular status reports and hearings will also be provided to the Bankruptcy Court to report the progress being made. Additionally, all Guardian Funds receipts and disbursements will go through a *Debtor in Possession (DIP) bank account which is reviewed by the United States Trustee's Office.*
3. <u>Results</u>: This should go without saying, but at the end of the day, none of what I say in this letter or on a Zoom meeting matters, if we don't make swift, significant, and positive financial progress. We have made forward progress on stabilizing the portfolio but we need to make more progress on that front, as well as moving the Fund's internal loans back to a performing status and creating an equitable solution with our secured investors.

*Next Steps*

I will be hosting a Zoom meeting on Wednesday, April 19th at 1:00 PDT to provide more details around the bankruptcy process, restructuring, and the recovery plans. In the meantime, I have a request of you as investors and creditors, as we move forward:

Please know that I would love to speak to every investor. But the reality is, I need time to tackle the above action items. As a result, I currently have very limited availability. Therefore, I am going to ask that you first send in your questions to Invest@12BR.com and we will compile a list. The team and I will review and use this list to help guide the monthly updates. We will do our best to answer as many as possible, as quickly as possible.

I know all of you have many well-deserved emotions around what has occurred with the leadership of HPC. I have not only listened to your stories, but I have "heard" you and the life-altering impact this entire swarm of events has had on you. My commitment, along with what I outlined above, is to guide the restructuring in a direction that is more aligned with you, the investor and creditor.

Thank you in advance for your willingness to allow me and the 12B Residential team to restructure the business model and asset base to support your investment. I look forward to speaking to you live next week on the Zoom meeting.

Best regards,

*Aaron*

Exhibit 21, Page 311

# Exhibit 22



**HouseCanary**



# Portfolio Services Webinar

**Wednesday, March 29, 2023**
10am PT (1pm ET)

**Register Now**

**Chris Rediger**
Head of Product,
HouseCanary

**Aaron Noe**
Chief Executive Officer,
Hughes Private Capital

Hi Eric,

The economic backdrop is making it critical for SFR investors to understand h
to navigate today's market and gain a competitive advantage for their
portfolios.

In this webinar, learn about SFR strategies to tackle today's economic
challenges.

1. **Explore strategies for mitigating portfolio risk and capitalize on opportunities**
2. **Leverage new disposition strategies for SFR investors for both off-market and on-market**

4

Exhibit 22, Page 312

3. **Access off-market properties for investors expanding their portfolios opportunistically**

**Panelists:**

1. Chris Rediger, Head of Product at HouseCanary

1. Aaron Noe, El Monte Capital, Founder | Hughes Private Capital, CEO

**Time:** Tuesday, March 29, 2023 10:00am PT | 1:00 pm ET

Register for Webinar



Introducing HouseCanary's **Portfolio Services\***: Whether you're an SFR investc acquiring assets or currently looking to offload inventory, we've got you covered.

Exhibit 22, Page 313

HouseCanary has access to over 1,400 investor-owned inventory across the United States. If you're an active buyer looking to expand your real estate portfolio, **sign up for the weekly hot sheet** **of available investor owned properties and be among the first to know about new opportunities. In February, there were over three dozen offers on the inventory.**

Additionally, HouseCanary can help you with asset disposition to maximize yc results. Reach out to **hotsheet@aexphub.com** for more details.

## Have questions or need more information?

Want industry-leading residential real estate valuations and analytics to powe your business decisions? **Contact** **Sales@Housecanary.com** **to book a demo**

### ⚐ HouseCanary

HouseCanary, Inc and Acquisition Explorer, LLC (AEXP) do not represent any sellers on the Hot Sheet as the broker/agent. T AEXP team will arrange an introduction between the seller, buyer, and a broker licensed in the state where the property i located, if needed, who can facilitate agency and assist in completing the transaction. Acquisition Explorer, LLC is compens via a referral agreement with the buyer broker of any property on the Hot Sheet.

If you are currently working with a real estate agent, this is not meant as a solicitation of your business.

HouseCanary, Inc. is a Licensed Real Estate Brokerage in KS, NM, SC and under the Trade Name ComeHome in AL, AK, AZ, CA, CT, DC, DE, FL, GA, HI, IA, ID, IL, IN, KY, LA, MA, MD, ME, MO, MN, MS, MT, NC, ND, NE, NH, NJ, NV, NY, OH, OK, OR, PA, RI, SD, TN, TX, VA, WA, WI, WV, WY. Trade Name ComeHome Real Estate in MI and UT. Trade Name ComeHome by HouseCanary in AR.

6

Exhibit 22, Page 314

https://vimeo.com/813250311

# Exhibit 23

## Jeff Golden

**To:**           Jeff Golden
**Subject:**   Selling Properties with HPC - Process and Next Steps Feb 16th 2023

---------- Forwarded message ---------
From: **Nate Edwards** <nate.edwards@hughescapital.com>
Date: Thu, Feb 16, 2023, 4:14 PM
Subject: Selling Properties with HPC - Process and Next Steps
To: ericfiegl@gmail.com <ericfiegl@gmail.com>

Hi Eric,

I apologize for the delay in getting back to you. You are the first one to go through this type of process so we had to generate the POA and make sure we've vetted out the procedure. Below are next steps:

- Isabella will be sending you a Real Estate Power of Attorney that is specific to your property/ies. This POA will allow Aaron Noe (CEO of Hughes Capital) to work the sale on your behalf. This type of execution was chosen to be the timeliest, most efficient and the least investor invasive. We're happy to provide updates at any time, otherwise, we will reach out with status updates as we have them.
  - We cannot move forward until this POA is signed.
- We expect to have your property listed in under a week after POA is signed.
  - This may vary if your property is occupied. There is additional administrative work that need to be completed (by HPC) when the property is occupied, however, that will not prevent the sale from moving forward.
- You will receive a copy of the closing docs. We do not anticipate needing your signature at this time, however, we will reach out if that changes for any reason.
- The only item you will be responsible for is closing costs. We will provide that information when we get to that point in the sale.
- After the property is sold, you will receive the proceeds from that sale and difference in cost between that amount and the amount you purchased the home for from HPC.

Again, because you are the first to go through this process, there may be items that come up along the way where we will need to reach out to you. Our goal is to get your property/ies sold quickly with as little intrusion to you as possible.

If you have questions now or along the way, please feel free to reach out.

Thank you,

**Nathan Edwards, MBA**

1

Exhibit 23, Page 316

**Senior Investor Relations Advisor**
**Email:** nate.edwards@hughescapital.com **| Phone: 775-446-3802**
**Mailing Address:** 5440 Louie Lane, Suite: 106, Reno, NV 89511
**Investor Relations Office:** 5440 Louie Lane, Suite: 102, Reno, NV 89511

*Nothing in this email should be interpreted as representing an offer to buy or sell any security or investment from us. Any such offer or solicitation may only be made through our Offering Documentation ("Offering"), available only to Accredited Investors with a minimum of $25,000 or more for investment. In addition, while marketing material in this email could be interpreted as including forward-looking statements, those statements can only be read within the context of disclaimers contained in the Offering.*

2

# Exhibit 24



# Hughes Private Capital Q3 2022 Investor Update

## Market Softening Bodes Well for the Buy and Hold Fund

The Buy and Hold Fund continues to grow at a steady and sustainable rate. **We now have over 2,400 doors under management within the portfolio and a total of $270 Million assets under management.**

Of this $270 Million:

- **$57 Million** are purchased properties in various stages, from rehab to ready for sale to the fund.
- **$74 Million** are assets of the Buy and Hold Fund.
- **$139 Million** are titled properties held in investors' names. *(These are composed of 1031 Exchanges or cash investors who are using outside financing to leverage their investment to increase their return.)*

Beyond these numbers, we don't have much to share about the Buy and Hold Fund. We continue to encounter most of the challenges we reported in the Q2 investor update with labor shortages and supply chain issues — the same things affecting most industries at the moment. Most of the challenges come in the form of finding reliable labor and finding/retaining team members on the construction and rehab side of the business. It is amazing how hard it is to find people who are not only *good* at the skills we need, but are also willing to do the work.

**However, the good news is that the market is beginning to soften, which is freeing up more inventory to purchase.** You may have seen in the news that major investing firms like Blackstone are buying fewer homes these days. That makes for less competition for the same inventory and should allow us to buy more as needed.

## It's All Fun and Games at Hughberry Homes

**We've been very pleased with the response to Hughberry Homes, our short-term rentals fund we announced last month.** Thanks to the interest we've received, we're planning to buy 2 to 5 more properties in our current market of Scottsdale, Arizona. Of the two properties we have there already, we recently sold one to complete a 1031 Exchange.

These short-term rentals continue to be booked frequently and receive stellar reviews. Our team is looking forward to continuing to design cool experiences for our guests. One new thing we're having fun adding to our STRs is virtual pinball machines — these are pinball machines that look exactly like traditional ones, but you can choose from 337 pinball games. The board and screen light up with 4K video quality, making everything look 3D and 100% realistic, including the feel of the bumpers, shooting the ball, and the vibration of the machine.

That's just one of many reasons we find this venture into STRs so exciting — **getting creative with how we can make our homes memorable for our visitors so they will tell others *and* want to come back.**

## Meet Our Leadership Team: Tom Ortiz

Reno residents may recognize the name "Tom Ortiz," the mastermind behind numerous development projects in the area. Earlier this year, we welcomed Tom to the Hughes Capital leadership team, where he is leading the construction/rehab and acquisition teams.

Exhibit 24, Page 318



# Hughes Private Capital Q3 2022 Investor Update

He has his work cut out for him, given the challenges we've encountered recently in those areas!  Bringing new big hitters onto the leadership team this year has <u>allowed us to strategize long-term while perfecting our company-wide processes in the meantime</u>.

## Two Commercial Properties Available for Purchase or 1031 Exchange

We own two commercial properties – one in Cleveland, Ohio and one in Birmingham, Alabama – and we have decided to make them available to investors to purchase or use for a 1031 Exchange.  If you're interested, please get in touch with our team: **Investing@HughesCapital.com**

## We Found Another Way to Make 1031 Exchanges Easier — and Better

To continue making 1031 Exchanges a great option for our investors, we found yet another way to gain the most benefits.  Many of you may already be familiar with the structure of a Delaware Statutory Trust (DST), but if not, **a DST is a real estate ownership structure where multiple investors hold fractions of the trust (which owns one or more properties).**

A DST allows investors to complete their 1031 within a large enough structure that can absorb them, and for those who have debt to replace from their sold property, a DST will usually accommodate that as well.  **What DSTs normally *don't* provide is liquidity and enough cash flow for many investors.**  Once you are in a DST, there is usually a 5- to 10-year lockup period for your investment.

We've found that, with Hughberry Homes, we can do a version of a DST (kind of like a "mini DST") to comply with the requirements for exchange, **but better.**  Investors can buy in, as fractional ownership, into Hughberry Homes.  If investors have debt to replace, it will be available for them *without* having to qualify for the loan, sign on the loan, <u>or pledge any personal guarantees</u>.  **Lastly, there is no lockup period on the investment.**  If at any time you want to withdraw your funds, our management team will make their best effort to get you out as needed.

## Hughes Private Capital is in the Top 1000 on the Inc 5000 List

**Hughes Private Capital was recently awarded a ranking of #939 on the Inc. 5000 2022 list, putting us in the top 1,000 fastest-growing companies in the U.S.**  This prestigious list is released yearly by Inc. Magazine.

To qualify, companies must be privately owned and have grossed at least $2 million in 2021.  But what's important to note is that the Inc. 5000 doesn't just award fast growth, but *stable* growth.  Only companies that demonstrate increased and sustained revenue growth over the past few years can earn this award.  That's what makes this award especially meaningful: it recognizes that while we have grown a lot in just a few short years, <u>our company is built for long-term success</u>.  **We're very proud of our team for receiving this award.**

Until next time,

Steve Sixberry          Greg Hughes

# Exhibit 25

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF NEVADA (LAS VEGAS)

| | |
|---|---|
| In Re: | ) Case No. 23-50233-nmc |
| | ) Chapter 11 |
| | ) Lead Case No. 23-50177-nmc |
| GUARDIAN FUND, LLC, | ) |
| | ) TRANSCRIPT of the |
| | ) MEETING of CREDITORS |
| Debtor. | ) |
| | ) |
| | ) May 15, 2023 |

Appearances:

Edward M. McDonald, Jr., trial attorney
 (Conducting the meeting)
Office of the United States Trustee
300 Las Vegas Boulevard, South, Suite 4300
Las Vegas, Nevada  89101

via video teleconference:

Aaron Michael Noe, debtor's responsible individual

Norma Guariglia, counsel for the debtor
Steven R. Harris, counsel for the debtor
Harris Law Practice LLC
850 East Patriot Boulevard, Suite F
Reno, Nevada  89511

Lebo Newman, creditor

Amy N. Tirre, counsel for the Andronico Family
 Limited Partnership, L.P., and Paul Andronico
Law Offices of Amy N. Tirre
3715 Lakeside Drive, Suite A
Reno, Nevada  89509

Proceedings recorded by:  Edward M. McDonald, Jr.

Transcribed by:                Susan Palmer, Certified Electronic
                                Transcriber 00124
                                Palmer Reporting Services

          Proceedings recorded by digital recording;
 transcript produced by federally-approved transcription service.

Exhibit 25, Page 320

*Transcript of the Meeting of Creditors of May 15, 2023*                     2

Monday, May 15, 2023                              2:08 o'clock p.m.

P R O C E E D I N G S

MR. MCDONALD:  My name is Edward McDonald.  I work for the Department of Justice.  I'm an attorney there.  And this is the 341 Meeting for a case entitled In re Guardian Fund, LLC, Lead Case Number 23-50177-nmc.  It's consolidated with another case of the same name with the number 23-50233-nmc.

The lead case was filed as an involuntary bankruptcy on March 17, 2023.  The — I believe the order for relief was entered on April 11th of 2023, which is the date that the second case was filed as a voluntary Chapter 11, and the two cases have been consolidated.

Today's date is May 15th, 2023.  It is approximately 2:08 in the afternoon Pacific Time.  And, as I said, my name is Edward M. McDonald, Jr.  I'm a trial attorney with the Office of the United States Trustee.  There is another gentleman named Jared Day who is not on the call right now, but he is also a trial attorney with the Office of the United States Trustee and will be working on this case.

This meeting is required under Section 341 of the Bankruptcy Code.  The purpose of the meeting is to allow for an examination of the debtor's representative under oath.  Questions may include but are not limited to:  Why the case was filed, the operation of the debtor's business, and the prospects for reorganization.

Exhibit 25, Page 321

*Transcript of the Meeting of Creditors of May 15, 2023*                3

I will initially question the debtor's representative and then creditors will also have an opportunity to examine the debtor's representative.

As a reminder, the meeting is being digitally recorded. Remember that the recorder cannot see who you are or your head nodding or shaking. So please identify yourself when asking a question and remember to give verbal responses which can be picked up by the recorder. And I am recording this right now. We keep the recording for two years after case closure. If anyone would like to obtain a recording of today's proceeding or a copy of the recording of today's proceeding, you would make the arrangements through my office.

My — you can — so in plain English, you can send an email to either me or to Mr. Day. My email address is: Edward.M — as in Michael — .McDonald — M-c-D-o-n-a-l-d, like the restaurant — @usdoj.gov. That's usdoj, as in U.S. Department of Justice, .gov, as in government.

Mr. Day's email address is: Jared — which is J-a-r-e-d — .A.Day@usdoj.gov. So send us a request, we'll get you linked up with the lady who will actually send the recording, and that's how we'll work that.

I would ask now that Ms. Guariglia and Mr. Harris make their appearances and tell us what law firm they work for and what their role is in this case.

MS. GUARIGLIA: Good afternoon, Mr. McDonald. This is

*Transcript of the Meeting of Creditors of May 15, 2023*                                    4

Norma Guariglia and Stephen Harris on the phone with Harris Law Practice. And we are counsel for the debtor Guardian Fund, LLC.

MR. MCDONALD: Okay. And, just for the purposes of spelling, Guariglia is G-u-a-r-i-g-l-i-a, right?

MS. GUARIGLIA: Yes, that is correct.

MR. MCDONALD: Okay. And then I have a gentleman here named Aaron Noe, who is debtor's representative.

Please make your appearance, Mr. Noe. Give me your full legal name.

MR. NOE: My name is Aaron Michael Noe, the last name is spelled N-o-e.

MR. MCDONALD: Very good. And what's your relationship with the debtor, Mr. Noe?

MR. NOE: I work for El Monte Capital, and El Monte Capital is the manager of the Guardian Fund —

MR. MCDONALD: Okay. Mr. Noe, —

MR. NOE: — as of April 11th.

AARON MICHAEL NOE, DEBTOR'S RESPONSIBLE INDIVIDUAL,

SWORN/AFFIRMED

MR. NOE: I do.

MR. MCDONALD: Thank you, sir. You can put your hand down.

So, Ms. Guariglia and/or Mr. Harris, is there anybody else here for the debtor that may provide testimony?

MS. GUARIGLIA: No, not today, Mr. McDonald.

Exhibit 25, Page 323

*Transcript of the Meeting of Creditors of May 15, 2023*                    5

MR. MCDONALD:  All right, very good.

Okay.  So, Mr. Noe, now that you're sworn in, so tell me again — tell me again — I should ask you this after I swear you in — but tell me your full name and who you work for and what that entity's relationship is to the debtor company.

MR. NOE:  Sure.  My name Aaron Michael Noe, last name spelled N-o-e.  I work for El Monte Capital.  El Monte Capital is the manager of the Guardian Fund, became the manager of the Guardian Fund April 11th of this year.

MR. MCDONALD:  Okay.  And I'll also note that, just for the record, that on or about — let's see — so on or about May 10th of 2023, the Office of the United States Trustee filed a Notice of Appointment of an Official Committee of Unsecured Creditors, which I'll call the committee if I need to refer to them again.  That was filed as Document 54 on May 10th of 2023 in the main case.  And, again, there's two case numbers.  When I say the main case, I'm referring to Case 23-50177-nmc.  And then there is an affiliate case that was consolidated into the main case, and that case number is 23-50233-nmc.

These cases — or this consolidated case is pending before the Honorable Natalie M. Cox, who is a bankruptcy judge in the District of Nevada.  And that's where I am too.  This meeting is being conducted telephonically and this case, I guess, is filed in the unofficial portion of the District of Nevada, the northern portion, which is centered around Reno.

*Transcript of the Meeting of Creditors of May 15, 2023*                6

But, anyways, so we appointed a creditors committee on May 10th.

And I would ask:  Is there anybody else that wants to make an appearance for the record, including a representative of the creditors committee, if any?

If so, Holly, hopefully you can help those folks make an appearance on the record at this time.

HOLLY:  Yes.

If any of those parties would like to make an appearance — I'm sorry — please press star zero.  I will grab your mic and take your name.

MR. MCDONALD:  Okay.  I don't hear anybody.  So just let me be clear, if there is anybody that wants to make an appearance besides the people that haven't made an appearance yet, let Holly know and then you'll make your appearance.

HOLLY:  Our first party is Lebo Newman.

Your line is open.

MR. NEWMAN:  Yes.  Mr. McDonald, I am Lebo Newman.  I am a member of the creditors committee that was appointed on 5/10.  I am not representing the committee on any specific intent that we have at this point.  We have not organized ourselves enough to let us do that, but I am on the line if you have questions for us.

MR. MCDONALD:  Okay.  So my question is do you have questions that you would like to ask Mr. Noe after I ask him questions?

*Transcript of the Meeting of Creditors of May 15, 2023*          7

MR. NEWMAN:  I may.  It depends on what you cover.

MR. MCDONALD:  Okay.  And your name is — is it L-i-d-o N-e-w-m-a-n?

MR. NEWMAN:  L-e-b-o N-e-w-m-a-n.

MR. MCDONALD:  — — N-a-w?

MR. NEWMAN:  No.  N-e-w-m-a-n, —

MR. MCDONALD:  Okay.

MR. NEWMAN:  — Newman.

THE COURT:  All right.  All right.  And — okay, very good.  And, tell me, do you represent yourself or are you here representing a company?

MR. NEWMAN:  No.  I — well, I have multiple investments in Guardian Fund funded through an LLC that I own and others are personal investments.

MR. MCDONALD:  Okay.

MR. NEWMAN:  So a couple different ways I'm representing myself today.

MR. MCDONALD:  Okay.  All right, very good.  And — all right.  Thank you.  So after I get done asking my questions, then I'll ask if anybody wants to ask questions.  And then it will be your time to chime in again, Mr. Newman.  I appreciate your appearance.

Is there anybody else that would like to appear?

HOLLY:  Yes.  We have Amy Tirre.

You may go ahead.

*Transcript of the Meeting of Creditors of May 15, 2023*                    8

MS. TIRRE:  Yes.  Good afternoon, Mr. McDonald.  This is Amy Tirre.  I am counsel for the Andronico Family Partnership, L.P. and Paul Andronico.  He is a member of the Official Committee of Unsecured Creditors.

MR. MCDONALD:  All right.  And, Ms. Tirre, do you have — or do you think you'll have questions that you would like to ask later?

MS. TIRRE:  Yes.

MR. MCDONALD:  Okay, very good.

Anybody else want to make an appearance?

Okay, hearing none, let me — let me say that so we appointed a committee of unsecured creditors.  We did so on the 10th, which was only about five days ago.  Usually that entity hires counsel.  There's been no appearance on the docket yet of counsel for the Unsecured Creditors Committee or the Official Committee of Unsecured Creditors.

And also we asked for certain documents from the debtor that we — I believe we did receive from them and that we got those documents late on Friday night.  We're still reviewing those.  And so given those two — those two facts, I am going to let you know that I plan to continue this Meeting of Creditors.  I am going to ask questions and let people ask questions, but I am going to also continue this Meeting of Creditors.  And, in consultation with Mr. Day, I'm going to continue it to Tuesday, May 30th, at one o'clock in the afternoon Pacific Time.  So just

*Transcript of the Meeting of Creditors of May 15, 2023*                   9

FYI. And hopefully I remember to do that at the end of the meeting.

Having said that, Ms. Guariglia, if you would like to give us an overview or your theory of the case or the 50,000-foot view of the case as you see it, I would ask you to do so at this time, ma'am.

MS. GUARIGLIA: Thank you. Norma Guariglia on behalf of the debtor. The high-level view, overview is that the debtor's position is that right now, if its assets were to be liquidated, there would be almost slim to no chance of the equity holders receiving anything and even the unsecured creditors would likely not be made whole.

However, the debtor has sufficient assets and an ongoing business that if managed correctly, those assets can generate revenue. Debtor's position is that these investments in the real estate fund were not — were not intended to be short-term investments. So with a viable plan of reorganization and given some time, the debtor can reorganize and manage these real estate investments, strategically selling some, rehabbing others that can generate rental revenue. And then by operating in that manner and also expanding its management arm, which is a subsidiary called 12B residential, that it can succeed in a plan and, you know, potentially make creditors whole, given some time. So that's — that's the broad overview.

Do you have anything you'd like to add, Mr. Noe?

*Transcript of the Meeting of Creditors of May 15, 2023*                    10

MR. NOE:  No, I think that sums it up well.  Thank you.

MR. MCDONALD:  Okay, very good.

MS. GUARIGLIA:  Do you have any questions, any specific questions, —

MR. MCDONALD:  No, no.  I just —

MS. GUARIGLIA:  — Mr. McDonald?

MR. MCDONALD:  No, ma'am.  I appreciate the high-level view.  And then hopefully we will try and get into some of the details in the upcoming line of questioning.

EXAMINATION ON BEHALF OF THE U.S. TRUSTEE

BY MR. MCDONALD:

Q.  I guess the first thing I wanted to ask about was I believe that Mr. Noe and perhaps Ms. Guariglia or Mr. Harris participated in what was called an initial debtor interview that was held on May 4th in the afternoon and was presided over by a lady named Kristine Kinne, who is a bankruptcy analyst with the Office of the United States Trustee.  And I believe we sent you — you folks a questionnaire, the IDI questionnaire.  So, Mr. Noe, as far as you know, were the answers to the initial debtor interview questionnaire that was supplied to the Office of the United States Trustee true and correct?

A.  I want to just put a caveat out there.  I'm using all the information that was put together by the prior manager, which was used by the capital in the Guardian Fund.  We're validating

*Transcript of the Meeting of Creditors of May 15, 2023*                    11

data as quickly as we can from a financial standpoint, but we're having to go back and audit a lot of that.  So to the best of the records that I have, it is true and accurate.

Q.  Okay.

A.  If that makes sense.

Q.  I understand.  And I'll, maybe if I have my head screwed on tight enough, I'll ask some more questions about how it is that you came to be the debtor's representative, but I appreciate your – your answer.  But given that caveat, as far as you know, the information is true and correct, right?

A.  That is correct.

Q.  Okay.  And then as far as you know, does the debtor have all of the insurance that is required for it to operate?

A.  I believe that is true.  We submitted to Norma and I believe Norma submitted those documents to the U.S. Trustee.

Q.  Okay.  And then –

A.  And certificates of insurance.

Q.  All right.  And then just so I don't fumble into anything that's covered by the attorney-client privilege, since you mentioned Ms. Guariglia, if I ask you a question that makes you want to tell me what you discussed with Ms. Guariglia or Mr. Harris, what you asked them or what information they supplied in response, it's not my intention to – to invade the attorney-client privilege.  Hopefully one of them will object if I accidentally do ask a question like that.  But I'm not trying

*Transcript of the Meeting of Creditors of May 15, 2023*          12

to get you to tell me what you discussed with your — with the debtor's attorney, so if I ask you a question like that, don't tell me what you asked Ms. Guariglia or Mr. Harris or what they told you, okay?

But, all right, I get it. You gave them whatever insurance documents they were and then they passed those along to Ms. Kinne.

Let's see what else. Do you know what kind of insurance the debtor carries?

A. The debtor carries general liability insurance. The general liability insurance is through the 12B residential and Guardian's name additionally insurance. Each property through Real Protect has a general liability policy as well. And then there's property and casualty insurance from the individual properties held by — by the Guardian Fund.

Q. Okay. So you said that for the liability insurance, that it's the primary insured is 12B and then Guardian is also on there. If that insurance is triggered and there's damages or liability that's incurred, who gets paid, 12B or Guardian, or —

A. I don't know the answer to that. And it would depend upon where the person was damaged. The property themselves have general liability insurance on them, which is different than the business liability insurance.

Q. Okay.

A. But the property's liability insurance is with Guardian.

Exhibit 25, Page 331

*Transcript of the Meeting of Creditors of May 15, 2023*     13

Q.   Okay.   So the — if somebody — if one of the properties is destroyed or somebody goes into a property and trips over a coach and sues Guardian, there's insurance coverage that covers it and not necessarily 12B; that's what you're saying, right?

A.   That's correct.

Q.   Okay.

A.   That's correct.

Q.   And then company liability, if the debtor company, which is the Guardian Fund, is found liable to somebody else, is there insurance that covers that liability or is that only to pay for liability incurred by 12B?

A.   I don't know the answer to that.   It's my understanding that the insurance that 12B Residential has in the event that they do something on behalf of Guardian, Guardian will also be covered as well as 12B Residential.

Q.   Okay.   But I guess that's perhaps something we'll cover next time so that you can give me a more definitive answer.   And so again the question is:   With regard to company liability, is Guardian Fund covered or is it just 12B that's covered for liability.

All right.   Anyways, we asked for the 2022 tax return. And I believe that you told Ms. Kinne that the debtor hadn't filed its 2022 tax return yet and that it had sought an extension; is that correct?

A.   That is correct.

Exhibit 25, Page 332

*Transcript of the Meeting of Creditors of May 15, 2023*                    14

Q.   And so when's the deadline to file the tax return, is that in October or when is the extension up?

A.   I believe it's October 15th, but I — one is the — it's either November or October 15th.  One is for individual returns and one is for corporate returns.

Q.   Who would the individual returns be for?

A.   No.  I was thinking out loud.  Sorry.

Q.   Oh, okay.

A.   I can validate it.  It's either occur or November, I am not sure.

Q.   Okay, I get it.  So you're just — in general, the extensions for individual tax filers are mid October, I guess six months, and then for corporations, they get another month; is that what you're saying?

A.   It — I believe it's the end of October is — is when the Guardian Fund would have to have it's tax return filed.

Q.   Okay.

A.   But it does issue K1s to the individual investors that then have to subsequently file their personal returns as well.

          MR. MCDONALD:  Okay.  And, Ms. Guariglia, so I think the Harris Law firm filed its — or Harris Law Practice, LLC filed its application to be employed as counsel for the estate in this case.  Right?

          MS. GUARIGLIA:  Yes, that is correct.

          MR. MCDONALD:  Okay.

Exhibit 25, Page 333

*Transcript of the Meeting of Creditors of May 15, 2023*                    15

MS. GUARIGLIA:  It is set for hearing June 13th at —

MR. MCDONALD:  Okay.

MS. GUARIGLIA:  — 9:30 a.m., I believe.  And the confusion is that it was filed in the Chapter 11 case before it got consolidated, so it is not showing on the docket of the consolidated case, the lead case, yeah.

MR. MCDONALD:  Okay.  All right.

MS. GUARIGLIA:  Yeah.  We were told by the Clerk's Office they will not docket, being they weren't stocking the newer cases, UK, so let's leave it there.

MR. MCDONALD:  All right.  That was filed, let's see here, that was filed as Document Number 20, supported by the Declaration of Stephen R. Harris with Docket 21 and was filed on April 24th of 2023.  And notice of — oh, and then the notice of hearing for that document was filed on May 8th of 2023 as Docket 29.  So under our Local Rules, I believe that the objection deadline would be May 30th.  It's two weeks before the hearing.  So I think it's Tuesday, May 30th.  But, anyways, we'll review that.

And also there is a motion to sell that I believe is on shortened time in this case.  Is that correct, Ms. Guariglia?

MS. GUARIGLIA:  Yes, that is correct.  And the hearing on that motion is scheduled for this Thursday at 9:30 a.m.  So that's Thursday, May 18th, at 9:30 a.m.

MR. MCDONALD:  Right.  And the objection deadline is

*Transcript of the Meeting of Creditors of May 15, 2023*                    16

tomorrow, right?

MS. GUARIGLIA:  I believe so.  Let me take a look at that.  That was on shortened time.

MR. MCDONALD:  That's — the OST is, I think it's, Docket — where is it — Docket 51.  I think it's tomorrow.

BY MR. MCDONALD:

Q.  So the debtor has — debtor has counsel of record.  Is the debtor — I believe that there was a — since there is a motion to sell, does the debtor need to employ any other professionals, like Realtors, auctioneers, accountants, appraisers, agents or special counsel, anybody like that?

MS. GUARIGLIA:  This is Norma Guariglia.  Did you want me to answer that or Mr. Noe?

MR. MCDONALD:  Yeah.  It's kind of more of a question — I understand you're not here to answer questions, but to the extent that you're willing to let us know if you guys plan to move to hire any more professionals, that — I'm asking you because you would probably be in a better to position to answer than Mr. Noe.

MS. GUARIGLIA:  Okay.  Sure.  So, yes, the debtor will actually shortly, today or tomorrow, be filing an application to employ a broker with respect to that motion to sell that's set for hearing on Thursday.

MR. MCDONALD:  So given that —

MS. GUARIGLIA:  That we will likely to have to employ

*Transcript of the Meeting of Creditors of May 15, 2023*          17

other brokers also if it sells any other properties, but that's to be determined at this point.

MR. MCDONALD:  Okay.

MS. GUARIGLIA:  The debtor is also looking into employing special litigation counsel to potentially — to investigate and potentially pursue professional negligence claims against certain lawyers in law firms that represented the debtor prepetition.  And it was transactional documents.  That it will have to employee tax accountants to prepare tax returns.  That's all we know of right now for sure.

MR. MCDONALD:  Okay.

MS. GUARIGLIA:  But, of course as you know, things change, and so we may need to employ more professionally.

MR. MCDONALD:  So if you have a motion to sell a property that's going to be heard on Thursday, can we assume that the motion to employ the broker related to that sale will be filed very soon and you will seek that application to be heard on shortened time, also on Thursday?

MS. GUARIGLIA:  We will try, but the — so the closing on that, even on that sale is not going to occur right away so even if the broker application is heard shortly after, we'd probably be okay.  But we will try to get shortened notice and I guess the — if the Judge grants it.

MR. MCDONALD:  Okay.

MS. GUARIGLIA:  It's a little tricky on that because

*Transcript of the Meeting of Creditors of May 15, 2023*          18

the listing had occurred months before, prepetition, and so, you know, so the broker's been working for three, three or four months before the bankruptcy to list this property and sell it, but —

MR. MCDONALD:  Okay.

MS. GUARIGLIA:  — you know, as the debtor kind of inherited it.

MR. MCDONALD:  All right.  And let's see here.

BY MR. MCDONALD:

Q.  So, Mr. Noe, I'm going to ask you to look at the big pile of electronic documents that I sent to you through Ms. Guariglia earlier today.  And I guess some of them are not the schedules and statements, although most of them are.  I'll just go in the order — well, I'm going to go in the order that they were filed in the involuntary or the voluntary case.

So the first one I want you to look at I called, it's 12, and then to differentiate between the involuntary and voluntary cases, I put an I or a V.  So I called, the first one I want you to look at, 12I, Stipulation to Consolidate Cases. So open that one up, and it's a three-page document.

A.  Yes, I have it.

Q.  All right.  On page 3 of 3 of that document, there is an electronic signature.  It's a signature that says /S/Aaron Noe. Is that your electronic signature?

A.  Yes, it is.

*Transcript of the Meeting of Creditors of May 15, 2023*          19

Q.   And did you authorize Ms. Guariglia to put that electronic signature there?

A.   I did.

Q.   Okay.  Now take a look at what I call 14I Corp. Ownership Statement, which is probably — well, it's a two-page statement — never mind.  You didn't sign that one.  You can skip over that one.

The next one would be 21I, Amended Schedules, which is a 160-page document.  So let me know when you have that document open.

MS. GUARIGLIA:  Mr. McDonald, this is Norma Guariglia.  Just to verify.  I think 21 is not the amended schedules.  Those are the original schedules.

MR. MCDONALD:  Oh, I call them amended if they're not attached to the petition, so my bad.  I'm sorry.  They're the schedules.

MR. NOE:  I have that in front of me.

BY MR. MCDONALD:

Q.   Okay.  So on page 1 of 160, there's an electronic signature on that page for Aaron Noe.  Is that your electronic signature, Mr. Noe?

A.   Yes, it is.

Q.   Okay.  And did you authorize Ms. Guariglia to put that electronic signature on that page?

A.   Yes, I did.

Exhibit 25, Page 338

*Transcript of the Meeting of Creditors of May 15, 2023*                    20

Q.   Okay.   Then just give me a second while I skip over to the next electronic signature.   Okay.   So, Ms. Guariglia, for this — oh, okay.   So there's no Statement of Financial Affairs.   So the verification is on the first page, very good.

Then the next document, again I call it the Amended Statement of Financial Affairs, just because it wasn't attached to the original.   I guess given the unusual nature of this case, the original petition wasn't filed by the debtor company anyways.   But, Mr. Noe, the next document, for what it's worth, it's called 22I, SOFA.   So please open that one.   That's a 25-page document.

A.   I have it in front of me.

Q.   Okay.   Then if you look at page — if you look at page 17 of 25, there is an electronic signature there for Aaron Noe.   Is that your electronic signature?

A.   Yes, it is.

Q.   All right.   And did you authorize Ms. Guariglia to place that electronic signature there?

A.   I did.

Q.   Okay.   The next document is called 20- — I'm sorry — 31I, Amended List of 20 Largest, and that is a four-page document. Let me know when you have that open.

A.   I do.   I have it in front of me.

Q.   All right.   On page 4 of 4 there is a wet, an ink signature for something, and underneath it says it's Aaron Noe's ink

*Transcript of the Meeting of Creditors of May 15, 2023*                    21

signature.  Is that your ink signature?

A.  Yes, it is.

MR. MCDONALD:  Okay.  And I guess, Ms. Guariglia, I forgot to ask this before, but have you ever met Mr. Noe?

MS. GUARIGLIA:  Yes, I have met him several times.

MR. MCDONALD:  Okay.  And did Mr. Noe show you some type of identification?

MS. GUARIGLIA:  Yes, he did.

MR. MCDONALD:  All right.  What did he show you, a driver's license, passport?

MS. GUARIGLIA:  Driver's license.

MR. MCDONALD:  And was it a valid Nevada State driver's license?

MS. GUARIGLIA:  Yes.  Yes, it is.

MR. MCDONALD:  And did the photo on that driver's license look like the gentleman that was showing you the identification?

MS. GUARIGLIA:  Yes, it did.

MR. MCDONALD:  And does — I guess he's sitting next to you, right?

MS. GUARIGLIA:  That is correct.

MR. MCDONALD:  Okay.  So the guy that says he's Aaron Noe, you've identified his identification in the past and it looks like the same guy, right?

MS. GUARIGLIA:  Yes, indeed.

*Transcript of the Meeting of Creditors of May 15, 2023*                22

MR. MCDONALD:  All right.

MS. GUARIGLIA:  I'm also looking at his driver's license again right now.

MR. MCDONALD:  Oh, very good.  Sorry, it's kind of a strange question but one given the age that we live in that — otherwise, I just look at his driver's license and say on the record I did it.  But since I'm not there, I had to ask it that way.

BY MR. MCDONALD:

Q.  Anyways, Mr. Noe, now that I've established you really are you, please look at Document 33I, Amended Schedules, which is a 40-page document.

A.  Here is the exhibit.

Q.  All right.  I appreciate — I know I sent a lot of documents over and I appreciate that it's a lot of stuff to look through.

MS. GUARIGLIA:  Mr. McDonald, what — what GS number are you looking at?

MR. MCDONALD:  It's in the main case and it's Document 33.

MS. GUARIGLIA:  33, okay.

MR. MCDONALD:  I have it in front of me now.

BY MR. MCDONALD:

Q.  All right.  So, Mr. Noe, that's a 40-page document and on page 2 of 40, there is an ink signature for Aaron Noe, President of El Monte Capital, Incorporated; is that your signature?

*Transcript of the Meeting of Creditors of May 15, 2023*                    23

A.   Yes, it is.

Q.   Okay.  See if there is any other.  Okay.  The next document I would like you to look at is — it's called 39I, Amended Creditor Matrix, and it's a 61-page document.

A.   I have that in front of me.

Q.   Okay.  So, Mr. Noe, on page 1 of 61, there is an electronic signature there for Aaron Noe; is that your electronic signature?

A.   Yes, it is.

Q.   And did you authorize Ms. Guariglia to place that electronic signature on that page?

A.   Yes, I did.

Q.   Okay.  I'm getting close to going through all these, but the next document is called 49I, Periodic Report re Affiliates, and that is is a 42-page document.

A.   I have it in front of me.

Q.   Okay.  And if you look on page 2 of 42, there is an electronic signature there for Aaron M. Noe; is that your electronic signature?

A.   Yes, it is.

Q.   And did you authorize Ms. Guariglia to place that signature on that page?

A.   Yes, I did.

Q.   Okay.  And then the next document is, I called it, 63I, Amended SOFA.  And that is is a 27-page document.  Let me know

*Transcript of the Meeting of Creditors of May 15, 2023*                    24

when you have that one open.

A.   66?

Q.   Yes, sir.

A.   I have it in front of me now.

Q.   Okay.  On page 2 of 27 there is an electronic signature there for Aaron Noe; is that your electronic signature?

A.   Yes, it is.

Q.   Okay.  And did you authorize Ms. Guariglia to place that electronic signature on page 2 of 27?

A.   Yes, I did.

Q.   Okay.  And the next document is 63 — no, I'm sorry.  I already asked you about that one.  The next one is, it's the voluntary petition in the Case 23-50233.  So I called that 01V, Vol. Petition.  And that is 66-page document.  Let me know when you have that document open.

A.   I have that in front of me now.

Q.   Okay.  Look on page 1 of 66 and tell me if the debtor company's name is on that page correctly?

A.   It's listed as Guardian Fund, LLC, and, yes, that is correct.

Q.   Okay.  And then underneath that in item 4 is the debtor's principal place of business, which is 5440 Louie Lane, Suite 106, Reno, Nevada.  Is that the debtor's principal place of business?

A.   It is no longer the debtor's principal place of business.

*Transcript of the Meeting of Creditors of May 15, 2023*          25

Q.   Okay.   And so —

A.   — one of the past filings, it moved.

Q.   So looking at the docket for the main case, which is the one 23-50177, it indicates that the debtor's mailing address is P.O. Box 12935, Reno, Nevada 89510.   Is that the debtor's mailing address?

A.   I believe that to be correct.   I don't know for certain.

Q.   Okay.   Let's see, so looking at the main and consolidated case, that's what's on there.   So why — I mean why aren't you sure that that's the mailing address?

A.   We just changed it, we just moved that — where we were at, it was a building that was owned by the previous managers, so we moved and we just changed that in the last couple days.   So I just don't have that in my memory yet, that —

Q.   Okay, very good.   And is — so that's a P.O. Box.   Is that — is that in like a mailing service where there's a bunch of P.O. Boxes for various entities or is that at a new office?

A.   I believe that's in a U.S. Post Office.

Q.   Oh, okay.   So does the debtor have offices, like physical offices?

A.   Yes.

Q.   And are — but those aren't at 5440 Louie Lane, Suite 106 in Reno, they're not there anymore?

A.   That — that is correct.

Q.   Where — where are they —

*Transcript of the Meeting of Creditors of May 15, 2023*                26

A.   Like I said, — oh, it's at 5905 South Virginia Street, Suite 201, Reno, Nevada 89502.

Q.   Okay.   And — all right.   Let's see what else.   Oh, so back to Document Number 1 in the consolidated case which is 23-50233. So if you go down to page 5 of 66.   Let me know when you're there, Mr. Noe.

A.   I am there.

Q.   Is that — so there's an electronic signature on that page for Aaron Noe, President.   Is that your electronic signature?

A.   Yes, it is.

Q.   And did you authorize Ms. Guariglia to place the electronic signature on that page?

A.   Yes, I did.

Q.   Okay.   If you go to page 10 of 66 for Docket Number 1 filed in the consolidated case, there is a signature on the page entitled Verification of Creditors Matrix, and that electronic signature is for Aaron Noe, President, is that your electronic signature?

A.   It is.

Q.   Okay.   And did you authorize Ms. Guariglia to place that electronic signature on that page?

A.   Yes, I did.

Q.   Okay.   Okay, you can close out of that one.   And, let's see here, if you go to what I called 4V Auth. Sign, which is the Statement Regarding Authority to Sign and File Petition, that

*Transcript of the Meeting of Creditors of May 15, 2023*                    27

was filed as Document Number 4 in the consolidated case 23-50233, it's a one-page document.  Let me know when you have that one open, Mr. Noe.

A.   I have that document in front of me.

Q.   There is an ink signature on that page for Aaron Noe, President of El Monte Capital, Incorporated, Manager.  Is that your ink signature?

A.   Yes, it is.

Q.   Okay.  And then the last document is one entitled 25V, List Equity Security Holders.  And that's the list of Equity Security Holders filed as Document 25 in the consolidated case, 23-50233, and that's a 38-page document.  Let me know when you have that open.

A.   I have it in front of me now.

Q.   Okay.  If you look at page 38 of 38, there is an electronic signature there for Aaron Noe; is that your electronic signature?

A.   Yes, it is.

Q.   Okay.  And did you authorize Ms. Guariglia to place that electronic signature there?

A.   Yes, I did.

Q.   Okay.  So when I talk about the debtor, I'm referring to Guardian Fund, LLC.  And, like I said, I'm not the smartest guy in the world, so if I say you, and you can't tell if I'm talking to you, the guy named Mr. Noe, or I mean you the company to ask

*Transcript of the Meeting of Creditors of May 15, 2023*                    28

me to ask a better question, but my question is:  Does this debtor company, Guardian Fund, LLC, does it require permits or licenses to operate its business, to lawfully operate its business?

A.  Yes, it does.

Q.  What kind of permits and licenses does it need to operate its business?

A.  There — there is a handful.  The Guardian Fund is in the business of renting property and some jurisdictions require you to file with the — with the municipality to get — to get a renter certificate, and any other things along that line.  Most of — most of the things that they have are with the local municipalities giving the authority to rent the properties out.

Q.  And does the debtor company have all of those required licenses or permits to do business legally in the various states where it operates?

A.  To the best of my knowledge, yes.

Q.  Okay.  And is this a Nevada LLC?

A.  Yes, it is.

Q.  Is it in good standing with the Secretary of State of Nevada?

A.  To the best of my knowledge, it is, yes.

Q.  Okay.  Did Ms. Kinne, the accountant for the U.S. Trustee Program, did she give you a Chapter 11 confirmation worksheet at the IDI for your reference, or Ms. Guariglia, did she give it to

Exhibit 25, Page 347

*Transcript of the Meeting of Creditors of May 15, 2023*                29

you?

MS. GUARIGLIA:  I believe so, Mr. McDonald.  The debtor has a lot of documents for the IDI meeting, so if you give us a minute we can look through those real quickly and answer your specific question.  You said the plan confirmation worksheet?

MR. MCDONALD:  Yes, ma'am.

MS. GUARIGLIA:  Yes, she did.  Would you like us to — does Mr. Noe need to refer to the —

MR. MCDONALD:  No, no, no.  I just wondered if you got it and if you folks had any questions about it.  If you — if —

MR. NOE:  I don't —

MR. MCDONALD:  — if you have any questions, please talk to us.  Reach out to me or Ms. Kinne, and we'll explain what it is you're asking about.  And I say me or Ms. Kinne, but I really mean Ms. Kinne.  If you ask me, I'll ask Ms. Kinne too, so she's — she's probably the one that's better situated to answer the questions about that.  But, anyways, I just wanted to make sure you got it.

BY MR. MCDONALD:

Q.  And, let's see here, oh, so I asked you to look at various documents that were filed in the lead case, which is 23-50177, or the consolidated case which is 23-50233, and directed your attention to various places where you, Mr. Noe, signed or esigned various documents.  And the reason I ask you is because

*Transcript of the Meeting of Creditors of May 15, 2023*                30

most of those places, at least with regard to the petition and schedules, the places you signed, you're asserting that before those documents were signed that you looked them over to see if they looked accurate and complete.  So I know we looked at a bunch of documents, but as far as you know, did you look over all of those documents before they were filed?

A.  Yes.

Q.  And based — and, again, you don't have to have super powers, so I'm just asking for your best knowledge and belief, but based on what you knew at the time that you looked at those various documents, as far as you knew at the time were they accurate and complete?

A.  Yes, they were.  We have made some — filed some amendments when we found something was — we got new information.

Q.  All right, very good.  And I believe that even though I called everything amended, everything, I actually did ask you about the amendments to the original versions of the petition and Statement of Financial Affairs as far as I know, unless you filed some very, very recently.  So I understand what you're saying.

As you sit here today, do you know of any other changes that you think should be made to the petition, to the schedules, or to the Statement of Financial Affairs to make them completely accurate and complete from an informational standpoint as far as you know today?

*Transcript of the Meeting of Creditors of May 15, 2023*                    31

A.   As far as I know today, I — let me put it this way, it is — we haven't filed — the reason we haven't filed the 2022 tax return is because we're going back and looking in a lot of the different transactions and so forth that occurred during 2022, which could affect some of the statements once we go through and do that reconciliation.

Q.   Okay.

A.   And even the — the — we haven't closed out the first quarter of 2023, so those numbers will most probably change, maybe not significantly, but they will change to some extent as we — as we close out the 2022 calendar year and close out the first quarter of 2023.

Q.   I understand.  But that — when you say the numbers may change, do you mean claim amounts or valuations, what numbers do you have in mind?

A.   It's really on the — the Statement of Financial Affairs. It's revenue and things to that extent that might change out. And we're learning more about the condition of the assets that Guardian holds.  As we learn more about the condition of assets, the value or the amount that we need to get those back and a rentable standard might change as we learn more information as well.

Q.   Okay.  And how long do you think it will be until you're done working through that process.  I understand that the extension to file the 2022 tax return is some time, I guess, in

Exhibit 25, Page 350

*Transcript of the Meeting of Creditors of May 15, 2023*        32

the late fall of this year, but when do you think that you'll have the numbers penned down such that you can figure out if any amendments need to be made to the schedules or to the Statement of Financial Affairs?

A.   That is a good question.  The first quarter in 2023 numbers, we're closing out April, we'll have April closed out by the 20th of May, which at that point we should close the first quarter numbers.  So in — in the revenue section of the Statement of Financial Affairs for 2023, we should have that closed out within a couple weeks.

Regarding the final 2022 tax return, I would say that's going to be much prior to the — the October deadline.  I would hope to get those closed out by the end of July.

Q.   Okay.  And when you said closed out, that triggered my limited memory.  I have — so have you — has the debtor company closed out its prebankruptcy bank accounts and opened what are called debtor-in-possession bank accounts?

A.   It did.  We opened a debtor-in-possession bank account with Heritage Bank.  The two accounts that were open at Umpqua are still open, but we're not utilizing them.

Q.   Okay.  And are you going to leave them open or are you going to close them down once you're sure that people have switched over to the debtor-in-possession account?

A.   I believe that we — we're going to close them down.  There was just a lot of (indecipherable) that were kind of set up to

*Transcript of the Meeting of Creditors of May 15, 2023*                33

either come in or go out.  They have some nonperforming loans that we have to get reunderwritten for the new bank account before they would move money into that.  That's really kind of a holdup right now.

Q.   Okay.  And when do you think that process will be complete?

A.   I hope that in the next two weeks.

Q.   Okay.  All right.  And, again, I have to warn you, Jared Day is the really smart guy that works on this case, but unfortunately he's out of the state right now.  So when you explain this to me, feel free to use small words, but my question is why did — why is this company in bankruptcy?  So what happened?

A.   I'll do my best.  The Guardian Fund as it was set up was designed to buy residential income-producing real estate and also to hold first trust deeds.  They also started doing master leases.  The process was the entity that was owned by the prior manager, Hughes Private Capital, would buy assets, sell that to the Guardian Fund.  And then the Guardian Fund would sell them to individuals and do a lease back on those properties.  The lease was not fair and equitable to the Guardian Fund, and for a number of reasons.  It was a full triple-net lease, where the Guardian Fund was responsible for all capital improvements, all expenditures, and they paid the fixed rent that could be adjusted a couple times a year.  And the properties themselves were not generating enough to cover the fixed rent and to cover

Exhibit 25, Page 352

*Transcript of the Meeting of Creditors of May 15, 2023*                    34

all the costs associated with maintaining the properties.  And they were losing significant amounts of money on that.

And that's why I would go back to saying that the — the income that was stated on the Statement of Financial Affairs for 2022 was most probably overstated, the revenue was probably overstated because it was accounting for — it was — excuse me — it was not accounting for the bad debt expense from some of the tenants.  And it was not accounting for the fact — the entity that Hughes Capital would borrow money from the Guardian Fund to buy these properties that it sold back to them.  And it was not servicing the debt, it was just accruing the debt.  And between those two, it significantly impacted the revenue.  And the Guardian Fund itself was losing money on those (indecipherable).  That was the predominant reason that put Guardian Fund into bankruptcy.

Q.  Okay.  So, just to bring it down to my level which is pretty low, so this is a — it's sort of a real estate investment company that owns rental properties that people can buy — and people can buy shares in the company or they can buy a property from the debtor company and then lease.  And then the company leases back the property from them and pays them a dividend, is that what this thing does?

A.  That is correct.  But it's a fixed rent, not a dividend because it wasn't driven by what the properties produced.  It was — it was by what was — what was called as the individual

*Transcript of the Meeting of Creditors of May 15, 2023*                    35

investors of the proper properties.

Q.   Okay.  And, let's see, the properties are in a number of states, I think Ohio, Missouri, Alabama, Illinois, Indiana, Kansas, Kentucky, Mississippi, Nevada, North Dakota, and Tennessee; is that right?

A.   I believe that is the entire list.

Q.   Okay.  And does this company have to file periodic reports with the Securities and Exchange Commission?

A.   I don't know the answer to that.

Q.   Well, can —

A.   Are — the investors that are in the fund are (indecipherable) investors and that the — it's stated that it isn't responsible for regulatory filings.  Whether that is accurate or not, I do not know at this juncture.

Q.   Well, I guess that's a request on my part, is can you find out if the debtor is exempt from filing periodic reports required by the 1933 or 1934 Acts under the Securities and Exchange Commission, the —

A.   We will.  We have been — I have been advised by the law firm that put all the documents together —

Q.   Again don't tell me —

A.   — that they're —

Q.   Don't reveal any privileged information.  I'm not asking you to reveal privileged information.

A.   Fair enough.

*Transcript of the Meeting of Creditors of May 15, 2023*                    36

Q.   But I guess the question is I'm asking if it's your understanding as to whether the debtor's required to file periodic reports and I guess the answer is at this time it is you're still trying to figure that out, but maybe not.

When you say accredited investors, what does that mean to you?

A.   There is a carveout that if somebody makes a certain amount of income or has a certain amount of net wealth, that they are accredited and that the — that it keeps the funds itself from having to file req- — filing requirements with the SEC.

Q.   Okay.

A.   And we — the prior manager, Hughes Private Capital, did use a third-party accreditation service to verify people's accreditation.

Q.   Okay.  And so you said Hughes Private Capital, right?

A.   That's correct.

Q.   Hughes Private Capital, Incorporated, is that the company you're talking about?

A.   That's correct.

Q.   And is that the —

A.   That is correct.

Q.   Is that the company that was the manager before El Monte, your company El Monte — what's the name of your company, El Monte what?

A.   El Monte Capital.

Exhibit 25, Page 355

*Transcript of the Meeting of Creditors of May 15, 2023*     37

Q.   Oh.

A.   Yes, that is correct.

Q.   Okay.   And do you — did you see that Hughes Private Capital, Incorporated filed Chapter 7 bankruptcy on Friday, May 12th?

A.   I — I didn't see where they filed.   It was my understanding that they filed, I thought they had filed today, but I did see that they did have — they did file.

Q.   Okay.   That's —

A.   It's my understanding that they filed.   I did not see the filing, so.

Q.   And without — without revealing privileged information, how is it you knew that they were going to file?   I mean if you can tell me without revealing what your attorneys discussed with you.

A.   It wasn't something the attorney discussed with me.   I had to close out some bank accounts and I saw Steve Sixberry, which is one of the members today.

Q.   Oh, okay.   Just FYI, let's see, when did these guys file, it's Case Number 23-50322, also before Judge Cox, who is the judge in this case.   And they filed on, let's see, when did they file, it was Friday, the 12th, at — Friday, the 12th, at about 4:30 in the afternoon Pacific Time.   So last Friday afternoon, at about 4:30.   Anyways, and the number again is 23-50322-nmc for that Chapter 7 case.

And Mr. Christopher P. Burke is the Chapter 7 Trustee

*Transcript of the Meeting of Creditors of May 15, 2023*                38

in that case.  His phone number is 775-333-9345.

Okay.  So you — you described what the debtor did in general terms.  I'll have more questions about that.  But we were talking about Hughes Private Capital.  You said that that was the original manager of the company, right?

A.  Of the Guardian Fund, that's correct.

Q.  Right.  I'm sorry.  You're right, of the Guardian Fund, the debtor company in this case.  And who is the — who runs Hughes Private Capital, Incorporated, if you know?

A.  Greg Hughes, Steve Sixberry, and Kyle Krch.

Q.  Okay.  And so I noticed on the schedules that there's a number of, I guess, affiliates and subsidiaries of the debtor company.  Hughes Private Capital, Incorporated is one of them.  Do you understand the corporate structure of this debtor, who owns it and what it owns and how various affiliates are related to it.  Do you have a general understanding of that structure?

A.  I do.

Q.  Okay.  So — so who — who owns the debtor company, if you know?

A.  It's a list of the managing — or, excuse me.  It's a list of the members that we filed.  I before that was on the list of equity security holders.

Q.  Okay.  So it's — let's see, 38 pages, so it's about, I don't know, several hundred people, right?

A.  That's correct.

*Transcript of the Meeting of Creditors of May 15, 2023*                39

Q.   Most of them are nonvoting persons.  And, let's see here, I guess they're all — let's see, so is El Monte Capital the only voting member of — of the debtor?

A.   That is correct.  The — the private placement memorandum and the operating agreement did not give the other members any voting rights, it was only the managing member.

Q.   Okay.  And when you say the private placement memorandum, what is that document?

A.   It is the document that was given to all the equity investors and I believe all the secured investors, the individuals who owned properties that were sold by the Guardian Fund and held the master lease agreement, describing what the fund did and how the fund operated and all the rules and disclosures of the fund.

Q.   Okay.  And you said that Hughes Private Capital used to be the manager.  How is it that El Monte Capital is now the voting member?  Was the — was that private placement memorandum or the operating agreement amended at some point?

A.   That is correct.

Q.   And when was it amended —

A.   It's an amendment to — oh, go ahead.

Q.   No, just I — I just asked when it was amended.

A.   April 11th.

Q.   So that was — so just to circle back, there was an involuntary case that was filed that started the 23-50177 case.

*Transcript of the Meeting of Creditors of May 15, 2023*                 40

That was filed March 17th.  And then the voluntary case, that was Case 23-50233, was filed on March — I'm sorry — April 11th of 2023.  So that would have been the same date that the debtor company filed its voluntary Chapter 11, right?

A.   That is correct.

Q.   And why was the operating agreement amended on that date to put El Monte Capital as the sole-voting, managing member of the debtor?

A.   The group that filed the involuntary bankruptcy as well as other members, nonvoting members no longer had faith in Hughes Private Capital.  And Hughes Private Capital elected to step down.  And I had worked for Hughes Private Capital in the past and understood the business and that — therefore, I should be assigned to step in as manager and, you know, file the bankruptcy and the consolidation.

Q.   So you said you took the assignment.  Did someone ask you to take that assignment or did you volunteer to do it?  How did it happen that your company took over the management of the debtor company?

A.   I would meet the members while I was still working for Hughes Private Capital and had several conversations with them as well as the — the debt — I didn't want to speak on their behalf, but the communications were several of the investors had confidence in my ability and the things that I did in the short time that I was at — with Hughes Private Capital and were

Exhibit 25, Page 359

*Transcript of the Meeting of Creditors of May 15, 2023*                41

interested in me taking that role.  And I took the role, I volunteered to take that role.

Q.  Okay.

A.  I don't know if that answers your question exactly.  If you could be more specific, I could probably be — I can answer the question better.

Q.  Okay.  Well, was Greg Hughes one of the people that asked you to take over — that asked El Monte Capital to take over?

A.  Yeah.  They were willing to give — they were willing to sign the amendment.  They did not ask me to take over.

Q.  What about Steven Sixberry, was he one of the people that asked El Monte Capital to take over?

A.  No, he wasn't.  He — he agreed to assignment the amendment of —

Q.  Okay.  And what about Kyle Krch, did he ask El Monte Capital to take over?

A.  He did not, but he was — he agreed to sign the amendment.

Q.  Okay.  Did people that — I guess the people you said that asked, they were the petitioning — were they the petitioning creditors that filed the involuntary Chapter 7 case?

A.  That was some of them.  I talked to several of the investors once we shut the — once the fund was shut down.  I spent about two months and most of December and January talking with the individual investors.  None specifically said — asked me to take over.  A lot did ask for me to stay involved because they were —

*Transcript of the Meeting of Creditors of May 15, 2023*                42

they felt that we had made more progress on getting it done, the fund back to a financially-stable position. And that's — that's when I was willing to take over.

I also met both of Ms. Guariglia and Mr. Harris while I was still working with — or working for, I should say, Hughes Private Capital.

Q.   Okay.

A.   I was never an officer or the director or having signing authority or anything with respect to Hughes Private Capital or any of their affiliates.

Q.   Okay. And you said the fund was shut down. So is this debtor company not operational right now?

A.   I apologize. When I say shut down, I meant gated. In the beginning of December, Hughes Private Capital, the prior manager, gated the fund, meaning that people — they would no longer take money in or let money out with regards to equity redemption.

Q.   Okay. And then —

A.   With that being said, I think there was one or two equity redemptions that were given out —

Q.   Okay.

A.   — after that point.

Q.   And you said you used to work for you, the fellow named Mr. Noe used to work for Hughes Private Capital; that's correct?

A.   That is correct.

*Transcript of the Meeting of Creditors of May 15, 2023*                    43

Q.  And when did you start — when did you, the gentleman named Mr. Noe, start working for Hughes Private Capital?

A.  It was on or about May 15th of 2022.

Q.  Okay.  And what was your job at Hughes Private Capital?

A.  I was brought on, my title was CEO, but, like I said, I was never an officer and I did not have signing authority.  I wasn't an officer or director of Hughes Private Capital or any of the entities.  They brought me on because they knew that they had some operational challenges and to — to help guide them and try to find out really what was going on with the fund as well as some of the other business ventures that they had.

Q.  But you were — so you were CEO, but you weren't an officer, that's what you're saying?

A.  That's correct.

Q.  So were you like — were you like a turnaround guy, or what was your actual job more like?

A.  It was — it was more operational.  They were — they had several operational issues, from lack of financial controls, lack of other type of controls with regards to the acquisition, the property management.  They needed to get — or try to get to a GAAP level of accounting.  And my background is mostly operational and I had worked for a publicly-traded real estate investment trust in the single-family space for quite some time. And that was really what I was tasked with, was trying to turn around the fund.

Exhibit 25, Page 362

*Transcript of the Meeting of Creditors of May 15, 2023*                44

Q.  Okay.  And is El Monte — is El Monte Capital a company that was created to help you do that with respect to Hughes Private Capital or the debtor company, or was that — is that just your company in general?

A.  No.  It was for — I believe back in February, when I left, I left Hughes Private Capital end of January, beginning of February, and there was conversations for me to take over as the manager, but there was a lot of liability outside of bankruptcy that I was not necessarily interested in doing.  I was interested in helping, but I wasn't interested in taking over with that amount of liability.  But the company was formed, to answer your question, for this purpose.

Q.  Okay.  And that you made mention of the conversations back in February, are those the same conversations we were discussing earlier with people that were asking you to step in as the manager of the debtor company?

A.  That is correct.

Q.  Okay.  And so you said you left — you left Hughes Private Capital, Incorporated in January of 2023; is that — did I get that right?

A.  It was on or about the end of January, beginning of February, I don't recall the exact date.

Q.  Okay.  And why did you leave Hughes Private Capital, Incorporated in January of — or February of 2023?

A.  Yeah.  There was a layer of events that occurred.  Over the

*Transcript of the Meeting of Creditors of May 15, 2023*          45

time period that I was at Hughes Private Capital, I was very optimistic at first that we could turn the — turn the organization around, but several — several things kept unfolding as I learned more and more, to the point that by, you know, middle out end of October, realized that we really wouldn't be able to turn it around. I met with the partners. They agreed that they would shut the fund down, meaning that they would take more money in or sell no more property, which was kind of a slow process of getting shut down. I stayed on even after that in December and January to talk to as many investors as we could and give them as much guidance as we could. There was really nothing left that I could do to help the investors, and so there was nothing — there was nothing that I could do to help.

Q. Okay. And you mentioned the partners that you had discussions with in November of 2022, who were you talking about when you say the partners?

A. Yeah, I apologize. The partners meaning Kyle Krch, Steve Sixberry, and Greg Hughes, the owners of — or the officers of Hughes Private Capital.

Q. Okay. So when you came on as CEO of Hughes Private Capital to help manage the debtor company in May of 2022, you said that there was some issues with accounting and operations that you were brought in to help address; can you give me more detail on what problems the debtor company was having from an operations or accounting standpoint in May of 2022?

Exhibit 25, Page 364

*Transcript of the Meeting of Creditors of May 15, 2023*          46

A.    Sure.    On the accounting side, had very little say in the financial records that were being produced.    There was a lot of things that I saw that didn't look accurate.    I mean I spent a lot of time looking at — looking at financial records and — on property performance records for a prior company that I worked for that was substantially larger, and some of the things didn't make sense to me.    And the accounting team that was in place couldn't explain those to me.

We brought in a new CFO shortly after I started, Andrew Palmer, to start cleaning that up.    We started hiring some additional accountants, and things like that.    There was a lot of things that weren't documented.

Some of the — moving in on property-management software, which is Propertyware, there were a lot of problems.    It looked like at first that there was — we just had a really bad collections issue, but as we dug through it, a lot of the properties had been vacant for months and we had to get the tenants moved out, bill out, and inspect the properties, and take — and see what condition they were in.

Additionally, I spent some time in the local markets looking at the actual assets that we owned and seeing what kind of condition that they were in, and I realized things like — that some of the vendors weren't performing the work that they said they were.    And we didn't have a strong PO system, so there was cash leaks going out with regards to the construction.    We

Exhibit 25, Page 365

*Transcript of the Meeting of Creditors of May 15, 2023*                    47

weren't collecting money in some cases where we were supposed to. We weren't moving our tenants out in a timely fashion when we were supposed to. And then we weren't getting the properties back online when we — when we were supposed to. Then we found out later on that we were overstating our revenue, we weren't properly handling how we managed the bad debt expense from our tenants, so we were overstating our rent for several months. So those are just some of the high-level kind of issues.

Q. And so when you took over as CEO in May of 2022, who did you take over from? I mean who was the CEO before you?

A. Greg Hughes was.

Q. Okay.

A. Greg Hughes was the CEO.

Q. Okay. And then who was the CFO before Mr. Palmer took over as CFO?

A. I don't know because there was no CFO in place when I started.

Q. Oh, okay. So he didn't take over from anybody, there just wasn't one, that's what you're saying?

A. That's right. There was a controller in place, but there was no — there was no CFO.

Q. What's the controller's name?

A. I can't — I can't recall.

Q. Can you find out for the — so when we ask you next time, you will be able to answer that question?

*Transcript of the Meeting of Creditors of May 15, 2023*                     48

MS. GUARIGLIA:  Mr. McDonald, this is Norma Guariglia, just to clarify one thing, and you can clarify with Mr. Noe.  I believe when he's talking about Greg Hughes being the CEO, he's referring to Hughes Private Capital.

MR. MCDONALD:  Oh, okay.  Yeah, my — I'm —

MS. GUARIGLIA:  So we're clear that it's not — yeah, he's speaking of Hughes Private Capital and not the debtor.

MR. MCDONALD:  Okay.

MR. NOE:  That is correct.

BY MR. MCDONALD:

Q.  And the controller would be the controller of Hughes Private Capital as well?

A.  That — that is correct.  The Guardian Fund was managed by Hughes Private Capital and the Guardian Fund does not have any employees.

Q.  Okay.  And — but I guess Mr. Hughes, Greg Hughes as the CEO of Hughes Private Capital, would he have been the fellow before you that would have gone and checked on the habitability of the properties and dealt with getting tenants in or getting tenants out of properties and working with other entities to fix the property so that they could be rented to other renters?

A.  From my experience, Mr. Hughes had very little day-to-day involvement except on the sales side.

Q.  Okay.  So who would be the person —

A.  That's your investor relation side.

Exhibit 25, Page 367

*Transcript of the Meeting of Creditors of May 15, 2023*                49

Q.   Oh, fair enough.  But it sounds like you were doing that when you took over as the CEO of Hughes Private Capital; is that right?

A.   That is correct.

Q.   So who — who — do you know who the person was who was doing that, if at all, for Hughes Private Capital before you took over as CEO?

A.   It was very fragmented.  There — they had a president, Roxanne Spring was the president for some time.  And then they had quite a bit of different managers for different functions.

Q.   And do you know if those people reported to Greg Hughes or —

A.   I don't know who they reported to.  Most of the managers, I think there was something like 32 people that reported to Roxanne Springs when I started.

Q.   Okay.  And I guess — let's see here, we've been talking about various companies, but Hughes Private Capital was the manager of the company until your company, El Monte Capital, took over at the end of January or the beginning of February of 2023, right?

A.   Until April 11th of 2023, the Hughes Private Capital was the manager of the Guardian Fund.

Q.   I'm sorry.  So you said you got out of Hughes Private Capital at the end of January or the beginning of February, and then El Monte took over on April 11th of 2023, right?

A.   That is correct.

*Transcript of the Meeting of Creditors of May 15, 2023*                50

Q.   Okay.   And then do you know who managed Hughes Private Capital between the end of January and the beginning of — and/or the beginning of February and April 11th of 2023, when you took over under El Monte Capital?

A.   The — the officers of Hughes Private Capital never changed, even when I was there, it was Greg Hughes, Steve Sixberry, and Kyle Krch.   So those — those three individuals stayed on as the managers when I was there and it didn't change when I left.

Q.   And what were their titles?

A.   I don't know.   I know listed on the website Steve Sixberry was the chief operating officer and Greg Hughes was the CEO prior to me joining.   I don't know if they unofficially changed their titles.   They didn't give — I don't know that.

Q.   Okay.   But were they the ones that you said — when you were with Hughes Private Capital as a CEO, you didn't have the power to make decisions on behalf of Hughes Capital, Incorporated, right?

A.   I was not an officer.

Q.   And so the people that —

A.   I was not an officer, I was not a signer on the bank accounts.

Q.   Okay.   And — but the people that were were Greg Hughes, Steven Sixberry, and Kyle Krch; is that right?

A.   That is correct.

Q.   Anybody else that had the ability to make decisions on

*Transcript of the Meeting of Creditors of May 15, 2023*          51

behalf of the debtor or to — had control of the bank accounts besides those three gentlemen that you know of?

A.   I don't know.  There might be — and I don't know what the — there might have been some resolution that allowed individuals to sign on behalf of Guardian for selling properties.  And I believe actually Rachel — or, excuse me — Roxanne Springs had the authority to sign on behalf, so there was a corporate resolution that allowed her to sign on behalf of for properties that Guardian sold.  I'm not positive on that.

Q.   Okay.  And I guess we've been talking about Hughes Private Capital, but there are actually two entities called Hughes Private Capital, right?  There was an LLC that was incorporated about 14 years ago.  And then Hughes Private Capital, Incorporated was incorporated in March of this year; is that — is that accurate to say?

A.   I believe they're one and the same.  I believe they still maintain the same TIN number, that they just changed the entity election from being an LLC to being a corporation at that juncture, that it's the same — same —

Q.   Basic company?

A.   Yes.  I believe that's the terms —

Q.   Why — do you have an understanding of why Hughes Private Capital went from being an LLC to being a corporation in mid March of 2023?

A.   I do not.

Exhibit 25, Page 370

*Transcript of the Meeting of Creditors of May 15, 2023*                52

Q.   And what about, have you heard of a company call Hughberry Homes LLC?

A.   I have.

Q.   Are you still there?

A.   Yes.  I have.  I apologize.

Q.   Did — and what is your understanding of what Hughberry Homes, LLC did in connection with the debtor company?

A.   Nothing that I know of.  It was a separate fund that Hughes Private Capital managed.

Q.   Okay.  What about Krch Realty, LLC, have you ever heard of that company?

A.   I have.

Q.   What is your understanding of what Krch Realty does with regard to the debtor company?

A.   A couple things.  Krch Realty was the property manager for the properties that the Guardian Fund held.  They also had employees that did the acquisitions for a company called 12 Bridges, which was an entity that was owned by Hughes Private Capital that bought properties, renovated them to sell them to the Guardian Fund.  Their employees purchased those properties, oversaw the renovations, and the sales transactions.  They also had individual 1099 agents that worked for them that had nothing to do with the Guardian Fund.

Q.   So Krch Realty was the property manager and 12 Bridges, Incorporated bought the properties that were managed by — bought

*Transcript of the Meeting of Creditors of May 15, 2023*          53

the properties and rehabbed and sold them to the debtor company, and then the properties were managed by Krch Realty; is that what you said?

A.   That is correct.

Q.   Okay.  So would Krch Realty be the entity that would be the one to go out and see if — what condition the properties were in after they were purchased and ensure that the tenants were, I guess, paying rent and making sure they were still there or removing them if they were not paying rent, or things like that; is that what Krch Realty did?

A.   That — that is correct.  They were responsible for getting tenants, getting tenants to pay, doing the maintenance, paying the utilities, ensuring the security of the properties.

Q.   And do you know if that — do you know who owns Krch Realty, LLC?

A.   Hughes Private Capital.

Q.   Was it run by Greg Hughes, Steve Sixberry, Kyle Krch, and a guy named Christopher Capurro?

A.   I believe Chris Capurro was the broker of record for the Nevada brokerage.

Q.   Okay.  And when you — when you, the gentleman named Mr. Noe, took over Hughes Private Capital, Incorporated in May of 2022, did you tell the people running this debtor company that it didn't look like, I guess, some of the things Krch Realty was supposed to do, namely, managed the underlying properties, or

*Transcript of the Meeting of Creditors of May 15, 2023*                    54

that it was doing those things?

MS. GUARIGLIA:  Mr. McDonald, this is Norma Guariglia. You stated at the beginning that when Mr. Noe took over Hughes Private Capital, I just want to clarify that he has not testified that he took over Hughes Private Capital.

MR. MCDONALD:  Oh, I'm sorry.  I'm sorry.  You're right.

MS. GUARIGLIA:  I'm not sure if you intended to say that.

MR. MCDONALD:  Well, I — sometimes I say things — a lot of times I ask questions that aren't the greatest questions, so I appreciate you pointing out that that's not the —

MS. GUARIGLIA:  Yeah.  So he worked as the CE- —

MR. MCDONALD:  Right.

MS. GUARIGLIA:  — as the CEO for Hughes Private Capital.  But —

MR. MCDONALD:  So —

MS. GUARIGLIA:  — he never became — yes, he —

BY MR. MCDONALD:

Q.  So when he became CEO of Hughes Private Capital in May of 2022, and I think you said that you were supposed to look at operational and accounting challenges that Hughes Private Capital with respect to the Guardian Fund was experiencing, and you said you saw that the operational challenges included not ensuring that the properties were habitable, were occupied, or

*Transcript of the Meeting of Creditors of May 15, 2023*                    55

that nonpaying tenants were being removed and replaced by paying tenants, and things of that nature, is that what you said?

A.   In loose terms, yes.

Q.   Okay.   And did — did you tell the officers of Hughes Private Capital that those operational challenges were — were being experienced by Guardian — by Hughes Private Capital and Guardian Fund, and could you point out that maybe Krch Realty was the entity that was supposed to be doing — providing those services?

A.   Yes.

Q.   Okay.   And —

A.   We made — we made several staffing changes to address it. We brought in — I brought in — probably we're a consultant to clean up our software system so we had better visibility into that.   I initiated a stop — stopping buying in 12 Bridges and buying a different asset class than they had in the past.   We reduced the holding substantially of what 12 Bridges, which is the company that was buying the properties that ultimately sold them to the Guardian Fund.   So we took several — we had several initiatives to take corrective actions for the problems, as we — as we saw them —

Q.   Well, —

A.   — and still had, yeah — yeah.

Q.   But you said Krch Realty was the entity that was meaning the property — the properties.   Was there any discussion of bringing in a property-management company that was more effective than

Exhibit 25, Page 374

*Transcript of the Meeting of Creditors of May 15, 2023*                    56

Krch Realty, LLC?

A.  That was one of the options was to look for a different third-party property manager.  The other was to rebuild Krch with people that they could actually perform the functions and had a lot more experience.  And we took — I thought I had quite a bit of experience trying to manage third-party property managers.  It's very difficult to align interests with third-party property managers.  And also it's really difficult for a third-party property manager to scale up if they don't know the assets.  I believed it was in the best interest of Guardian to bring in the people as — as employees of Krch Realty that could actually do the job much better than a third party would, so.

Q.  And did you — did you see an improvement in the management of the properties through the restaffed Krch Realty, LLC?

A.  We did.  There was some — there were some challenges because there were so many folks and so many tenants in the property that weren't paying and that no evictions had been initiated.  So if you look at the financial performance, the financial performance actually went down for a month or two as we evicted quite a few of those folks out of the property that hadn't been paying, some for more than six months.

Q.  And then 12 Bridges is the entity that would buy the underlying properties and would initially fix them up to be habitable; is that what you said?

A.  That's correct.

Exhibit 25, Page 375

*Transcript of the Meeting of Creditors of May 15, 2023*          57

Q.   12 bridges did — was just a single entity disregarded and did not have any employees, so between the employees that were in Hughes Private Capital and the employees that were in Krch Realty, they did all the work, the acquisitions, oversight work, the construction oversight work, those type of things.

Q.   Okay.  And —

A.   For the 12 Bridges entity.

Q.   And 12 Bridges, Incorporated, was that — the officers of 12 Bridges, Incorporated, were they also Greg Hughes, Steven Sixberry, and Kyle Krch?

A.   That — that is correct.

Q.   Okay.  And so based on — you said that when you came in as the CEO of Hughes Private Capital, Incorporated, you saw various operational issues that the properties weren't habitable, they didn't have — many of them didn't have tenants or tenants that were paying.  And I guess in layman's terms, why — why wasn't Krch Realty or 12 Bridges, Incorporated able to ensure that the properties were habitable or that they had people in there paying rent or that the people that weren't paying rent that were in there were being evicted?

A.   This is — this is just my opinion.  There was — the company scaled — the company meaning Hughes Private Capital and its affiliated entities, being Krch Realty and 12 Bridges, scaled very quickly without having the operational and financial controls in place.  For example, they didn't have a purchase

*Transcript of the Meeting of Creditors of May 15, 2023*                    58

order system in place for the construction and renovation.  So the individual could create financial obligation — an individual meaning a superintendent out in the field in a local market could engage a third-party vendor, acknowledge that the work was done and facilitate payment for them.  Being able to control all three of those aspects opens up a lot of opportunity for fraud and misconduct.  So those type of — those type of operational controls that need to be in place to make sure that things run smoothly and that you're not taken advantage of by your employees or your vendors just weren't in place.

The other — the other thing where there's not a lot of financial controls in place, most of the employees had credit cards that were company credit cards.  So there was no controls over expenditures.

There was no strong controls over ensuring that the properties that were purchased were in the condition or the type of properties that you wanted to purchase.  They — there were policies in place, but people weren't following the policies and nobody was holding them accountable for that standard.

Q.  And so when you came in as CEO of Hughes Private Capital, did you see fraud and mismanagement taking place in the management of the debtor company and its — the properties it held?

A.  I would say I definitely saw mismanagement on the side of property management.  There's a lot of things that you would

*Transcript of the Meeting of Creditors of May 15, 2023*                59

just normally do as a property manager that weren't happening, such as renewing leases, such as pushing evictions forward, such as getting out to do a move-out inspection as soon as somebody vacated securing the premises. So there was a lot of things happening like that that should have been happening on behalf of the property that the debtor either owned or was the lessee on.

There was potential for fraud. When I went out to the properties and walked a property that supposed had construction done on them, yet when I walked the property I did not see all the aspects that we paid for and that were done. So I suspected that some employees may not have been acting in the best interest of the entity when I walked it.

And we let quite a few people go. We laid quite a few people — excuse me — we fired quite a few people on the construction side of the house that worked for Krch.

Q. And then so Krch Realty either acting through 12 Bridges or as Krch Realty, Krch Realty was in charge of rehabbing the properties, I think is what you said. Did they — did they do that work directly or did they use third-party companies, or how did that work?

A. There were third-party vendors that they used to do — that performed the physical work on the properties. There were individuals with Krch that were responsible for overseeing and making sure that the work got done and still doing the work that needed to be done. But there was no proper segregation of

*Transcript of the Meeting of Creditors of May 15, 2023*          60

responsibilities on those.  For example, somebody that was creating a liability shouldn't be able to prove that liability as well, and then they shouldn't be able to receive that liability to make sure that the — to release payment to the vendor.  And they had one — one role that was doing all three of those.

Q.  Okay.  I guess that role that you're speaking of, who had that role, if you know?

A.  It was the project superintendents.  I — I can't recall exactly what their title was, there were quite a few different titles of folks in the field —

Q.  But —

A.  — when I started.

Q.  Was that more than one person or a bunch of people?

A.  Yes.

Q.  Okay.

A.  Yes.  That was — that is individual superintendents and the field folks.  There was people that were physically located in each one of the markets — well, not each one of the markets.  They owned property and they were located in Toledo, they were located in Cleveland, they were located in St. Louis, and located in Birmingham.

Q.  And you — but you — when you came on as CEO of Hughes Private Capital, you expressed — you told the officers of that company about the mismanagement you saw, did you do that?

*Transcript of the Meeting of Creditors of May 15, 2023*                  61

A.   Yes.

Q.   And when did you tell them that, what period of time?

A.   It was — it was during the period and there were several layers, because I couldn't look at everything at once.  So it was — it was layers starting probably mid June, I had a reasonable feel of some of the things that were breaking down, which was really kind of a first step, was the property that we were — they were acquiring in 12 Bridges, when I saw some of the properties that they were acquiring and didn't understand why we kept buying properties when I believe at the time we had over 400 properties that were owned by 12 Bridges, that was one of the first things, is we changed with we were buying.  And that was the first thing that was brought to their attention.

        The next thing I brought to their attention I think was the construction side, that we didn't have a PO system in place and it was — it was allowing us to be taken advantage of by our vendors.

        We started engaging the consultant to get a third-party property — excuse me — a third-party construction software call Buildertrend.  Then we also — I also brought to their attention that there's a lot of things in the Krch Realty property management that were being mismanaged.  And we brought in a consultant from Propertyware, which is the software company, to review the way the software was configured because was it configured accurately, so it was very difficult to see

Exhibit 25, Page 380

*Transcript of the Meeting of Creditors of May 15, 2023*                    62

what was really going on with the properties.

And then brought up my concerns of the individual that was running property management, brought in a consultant in, I believe, it was the beginning of July, on or about the beginning of July to kind of take a look at and have a deeper dive.  And that individual, Adrian Maravilla, ended up coming in and taking over to run property management.  I believe it was somewhere on or about August or September; and let the majority of the staff go during that period of time that was working in property management.

Q.  Okay.  And do you know if the debtor company Guardian Fund was still marketing the business to potential investors all during this period of time?

A.  Investors did come in to the Guardian Fund.  I believe it was December that they were stopped, but I'm not sure.  But it wasn't by — the Guardian Fund itself did not market its — the fund.  It was a marketing for the fund with someone at Hughes Private Capital.

Q.  Okay, fair enough.  And you said that that was — was that Greg Hughes that did most of the marketing; is that what you said previously?

A.  That is correct.

Q.  And do you know if he — how did he — I guess in — did he issue reports or send out information about the fund to investors or potential investors during the period where you

Exhibit 25, Page 381

*Transcript of the Meeting of Creditors of May 15, 2023*                    63

were the Hughes Private Capital CEO?

A.   They had a data room that they published some financials to. And I don't know what all of their marketing efforts were.

Q.   Do you know if they provided information — any information to investors or potential investors about the operational and accounting challenges that you saw when you came on as Hughes Private Capital CEO in May of 2022, if any of those challenges were communicated to investors or potential investors in 2022 or — yeah, in 2022?

A.   I don't know.

Q.   Okay.  You said — so does the debtor have any employees now, the debtor being Guardian Fund?

A.   No.  The Guardian Fund's operations are being run by an entity, 12B Residential, that Guardian Fund is the sole shareholder of.

Q.   And who — who runs 12B Residential, Incorporated?

A.   12B Residential, the officers — officers of that are Adrian Maravilla and Andrew Palmer.  I am on the board of directors.

Q.   Okay.  And when did that take over as the, I guess, the operational — the company operating — or running the operations of the debtor company?

A.   It's really hard to give a specific date because it was in stages, trying to separate from Hughes Private Capital and Krch Realty, it was relatively difficult, so it was in stages starting — starting on or about the middle of February, but it

*Transcript of the Meeting of Creditors of May 15, 2023*                    64

was — different aspects were taken over at different times.

Q.   Okay.   And Andrew Palmer is the CEO that came in after you became CEO of Hughes Private Capital, right?

A.   Yes, that's correct.

Q.   And then Adrian Maravilla, I think you mentioned her before too.   What did she do for Hughes Private Capital, if anything?

A.   Adrian, he — he took over the property management.   He came in to oversee and help me out on a consultant basis at first, because there were so many things I was looking at at the time, I didn't have the bandwidth to do a deep dive into all the property-management functions, so he came in as a consultant for a couple months, and then took over to run all of property management.   On or about that August-September timeframe.

Q.   Okay.   And does El Monte Capital get paid $20,000 a month as the manager of the debtor company at this time?

A.   Starting as of — in a pro rata basis starting April 11th, that is correct.

Q.   Okay.   And, let's see here, I got — since I'm going to continue this, I don't want to eat up everyone else's time, so I'm going to wrap up my questions and then reserve the right to ask additional questions at the continued meeting I have set here.   Since the debtor went into voluntary Chapter 11, has it implemented or does it plan to implement any cost-cutting measures and, if so, what?

A.   Yes, I think there's — there's several.   The — the debtor

*Transcript of the Meeting of Creditors of May 15, 2023*                65

had reduced the — the fixed rent payment and hasn't made a fixed rent payment to the secured investors on the master lease since it started.  It hasn't been making payments to its unsecured creditors.  Those are the — those were really the biggest expenses.

The fund does need to raise some capital to invest more in some of their properties to get them all occupiable. Those are the main content issues I believe of the fund itself.

Q.  And — so where is it going to get — I guess there's still people in some of the properties paying rent, right?

A.  That — that is correct.

Q.  And how much — do you know how much a month the debtor company gets in rent payments?

A.  Let me just look and see on the spreadsheet here.  So there is — there are several different ways, as you know.  There are three different subsidiary areas of the fund.  There is the Guardian Fund CD 1, Guardian Fund CD 2, Guardian Fund DD, and then there is the master lease payments.  So if you — the biggest pocket is the master lease, and the — if you look through the first four months of 2023, the secured property had a net operating income of somewhere about 400,000.

Q.  Per month?

A.  No, in total for the four months.

Q.  So a hundred thousand a month?

A.  Roughly, but it's not — it's not static.

*Transcript of the Meeting of Creditors of May 15, 2023*   66

Q.   Okay.

A.   But if you look at it across the four months.  The Guardian Fund —

MS. GUARIGLIA:  Sorry.

MR. NOE:  I'm sorry.

MS. GUARIGLIA:  This is Norma Guariglia.  When you say net operating, you just need to maybe clarify that, is it net of all the (indecipherable).

MR. NOE:  Sure.  That is taking all rental and other income collected from the properties minus all the expenses, essentially with the properties, meaning maintenance, property management, turnover costs, utilities, insurance, I believe — I think.

And this — this — like — as I said, we didn't close the quarter yet, so these are — these numbers might change a little bit.  And then of that 395,000, Hughes Private Capital, the prior manager, paid about 260,000 out in fixed rent payments in March to the secured investors.  And if you look at the Guardian, different Guardian entities, PV 1 over that time period, before — before interest payments, had a net operating income of somewhere around three — 33,000, almost 34,000, 33,300.  Guardian CD 2 in that same time period, before interest payments, had a net operating income of about 6,600.

The Guardian Fund, the properties that the Guardian Fund holds, the whole interest payments, lost about $134,300.

Exhibit 25, Page 385

*Transcript of the Meeting of Creditors of May 15, 2023*                    67

And if you consolidate all those entities together that I just mentioned, it's about a negative, it's about a loss of 94,000.

BY MR. MCDONALD:

Q. Per month or per four-month period?

A. That — I'm sorry. All those numbers were for the first four periods of 2022.

Q. Okay. So — let's see. So that's, what, like a negative $23,000 a month right now; is that —

A. Somewhere in that neighborhood.

Q. Okay. And if it's losing money from just the general operation, how are you going to generate enough income to fix up properties, evict tenants, et cetera, et cetera, so that the — the debtor performs better? Where are you going to get the money? Are you going —

A. Yeah.

Q. Do you think you'll — the debtor will —

A. (Indecipherable.)

Q. — a DIP loan, a new investment money? What — how will it do that?

A. There — there are several aspects. The first is 12 Bridges, that it's run by Hughes Private Capital. Loans — or Guardian — the debtor to Guardian for — on a loan for about $25 million it's not servicing. We're in the process of perfecting that loan as it's just an unsecured — unsecured promissory note. It was supposed to be secured by those individual properties. So

*Transcript of the Meeting of Creditors of May 15, 2023*          68

securing that note.  And taking the revenue generated by those properties and potentially getting court approval to sell some of those properties.  That's a property that's causing — where — somewhere in the neighborhood of between 13,- and $15 million.

And there are other assets that Guardian has. Guardian has about $16.5 million worth of internal loans they have loaned to some of the secured investors that bought properties from them.  Those notes currently are not performing as we generate revenue from them.

We're also looking to ask of the Court to sell some of the assets that the Guardian Fund holds that aren't performing, to recapitalize some of the types that we think are worth investing in.

Q.  When you talk about — I think you mentioned 12 Bridges and you mentioned the note that you're going to get secured and then the $16 million in advances.  There's a transfer that — a series of transfers that were made between December 17th of 2022 and March 17th of 2023 to 12 Bridges, LLC, totaling $50,710,937, is that the money you're talking about?

A.  That is correct.

Q.  Okay.  And then I guess —

A.  Let me — let me clarify.  That is — that is for the 20 — the roughly $20 million that 12 Bridges — the promissory note between 12 Brides and the Guardian Fund.  The 60.4 million is — is not part of that 50 million.

*Transcript of the Meeting of Creditors of May 15, 2023*                    69

Q.   Oh, so you said 25 million, so where is the other 25,-? What happened to the other 25,- of that almost $51 million, as far as you know?

A.   That — that was the total transactions, so the Guardian Fund, that note, that promissory note would get paid down when 12 Bridges sold properties back to the Guardian Fund.  So that was in total the amount of transaction dollars, but that loan would go up and down as properties got sold to the Guardian Fund.

Q.   Oh, okay.

A.   So there was — there was about $25 million in repayment of that note.

Q.   So — oh, I get it, okay.  So that's a gross figure, not a net figure, that item that I mentioned on page 8 of 27, the fifty million seven hundred ten thousand in payments between December 17th and March 17th, that's a gross number, and you're saying that the net amount owed by 12 Bridges is now 25 million bucks?

A.   It is roughly $25 million, that is correct.

Q.   Okay.

A.   Of the gross number.

Q.   So I guess there is a number of fairly substantial payments between mid December and mid March to various insiders that's listed on pages 8 and 9 of Document 63, which is the amended SOFA.  Does it — I guess — so you're saying you're trying —

*Transcript of the Meeting of Creditors of May 15, 2023*     70

you're going to get some of those secured by properties owned by 12 Bridges or recover those payments from those insiders, is that what you said?

A. Let me clarify. The — the properties that are sitting in 12 Bridges, we are perfecting that promissory note and using — and getting those properties, put a — securing them with a first trust deed or a mortgage, depending upon the state, to secure that loan, that $25 million loan. But the 15 million that I'm referring to are not the insider transactions. These are — these are loans that Guardian over time made to individuals that bought properties from them.

So if somebody, say, bought a property from the Guardian Fund for a hundred thousand dollars, they might come in with 25,000 — or, excuse me — $75,000, and then they would borrow $25,000 from the Guardian Fund. So the 16.5 million that I'm talking about are for those type of loans. Those loans weren't perfected either. They were promissory notes that were supposed to be secured by a mortgage or a first trust deed. Most of them were not.

Q. Okay. All right. Okay, and then there's — there were various people that are co-debtors or guarantors of the debtor's debt that are listed on Schedule H. As far as you know, is Schedule H complete? Does it have all the guarantors or co-obligors of the debtor on there, which I think is Mr. Hughes —

*Transcript of the Meeting of Creditors of May 15, 2023*                71

A.   So —

Q.   Yeah?

A.   Let me open that up, if you can give me a moment.

Q.   So, let's see, if you look at Document 33 and look at pages 38 to 39 of 40, it lists Greg Hughes is a co-debtor for debts owed to Aaron Shoaf, Andronico Family Partnership, Fay Servicing, Hughesberry Homes owes — or is a co-debtor to Aaron Shoaf, an Andronico Family Partnership.  Hughes Private Capital, same.  Krch Realty for Mr. Shoaf and Fay Servicing; Steve Sixberry; Mr. Shoaf and Andronico Family Partnership, are those all the nondebtor entities that are co-obligors or guarantors of the debtor's debt, as far as you know?

A.   I think those are all co-defendants for lawsuits that were filed.

Q.   So they're co-defendants, but did they — as far as you know, they're not on here because they signed guaranties to backstop the debt of the debtor, various debts of the debtor?

A.   The only one that might be is the Fay Servicing.

Q.   Okay.

A.   The —

Q.   All right, fair enough.

A.   — I believe the only one is Fay Servicing, the others are co-defendants.

Q.   Okay.  And do you know of any transfers outside the ordinary course of the debtor's business to any insiders like officers,

*Transcript of the Meeting of Creditors of May 15, 2023*                72

partners, or their relatives within three years before this — the voluntary case was filed?

A.   I don't know within that timeframe.  I do think we put — we listed all the ones that we knew of —

Q.   Okay.

A.   — and — and I believe Document — Doc 22.

Q.   Uh-huh, okay.  Would that also be in the amended schedule which is Document 63?

A.   Yes.

Q.   Okay.  That would be the — that just goes back a year, as is required for the bankruptcy —

A.   Right, I believe it only goes back to — I don't know beyond the one — the one here.

Q.   Okay, fair enough.  I guess to the extent you can find out, we'll ask about it next time.  And then is the debtor paying any —

MS. GUARIGLIA:  Mr. McDonald?

MR. MCDONALD:  Yeah.

MS. GUARIGLIA:  I'm sorry.  This is Norma Guariglia. You want me to look back three years; is that correct?

MR. MCDONALD:  Yeah, three years.

MS. GUARIGLIA:  Okay.

MR. MCDONALD:  I would say — I would say under the Nevada revised statute it's four years, so let's say four years, I think it's four years under state law.

*Transcript of the Meeting of Creditors of May 15, 2023*                    73

BY MR. MCDONALD:

Q.   Okay.  And, let's see what else here, tell me generally how the debtor is going to reorganize.  Is it going, like you — I mean, basically, you said you're going to get the — you're going to get money from either 12 Bridges or some of the investors, you may sell some properties?  Is that the way the money — the debtor's going to get money to reorganize, is do motions to sell like the one on the docket now or claw back or get payments from people that owe money to the debtor and then use that to fund a plan or is that just to get the debtor operational and then the debtor would operate out of bankruptcy?  How do you think — what do you think the plan will look at — look like at this point?

A.   I think it's some of both, right.  The first thing is the debtor is going to go after whatever assets are due to them.  It will sell some of the assets to recapitalize other assets to get the full portfolio performing better.  The — the operating entity can take on third-party property management contracts and other contracts to raise, to generate revenue in that way too. So I think that it's going to be a multilayered reorganizational plan to bridge the gap.  It is — it is going to be before we get a formal restructure plan together.  It's really collecting the — collecting on all the debt that is owed to them and probably requesting the Court to help us out with some additional —

Q.   Okay.  And —

A.   — assets as well as some of the assets that are — that will

*Transcript of the Meeting of Creditors of May 15, 2023*          74

have first trust deeds on them that are sitting in 12 Bridges are for sale or in escrow, and those properties will be closing and pushing money into the Guardian Fund as well as part of that debt repayment —

Q.  All right.  And —

A.  — that 12 Bridges has with the Guardian Fund.

Q.  Okay, fair enough.  And do you know of any debts that have come due since the — since the voluntary case was filed on April 11th of 2023 that haven't been paid, like utility payments that the debtor is liable for, tax payments that the debtor has to pay, anything like that that is accruing and remains unpaid that came due after the bankruptcy, the order for relief in the voluntary bankruptcy was entered on April 11th of 2023?

A.  After?

Q.  Yes.

A.  I believe those debts, to the extent that we know of them, are being paid.

Q.  Okay.  And let me just say that — well, do you know that the debtor has to file what's called monthly operating reports in this case every month, reporting on the previous month's financial activities?

A.  That was brought to our attention in the initial debtor interview, those are due on the 21st of the preceding month.

Q.  Okay.  And will the debtor file —

A.  — due May 21st.

Exhibit 25, Page 393

*Transcript of the Meeting of Creditors of May 15, 2023*                75

Q.   Okay.   And will the debtor timely file those reports?

A.   Yes.

Q.   Okay.   Failure to timely file, an unexcused failure to timely file those reports could be considered cause under 1112(b)(4)(F) and could be a reason why somebody like me might show up and ask the Court to convert or dismiss the case.   Also are you aware that the debtor has to pay what are called quarterly fees, which are assessed based on the disbursements that are contained within the monthly operating reports?

A.   That was also brought to our attention at the initial debtor interview, yes.

Q.   Okay.   And will the debtor make, pay those quarterly fees?

A.   Yes.

MR. MCDONALD:   All right.   And, again, that could be cause to ask the Court to convert or dismiss a case if those fees aren't paid.

Anyways, I don't want to suck all the oxygen out of this 341, and so I reserve the right to ask additional questions.   I'm going to continue this meeting to, let's see, make sure that it's an approved time, right, to May 30th at one o'clock in the afternoon.   We'll file a notice on the docket of the call-in number and code, and all that good stuff.   But, anyways, I reserve the right to ask additional questions at that time, or Mr. Day or whoever the representative of the U.S. Trustee is that runs the 341 meeting.

*Transcript of the Meeting of Creditors of May 15, 2023*                    76

Having said that, Ms. Tirre, if you'd like to ask questions, make your appearance and start asking your questions now.  Amy Tirre.

Holly, are you on the phone?

HOLLY:  I am here.

MR. MCDONALD:  Okay.  Please let Ms. Tirre on and see if she has any questions she would like to ask Mr. Noe.

HOLLY:  Ms. Tirre, please press star zero so your line can be opened.

(No audible response.)

MR. MCDONALD:  Ms. Tirre, are you there?

Okay, maybe —

HOLLY:  No, she's open.  Her line is open.

MR. MCDONALD:  Oh, very good.

MS. TIRRE:  So, Mr. McDonald, can you hear me now?

MR. MCDONALD:  I can't — you can — you're muffled. Can you get closer to the phone?

MS. TIRRE:  Yes.  Hold on.

MR. MCDONALD:  All right.

MS. TIRRE:  I can change —

MR. MCDONALD:  No, I can hear you.

MS. TIRRE:  I can change —

MR. MCDONALD:  I can hear you now.  Go ahead and ask your questions, ma'am.

MS. TIRRE:  Thank you.

*Transcript of the Meeting of Creditors of May 15, 2023*                77

EXAMINATION ON BEHALF OF CREDITORS

BY MS. TIRRE:

Q.   Mr. Noe, my name is Amy Tirre.  I'm counsel for the Andronico Family Partnership, a Limited Partnership.  My first — my question at first relates to the values of the assets you scheduled and the amounts of the liabilities that you scheduled.  So, for example, schedules you filed on May 2nd at Docket 21, Schedule E/F identifies a large number of unsecured creditors.  And there are homeowners that you've identified with potential damages.  And, as I understand it, the debtor has certain repurchase obligations and buyback obligations with the buyers of homes from the debtor.  And you've identified these claims as disputed, potentially disputed.  What is the basis of the dispute?

A.   So let me answer — let me see if I heard you correctly.  You're asking me what is the basis of my dispute for the individuals with buyback sign letters; is that the question?

Q.   Yes.

A.   Well, I — I'm going to have to just say that we need to review every one of those with counsel to decide which ones we are going to challenge and kind of to dispute those.  While those — those agreements were mostly made, some were — some were — some actually had side letters, some didn't.  Some — and were just verbal agreements made between Hughes Private Capital and the individual buyer, so it really depends upon the set of

*Transcript of the Meeting of Creditors of May 15, 2023*                78

circumstances, what we can — and the way we proceed forward.  We

have to look at each one based on the individual merits.

Q.  All right.  My client — yes.

MS. GUARIGLIA:  I'm sorry.  This is Norma Guariglia.

Just to clarify, to make sure he knows exactly what you're

referring to, can you maybe name one in the Schedule of Assets

and Liabilities that's representative of the category of

creditor that you're asking about?

MS. TIRRE:  My client, for example, at page 42,

Schedule E/F, Number 3.28, it's the Andronico Family

Partnership, you have identified it as litigation.  To actually

make it out, that — but that's an example.  And you stated a

dollar.  But there are a number that states homeowner/potential

damages.  And let me see if I can find —

MR. MCDONALD:  What about 3.25, Andrew Lodato and

Misti Lodato on that same page?

MS. TIRRE:  I would say — thank you, Mr. McDonald.

MS. GUARIGLIA:  And, Ms. Tirre, your sound keeps kind

of coming in and out also.

MS. TIRRE:  Thank you.  Then I'll go ahead and take my

— I'm using headphones, so let me take myself off my headphones.

How does this sound; is it better?

MR. MCDONALD:  Oh, much better.

MS. TIRRE:  Great.  Thank you.

BY MS. TIRRE:

Exhibit 25, Page 397

*Transcript of the Meeting of Creditors of May 15, 2023*                79

Q.   So now that we have identified the claims that I'm asking about, Mr. Noe, could you please respond to the question?

A.   They are listed as — as a dollar and it's unidentified exactly what the damages might be that that individual has. These are folks that have bought properties from the Guardian Fund, have a master lease, and — and the secured agreement. It's unknown what the damages are going to be.  Therefore, they're not listed.

Q.   All right.  Well, my concern is there, I think, possibly 35 of these listed at a dollar.  And I mentioned that the Andronico Family Partnership has filed a claim as — in the amount of $1.7 million.  And I'm wondering if you have evaluated any of these other claims and understand what the range of potential, you know, amounts may be?

A.   Yeah.  Thanks for clarifying that a little bit.  That helps me.  I have not.

Q.   Okay.  Because I believe there's a concern that perhaps the $1 claims might be actually much larger claims than are stated on your schedules, so that's really the point of my question, to get to what your understanding is of the amounts of those claims.  And at this point you're stating you don't know.

A.   And that is —

Q.   And also — okay.  Pardon.  Let me go ahead and allow you to complete your statement.

A.   That is correct.  I just wanted to clarify that those dollar

*Transcript of the Meeting of Creditors of May 15, 2023*          80

claims, it's — I'm unaware of what the damage is, if any might be.

Q.   All right.   And to clarify, my understanding of your assertion or the assertion on the schedule that these claims are disputed, I believe I understand that you need to evaluate each and every individual claim to see that — the basis of the claim and, therefore, you marked them as undisputed.   But, as you sit here today, do you know of any particular claim, for example with my client's claim, my client has a written side letter executed by the Guardian Fund, do you have any reason to dispute my claim for a repurchase obligation?

A.   I don't know if I have anything, in reading through this, the agreement itself, I just don't know exactly what the damages are.

Q.   All right.   Thank you for that clarification.

Now that you — I'm going to ask a different question related to these master lease agreements.   So again on the Schedule, Docket 21, filed on May 2nd, 2023, there is a Schedule G of the debtor, Executory Contract and Leases.   And I understand that the debtor has entered into master lease agreements with a number of the homeowners, the parties who purchased homes from the debtor, and that under those master lease agreements, the debtor is the master tenant and it was the debtor's obligation to then enter into, let's say seldom, tenant's agreements or sublease agreements with the actual

Exhibit 25, Page 399

*Transcript of the Meeting of Creditors of May 15, 2023*        81

renters and occupy the property, and then collect the rents, and then pay certain amounts agreed to under those master lease agreements.  Have I correctly stated what those master lease agreements are?

A.  Yes.

Q.  Thank you.  Also on Schedule E/F, I see that there are parties who are homeowners who are parties to these master lease agreements as the landlords, and those claims are disputed.  And so I'm asking the same question:  What's the basis of the dispute, is it the amount or is it the, you know, the legal basis for the claim?

A.  It — it's really the amount and potentially whether there was any damages or not.

Q.  And when you say it's the amount, what's the reason for disputing the amount?  Because the amounts are specified in the master lease agreements, correct?

MS. GUARIGLIA:  Ms. Tirre, this is Norma Guariglia. I'm going to object just to the extent you're expecting to give legal conclusions, because there are some legal issues with those contracts.  There are some contradicted provisions and whatnot.  So I mean I think Mr. Noe can't answer those questions as to the legality of certain clauses in those contracts.  So if you allow him to answer with that caveat, that he's, you know, not qualified to give legal conclusions about them.

MS. TIRRE:  Understood.  Thank you.

Exhibit 25, Page 400

*Transcript of the Meeting of Creditors of May 15, 2023*                    82

BY MS. TIRRE:

Q.   To the best of your understanding, what's the basis of the dispute regarding the claims that homeowners have for, you know, let's say unpaid rent under these master lease agreements?

A.   One thing I think there — there's a few things, that there is the decision has to be made whether proper notice was given back in December of changing that master lease payment to zero. There's other claims that — that there's contradicting terms within that master lease.  I believe that at one point it says Guardian is responsible for all improvements except for capital improvements, so there is quite — there's some very much uniqueness to these contracts because there was three documents that were signed.  There was a document that was signed that was a security interest agreement, a purchase agreement, and then — and then a contract for the master lease.  They were all three signed at the same time, so understanding whether the individual that owned those properties and have a master lease are also having equity interest or not because they have signed a security agreement.  And several of those individuals also had — had a capital account within the Guardian Fund as members that that fixed rent was — was going to.  So there's just several things that we have to unpack before we really understand that. And I am deferring a lot of that to legal counsel.

Q.   Thank you.  I just note on your answer, I know you need to circle back around to the continued 341 meeting after — after

*Transcript of the Meeting of Creditors of May 15, 2023*                 83

having a chance to confer with me client, but I appreciate your response.

I now have a question related to these master lease agreements. You, as the debtor, the debtor has an opportunity to assume or reject those leases. Do you know if you will be assuming or rejecting any of these leases?

A. I believe we'll be amending the — the majority of them and the ones that the individuals don't — that we can't come to a mutual agreement on the amendments, those just by nature of the bankruptcy after 120 days will be (indecipherable). So if we can't come to a more equitable arrangement, but they won't be — those others, they won't be accepted. That is just a high level of the thinking at this juncture.

Q. All right. Thank you. Do you anticipate the debtor may choose to reject any of the disputed leases prior to the 120-day period under the Code?

A. I don't believe so, but I'm not taking that off the table.

Q. All right. Thank you. I now have a question related to the amended Statement of Financial Affairs, Docket Number 63. It was filed yesterday, I believe, May 14th. In Question 4, there are a list of transfers to insiders, and Mr. McDonald asked you some questions about that in amended that list to go back up to four years. My question is these moneys that were transferred, in particular, at 4.10 to 4.10, 4.11, and 4.9, those large sums of money that went out to 12 Bridges, probably 50 million; the

*Transcript of the Meeting of Creditors of May 15, 2023*                84

amount that went out to Hughes Private Capital in the amount of 3.9 million; and the amount that went out to Krch Realty in the amount of 4 — or, I'm sorry — 2.1 million, who authorized those transfers?

A.   I have learned — assume, I haven't seen all of them of course, but that would be — I would assume that that was done by the prior manager of Hughes Private Capital and its officers.

Q.   And you were CEO of Hughes Private Capital, correct?

A.   That is correct, by title.

Q.   By title, okay.  Well, and I understand you resigned at the end of June; is that correct?

A.   It was — it was the end of January, beginning of February. There was — when I resigned and then when I knew my last date, so I think I resigned in January and my last day was in the beginning of February.  Those are (indecipherable).

MS. GUARIGLIA:  Sorry, this is Norma Guariglia.  I mean Mr. Noe maybe should clarify because he did testify before that he was the — over the operational aspect as far as the property management operational aspect, not the investment side of it, and these types of distributions and whatnot, I don't think were her purview, but you may ask him specifically about that, I guess, to clarify that.

MS. TIRRE:  Sure.

BY MS. TIRRE:

Q.   So, Mr. Noe, were these transfers within the scope of your

*Transcript of the Meeting of Creditors of May 15, 2023*                    85

authority as CEO of Hughes Private Capital?

A.   No.

Q.   No.   So who was the person who had authority to authorize these transfers?

A.   Steve Sixberry operated as the organization's treasurer and was the one in most instances that was moving money between the different entities.

Q.   And did you have knowledge of these transfers at that time?

A.   In some of them, I did.   I was aware that Hughes had — or, excuse me — the Guardian Fund was loaning money to — to — I apologize — that the Guardian Fund was loaning money to 12 Bridges.   It was some time down the road, but I understood, I found out that these loans were not being perfected and there was now trust deeds being filed on them.   The money that moved to Hughes Private Capital, I was unaware of that, or of Krch Realty.

It was my understanding at first that all the money for every property sale was moving to 12 Bridges and then 12 Bridges was disbursing that to the other entities, being Hughes Private Capital and Krch Realty, because that's where the individuals that were performing the work for 12 Bridges were. I think in some cases the money was just moved directly from Guardian to one of those two entities, but I was not aware of that until quite some time after I started, of — going back to (indecipherable).

*Transcript of the Meeting of Creditors of May 15, 2023*                    86

Q.   Thank you.   You testified earlier that with respect to approximate $6 million that flowed out of the debtor to 12 Bridges between December 2022 and March of 2023, that really the net number is 25 million because these were loans and 12 Bridges repaid the loans to the debtor; is that accurate?

A.   That is — that is accurate.   It — I'm relying on numbers that were given to me.   I have not personally done a reconciliation of bank accounts to make sure that that money has transferred.

Q.   Well, so my question is if $25 million were — was retained back to the debtor from 12 Bridges and the debtor is getting here was, I think, possibly less than a million dollars in the bank account, at Umpqua Bank, where did the money go, do you know?

A.   Yes.   I can give you a high-level understanding of the way that loan was paid down.   So when 12 Bridges would sell a property to Guardian, they wouldn't pay them in cash, they would write down the note of — to the price that 12 Bridges actually had in that property and that Guardian would only pay what the difference was between 12 Bridges' cost and the amount that Hughes Private Capital was charging them.   So these — they weren't all caps transactions, kind of, if that makes sense.

Q.   It doesn't —

A.   — they were getting properties.

Q.   They were getting properties.   So if you could just break

*Transcript of the Meeting of Creditors of May 15, 2023*                    87

that down a little bit for me in terms of 12 Bridges was

transferring what to the debtor in exchange for the moneys

flowing to 12 Bridges from the debtor.

A.   Yeah.  So it was all tracked on a spreadsheet and if you

look at it, it's somewhat difficult to track back, and we've had

Window (phonetic) and some others starting to go through that

account.  So what would happen was would — Guardian would loan a

specific amount to 12 Bridges.  Then he would transfer that

money over to 12 Bridges.  12 Bridges would buy the property,

renovate it, and then sell that property back to Guardian.  Part

of the repayment was they got that property.

          And then the difference between whatever they called

GPTI, which was the — their basic cost basis, meaning 12

Bridges' cost basis, that would pay down the loan, and then what

they determined the purchase price to be for Guardian, the

difference between the purchase price and their actual cost is

what they would consider profit.  And then that money would come

back into 12 Bridges or come back into 12 Bridges, Krch, and

Hughes Private Capital.  So that property transaction is what

paid down the (indecipherable).

Q.   Again I'm probably going to have to follow up with you at

the continued meeting on May 30th, but thank you for that

explanation.  I have a question related to a number that you

stated in your answer to Mr. McDonald whose question was

regarding the perfection of the loan to 12 Bridges.  So you

*Transcript of the Meeting of Creditors of May 15, 2023*                88

stated, I believe, that there's about 13 million to $15 million in, I believe, the value of the real properties owned by 12 Bridges. Is that accurate, or could you explain to me what 13 million to 15 million represents?

A.   Yes, I can.  I looked at all the properties that are currently being held in 12 Bridges.  And we used a third party to generate a value of those assets.  And those assets right now, if you look at and say a five-percent cost of sale or five-percent mediation from that third party, it produces a value of somewhere around 15 million.  We know that there is substantial work that needs to be done on those, somewhere between probably one and three million, so I probably should have stated maybe it's between 12 and 15 million, is what those value of those costs that remain in 12 Bridges.

          Does that — does that make sense?  Did that answer —

Q.   It does.  You have potentially what I understand the situation to be is you're documenting a loan now with a principal balance of approximately $25 million and that loan is secured by assets with a value bringing between 12 million and $15 million; is that about right?

A.   That is right.  It doesn't mean that we're going to write off the balance of that loan.  It just means that we want to secure our interest in those assets because we don't have control of those assets.

Q.   And —

Exhibit 25, Page 407

*Transcript of the Meeting of Creditors of May 15, 2023*                          89

A.   Meaning — when I said we, the Guardian Fund does not have control of those assets.

Q.   And do you have a balance sheet for 12 Bridges so we know what else it may own and whether or not it's (indecipherable)?

A.   I believe the only other property it owns is an apartment complex.  And when I looked at the apartment complex, the value, the existing loan on it, and the back taxes and other things, it looks like it has a negative value of somewhere between 400 to — it has a negative equity position of somewhere between 4- and $900,000.  And that — that's the only other asset that I know of.  It is in title.  They may still have title to a vacation home that has a mortgage on it as well.  I don't know if that's still sitting in 12 Bridges or if that got moved to (indecipherable) or not.  But to the best of my knowledge, those are the only assets that 12 Bridges has.

Q.   Thank you.  And now I have a question related to its Schedule B, as in boy, Docket Number 21.  It's Part 3, Question 11, related to the accounts receivable the debtor holds.  The total amount is approximately $2.9 million.  What's the basis for these accounts receivable?

A.   Let me open that.

Q.   Oh, fine, take your time.

         MS. GUARIGLIA:  Ms. Tirre, just to clarify, this is Norma Guariglia, did you want him — because that judgment was amended.  Did you want Mr. Noe to look at the original Schedule

*Transcript of the Meeting of Creditors of May 15, 2023*                90

A/B or the amended one?

MS. TIRRE:  Oh, thank you for pointing that out.  I thought you only amended Schedule A/B, but you amended Schedule A/B.  I'm looking at —

MS. GUARIGLIA:  Well, it —

MS. TIRRE:  — Docket Number —

MS. GUARIGLIA:  — they came together.

MS. TIRRE:  I see, yeah, of course.  Okay, let's look at that then, Docket Number 33.

MS. GUARIGLIA:  Okay.

BY MS. TIRRE:

Q.  Okay, the amount is now a little less.  It's 2.7 million, but it's still Part 3, Question 11, page 540.

A.  Oh, these are rent payments.  The 2.7 million is tasked to rent payments that are sitting on — it is my understanding they're all — this is just all backdue rent payments that are sitting on the balance sheet or have sat on the balance sheet for some amount of time.  And how long they were on is — the 8 point...

Q.  And I do have a follow-up question for you.  It sounds —

A.  Sure.  You said you were saying — I'm just trying to understand the (indecipherable).

Q.  All right.  So, for example, it shows there at 11a, you know, the dates, amount for the auction granted, 8.1 through 7 million.  But then it states that 7 — approximately $7 million

Exhibit 25, Page 409

*Transcript of the Meeting of Creditors of May 15, 2023*                    91

at this amount is doubtful or uncollectible.  And how did you reach, you know, that understanding and make that assertion?

MS. GUARIGLIA:  If you look at the schedule, the spreadsheet that explains that, so that redeemable is not all rent.  So that spreadsheet has been (indecipherable).  So how it's broken down, at the last page of — and that's Docket at ECF, that's page 24 of 40, of ECF 33.

MS. TIRRE:  Okay.

MS. GUARIGLIA:  And —

MR. NOE:  So if I can walk you through this, if the — the bad debt is — there are receivables in a couple of different buckets.  The totals rent is the one forty-two six eight million.  The amount in addition to that $25 million loan is 1.121 million from 12 Bridges.  There's a receivable from Krch Realty of $196,000.  And then a receivable from HPC of 5.4 — excuse me — $5.540 million.  That too from HPC.  The bulk of that, about five million of that, is the construction obligation.  It's construction work that wasn't performed or that is still owed.  And the — looking at it, let's go back to that, writing it off, the majority of the 90-day plus, the majority of — we know that the assets that are sitting in 12 Bridges aren't worth what that $25 million note is.  And the fact that HPC has just filed bankruptcy as of Friday, we also believe that is going to be uncollectible.

BY MS. TIRRE:

*Transcript of the Meeting of Creditors of May 15, 2023*     92

Q.  Do you anticipate filing further amended schedules based upon the filings of the bankruptcy by HPC?

A.  I don't know.  I don't know.  As we find more information out, there is a possibility that we'll file amended schedules.

Q.  All right.  Thank you.  Mr. Noe, does El Monte Capital employ a CFO?

A.  No.

Q.  Who are the employees that El Monte Capital?

A.  El Monte Capital is — the only employee of El Monte Capital is me.  The CFO, the people that are doing the accounting and financial work are employed by 12B Residential.

Q.  Thank you.  I had heard your testimony earlier about Andrew Palmer.  My follow-up question for you is:  Who will be preparing the monthly operating reports for the debtor?

A.  It will be 12B Residential with my oversight.

Q.  And who would — specifically would be the current one; do you know?

A.  It's probably a combination of Wendell King and Andrew Palmer.

Q.  To your knowledge, is Wendell King an employee of 12B Residential?

A.  I believe he is.  He is also an investor in the Guardian Fund.

Q.  I have a question about your amended list of 20 largest unsecured creditors.  On that list, you have some creditors who

Exhibit 25, Page 411

*Transcript of the Meeting of Creditors of May 15, 2023*          93

are identified as illiquidity account holders.  What does that mean?

A.   There was two different vehicles that people could loan the Guardian Fund money.  One was what they called a liquidity account.  It is a promissory note with a 30-day redemption period.  Then there was what they called noteholders, which was somebody that loaned money with a longer redemption period.  And I can't recall, it was either 120- or 180-day redemption period.

Q.   And so which group is this?  Is it — the parties that were listed on that list of 20 largest, are they in either of these two categories that you just described or only one of them?

A.   They're in both, the — where it is — it's the nature of the claim, the liquidity account leaders are the individuals with the shorter-term redemption period and the money loan are the individuals with the longer redemption period.

          MS. TIRRE:  Thank you.  For now, I think those are my questions.  I know we have another opportunity on May 30th, so I'm holding further questions until that time.  Thank you.

          MR. MCDONALD:  Thank you.

          MS. TIRRE:  Thank you.

          MR. MCDONALD:  Mr. Newman, I think you're the only other person that appeared.  Would you like to ask questions of Mr. Noe?

          MR. NEWMAN:  Yes.

          MR. MCDONALD:  Okay, go ahead, Mr. Newman.

Exhibit 25, Page 412

*Transcript of the Meeting of Creditors of May 15, 2023*                    94

MR. NEWMAN:  Yes.  Can you guys hear me okay?

MR. MCDONALD:  Yeah.  If you could speak louder, that would be good for the record.

### EXAMINATION BY A CREDITOR

BY MR. NEWMAN:

Q.  All right.  I'm going to try now to displace Ms. Tirre's questions.  So I'm going to apologize because some of them may overlap a little bit in detail.  Mr. Noe, it's really hard to tell what you are responsible for as the CEO of HPC and operations of the Guardian Fund and 12 Bridges before you resigned and then two months later became the officer or the manager, essentially the BRO in two boxes of a reorganization officer of sorts under El Monte.  So I'm going to try to clear up some of these things.

So it seems like you were a troubleshooter, initially brought in by them,  and then maybe approve or maybe did not approve some of these actions that you filed in HPC homeowners pay (phonetic).  And I think if I heard you correctly, you essentially revised because of what you saw going on; is that correct?

A.  At a high level.  When I first started discussions with HPC, there — the — my belief was that I would step in as a CEO over time, that I would have the opportunity to go over what I thought was a business that was — just needed some operational tweaks and some — some governance spread around a lot of their

Exhibit 25, Page 413

*Transcript of the Meeting of Creditors of May 15, 2023*                    95

processes to allow them scale.  Once I came in and started seeing a lot of the operational challenges, I never took over really that CEO role for the company, because I saw all the operational challenges.  It was an extremely complex group of businesses that they had, from their mortgage company to a lot of other different things.

Q.  Would it be fair to say that the — first of all, that HPC really looked at the Guardian Fund as an entity that they owned versus a fund that they were responsible to manage?

A.  I would say the governance around inter-company transfers were not good.  They looked at a lot of the companies that they run as sort of intermingled and then they did, say, look at the difference between the Guardian Fund and 12 Bridges.  And it was really — I did not — I brought it to their attention very quickly when I saw that.  And we started putting some governance around that and getting things documented.  Things were not well documented.  The loan between Guardian and 12 Bridges was not we'll documented.  A lot of the inter-company documents were not documented well.  You go through the net suites (phonetic) and a lot of these journal entries and things like that are not documented very well, so it takes some forensic accounting to really understand kind of what is going on.  So, yeah, I never really kind of agreed with the governance and business practices that HPC had and — and, thus, I never took over as an officer. And, you know, I knew that I needed to look at really the

*Transcript of the Meeting of Creditors of May 15, 2023*          96

operational aspects of the business.  And that's where my focus was, was on the operational side.

Greg and (indecipherable) stayed in as running the marketing team.  His daughter Kayla (phonetic) was — was running kind of a marketing team.  And that is a relatively large group that he oversaw.  He oversaw the messaging.  He filled in the television and radio spots, I should say.  And then Steve Sixberry remained as the treasurer for Guardian and all of the other entities, of the various HPC entities.  And I never took over as treasurer, nor received that item.

Q.  You mentioned Wendell King, has he been hired to do the forensic research that you just referred to that needs to be done?

A.  Wendell King has been helping us get all the schedules together.  Wendell King is a retired CPA and he has been helping us get all the schedules together.  And it is my understanding that he is an employee of 12B Residential.

Q.  Now as I understand the role of the creditors committee, we may be charged with hiring a forensic accountant to try to sort out all of the — a lot of the questions that Ms. Tirre was asking, so I'll try to avoid any more of these because I think we need to find out a lot more before we delve in.

Can you give us — back to eye elevation, can you give us a better background on your ability to manage Guardian Fund going forward?

A.   I can.  My background is:  I spent eight years with American Homes for Rent.  American Home is Rent is a publicly-traded REIT with a market cap of somewhere around thirteen and a half billion dollars.  I started at American Homes for Rent.  I was one of the founding executives there.  We built that company from having about 50 assets to having over 51,000 assets from the time that I left.

My role was executive vice president of operations.  I was responsible for all the property management operations, all the resident operations, and all the local offices that we had.  When — I'm sorry.  Looking at the assets and so forth that we had, I know that there is a lot of assets that we probably want to start off, just looking at Guardian.

I also know that, you know, I have a background in helping 12B Residential build a very large and structured property-management and asset-management organization from what we've been in the past.  And one of the things that we realized — or I realized, I should say, talking of all the investors, there is a tremendous demand.  People want to be in real estate, in passive real estate, and we want to do everything that we can or I want to do everything that I can, I should say, to help out those individuals, whether those be members of the Guardian Fund or whether those be securing investors that are looking for help to get there (indecipherable), or even third-party even owners.

I don't know if that helps answer that question or

*Transcript of the Meeting of Creditors of May 15, 2023*          98

not.

(Simultaneous talking.)

MR. MCDONALD:  Mr. —

MR. NEWMAN:  I think that's an adequate point.

MR. MCDONALD:  Mr. Newman, I apologize for interrupting.

But, Holly, how long until I get the axe?  This is McDonald calling from the U.S. Trustee, so how much longer do we have before we have —

HOLLY:  As long as you need, sir.  Don't worry about it.

MR. MCDONALD:  Oh, great, okay.  And I also want to note that I believe I didn't hear for — it may be a logistical issue, but Marjorie Guymon made an appearance as counsel for the Vano 1983 Trust (phonetic).  And so I just wanted to make that clear.

And, Mr. Newman, I apologize for interrupting you.  Go ahead, sir.

MR. NEWMAN:  No problem, Mr. McDonald.  Thank you.

BY MR. NEWMAN:

Q.  Mr. Noe, as part of the small group of investors who participated in the involuntary Chapter 7 petition, you shared with us as we tried to gather information and reorganization plans that you would like to implement a mature 90 (phonetic) to learn a lot more about that, but it — have you made any

*Transcript of the Meeting of Creditors of May 15, 2023*                    99

substantial change — changes to that since last we shared with you?

A.   I haven't, and just to disclose, this was prepetition.  And it is — I haven't been soliciting a reorganization plan with anyone.

Q.   Okay, okay, all right.  As you come up with any data — well, I'll save that question for the continuance.  I'm going to try to get to some very specific questions that we heard a possible reorg, but I don't know if you'll have answers for them yet.

Do you have any idea when you forecast week payments to be renewed or cap that rate?

A.   When I look at April's performance, the two-percent payment that was made out, which was, I think, a total of about 256,000 in March, the properties were generating the secured investment pool.  It was generating enough to cover those — all of the property expenses and to cover that two percent.  So when — the paper hasn't been cost out, but it looks like that that is a manageable number at this juncture.

Q.   And (indecipherable) cause is true, but do you have any tool and you think that you would try to instigate those payments all together?

A.   It is my understanding, and correct me if I'm wrong, counsel, that that fixed-rent payment rent can be made without board approval, as it's part of the lease that the Guardian Fund is obligated to.

Exhibit 25, Page 418

*Transcript of the Meeting of Creditors of May 15, 2023*                    100

Q.   So, again, do you think you can do in 30 days, 90 days —

(Recording on the first audio file ends.  Length of audio file:  Three hours.  Transcription of the second audio file:)

MR. MCDONALD:  My name is Edward McDonald, I work for the Department of Justice.  It's 5:57.  Just for the record, in a case entitled In re Guardian Fund, LLC, Case Number 23-50177-nmc, I'm using a recording device that apparently cut off the end or stopped recording at some point even though it looked like it was recording.  And so I just want to make clear for the record that I continued the 341 Meeting of Creditors in the case entitled In re Guardian Fund, LLC, Case Number 23-50177-nmc, I continued that Meeting of Creditors on the record, although it wasn't recording, to Tuesday, May 30th, 2023, at one o'clock in the afternoon Pacific Time.  And so I just wanted to create a record to make that clear.  And it is approximately six o'clock in the evening, May 15, 2023, but the Meeting of Creditors in the case entitled In re Guardian Fund, LLC, Case Number 23-50177-nmc is continued to May 30th, 2023, at one o'clock in the afternoon Pacific Time, and that will be put on the docket.

(Recording of second audio file ends.  Length of audio:  One minute, 36 seconds.)

—o0o—

Exhibit 25, Page 419

State of California          )
                             )    SS.
County of Stanislaus         )


        I, Susan Palmer, certify that the foregoing is a true

and correct transcript, to the best of my ability, of the above

pages, of the digital recording, files named "Recording

(57).m4a" and "Recording (58).m4a", provided to me by the United

States Department of Justice, United States Trustee, Region 17,

District of Nevada, Las Vegas Division, of the 341 Meeting of

Creditors taken on the date and time previously stated in the

above matter.

        I further certify that I am not a party to nor related

to nor in any way interested in the outcome of this matter.

        I am a Certified Electronic Reporter and Transcriber

by the American Association of Electronic Reporters and

Transcribers, Certificate Nos. CER-124 and CET-124.  Palmer

Reporting Services is approved by the Administrative Office of

the United States Courts to officially prepare transcripts for

the U.S. District and Bankruptcy Courts.


                                    Susan Palmer
                                    Palmer Reporting Services
                                    PO Box 4082
                                    Modesto, California  95352-4082
                                    (209) 915-3065

                                    Dated May 26, 2023


Exhibit 25, Page 420

# Exhibit 26

Unofficial
20:Document

RECORDING REQUESTED BY:
Chicago Title Agency, Inc.

**CT.**
**Ga.**

WHEN RECORDED MAIL TO:
Joseph Nacy Castello, Hughberry Homes, LLC and The
Stephen T. Doyle Trust dated November 5, 2013
5440 Louie Lane, Ste. 106
Reno, NV 89511

---

Escrow No.:  CT312230011-NDA
APN:           215-40-547

Space above this line for Recorder's Use

## WARRANTY DEED

For the consideration of Ten And No/100 Dollars ($10.00), and other valuable considerations,

**12 Bridges LLC, A Nevada limited liability company**

does hereby convey to

**Joseph Nacy Castello, as to an undivided 33.42% and Hughberry Homes, LLC, a Nevada limited liabilty company, as to an undivded 56.86% and The Stephen T. Doyle Trust dated November 5, 2013, as to an undivided 9.72%**

the following real property situated in County of Maricopa, State of Arizona:

SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF

Trust Disclosure-Grantee
In Compliance with ARS 33-404, Beneficiaries for the Grantee's Trust is:

Stephen T. Doyle 5440 Louie Lane Ste. 106 Reno, NV 89511

SUBJECT TO: Current taxes and other assessments, reservations in patents and all easements, rights of way, covenants, conditions and restrictions as may appear of record.

The undersigned hereby warrants the title against all persons whomsoever, subject to the matters set forth.

Deed (Warranty)
AZD1053.doc / Updated: 01.30.23

Page 1

AZ-CT-FWPY-01085.043312-CT312230011

Exhibit 26, Page 421

## WARRANTY DEED
(continued)

IN WITNESS WHEREOF, said Corporation has caused these presents to be signed by its duly authorized officer(s), this,

Dated: February 27, 2023

12 Bridges LLC, A Nevada limited liability company

BY: _____

~~Adam Johnson~~, Real Estate Administrator
AARON NOE

STATE OF Nevada

COUNTY OF Washoe

On the 1st day of March , 2023 , before me, a Notary Public in and for said State, personally appeared ~~Adam Johnson~~ Aaron Noe proven to be the Real Estate Administrator of 12 Bridges LLC, A Nevada limited liability company, who did execute the within instrument on behalf of said corporation therein named, and acknowledged to me that such Corporation executed the within instrument pursuant to its by-laws or a resolution of its board of directors.

Witness my hand and seal

_____
Notary Public                                   Unofficial Document

My Commission Expires: 7/21/2024

(SEAL)

**HEATHER HULL**
Notary Public - State of Nevada
Appointment Recorded in Washoe County
No: 08-7695-2 - Expires July 21, 2024

Deed (Warranty)
AZD1053.doc / Updated: 01.30.23                    Page 2                    AZ-CT-FWPY-01085.043312-CT312230011

Exhibit 26, Page 422

## EXHIBIT "A"
Legal Description

For APN/Parcel ID(s):  215-40-547

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE COUNTY OF MARICOPA, STATE OF
ARIZONA AND IS DESCRIBED AS FOLLOWS:

Lot 135, of Trails North Unit Two Amended, according to the Plat of record in the office of the County Recorder of
Maricopa County, Arizona, recorded in Book 248 of Maps, Page 2.

### Right of First Offer

*Notice Requirements- Before the Owner of Record may sell the Premises to a third party, Owner of
Record shall first offer the Premises to Hughes Private Capital following the procedures set forth in this
Section. Hughes Private Capital shall have twenty (20) days following written receipt of such offer to
respond to Owner of Record with a written offer to purchase. Both notices may be delivered via
electronic mail (email) if the parties agree and reply to the notice confirming receipt.*
*Negotiations- If Owner of Record does not receive a written offer to purchase within said 20-day
period, or if Owner of Record and Hughes Private Capital do not enter into a legally binding, written
agreement for the purchase and sale of the Premises within 30 days, Owner of record shall be free to
enter into an agreement with a third party at terms no more favorable to the third party than Hughes
Private Capital offered to Owner of Record.*
*Expiration- If Owner of Record does not complete the sale of the Premises with a third party within 90
days from the date Owner of Record first offered the Premises to Hughes Private Capital, Owner of
record's right to sell the Premises to a third party shall expire and the procedure described shall be
applicable again. Upon each repetition of this procedure, notice shall once again be due. Deed
restriction expires and will be released after the next successful deed transfer to new ownership.*

Deed (Warranty)
AZD1053.doc / Updated: 01.30.23                    Page 3                    AZ-CT-FWPY-01085.043312-CT312230011

Exhibit 26, Page 423

# Exhibit 27

DocuSign Envelope ID: 9F60F83D-32F2-42A6-B030-280C5EFC968C

# FIRST AMENDMENT TO MARKETING AND DEVELOPMENT AGREEMENT

This FIRST AMENDMENT ("Amendment") to the REAL ESTATE POWER OF ATTORNEY dated February 16, 2023 ("Agreement") is made and entered into this _9th__ day of _March_, 2023 ("Effective Date"), by and between Eric Fiegl, and individual with a mailing address of PO Box 879, Honeoye, NY 14471, hereinafter referred to as **"Principal"** Aaron Noe, an individual acting as Manager of 12 Bridges Residential with a mailing address of 5440 Louie Lane Reno, Nevada 89511, hereinafter referred to as **"Noe"**, and Gregory Hughes, an individual with a mailing address of 5440 Louie Lane Suite 106, Reno, NV 89511, hereinafter referred to as **"Hughes"**. **Principal**, **Noe**, and **Hughes** may hereinafter be referred to singularly as "Party" and collectively referred to as the "Parties".

WHEREAS, Principal and Noe entered into the Agreement whereby Principal appointed Noe as his real estate power of attorney on terms and conditions as more fully described in the Agreement, a true and correct copy of which is attached as Exhibit "A; and

WHEREAS, Principal wishes to immediately revoke Noe as his real estate power of attorney under the Agreement and Noe wishes to be immediately released of his duties as agent under the Agreement; and

WHEREAS, Principal wishes to immediately appoint Hughes as his new agent and real estate power of attorney under the Agreement, and Hughes wishes to accept the role and responsibility as Principal's agent and real estate power of attorney under the Agreement; and

WHEREAS, the Parties wish to amend the Agreement as set forth herein;

NOW, THEREFORE, for and in consideration of the mutual covenants herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by each party hereto, the Parties hereby agree as follows:

1. **Revocation and Appointment of New Agent.** Principal immediately revokes Noe as his real estate power of attorney under the Agreement and immediately appoint Hughes as his new agent and real estate power of attorney under the Agreement, with Hughes hereby assuming the role of "Agent" under the Agreement.

2. **Effect on Agreement; General Provisions.** Except as set forth in this Amendment, the terms and provisions of the Agreement are hereby ratified and declared to be in full force and effect and will not be, or deemed to be, waived, modified, superseded, or otherwise affected by this Amendment. This Amendment shall be governed by the provisions of the Agreement, as amended by this Amendment, which provisions are incorporated herein by reference. All capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Agreement.

3. **Entire Agreement.** This Amendment together with the Agreement, as amended by this Amendment, constitute the entire agreement and understanding between the Parties hereto with respect to the subject matter of this Amendment and supersede any and all prior agreements and understandings, written or oral, relating to the subject matter of this Amendment.

1 of 2

Exhibit 27, Page 424

DocuSign Envelope ID: 9F60F83D-32F2-42A6-B030-280C5EFC968C

4. **Construction.** Unless the context clearly requires otherwise: (i) the terms defined herein include the plural as well as the singular; (ii) all references to this Agreement and the words "herein," "hereof," "hereto," and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular section, or other subdivision, except as expressly stated otherwise; (iii) the words "including," "included," and "includes" mean inclusion without limitation; and (v) each party hereto acknowledges it has been represented by legal counsel, or has had full opportunity to seek the advice of legal counsel, and the parties have jointly participated in the negotiation and drafting this Agreement. In the event of an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if jointly drafted by the parties and no presumption, inference, or burden of proof shall arise favoring or disfavoring a party by virtue of the authorship of any or all of the Agreement provisions.

IN WITNESS THEREOF, the Parties have executed this Agreement as of the date first above written.

**Principal**

By: _Eric Fiegl_          3/9/2023 | 8:11:38 PM PST
Eric Fiegl

Mark Lack, Authorized Representative

**Noe**

By: _____

Aaron Noe, Manager, 12 Bridges Residential

**Hughes**

By: _Greg Hughes_          3/9/2023 | 10:15:21 AM PST
Greg Hughes

Exhibit 27, Page 425

DocuSign Envelope ID: 9F60F83D-32F2-42A6-B030-280C5EFC968C

# EXHIBIT "A"

DocuSign Envelope ID: 9F60F83D-32F2-42A6-B030-280C5EFC968C

# REAL ESTATE POWER OF ATTORNEY

**I.    APPOINTMENT.** This Power of Attorney is made on February 16, 2023, ("Effective Date") between the following:

Principal: I, Eric Fiegl, the "Principal," with a mailing address of PO Box 879, Honeoye, NY 14471, hereby appoint:

Agent: Aaron Noe, Manager of 12 Bridges Residential with a mailing address of 5440 Louie Lane Reno, Nevada 89511 ("Agent").

**II.    REAL ESTATE.** This Power of Attorney is in reference to: (check one)

☐ - **A Single-Property.** For the following property: [PROPERTY DESCRIPTION] ("Real Estate").

☒ - **Multiple Properties.** For the following properties, partially or wholly owned by the principal, whether directly or by and through an investment vehicle.

9008 Birchdale Ave, Cleveland, OH 44106 ("Real Estate").
11306 Matilda Ave, Cleveland, OH 44105 ("Real Estate").

**III.    POWERS GRANTED.** The Principal grants the Agent power to negotiate, execute, modify, and deliver any documents necessary to complete the following type(s) of real estate transactions: (initial and check all that apply)

☒ - **Negotiation and Sale.** Including, but not limited to, the authority to offer or list for sale, solicit, discuss, negotiate or entertain any inquiries or proposals from, or enter into any negotiations with, any person, representative, or entity with respect to selling the Real Estate, as well as obtain any services and/or hire such persons to perform services necessary or proper to complete such sale of the Real Estate. Additionally, this may include accepting closing proceeds for deposit into my account, which has been previously disclosed to my Agent.

**IV.    TERM.** This Power of Attorney shall begin on the Effective Date and shall continue until the: (initial and check one)

☒ - **All "Real Estate" is sold.**

☐ - **The Principal's death** or **revocation.**

**V.    DURABLE.** In the event the principal is shown to be incapacitated, or not able to think for themself, this Power of Attorney shall: (initial and check one)

Page 1 of 3

Exhibit 27, Page 427

DocuSign Envelope ID: 9F60F83D-32F2-42A6-B030-280C5EFC968C

☐ - **NOT be Valid**. This Power of Attorney is non-durable and shall be revoked immediately upon the Principal's incapacitation.

☐ - **Remain Valid**. This Power of Attorney is durable and shall not be revoked upon the Principal's incapacitation.

**VI.** **GOVERNING LAW**. This Power of Attorney shall be governed by the laws located in Washoe County, Nevada. ("Governing Law").

*EF*

In accordance with Governing Law, I, the Principal, hereby revoke any other Power of Attorney related specifically to the Real Estate mentioned in Section III with the Agent, and any Alternate Agent, as the only persons allowed to act in my presence for such matters.

**VII.** **EXECUTION**. As required under the Governing Law, this Power of Attorney shall be signed under: (initial and check all that apply)

*EF*

☐ - Notary Public
☐ - One (1) Witness
☐ - Two (2) Witnesses

Eric Fiegl
_____
**Principal's Printed Name**

┌─DocuSigned by:
│ *Eric Fiegl*              2/16/2023 | 7:03:45 PM PST
└─4737E03ED094405...
_____     _____
**Principal's Signature**          **Date**


_____     _____
**Agent's Signature**              **Date**
Aaron Noe, Manager
12 Bridges Residential



Exhibit 27, Page 428

DocuSign Envelope ID: 9F60F83D-32F2-42A6-B030-280C5EFC968C

## NOTARY ACKNOWLEDGMENT

STATE OF [STATE]
COUNTY OF [COUNTY] ss.

On this day of [MONTH] 20[YEAR] before me appeared [NAME] as Principal of this Power of Attorney who proved to me through government issued photo identification to be the above-named person, in my presence executed the foregoing acceptance of appointment and acknowledged that (s)he executed the same as his/her free act and deed.

_____
Notary Public

[NAME]
Print Name

My commission expires: [DATE]


## WITNESS ACKNOWLEDGMENT

I/We, the witness(es), each do hereby declare in the presence of the Principal that he/she/they signed and executed this instrument in my/our presence, and that the Principal signed it willingly, and that each witness hereby signs this Power of Attorney as witness at the request of the Principal and in the Principal's presence, and that, to the best of knowledge, the Principal is at least eighteen (18) years of age, of sound mind, and under no constraint or undue influence.

_____                [NAME]
**1ˢᵗ Witness Signature**                       Print Name
[ADDRESS]
Mailing Address
[PHONE]
Phone


_____                [NAME]
**2ⁿᵈ Witness Signature**                       Print Name
[ADDRESS]
Mailing Address
[PHONE]
Phone



Page 3 of 3

Exhibit 27, Page 429

# Exhibit 28

# 12B RESIDENTIAL

## CONTRACT FOR CONVEYANCE OF REAL PROPERTY IN EXCHANGE FOR MONEY OWED

For value received, the undersigned _____ (the "Borrower" and/or the "Seller") and Guardian Fund, LLC (the "Lender" and/or the "Buyer"), hereinafter referred to as the Party ("Party") or Parties ("Parties"), agree to exchange real property for a reduction of promissory note balance owed to Lender, as detailed below.

This agreement and any amendments thereto, along with associated Promissory Note ("Note") encumbering certain real property as described in Exhibit A (the "Property"), are hereinafter collectively referred to as the "Agreement."

1. **EFFECTIVE DATE OF AGREEMENT**

   A. This Agreement is effective on the later of _____ or immediately upon entry of an order in the Bankruptcy Case (defined below) approving the Agreement. This Agreement is binding between the Parties on the date signed by the last Party.

2. **PURCHASE AND SALE AGREEMENT**

   A. Seller hereby agrees to sell and convey to Buyer, who hereby agrees to purchase from Seller, the Property described in the attached Exhibit A. The Property shall be transferred by special warranty deed to Guardian Fund, LLC by the later of _____ or within _____ days after entry of an order of the bankruptcy court approving this Agreement in Guardian Fund, LLC's chapter 11 case pending in the District of Nevada as consolidated case 23-50177-hlb ("Bankruptcy Case"). In the event escrow cannot close by the date contemplated herein, the Parties can agree in writing to another mutually agreeable closing date without otherwise altering this Agreement or affecting its enforceability.

   B. The Property shall be sold to Lender at a combined total sale price of $_____ ("Sale Price") which Sale Price shall be paid by Lender through a reduction in the same amount credited against the balance owed by Borrower to Lender under the Note dated _____ , with said Note to be amended and restated as specified in Section 3 below for any remaining unpaid balance after the Sale Price credits.

   C. No earnest money or other setoff shall be required by either Party.

   D. Closing costs, associated closing fees, transfer taxes and any outstanding taxes or liens to be paid by Buyer.

   E. Buyer to be designated as: <u>Guardian Fund, LLC</u>.

   F. Seller to be designated as: _____.

   G. Title Company to be <u>Title One</u>, unless unavailable in the area of the Property, in which case a title company will be agreed to in an attached Addendum.

   H. Sale of Property to be as-is, with no requirements for inspection, improvements, or other conditions or considerations except that Seller represents, affirms and warrants as follows: (1) Seller is the sole legal owner of the Property in fee simple and the Property is not subject to any mortgage, deed of trust, lease,

Exhibit 28, Page 430

# 12 B RESIDENTIAL

## CONTRACT FOR CONVEYANCE OF REAL PROPERTY IN EXCHANGE FOR MONEY OWED

option, right of first refusal or agreement of sale, recorded or unrecorded (except for any lease between Buyer and Seller which shall be terminated as stated below, and associated subleases of which Buyer is aware); (2) Seller has not engaged any contractors or suppliers or otherwise caused any work to be performed on the Property which has not been fully paid for and/or which could result in the filing of a mechanic's or materialman's lien against the Property; (3) Seller has the full power and authority to execute, deliver and perform this Agreement and all agreements and documents referred to in this Agreement or contemplated hereby (no consents of any third party are required); (4) this Agreement is binding and enforceable against Seller in accordance with its terms; and (5) the person who has executed this Agreement on behalf of Seller has the authority to do so.

I.  If any Property leases are in effect between Buyer and Seller on the Effective Date, the Parties agree that such leases shall terminate on the Effective Date.

J.  As of the Effective Date of this Agreement, any rents, security deposits, property expenses, or other revenue or expenses incurred as part of the management of the Property are solely owned by, and the responsibility of, the Buyer.

## 3. RELEASE AND REISSUE OF PROMISSORY NOTE

A.  The Note between Borrower and Lender, with an effective date of _____ and a total principal balance of $_____ shall be amended and restated with the principal balance of that Note reduced by the Sale Price, for a remaining new principal balance of $_____ ("Principal Balance").

B.  Any outstanding principal balance allocated to the Property listed in Exhibit A will be released and considered PAID IN FULL, upon the completion of the sale of the Property to Buyer.

C.  If needed, a notarized mortgage release form ("Release") shall be filed along with the closing documents by the title company, at the expense of Lender.

## 4. MUTUAL RELEASE OF CLAIMS

A.  Except for the obligations created by this Agreement or as otherwise provided in this Agreement, each of the Parties, and their parents, subsidiaries, affiliates, successors, assigns, directors, officers, shareholders, members, managers, trustees, partners, beneficiaries, heirs, employees, agents, and personal and other representatives (collectively "Affiliates"), forever, finally and irrevocably release, relieve, acquit and discharge each and every of the other Parties to this Agreement and their Affiliates, from any losses, claims, causes of action, demands, debts, expenses, damages, suits or actions of whatever kind or nature, or liability for any and all known and unknown, unforeseen, unanticipated or unsuspected claims, counterclaims, controversies, administrative or regulatory claims or complaints, actions, causes of action, demands, debts, damages, costs, attorneys' fees, or liabilities of any nature whatsoever, in law or in equity, comprising any claim under federal, state, or local statute, code, or

Page **2** of **5**

Exhibit 28, Page 431



## CONTRACT FOR CONVEYANCE OF REAL PROPERTY IN EXCHANGE FOR MONEY OWED

ordinance or common law, including without limitation those claims related to Guardian Fund's Bankruptcy, which occurred from the beginning of time until the date the Property is transferred Lender. If Borrower has filed a proof of claim in the Bankruptcy Case, Borrower agrees to withdraw and rescind the claim(s) within five (5) business days after transferring the Property to Guardian Fund.

B.  With respect to the claims released in this Agreement, the Parties expressly waive any rights or benefits that may be available to them under any statute or law of the State of Nevada, the State of California or any other state or the United States of America that may operate to preserve any unknown or unsuspected claim including without limitation the provisions of §1542 of the California Civil Code or any other similar statute or law of the State of Nevada, the State of California or any other state or of the United States of America. The Parties agree, acknowledge and warrant that (a) each has executed this Agreement with full knowledge of all facts; (b) each has conferred with counsel (or been strongly encouraged, and had the opportunity, to do so) who has explained the meaning and import of this Agreement and negotiate the terms hereof; (c) each has a full and complete understanding of the meaning, intent and legal effects of this Agreement; and (d) each is of sound mind and competent to execute this Agreement and has done so free from coercion, duress or undue influence. Nothing in this Agreement is, nor is to be construed as, an admission or acknowledgment of liability or responsibility whatsoever on the part of any Party.

C.  To the fullest extent permitted by applicable law, the Parties waive the terms and provisions of any statute, rule, or doctrine of common law, that either: (i) narrowly construes releases purporting by their terms to release claims in whole or in part based upon, arising from, or related to such acts, omissions, matters, causes or things; or (ii) restricts or prohibits the releasing of such claims.

D.  Each of the Parties shall take whatever additional action and execute whatever additional documents (including any assignments of rights) that may be necessary or advisable in order to carry out or effectuate one or more of the provisions of this Agreement.

## 5.  FULL COMPROMISE AND NO ADMISSION OF LIABILITY

It is understood that, except as otherwise provided herein, including the obligations created by this Agreement, this Agreement shall constitute a full compromise and settlement of the Parties' claims against each other. This Agreement shall not be construed as an admission of liability or an existence of a defense by any of the Parties.

## 6.  GOVERNING LAW; VENUE; INTEPRETATION

This Agreement shall be construed in accordance with the laws of the State of Nevada without reference or regard to any conflict of laws principles. The exclusive jurisdiction and venue of any action or proceeding related to or arising from this Agreement (whether sounding in contract, tort, equity or otherwise) shall be in the state courts located in Washoe County, Nevada (or in the federal bankruptcy court having jurisdiction over the Bankruptcy Case), and the Parties herby so consent and waive any objection to that venue. Each Party has

Page 3 of 5

Exhibit 28, Page 432

# 12B RESIDENTIAL

## CONTRACT FOR CONVEYANCE OF REAL PROPERTY IN EXCHANGE FOR MONEY OWED

reviewed this Agreement and had the opportunity to negotiate its terms such that any rule of construction providing that any ambiguities are to be resolved against the drafting party shall not apply to the interpretation or enforcement of this Agreement. Each of the Parties agrees to cooperate fully and execute any-and-all supplementary documents and to take all additional actions that may be necessary or appropriate to give full force and effect to the terms and intent of this Agreement.

7. **SUBJECT TO COURT APPROVAL**

   A. This Agreement is subject to approval of the bankruptcy court in the Bankruptcy Case.

   B. If this Agreement is not approved by the bankruptcy court in the Bankruptcy Case, the Agreement shall be immediately nullified.

8. **TAX CONSEQUENCES**

   Buyer makes no warranties or representations to Seller as to the tax effect or consequences of this Agreement. Buyer has advised Seller to consult with Seller's tax advisor before entering into this Agreement to determine Seller's tax consequences, if any, resulting from this Agreement, including from any related loan forgiveness.

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement on the day and year written below.

**SELLER**
Entity:
*(if different from name of signer)* _____

Name of Signer: _____

Signature: _____

Date Signed: _____

Name of Signer: _____

Signature: _____

Date Signed: _____

**BUYER**
Entity:
*(if different from name of signer)* _Guardian Fund, LLC_____

Name of Signer: _Aaron Noe, President, El Monte Capital, Inc., Manager____

Signature: _____

Date Signed: _____

Exhibit 28, Page 433



## 12B RESIDENTIAL

### CONTRACT FOR CONVEYANCE OF REAL PROPERTY IN EXCHANGE FOR MONEY OWED

Exhibit A – Property List

| Address | City | State | Zip | Sales Price |
|---------|------|-------|-----|-------------|
|         |      |       |     |             |

Exhibit 28, Page 434