STEPHEN R. HARRIS, ESQ. NVB 1463
Email: steve@harrislawreno.com
NORMA GUARIGLIA, ESQ. NVB 16244
Email: norma@harrislawreno.com
HARRIS LAW PRACTICE LLC
850 E. Patriot Blvd., Suite F
Reno, NV 89511
Telephone: (775) 786-7600
Attorneys for Jointly Administered Debtors

## UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF NEVADA

* * * * *

IN RE:

GUARDIAN FUND, LLC,

☐ AFFECTS THIS DEBTOR

☐ AFFECTS GUARDIAN CV1, LLC

☐ AFFECTS GUARDIAN CV2, LLC

☒ AFFECTS ALL DEBTORS

Debtors.
_____/

Case No.: BK-23-50177-hlb
Case No.: BK-23-50233-hlb
**Consolidated Under Case No. BK-23-50177-hlb**
(Chapter 11)

Jointly Administered with:

| 23-50951-hlb | Guardian CV1, LLC |
| 23-50952-hlb | Guardian CV2, LLC |

Hrg. Date:  TBD
Hrg. Time: TBD

## [PROPOSED] AMENDED JOINT DISCLOSURE STATEMENT

Dated:          July 16, 2024

Filed by:       GUARDIAN FUND, LLC, a Nevada limited liability company;

                GUARDIAN CV1, LLC, a Delaware limited liability company;

                GUARDIAN CV2 LLC, a Delaware limited liability company; and

                THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF
                GUARDIAN FUND, LLC

**THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN.
ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE
STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS
DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT YET
BEEN APPROVED BY THE BANKRUPTCY COURT.**

# I. INTRODUCTION

GUARDIAN FUND, LLC ("Guardian Fund" or "Guardian"), GUARDIAN CV1, LLC ("CV1"), and GUARDIAN CV2, LLC ("CV2"), Debtors and Debtors-in-Possession herein (Guardian Fund, CV1, and CV2 collectively the "Debtors") in the above-captioned jointly administered Chapter 11 cases, and the OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF GUARDIAN FUND, LLC ("Committee"), provide the information contained in this AMENDED JOINT DISCLOSURE STATEMENT ("Disclosure Statement") to all known creditors and other parties in interest of the Debtors in order to disclose that information deemed material, important, and necessary to the creditors to arrive at a reasonably informed decision in exercising their rights to vote for acceptance of their JOINT PLAN OF REORGANIZATION.

Together with this Disclosure Statement, each creditor should also have received a copy of the AMENDED JOINT PLAN OF REORGANIZATION ("Plan"), a form ballot ("Ballot") on which creditors and other parties in interest who are entitled to vote may cast their respective votes, and a copy of the ORDER APPROVING AMENDED JOINT DISCLOSURE STATEMENT which indicates that the Bankruptcy Court has approved this Disclosure Statement for circulation to creditors in that it contains information of a kind and of sufficient detail, as far as its reasonably practicable, to enable creditors and other parties in interest to make an informed decision about the Plan. As indicated in the instructions accompanying the Ballot, which is the form on which you may cast your vote to accept or reject the Plan, the Ballot must be mailed to Debtors' counsel in time to ensure that your Ballot will be received by the due date. Ballots received after the due date may not be counted.

## Summary of Value of Plan

The Plan was strategically crafted to optimize the value of the Debtors' current assets and to leverage the infrastructure, expertise, and experience of the Debtors to generate future reoccurring revenue and increased value of Debtors' fixed assets. The business operating platform developed by Guardian through its wholly owned subsidiary, 12B Residential, Inc. ("12BR"), will provide significant revenue and market value even after sale and reinvestment of the Debtors' current assets.

The Debtors' real estate portfolio is comprised of around 446 low-income residential properties ("Properties"). The Properties are approximately 50% occupied and many need substantial deferred maintenance, the result being that  many Properties would not qualify for traditional financing in their "as is" condition. Many of the vacant Properties are also boarded up with utilities turned off, making it difficult for a potential buyer to perform due diligence. The average age of the Properties in the portfolio is 91 years old with the oldest building over 135 years old. As explained in more detail in the chapter 7 Liquidation Analysis, Debtors believe a wholesale or bulk liquidation of the Properties in their "as is" condition will most likely generate only about 20-30% of their fair market value in a habitable condition. Auctions of individual Properties would take longer than bulk sales and would still likely result in only about 40% of their fair market value.

On the other hand, the Debtors can add significant value to the Properties through strategic renovations, leasing, asset management, and disposition. For the Debtors to capture this value, they will need to continue building out the asset management, field services, and brokerage capabilities inside of 12BR. Additionally, the amount of time required for creditors to receive distributions from a straight liquidation would be roughly the same as the time required to implement the Chapter 11 reorganization Plan that generates higher returns for creditors.

The Debtors and Committee have considered and analyzed several financial models to determine the model that is most likely to optimize value for and return the most value to the Debtors' creditors and equity holders. This Plan, and the related financial projections, are based on what the Debtors and Committee believe is the best and most feasible operating model which will result in payment in full to allowed unsecured creditors, with accrued interest, and also allow equity holders to retain their ownership interests in Guardian to benefit from future dividend distributions. Accordingly, the Debtors and Committee urge creditors and equity holders to vote in support of the Plan.

You are urged to carefully read this Disclosure Statement and the Plan before deciding to accept or reject the Plan. Please direct particular attention to the provisions of the Plan affecting your rights as well as the Liquidation Analysis which describes the results which would likely be

obtained in the event the Debtors' business is discontinued, and their assets liquidated by a trustee of the Court.

**Definitions: Unless otherwise noted, all capitalized terms in this Disclosure Statement are defined in the accompanying Plan.**

## II. THE CHAPTER 11 CONFIRMATION PROCESS

The Chapter 11 confirmation process is governed, in large part, by the Bankruptcy Code. Under the Bankruptcy Code, to be confirmed, the Plan must be accepted by at least one (1) Class of Creditors whose claims against the Debtors will be "impaired" under the Plan. Claimants who are scheduled to receive full payment on their Claims without any modification or changes to their right to payment are considered "unimpaired," are deemed by the Bankruptcy Code to have accepted the Plan and do not vote. Only Creditors whose Claims are "impaired" (their right to payment terms is modified or changed) are entitled to vote in favor of accepting or rejecting the Plan. A Class of claims is "impaired" if the amount to be paid to the Class provides the Claimants in that Class with less than full payment of the Allowed Claims in that Class or the terms for repayment are extended beyond the contractual due date or some other legal or contractual terms are changed. Acceptance by such Class of Claims requires at least one-half of the Creditors in the Class who cast accepting votes on the Plan and hold at least two-thirds of the total dollar amount of the Claims in that Class casting votes on the Plan. Acceptance by a Class of Interests requires that the Plan be accepted by holders of such Interests that hold at least two-thirds in amount of the allowed interests of such Class who have voted.

## III. DISCLAIMER

**THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE PLAN OF REORGANIZATION PROPOSED BY DEBTORS  AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN. NO PERSON MAY GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS, OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THIS DISCLOSURE STATEMENT, REGARDING THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN.**

**THIS DISCLOSURE STATEMENT SETS FORTH CERTAIN INFORMATION REGARDING THE DEBTORS' PREPETITION OPERATING AND FINANCIAL**

HISTORY, THE NEED TO SEEK CHAPTER 11 PROTECTION, SIGNIFICANT EVENTS DURING THE CHAPTER 11 CASE, AND THE ANTICIPATED ORGANIZATION, OPERATIONS AND FINANCING OF THE DEBTORS UPON SUCCESSFUL EMERGENCE FROM CHAPTER 11. THIS DISCLOSURE STATEMENT ALSO DESCRIBES TERMS AND PROVISIONS OF THE PLAN, CERTAIN EFFECTS OF CONFIRMATION OF THE PLAN, CERTAIN RISK FACTORS, AND THE CONFIRMATION PROCESS AND VOTING PROCEDURES THAT HOLDERS OF CLAIMS ENTITLED TO VOTE UNDER THE PLAN MUST FOLLOW FOR THEIR VOTES TO BE COUNTED.

THIS DISCLOSURE STATEMENT AND THE PLAN WERE COMPILED FROM INFORMATION OBTAINED FROM NUMEROUS INDUSTRY SOURCES BELIEVED TO BE ACCURATE TO THE BEST OF THE DEBTORS' AND COMMITTEE'S KNOWLEDGE, INFORMATION, AND BELIEF. NO GOVERNMENTAL AUTHORITY HAS PASSED ON, CONFIRMED, OR DETERMINED THE ACCURACY OF THE INFORMATION CONTAINED HEREIN.

UNLESS OTHERWISE NOTED, ALL DOLLAR AMOUNTS PROVIDED IN THIS DISCLOSURE STATEMENT AND THE PLAN ARE GIVEN IN UNITED STATES DOLLARS.

ALL CREDITORS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN, THE EXHIBITS AND SCHEDULES ANNEXED TO THE PLAN, THE PLAN SUPPLEMENT DOCUMENTS ONCE FILED, AND THIS DISCLOSURE STATEMENT. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE UNITED STATES BANKRUPTCY CODE AND RULE 3016(c) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-BANKRUPTCY LAW. THIS DISCLOSURE STATEMENT HAS BEEN NEITHER APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC"), NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN. PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING SECURITIES OR CLAIMS OF DEBTORS IN THIS CASE SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS PURSUANT TO RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND OTHER APPLICABLE EVIDENTIARY RULES. THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR SHALL IT BE CONSTRUED TO BE

**CONCLUSIVE ADVICE ON THE TAX, SECURITIES OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST, OR INTERESTS IN, DEBTORS.**

**TO ENSURE COMPLIANCE WITH TREASURY DEPARTMENT CIRCULAR 230, EACH HOLDER IS HEREBY NOTIFIED THAT (A) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE RELIED UPON, AND CANNOT BE RELIED UPON, BY ANY HOLDER FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON A HOLDER UNDER THE TAX CODE; (B) SUCH DISCUSSION IS INCLUDED HEREBY BY THE DEBTORS IN CONNECTION WITH THE PROMOTION OR MARKETING (WITHIN THE MEANING OF CIRCULAR 230) BY THE DEBTORS OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) EACH HOLDER SHOULD SEEK ADVICE BASED ON ITS PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

## IV. DEBTORS' HISTORY

1. **Entity Descriptions:** Guardian is a Nevada limited liability company established in 2017. It has been actively involved in residential real estate and debt investments since its inception. CV1 and CV2 are Delaware limited liability companies wholly owned by Guardian and formed on February 26, 2020, and May 21, 2021, respectively, as special purpose entities to facilitate two loans extended by Wilmington Trust (see more about Wilmington Trust below). CV1 and CV2 collectively hold title to 121 properties in Alabama, Missouri, and Ohio which serve as collateral to secure Wilmington Trust's loans.

2. **Investment Focus:** Guardian's primary objective was to provide its members with steady, annuity-like returns. It aimed to achieve this goal by investing in income-producing residential real estate and first deeds of trust.

3. **Divergence from Initial Strategy:** Over time, Guardian shifted from its original strategy of investing in "qualified investments" and began allocating a sizable portion of its funds to unsecured notes and leasehold interests. At one point, Guardian held almost $41.5 million in unsecured notes and was responsible for over $155 million in leasehold interests.

### Financial Troubles and Attributed Causes

1. **Leasehold Interests:** Guardian's portfolio of triple net leases experienced substantial monthly operating losses, totaling approximately $700,000 per month. These losses resulted from a combination of high operating expenses, low occupancy rates, and challenges in rent collection. Stabilizing this leasehold portfolio and improving operating income would require

a substantial investment of $10-12 million because of significant deferred maintenance of the Properties at the leases' inception. However, the majority of leased properties operated under twelve month renewable leases with a 90-day at-will termination clause at the election of Guardian, or 30-day at-will termination clause at the election of the lessor, making such capital investments financially unfeasible for Guardian.

2. **Promissory Note with 12 Bridges, Inc. and 1031 Exchange Program:** Guardian extended a revolving unsecured line of credit to 12 Bridges, Inc. ("12 Bridges"), a wholly-owned subsidiary of the Debtor's former non-equity manager, Hughes Private Capital, Inc ("HPC"). The note had an unpaid balance of approximately $25M ("12 Bridges Note") on the Petition Date. The purpose of the 12 Bridges Note was to facilitate the purchase of real properties which 12 Bridges would sell back to Guardian.

To summarize, Guardian would loan money to 12 Bridges, 12 Bridges would purchase real properties in various markets, but primarily in Ohio, Alabama, Missouri, and Tennessee. Then 12 Bridges would sell the properties back to Guardian at a marked-up price, and Guardian would either retain the properties for its portfolio or sell the properties at its cost to third-party individuals, many who were interested in purchasing rental properties as investments that qualified as "1031 exchanges" under Internal Revenue Service rules. The properties sold by Guardian to accredited third parties as unregistered securities under certain Secured Investment Agreements were then leased back to Guardian by the third-party owners under the triple net leases described above. The profits earned by 12 Bridges for selling the marked-up properties back to Guardian were then distributed among HPC and its other wholly owned subsidiaries who managed the Debtors' prepetition day-to-day business and property management operations. This financial model became unsustainable for Guardian because it was not making any profit on the front-end from the sale of properties to third-parties, yet Guardian was assuming significant future liabilities under the triple net leases.

3. **Operational and Liquidity Problems:** On or around April 2022, Guardian's manager, HPC, began looking for a new COO with significant industry experience with the goal of helping HPC and its related entities, including Guardian, improve the efficiency of their

business operations. At this time, an executive recruiter connected Aaron Noe with HPC's principals, Greg Hughes, Steve Sixberry, and Kyle Krch. Mr. Noe had previously worked for American Homes 4 Rent for about eight years, from the time it was an early start-up until it grew to one of the country's largest publicly traded REITs. At the time he left American Homes 4 Rent, Mr. Noe was its Executive Vice President, Director of Operations. After that, Mr. Noe joined Redfin and became a vice president and founder of Redfin Home Services.

HPC hired Mr. Noe on or about May 2022, with the idea that he would eventually transition into the responsibilities and authority of a traditional CEO or COO role for HPC. Mr. Noe never transitioned into this role (and he did not have what would be considered the traditional responsibilities of a CEO or COO), but over the next several months, as Mr. Noe began familiarizing himself with the network of HPC's owned or managed companies, Mr. Noe began to discover significant operational problems within HPC broadly and including the Debtors. For example, Mr. Noe found that agents for HPC and 12 Bridges were not buying properties strategically to ensure asset appreciation or income production but were instead buying damaged and/or very low income-producing properties. Additionally, the property management and property rehab activities for the Debtors lacked proper cash and quality controls to minimize waste and abuse. Some of the properties owned by the Debtors or leased by Guardian under the triple net leases were vacant and in significant disrepair. Accordingly, Mr. Noe began making recommendations to HPC's corporate officers for changes in operations, financial controls, and personnel.

These activities continued until approximately October 2022, when it became apparent to Mr. Noe that the Debtor's financial problems were greater than what was originally disclosed to him by HPC.  The Debtors' portfolio of owned and leased properties was not generating enough revenue to sustain Guardian's financial model and pay the lessors with contractual fixed rent under the leases. Mr. Noe expressed his concerns to HPC's corporate officers who determined to "gate the fund," which  meant Guardian would stop taking new investor money and stop all equity distributions to members. In January 2023, Mr. Noe tendered his resignation and officially stopped working for HPC around February 2023.

During this time, certain of Guardian's concerned investors and unsecured creditors (collectively "Concerned Investors") started reviewing the Debtors' books and records and were meeting with the principals of HPC to discuss possible restructuring solutions for Guardian. The Concerned Investors encouraged HPC's principals to select Mr. Noe as Guardian's new manager to implement any reorganization of Guardian. The Concerned Investors also urged HPC's principals to assign approximately 168 properties from 12 Bridges to Guardian for the purpose of paying down 12 Bridges' substantial debt. Accordingly, 12 Bridges appointed El Monte and Mr. Noe as agents under a Power of Attorney ("POA") to administer, transfer, encumber, and sell the 12 Bridges properties ("POA Properties") for the benefit of Guardian. Finally, the primary property manager for the Debtors' owned and leased properties, Krch Realty (a wholly owned subsidiary of HPC), was quickly running out of cash and could no longer continue the needed property management functions for the Debtors. It was also impossible for the Debtors to immediately transition property management of the estimated 1,500 +/- properties to new third-party property managers without a few months' lead time. Accordingly, HPC's principals and the Concerned Investors agreed that Guardian should immediately form a wholly owned subsidiary, 12BR, to take over property management functions from Krch Realty to avoid a disastrous interruption in property management of the Debtors' owned and leased properties. But HPC's principals were not acting as quickly as the Concerned Investors wanted, with Guardian's cash rapidly dissipating without an adequate explanation. Thus, on March 17, 2023, certain creditors ("Petitioning Creditors") filed an involuntary chapter 7 case against Guardian as case number 23-50177 ("Involuntary Case").

After the Involuntary Chapter 7 Case, HPC's principals determined that it was in the best interest of Guardian to avoid litigation with the Petitioning Creditors and to initiate a voluntary chapter 11 reorganization filing for Guardian. Accordingly, on April 11, 2023, HPC amended Guardian's operating agreement to appoint Mr. Noe's wholly owned company, El Monte Capital, Inc. ("El Monte") as Guardian's non-equity manager in HPC's place. HPC also authorized Guardian's voluntary chapter 11 petition. As the new manager for Guardian, El Monte initiated Guardian's chapter 11 voluntary petition as case number 23-50233 ("Voluntary Chapter 11

Case").

After more negotiations with the Petitioning Creditors, on April 17, 2023, Guardian filed a *Stipulation Between Debtor and Petitioning Creditors to Consolidate Involuntary and Voluntary Cases Pursuant to Fed. R. Bankr. P. 1015(a)* in both the Involuntary Case and the Voluntary Chapter 11 Case. On April 27, 2023, the Court entered its *Order Approving Stipulation Between Debtor and Petitioning Creditors to Consolidate Involuntary and Voluntary Cases Pursuant to Fed. R. Bankr. P. 1015(a) and Fixing Petition Date and Commencement Date* ("Consolidation Order"). The Consolidation Order consolidated the Involuntary Case together with the Voluntary Chapter 11 Case under the first-filed case, 23-50177-hlb, and fixed Guardian's Chapter 11 petition date, as defined under 11 U.S.C. § 101(42), to March 17, 2023 ("Petition Date").

> 4. **Disputes with Wilmington Trust and subsequent chapter 11 filings for CV1 and CV2:**

CV1 and CV2 are holding companies for certain real properties ("CV1/CV2 Properties") which are encumbered by notes and mortgages or deeds of trust in favor of Wilmington Trust, N.A., as Trustee, for the benefit of Holders of CoreVest American Finance 2020-3 Trust Mortgage Pass-Through Certificates; and Wilmington Trust, N.A., as Trustee for the benefit of the Holders of CoreVest American Finance 2021-2 Trust Mortgage Pass-Through Certificates (collectively, "Wilmington Trust"). CV1 borrowed the original principal amount of $2,881,000 ("Loan 1") from Wilmington Trust's predecessor on or about June 4, 2020. CV2 borrowed the original principal amount of $3,134,000 ("Loan 2") from Wilmington Trust's predecessor on or about June 18, 2021. (Loan 1 and Loan 2 collectively, the "Loans.")

On May 23, 2023, Wilmington Trust delivered to CV1 and CV2 two Notices of Default, invoking non-monetary defaults of the Loans which were allegedly triggered by Guardian's bankruptcy filing. Wilmington Trust also accelerated the Loans. On June 22, 2023, Wilmington Trust filed a Complaint in the United Stated District Court of Nevada–Southern Nevada against CV1 and CV2, as Case No. 2:23-cv-00966 ("Receivership Action"), seeking specific performance of the Loans and appointment of a receiver over CV1/CV2 Properties even though Guardian owns

a 100% member's interest in CV1 and CV2.

Based on Wilmington Trust's actions which put the value of CV1 and CV2 at risk, Guardian filed a motion with the Bankruptcy Court seeking an order finding that Wilmington Trust violated Guardian's automatic stay, or alternatively, seeking authorization to file chapter 11 voluntary petitions for CV1 and CV2. On November 30, 2023, the Court entered its Order [ECF 627] denying Guardian's request related to the automatic stay but granting Guardian's request to file chapter 11 petitions for CV1 and CV2. Accordingly, on December 14, 2023 ("CV1/CV2 Petition Date"), CV1 and CV2 filed their chapter 11 voluntary petitions as Case Nos. 23-50951-hlb and 23-50952-hlb, respectively.

## V.  DESCRIPTION AND VALUATION OF DEBTORS' ASSETS

The Debtors' known assets which existed on the Petition Date and on the CV1/CV2 Petition Date, are generally described as follows:[1]

**Guardian:**

*See* Amended Schedules A/B attached hereto as **Exhibit A**.

**CV1**:

| | |
|---|---|
| Heritage Bank checking account | $62,283.61 |
| Funds held in escrow by Wilmington Trust | $245,057.00 |
| Reserve deposits held in Evernest Owners' Account | $7,651.18 |
| Rents receivable | $Unknown |
| 66 residential real properties located in Alabama, Missouri, and Ohio | $6,649,710.00[2] |
| Potential causes of action against Wilmington Trust | $Unknown |

**CV2**:

| | |
|---|---|
| Heritage Bank checking account | $60,044.40 |
| Funds held in escrow by Wilmington Trust | $8,259.00 |
| Reserve deposits held in Evernest Owners' Account | $28,393.48 |

---

[1] The Debtors' assets continue to accrue post-petition pursuant 11 U.S.C. § 541(a).

[2] CV1 estimates that the current value of its properties has increased post-petition with a current value of approximately $6.7-$6.9 million.

| | |
|---|---|
| Rents receivable | $Unknown |
| 55 residential real properties located in Alabama, Missouri, and Ohio | $5,404,649.00[3] |
| Potential causes of action against Wilmington Trust | $Unknown |

## VI. SIGNIFICANT POST-PETITION EVENTS

The following significant events have occurred post-petition:

- Guardian obtained Court approval to employ Harris Law Practice LLC ("HLP") as its general bankruptcy counsel. After CV1 and CV2 filed their chapter 11 cases, they also obtained Court approval to employ HLP as their general bankruptcy counsel.

- The Committee was appointed in Guardian's case on May 10, 2023, and subsequently obtained Court approval to employ McDonald Carano LLP as its counsel. One of the Committee's statutory duties is to "investigate the acts, conduct, assets, liabilities, and financial condition of the debtor, the operation of the debtor's business and the desirability of the continuance of such business," and to "participate in the formulation of a plan." *See* 11 U.S.C. §§ 1103(c)(2) and (3). The Committee has worked diligently with Guardian to perform its duties and assist toward the preparation of their joint Plan.

- On June 13, 2023, the United States Trustee ("US Trustee") filed her *United States Trustee's Motion Under 11 U.S.C. § 1104(a) to Appoint a Chapter 11 Trustee or, in the Alternative, an Examiner Under 11 U.S.C. § 1104(c), and Reservation of Rights* [ECF No. 107] ("UST Motion"). Guardian and the Committee opposed appointment of a trustee but consented to the appointment of an examiner with limited duties in order to limit associated costs of the examiner's investigation and report. After a contested hearing, the Court entered an order on July 24, 2023, appointing an examiner to "review the finances and operations of [Guardian's] wholly owned property management company, 12B Residential, Inc. (or any of its predecessors) and to investigate Mr. Aaron Noe's background, experience, and involvement, either past or

---

[3] CV2 estimates that the current value of its properties has increased post-petition with a current value of approximately $5.5-$5.7 million.

current, with Debtor's prior management, Hughes Private Capital (or any of its predecessors)." Jeffrey I. Golden ("Examiner") was then selected as examiner by the US Trustee.

- On January 5, 2024, the Examiner filed his Report [ECF No. 648], and subsequently filed a First Amended Report [ECF No. 739] on March 29, 2024. The Examiner found, among other things, that: (1) Mr. Noe did not appear to be involved in any fraud or deceit or the solicitation of investor funds prior to the gating of Guardian; (2) Mr. Noe appears to have sought to help HPC and protect the investors to the extent he was able to do so; (3) Mr. Noe precipitated the gating of Guardian which helped investors and stopped further losses and damage; (4) Mr. Noe was not legally CEO or COO at HPC, but was the *de facto* CEO; and (5) Mr. Noe was not a signatory on bank accounts at HPC.

- HPC filed its own chapter 7 case on May 12, 2023, as Case No. 23-50322-hlb. Christopher P. Burke is HPC's trustee. Around May 24, 2023, without first providing notice to Guardian or seeking relief from the automatic stay, Mr. Burke dissolved 12 Bridges and revoked the POA pursuant to which Guardian had received the right to the 168 POA Properties. This resulted in Guardian losing control of the POA Properties and their proceeds, proceeds on which Guardian was relying to provide capital for its reorganization. This significantly hampered Guardian's reorganization efforts.

- Guardian and the Committee then filed a joint *Motion to Enforce the Automatic Stay and for Sanctions for Violation of the Automatic Stay Against Christopher Burke* [ECF No. 113] ("Motion to Enforce Stay") to remedy the problems caused by Mr. Burke's actions. After contested hearings, the parties entered into an Interim Stipulation [ECF No. 390]  which temporarily resolved their disputes and reinstated 12 Bridges and the POA. Under the Interim Stipulation, Mr. Noe could continue administering the POA Properties for Guardian's benefit, with the net proceeds of any sales split 65%/35% between Guardian and Mr. Burke, with Mr. Burke to hold the 35% on behalf of 12

Bridges subject to a future final agreement or Court order.

- Because of the sudden disruption in Guardian's working capital during the time Mr. Burke revoked the POA, Guardian could not invest the needed funds to sustain the significant property management functions 12BR needed for the Debtors' Properties and the more than 1,000 leased properties. To avoid catastrophic consequences, 12BR entered into agreements with an unrelated third-party property manager, Evernest Property Management, to start taking over most property management functions, thus reducing 12BR's fixed overhead and personnel costs.

- Guardian retained a new tax accountant, Excelsis Accounting, to prepare its 2022 consolidated income tax return and associated K-1 Forms for distribution to Guardian's equity holders.

- Guardian terminated the triple net leases with third-party owners for more than 1,000 properties in the ordinary course under the leases' at-will termination provisions, thus reducing or eliminating Guardian's future potential liabilities and lease rejection damages. 12BR worked with property owners to "offboard" properties as leases terminated in order to ease the transition to the new property managers selected by owners.

- On February 5, 2024, Guardian, the Committee, a group of creditors represented by Fletcher & Lee ("Investor Group"), Mr. Burke, and Vista Fund, LLC (another alleged creditor of 12 Bridges), participated in a settlement conference with Bankruptcy Judge Paul Sala to finally resolve the Motion to Enforce Stay and related issues. The parties agreed to a settlement ("HPC Settlement"), subject to the Bankruptcy Court's approval. Under the HPC Settlement, Guardian will keep all the POA Properties and their proceeds and pay Vista Fund the sum of $65,000 in cash, with Mr. Burke to retain for HPC's chapter 7 estate approximately $375,000 he is currently holding for 12 Bridges, of which around $245,000 was from prior sales of POA Properties. Mr. Burke will also pay Vista Fund $35,000, and Vista Fund will retain any interest in four properties located around Scottsdale, AZ, which are subject to fractional interests and

managed by Hughberry Homes, LLC. The Court approved the HPC Settlement at a hearing held on June 13, 2024. The HPC Settlement has allowed the Debtors to move forward with their Plan.

- As explained previously, Wilmington Trust sought to appoint a receiver to take control of CV1/CV2 Properties, thus precipitating the need for Guardian to file chapter 11 cases for CV1 and CV2. On March 13, 2024, Wilmington Trust filed a *Motion for Appointment of a Chapter 11 Trustee or, In the Alternative, Conversion of Case to Chapter 7 or Dismissal* in each of CV1 and CV2's cases. CV1 and CV2 have filed oppositions, and the hearings on these motions are scheduled to occur on the same date and time as the hearing to consider confirmation of the Plan.

- Guardian has responded to a Subpoena from the United States Securities and Exchange Commission ("SEC") seeking extensive documents and information in relation to a formal investigation titled In re: Hughes Private Capital, Inc. HO-14793. Guardian has produced over 19,000 pages of documents under a letter agreement for purposeful production without privilege review between Guardian and the SEC dated February 16, 2024, and continues working with the SEC to comply with any reasonable production requests. Guardian has advised the SEC that if its production requests unduly burden these bankruptcy estates or seek to control or interfere with property of the estates, the Debtors will seek protection from the Bankruptcy Court.

- The Debtors are not aware of any formal claims asserted by the SEC against them, but the SEC's investigation is ongoing, and the SEC has filed "place holder" claims against each Debtor in the amount of $0 to preserve its rights. Accordingly, at the SEC's request, CV1 and CV2 agreed to a stipulation for an extension of time for the SEC to file any complaint objecting to dischargeability of a debt under 11 U.S.C. §§ 523(a)(2),(4), and (6).

- On June 4, 2024, Andronico Family Partnership, L.P. ("Andronico") filed a *Motion Pursuant to Fed. R. Bankr. P. 3013 Regarding Improper Classification and Subordination of Class 6 Unsecured Claims Under Joint Plan of Reorganization* [ECF

No. 798] ("Andronico's Motion"). Andronico's Motion seeks a finding by this Court that no Property Owners' allowed claims against Guardian can be subordinated as damages arising from the purchase or sale of a security under 11 U.S.C. § 510(b). The Debtors and the Committee disagree, but the issues raised in the Andronico Motion will be reserved and determined either before or in connection with the Plan confirmation. The SEC also has reached out to the Debtors and Committee to express its concern about the potential effect on its investigation under federal securities' laws if the Court adjudicates whether these transactions are related to a purchase or sale of "securities" as that term is defined under the Bankruptcy Code and bankruptcy law for purposes of 11 U.S.C § 510(b). The Debtors and Committee have orally agreed with the SEC to include in any order on this issue that this Court's conclusions of law in determining whether transactions are "securities" for purposes of the Bankruptcy Code and claim subordination will not be preclusive in any future legal proceedings potentially brought by the SEC against the Debtors or others under federal securities laws.

- Many other administrative matters have occurred in these cases as reflected on the Court's dockets.

## VII. ADMINISTRATIVE AND UNCLASSIFIED CLAIMS

### ADMINISTRATIVE CLAIMS:

All costs and expenses of administration in this case, including any actual and necessary expenses of preserving or liquidating the assets of the Debtors' estates, all allowances, including professional fees and costs, approved by the Court, and any other costs and expenses entitled to priority pursuant to 11 U.S.C. §§ 507(a)(1) and (2) of the Bankruptcy Code and 28 U.S.C. § 1930, shall be paid in full on or before the Effective Date[4] of the Plan.  The holders of these claims include the attorneys and accountants for the Debtors, attorneys for the Committee, unpaid post-petition accounts payable (if any), and all fees to be paid to the Office of the United States Trustee.

---

[4] Effective Date, as defined in Section II(26) of the Plan, is the earlier of ninety (90) calendar days after entry of the Confirmation Order, or December 30, 2024, so that the Effective Date in no event will be later than December 30, 2024.

The estimated administrative expenses for the Debtors' reorganization proceeding consist of the following:

**For Guardian:**

| Amount | Description |
| --- | --- |
| $0.00 | Fees that are owed the U.S. Trustee's Office for the applicable quarters of 2023and 2024 prior the Confirmation Date [payment is anticipated to be made when due]. |
| $950,000.00 | Estimated administrative professional legal fees and costs for Guardian's general bankruptcy attorneys, Harris Law Practice LLC, calculated as of the Confirmation Date. Of this estimated amount, $487,750.42 has already been approved by the Court on an interim basis and paid by Guardian. |
| $90,000.00 | Estimated professional fees for Guardian's tax accountants, Excelsis Accounting Group, calculated as of the Confirmation Date. Of this estimated amount, $55,163.75 has already been approved by the Court on an interim basis and paid by Guardian. |
| $0.00 | Professional fees paid to real estate brokers employed by Guardian for property sales [all broker fees have been paid from escrow upon closing of the sale]. |
| $500,000.00 | Estimated administrative professional legal fees and costs for the Committee's attorneys, McDonald Carano LLP, calculated as of the Confirmation Date. Of this estimated amount, $171,157.57 has already been approved by the Court on an interim basis and paid by Guardian. |
| $155,062.15 | Allowed administrative fees and costs of the Examiner for his investigation and report. Guardian anticipates paying these fees and costs before any Plan confirmation hearing. |
| $0.00 | Post-petition accounts payable, including from Guardian's leases [Guardian expects to pay all post-petition administrative expenses in full in the ordinary course of business prior to the Confirmation Date]. |

**For CV1:**

| Amount | Description |
|---|---|
| $0.00 | Fees that are owed the U.S. Trustee's Office for the applicable quarters of 2023and 2024 prior the Confirmation Date [payment is anticipated to be made when due]. |
| $100,000.00 | Estimated administrative professional legal fees and costs for CV1's general bankruptcy attorneys, Harris Law Practice LLC, calculated as of the Confirmation Date. |
| $0.00 | Post-petition accounts payable [all post-petition administrative expenses are expected to be paid in full in the ordinary course of business prior to the Confirmation Date]. |

**For CV2:**

| Amount | Description |
|---|---|
| $0.00 | Fees that are owed the U.S. Trustee's Office for the applicable quarters of 2023and 2024 prior the Confirmation Date [payment is anticipated to be made when due]. |
| $100,000.00 | Estimated administrative professional legal fees and costs for CV2's general bankruptcy attorneys, Harris Law Practice LLC, calculated as of the Confirmation Date. |
| $0.00 | Post-petition accounts payable [all post-petition administrative expenses are expected to be paid in full in the ordinary course of business prior to the Confirmation Date]. |

Professional fees, both legal and accounting, shall continue to accrue up through and subsequent to the Confirmation Date, with final amounts owing subject to Court approval.

<u>UNCLASSIFIED PRIORITY CLAIMS</u>:

1. **Description**. The Debtors' priority claims are as follows:

| Name | Scheduled Amount | Proof of Claim Amount | Allowed Priority Amount |
|---|---|---|---|
| None | | | |

Pursuant to the Plan, the treatment and disposition of the unclassified priority claims, now totaling

$0, will be as follows: Any claim discrepancy will be resolved by the claim objection process, with the stipulated amount and/or Court decreed amount owing used to calculate that particular creditors' allowed claim being paid by the Debtors. All unclassified priority creditors shall be paid 100% of their allowed claim amount, with statutory interest thereon, over a one (1) year time period commencing on the Effective Date of the Plan. The payments shall be made monthly, equally amortized over twelve (12) months, with statutory interest accrued thereon, but without any penalties. At the option of the Debtors, any allowed priority claims may be paid on a shortened time schedule from the one (1) year described hereinabove. In the event the Debtors fail to make the payments as set forth hereinabove, the allowed priority creditors, if any, shall have the right to proceed with any administrative remedies available to them, fifteen (15) days after written notice of default has been given to the Debtors and their attorney, Norma Guariglia, Esq.

## VIII. CLASSIFICATION OF CLAIMS AND INTERESTS

Pursuant to Section 1122 of the Bankruptcy Code, claims against the estates have been divided into the following classifications for purposes of administration and voting on the Plan:

**1.    GUARDIAN CLASS 1 CLAIM [ALLOWED SECURED CLAIM OF FAY SERVICING]**: This Class consists of the allowed secured claim of Fay Servicing in the amount of $191,527.65 as of March 17, 2023, secured by Guardian Fund's real property located at 19607 Cherrywood Lane, Warrensville Heights, OH 44128; 2311 W. 37th Street, Cleveland, OH 44113; and 3801 E. 143rd Street, Cleveland, OH 44128.

**2.    CV1 CLASS 2A CLAIM [SECURED CLAIM OF WILMINGTON TRUST]**: This class consists of the allowed secured claim of Wilmington Trust, N.A., as Trustee for the benefit of the Holders of CoreVest American Finance 2020-3 Trust Mortgage Pass Through Certificates ("Wilmington Trust") in the principal amount of $2,881,000 ("Loan 1"). Loan 1 accrues interest at the non-default rate of 5.65% per annum, with monthly interest-only payments, and matures on July 9, 2030. It is also secured by 66 residential real properties owned by CV1 located in Missouri, Ohio, and Alabama. The properties securing Loan 1 are estimated to have a collective market value of $6,649,710 as of December 14, 2023. Guardian is a guarantor of Loan 1, with that guaranty claim explained in Class 2C.

3.      **CV2 CLASS 2B CLAIM [SECURED CLAIM OF WILMINGTON TRUST]**: This class consists of the allowed secured claim of Wilmington Trust, N.A., as Trustee for the benefit of the Holders of CoreVest American Finance 2021-2 Trust Mortgage Pass-Through Certificates ("Wilmington Trust") in the principal amount of $3,134,000 ("Loan 2"). Loan 2 accrues interest at the non-default rate of 4.91% per annum, with monthly interest-only payments, and matures on July 9, 2031. It is also secured by 55 residential real properties owned by CV2, located in Missouri, Ohio, and Alabama. The properties securing Loan 2 are estimated to have a collective market value of $5,404,649 as of December 14, 2023. Guardian is a guarantor of Loan 2, with that guaranty claim explained in Class 2C.

4.      **GUARDIAN CLASS 2C [SECURED CLAIMS OF WILMINGTON TRUST]**: This class consists of any allowed secured claims of Wilmington Trust arising from Guardian's Pledgor Guaranties of Loan 1 and Loan 2, which are allegedly secured by its membership interests in CV1 and CV2. Guardian anticipates that CV1 and CV2 will pay Wilmington Trust's claims in full under the treatment proposed in Classes 2A and 2B. Moreover, the Pledgor Guaranties expressly state that "[Wilmington Trust's] recourse against [Guardian] with respect to any indebtedness owing under this Agreement shall be limited solely to the Pledged Collateral." Thus, Wilmington Trust has no ability to enforce payment of money from Guardian under the Pledgor Guaranties, and its only remedy against Guardian is to foreclose on the alleged collateral, i.e., Guardian's membership interests in CV1 and CV2.

5.      **GUARDIAN CLASS 3A CLAIM [UNLIQUIDATED CLAIM OF SEC]:** This Class consists of the unsecured claim for fines and penalties against Guardian that may be allowed for the United States Securities and Exchange Commission. This claim is estimated at $100,000 for Plan voting purposes.

6.      **CV1 CLASS 3B CLAIM [UNLIQUIDATED CLAIM OF SEC]:** This Class consists of the unsecured claim for fines and penalties against CV1 that may be allowed for the United States Securities and Exchange Commission. This claim is estimated at $100,000 for Plan voting purposes.

7.      **CV2 CLASS 3C CLAIM [UNLIQUIDATED CLAIM OF SEC]:** This Class consists of the unsecured claim for fines and penalties that may be allowed for the United States Securities and Exchange Commission. This claim is estimated at $100,000 for Plan voting purposes.

8.      **GUARDIAN CLASS 4 CLAIMS [UNSECURED CLAIMS OF NOTE HOLDERS]:** This class consists of the allowed unsecured claims of creditors who loaned money to Guardian under certain promissory notes with various maturity dates. The Class 4 allowed claims are estimated in the total amount of $7.9 million as of the Petition Date, detailed as follows:

| Creditor Claims: | Scheduled Amount | Proof of Claim Amount | Allowed Amount |
|---|---|---|---|
| Abbott, Joshua Benjamin | $114,031.00 | $117,189.74 | $114,031.00 |
| Adams, Daniel S. and Laure M., Ttees | $211,129.46 | $213,065.27 | $211,129.46 |
| Bell, Eric | $26,507.91 | | $26,507.91 |
| Boughton, Michael L. and Mary R. | $203,703.57 | $200,000.00 | $200,000.00 |
| Cagle, Mary K., Trustee; Joseph and Mary K. Lee Revocable Trust-Survivors | $507,929.26 | $500,000.00 | $500,000.00 |
| Chelling, Todd; American Estate and Trust LLC fbo Todd Chelling | $100,000.00 | $100,000.00 | $100,000.00 |
| Christopher, Susan B., Trustee, Susan B. Christopher Trust | $100,000.00 | $100,000.00 | $100,000.00 |
| Coombs, Katie; The Kathleen A DiLillo Revocable Trust | $50,000.00 | | $50,000.00 |
| Dallas, John C. and Nancy J. | $12,748.22 | | $12,748.22 |
| Dorsa, Paul; Paul J. Dora and Linda E. Dorsa Family Trust Agreement | $308,713.31 | | $308,713.31 |
| Dubanski, Gertrude and Robert | $149,535.33 | $148,560.51 | $148,560.51 |
| Finnigan, Paddy; The Dayton Duncan Finnigan Living Trust | $10,802.37 | $10,401.50 | $10,401.50 |

| | | | |
|---|---|---|---|
| Gay, Steve, Wellspring Bible Church | $200,000.00 | $200,000.00 | $200,000.00 |
| Gibson, Kathy; Horizon Trust fbo Kathryn A. Gibson | $190,170.47 | $190,179.47 | $190,170.47 |
| Grant, Joan | $100,702.22 | | $100,702.22 |
| Grant, Joan | $103,026.48 | | $103,026.48 |
| Grenz, James H. and W. Kay | $15,000.00 | | $15,000.00 |
| Healy, Joe; Healy Family Living Trust | $10,000.00 | $10,000.00 | $10,000.00 |
| Hernandez, Arthur Angel | $100,000.00 | | $100,000.00 |
| Herrin, Don | $543,619.49 | | $543,619.49 |
| Herrin, Don; The Donald and Charlotte Herrin Rev. Family Trust | $52,098.98 | | $52,098.98 |
| Iveson, Roger and Sherry, Trustees, The Iveson 1982 Trust | $330,000.00 | $830,000 | $830,000.00 |
| Jaegle, Arthur A. | $25,000.00 | | $25,000.00 |
| Johnson, Kirk and Roberta, Trustees of the Kiro Family Trust | $217,658.00 | $217,658.00 | $217,658.00 |
| Larson, Robert A., II, and Kathryn D. | $171,229.13 | $171,229.13 | $171,229.13 |
| Larson, Robert and Lillian | $31,863.40 | $31,863.40 | $31,863.40 |
| Larson, Robert and Luke | $31,863.40 | $31,863.96 | $31,863.96 |
| Maclyman, Debra Living Trust | $336,082.44 | $332,015.25 | $332,015.25 |
| Mahoney, Jeremy B. | $214,763.68 | $204,014.43 | $204,014.43 |
| Malloy, Dean, Co-Trustee, The Dean Malloy Trust | $300,000.00 | $300,000.00 | $300,000.00 |
| Nash, Guy | $327,621.55 | | $327,621.55 |
| Perwein, Andy | $25,000.00 | | $25,000.00 |
| Poidmore, Paolo | $523,649.85 | $508,174.00 | $508,174.00 |
| Quinn, Thomas | $50,000.00 | | $50,000.00 |

| | | | |
|---|---|---|---|
| Ricciardi, Paul; Ricciardi Family Trust | $200,000.00 | $223,299.97 | $200,000.00 |
| Saunders, Steven/ Low Altitude LLC | $250,000.00 | $250,000.00 | $250,000.00 |
| Scarola, John | $53,908.87 | $53,908.37 | $53,908.87 |
| Staniforth, Diane | $52,159.73 | $51,528.50 | $51,528.50 |
| Stieg, Ryan | $18,468.56 | $18,408.36 | $18,408.36 |
| Stoll, Jeanette | $64,792.24 | $64,792.24 | $64,792.24 |
| Taylor, Tom, Taylor, Susan J., Trustee of the Susan J. Taylor Revocable Trust | $105,639.52 | $105,639.52 | $105,639.52 |
| The Amp'd Group, LLC, Attn: Trimble, Justin | $200,000.00 | $200,000.00 | $200,000.00 |
| Turner, Timothy J. | $106,377.21 | | $106,377.21 |
| Ullrich, Julia, Trustee Girona Living Trust dtd July 29, 2020 | $230,252.57 | $236,682.41 | $230,252.57 |
| Van Der Bokke, Lee; The Van Der Bokke Family Trust | $91,517.51 | $93,386.01 | $91,517.51 |
| Waters, Christopher and Cori, Ttees | $61,806.76 | | $61,806.76 |
| Watson, Katrine (Trinkie), Trustee, Watson Family Trust | $116,306.15 | $115,163.36 | $115,163.36 |
| Weigle, Larry; Larry L. Weigel and Debra K Weigel Trust utd 3/12/15 | $50,715.36 | | $50,715.36 |
| Whitney, Bernard | $3,429.72 | | $3,429.72 |
| Wise, Jeff; NuView Trust c/o Custodian FBO Jeffrey Wise | $100,000.00 | $101,910.57 | $100,000.00 |
| **Total:** | **$7,399,823.72** | | **$7,854,689.25** |

9.  **GUARDIAN CLASS 5A CLAIMS [UNSECURED CLAIMS OF GUARDIAN FUND TRADE VENDORS]**: This class consists of the allowed unsecured claims of creditors who provided goods or services to Guardian in the ordinary course of business. The Class 5A allowed claims are estimated in the total amount of $80,254.41 as of the Petition Date, detailed as follows:

| **Creditor Claims:** | **Scheduled Amount** | **Proof of Claim Amount** | **Allowed Amount** |
|---|---|---|---|
| 12Mays Clean Up Services LLC | $1,350.00 | | $1,350.00 |
| All Things Interiors, LLC | $4,875.00 | | $4,875.00 |
| Alpha Omega Housing Development, Inc. | $5,953.57 | | $5,953.57 |
| American Estate & Trust LLC | $816.66 | | $816.66 |
| Boone County Collector | $0.00 | $350.06 | $360.06 |
| Business Tax Solutions | $100.00 | | $100.00 |
| Castillo Painting Company and Finishing | $3,000.00 | | $3,000.00 |
| City of Anniston Garbage | $180.00 | | $180.00 |
| Cut N Roll Paint Co. | $5,000.00 | | $5,000.00 |
| Green Cove Investments LLC | $4,048.19 | | $4,048.19 |
| Green Lane Group LLC | $34,141.50 | | $34,141.50 |
| High Sierra Business Systems, Inc. | $162.85 | $842.61 | $842.61 |
| Lepepe Investments | $6,425.00 | | $6,425.00 |
| Minute Rehab, LLC | $8,200.00 | | $8,200.00 |
| Ohio Edison | $0.00 | $226.28 | $226.28 |
| Raven Contractors LLC | $545.00 | | $545.00 |
| Republic Services | $306.93 | | $306.93 |
| Roto-Rooter Services Company CLV | $430.40 | | $430.40 |
| Spectrum (Charter Communications) | $358.89 | $1,615.68 | $1,615.68 |
| The Illuminating Company | $550.34 | $273.65 | $550.34 |
| Title One Agency | $436.00 | | $436.00 |
| Tresa Baker, CPA | $346.95 | | $346.95 |
| Waste Management | $145.35 | | $145.35 |
| **Total:** | **$77,372.63** | | **$80,254.41** |

10. **CV1 CLASS 5B CLAIMS [UNSECURED CLAIMS OF CV1 TRADE VENDORS]**: This class consists of the allowed unsecured claims of creditors who provided goods or services to CV1 in the ordinary course of business. The Class 5B allowed claims are estimated in the total amount of $64,165.87 as of the Petition Date, detailed as follows:

| Creditor Claims: | Scheduled Amount | Proof of Claim Amount | Allowed Amount |
|---|---|---|---|
| 12B Residential, Inc. | $14,478.81 | | $11,678.81 |
| City of Cleveland Division of Water | $917.28 | $399.42 | $399.42 |
| City of Ferguson | $1,564 | | $1,564.00 |
| Evernest Property Management | $18,500.00 | | $18,500.00 |
| Hoy Chrissinger Vallas, PC | $0.00 | | $2,800.00 |
| LP Insurance Services | $8,492.18 | | $8,492.18 |
| Metropolitan St. Louis Sewer District | $9,822.45 | | $9,822.45 |
| Missouri American Water | $140.68 | | $140.68 |
| ZVN Properties Inc. | $10,768.33 | | $10,768.33 |
| **Total:** | **$64,683.73** | | **$64,165.87** |

11. **CV2 CLASS 5C CLAIMS [UNSECURED CLAIMS OF CV2 TRADE VENDORS]**: This class consists of the allowed unsecured claims of creditors who provided goods or services to CV2 in the ordinary course of business. The Class 5C allowed claims are estimated in the total amount of $58,876.54 as of the Petition Date, detailed as follows:

| Creditor Claims: | Scheduled Amount | Proof of Claim Amount | Allowed Amount |
|---|---|---|---|
| 12B Residential, Inc. | $17,618.31 | | $14,418.31 |
| City of Cleveland Division of Water | $8,433.78 | | $8,433.78 |
| Evernest Property Management | $18,500.00 | | $18,500.00 |
| Hoy Chrissinger Vallas, PC | $0.00 | | $3,200.00 |

| | | | |
|---|---|---|---|
| LP Insurance Services | $2,770.47 | | $2,770.47 |
| Metropolitan St. Louis Sewer | $6,345.43 | | $6,345.43 |
| Waste Management | $196.42 | | $196.42 |
| ZVN Properties Inc. | $5,012.13 | | $5,012.13 |
| **Total:** | **$58,876.54** | | **$58,876.54** |

**12.**   **CV1 CLASS 5D CLAIM [UNSECURED CLAIM OF INTERNAL REVENUE SERVICE]**: This class consists of the allowed general unsecured claim of the Internal Revenue Service against CV1 in the amount of $3,510.00 for penalties for late-filed income tax returns.

**13.**   **CV2 CLASS 5E CLAIM [UNSECURED CLAIM OF INTERNAL REVENUE SERVICE]**: This class consists of the allowed general unsecured claim of the Internal Revenue Service against CV2 in the amount of $8,190.00 for penalties for late-filed income tax returns.

**14.**   **GUARDIAN CLASS 6A CLAIMS [UNSECURED LEASE DAMAGE CLAIMS]**: This class consists of the allowed unsecured claims of property owners who purchased properties from Guardian under certain "Secured Investment Agreements" and then leased the properties back to Guardian under lease agreements requiring Guardian to pay property owners fixed rent for the term of the leases. Guardian, as lessee, also had other obligations under the lease agreements. These claims consist of allowed claims for unpaid fixed rent, other expenses, and damages arising under the lease agreements through the Petition Date. The Class 6A allowed claims are estimated in the total amount of $4M as of the Petition Date, detailed as shown on **Exhibit B** attached hereto.

**15.**   **GUARDIAN CLASS 6B CLAIMS [CLAIMS OF PROPERTY OWNERS WITHOUT 2-YEAR BUY-BACK SIDE LETTERS]**: This class consists of the allowed claims of property owners who purchased properties from Guardian under certain "Secured Investment Agreements" and related purchase and sale agreements, and then leased the properties back to Guardian under lease agreements requiring Guardian to pay property owners fixed rent for the term of the leases. The Secured Investment Agreements expressly state that the purchase

transaction represents a security that has not been registered under the Securities Act of 1933, as amended, or qualified under applicable state securities laws. The Class 6B claimants do not have written agreements with Guardian for a 2-year buy-back of their properties. These claims were contingent and unliquidated on the Petition Date and consist of alleged damages arising from the Secured Investment Agreements and purchase and sale agreements (but not for fixed rent or lease damages) under various tort, contract, and miscellaneous legal theories. The Class 6B allowed claims are shown on **Exhibit C** attached hereto.

16.    **GUARDIAN CLASS 6C CLAIMS [CLAIMS OF PROPERTY OWNERS WITH 2-YEAR BUY-BACK SIDE LETTERS]:** This class consists of the allowed claims of property owners who purchased properties from Guardian under certain "Secured Investment Agreements" and related purchase and sale agreements and then leased the properties back to Guardian under lease agreements requiring Guardian to pay property owners fixed rent for the term of the leases. The Secured Investment Agreements expressly state that the purchase transaction represents a security that has not been registered under the Securities Act of 1933, as amended, or qualified under applicable state securities laws. The Class 6C claimants have written agreements with Guardian for a 2-year buy-back of their properties, although the enforceability of those agreements is currently unknown. These claims were contingent and unliquidated on the Petition Date and consist of alleged damages arising from the Secured Investment Agreements and purchase and sale agreements (but not for fixed rent or lease damages) under various tort, contract, and miscellaneous legal theories. The Class 6C allowed claims are shown on **Exhibit D** attached hereto.

17.    **CLASS 7A EQUITY INTERESTS OF GUARDIAN FUND**:  This Class 7A consists of the member's equity interests in Guardian Fund as of the Petition Date, as shown on **Exhibit E** attached hereto.

18.    **CLASS 7B EQUITY INTERESTS OF GUARDIAN CV1**:  This Class 7B consists of Guardian Fund's 100% member's interest in Guardian CV1, LLC.

19.    **CLASS 7C EQUITY INTERESTS OF GUARDIAN CV2**:  This Class 7C consists of Guardian Fund's 100% member's interest in Guardian CV2, LLC.

# IX. TREATMENT OF CLASSES

**1.** **GUARDIAN CLASS 1 CLAIM [ SECURED CLAIM OF FAY SERVICING]**:

The Class 1 allowed secured claim of Fay Servicing in the amount of $191,527.65, calculated as of the Petition Date, shall be paid in full by Guardian, with interest at the contract rate pursuant to the existing contractual loan terms without modification. Accordingly, the Class 1 allowed secured claim of Faye Servicing is unimpaired under the Plan.

**2.** **CV1 CLASS 2A CLAIM [SECURED CLAIM OF WILMINGTON TRUST]**:

The Class 2A allowed secured claim of Wilmington Trust for Loan 1 shall be paid as follows:

A.       Wilmington Trust shall retain its existing liens, and on the Effective Date, CV1 shall borrow from Guardian on an unsecured basis, the money needed to cure all pre and post-petition defaults under Loan 1 pursuant to 11 U.S.C. § 1124(2), including payment of default interest to the extent so allowed by the Court. Guardian's obligation to lend the money needed to cure all pre and post-petition defaults under Loan 1 will be the only obligation Guardian has to Wilmington under the terms of the Plan. Wilmington Trust alleges that as of June 30, 2024, the approximate cure amount is $610,241.11, plus all interest, escrow payments, and fees incurred after June 30, 2024, reasonable attorney's fees, escrow/protective advances, and damages and pecuniary loss. Interest and default interest continue to accrue at the rates of $852.30 per day and impounds continue to accrue at $14,481.52 per month. This alleged cure amount has not yet been allowed by the Court, and Debtors and the Committee dispute Wilmington Trust's alleged entitlement to certain default interest, prepayment penalty, fees, and charges. Moreover, with Wilmington Trust's consent, CV1 has directly paid its post-petition property insurance and tax payments, thus it alleges that Wilmington Trust is not entitled to those impounds in arrears because Wilmington Trust is not required to pay any past property taxes or insurance for CV1's Properties. After paying Wilmington Trust's allowed cure amount, CV1 will then pay Wilmington Trust the allowed amount of Loan 1 according to the parties' unaccelerated contractual terms, without modification. Guardian will also reconfirm its Guaranty obligation to Wilmington Trust, which is the pledge of Guardian's interest in CV1. Accordingly, the Class 2A allowed secured

1  claim of Wilmington Trust is <u>unimpaired</u> under the Plan.[5]

2       B.     Once the Court determines Wilmington Trust's cure amount, if the amount the

3  Court determines is necessary to cure impacts the feasibility of this Plan or Guardian and CV1

4  determine the cure amount is too high, or if the Court determines that Wilmington Trust's Class

5  2A claim is impaired instead of unimpaired under the treatment proposed in paragraph A above,

6  then CV1 proposes the following alternative treatment of the Class 2A allowed secured claim of

7  Wilmington Trust for Loan 1: Wilmington Trust shall retain its existing liens and contractual

8  remedies without modification, and on the Effective Date, Wilmington Trust can enforce its

9  contractual and state law remedies to foreclose or otherwise take possession and control of its

10  collateral. CV1 reserves all its legal and contractual rights to pursue litigation claims against

11  Wilmington Trust, including, but not limited to, lender liability, breach of the covenant of good

12  faith and fair dealing, and claims for improper disposition of the collateral. The election by CV1

13  and Guardian to cure Wilmington Trust's claim or otherwise proceed with this alternative

14  treatment is independent from any election made by Guardian and CV2 with respect to

15  Wilmington Trust's secured claim against CV2. Accordingly, the Class 2A allowed secured claim

16  of Wilmington Trust under this alternative treatment is <u>unimpaired</u> under the Plan.

17       **3.**     <u>**CV2 CLASS 2B CLAIM [SECURED CLAIM OF WILMINGTON TRUST]**</u>:

18  The Class 2B allowed secured claim of Wilmington Trust for Loan 2 shall be paid as follows:

19       A.     Wilmington Trust shall retain its existing liens, and on the Effective Date, CV2

20  shall borrow from Guardian on an unsecured basis, the money needed to cure all pre and post-

21  petition defaults under Loan 2 pursuant to 11 U.S.C. § 1124(2), including payment of default

22  interest to the extent so allowed by the Court. Guardian's obligation to lend the money needed to

23  cure all pre and post-petition defaults under Loan 2 will be the only obligation Guardian has to

24  Wilmington Trust under the terms of the Plan. Wilmington Trust alleges that as of June 30, 2024,

25

26  [5] Wilmington Trust has alleged that this proposed claim treatment should be classified as impaired
instead of unimpaired because CV1 and CV2 reserve the right to object to Wilmington Trust's

27  default interest, fees, and charges according to state and bankruptcy law and equitable principles.
The Debtors and Committee disagree with this analysis but believe these issues can be determined

28  in connection with Plan confirmation.

HARRIS LAW PRACTICE LLC
850 E. PATRIOT BLVD
SUITE F
RENO, NV 89511
775 786 7600

the approximate cure amount is $626,945.92, plus all interest, escrow payments, and fees incurred after June 30, 2024, reasonable attorney's fees, escrow/protective advances, and damages and pecuniary loss. Interest and default interest continue to accrue at the rates of $862.72 per day and impounds continue to accrue at $14,673.50 per month. This alleged cure amount has not yet been allowed by the Court, and Debtors and the Committee dispute Wilmington Trust's alleged entitlement to certain default interest, prepayment penalty, fees, and charges. Moreover, with Wilmington Trust's consent, CV2 has directly paid its post-petition property insurance and tax payments, thus it alleges that Wilmington Trust is not entitled to those impounds in arrears because Wilmington Trust is not required to pay any past property taxes or insurance for CV2's Properties. After paying Wilmington Trust's allowed cure amount,  CV2 will then pay Wilmington Trust the allowed amount of Loan 2 according to the parties' unaccelerated contractual terms, without modification. Guardian will also reconfirm its Guaranty obligation to Wilmington Trust, which is the pledge of Guardian's interest in CV2. Accordingly, the Class 2B allowed secured claim of Wilmington Trust is <u>unimpaired</u> under the Plan.

B. Once the Court determines Wilmington Trust's cure amount, if the amount the Court determines is necessary to cure impacts the feasibility of this Plan, or Guardian and CV2 determine the cure amount is too high, or if the Court determines that Wilmington Trust's Class 2B claim is impaired instead of unimpaired under the treatment proposed in paragraph A, then CV2 proposes the following alternative treatment of the Class 2B allowed secured claim of Wilmington Trust for Loan 2:  Wilmington Trust shall retain its existing liens and contractual remedies without modification, and on the Effective Date, Wilmington Trust can enforce its contractual and state law remedies to foreclose or otherwise take possession and control of its collateral. CV2 reserves all its legal and contractual rights to pursue litigation claims against Wilmington Trust, including, but not limited to, lender liability, breach of the covenant of good faith and fair dealing, and claims for improper disposition of the collateral. The election by CV2 and Guardian to cure Wilmington Trust's claim or otherwise proceed with this alternative treatment is independent from any election made by Guardian and CV1 with respect to

Wilmington Trust's secured claim against CV1. Accordingly, the Class 2B allowed secured claim of Wilmington Trust under this alternative treatment is unimpaired under the Plan.

**4.      GUARDIAN CLASS 2C CLAIM [SECURED CLAIMS OF WILMINGTON TRUST]**: The Class 2C allowed secured claims of Wilmington Trust under Guardian's Pledgor Guaranties of Loan 1 and Loan 2, which provide that Wilmington Trust's only recourse is against the "Pledged Collateral," shall not be modified. Accordingly, the Class 2C allowed secured claims of Wilmington Trust in the amounts ultimately allowed by the Court or through agreement of the parties, are unimpaired under the Plan.

**5.      GUARDIAN CLASS 3A CLAIM [UNLIQUIDATED CLAIM OF SEC]:** The Class 3A allowed general unsecured claim of the SEC estimated in the amount of $100,000, shall be paid 100% of its allowed claim amount, plus accrued simple interest of 4% from the Petition Date until paid in full, but without any penalties, with such claim to be paid by Guardian in monthly installments of $2,800.00 commencing on January 5, 2026, and continuing on the fifth day of each month thereafter until January 5, 2029, when all remaining unpaid balance with accrued interest will be due in full.  Accordingly, the Class 3A allowed general unsecured claim of the SEC is impaired under the Plan.

**6.      CV1 CLASS 3B CLAIM [UNLIQUIDATED CLAIM OF SEC]:** The Class 3B allowed general unsecured claim of the SEC estimated in the amount of $100,000, shall be paid 100% of its allowed claim amount, plus accrued simple interest of 4% from the Petition Date until paid in full, but without any penalties, with such claim to be paid by CV1 in monthly installments of $2,800.00 commencing on January 5, 2026, and continuing on the fifth day of each month thereafter until January 5, 2029, when all remaining unpaid balance with accrued interest will be due in full. CV1 does not anticipate owing the SEC $100,000, but Guardian will loan to CV1 the amount needed up to $100,000 to pay any allowed Class 3B claim under the payment schedule described above. Accordingly, the Class 3B allowed general unsecured claim of the SEC is impaired under the Plan.

**7.      CV2 CLASS 3C CLAIM [UNLIQUIDATED CLAIM OF SEC]:** The Class 3C allowed general unsecured claim of the SEC estimated in the amount of $100,000, shall be paid

100% of its allowed claim amount, plus accrued simple interest of 4% from the Petition Date until paid in full, but without any penalties, with such claim to be paid by CV2 in monthly installments of $2,800.00 commencing on January 5, 2026, and continuing on the fifth day of each month thereafter until January 5, 2029, when all remaining unpaid balance with accrued interest will be due in full. CV2 does not anticipate owing the SEC $100,000, but Guardian will loan to CV2 the amount needed up to $100,000 to pay any allowed Class 3C claim under the payment schedule described above. Accordingly, the Class 3C allowed general unsecured claim of the SEC is impaired under the Plan.

8.    **GUARDIAN CLASS 4 CLAIMS [UNSECURED CLAIMS OF NOTE HOLDERS]**: The Class 4 allowed unsecured claims of Note Holders in the estimated amount of $7.9 million calculated as of the Petition Date shall accrue simple interest at 4% per annum from the Petition Date until paid in full as follows: The allowed claim amount owing on the Petition Date shall be paid in quarterly cash payments of $527,000 distributed on a pro-rata basis equally among each claimant, with the first payment due on June 30, 2025, and continuing on the last day of each calendar quarter thereafter until the Class 4 claims are paid in full. Additionally, Guardian will make interest-only payments calculated on the balances owing on the Petition Date, with the first interest-only payment due on June 30, 2025, which will cover all accrued interest from the Petition Date (March 17, 2023) through June 30, 2025, and then continuing monthly on the last day of each month thereafter until total principal and accrued interest is paid in full. Guardian estimates the first interest-only lump sum payment on June 30, 2025, will be around $722,411. Guardian estimates that the Class 4 claims will be paid in full on or about December 31, 2028. Accordingly, the Class 4 allowed unsecured claims of Note Holders are impaired under the Plan.

9.    **GUARDIAN CLASS 5A CLAIMS [UNSECURED CLAIMS OF GUARDIAN FUND TRADE VENDORS]**: The Class 5A allowed unsecured claims of Guardian Fund Trade Vendors in the amount of $80,254.41, calculated as of the Petition Date, shall be paid in full with simple interest at 4% per annum from the Petition Date and shall be paid in full in monthly installments of $6,700 starting on January 31, 2025, distributed on a pro-rata basis equally among each claimant, and continuing on the last day of each month thereafter for

one year until December 31, 2025, when all unpaid principal and accrued interest shall be due and payable in full. Accordingly, the Class 5A Allowed unsecured claims of Guardian Fund Trade Vendors are <u>impaired</u> under the Plan.

          **10.**    **CV1 CLASS 5B CLAIMS [UNSECURED CLAIMS OF CV1 TRADE VENDORS]**: The Class 5B allowed unsecured claims of CV1 Trade Vendors in the amount of $64,165.87 calculated as of the Petition Date shall be paid in full with simple interest at 4% per annum from the Petition Date and shall be paid in monthly installments of $8,000 distributed on a pro-rata basis equally among each claimant, with the first payment due on June 30, 2025, and continuing on the last day of each calendar month thereafter until the Class 5B claims are paid in full. CV1 estimates the Class 5B claims will be paid in full on or about January 31, 2026. Accordingly, the Class 5B Allowed unsecured claims of CV1 Trade Vendors are <u>impaired</u> under the Plan.

          **11.**    **CV2 CLASS 5C CLAIMS [UNSECURED CLAIMS OF CV2 TRADE VENDORS]**: The Class 5C allowed unsecured claims of CV2 Trade Vendors in the amount of $58,876.54 calculated as of the Petition Date shall be paid in full with simple interest at 4% per annum from the Petition Date and shall be paid in monthly installments of $8,000 distributed on a pro-rata basis equally among each claimant, with the first payment due on June 30, 2025, and continuing on the last day of each calendar month thereafter until the Class 5C claims are paid in full. CV2 estimates the Class 5C claims will be paid in full on or about January 31, 2026. Accordingly, the Class 5C allowed unsecured claims of CV2 Trade Vendors are <u>impaired</u> under the Plan.

          **12.**    **CV1 CLASS 5D CLAIM [UNSECURED CLAIM OF INTERNAL REVENUE SERVICE]**: The Class 5D allowed unsecured claim of the Internal Revenue Service against CV1 in the amount of $3,510.00 for penalties will be paid in full with simple interest at 4% per annum from the Petition Date and shall be paid by CV1 in monthly installments of $500 commencing on July 1, 2025, and continuing on the first day of each month thereafter until the Class 5D claim is paid in full. Accordingly, the Class 5D allowed unsecured claim of Internal Revenue Service is <u>impaired</u> under the Plan.

**13.    CV2 CLASS 5E CLAIM [UNSECURED CLAIM OF INTERNAL REVENUE SERVICE]**: The Class 5E allowed unsecured claim of the Internal Revenue Service against CV1 in the amount of $8,190.00 for penalties will be paid in full with simple interest at 4% per annum from the Petition Date and shall be paid by CV2 in monthly installments of $500 commencing on July 1, 2025, and continuing on the first day of each month thereafter until the Class 5E claim is paid in full. Accordingly, the Class 5E allowed unsecured claim of Internal Revenue Service is <u>impaired</u> under the Plan.

**14.    GUARDIAN CLASS 6A CLAIMS [UNSECURED LEASE DAMAGE CLAIMS]**: The Class 6A allowed unsecured lease damage claims estimated in the amount of $4 million calculated as of the Petition Date, shall accrue simple interest at 4% per annum from the Petition Date until paid in full, and shall be paid as follows: the allowed claim amount owing on the Petition Date shall be paid in quarterly cash payments of $267,000 distributed on a pro-rata basis equally among each claimant, with the first payment due on June 30, 2025, and continuing on the last day of each calendar quarter thereafter until the Class 6A claims are paid in full. Additionally, Guardian will make interest-only payments calculated on the balances owing on the Petition Date, with the first interest-only payment due on June 30, 2025, which will cover all accrued interest from the Petition Date (March 17, 2023) through June 30, 2025, and then continuing monthly on the last day of each month thereafter until total principal and accrued interest is paid in full. Guardian estimates the first interest-only lump sum payment on June 30, 2025, will be around $365,778. Guardian estimates that the Class 6A claims will be paid in full on or about December 31, 2028. Any disputed claims shall not be paid until the allowed claim is mutually agreed upon or adjudicated by the Court. However, until the disputed claims are resolved, Guardian shall reserve from any quarterly distributions the pro-rata share of the disputed claims based on a claim estimation procedure to be established by the Court. Accordingly, the Class 6A allowed unsecured lease damage claims are <u>impaired</u> under the Plan.

**15.    GUARDIAN CLASS 6B CLAIMS [CLAIMS OF PROPERTY OWNERS WITHOUT 2-YEAR BUY-BACK SIDE LETTERS]:** The Class 6B allowed claims of Property Owners without 2-year buy-back side letters shall be subordinated to Class 2C, Class 4, Class 5A,

Class 5B, Class 5C, and Class 6A unsecured claims as damages arising from the purchase or sale of a security under 11 U.S.C. § 510(b), and recharacterized as equity interests in Guardian, and paid in equal priority to Class 6C and Class 7A common member equity interests as follows: The allowed claim amounts as mutually agreed by Guardian and the claimant, or as adjudicated by the Court, shall be combined with Class 6C and Class 7A, and prorated against the total outstanding capital accounts of Guardian's Class 7A equity holders existing on the Petition Date (estimated at $70.4 million). For example, if Class 6B and Class 6C claims are allowed in the total amount of $10 million, Guardian's new total capital account value will be calculated at $80.4 million, and each equity holder's new member's interest will be prorated by taking the dollar amount of their allowed claim (or prepetition capital account value) against $80.4 million. Accordingly, the Class 6B claims of Property Owners without 2-year buy-back side letters are impaired under the Plan.

**16.    GUARDIAN CLASS 6C CLAIMS [CLAIMS OF PROPERTY OWNERS WITH 2-YEAR BUY-BACK SIDE LETTERS]:** The Class 6C allowed claims of Property Owners with 2-year buy-back side letters shall be subordinated to Class 2C, Class 4, Class 5A, Class 5B, Class 5C, and Class 6A unsecured claims as damages arising from the purchase or sale of a security under 11 U.S.C. § 510(b), and recharacterized as equity interests in Guardian, and paid in equal priority to Class 6B and Class 7A common member equity interests as follows: The allowed claim amounts as mutually agreed by Guardian and the claimant, or as adjudicated by the Court, shall be combined with Class 6B and Class 7A, and prorated against the total outstanding capital accounts of Guardian's Class 7A equity holders existing on the Petition Date (estimated at $70.4 million). For example, if Class 6B and Class 6C claims are allowed in the total amount of $10 million, Guardian's new total capital account value will be calculated at $80.4 million, and each equity holder's new member's interest will be prorated by taking the dollar amount of their allowed claim (or prepetition capital account value) against $80.4 million. Accordingly, the Class 6C claims of Property Owners with 2-year buy-back side letters are impaired under the Plan.

**17.    CLASS 7A EQUITY INTERESTS OF GUARDIAN FUND**: The Class 7A equity interests of Guardian existing on the Petition Date shall be combined with the Class 6B and Class 6C allowed claims of Property Owners and reallocated on a pro rata basis as follows:

The allowed Class 6B and Class 6C claim amounts as mutually agreed by Guardian and the claimant, or as adjudicated by the Court, shall be combined with and prorated against the total outstanding capital accounts of Guardian's Class 7A equity holders existing on the Petition Date (estimated at $70.4 million). For example, if Class 6B and Class 6C claims are allowed in the total amount of $10 million, Guardian's new total capital account value will be calculated at $80.4 million, and each equity holder's new member's interest will be prorated by taking the dollar amount of their allowed claim (or prepetition capital account value) against $80.4 million. Additionally, Class 7A equity holders will be provided with a ballot election to opt in to abandon their equity interests so that they can take an immediate tax loss effective for tax year 2024. Any abandoned equity interests will be cancelled and not included for purposes of calculating the pro-rata equity interests of Classes 6B, 6C, and 7A. Accordingly, the Class 7A equity interests of Guardian are <u>impaired</u> under the Plan.

      **18.**    **<u>CLASS 7B EQUITY INTERESTS OF GUARDIAN CV1, LLC</u>**:  The Class 7B equity interests of Guardian CV1, LLC existing on the Petition Date shall not be modified. Accordingly, the Class 7B equity interests of Guardian CV1, LLC are <u>unimpaired</u> under the Plan.

      **19.**    **<u>CLASS 7C EQUITY INTERESTS OF GUARDIAN CV2, LLC</u>**:  The Class 7C equity interests of Guardian CV2, LLC existing on the Petition Date shall not be modified. Accordingly, the Class 7C equity interests of Guardian CV2, LLC are <u>unimpaired</u> under the Plan.

## X. BAR DATE FOR FILING CLAIMS

      The bar date for filing a proof of claim in Guardian's case was August 14, 2023, for all creditors (except a governmental unit). The bar date for filing a proof of claim in CV1's case is April 22, 2024, for all creditors (except a governmental unit). The bar date for filing a proof of claim in CV2's case is April 22, 2024, for all creditors (except a governmental unit).

      The bar date for objecting to claims filed against all Debtors will be one-hundred-twenty days (120) days after the Effective Date. Failure to file a proof of claim by a disputed claimant or a claimant who disagrees with the amount listed in the Plan within such time period will result in the amount listed in the Plan being established as the amount owing to such creditor, and such creditor will participate in the Plan, based upon its claim listed in the Plan.

## XI. MEANS FOR EXECUTION AND IMPLEMENTATION OF THE PLAN

### 1.    Funding of Proposed Plan Payments

The Debtors intend to continue renting, rehabbing, and selling their real properties in the ordinary course of business and reinvesting the sale proceeds into better properties in more commercially desirable locations. They will continue the process of selling and buying new properties in the ordinary course of business to earn ongoing revenue from property appreciation. Additionally, Guardian's subsidiary, 12BR, will expand its property site operations and will also continue to provide selective property sales and brokerage services. The operating platform being developed by Guardian and 12BR will provide significant revenue and market value to Guardian and 12BR even after the Debtors' current assets are sold. Below is a summary of the future business plan:

- **Asset Management** – Continue developing 12BR's asset management platform including strategic partnerships and system integrations with third- party property managers. The partnerships provide greater capacity, while the integrations provide the financial and operational visibility needed to drive operational performance. Collectively, the Debtors will have the ability to expedite leasing and stabilizing of their Properties and also minimize fixed costs and direct property expenses. Additionally, the asset management product is a catalyst for other 12BR services and future Guardian investments. Currently, 12BR is generating over $20k per month in third-party asset management fees in addition to servicing the Debtors' assets.

- **Field Services** – 12BR will need to continue developing its field services platform, including hiring field services/maintenance technician to cost effectively rehabilitate the Debtors' Properties. The field services team will scope projects, oversee third party subcontractors, self-perform maintenance and handyman services, and validate and quality control workmanship. Construction and property maintenance are the biggest drivers of the financial performance of single-family residential investment properties. A well-organized field team will significantly increase net operating income, lowering vacancy by reducing turn time and minimizing expenses by self-performing work. The field team at American Homes 4 Rent was able to reduce the average service ticket by over 30% and reduce the cash-to-cash cycle by more than 20 days, saving the company over $40 million dollars annually. The 12BR field service/maintenance technician will be equipped with a fully stocked van, have a small central warehouse, and leverage the Hubspot and Marginpoint logistics and inventory control. The field service team will service the Debtors' portfolio as well as generate additional revenue by servicing customers of the Debtors' third-party property managers.

- **Brokerage** – 12BR will reformat its leasing website through a Hubspot integration and

will potentially include an IDX feed, allowing Guardian to market its Properties directly to buyers. This will reduce the sales cost, provide market knowledge, and drive leads for other 12BR service businesses. 12BR is developing an investor database organically and through partnerships with title companies, Rent Range, and other service providers.

- **Value-Add Investments** – The 12BR platform provides the investment expertise and operational capability that will allow Guardian to acquire, reposition/stabilize, and sell distressed assets in quality locations at sustainable margins. The Debtors' financial projections are relatively conservative in both margin and cycle times as compared to Opendoor's or Offerpad's, public quarterly statements. The Debtors' investment property offerings will provide more visibility and transparency into property condition and financial performance than is currently available in the market. They can disrupt the residential investment property market in a similar manner to what Auction.com was able to accomplish for the trustee sale space.

The Debtors' consolidated five-year financial projections show that the Debtors will have enough cash from operations and sales of assets to fund the Plan and pay allowed creditor claims, with enough expected revenue after year five for potential dividend distributions to Guardian's existing members (equity holders) after allowed creditor claims are paid in full under the Plan. One five-year model includes CV1 and CV2's assets and assumes that Guardian will obtain a warehouse credit facility from a traditional institutional lender in the first quarter of year 2027, secured by Guardian's Properties. The second five-year model includes CV1 and CV2's assets and assumes that Guardian will not obtain a warehouse credit facility or any new borrowings. Attached **as Exhibit F1** are summaries of both consolidated five-year financial projections.

Attached as **Exhibit F2** are summaries of five-year consolidated financial projections for Guardian and its subsidiaries, but not including CV1 and CV2, and with and without the assumption of a warehouse credit facility in year 2027.

Attached as **Exhibit F3** are individual, unconsolidated five-year financial projections for CV1 and CV2. These financial projections include an assumption that CV1 and CV2 will borrow funds from Guardian, on an unsecured basis and at Guardian's election, as needed to renovate Properties in 2025 and 2026 as shown on the financial projection summaries.

Guardian does not know if it will be able to obtain a warehouse credit facility as suggested in the Plan, but, as noted in the five-year models, the warehouse credit facility is not necessary to ensure the feasibility of the Plan. It is but one possible avenue for reorganization.

The Debtors' financial projections do not include any amounts for potential preference

claim recoveries or recovery of other potential litigation claims. Thus, any preference or litigation claims recovered by the Debtors will provide additional funds for distribution to Debtors' creditors and Guardian's equity holders.

Lastly, the Debtors' financial projections are estimates only and not promises of future performance. The financial projections are subject to common risk factors existing for any forward-looking projections, meaning that the projections are based on current known market conditions and assumptions. Any significant changes in the national economy or other outside factors could materially affect the financial projections for better or worse. There can be no assurances that the estimated proceeds on which future distributions have been projected in the Plan will be realized by the Debtors. There can also be no assurances that the estimated Claim amounts set forth in the Plan for unliquidated, contingent, or disputed Claims are correct. The estimated amounts are based on certain assumptions and facts believed by the Debtors and Committee with respect to a variety of factors that have not yet been adjudicated by any court. Both the actual amount of Allowed Claims in a particular Class and the Allowed amount of funds available for distribution to such Class may differ from the estimates in the Plan. If the total amount of Allowed Claims or Interests in a Class is higher than the estimates, such Claims or Interests may take longer to pay or may ultimately receive less than projected in the Plan.

2.     **Post-Confirmation Default**

In the event the Debtors become delinquent in any duty or obligation under the Plan, the affected creditor or creditors may provide written notice of such default to the Debtors and their counsel. The Debtors shall thereafter have thirty (30) business days from receipt of said notice in which to cure the default. In the event such default remains uncured, the affected creditor or creditors shall be entitled to foreclose upon any collateral (if a secured creditor) or take other appropriate action. The Debtors shall have the right to bring the issue of default before the Bankruptcy Court. At any hearing, the Bankruptcy Court may consider the reason for the default and the ability of the Debtors to cure the default in a reasonable period of time. The Bankruptcy Court may also consider conversion of the case to a Chapter 7 of the Bankruptcy Code or dismissal of the same is in the best interest of creditors.

### 3.    Professionals' Fees

After the Confirmation Date of the Plan, the Debtors and any other professional, such as Debtors' general bankruptcy counsel, Committee's counsel, any special purpose counsel, or accountants, will not be required to apply to the Court for compensation for services rendered post-confirmation. Post-confirmation compensation of the Debtors' professionals shall be at their normal hourly rate(s) and customary cost charges.

### 4.    Distribution

All cash proceeds shall be distributed in the foregoing manner except amounts necessary to pay disputed claims against the Debtors in the event they are allowed, which shall be held as a reserve and paid as such claims are determined by agreement between the parties or as are judicially determined.

### 5.    Taxes

Unless otherwise provided in the Plan, all taxes are paid current and there are no income tax liens on real or personal property owned by the Debtors. The Debtors are not aware of any material tax consequences from the proposed Plan that would affect them because they are limited liability companies. All tax benefits and liabilities flow through to Guardian's equity holders. In accordance with 11 U.S.C. § 1146(a), any property transfers or sales by the Debtors as a result of this Plan may not be taxed under any law imposing a stamp tax or similar tax, including real property transfer taxes.

### 6.    General Risk Factors

The Plan and its implementation are subject to certain risks, including that the Plan may not be accepted by the requisite number of Creditors to confirm the Plan. Even if the Plan receives the requisite acceptances, there is no assurance that the Bankruptcy Court, which may exercise substantial discretion as a court of equity, will confirm the Plan. Even if the Bankruptcy Court determined that the Plan and the balloting procedures and results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for confirmation had not been met. Moreover, the Debtors and Committee cannot provide assurances that modifications to the Plan will not be required for Confirmation or that

such modifications would not necessitate the re-solicitation of votes. If the Plan is not confirmed, it is unclear what distributions Holders of Claims or Interests ultimately would receive with respect to their Claims or Interests in a subsequent plan.

If the Plan is not confirmed, the Debtors and Committee will need to revise the Plan and it is unclear whether an alternative chapter 11 plan could be implemented and what distribution the holders of Allowed Claims and Interests would receive. If an alternative could not be agreed to, it is possible that the Debtors would have to liquidate their assets in chapter 7, in which case it is likely that the holders of Allowed Claims would receive substantially less favorable treatment than they would receive under the Plan, and Interest Holders would likely receive nothing.

### 7.  Risk Factors Alleged by Andronico

To minimize litigation costs and consensually resolve certain objections raised by Andronico, the Debtors and Committee agreed to include the following language in this Disclosure Statement as proposed verbatim by Andronico. The Debtors and Committee do not agree with Andronico's legal and factual contentions (please see paragraph 7 below).[6]

Andronico contends that the Committee is a co-proponent of a plan that is adverse to a particular group of general unsecured creditors, i.e., Property Owners. Andronico asserts that 138 Property Owners' general unsecured claims are being improperly equitably subordinated under Section 510(b) of the Bankruptcy Code and treated as equity. Andronico asserts that the treatment of the Property Owners' claims is in violation of their right to be treated the same as other general unsecured creditors under Section 1123(a)(4). Andronico further asserts that the Plan also violates Property Owners' priority right to be paid in full as unsecured creditors ahead of equity interest holders. The common-law absolute priority rule requires that a creditor be "made whole" before junior interests—including equity holders— take from the bankruptcy estate. In re PG&E Corp., 46 F.4th 1047, 1054 (9th Cir. 2022), cert. denied sub nom. Pac. Gas & Elec. Co. v. Ad Hoc Comm. of Holders of Trade Claims, 143 S. Ct. 2492 (2023) (citations omitted).

On June 4, 2024, the Andronico Family Partnership, L.P. (Andronico") filed its Motion Pursuant to Fed. R. Bank. P. 3013 Regarding Improper Classification and Subordination of Class 6 Unsecured Claims Under Joint Plan of Reorganization ("Rule 3013 Motion") [ECF No. 798] to preserve these legal issues for the Court's review and determination. Andronico asserts that the Plan improperly classifies similar claims into different classes in violation of the Bankruptcy Code. Specifically, the Plan segregates general unsecured claims into

---

[6] Generally, disclosure statements are not intended to be legal briefs containing parties' legal arguments and responses, but the Debtors and Committee agreed to include this section at Andronico's insistence.

separate classes in order to treat them differently. The Plan creates six (6) separate subclasses of general unsecured claims for Guardian: Classes 3A (Unliquidated Claim of SEC), 4 (Unsecured Claims of Note Holders), 5A (Unsecured Claims of Guardian Fund Trade Vendors), 6A (Unsecured Lease Damage Claims), 6B (Claims of Property Owners Without 2-Year Buy-Back Side Letters), 6C (Claims of Property Owners with 2-Year Buy-Back Side Letters).

The Plan treats four (4) of these six subclasses identically – they will receive payment in full with accrued interest at the rate of four (4%) percent from the Petition Date. However, Classes 6B and 6C for Property Owners' general unsecured claims, which are based upon breaches of the respective Purchase and Sale Agreements with or without Side Letters, will not receive the same treatment as other general unsecured claims. Instead of being paid in full with accrued interest, Class 6B and Class 6C Property Owners' general unsecured claims will be subordinated and given the same treatment Class 7 equity interests. This is far less favorable treatment because Class 7 equity interests are not guaranteed payment in full with 4% interest. Instead, Class 7 equity interest holders will receive new equity interests, i.e., membership units in the reorganized Guardian Fund, LLC based upon a pro rata formula or a tax write off. There is no guaranty of *any* payments to the equity interest holders.

Debtor and the Committee assert that Class 6B and Class 6C Property Owners' general unsecured claims should be subordinated under Section 510(b) of the Bankruptcy Code because they "arise from the purchase or sale of a security." Andronico disputes this blanket assertion. Andronico contends that the Property Owners did not purchase "securities" aka equity interests or membership units in the Fund. Instead, the Property Owners purchased residential real properties. Andronico asserts that the Property Owners purchased homes pursuant to Purchase and Sale Agreements and subject to Lease Agreements, which have been breached. Rule 3013 Motion at Sections IV. B., C. and D. Andronico asserts that the Plan does not satisfy the rationales for equitable subordination under Section 510(b). Rule 3013 Motion at 12:25-14:1.

Andronico, the Committee and the Debtor believe that these issues should be resolved before the Plan proceeds to a confirmation hearing. *See Stipulation Regarding Creditor Andronico Family Partnership, L.P.'s Fed. R. Bank. P. 3013 Motion* filed on May 22, 2024 [ECF No. 787] at Paragraph 6.

If Andronico's position is correct, Andronico asserts that the Plan as proposed will not satisfy the requirements for confirmation under the Bankruptcy Code.[7]

///

///

---

[7]  As noted by Andronico, if it is correct, the Plan will fail.  From the Debtors' and  Committee's perspective, if the Plan fails, potential creditors, after potentially years of litigation over the amount and characterization of their claims, can expect to receive pennies on the dollars.  See Liquidation Analysis, Section XIX.

### 8. The Committee Is A Joint Proponent of the Plan Because It Believes The Plan Provides The Fairest Approach And Greatest Potential For Recovery To All Potential Unsecured Creditors.

The Committee, with unanimous support from all of its members, became a joint proponent of the Plan after exhaustive analysis, evaluation, and examination. In doing so, the Committee members put their own personal interests aside for what they believe is in the best interests of all of Guardian's potential and alleged unsecured creditors.

The Committee itself is comprised of various constituents with differing and alleged unsecured claims as follows:

1. Several  members of the Committee are Note Holders. The Note Holders and Trade Vendors are perhaps the only creditors with undisputed unsecured claims against Guardian.  The Note Holders are, therefore, a constituent of the Committee.

2. Several members of the Committee are Property Owners—homeowners with potential damages arising from the purchase of real properties. The Property Owners are third parties who purchased property from Guardian under certain Secured Investment Agreements and then leased the properties back to Guardian under related lease agreements. The Property Owners are constituents of the Committee with disputed claims. Property Owners have claims under both the lease agreement and the Secured Investment Agreements; however, because the Secured Investment Agreement contains plain and unambiguous language identifying the transaction as a security, the Committee believes that the Property Owners' claims (many of which are subject to objection for other reasons as well) are properly subordinated. Thus, in joining with the Committee to become a joint proponent of the Plan, these members have put the interests of the entire potential Guardian creditor body above their own personal interests.

3. Several members are Equity Investors with redemption rights, who, as many other Equity Investors do, have potential unsecured claims.[8]   The Equity Investors with potential unsecured claims are also constituents of the Committee with disputed claims. These members, too, have put the interests of the entire potential Guardian creditor body above their own personal interests by supporting the Plan which treats their claims as true equity investments and disallows them any potential unsecured claims.[9]

---

[8] Many Equity Investors have filed unsecured Proofs of Claim.

[9] It will take years of litigation to resolve the claims of Property Owners and Equity Investors.

The Committee's duty is to all potential, alleged unsecured creditors of Guardian, but that does not mean the Committee must ignore the legitimate legal disputes that underpin the unsecured claims which have been filed by Property Owners and Equity Investors. The Committee believes the best way for the Debtors to proceed is as set forth in the Plan: to eliminate litigation costs and optimize the value of the Guardian's current assets by leveraging the infrastructure, expertise, and experience of Guardian's current management to generate future reoccurring revenue and to increase the value of Guardian's fixed assets. Thus, each of the Committee members, though their personal interests may be different, are supporting the Plan because they believe it benefits all potential creditors by providing the best possible opportunity of a return to the potential creditor body as a whole through the successful reorganization of Guardian.

## XII. PROVISIONS GOVERNING DISTRIBUTION AND DISCHARGE

### 1. The Disbursing Agent.

The Debtors are ultimately responsible for making all distributions pursuant to the Plan. Debtors may use Guardian's accounting and fund management contractor, Verivest, or 12BR to assist in discharging those responsibilities.

### 2. Unclaimed Distributions.

Any property to be distributed pursuant to the Plan, if not claimed by the distributee within one (1) year after the payment, shall be returned to the Debtors and forfeited by the distributee.

### 3. Effect of Confirmation.

Upon confirmation and performance of the Plan, the Debtors shall be discharged from any debt that arose before the date of Confirmation, and any debt of a kind specified in §§ 502(g), 502(h), or 502(I) of the Bankruptcy Code, to the full extent permitted by Bankruptcy Code § 1141(d). In addition, pending execution of the Plan, and unless the Court has otherwise expressly ordered or the Plan otherwise expressly provides, all creditors and parties in interest shall be stayed from proceeding against the Debtors' assets including stay of default proceedings.

### 4. Exculpation.

Neither the Committee, nor Debtors, nor any of their respective members, managers,

officers, directors, employees, representatives, professionals or agents, will have or incur any liability to any Creditor for any act or omission in connection with or arising out of the Reorganization Case, including, without limitation, prosecuting confirmation of this Plan, consummation of this Plan, or the administration of this Plan or the property to be distributed under this Plan, except for breach of fiduciary duty, gross negligence, willful misconduct, or fraud.

## XIII. POST-CONFIRMATION INJUNCTION

No entity may commence, continue, or assert any claim, counterclaim, crossclaim, affirmative defense, defense, set off, recoupment, or any action of any kind or nature (collectively "Potential Actions") against Debtors other than as currently set forth or in relation to their existing Claims filed in these chapter 11 cases. Confirmation of the Plan shall constitute a permanent injunction against and irrevocable release of any and all Potential Actions. Confirmation of the Plan shall constitute a permanent injunction against and irrevocable release of any and all Potential Actions.

## XIV. EXECUTORY CONTRACTS AND LEASES

Reservation of Rights. The Debtors reserve the right to assume or reject, pursuant to §365 of the Code, any executory contract or unexpired lease not assumed or rejected prior to the Confirmation Date. All executory contracts and unexpired leases not specifically assumed or rejected as of the Confirmation Date or as to which an application to reject shall not be pending on the Confirmation Date shall be deemed rejected by the Debtors. Debtors hereby assume or rejects their leases and executory contracts as follows:

| DEBTOR | OTHER PARTY | DESCRIPTION | ASSUME/REJECT |
|--------|-------------|-------------|---------------|
| CV1 | Evernest Property Management | Property Management Agreement | Assume |
| CV2 | Evernest Property Management | Property Management Agreement | Assume |
| Guardian | Home Partners of America LLC | Settlement Agreement dated February 21, 2023, for alleged trademark infringement claims | Assume |

| Guardian | 12B Residential, Inc. | Oral Property and Operations Management Agreement | Assume |
|---|---|---|---|
| Guardian | Joanne Vano, Cynthia R. Fors & John Vano, Ttees, the Michael Vano and Joanne Vano 1983 Trust | Land Installment Contract dated February 16, 2023, for APNs: 109-23-009, 109-20-082, and 138-17-013 Cuyahoga County, OH | Assume |
| Guardian | Royal Court Apartments, LLC | Land Installment Contract dated February 17, 2023, for 3586 W. 48th St., Cleveland, OH 44102 | Assume |

## XV. **MISCELLANEOUS PROVISIONS**

Notice. Any notice described in or required by the terms of this Plan, or the Code and Rules shall be deemed to have been properly given when actually received or if mailed, five days after the date of mailing, if such shall have been sent by certified mail, return receipt requested, and if sent to:

> The Debtors, addressed to:
> NORMA GUARIGLIA, ESQ.
> HARRIS LAW PRACTICE LLC
> 850 E. Patriot Blvd., Suite F
> Reno, NV 89511

Headings. the headings used herein are inserted for convenience only and neither constitute a portion of the Plan nor in any manner affect the construction of the provisions of the Plan.

Severability. Should any provision of this Plan be determined to be unenforceable following the Effective date, such determination shall in no way limit or affect the enforceability of any and all other provisions of this Plan.

Governing Law. Except to the extent that the Code or other applicable federal law is applicable, the rights, duties and obligations arising under this Plan shall be governed by and construed in accordance with the laws of the State of Nevada, notwithstanding any conflict of law principles.

Successors and Assigns. The rights, duties and obligations of any Person named or referred to in this Plan shall be binding upon and shall inure to the benefit of the successors and assigns of such person.

Designation of Managers and Governance Issues. El Monte shall continue to serve as the initial Manager and voting non-equity member of Guardian and shall be initially compensated at the gross rate of $240,000 annually from Guardian. Additionally, El Monte shall appoint an initial board of directors ("Board") for Guardian consisting of five (5) members whose identities will be provided to the Court in a supplement to the Plan to be filed by the Debtors within thirty (30) days before the date of the Plan confirmation hearing date scheduled by the Court . HPC's principals, Greg Hughes, Steve Sixberry, and Kyle Krch, shall in no event be selected or eligible to serve on the Board and shall not be part of the Debtors' future management. El Monte shall also amend Guardian's operating agreement to provide for the new Board and to grant voting rights to all of Guardian's members according to their equity interests retained under this Plan. Guardian shall also file a copy of its amended operating agreement in the supplement to the Plan to be filed naming the new Board. The new Board will set future compensation for El Monte in the ordinary course of Guardian's business which may consist of cash and equity options in Guardian based on certain success or profit benchmarks to be decided at the discretion of the Board.

Post Confirmation Reporting and Payment of US Trustee Fees. Post confirmation, the Reorganized Debtors shall continue filing monthly operating reports through the Effective Date. After the Effective Date, the Reorganized Debtors and any other authorized parties who have been charged with administering the confirmed plan shall file post confirmation reports in the manner prescribed by 11 U.S.C. § 1106(a)(7) and Fed. R. Bankr. P. 2015(a)(5) for every calendar quarter through the date the Court enters a final decree closing these cases, an order dismissing the cases, or an order converting the cases to another chapter in bankruptcy.

Until the Effective Date of a confirmed plan, the Debtors shall timely pay the US Trustee the appropriate sums required pursuant to 28 U.S.C. § 1930(a)(6). After the Effective Date, the Reorganized Debtors and any other authorized parties who have been charged with administering the confirmed plan shall be responsible for the timely payment of all fees incurred after the

Effective Date pursuant to 28 U.S.C. § 1930(a)(6) until the Court enters a final decree closing the case(s), an order dismissing the case(s), or an order converting the case(s) to another chapter in bankruptcy.

The resumption of the filing of post confirmation reports and the payment of fees shall occur if an order has been entered on the docket that vacates any of the above orders or reopens the case(s) for a reason other than that which is purely administrative.

## XVI. <u>PROCEDURES FOR RESOLVING CONTESTED CLAIMS</u>

<u>Claims Objections</u>. Objections to Claims shall be filed with the Court and served upon each holder of a Claim to which objection is made no later than one-hundred-twenty (120) days after the Effective Date.

<u>Payment Procedures</u>. Payments to the holder of a Claim to which an objection has been filed that ultimately becomes an Allowed Claim shall be made in accordance with the provisions of the Plan with respect to the Class of Creditors to which the holder of such an Allowed Claim belongs.  Interest, if any, on any funds reserved for a contested claim shall inure to the benefit of the holder of such an Allowed Claim.

<u>Avoidance Actions</u>. In accordance with 11 U.S.C. § 1123(b), the Debtors shall retain and may enforce any claims, rights, and causes of action that the Debtors or their bankruptcy estates may hold against any person or entity, including, without limitation, claims and causes of action arising under sections 542, 543, 544, 547, 548, 550, or 553 of the Bankruptcy Code. To the extent appropriate, the Debtors shall reserve and have the right to bring any and all avoidance actions, the same to be commenced within one year after the Effective Date. Proceeds of all avoidance actions shall vest in the Debtors pursuant to 11 U.S.C. §1141.

<u>Litigation Claims</u>. In accordance with 11 U.S.C. § 1123(b), the Debtors shall retain and may enforce any claims, rights, and causes of action that the Debtors or their bankruptcy estates may hold against any person or entity, including, without limitation, claims and causes of action arising under sections 542, 543, 544, 547, 548, 550, or 553 of the Bankruptcy Code. To the extent appropriate, the Debtors shall reserve and have the right to commence any and all actions on contingent and unliquidated litigation claims within one year after the Effective Date. Proceeds

of all litigation claims shall vest in the Debtors pursuant to 11 U.S.C. §1141. The Debtors are currently aware of the following potential litigation claims:

**All Debtors:**

- Potential direct and derivative claims including, but not limited to, professional negligence and fraud against Larry Pino, Esq. and Pino Law Group.
- Potential direct and derivative claims including, but not limited to, professional negligence against Evans Nelson & Company CPAs.
- Potential direct and derivative claims against Umpqua Bank.
- Potential direct and derivative claims against Greg Hughes, Steve Sixberry, and Kyle Krch.
- Potential direct and derivative claims against Krch Realty, LLC.
- Potential direct and derivative claims against Hughberry Homes, LLC.
- Potential lender liability and breach of contract claims against Wilmington Trust, including for breach of the implied covenant of good faith and fair dealing.
- Potential breach of contract and collection actions to collect monies owed to the Debtors under prepetition loans and contracts of sale to third parties.
- All potential objections to fee requests, including those of Wilmington Trust's counsel.

The Debtors expressly reserve the right to pursue these litigation claims and other related claims against these parties and any of their predecessors, successors, and assigns, and also their insurance providers, sureties, and guarantors.

## XVII. <u>RETENTION OF JURISDICTION</u>

Notwithstanding confirmation of this Plan, the Court will retain jurisdiction for the following purposes, and each of them:

1. The Court will retain jurisdiction to determine the allowability and payment of any claim(s) upon any objection(s) thereto (or other appropriate proceedings) by the Debtors or by any other party in interest entitled to proceed in that manner. As part of such retained jurisdiction,

the Court will continue to determine the allowability of Administrative Claims and any request(s) for payment(s) thereof, including professional fees and costs which are Administrative Claims.

2.    The Court will retain jurisdiction to determine any dispute(s) which may arise regarding the interpretation of any provision(s) of this Plan.

3.    The Court will retain jurisdiction to facilitate the consummation of this Plan by entering, consistent with the provisions of this Plan, any further necessary or appropriate order(s) regarding the enforcement of this Plan and any provision(s) thereof.

4.    The Court will retain jurisdiction to adjudicate any cause(s) of action or other proceeding(s) presently pending or otherwise referenced here or elsewhere in the Plan, including, but not limited to, the adjudication of any and all "core proceedings" under 28 U.S.C. § 157(b), which may be pertinent to this Reorganization Case, and which the Debtors may deem appropriate to initiate and prosecute in aid of their reorganization.

5.    The Court will retain jurisdiction to enter an appropriate final decree in this Reorganization Case.

6.    The Court will retain jurisdiction to enter an appropriate final decree, and any interim order(s), in any adversary proceedings which may be initiated during these Chapter 11 proceedings.

## XVIII. <u>FEASIBILITY OF PLAN</u>

Debtors and the Committee believe that the Plan is feasible based on the value of the Debtors' tangible assets existing on the Confirmation Date and the ongoing business operations of the Debtors. The Debtors intend to initially continue renting, rehabbing, and selling their Properties in the ordinary course of business and reinvesting the sale proceeds into better properties in more commercially desirable locations. Additionally, Guardian's subsidiary, 12BR, will expand its property site operations as explained in more detail previously. The Debtors and the Committee believe that expanding property site operations and adding such other accretive business operations as may be desirable will allow the Debtors to grow and increase their profitability.

The Debtors' consolidated five-year financial projections show that the Debtors will have

enough cash from operations and sales of assets to fund the Plan and pay allowed creditor claims, with enough expected revenue after year five for the Board to authorize dividend distributions to Guardian's existing members after creditor claims are paid in full under the Plan.

The Debtors' principal, Aaron Noe, prepared and calculated the consolidated five-year financial projections based on his personal knowledge of industry standards. Current estimated Property values were calculated by utilizing Automated Valuation Models as explained in the Liquidation Analysis in Section XIX. In year one of the Plan (2025), Guardian projects it will renovate and sell around nine Properties per month (not including CV1 and CV2 Properties), and CV1 and CV2 estimate they will not sell any of their Properties for the first five years of the Plan because of Wilmington Trust's cumbersome individual lien release process and Loan pre-payment penalties. Guardian will acquire one new property per month for the first half of 2025, increasing to three properties per month in July 2025 through the end of that year, and then increasing to five properties per month starting in January 2026. Guardian's Property absorption rate will continue to increase each Plan year.

Guardian estimates that the average gross sale price for its existing Properties is $88,454 for Properties it currently owns, and $106,406 for Properties currently titled in 12 Bridges which will be transferred to Guardian as a result of the HPC Settlement. The average renovation cost per Property is $24,500. Guardian estimates that the average per property gross cost for its future acquisitions will be $245,000, and average gross sale price of future-acquired property will be $325,000, with an average renovation cost of $20,000. Other revenue assumptions can be seen in the supporting schedules included with the attached five-year financial projections.

## XIX. LIQUIDATION ANALYSIS

Debtors are proposing a Plan based on business revenues which includes liquidation of assets in the ordinary course of the Debtors' business.

The Plan must provide that a nonconsenting impaired claimant or interest holder of a consenting class receive at least as much as would be available had the debtor filed a Chapter 7 petition instead.

In a Chapter 7 case, the general rule is that the Debtors' assets are sold by a trustee.

Unsecured creditors share in the proceeds of sale only after secured creditors and administrative claimants are paid. Certain unsecured creditors get paid before other unsecured creditors do. Unsecured creditors with the same priority share in proportion to the amount of their allowed claim in relationship to the total amount of allowed claims. A creditor would recover from the assets of the bankruptcy estates less under Chapter 7 than under Chapter 11. First, the Debtors' Plan proposes to pay all allowed unsecured creditors in full, which is not guaranteed in a Chapter 7 case. Second, in a Chapter 7 case a trustee is appointed and is entitled to compensation from the bankruptcy estate in an amount no more than 25% of the first $5,000 of all money disbursed, 10% on any amount over $5,000 but less than $1,000,000, 5% on all amounts over $1,000,000 but less than $3,000,000, and reasonable compensation not to exceed 3% on any amount over $3,000,000, thus diminishing monies available for payment to unsecured creditors

Debtors' Plan proposes 100% payment of allowed unsecured claims, with post-petition interest until paid. Guardian estimates that the gross liquidation value of its assets is in a range of $10,352,309 to $17,040,300 before selling costs and administrative expenses, and not including CV1 and CV2 Properties because the Debtors estimate that all surplus equity in CV1 and CV2 Properties would be lost in a chapter 7 liquidation. CV1 estimates that the gross liquidation value of its assets is in a range of $2,247,637 to $3,673,832 before selling costs and administrative expenses. CV2 estimates that the gross liquidation value of its assets is in a range of $1,868,395 to $3,074,681 before selling costs and administrative expenses.

The gross liquidation values were calculated by utilizing Automated Valuation Models ("AVMs") from HouseCanary, Collateral Analytics, and Zillow. The most weight was placed on the Collateral Analytics valuations. Debtors assume the Properties will be sold in "as is" condition and will most likely sell at the low end of the valuation range established by the three independent valuation services. Additionally, most of Guardian's Properties in their current condition would not qualify for traditional financing. Thus, the Properties would most probably sell as a portfolio sale, in multiple "bulk" sales, or through an auction platform such as Auction.com. Debtors have received unsolicited offers by investors/wholesalers and offers for the purchase of multiple Properties have ranged from 20% to 30% of the AVM. Accordingly, the gross liquidation values

for Guardian's Properties shown in the liquidation analysis represent 25%, 35%, and 45% of the AVMs. CV1's and CV2's Properties are in somewhat better condition. Accordingly, the gross liquidation values for their Properties shown in the liquidation analysis represent 30%, 40%, and 50% of the AVM.

Selling costs and property expenses for Guardian's assets are estimated in a range of $1,867,338 to $2,346,641. Secured debts encumbering the assets are estimated at $495,751, and a chapter 7 trustee's fees and other professional fees are estimated in a range of $1,205,184 to $1,573,023. The resulting net available for distribution to unsecured creditors is estimated to be $6,784,036 to $12,624,884. *See* **Exhibit G1**.

Selling costs and property expenses for CV1's assets are estimated in a range of $395,236 to $488,417. Secured debt encumbering the assets is estimated at $3,036,996, and a chapter 7 trustee's fees and other professional fees are estimated in a range of $261,429 to $304,215. The resulting net available for distribution to unsecured creditors is estimated to be $0, and the secured lender, Wilmington Trust, would not receive payment in full. *See* **Exhibit G2**.

Selling costs and property expenses for CV2's assets are estimated in a range of $368,837 to $444,050. Secured debt encumbering the assets is estimated at $3,489,291, and a chapter 7 trustee's fees and other professional fees are estimated in a range of $233,552 to $269,740. The resulting net available for distribution to unsecured creditors is estimated to be $0, and the secured lender, Wilmington Trust, would not receive payment in full. *See* **Exhibit G3**.

Notably, unsecured creditors would not receive more in chapter 7 liquidation because allowed unsecured creditors will be paid in full through the Plan whereas the projected recovery for unsecured creditors of Guardian would be approximately $6 million in a chapter 7 liquidation, and $0 for unsecured creditors of CV1 and CV2. Also, distributions under the Plan will occur in approximately the same time frame that could be expected in a chapter 7 liquidation. Allowed interest holders will also receive more through the Plan than in Chapter 7 because the Debtors are operating their business through the Plan and retaining future value for interest holders after payments to unsecured creditors. Finally, the Debtors intend to maximize the value of their

Properties and sell them in individual listings, after ordinary marketing to achieve their fair market value upon sale.

## XX. **CONFIRMATION REQUEST**

The Debtors and Committee request that the Court confirm the Plan in accordance with the provisions of Section 1129(a) and/or Section 1129(b) of the Code.

Respectfully submitted July 16, 2024.

HARRIS LAW PRACTICE LLC

*/s/ Norma Guariglia*
Norma Guariglia, Esq.
*Attorneys for Jointly Administered Debtors*

McDONALD CARANO LLP

*/s/ Sallie B. Armstrong*
Sallie B. Armstrong, Esq. (NSBN 1243)
McDONALD CARANO LLP
100 W. Liberty Street, 10th Floor
Reno, NV  89501
Telephone: (775) 788-2000
sarmstrong@mcdonaldcarano.com
*Attorneys for Official Committee of Unsecured Creditors of Guardian Fund, LLC*