HARRIS LAW PRACTICE LLC
STEPHEN R. HARRIS, ESQ. (NSBN 1463)
Email: steve@harrislawreno.com
NORMA GUARIGLIA, ESQ. (NSBN 16244)
Email: norma@harrislawreno.com
850 E. Patriot Blvd., Suite F
Reno, NV 89511
Telephone: (775) 786-7600
*Attorneys for Jointly Administered Debtors*

McDONALD CARANO LLP
SALLIE B. ARMSTRONG, ESQ. (NSBN 1243)
100 W. Liberty Street, 10th Floor
Reno, NV 89501
Telephone: (775) 788-2000
Email: sarmstrong@mcdonaldcarano.com
*Attorneys for Official Committee of*
*Unsecured Creditors of Guardian Fund, LLC*

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF NEVADA

\* \* \* \* \*

IN RE:

GUARDIAN FUND, LLC,

☐ AFFECTS THIS DEBTOR

☐ AFFECTS GUARDIAN CV1, LLC

☐ AFFECTS GUARDIAN CV2, LLC

☒ AFFECTS ALL DEBTORS

    Debtors.

_____/

Case No.: BK-23-50177-hlb
Case No.: BK-23-50233-hlb
**Consolidated Under Case No. BK-23-50177-hlb**
(Chapter 11)

Jointly Administered with:

| 23-50951-hlb | Guardian CV1, LLC |
| 23-50952-hlb | Guardian CV2, LLC |

Hrg. Date:  December 10, 2024
Hrg. Time: 9:30 a.m.

## **SECOND AMENDED JOINT PLAN OF REORGANIZATION**

Dated:        October 20, 2024

Filed by:      GUARDIAN FUND, LLC, a Nevada limited liability company;
GUARDIAN CV1, LLC, a Delaware limited liability company;
GUARDIAN CV2 LLC, a Delaware limited liability company; and
THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF
GUARDIAN FUND, LLC

GUARDIAN FUND, LLC ("Guardian" or "Guardian Fund"), GUARDIAN CV1, LLC ("CV1"), and GUARDIAN CV2, LLC ("CV2"), Debtors and Debtors-in-Possession herein (Guardian, CV1, and CV2 collectively the "Debtors") in the above-captioned jointly administered Chapter 11 cases, and the OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF GUARDIAN FUND, LLC ("Committee"), through their undersigned counsel, pursuant to 11 U.S.C. § 1121(a), hereby propose the following **SECOND AMENDED JOINT PLAN OF REORGANIZATION** and request confirmation pursuant to the provisions of 11 U.S.C. §§ 1129(a) and/or (b).

## I.

## **INTRODUCTION**

This SECOND AMENDED JOINT PLAN OF REORGANIZATION ("Plan")  is proposed by the Debtors and Committee for the resolution of the Debtors' outstanding creditor obligations. The Plan is offered pursuant to Chapter 11 of Title 11 of the United States Code and should be read in conjunction with the [PROPOSED] AMENDED JOINT DISCLOSURE STATEMENT ("Disclosure Statement"), as amended and supplemented, concerning these Debtors that will be approved by the United States Bankruptcy Court.

Along with this Plan, creditors will receive a Disclosure Statement which has been approved by the United States Bankruptcy Court.  The Court has determined that the Disclosure Statement is adequate to enable creditors to make an informed judgment on whether to accept or reject the Plan.  The Disclosure Statement fully sets forth the Debtors' background information, an analysis of the Debtors' financial position, and a summary of this Plan.  The Debtors have not authorized any statement or representation, such as the value of their property or the amount of their creditors' claims, which is not contained in the Court approved Disclosure Statement.

Information as to the procedures relating to approval, confirmation, and consummation of the Plan may be obtained from counsel for the Debtors and Committee, upon written request.

**THE PROVISIONS OF THE CONFIRMED PLAN WILL LEGALLY BIND THE DEBTORS AND THEIR CREDITORS, REGARDLESS OF WHETHER THEY HAVE FILED CLAIMS OR HAVE ACCEPTED THE PLAN**.  Creditors should thoroughly review

HARRIS LAW PRACTICE LLC
850 E. PATRIOT BLVD
SUITE F
RENO, NV 89511
775 786 7600

both the Plan and the Disclosure Statement before determining whether to accept or reject the proposed Plan.

**II.**
**DEFINITIONS**
**SCOPE OF DEFINITIONS**

For purposes of this Plan, all capitalized terms and otherwise defined terms shall have the meanings assigned to them in this Article II.  Whenever the context requires, such terms shall include the plural number as well as the singular and the female and/or masculine gender as well as the neuter.

1. "ADMINISTRATIVE CLAIM."  This term shall refer to and mean every claim that is entitled to allowance under Section 503(b) of the Bankruptcy Code or otherwise entitled to priority pursuant to Section 507(a)(1) of the Bankruptcy Code, arising prior to the Effective Date, including, without limitation: **(a)** any actual, necessary expense preserving the Estate, including, without limitation, expenses necessary or appropriate to carry out, facilitate, or effectuate this Plan; **(b)** any amount required to be paid under Section 365(b) of the Bankruptcy Code in connection with the curing of defaults under executory contracts or unexpired leases; and **(c)** all allowances, including professional fees and costs, approved by the Bankruptcy Court for the Examiner and his professionals, and the Debtors' professionals and professionals employed by the Committee.

2. "ALLOWED ADMINISTRATIVE CLAIM" shall mean an Administrative Claim: **(a)** as to which no objection has been filed or, if an objection has been filed, such objection has been resolved by the allowance of such Administrative Claim by a Final Order; **(b)** which requires payment in the ordinary course of the business of the Debtors and as to which there is no order of the Bankruptcy Court in effect which prohibits any such payment; or **(c)** which requires payment pursuant to a Final Order.

3. "ALLOWED CLAIM" or "ALLOWED INTEREST" shall mean claims against or interest in the Debtors to the extent that--
(a) Proof of claim or interest was–

(i)  timely filed;

(ii) deemed filed, if such claim or interest appears in the schedules filed herein, unless such claim or interest is scheduled as disputed, contingent, or unliquidated; or

(iii) late filed–

(I) with leave of the Bankruptcy Court; or

(II) without objection by the Debtors within a time fixed by the Bankruptcy Court; and

(b) (i) the Debtors do not file an objection within a time fixed by the Bankruptcy Court; or

(ii) the claim or interest is allowed by a Final Order; or

(iii) the claim or interest is allowed under this Plan.

4. "ALLOWED PRIORITY CLAIM" shall mean a Priority Claim which is an Allowed Claim.

5. "ALLOWED SECURED CLAIM" shall mean an Allowed Claim secured by a lien, security interest or other charge against or interest in property in which the Debtors have an interest, or which is subject to setoff under Section 553 of the Code, to the extent of the value (determined in accordance with Section 506(a) of the Code) of the interest of the holder of such Allowed Claim in the Debtors' interest in such property or to the extent of the amount subject to such set-off, as the case may be.

6. "ALLOWED SUBORDINATED CLAIM" shall mean an Allowed Claim arising from any Indebtedness evidenced by or related to the claim of a Subordinated Creditor.

7. "DEFINITION OF THE BALLOT" shall mean the Ballot(s) for accepting or rejecting this Plan in a form(s) approved by the Bankruptcy Court.

8. "BANKRUPTCY CODE" as used herein refers to Title I of Public Law No. 95-598, as codified in Title 11 of the United States Code, and all amendments thereto.

9. "BANKRUPTCY COURT" (or "COURT") shall mean the United States Bankruptcy Court, for the District of Nevada (Reno, Nevada), in which the Debtors' Chapter 11 cases are pending, such other court as has jurisdiction in these Chapter 11 cases, and any court

having competent jurisdiction to hear appeals or certiorari proceedings therefrom.

10.    "US TRUSTEE" or "UST" or "OUST" shall mean Tracy Hope Davis, the United States Trustee for Region 17, or any successor United States Trustee as of the relevant time.

11.    "BANKRUPTCY RULES" shall mean the Federal Rules of Bankruptcy Procedure, promulgated under 28 U.S.C. § 2075, including any amendments thereto, which are in effect before and as of the Confirmation Date, and thereafter during the Reorganization Cases, to the extent that they are consistent with vested rights under this Plan and the Confirmation Order.

12.    "BUSINESS DAY" shall mean any day except Saturday, Sunday, or a day on which commercial banks in Washoe County, Nevada, are authorized or required by law to close.

13.    "CLAIM" shall mean:  (a) any right to payment from the Debtors or their Estates, including an Administrative Claim, whether or not such right is reduced to judgment, or is liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured; and (b) any right to an equitable remedy for breach of performance of such breach gives rise to a right to payment from the Debtors or their Estates, including an Administrative Claim, whether or not such right to an equitable remedy is reduced to judgment, or is fixed, contingent, matured, unmatured, disputed, secured or unsecured.

14.    "CLAIMANT" shall mean the holder of an Allowed Claim or an Allowed Administrative Claim.

15.    "CLASS" shall mean any class into which Allowed Claims or Allowed Interests are classified pursuant to Article IV.

16.    "COMMENCEMENT DATE" (or "PETITION  DATE") shall mean March 17, 2023, for Guardian, and December 14, 2023, for CV1 and CV2, which dates shall be utilized to determine the cessation of interest on certain claims and the date of commencement of the rights of certain creditors to make claim for administrative expenses and allowances, among other rights that are determined by relation to said date.

17.    "CONFIRMATION" shall mean the entry of the Confirmation Order by the United States Bankruptcy Court.

HARRIS LAW PRACTICE LLC
850 E. PATRIOT BLVD
SUITE F
RENO, NV 89511
775 786 7600

18. "CONFIRMATION DATE" shall mean the date on which the Confirmation Order is entered on the Bankruptcy Court's docket.

19. "CONFIRMATION ORDER" shall mean the Order of the Bankruptcy Court confirming this Plan pursuant to Section 1129 of the Bankruptcy Code and approving the transactions contemplated herein, which shall be in form and substance acceptable to the proponents.

20. "CREDITOR" shall mean any entity that has a claim against the Debtors, which claim arose to or before the order for relief concerning the Debtors, including any claim that may arise under 11 U.S.C. Sections 502(f), 502(g), 502(h) and 502(i).

21. "DEBTORS" shall mean GUARDIAN FUND, LLC, GUARDIAN CV1, LLC, and GUARDIAN CV2, LLC, Jointly Administered Debtors and Debtors-in-Possession herein.

22. "DEBTORS' ASSETS" shall mean all assets and property of every kind, nature and description of which the Debtors or their Estates have any right, title or interest, including but not limited to: real property, personal property, including but not limited to bank deposits, instruments, credit of instruments, certificates of deposit and drafts; all executory contracts which are not and have not been rejected; all choses in action; and all claims, demands, causes of action, damages and obligations of any nature whatsoever, known or unknown in law or in equity, including, without limitation, claims or causes of action arising under the Bankruptcy Code (including, without limitation, Sections 362, 510, 544, 545, 547, 548, 549, 550 and 553 of the Bankruptcy Code), or under any Nevada statute or regulation.

23. "DEBTORS' PROFESSIONALS" shall mean the law firm of HARRIS LAW PRACTICE LLC, as Debtors' general bankruptcy counsel; and all other professionals retained and employed by the Debtors.

24. "DISCLOSURE STATEMENT" means the written [PROPOSED] AMENDED JOINT DISCLOSURE STATEMENT, as may be amended, with respect to this Plan which is approved by the Bankruptcy Court under Section 1125 of the Bankruptcy Code.

25. "DISPUTED CLAIM" shall mean every claim that is not an Allowed Claim or an Allowed Administrative Claim or to which the Debtors or the Committee or Party-in-Interest

HARRIS LAW PRACTICE LLC
850 E. PATRIOT BLVD
SUITE F
RENO, NV 89511
775 786 7600

files an objection before the deadline for objection set forth in this Plan or an operative order of the Bankruptcy Court.

26. "EFFECTIVE DATE of the PLAN and NOTICE of EFFECTIVE DATE" shall mean the earlier of ninety (90) calendar days after all of the following have occurred (so long as they remain in effect), or December 30, 2024: **(a)** this Plan has been confirmed pursuant to the Confirmation Order and the Confirmation Order remains in full force and effect without material modification thereof; **(b)** there is not in effect any stay, injunction or restraining order or any other order of any kind which has been issued by a Court of competent jurisdiction or other governmental entity staying, restricting or prohibiting the effectuation of this Plan; and **(c)** there is not in effect any statute, rule, regulation or order enacted, promulgated or entered which is applicable to the effectuation of this Plan of which results in the consequences referred to in subsection (b) immediately above. The Effective Date must occur no later than December 30, 2024. Within two business days of the Effective Date, the Reorganized Debtor(s) or any other authorized parties who have been charged with administering the confirmed plan shall file a Notice of Occurrence of the Effective Date with the Bankruptcy Court indicating that the conditions precedent in this section have occurred, identifying the Effective Date, and indicating that it has occurred.

27. "EQUITY HOLDINGS" shall mean the Debtors' equity members' interests retained in the Plan, after payment of all allowed creditors' claims.

28. "ESTATE" shall mean the Estates created in the Reorganization Case(s) pursuant to Section 541 of the Bankruptcy Code.

29. "EXPIRATION DATE" shall mean the last date determined by the Bankruptcy Court for the casting of Ballots, which date shall be acceptable to the proponents.

30. "FINAL ORDER" shall mean a final order, judgment or other decree of the Bankruptcy Court or other Court of competent jurisdiction which has not been vacated, reversed, saved, modified or amended **(a)** as to which **(i)** the time to appeal or seek review or rehearing has expired and as to which no appeal, petition for certiorari, request for review or rehearing is pending, or **(ii)** if appeal, review, rehearing or certiorari of the order has been sought, the order

has been affirmed or the request for review, rehearing or certiorari has been denied, the time to seek a further appeal, review, rehearing or certiorari has expired, and **(b)** as a result of which such orders shall become final and not appealable in accordance with applicable law.

31.    "LIEN" shall mean a charge or encumbrance against or interest in property of the Debtors or the Estate, including Debtors' Property, to secure the payment of a debt or performance of an obligation, and includes any right of setoff under Section 553 of the Bankruptcy Code.

32.    "PERSON" includes individual, partnership, corporation, association, joint stock company, joint venture, estate, trust, unincorporated organization, any governmental unit, or political subdivision thereof, or other entity, and all of the respective heirs, personal representatives, successors, and assigns.

33.    "PETITION DATE" shall mean March 17, 2023, for Guardian, and December 14, 2023, for CV1 and CV2.

34.    "PLAN" means the JOINT PLAN OF REORGANIZATION, in the form filed by the proponents and any amendments or modifications thereof or supplements thereto filed by the proponent and permitted by Article X hereof or the Bankruptcy Court.

35.    "PRIORITY CLAIM" shall mean a claim entitled to priority under Section 507(a)(2)-(8) of the Bankruptcy Code.

36.    "PROPONENT" shall mean the Debtors and Committee acting as the proponents of this Plan.

37.    "*PRO RATA* SHARE" shall mean the proportion that an Allowed Claim in a particular class bears to the aggregate amount of all Allowed Claims in such class.

38.    "PURCHASER" shall mean the transferee(s) of a voluntary transfer(s).

39.    "RECORD DATE" shall mean, for purposes of voting, the date of entry by the Bankruptcy Court of the Order Approving the Disclosure Statement and, for purposes of distribution, the Confirmation Date.

40.    "REORGANIZATION CASES" shall mean the Debtors' cases under Chapter 11 of the Bankruptcy Code, which are currently pending before the Bankruptcy Court as Case Nos. 23-50177-hlb (consolidated with 23-50233-hlb), 23-50951-hlb, and 23-50952-hlb, and jointly

administered under the lead case 23-50177-hlb.

41.     "REORGANIZED DEBTORS" shall mean GUARDIAN FUND, LLC, a Nevada limited liability company, GUARDIAN CV1, LLC, a Delaware limited liability company, and GUARDIAN CV2, LLC, a Delaware limited liability company, on and after the Effective Date of the Plan.

42.     "SECURED CLAIM" shall mean any claim secured by a lien which is valid, perfected, enforceable, and not avoidable.  If the value of the creditors' interest and the Estate's interest in the property securing a claim is not sufficient to satisfy such claim, then in accordance with Section 506 of the Bankruptcy Code and subject to Section 1111(b) of the Bankruptcy Code, such claim shall be deemed to be an unsecured claim under this Plan to the extent of any insufficiency in the value of the creditors' interest.

43.     "UNSECURED CLAIM" shall mean any claim which is not a Secured Claim, Priority Claim, Administrative Claim, or an unclassified claim or the kind described in Section 507(a)(7) of the Bankruptcy Code.

44.     "UNSECURED CREDITORS' COMMITTEE" OR "COMMITTEE" means the Official Committee of Unsecured Creditors appointed by the United States Trustee in Guardian's case, as modified by the addition or removal of members from time to time by the United States Trustee or Bankruptcy Court.

A term used in this Plan that is not defined in this Plan but that is used in the Bankruptcy Code has the meaning assigned to the term in the Bankruptcy Code.

### III.

### ADMINISTRATIVE AND UNCLASSIFIED CLAIMS

### ADMINISTRATIVE CLAIMS:

All allowed costs and expenses of administration in this case, including any actual and necessary expenses of preserving or liquidating the assets of the Debtors' estates, all allowances, including professional fees and costs, approved by the Court, and any other costs and expenses entitled to priority pursuant to 11 U.S.C. §§ 507(a)(1) and (2) of the Bankruptcy Code and 28 U.S.C. § 1930, shall be paid in full on or before the Effective Date of the Plan or when  otherwise

HARRIS LAW PRACTICE LLC
850 E. PATRIOT BLVD
SUITE F
RENO, NV 89511
775 786 7600

agreed by the allowed administrative claimant.  The holders of these claims include the attorneys and accountants for the Debtors, attorneys for the Committee, unpaid post-petition accounts payable (if any), and all fees to be paid to the Office of the United States Trustee. The estimated administrative expenses for the Debtors' reorganization proceeding consist of the following:

**For Guardian:**

| Amount | Description |
|---|---|
| $0.00 | Fees that are owed the U.S. Trustee's Office for the applicable quarters of 2023 and 2024 prior the Confirmation Date [payment is anticipated to be made when due]. |
| $950,000.00 | Estimated administrative professional legal fees and costs for Guardian's general bankruptcy attorneys, Harris Law Practice LLC, calculated as of the Confirmation Date. Of this estimated amount, as of October 20, 2024, $641,461.83 has already been paid by Guardian thru fee applications or thru the approved interim monthly payment procedures. |
| $75,378.75 | Estimated professional fees for Guardian's tax accountants, Excelsis Accounting Group, calculated as of the Confirmation Date. Of this estimated amount, $55,163.75 has already been approved by the Court on an interim basis and paid by Guardian. |
| $0.00 | Professional fees paid to real estate brokers employed by Guardian for property sales [all broker fees have been paid from escrow upon closing of the sale]. |
| $500,000.00 | Estimated administrative professional legal fees and costs for the Committee's attorneys, McDonald Carano LLP, calculated as of the Confirmation Date. Of this estimated amount, as of October 20, 2024, $221,393.78 has already been paid by Guardian thru fee applications or thru the approved interim monthly payment procedures. |
| $155,062.15 | Allowed administrative fees and costs of the Examiner for his investigation and report. Guardian has already paid these fees and costs. |
| $0.00 | Post-petition accounts payable, including from Guardian's leases [Guardian expects to pay all post-petition administrative expenses in full in the ordinary course of business prior to the Confirmation Date]. |

**For CV1:**

| Amount | Description |
|---|---|
| $0.00 | Fees that are owed the U.S. Trustee's Office for the applicable quarters of 2023 and 2024 prior the Confirmation Date [payment is anticipated to be made when due]. |
| $100,000.00 | Estimated administrative professional legal fees and costs for CV1's general bankruptcy attorneys, Harris Law Practice LLC, calculated as of the Confirmation Date. |
| $0.00 | Post-petition accounts payable [all post-petition administrative expenses are expected to be paid in full in the ordinary course of business prior to the Confirmation Date]. |

**For CV2:**

| Amount | Description |
|---|---|
| $0.00 | Fees that are owed the U.S. Trustee's Office for the applicable quarters of 2023 and 2024 prior the Confirmation Date [payment is anticipated to be made when due]. |
| $100,000.00 | Estimated administrative professional legal fees and costs for CV2's general bankruptcy attorneys, Harris Law Practice LLC, calculated as of the Confirmation Date. |
| $0.00 | Post-petition accounts payable [all post-petition administrative expenses are expected to be paid in full in the ordinary course of business prior to the Confirmation Date]. |

Professional fees, both legal and accounting, shall continue to accrue up through and subsequent to the Confirmation Date, with final amounts owing subject to Court approval.

<u>UNCLASSIFIED PRIORITY CLAIMS</u>:

1.  **Description**. The Debtors' priority claims are as follows:

| Name | Scheduled Amount | Proof of Claim Amount | Allowed Priority Amount |
|---|---|---|---|
| None | | | |

Pursuant to the Plan, the treatment and disposition of the unclassified priority claims, now totaling $0, will be as follows: Any claim discrepancy will be resolved by the claim objection process,

with the stipulated amount and/or Court decreed amount owing used to calculate that particular creditors' allowed claim being paid by the Debtors. All unclassified priority creditors shall be paid 100% of their allowed claim amount, with statutory interest thereon, over a one (1) year time period commencing on the Effective Date of the Plan. The payments shall be made monthly, equally amortized over twelve (12) months, with statutory interest accrued thereon, but without any penalties. At the option of the Debtors, any allowed priority claims may be paid on a shortened time schedule from the one (1) year described hereinabove. In the event the Debtors fail to make the payments as set forth hereinabove, the allowed priority creditors, if any, shall have the right to proceed with any administrative remedies available to them, fifteen (15) days after written notice of default has been given to the Debtors and their attorney, Norma Guariglia, Esq.

## IV.

## CLASSIFICATION OF CLAIMS AND INTERESTS

Pursuant to Section 1122 of the Bankruptcy Code, claims against the estates have been divided into the following classifications for purposes of administration and voting on the Plan:

1.    **GUARDIAN CLASS 1 CLAIM [ALLOWED SECURED CLAIM OF FAY SERVICING]**: This Class consists of the allowed secured claim of Fay Servicing in the amount of $191,527.65 as of March 17, 2023, secured by Guardian Fund's real property located at 19607 Cherrywood Lane, Warrensville Heights, OH 44128; 2311 W. 37th Street, Cleveland, OH 44113; and 3801 E. 143rd Street, Cleveland, OH 44128.

2.    **CV1 CLASS 2A CLAIM [SECURED CLAIM OF WILMINGTON TRUST]**: This class consists of the allowed secured claim of Wilmington Trust, N.A., as Trustee for the benefit of the Holders of CoreVest American Finance 2020-3 Trust Mortgage Pass Through Certificates ("Wilmington Trust") in the principal amount of $2,881,000 ("Loan 1"). Loan 1 accrues interest at the non-default rate of 5.65% per annum, with monthly interest-only payments, and matures on July 9, 2030. It is also secured by 66 residential real properties owned by CV1 located in Missouri, Ohio, and Alabama. The properties securing Loan 1 are estimated to have a collective market value of $6,649,710 as of December 14, 2023. Guardian is a guarantor of Loan 1, with that guaranty claim explained in Class 2C.

3.    **CV2 CLASS 2B CLAIM [SECURED CLAIM OF WILMINGTON TRUST]**: This class consists of the allowed secured claim of Wilmington Trust, N.A., as Trustee for the benefit of the Holders of CoreVest American Finance 2021-2 Trust Mortgage Pass-Through Certificates ("Wilmington Trust") in the principal amount of $3,134,000 ("Loan 2"). Loan 2 accrues interest at the non-default rate of 4.91% per annum, with monthly interest-only payments, and matures on July 9, 2031. It is also secured by 55 residential real properties owned by CV2, located in Missouri, Ohio, and Alabama. The properties securing Loan 2 are estimated to have a collective market value of $5,404,649 as of December 14, 2023. Guardian is a guarantor of Loan 2, with that guaranty claim explained in Class 2C.

4.    **GUARDIAN CLASS 2C [SECURED CLAIMS OF WILMINGTON TRUST]**: This class consists of any allowed secured claims of Wilmington Trust arising from Guardian's Pledgor Guaranties of Loan 1 and Loan 2, which are allegedly secured by its membership interests in CV1 and CV2. Guardian anticipates that CV1 and CV2 will pay Wilmington Trust's claims in full under the treatment proposed in Classes 2A and 2B. Moreover, the Pledgor Guaranties expressly state that "[Wilmington Trust's] recourse against [Guardian] with respect to any indebtedness owing under this Agreement shall be limited solely to the Pledged Collateral." Thus, Wilmington Trust has no ability to enforce payment of money from Guardian under the Pledgor Guaranties, and its only remedy against Guardian is to foreclose on the alleged collateral, i.e., Guardian's membership interests in CV1 and CV2.

5.    **GUARDIAN CLASS 3A CLAIM [UNLIQUIDATED CLAIM OF SEC]:** This Class consists of the unsecured claim for fines and penalties against Guardian that may be allowed for the United States Securities and Exchange Commission. This claim is estimated at $100,000 for Plan voting purposes.

6.    **CV1 CLASS 3B CLAIM [UNLIQUIDATED CLAIM OF SEC]:** This Class consists of the unsecured claim for fines and penalties against CV1 that may be allowed for the United States Securities and Exchange Commission. This claim is estimated at $1.00 for Plan voting purposes.

HARRIS LAW PRACTICE LLC
850 E. PATRIOT BLVD
SUITE F
RENO, NV 89511
775 786 7600

7.    **CV2 CLASS 3C CLAIM [UNLIQUIDATED CLAIM OF SEC]:** This Class consists of the unsecured claim for fines and penalties that may be allowed for the United States Securities and Exchange Commission. This claim is estimated at $1.00 for Plan voting purposes.

8.    **GUARDIAN CLASS 4 CLAIMS [UNSECURED CLAIMS OF NOTE HOLDERS]:** This class consists of the allowed unsecured claims of creditors who loaned money to Guardian under certain promissory notes with various maturity dates. The Class 4 allowed claims are estimated in the total amount of $7.9 million as of the Petition Date, detailed as follows:

| Creditor Claims: | Scheduled Amount | Proof of Claim Amount | Allowed Amount |
|---|---|---|---|
| Abbott, Joshua Benjamin | $114,031.00 | $117,189.74 | $114,031.00 |
| Adams, Daniel S. and Laure M., Ttees | $211,129.46 | $213,065.27 | $211,129.46 |
| Bell, Eric | $26,507.91 | | $26,507.91 |
| Boughton, Michael L. and Mary R. | $203,703.57 | $200,000.00 | $200,000.00 |
| Cagle, Mary K., Trustee; Joseph and Mary K. Lee Revocable Trust-Survivors | $507,929.26 | $500,000.00 | $500,000.00 |
| Chelling, Todd; American Estate and Trust LLC fbo Todd Chelling | $100,000.00 | $100,000.00 | $100,000.00 |
| Christopher, Susan B., Trustee, Susan B. Christopher Trust | $100,000.00 | $100,000.00 | $100,000.00 |
| Coombs, Katie; The Kathleen A DiLillo Revocable Trust | $50,000.00 | | $50,000.00 |
| Dallas, John C. and Nancy J. | $12,748.22 | $150,000.00 | $12,748.22 |
| Dorsa, Paul; Paul J. Dora and Linda E. Dorsa Family Trust Agreement | $308,713.31 | $308,582.00 | $308,713.31 |
| Dubanski, Gertrude and Robert | $149,535.33 | $148,560.51 | $148,560.51 |
| Finnigan, Paddy; The Dayton Duncan Finnigan Living Trust | $10,802.37 | $10,401.50 | $10,401.50 |
| Gay, Steve, Wellspring Bible Church | $200,000.00 | $200,000.00 | $200,000.00 |

HARRIS LAW PRACTICE LLC
850 E. PATRIOT BLVD
SUITE F
RENO, NV 89511
775 786 7600

| | | | |
|---|---|---|---|
| Gibson, Kathy; Horizon Trust fbo Kathryn A. Gibson | $190,170.47 | $190,179.47 | $190,170.47 |
| Grant, Joan | $100,702.22 | | $100,702.22 |
| Grant, Joan | $103,026.48 | | $103,026.48 |
| Grenz, James H. and W. Kay | $15,000.00 | | $15,000.00 |
| Healy, Joe; Healy Family Living Trust | $10,000.00 | $10,000.00 | $10,000.00 |
| Hernandez, Arthur Angel | $100,000.00 | | $100,000.00 |
| Herrin, Don | $543,619.49 | | $543,619.49 |
| Herrin, Don; The Donald and Charlotte Herrin Rev. Family Trust | $52,098.98 | | $52,098.98 |
| Iveson, Roger and Sherry, Trustees, The Iveson 1982 Trust | $330,000.00 | $830,000.00 | $830,000.00 |
| Jaegle, Arthur A. | $25,000.00 | | $25,000.00 |
| Johnson, Kirk and Roberta, Trustees of the Kiro Family Trust | $217,658.00 | $217,658.00 | $217,658.00 |
| Larson, Robert A., II, and Kathryn D. | $171,229.13 | $171,229.13 | $171,229.13 |
| Larson, Robert and Lillian | $31,863.40 | $31,863.40 | $31,863.40 |
| Larson, Robert and Luke | $31,863.40 | $31,863.96 | $31,863.96 |
| Maclyman, Debra Living Trust | $336,082.44 | $332,015.25 | $332,015.25 |
| Mahoney, Jeremy B. | $214,763.68 | $204,014.43 | $204,014.43 |
| Malloy, Dean, Co-Trustee, The Dean Malloy Trust | $300,000.00 | $300,000.00 | $300,000.00 |
| Opel, Craig and Peggy | $51,605.73 | $51,605.73 | $51,605.73 |
| Nash, Guy/ BC III Properties, LLC | $327,621.55 | $341,391.03 | $327,621.55 |
| Perwein, Andy | $25,000.00 | | $25,000.00 |
| Poidmore, Paolo | $523,649.85 | $508,174.00 | $508,174.00 |
| Quinn, Thomas | $50,000.00 | | $50,000.00 |

HARRIS LAW PRACTICE LLC
850 E. PATRIOT BLVD
SUITE F
RENO, NV 89511
775 786 7600

15

| | | | |
|---|---|---|---|
| Ricciardi, Paul; Ricciardi Family Trust | $200,000.00 | $223,299.97 | $200,000.00 |
| Saunders, Steven/ Low Altitude LLC | $250,000.00 | $250,000.00 | $250,000.00 |
| Scarola, John | $53,908.87 | $53,908.37 | $53,908.87 |
| Staniforth, Diane | $52,159.73 | $51,528.50 | $51,528.50 |
| Stieg, Ryan | $18,468.56 | $18,408.36 | $18,408.36 |
| Stoll, Jeanette | $64,792.24 | $64,792.24 | $64,792.24 |
| Taylor, Tom, Taylor, Susan J., Trustee of the Susan J. Taylor Revocable Trust | $105,639.52 | $105,639.52 | $105,639.52 |
| The Amp'd Group, LLC, Attn: Trimble, Justin | $200,000.00 | $200,000.00 | $200,000.00 |
| Turner, Timothy J. | $106,377.21 | | $106,377.21 |
| Ullrich, Julia, Trustee Girona Living Trust dtd July 29, 2020 | $230,252.57 | $236,682.41 | $230,252.57 |
| Van Der Bokke, Lee; The Van Der Bokke Family Trust | $91,517.51 | $93,386.01 | $91,517.51 |
| Waters, Christopher and Cori, Ttees | $61,806.76 | | $61,806.76 |
| Watson, Katrine (Trinkie), Trustee, Watson Family Trust | $116,306.15 | $115,163.36 | $115,163.36 |
| Weigle, Larry; Larry L. Weigel and Debra K Weigel Trust utd 3/12/15 | $50,715.36 | | $50,715.36 |
| Whitney, Bernard | $3,429.72 | | $3,429.72 |
| Wise, Jeff; NuView Trust c/o Custodian FBO Jeffrey Wise | $100,000.00 | $101,910.57 | $100,000.00 |
| **Total:** | **$7,451,429.45** | | **$7,906,294.98** |

9.     **GUARDIAN CLASS 5A CLAIMS [UNSECURED CLAIMS OF GUARDIAN FUND TRADE VENDORS]**: This class consists of the allowed unsecured claims of creditors who provided goods or services to Guardian in the ordinary course of business. The Class 5A allowed claims are estimated in the total amount of $80,254.41 as of the Petition Date, detailed as follows:

| Creditor Claims: | Scheduled Amount | Proof of Claim Amount | Allowed Amount |
|---|---|---|---|
| 12Mays Clean Up Services LLC | $1,350.00 | | $1,350.00 |
| All Things Interiors, LLC | $4,875.00 | | $4,875.00 |
| Alpha Omega Housing Development, Inc. | $5,953.57 | | $5,953.57 |
| American Estate & Trust LLC | $816.66 | | $816.66 |
| Boone County Collector | $0.00 | $350.06 | $360.06 |
| Business Tax Solutions | $100.00 | | $100.00 |
| Castillo Painting Company and Finishing | $3,000.00 | | $3,000.00 |
| City of Anniston Garbage | $180.00 | | $180.00 |
| Cut N Roll Paint Co. | $5,000.00 | | $5,000.00 |
| Green Cove Investments LLC | $4,048.19 | | $4,048.19 |
| Green Lane Group LLC | $34,141.50 | | $34,141.50 |
| High Sierra Business Systems, Inc. | $162.85 | $842.61 | $842.61 |
| Lepepe Investments | $6,425.00 | | $6,425.00 |
| Minute Rehab, LLC | $8,200.00 | | $8,200.00 |
| Ohio Edison | $0.00 | $226.28 | $226.28 |
| Raven Contractors LLC | $545.00 | | $545.00 |
| Republic Services | $306.93 | | $306.93 |
| Roto-Rooter Services Company CLV | $430.40 | | $430.40 |
| Spectrum (Charter Communications) | $358.89 | $1,615.68 | $1,615.68 |
| The Illuminating Company | $550.34 | $273.65 | $550.34 |
| Title One Agency | $436.00 | | $436.00 |
| Tresa Baker, CPA | $346.95 | | $346.95 |
| Waste Management | $145.35 | | $145.35 |
| **Total:** | **$77,372.63** | | **$80,254.41** |

HARRIS LAW PRACTICE LLC
850 E. PATRIOT BLVD
SUITE F
RENO, NV 89511
775 786 7600

10.    **CV1 CLASS 5B CLAIMS [UNSECURED CLAIMS OF CV1 TRADE VENDORS]**: This class consists of the allowed unsecured claims of creditors who provided goods or services to CV1 in the ordinary course of business. The Class 5B allowed claims are estimated in the total amount of $14,189.80 as of the Petition Date, detailed as follows:

| Creditor Claims: | Scheduled Amount | Proof of Claim Amount | Allowed Amount |
|---|---|---|---|
| 12B Residential, Inc. | $14,478.81 | | $11,678.81 |
| City of Cleveland Division of Water | $917.28 | $399.42 | $399.42 |
| City of Ferguson | $1,564 | | $1,564.00 |
| Evernest Property Management | $18,500.00 | | $0.00 |
| Hoy Chrissinger Vallas, PC | $0.00 | | $0.00 |
| LP Insurance Services | $8,492.18 | | $0.00 |
| Metropolitan St. Louis Sewer District | $9,822.45 | | $Unknown |
| Missouri American Water | $140.68 | | $Unknown |
| ZVN Properties Inc. | $10,768.33 | | $547.57 |
| **Total:** | **$64,683.73** | | **$14,189.80** |

11.    **CV2 CLASS 5C CLAIMS [UNSECURED CLAIMS OF CV2 TRADE VENDORS]**: This class consists of the allowed unsecured claims of creditors who provided goods or services to CV2 in the ordinary course of business. The Class 5C allowed claims are estimated in the total amount of $18,753.47 as of the Petition Date, detailed as follows:

| Creditor Claims: | Scheduled Amount | Proof of Claim Amount | Allowed Amount |
|---|---|---|---|
| 12B Residential, Inc. | $17,618.31 | | $14,418.31 |
| City of Cleveland Division of Water | $8,433.78 | | $Unknown |
| Evernest Property Management | $18,500.00 | | $0.00 |
| Hoy Chrissinger Vallas, PC | $0.00 | | $0.00 |

HARRIS LAW PRACTICE LLC
850 E. PATRIOT BLVD
SUITE F
RENO, NV 89511
775 786 7600

| | | | |
|---|---|---|---|
| Jefferson County | $.00 | | $3,231.60 |
| LP Insurance Services | $2,770.47 | | $0.00 |
| Metropolitan St. Louis Sewer | $6,345.43 | | $Unknown |
| Waste Management | $196.42 | | $196.42 |
| ZVN Properties Inc. | $5,012.13 | | $907.14 |
| **Total:** | **$58,876.54** | | **$18,753.47** |

12.     **CV1 CLASS 5D CLAIM [UNSECURED CLAIM OF INTERNAL REVENUE SERVICE]**: This class consists of the allowed general unsecured claim of the Internal Revenue Service against CV1 in the amount of $3,510.00 for penalties for late-filed income tax returns.

13.     **CV2 CLASS 5E CLAIM [UNSECURED CLAIM OF INTERNAL REVENUE SERVICE]**: This class consists of the allowed general unsecured claim of the Internal Revenue Service against CV2 in the amount of $8,190.00 for penalties for late-filed income tax returns.

14.     **GUARDIAN CLASS 6A CLAIMS [UNSECURED LEASE DAMAGE CLAIMS]:** This class consists of the allowed unsecured claims of property owners who purchased properties from Guardian under certain "Secured Investment Agreements" and then leased the properties back to Guardian under lease agreements requiring Guardian to pay property owners fixed rent for the term of the leases. Guardian, as lessee, also had other obligations under the lease agreements. These claims consist of allowed claims for unpaid fixed rent, other expenses, and damages arising under the lease agreements through the Petition Date. The Class 6A allowed claims are estimated in the total amount of $3.5 million to $4 million as of the Petition Date, detailed as shown on **Exhibit B** attached hereto.

15.     **GUARDIAN CLASS 6B CLAIMS [CLAIMS OF PROPERTY OWNERS WITHOUT 2-YEAR BUY-BACK SIDE LETTERS]:** This class consists of the allowed claims of property owners who purchased properties from Guardian under certain "Secured Investment Agreements" and related purchase and sale agreements, and then leased the properties back to Guardian under lease agreements requiring Guardian to pay property owners fixed rent for the

HARRIS LAW PRACTICE LLC
850 E. PATRIOT BLVD
SUITE F
RENO, NV 89511
775 786 7600

term of the leases. The Secured Investment Agreements expressly state that the purchase transaction represents a security that has not been registered under the Securities Act of 1933, as amended, or qualified under applicable state securities laws. The Class 6B claimants do not have written agreements with Guardian for a 2-year buy-back of their properties. These claims were contingent and unliquidated on the Petition Date and consist of alleged damages arising from the Secured Investment Agreements and purchase and sale agreements (but not for fixed rent or lease damages) under various tort, contract, and miscellaneous legal theories. The Class 6B allowed claims are shown on **Exhibit C** attached hereto.

16.    **GUARDIAN CLASS 6C CLAIMS [CLAIMS OF PROPERTY OWNERS WITH 2-YEAR BUY-BACK SIDE LETTERS]:** This class consists of the allowed claims of property owners who purchased properties from Guardian under certain "Secured Investment Agreements" and related purchase and sale agreements and then leased the properties back to Guardian under lease agreements requiring Guardian to pay property owners fixed rent for the term of the leases. The Secured Investment Agreements expressly state that the purchase transaction represents a security that has not been registered under the Securities Act of 1933, as amended, or qualified under applicable state securities laws. The Class 6C claimants have written agreements with Guardian for a 2-year buy-back of their properties, although the enforceability of those agreements is currently unknown. These claims were contingent and unliquidated on the Petition Date and consist of alleged damages arising from the Secured Investment Agreements and purchase and sale agreements (but not for fixed rent or lease damages) under various tort, contract, and miscellaneous legal theories. The Class 6C allowed claims are shown on **Exhibit D** attached hereto.

17.    **CLASS 7A EQUITY INTERESTS OF GUARDIAN FUND**:  This Class 7A consists of the member's equity interests in Guardian Fund as of the Petition Date, as shown on **Exhibit E** attached hereto.

18.    **CLASS 7B EQUITY INTERESTS OF GUARDIAN CV1**:  This Class 7B consists of Guardian Fund's 100% member's interest in Guardian CV1, LLC.

19.    **CLASS 7C EQUITY INTERESTS OF GUARDIAN CV2**:  This Class 7C

HARRIS LAW PRACTICE LLC
850 E. PATRIOT BLVD
SUITE F
RENO, NV 89511
775 786 7600

20

consists of Guardian Fund's 100% member's interest in Guardian CV2, LLC.

## V.

## TREATMENT OF CLASSES

1.    **GUARDIAN CLASS 1 CLAIM [ SECURED CLAIM OF FAY SERVICING]**: The Class 1 allowed secured claim of Fay Servicing in the amount of $191,527.65, calculated as of the Petition Date, shall be paid in full by Guardian, with interest at the contract rate pursuant to the existing contractual loan terms without modification. Accordingly, the Class 1 allowed secured claim of Faye Servicing is <u>unimpaired</u> under the Plan.

2.    **CV1 CLASS 2A CLAIM [SECURED CLAIM OF WILMINGTON TRUST]**: The Class 2A allowed secured claim of Wilmington Trust for Loan 1 shall be paid as follows:

A.    Wilmington Trust shall retain its liens without modification as they existed on the Petition Date, and on the Effective Date, CV1 shall borrow from Guardian on an unsecured basis, the money needed to cure all pre and post-petition defaults under Loan 1 pursuant to 11 U.S.C. § 1124(2), including payment of default interest, as such defaults are determined and allowed by the Court. Guardian's obligation to lend the money needed to cure all pre and post-petition defaults under Loan 1 will be the only obligation Guardian has to Wilmington Trust under the terms of the Plan. Wilmington Trust alleges that as of June 30, 2024, the approximate cure amount is $610,241.11, plus all interest, escrow payments, and fees incurred after June 30, 2024, reasonable attorney's fees, escrow/protective advances, and damages and pecuniary loss. Interest and default interest continue to accrue at the rates of $852.30 per day and impounds continue to accrue at $14,481.52 per month. This alleged cure amount has not yet been allowed by the Court, and Debtors and the Committee dispute Wilmington Trust's alleged entitlement to certain default interest, prepayment penalty, fees, and charges. The Debtors also believe they have claims and counterclaims against Wilmington Trust for lender liability, including but not limited to, breach of the covenant of good faith and fair dealing, fraud, aiding and abetting HPC's breach of fiduciary duties to Guardian, and other wrongful acts.  Moreover, with Wilmington Trust's consent, CV1 has directly paid its post-petition property insurance and tax payments, thus it alleges that Wilmington Trust is not entitled to those impounds in arrears because Wilmington

HARRIS LAW PRACTICE LLC
850 E. PATRIOT BLVD
SUITE F
RENO, NV 89511
775 786 7600

Trust is not required to pay any past property taxes or insurance for CV1's Properties. After paying Wilmington Trust's allowed cure amount, CV1 will then pay Wilmington Trust the allowed amount of Loan 1 according to the parties' unaccelerated contractual terms, without modification. Guardian will also reconfirm its Guaranty obligation to Wilmington Trust, which is the pledge of Guardian's interest in CV1. Accordingly, the Class 2A allowed secured claim of Wilmington Trust is <u>unimpaired</u> under the Plan.[1]

B.      Once the Court determines Wilmington Trust's cure amount, if the amount the Court determines is necessary to cure impacts the feasibility of this Plan or Guardian and CV1 determine the cure amount is too high, or if the Court determines that Wilmington Trust's Class 2A claim is impaired instead of unimpaired under the treatment proposed in paragraph A above, then CV1 proposes the following alternative treatment of the Class 2A allowed secured claim of Wilmington Trust for Loan 1: Wilmington Trust shall retain its existing liens and contractual remedies without modification, and on the Effective Date, Wilmington Trust can enforce its contractual and state law remedies to foreclose or otherwise take possession and control of its collateral. CV1 reserves all its legal and contractual rights to pursue litigation claims against Wilmington Trust, including, but not limited to, lender liability, breach of the covenant of good faith and fair dealing, and claims for improper disposition of the collateral. The election by CV1 and Guardian to cure Wilmington Trust's claim or otherwise proceed with this alternative treatment is independent from any election made by Guardian and CV2 with respect to Wilmington Trust's secured claim against CV2. Accordingly, the Class 2A allowed secured claim of Wilmington Trust under this alternative treatment is <u>unimpaired</u> under the Plan.

**3.      CV2 CLASS 2B CLAIM [SECURED CLAIM OF WILMINGTON TRUST]**: The Class 2B allowed secured claim of Wilmington Trust for Loan 2 shall be paid as follows:

---

[1] Wilmington Trust has alleged that this proposed claim treatment should be classified as impaired instead of unimpaired because CV1 and CV2 reserve the right to object to Wilmington Trust's default interest, fees, and charges according to state and bankruptcy law and equitable principles. The Debtors and Committee disagree with this analysis but believe these issues can be determined in connection with Plan confirmation.

A.      Wilmington Trust shall retain its liens without modification as they existed on the Petition Date, and on the Effective Date, CV2 shall borrow from Guardian on an unsecured basis, the money needed to cure all pre and post-petition defaults under Loan 2 pursuant to 11 U.S.C. § 1124(2), including payment of default interest, as such defaults are determined and allowed by the Court. Guardian's obligation to lend the money needed to cure all pre and post-petition defaults under Loan 2 will be the only obligation Guardian has to Wilmington Trust under the terms of the Plan. Wilmington Trust alleges that as of June 30, 2024, the approximate cure amount is $626,945.92, plus all interest, escrow payments, and fees incurred after June 30, 2024, reasonable attorney's fees, escrow/protective advances, and damages and pecuniary loss. Interest and default interest continue to accrue at the rates of $862.72 per day and impounds continue to accrue at $14,673.50 per month. This alleged cure amount has not yet been allowed by the Court, and Debtors and the Committee dispute Wilmington Trust's alleged entitlement to certain default interest, prepayment penalty, fees, and charges. The Debtors also believe they have claims and counterclaims against Wilmington Trust for lender liability, including but not limited to, breach of the covenant of good faith and fair dealing, fraud, aiding and abetting HPC's breach of fiduciary duties to Guardian, and other wrongful acts.  Moreover, with Wilmington Trust's consent, CV2 has directly paid its post-petition property insurance and tax payments, thus it alleges that Wilmington Trust is not entitled to those impounds in arrears because Wilmington Trust is not required to pay any past property taxes or insurance for CV2's Properties. After paying Wilmington Trust's allowed cure amount,  CV2 will then pay Wilmington Trust the allowed amount of Loan 2 according to the parties' unaccelerated contractual terms, without modification. Guardian will also reconfirm its Guaranty obligation to Wilmington Trust, which is the pledge of Guardian's interest in CV2. Accordingly, the Class 2B allowed secured claim of Wilmington Trust is <u>unimpaired</u> under the Plan.

B. Once the Court determines Wilmington Trust's cure amount, if the amount the Court determines is necessary to cure impacts the feasibility of this Plan, or Guardian and CV2 determine the cure amount is too high, or if the Court determines that Wilmington Trust's Class 2B claim is impaired instead of unimpaired under the treatment proposed in paragraph A, then

HARRIS LAW PRACTICE LLC
850 E. PATRIOT BLVD
SUITE F
RENO, NV 89511
775 786 7600

CV2 proposes the following alternative treatment of the Class 2B allowed secured claim of Wilmington Trust for Loan 2: Wilmington Trust shall retain its existing liens and contractual remedies without modification, and on the Effective Date, Wilmington Trust can enforce its contractual and state law remedies to foreclose or otherwise take possession and control of its collateral. CV2 reserves all its legal and contractual rights to pursue litigation claims against Wilmington Trust, including, but not limited to, lender liability, breach of the covenant of good faith and fair dealing, and claims for improper disposition of the collateral. The election by CV2 and Guardian to cure Wilmington Trust's claim or otherwise proceed with this alternative treatment is independent from any election made by Guardian and CV1 with respect to Wilmington Trust's secured claim against CV1. Accordingly, the Class 2B allowed secured claim of Wilmington Trust under this alternative treatment is unimpaired under the Plan.

**4.      GUARDIAN CLASS 2C CLAIM [SECURED CLAIMS OF WILMINGTON TRUST]**: The Class 2C allowed secured claims of Wilmington Trust under Guardian's Pledgor Guaranties of Loan 1 and Loan 2, which provide that Wilmington Trust's only recourse is against the "Pledged Collateral," shall not be modified. Accordingly, the Class 2C allowed secured claims of Wilmington Trust in the amounts ultimately allowed by the Court or through agreement of the parties, are unimpaired under the Plan.

**5.      GUARDIAN CLASS 3A CLAIM [UNLIQUIDATED CLAIM OF SEC]:** The Class 3A allowed general unsecured claim of the SEC estimated in the amount of $100,000, shall be paid 100% of its allowed claim amount, plus accrued simple interest of 4% from the Petition Date until paid in full, but without any penalties, with such claim to be paid by Guardian in monthly installments of $2,800.00 commencing on January 5, 2026, and continuing on the fifth day of each month thereafter until January 5, 2029, when all remaining unpaid balance with accrued interest will be due in full. Accordingly, the Class 3A allowed general unsecured claim of the SEC is impaired under the Plan.

**6.      CV1 CLASS 3B CLAIM [UNLIQUIDATED CLAIM OF SEC]:** The Class 3B allowed general unsecured claim of the SEC estimated in the amount of $1.00, shall be paid 100% of its allowed claim amount, plus accrued simple interest of 4% from the Petition Date until paid

in full, but without any penalties, with such claim to be paid by CV1 in monthly installments of $2,800.00 commencing on January 5, 2026, and continuing on the fifth day of each month thereafter until January 5, 2029, when all remaining unpaid balance with accrued interest will be due in full. CV1 does not anticipate owing the SEC anything, but if needed, Guardian may loan to CV1 the amount needed up to $100,000 to pay any allowed Class 3B claim under the payment schedule described above. Accordingly, the Class 3B allowed general unsecured claim of the SEC is <u>impaired</u> under the Plan.

7.    **CV2 CLASS 3C CLAIM [UNLIQUIDATED CLAIM OF SEC]:** The Class 3C allowed general unsecured claim of the SEC estimated in the amount of $1.00, shall be paid 100% of its allowed claim amount, plus accrued simple interest of 4% from the Petition Date until paid in full, but without any penalties, with such claim to be paid by CV2 in monthly installments of $2,800.00 commencing on January 5, 2026, and continuing on the fifth day of each month thereafter until January 5, 2029, when all remaining unpaid balance with accrued interest will be due in full. CV2 does not anticipate owing the SEC anything, but if needed, Guardian may loan to CV2 the amount needed up to $100,000 to pay any allowed Class 3C claim under the payment schedule described above. Accordingly, the Class 3C allowed general unsecured claim of the SEC is <u>impaired</u> under the Plan.

8.    **GUARDIAN CLASS 4 CLAIMS [UNSECURED CLAIMS OF NOTE HOLDERS]**: The Class 4 allowed unsecured claims of Note Holders in the estimated amount of $7.9 million calculated as of the Petition Date shall accrue simple interest at 4% per annum from the Petition Date until paid in full as follows: The allowed claim amount owing on the Petition Date shall be paid in quarterly cash payments of  $465,139.23 distributed on a pro-rata basis equally among each claimant, with the first payment due on September 30, 2025, and continuing on the last day of each calendar quarter thereafter until the Class 4 claims are paid in full. Additionally, Guardian will make interest-only payments calculated on the balances owing on the Petition Date, with the first interest-only payment due on June 30, 2025, which will cover all accrued interest from the Petition Date (March 17, 2023) through June 30, 2025, and then continuing monthly on the last day of each month thereafter until total principal and accrued

HARRIS LAW PRACTICE LLC
850 E. PATRIOT BLVD
SUITE F
RENO, NV 89511
775 786 7600

interest is paid in full. Guardian estimates the first interest-only lump sum payment on June 30, 2025, will be around $722,411. Guardian estimates that the Class 4 claims will be paid in full on or about September 30, 2029. Accordingly, the Class 4 allowed unsecured claims of Note Holders are <u>impaired</u> under the Plan.

**9.     GUARDIAN CLASS 5A CLAIMS [UNSECURED CLAIMS OF GUARDIAN FUND TRADE VENDORS]**: The Class 5A allowed unsecured claims of Guardian Fund Trade Vendors in the amount of $80,254.41, calculated as of the Petition Date, shall be paid in full with simple interest at 4% per annum from the Petition Date and shall be paid in full in monthly installments of $6,700 starting on January 31, 2025, distributed on a pro-rata basis equally among each claimant, and continuing on the last day of each month thereafter for one year until December 31, 2025, when all unpaid principal and accrued interest shall be due and payable in full. Accordingly, the Class 5A Allowed unsecured claims of Guardian Fund Trade Vendors are <u>impaired</u> under the Plan.

**10.     CV1 CLASS 5B CLAIMS [UNSECURED CLAIMS OF CV1 TRADE VENDORS]**: The Class 5B allowed unsecured claims of CV1 Trade Vendors estimated in the amount of $14,189.80 calculated as of the Petition Date shall be paid in full with simple interest at 4% per annum from the Petition Date as follows: the non-insider allowed unsecured claims totaling the estimated amount of $2,510.99 shall be paid in in full with accrued interest on the Effective Date. The Class 5B claim of Guardian's subsidiary, 12BR, will be subordinated by agreement to all other allowed unsecured claims under 11 U.S.C. § 510(a) and will be paid later by CV1 only if sufficient revenue or assets exist to pay said claim without impairing CV1's ability to pay other claims and operating expenses. If CV1 does not have sufficient revenue or assets within five years after the Effective Date to pay this insider claim, 12BR has agreed to write off its claim. Accordingly, the Class 5B Allowed unsecured claims of CV1 Trade Vendors are <u>impaired</u> under the Plan.

**11.     CV2 CLASS 5C CLAIMS [UNSECURED CLAIMS OF CV2 TRADE VENDORS]**: The Class 5C allowed unsecured claims of CV2 Trade Vendors estimated in the amount of $18,753.47 calculated as of the Petition Date shall be paid in full with simple interest

at 4% per annum from the Petition Date as follows: the non-insider allowed unsecured claims totaling the estimated amount of $4,335.16 shall be paid in full with accrued interest on the Effective Date. The Class 5C claim of Guardian's subsidiary, 12BR, will be subordinated by agreement to all other allowed unsecured claims under 11 U.S.C. § 510(a) and will be paid later by CV2 only if sufficient revenue or assets exists to pay said claim without impairing CV2's ability to pay other claims and operating expenses. If CV2 does not have sufficient revenue or assets within five years after the Effective Date to pay this insider claim, 12BR has agreed to write off its claim. Accordingly, the Class 5C allowed unsecured claims of CV2 Trade Vendors are impaired under the Plan.

12.    **CV1 CLASS 5D CLAIM [UNSECURED CLAIM OF INTERNAL REVENUE SERVICE]**: The Class 5D allowed unsecured claim of the Internal Revenue Service against CV1 in the amount of $3,510.00 for penalties will be paid in full with simple interest at 4% per annum from the Petition Date and shall be paid by CV1 in monthly installments of $500 commencing on July 1, 2025, and continuing on the first day of each month thereafter until the Class 5D claim is paid in full. Accordingly, the Class 5D allowed unsecured claim of Internal Revenue Service is impaired under the Plan.

13.    **CV2 CLASS 5E CLAIM [UNSECURED CLAIM OF INTERNAL REVENUE SERVICE]**: The Class 5E allowed unsecured claim of the Internal Revenue Service against CV1 in the amount of $8,190.00 for penalties will be paid in full with simple interest at 4% per annum from the Petition Date and shall be paid by CV2 in monthly installments of $500 commencing on July 1, 2025, and continuing on the first day of each month thereafter until the Class 5E claim is paid in full. Accordingly, the Class 5E allowed unsecured claim of Internal Revenue Service is impaired under the Plan.

14.    **GUARDIAN CLASS 6A CLAIMS [UNSECURED LEASE DAMAGE CLAIMS]**: The Class 6A allowed unsecured lease damage claims estimated in the amount of $3.5 million to $4 million calculated as of the Petition Date, shall accrue simple interest at 4% per annum from the Petition Date until paid in full, and shall be paid as follows: the allowed claim amount owing on the Petition Date shall be paid in quarterly cash payments of  $235,750

HARRIS LAW PRACTICE LLC
850 E. PATRIOT BLVD
SUITE F
RENO, NV 89511
775 786 7600

distributed on a pro-rata basis equally among each claimant, with the first payment due on September 30, 2025, and continuing on the last day of each calendar quarter thereafter until the Class 6A claims are paid in full. Additionally, Guardian will make interest-only payments calculated on the balances owing on the Petition Date, with the first interest-only payment due on June 30, 2025, which will cover all accrued interest from the Petition Date (March 17, 2023) through June 30, 2025, and then continuing monthly on the last day of each month thereafter until total principal and accrued interest is paid in full. Guardian estimates the first interest-only lump sum payment on June 30, 2025, will be around $365,778. Guardian estimates that the Class 6A claims will be paid in full on or about March 31, 2029. Any disputed claims shall not be paid until the allowed claim is mutually agreed upon or adjudicated by the Court.  However, until the disputed claims are resolved, Guardian shall reserve from any quarterly distributions the pro-rata share of the disputed claims based on a claim estimation procedure to be established by the Court. Accordingly, the Class 6A allowed unsecured lease damage claims are impaired under the Plan.

15.    **GUARDIAN CLASS 6B CLAIMS [CLAIMS OF PROPERTY OWNERS WITHOUT 2-YEAR BUY-BACK SIDE LETTERS]:** The Class 6B allowed claims of Property Owners without 2-year buy-back side letters shall be subordinated to Class 2C, Class 3A, Class 4, Class 5A, Class 6A, and Option 1 Class 6C  unsecured claims as damages arising from the purchase or sale of a security under 11 U.S.C. § 510(b), and recharacterized as equity interests in Guardian, and paid in equal priority to Class 6C and Class 7A common member equity interests as follows: The allowed claim amounts as mutually agreed by Guardian and the claimant, or as adjudicated by the Court, shall be combined with Option 2 Class 6C and Class 7A, and prorated against the total outstanding capital accounts of Guardian's Class 7A equity holders existing on the Petition Date (estimated at $70.4 million). For example, if Class 6B and Option 2 Class 6C claims are allowed in the total amount of $10 million, Guardian's new total capital account value will be calculated at $80.4 million, and each equity holder's new member's interest will be prorated by taking the dollar amount of their allowed claim (or prepetition capital account value) against $80.4 million. Accordingly, the Class 6B claims of Property Owners without 2-year buy-back side letters are impaired under the Plan.

HARRIS LAW PRACTICE LLC
850 E. PATRIOT BLVD
SUITE F
RENO, NV 89511
775 786 7600

**16.    GUARDIAN CLASS 6C CLAIMS [CLAIMS OF PROPERTY OWNERS WITH 2-YEAR BUY-BACK SIDE LETTERS]:** The Class 6C allowed claims of Property Owners with 2-year buy-back side letters which are estimated to be in the total amount of $3 million to $3.4 million, shall be paid pursuant to one of the two options described below at the election of the Class 6C claimant on their ballots.

**Option 1:** 30% of the gross claim amount as allowed by mutual agreement between Guardian and the claimant or otherwise adjudicated by the Court shall be treated as a general unsecured claim, with any amount over 30% disallowed entirely, and shall accrue simple interest at 4% per annum from the Petition Date until paid in full. The general unsecured claim  shall be paid as follows: the allowed general unsecured claims in the reduced amount of 30% of the gross allowed claims shall be paid in quarterly cash payments of  the lesser of $60,753.41 or 6% of the total claims electing this treatment, distributed on a pro-rata basis equally among each claimant, with the first payment due on September 30, 2025, and continuing on the last day of each calendar quarter thereafter until the Class 6C claims are paid in full. Additionally, Guardian will make interest-only payments calculated on the 30% allowed general unsecured claim amounts, with the first interest-only payment due on June 30, 2025, which will cover all accrued interest from the Petition Date (March 17, 2023) through June 30, 2025, and then continuing monthly on the last day of each month thereafter until total principal and accrued interest is paid in full. Guardian estimates that the Class 6C claims will be paid in full on or about March 31, 2029. Any claimants who elect this payment option but have unadjudicated disputed claims shall not be paid until the allowed claim is mutually agreed upon or adjudicated by the Court.   However, until the disputed claims are resolved, Guardian shall reserve from any quarterly distributions the pro-rata share of the disputed claims based on a claim estimation procedure to be established by the Court .

**Option 2:** The gross claim amount ultimately allowed by mutual agreement between Guardian and the claimant or otherwise adjudicated by the Court shall be  subordinated to Class 2C, Class 3A, Class 4, Class 5A, Class 6A and Option 1 Class 6C unsecured claims

as damages arising from the purchase or sale of a security under 11 U.S.C. § 510(b), and recharacterized as equity interests in Guardian, and paid in equal priority to Class 6B and Class 7A common member equity interests as follows: The allowed claim amounts as mutually agreed by Guardian and the claimant, or as adjudicated by the Court, shall be combined with Class 6B and Class 7A, and prorated against the total outstanding capital accounts of Guardian's Class 7A equity holders existing on the Petition Date (estimated at $70.4 million). For example, if Class 6B and Option 2 Class 6C claims are allowed in the total amount of $10 million, Guardian's new total capital account value will be calculated at $80.4 million, and each equity holder's new member's interest will be prorated by taking the dollar amount of their allowed claim (or prepetition capital account value) against $80.4 million.

**If a Class 6C claimant fails to vote thereby failing to make a treatment election between Options 1 and 2 on their Ballot, their allowed Class 6C claim, if any, shall be treated under Option 2 as a subordinated equity interest under 11 U.S.C. § 510(b).**

Accordingly, the Class 6C claims of Property Owners with 2-year buy-back side letters are <u>impaired</u> under the Plan.

17.    <u>**CLASS 7A EQUITY INTERESTS OF GUARDIAN FUND**</u>: The Class 7A equity interests of Guardian existing on the Petition Date shall be combined with the Class 6B and Option 2 Class 6C allowed claims of Property Owners and reallocated on a pro rata basis as follows: The allowed Class 6B and Option 2 Class 6C claim amounts as mutually agreed by Guardian and the claimant, or as adjudicated by the Court, shall be combined with and prorated against the total outstanding capital accounts of Guardian's Class 7A equity holders existing on the Petition Date (estimated at $70.4 million). For example, if Class 6B and Option 2 Class 6C claims are allowed in the total amount of $10 million, Guardian's new total capital account value will be calculated at $80.4 million, and each equity holder's new member's interest will be prorated by taking the dollar amount of their allowed claim (or prepetition capital account value) against $80.4 million. Additionally, Class 7A equity holders will be provided with a ballot election to opt in to abandon their equity interests so that they can take an immediate tax loss

HARRIS LAW PRACTICE LLC
850 E. PATRIOT BLVD
SUITE F
RENO, NV 89511
775 786 7600

30

effective for tax year 2024. Any abandoned equity interests will be cancelled and not included for purposes of calculating the pro-rata equity interests of Classes 6B, Option 2 6C, and 7A. Accordingly, the Class 7A equity interests of Guardian are <u>impaired</u> under the Plan.

**18.** **<u>CLASS 7B EQUITY INTERESTS OF GUARDIAN CV1, LLC</u>**:  The Class 7B equity interests of Guardian CV1, LLC existing on the Petition Date shall not be modified. Accordingly, the Class 7B equity interests of Guardian CV1, LLC are <u>unimpaired</u> under the Plan.

**19.** **<u>CLASS 7C EQUITY INTERESTS OF GUARDIAN CV2, LLC</u>**:  The Class 7C equity interests of Guardian CV2, LLC existing on the Petition Date shall not be modified. Accordingly, the Class 7C equity interests of Guardian CV2, LLC are <u>unimpaired</u> under the Plan.

**VI.**

**<u>TREATMENT OF EXECUTORY CONTRACTS, NON-EXECUTORY CONTRACTS, UNEXPIRED LEASES AND DISPUTED CLAIMS</u>**

**1.** **RESERVATION OF RIGHTS**. The Debtors reserve the right to assume or reject, pursuant to §365 of the Code, any executory contract or unexpired lease not assumed or rejected prior to the Confirmation Date. All executory contracts and unexpired leases not specifically assumed or rejected as of the Confirmation Date or as to which an application to reject shall not be pending on the Confirmation Date shall be deemed rejected by the Debtors. Debtors hereby assume or rejects their leases and executory contracts as follows:

| DEBTOR | OTHER PARTY | DESCRIPTION | ASSUME/REJECT |
|---|---|---|---|
| CV1 | Evernest Property Management | Property Management Agreement | Assume |
| CV2 | Evernest Property Management | Property Management Agreement | Assume |
| Guardian | Home Partners of America LLC | Settlement Agreement dated February 21, 2023, for alleged trademark infringement claims | Assume |
| Guardian | 12B Residential, Inc. | Oral Property and Operations Management Agreement | Assume |

| Guardian | Joanne Vano, Cynthia R. Fors & John Vano, Ttees, the Michael Vano and Joanne Vano 1983 Trust | Land Installment Contract dated February 16, 2023, for APNs: 109-23-009, 109-20-082, and 138-17-013 Cuyahoga County, OH | Assume |
|---|---|---|---|
| Guardian | Royal Court Apartments, LLC | Land Installment Contract dated February 17, 2023, for 3586 W. 48th St., Cleveland, OH 44102 | Assume |

### 2.   DISPUTED CLAIMS.

Through their Disbursing Agent, the Debtors will only make distributions according to the Plan and when claims become allowed claims as such terms are defined in the Plan. There are currently claims pending against the Debtors, either filed or scheduled, which are or will become Disputed Claims. As to some Disputed Claims, the Debtors dispute only the classification of the claims asserted by the holder. With respect to other Disputed Claims, the Debtors accept the classification asserted by the holder but dispute the amount of the claim alleged by such holder. In some cases, the Debtors dispute both the asserted classification and the alleged amount. In addition, the Debtors and other parties in interest may object to certain other claims based upon equitable or contractual subordination pursuant to § 510 of the Bankruptcy Code. Specifically, such subordination claims may be asserted against any person or entity buying claim(s) for speculation and profit in Debtors' bankruptcy cases. No distribution will be made with respect to any such Disputed Claims unless and until they become allowed claims.

Claims Objections. Objections to Claims shall be filed with the Court and served upon each holder of a Claim to which objection is made no later than one-hundred-eighty (180) days after the Effective Date.

Payment Procedures. Payments to the holder of a Claim to which an objection has been filed that ultimately becomes an Allowed Claim shall be made in accordance with the provisions of the Plan with respect to the Class of Creditors to which the holder of such an Allowed Claim belongs. Interest, if any, on any funds reserved for a contested claim shall inure to the benefit of the holder of such an Allowed Claim.

Avoidance Actions. In accordance with 11 U.S.C. § 1123(b), the Debtors shall retain and

may enforce any claims, rights, and causes of action that the Debtors or their bankruptcy estates may hold against any person or entity, including, without limitation, claims and causes of action arising under sections 542, 543, 544, 547, 548, 550, or 553 of the Bankruptcy Code. To the extent appropriate, the Debtors reserves the right to bring any and all avoidance actions within one year after the Effective Date. Proceeds of all avoidance actions shall vest in the Debtors pursuant to 11 U.S.C. §1141.

Litigation Claims. In accordance with 11 U.S.C. § 1123(b), the Debtors shall retain and may enforce any claims, rights, and causes of action that the Debtors or their bankruptcy estates may hold against any person or entity, including, without limitation, claims and causes of action arising under sections 542, 543, 544, 547, 548, 550, or 553 of the Bankruptcy Code. To the extent appropriate, the Debtors shall reserve and have the right to commence any and all actions on contingent and unliquidated litigation claims within one year after the Effective Date. Proceeds of all litigation claims shall vest in the Debtors pursuant to 11 U.S.C. §1141. The Debtors are currently aware of the following potential litigation claims:

**All Debtors:**

- Potential direct and derivative claims including, but not limited to, professional negligence and fraud against Larry Pino, Esq. and Pino Law Group.
- Potential direct and derivative claims including, but not limited to, professional negligence against Evans Nelson & Company CPAs.
- Potential direct and derivative claims against Umpqua Bank for, among other things, failure to report or act upon suspicious banking activity.
- Potential direct and derivative claims against Greg Hughes, Steve Sixberry, and Kyle Krch and their related entities for, among other things, preferences, fraudulent transfers, breach of fiduciary duty, and other related claims.
- Potential direct and derivative claims against Krch Realty, LLC.
- Potential direct and derivative claims against Hughberry Homes, LLC.
- Potential lender liability and breach of contract claims against Wilmington Trust, including, but not limited to, breach of the implied covenant of good faith and fair

dealing, fraud, fraudulent transfers, and aiding and abetting HPC's breach of fiduciary duties.

- Potential breach of contract and collection actions to collect monies owed to the Debtors under prepetition loans and contracts of sale to third parties.

- All potential objections to fee requests, including those of Wilmington Trust's counsel.

The Debtors expressly reserve the right to pursue these litigation claims and other related claims against these parties and any of their predecessors, successors, and assigns, and also their insurance providers, sureties, and guarantors.

## VII.

## STATEMENT OF IMPAIRMENT

The following classes are impaired and therefore entitled to vote for the Plan—for **Guardian**: Class 3A, Class 4, Class 5A, Class 6A, Class 6B, Class 6C, and Class 7A; for **CV1**: Class 3B, Class 5B, Class 5D; for **CV2**: Class 3C, Class 5C, Class 5E.

The remaining classes are unimpaired, do not vote, and pursuant to the Bankruptcy Code are deemed to have accepted the Plan.

## VIII.

## MEANS FOR EXECUTION OF THE PLAN

1.    **Funding of Proposed Plan Payments**

The Debtors intend to continue renting, rehabbing, and selling their real properties in the ordinary course of business and reinvesting the sale proceeds into better properties in more commercially desirable locations. They will continue the process of selling and buying new properties in the ordinary course of business to earn ongoing revenue from property appreciation. Additionally, Guardian's subsidiary, 12BR, will expand its property site operations and will also continue to provide selective property sales and brokerage services. The operating platform being developed by Guardian and 12BR will provide significant revenue and market value to Guardian and 12BR even after the Debtors' current assets are sold. Below is a summary of the future business plan:

HARRIS LAW PRACTICE LLC
850 E. PATRIOT BLVD
SUITE F
RENO, NV 89511
775 786 7600

34

- **Asset Management** – Continue developing 12BR's asset management platform including strategic partnerships and system integrations with third-party property managers. The partnerships provide greater capacity, while the integrations provide the financial and operational visibility needed to drive operational performance. Collectively, the Debtors will have the ability to expedite leasing and stabilizing of their Properties and also minimize fixed costs and direct property expenses. Additionally, the asset management product is a catalyst for other 12BR services and future Guardian investments. Currently, 12BR is generating over $20k per month in third-party asset management fees in addition to servicing the Debtors' assets.

- **Field Services** – 12BR will need to continue developing its field services platform, including hiring field services/maintenance technician to cost effectively rehabilitate the Debtors' Properties. The field services team will scope projects, oversee third party subcontractors, self-perform maintenance and handyman services, and validate and quality control workmanship. Construction and property maintenance are the biggest drivers of the financial performance of single-family residential investment properties. A well-organized field team will significantly increase net operating income, lowering vacancy by reducing turn time and minimizing expenses by self-performing work. The field team at American Homes 4 Rent was able to reduce the average service ticket by over 30% and reduce the cash-to-cash cycle by more than 20 days, saving the company over $40 million dollars annually. The 12BR field service/maintenance technician will be equipped with a fully stocked van, have a small central warehouse, and leverage the Hubspot and Marginpoint logistics and inventory control. The field service team will service the Debtors' portfolio as well as generate additional revenue by servicing customers of the Debtors' third-party property managers.

- **Brokerage** – 12BR will reformat its leasing website through a Hubspot integration and will potentially include an IDX feed, allowing Guardian to market its Properties directly to buyers. This will reduce the sales cost, provide market knowledge, and drive leads for other 12BR service businesses. 12BR is developing an investor database organically and through partnerships with title companies, Rent Range, and other service providers.

- **Value-Add Investments** – The 12BR platform provides the investment expertise and operational capability that will allow Guardian to acquire, reposition/stabilize, and sell distressed assets in quality locations at sustainable margins. The Debtors' financial projections are relatively conservative in both margin and cycle times as compared to Opendoor's or Offerpad's, public quarterly statements. The Debtors' investment property offerings will provide more visibility and transparency into property condition and financial performance than is currently available in the market. They can disrupt the residential investment property market in a similar manner to what Auction.com was able to accomplish for the trustee sale space.

The Debtors' consolidated five-year financial projections show that the Debtors will have enough cash from operations and sales of assets to fund the Plan and pay allowed creditor claims, with enough expected revenue after year five for potential dividend distributions to Guardian's

existing members (equity holders) after allowed creditor claims are paid in full under the Plan. One five-year model includes CV1 and CV2's assets and assumes that Guardian will obtain a warehouse credit facility from a traditional institutional lender in the first quarter of year 2027, secured by Guardian's Properties. The second five-year model includes CV1 and CV2's assets and assumes that Guardian will not obtain a warehouse credit facility or any new borrowings. Attached **as Exhibit F1** are summaries of both consolidated five-year financial projections.

Attached as **Exhibit F2** are summaries of five-year consolidated financial projections for Guardian and its subsidiaries, but not including CV1 and CV2, and with and without the assumption of a warehouse credit facility in year 2027.

Attached as **Exhibit F3** are individual, unconsolidated five-year financial projections for CV1 and CV2. These financial projections include an assumption that after the Effective Date, in addition to borrowing money from Guardian for any loan cure amounts owing to Wilmington Trust, CV1 and CV2 may each borrow up to $100,000  from Guardian, on an unsecured basis, which loans shall be solely at Guardian's option, to renovate Properties as shown on the financial projection summaries.

Guardian does not know if it will be able to obtain a warehouse credit facility as suggested in the Plan, but, as noted in the five-year models, the warehouse credit facility is not necessary to ensure the feasibility of the Plan. It is but one possible avenue for reorganization.

The Debtors' financial projections do not include any amounts for potential preference claim recoveries or recovery of other potential litigation claims. Thus, any preference or litigation claims recovered by the Debtors will provide additional funds for distribution to Debtors' creditors and Guardian's equity holders.

Lastly, the Debtors' financial projections are estimates only and not promises of future performance. The financial projections are subject to common risk factors existing for any forward-looking projections, meaning that the projections are based on current known market conditions and assumptions. Any significant changes in the national economy or other outside factors could materially affect the financial projections for better or worse. There can be no assurances that the estimated proceeds on which future distributions have been projected in the

Plan will be realized by the Debtors. There can also be no assurances that the estimated Claim amounts set forth in the Plan for unliquidated, contingent, or disputed Claims are correct. The estimated amounts are based on certain assumptions and facts believed by the Debtors and Committee with respect to a variety of factors that have not yet been adjudicated by any court. Both the actual amount of Allowed Claims in a particular Class and the Allowed amount of funds available for distribution to such Class may differ from the estimates in the Plan. If the total amount of Allowed Claims or Interests in a Class is higher than the estimates, such Claims or Interests may take longer to pay or may ultimately receive less than projected in the Plan.

2.    **Post-Confirmation Default**

In the event the Debtors become delinquent in any duty or obligation under the Plan, the affected creditor or creditors may provide written notice of such default to the Debtors and their counsel. The Debtors shall thereafter have thirty (30) business days from receipt of said notice in which to cure the default. In the event such default remains uncured, the affected creditor or creditors shall be entitled to foreclose upon any collateral (if a secured creditor) or take other appropriate action. The Debtors shall have the right to bring the issue of default before the Bankruptcy Court. At any hearing, the Bankruptcy Court may consider the reason for the default and the ability of the Debtors to cure the default in a reasonable period of time. The Bankruptcy Court may also consider conversion of the case to a Chapter 7 of the Bankruptcy Code or dismissal of the same is in the best interest of creditors.

3.    **Professionals' Fees**

After the Confirmation Date of the Plan, the Debtors and any other professional, such as Debtors' general bankruptcy counsel, any special purpose counsel, or accountants, will not be required to apply to the Court for compensation for services rendered post-confirmation. Post-confirmation compensation of the Debtors' professionals shall be at their normal hourly rate(s) and expense reimbursement shall be at customary cost charges.

4.    **Distribution**

All cash proceeds shall be distributed in the foregoing manner except amounts necessary to pay disputed claims against the Debtors in the event they are allowed, which shall be held as a

reserve and paid as such claims are determined by agreement between the parties or as are judicially determined.

5.    **Taxes**

Unless otherwise provided in the Plan, all taxes are paid current and there are no income tax liens on real or personal property owned by the Debtors. The Debtors are not aware of any material tax consequences from the proposed Plan that would affect them because they are limited liability companies. All tax benefits and liabilities flow through to Guardian's equity holders. In accordance with 11 U.S.C. § 1146(a), any property transfers or sales by the Debtors as a result of this Plan may not be taxed under any law imposing a stamp tax or similar tax, including real property transfer taxes.

6.    **General Risk Factors**

The Plan and its implementation are subject to certain risks, including that the Plan may not be accepted by the requisite number of Creditors to confirm the Plan. Even if the Plan receives the requisite acceptances, there is no assurance that the Bankruptcy Court, which may exercise substantial discretion as a court of equity, will confirm the Plan. Even if the Bankruptcy Court determined that the Plan and the balloting procedures and results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for confirmation had not been met. Moreover, the Debtors and Committee cannot provide assurances that modifications to the Plan will not be required for Confirmation or that such modifications would not necessitate the re-solicitation of votes. If the Plan is not confirmed, it is unclear what distributions Holders of Claims or Interests ultimately would receive with respect to their Claims or Interests in a subsequent plan.

If the Plan is not confirmed, the Debtors and Committee will need to revise the Plan and it is unclear whether an alternative chapter 11 plan could be implemented and what distribution the holders of Allowed Claims and Interests would receive. If an alternative could not be agreed to, it is possible that the Debtors would have to liquidate their assets in chapter 7, in which case it is likely that the holders of Allowed Claims would receive substantially less favorable treatment than they would receive under the Plan, and Interest Holders would likely receive nothing.

HARRIS LAW PRACTICE LLC
850 E. PATRIOT BLVD
SUITE F
RENO, NV 89511
775 786 7600

# IX.

## MISCELLANEOUS PROVISIONS

1.      **The Disbursing Agent**.

The Debtors are ultimately responsible for making all distributions pursuant to the Plan. Debtors may use Guardian's accounting and fund management contractor, Verivest, or 12BR to assist in discharging those responsibilities.

2.      **Unclaimed Distributions**.

Any property to be distributed pursuant to the Plan, if not claimed by the distributee within one (1) year after the payment, shall be returned to the Debtors and forfeited by the distributee.

3.      **Effect of Confirmation**.

Upon confirmation and performance of the Plan, the Debtors shall be discharged from any debt that arose before the date of Confirmation, and any debt of a kind specified in §§ 502(g), 502(h), or 502(I) of the Bankruptcy Code, to the full extent permitted by Bankruptcy Code § 1141(d). In addition, pending execution of the Plan, and unless the Court has otherwise expressly ordered or the Plan otherwise expressly provides, all creditors and parties in interest shall be stayed from proceeding against the Debtors' assets including stay of default proceedings.

4.      **Exculpation**.

Neither the Committee, nor Debtors, nor any of their respective members, managers, officers, directors, employees, representatives, professionals or agents, will have or incur any liability to any Creditor for any act or omission in connection with or arising out of the Reorganization Case, including, without limitation, prosecuting confirmation of this Plan, consummation of this Plan, or the administration of this Plan or the property to be distributed under this Plan, except for breach of fiduciary duty, gross negligence, willful misconduct, or fraud.

5.      **Notice.**

Any notice described in or required by the terms of this Plan, or the Code and Rules shall be deemed to have been properly given when actually received or if mailed, five days after the date of mailing, if such shall have been sent by certified mail, return receipt requested, and if sent

HARRIS LAW PRACTICE LLC
850 E. PATRIOT BLVD
SUITE F
RENO, NV 89511
775 786 7600

to:

      The Debtors, addressed to:
      NORMA GUARIGLIA, ESQ.
      HARRIS LAW PRACTICE LLC
      850 E. Patriot Blvd., Suite F
      Reno, NV 89511

      6.    **Headings**.

The headings used herein are inserted for convenience only and neither constitute a portion of the Plan nor in any manner affect the construction of the provisions of the Plan.

      7.    **Severability**.

Should any provision of this Plan be determined to be unenforceable following the Effective date, such determination shall in no way limit or affect the enforceability of any and all other provisions of this Plan.

      8.    **Governing Law**.

Except to the extent that the Code or other applicable federal law is applicable, the rights, duties and obligations arising under this Plan shall be governed by and construed in accordance with the laws of the State of Nevada, notwithstanding any conflict of law principles.

      9.    **Successors and Assigns**.

The rights, duties and obligations of any Person named or referred to in this Plan shall be binding upon and shall inure to the benefit of the successors and assigns of such person.

      10.    **Designation of Managers and Governance Issues**.

El Monte shall continue to serve as the initial Manager and voting non-equity member of Guardian and shall be initially compensated at the gross rate of $240,000 annually from Guardian. Additionally, El Monte shall appoint an initial board of directors ("Board") for Guardian consisting of five (5) members whose identities will be provided to the Court in a supplement to the Plan to be filed by the Debtors within thirty (30) days before the date of the Plan confirmation hearing date scheduled by the Court . HPC's principals, Greg Hughes, Steve Sixberry, and Kyle Krch, shall in no event, now or in the future, be selected or eligible to serve on the Board, nor shall they ever be part of the Debtors' future management. El Monte shall also amend Guardian's

operating agreement to provide for the new Board and to include such other provisions as may be important to the continued operation of Guardian.  Guardian shall also file a copy of its amended operating agreement in the supplement to the Plan to be filed naming the new Board. The new Board will set future compensation for El Monte in the ordinary course of Guardian's business which may consist of cash and equity options in Guardian based on certain success or profit benchmarks to be decided at the discretion of the Board.

11.    **Post Confirmation Reporting and Payment of US Trustee Fees**.

Post confirmation, the Reorganized Debtors shall continue filing monthly operating reports through the Effective Date. After the Effective Date, the Reorganized Debtors and any other authorized parties who have been charged with administering the confirmed plan shall file post confirmation reports in the manner prescribed by 11 U.S.C. § 1106(a)(7) and Fed. R. Bankr. P. 2015(a)(5) for every calendar quarter through the date the Court enters a final decree closing these cases, an order dismissing the cases, or an order converting the cases to another chapter in bankruptcy.

Until the Effective Date of a confirmed plan, the Debtors shall timely pay the US Trustee the appropriate sums required pursuant to 28 U.S.C. § 1930(a)(6). After the Effective Date, the Reorganized Debtors and any other authorized parties who have been charged with administering the confirmed plan shall be responsible for the timely payment of all fees incurred after the Effective Date pursuant to 28 U.S.C. § 1930(a)(6) until the Court enters a final decree closing the case(s), an order dismissing the case(s), or an order converting the case(s) to another chapter in bankruptcy.

The resumption of the filing of post confirmation reports and the payment of fees shall occur if an order has been entered on the docket that vacates any of the above orders or reopens the case(s) for a reason other than that which is purely administrative.

## X.

## MODIFICATION OF THE PLAN

The Debtors will have the right to modify this Plan in accordance with the provisions of the Bankruptcy Code and Chapter 11.  In this regard:

HARRIS LAW PRACTICE LLC
850 E. PATRIOT BLVD
SUITE F
RENO, NV 89511
775 786 7600

1.    In accordance with Section 1127(a) of the Bankruptcy Code and Chapter 11, 11 U.S.C. § 1127(a), modification(s) of this Plan may be proposed in writing by the Debtors at any time(s) before confirmation, provided that the Plan, as thus modified, meets the requirements of Sections 1122 and 1123 of the Bankruptcy Code and Chapter 11, 11 U.S.C. §§ 1122 and 1123, and the Debtors comply with Section 1125 of the Bankruptcy Code and Chapter 11, 11 U.S.C. § 1125.

2.    In accordance with Section 1127(b) of the Bankruptcy Code and Chapter 11, this Plan also may be modified by the Debtors at any time(s) after confirmation and before substantial consummation of this Plan, provided that the Plan, as thus modified, meets the requirements of Sections 1122 and 1123 of the Bankruptcy Code as more fully set forth in Section 1127.

3.    Any holder(s) of a claim that has accepted or rejected the Plan will be deemed to have accepted or rejected, as the case may be, the Plan as modified unless, within the time fixed by the Court for doing so, such holder(s) changes their previous acceptance(s) or rejection(s).

4.    Every modification of this Plan will supersede the previous version(s) of the Plan as and whenever each such modification is effective as provided in this Article X.  When superseded, the previous version(s) of the Plan will be in the nature of withdrawn or rejected settlement proposal(s), and will be null, void, and unusable by the Debtors or any other party for any purpose(s) whatsoever with respect to any of the contents of such version(s) of the Plan.

## XI.

## DISCHARGE AND STAY CONTINUATION

Confirmation and performance of this Plan will discharge the Debtors from any and all debts to the extent provided under Section 1141(d) of the Bankruptcy Code and will otherwise have all effects provided in such 11 U.S.C. § 1141, which are not expressly inconsistent with the provisions of this Plan.  Pending execution of this Plan and unless: (a) the Court has otherwise expressly ordered; or (b) this Plan otherwise expressly provides, all creditors will continue to be stayed from proceeding against the Debtors or their assets.

### Post Confirmation Injunction

No entity may commence or continue any action or proceeding, or perform any act: (i) to

HARRIS LAW PRACTICE LLC
850 E. PATRIOT BLVD
SUITE F
RENO, NV 89511
775 786 7600

interfere with implementation and consummation of the Plan and the payments to be made thereunder; or (ii) or assert any claim, counterclaim, crossclaim, affirmative defense, defense, set off, recoupment, or any action of any kind or nature (collectively "Potential Actions") against Debtors, or any of their successors or assigns, except as authorized by the Court, or as necessary to adjudicate the Allowance of Claims filed.

Except as otherwise provided herein, confirmation of the Plan shall constitute a permanent injunction against and irrevocable release of any and all Potential Actions.

## XII.

## RETENTION OF JURISDICTION

Notwithstanding confirmation of this Plan, the Court will retain jurisdiction for the following purposes, and each of them:

1. The Court will retain jurisdiction to determine the allowability and payment of any claim(s) upon any objection(s) thereto (or other appropriate proceedings) by the Debtors or by any other party in interest entitled to proceed in that manner. As part of such retained jurisdiction, the Court will continue to determine the allowability of Administrative Claims and any request(s) for payment(s) thereof, including professional fees and costs which are Administrative Claims.

2. The Court will retain jurisdiction to determine any dispute(s) which may arise regarding the interpretation of any provision(s) of this Plan.

3. The Court will retain jurisdiction to facilitate the consummation of this Plan by entering, consistent with the provisions of this Plan, any further necessary or appropriate order(s) regarding the enforcement of this Plan and any provision(s) thereof.

4. The Court will retain jurisdiction to adjudicate any cause(s) of action or other proceeding(s) presently pending or otherwise referenced here or elsewhere in this Plan, including, but not limited to, the adjudication of any and all "core proceedings" under 28 U.S.C. § 157(b), which may be pertinent to this Reorganization Case, and which the Debtors may deem it appropriate to initiate and prosecute in aid of its reorganization.

5. The Court will retain jurisdiction to enter an appropriate final decree in these Reorganization Cases.

HARRIS LAW PRACTICE LLC
850 E. PATRIOT BLVD
SUITE F
RENO, NV 89511
775 786 7600

6.      The Court will retain jurisdiction to enter an appropriate final decree, and any interim order(s), in any adversary proceedings which may be initiated during these Chapter 11 proceedings.

## XIII.

## FEASIBILITY OF PLAN

Debtors and the Committee believe that the Plan is feasible based on the value of the Debtors' tangible assets existing on the Confirmation Date and the ongoing business operations of the Debtors. The Debtors intend to initially continue renting, rehabbing, and selling their Properties in the ordinary course of business and reinvesting the sale proceeds into better properties in more commercially desirable locations. Additionally, Guardian's subsidiary, 12BR, will expand its property site operations as explained in more detail previously. The Debtors and the Committee believe that expanding property site operations and adding such other accretive business operations as may be desirable will allow the Debtors to grow and increase their profitability.

The Debtors' consolidated five-year financial projections show that the Debtors will have enough cash from operations and sales of assets to fund the Plan and pay allowed creditor claims, with enough expected revenue after year five for the Board to authorize dividend distributions to Guardian's existing members after creditor claims are paid in full under the Plan.

The Debtors' principal, Aaron Noe, prepared and calculated the consolidated five-year financial projections based on his personal knowledge of industry standards. Current estimated Property values were calculated by utilizing Automated Valuation Models as explained in the Liquidation Analysis in Section XIV. In year one of the Plan (2025), Guardian projects it will renovate and sell around nine Properties per month (not including CV1 and CV2 Properties), and CV1 and CV2 estimate they will not sell any of their Properties for the first five years of the Plan because of Wilmington Trust's cumbersome individual lien release process and Loan pre-payment penalties. Guardian will acquire one new property per month for the first half of 2025, increasing to three properties per month in July 2025 through the end of that year, and then increasing to five properties per month starting in January 2026. Guardian's Property absorption

rate will continue to increase each Plan year.

Guardian estimates that the average gross sale price for its existing Properties is $88,454 for Properties it currently owns, and $106,406 for Properties titled in 12 Bridges which were transferred to Guardian as a result of the HPC Settlement. The average renovation cost per Property is $24,500. Guardian estimates that the average per property gross cost for its future acquisitions will be $245,000, and average gross sale price of future-acquired property will be $325,000, with an average renovation cost of $20,000. Other revenue assumptions can be seen in the supporting schedules included with the attached five-year financial projections.

## XIV.

## <u>LIQUIDATION ANALYSIS</u>

Debtors are proposing a Plan based on business revenues which includes liquidation of assets in the ordinary course of the Debtors' business.

The Plan must provide that a nonconsenting impaired claimant or interest holder of a consenting class receive at least as much as would be available had the debtor filed a Chapter 7 petition instead.

In a Chapter 7 case, the general rule is that the Debtors' assets are sold by a trustee. Unsecured creditors share in the proceeds of sale only after secured creditors and administrative claimants are paid. Certain unsecured creditors get paid before other unsecured creditors do. Unsecured creditors with the same priority share in proportion to the amount of their allowed claim in relationship to the total amount of allowed claims. A creditor would recover from the assets of the bankruptcy estates less under Chapter 7 than under Chapter 11. First, the Debtors' Plan proposes to pay all allowed unsecured creditors in full, which is not guaranteed in a Chapter 7 case. Second, in a Chapter 7 case a trustee is appointed and is entitled to compensation from the bankruptcy estate in an amount no more than 25% of the first $5,000 of all money disbursed, 10% on any amount over $5,000 but less than $1,000,000, 5% on all amounts over $1,000,000 but less than $3,000,000, and reasonable compensation not to exceed 3% on any amount over $3,000,000, thus diminishing monies available for payment to unsecured creditors

Debtors' Plan proposes 100% payment of allowed unsecured claims, together with simple interest at 4% interest until paid. Guardian estimates that the gross liquidation value of its assets is in a range of $9,451,955 to $14,396,615 before selling costs and administrative expenses, and not including CV1 and CV2 Properties because the Debtors estimate that all surplus equity in CV1 and CV2 Properties would be lost in a chapter 7 liquidation. CV1 estimates that the gross liquidation value of its assets is in a range of $2,247,637 to $3,673,832 before selling costs and administrative expenses. CV2 estimates that the gross liquidation value of its assets is in a range of $1,868,395 to $3,074,681 before selling costs and administrative expenses.

The gross liquidation values were calculated by utilizing Automated Valuation Models ("AVMs") from HouseCanary, Collateral Analytics, and Zillow. The most weight was placed on the Collateral Analytics valuations. Debtors assume the Properties will be sold in "as is" condition and will most likely sell at the low end of the valuation range established by the three independent valuation services. Additionally, most of Guardian's Properties in their current condition would not qualify for traditional financing. Thus, the Properties would most probably sell as a portfolio sale, in multiple "bulk" sales, or through an auction platform such as Auction.com. Debtors have received unsolicited offers by investors/wholesalers and offers for the purchase of multiple Properties have ranged from 20% to 30% of the AVM. Accordingly, the gross liquidation values for Guardian's Properties shown in the liquidation analysis represent 25%, 35%, and 45% of the AVMs. CV1's and CV2's Properties are in somewhat better condition. Accordingly, the gross liquidation values for their Properties shown in the liquidation analysis represent 30%, 40%, and 50% of the AVM.

Selling costs and property expenses for Guardian's assets are estimated in a range of $1,748,659 to $2,174,994. Secured debts encumbering the assets are estimated at $495,751, and a chapter 7 trustee's fees and other professional fees are estimated in a range of $1,153,608 to $2,174,994. The resulting net available for distribution to unsecured creditors is estimated to be $6,053,937 to $10,274,431. *See* **Exhibit G1**.

Selling costs and property expenses for CV1's assets are estimated in a range of $395,236 to $488,417. Secured debt encumbering the assets is estimated at $3,036,996, and a chapter 7

trustee's fees and other professional fees are estimated in a range of $261,429 to $304,215. The resulting net available for distribution to unsecured creditors is estimated to be $0, and the secured lender, Wilmington Trust, would not receive payment in full. *See* **Exhibit G2**.

Selling costs and property expenses for CV2's assets are estimated in a range of $368,837 to $444,050. Secured debt encumbering the assets is estimated at $3,489,291, and a chapter 7 trustee's fees and other professional fees are estimated in a range of $233,552 to $269,740. The resulting net available for distribution to unsecured creditors is estimated to be $0, and the secured lender, Wilmington Trust, would not receive payment in full. *See* **Exhibit G3**.

Notably, unsecured creditors would not receive more in chapter 7 liquidation because allowed unsecured creditors will be paid in full through the Plan whereas the projected recovery for unsecured creditors of Guardian would be approximately $6 million in a chapter 7 liquidation, and $0 for unsecured creditors of CV1 and CV2. Also, distributions under the Plan will occur in approximately the same time frame that could be expected in a chapter 7 liquidation. Allowed interest holders will also receive more through the Plan than in Chapter 7 because the Debtors are operating their business through the Plan and retaining future value for interest holders after payments to unsecured creditors. Finally, the Debtors intend to maximize the value of their Properties and sell them in individual listings, after ordinary marketing to achieve their fair market value upon sale.

**XV.**

**DISCLOSURE STATEMENT**

When the Debtors and Committee solicit the requisite acceptance(s) of this Plan, it will be accompanied by a Disclosure Statement that will have been approved by the Court, as amended, prior to such solicitation. The Debtors and Committee request that all parties whose acceptance(s) of this Plan are solicited should direct their attention to the Disclosure Statement.

///

///

///

///

HARRIS LAW PRACTICE LLC
850 E. PATRIOT BLVD
SUITE F
RENO, NV 89511
775 786 7600

## XVI.

## <u>CONFIRMATION REQUEST</u>

The Debtors and Committee request that the Court confirm the Plan in accordance with the provisions of Section 1129(a) and/or Section 1129(b) of the Code.

Respectfully submitted October 20, 2024.

HARRIS LAW PRACTICE LLC

*/s/ Norma Guariglia*
Norma Guariglia, Esq.

*Attorneys for Jointly Administered Debtors*

McDONALD CARANO LLP

*/s/ Sallie B. Armstrong*
Sallie B. Armstrong, Esq.

*Attorneys for Official Committee of Unsecured Creditors of Guardian Fund, LLC*